# 15-3135(L)

15-3151(Con)

# United States Court of Appeals

## FOR THE

## Second Circuit

◆━◆

**EVA WALDMAN, REVITAL BAUER, individually and as natural guardian of plaintiffs YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, minor, by his next friend and guardian VARDA GUETTA, VARDA GUETTA, individually and as natural guardian of plaintiff OZ JOSEPH GUETTA, NORMAN GRITZ, individually and as personal representative of THE ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, individually and as a natural guardian of plaintiff JAMIE A. SOKOLOW, RENA M. SOKOLOW, individually and as a natural guardian of plaintiff JAIME A. SOKOLOW, JAMIE A. SOKOLOW, minor, by her next friends and guardian MARK I. SOKOLOW and** *(Additional Caption on the Reverse)*

On Appeal From The United States District Court
for the Southern District of New York, Case No. 04-cv-0397 (GBD)

## JOINT APPENDIX
### Volume 13 of 37 (Pages JA-3601 – JA-3900)

Gassan A. Baloul
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 872-9800

Mitchell R. Berger
Pierre H. Bergeron
John A. Burlingame
Alexandra E. Chopin
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC  20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

*Attorneys for Defendants-Appellants*

RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, individually and as natural guardian of plaintiffs YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, minor, by his next friend and guardians DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, minor, by his next friend and guardians DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL BAUER, minor, by his next friend and guardians DR. ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, minor, by his next friend and guardians DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD MANDELKORN, KATHERINE BAKER, individually and as personal representative of THE ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN, individually and as personal representative of THE ESTATE OF BENJAMIN BLUTSTEIN, LARRY CARTER, individually and as personal representative of THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR., individually and as personal representative of THE ESTATE OF JANIS RUTH COULTER, CHANA BRACHA GOLDBERG, minor, by her next friend and guardian KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, minor, by her next friend and guardian KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, minor, by her next friend and guardian KAREN GOLDBERG, KAREN GOLDBERG, individually, as personal representative of THE ESTATE OF STUART SCOTT GOLDBERG/natural guardian of plaintiffs CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG,TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, minor, by her next friend and guardian KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, minor, by her next friend and guardian KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, minor, by her next friend and guardian KAREN GOLDBERG, YITZHAK SHALOM GOLDBERG, minor, by her next friend and guardian KAREN GOLDBERG, NEVENKA GRITZ, sole heir of NORMAN GRITZ, deceased,

*Plaintiffs - Appellees - Cross - Appellants*,

v.

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY AND OR PALESTINIAN COUNCIL AND OR PALESTINIAN NATIONAL AUTHORITY,

*Defendants - Appellants - Cross - Appellees*,

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESATATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, deceased, ESTATE OF MUHANAD ABU HALAWA, deceased, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,

*Defendants*.

**TABLE OF CONTENTS**

Docket Entries ................................................................................................JA-1

Summons Returned Executed on Hassan Abdel Rahman,
     filed June 3, 2004 ............................................................................JA-271

First Amended Complaint, filed May 23, 2005 ......................................JA-274

Memorandum in Support of Motion to Dismiss Exhibit B, Biography
     of Hasan Abdel Rahman, filed Feb. 21, 2006 .................................JA-321

Memorandum in Support of Motion to Dismiss Exhibit N,
     FARA Listing of Palestine Liberation Organization's Foreign Agents,
     filed Feb. 21, 2006 .........................................................................JA-323

Memorandum in Support of Motion to Dismiss Exhibit KK, PLO
     Washington Office Registration Statement, Exhibit B,
     filed Feb. 21, 2006 .........................................................................JA-325

Defendants' Motion to Dismiss, filed July 7, 2007 ................................JA-328

Memorandum Decision and Order re Motion to Dismiss,
     filed on Sept. 30, 2008 ...................................................................JA-352

Defendants' Memorandum of Law in Support of Defendants' Renewed Motion to
     Dismiss, filed May 29, 2009 ..........................................................JA-366

     Exhibit 1, Letter from Eric J. Boswell to Hasan Abdel Rahman,
     dated June 22, 1995 ........................................................................JA-394

     Exhibit 2, U.N. General Assembly Memorandum, dated Nov. 22, 1974........JA-398

     Exhibit 3, Defendants' Objections and Answers to Plaintiffs' Personal
     Jurisdiction Interrogatories, dated Jan. 29, 2009 ............................JA-400

     Exhibit 4, Defendants' Objections and Responses to Plaintiffs' Personal
     Jurisdiction Request for Production, dated Jan. 29, 2009 ...............JA-430

     Exhibit 5, Washington Office Registration Statement, Exhibits A and B,
     filed Mar. 18, 1998 ........................................................................JA-445

**TABLE OF CONTENTS**

Exhibit 6, Excerpt from General Assembly Thirty-fifth Session, U.N. General Assembly Memoranda ................................................................................ JA450

Order Denying Defendants' Motion to Dismiss, filed Mar. 11, 2010 ....................... JA-463

Defendants' Memorandum of Law in Support of Renewed Motion to Dismiss, filed Apr. 15, 2010 ................................................................................ JA-464

Exhibit 1, Letter from Eric J. Boswell to Hasan Abdel Rahman, dated June 22, 1995 ................................................................................ JA-493

Exhibit 2, U.N. General Assembly Memorandum, dated Nov. 22, 1974 ........ JA-497

Exhibit 3, Defendants' Objections and Answers to Plaintiffs' Personal Jurisdiction Interrogatories, dated Jan. 29, 2009 ................................. JA-499

Exhibit 4, Defendants' Objections and Responses to Plaintiffs' Personal Jurisdiction Request for Production, dated Jan. 29, 2009 ...................... JA-529

Exhibit 5, Washington Office Registration Statement, Exhibits A and B, filed Mar. 18, 1998 ................................................................................ JA-544

Declaration of M. Abdel-Rahman in Support of Plaintiffs Opposition to Renewed Motion to Dismiss, filed May 28, 2010 ............................................ JA-550

Appendix 1, Translation of Letter from Director of Budget to Ambassador, dated Aug. 21, 2002 ................................................................ JA-551

Appendix 2, Arabic Letter from Director of Budget to Ambassador, dated Aug. 21, 2002 ................................................................................ JA-552

Appendix 3, Translation of Statement of Rental Contracts for FY 2004 ........ JA-553

Appendix 4, Arabic Statement of Rental Contracts for FY 2004 .................... JA-554

Appendix 5, Translation of Letter from Budget Director to Hassan Abdel Rahman, dated Apr. 9, 2003 ............................................................ JA-555

Appendix 6, Translation of Letters from Said Hamad and Hassen Abdel Rahman ................................................................................................ JA-556

Appendix 7, Arabic Letters ............................................................................ JA-557

ii

## TABLE OF CONTENTS

Appendix 8, Arabic Statements ..........................................................JA-566

Defendants' Answer to First Amended Complaint, filed Apr. 13, 2011 ...................JA-576

Defendants' Motion to Transfer or Dismiss, filed Apr. 20, 2011..............................JA-627

Plaintiffs' Motion to Transfer, filed May 11, 2011 .................................................JA-629

Order to Close Motions to Transfer, filed Jun. 3, 2011 ...........................................JA-631

Defendants' Motion for Partial Judgment on the Pleadings, Jan. 4, 2012................JA-632

Defendants' Motion for Reconsideration of Court's Mar. 30, 2011
    Interlocutory Order on Personal Jurisdiction, filed Jan. 31, 2014...................JA-635

Excerpt of Transcript of Hearing before the Hon. Ronald L. Ellis,
    Feb. 10, 2014...............................................................................................JA-654

Plaintiffs' Letter to Hon. Ronald L. Ellis, Request for Sanctions,
    dated Mar. 18, 2014 .....................................................................................JA-657

    Exhibit A, Plaintiffs' Letters to Hon. Ronald L. Ellis, Pre-Motion
    Requests .......................................................................................................JA-660

    Exhibit B, Excerpt of Transcript of Hearing before the Hon. Ronald
    L. Ellis, Feb. 10, 2014..................................................................................JA-665

    Exhibit C, Translation of Letter from Tawfiq al-Tirawi to President and
    General Commander, dated Feb. 10, 2002 .....................................................JA-670

    Exhibit D, The Bauer Plaintiffs' First Request to Produce Documents
    and Things, dated Mar. 23, 2012 ...................................................................JA-674

    Exhibit E, The Bauer Plaintiffs' Second Set of Interrogatories,
    dated Oct. 3, 2011 .........................................................................................JA-680

Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for
    Reconsideration, filed Mar. 21, 2014 ...........................................................JA-684

    Exhibit A.1, Letter from Plaintiffs to Hon. George B. Daniels,
    dated May 31, 2011 .......................................................................................JA-728

iii

# TABLE OF CONTENTS

Exhibit A.2, Letter from Plaintiffs to Hon. George B. Daniels, dated June 3, 2011 ................................................................JA-729

Exhibit B, FBI Listing of Most Wanted Terrorist ...........................................JA-730

Excerpt Exhibit C.6, Expert Report of Israel Shrenzel...................................JA-732

Excerpt Exhibit G, Defendant's Memorandum of Law in Support of Motion to Dismiss, dated June 5, 2013 ......................................................JA-736

Exhibit H.122, Plaintiffs Trial Exhibit 1075, Website, Palestine Liberation Organization................................................................JA-742

Exhibit H.123, Plaintiffs' Trial Exhibit 1076, Jewish Virtual Library, Constitution of the Palestine Liberation Organization, July 17, 1968 ............JA-745

Exhibit H.124, Plaintiffs' Trial Exhibit 1077, Time Article, Clinton Saves Last Dance for Arafat, dated Jan. 2, 2001 ..............................................JA-751

Exhibit H.125, Plaintiffs' Trial Exhibit 1078, White House Press Release, Sept. 28, 1995................................................................JA-753

Exhibit H.126, Plaintiffs' Trial Exhibit 1079, Trilateral Statement on the Middle East Peace Summit at Camp David, July 25, 2000 .......................JA-762

Exhibit H.127, Plaintiffs' Trial Exhibit 1080, CNN Transcript, Can Yasser Arafat Stop the Violence in the Middle East?, Oct. 17, 2000 .............JA-763

Exhibit H.128, Plaintiffs' Trial Exhibit 1081, CNN Transcript, Larry King Interviews Frank Lindh, Shimon Perez, Dec. 3, 2001...................JA-769

Exhibit H.129, Plaintiffs' Trial Exhibit 1082, Article, Forum of the Center for Policy Analysis on Palestine, May 29, 2001 ..................................JA-782

Exhibit H.130, Plaintiffs' Trial Exhibit 1083, CNN Transcript, Q&A, Jan. 29, 2002 ................................................................JA-793

Exhibit H.131, Plaintiffs' Trial Exhibit 1084, CNN Transcript, Interview with Hassan Abdel Rahman, Feb. 3, 2002 ......................................JA-801

# TABLE OF CONTENTS

Exhibit H.132, Plaintiffs' Trial Exhibit 1085, MSNBC Transcript,
Any Hope for Peace in the Middle East?, Feb. 25, 2002 ...............................JA-803

Exhibit H.133, Plaintiffs' Trial Exhibit 1086, MSNBC Transcript,
Operation Anaconda Has Ended, Air Patrols Over Major Cities Will
be Scaled, Mar. 18, 2002 ..................................................................................JA-817

Exhibit H.134, Plaintiffs' Trial Exhibit 1087, CNBC Transcript,
Palestinian Representative Hasan Abdel Rahman, Mar. 18, 2002 .................JA-834

Exhibit H.135, Plaintiffs' Trial Exhibit 1088, MSNBC Transcript,
Jerusalem Suicide Attack Halts Israeli-Palestinian Talks; Many
Al Qaeda in Pakistan, Mar. 21, 2002.............................................................JA-836

Exhibit H.136, Plaintiffs' Trial Exhibit 1089, MSNBC Transcript,
Will Saudi Peace Plan Work, Mar. 28, 2002...................................................JA-852

Exhibit H.137, Plaintiffs' Trial Exhibit 1090, CNN Transcript,
Ambassadors Debate Arafat Presence in Israel, Apr. 3, 2002........................JA-859

Exhibit H.138, Plaintiffs' Trial Exhibit 1091, NBC News Transcript,
Hassan Abdel Rahman and Zalman Shoval discuss the crisis in the
Middle East, Apr. 7, 2002................................................................................JA-863

Exhibit H.139, Plaintiffs' Trial Exhibit 1092, CNN Transcript,
Terror Strikes Jerusalem Again; Secretary Powell Visits Israeli
Prime Minister, Apr. 12, 2002 ........................................................................JA-870

Exhibit H.140, Plaintiffs' Trial Exhibit 1093, Fox News Transcript,
Interview with Hasan Abdel Rahman, Apr. 15, 2002 .....................................JA-885

Exhibit H.141, Plaintiffs' Trial Exhibit 1094, Fox News Transcript,
Interview with Hasan Abdel Rahman and Alon Pinkas, May 3, 2002............JA-889

Exhibit H.142, Plaintiffs' Trial Exhibit 1095, CNBC Transcript, Hasan
Abdel Rahman, Palestinian chief rep. to U.S., and Israeli Consul General
Alon Pinkas debate whether Arafat can bring peace, May 8, 2002 ................JA-893

Exhibit H.143, Plaintiffs' Trial Exhibit 1096, Federal News Service
Transcript, National Press Club Morning Newsmaker, May 9, 2002 .............JA-897

v

## TABLE OF CONTENTS

Exhibit H.144, Plaintiffs' Trial Exhibit 1097, CNN Transcript, Suicide Bomber Strikes Netanya, May 19, 2002...............................................JA-905

Exhibit H.145, Plaintiffs' Trial Exhibit 1098, Fox Transcript, Interview with Hasan Abdel, Alon Pinkas, June 18, 2002.............................JA-912

Exhibit H.146, Plaintiffs' Trial Exhibit 1099, CNN Transcript, Biden, Hagel Discuss War on Terror, Nov. 24, 2002 ...................................................JA-918

Exhibit H.147, Plaintiffs' Trial Exhibit 1100, MSNBC Transcript, Countdown Iraq, Mar. 5, 2003............................................................................JA-966

Exhibit H.148, Plaintiffs' Trial Exhibit 1101, CNBC Transcript, Nassser Al-Kidwa, permanent Palestinian observer, June 2, 2003 ....................................JA-996

Exhibit H.149, Plaintiffs' Trial Exhibit 1102, CNN Transcript, Q&A, Sept. 19, 2003 ...................................................................................................JA-1002

Exhibit H.150, Plaintiffs' Trial Exhibit 1103, CNN Transcript, Lou Dobbs Moneyline, Mar. 19, 2002 .....................................................................................JA-1008

Exhibit H.151, Plaintiffs' Trial Exhibit 1104, Transcript, War on Peace, Mar. 29, 2002 .....................................................................................................JA-1023

Exhibit H.152, Plaintiffs' Trial Exhibit 1103, CNN Transcript, Powell Met With Top Lebanese Officials Today Before Going to Meet with Syrian Leaders, Apr. 15, 2002.......................................................JA-1038

Exhibit H.153, Plaintiffs' Trial Exhibit 1106, CNN Transcript, Is Middle East Peace Possible?, Apr. 14, 2002 .............................................JA-1044

Exhibit H.154, Plaintiffs' Trial Exhibit 1107, Federal News Service Transcript, National Press Club Morning Newsmaker, May 9, 2002 ...........JA-1059

Exhibit H.155, Plaintiffs' Trial Exhibit 1108, Federal News Service Transcript, National Press Club Morning Newsmaker, May 9, 2002 ...........JA-1067

Transcript of Hearing before the Hon. George B. Daniels, Apr. 11, 2014..............JA-1075

## TABLE OF CONTENTS

Exhibit A.1076 to Declaration of K. Yalowitz in Support of Motion
    Summary Judgment, Jewish Virtual Library, Constitution of the
    Palestine Liberation Organization, July 17, 1968............................................JA-1189

Excerpt of Defendants' Memorandum of Law in Support of Motion for Summary
    Judgment, filed May 6, 2014 ......................................................................JA-1196

    Exhibit A, Defendants' Statement of Material Facts as to Which
    There is No Genuine Issue...........................................................................JA-1199

    Exhibit A-71, Declaration of Ambassador Maen Areikat, May 2, 2014.......JA-1265

Exhibit A-1, Excerpt of Hasan Abu-Libdeh Deposition Transcript,
    June 16, 2010 ...........................................................................................JA-1272

Exhibit A-2, Excerpt of Afif Safieh Deposition Transcript,
    Feb. 10, 2011...........................................................................................JA-1279

Exhibit A-3, Excerpt of Salam Fayyad Deposition Transcript,
    Mar. 9, 2010.............................................................................................JA-1288

Exhibit A-4, Excerpt of John B. Quigley Deposition Transcript,
    Oct. 10, 2013............................................................................................JA-1291

Exhibit A-5, U.N. General Assembly Memorandum re Status of
    Palestine in the United Nations, Nov. 26, 2013............................................JA-1319

Exhibit A-6, The Guetta Plaintiffs' Objections and Responses to First
    Requests for Admission, Jan. 7, 2013..........................................................JA-1324

Exhibit A-7, The Gould and Waldman Plaintiffs' Objections and
    Answers to First Requests for Admission, Jan. 7, 2013 ................................JA-1328

Exhibit A-8, The Sokolow Plaintiffs' Objections and Responses to
    First Requests for Admission, Jan. 7, 2013 .................................................JA-1334

Exhibit A-9, The Bauer Plaintiffs' Objections and Responses to First
    Requests for Admission, Jan. 7, 2013..........................................................JA-1339

Exhibit A-10, The Mandelkorn Plaintiffs' Objections and Responses
    to First Requests for Admission, Jan. 7, 2013 .............................................JA-1344

# TABLE OF CONTENTS

Exhibit A-11, The Carter, Coulter, and Gritz Plaintiffs' Objections and Responses to First Requests for Admission, Jan. 7, 2013 ......................JA-1349

Exhibit A-12, The Goldberg Plaintiffs' Objections and Responses to First Requests for Admission, Jan. 7, 2013 ...............................JA-1355

Exhibit A-13, Excerpt of Raja Shehadeh Deposition Transcript, Oct. 13, 2013 .......................................................JA-1361

Exhibit A-14, Excerpt of Majed Faraj Deposition Transcript, Aug. 8, 2010................................................JA-1364

Exhibit A-15, Excerpt of Yaser Muhammed Mussa Shaqba'u Deposition Transcript, May 25, 2010 ...........................................JA-1367

Defendants' Memorandum of Law in Support of Motion in Limine to Exclude Expert Testimony, filed May 6, 2014...............................JA-1375

Exhibit 1, Expert Report of David Miller, July 15, 2013 ..............................JA-1463

Exhibit 2, Expert Report of Glenn E. Robinson, July 15, 2013 ....................JA-1511

Exhibit 2-A, Curriculum Vitae of Dr. Glenn E. Robinson ...........................JA-1581

Exhibit 2-B, Chart.......................................................JA-1596

Exhibit 2-C, Map, Jewish Settlements in the West Bank, May 2002 ...........JA-1604

Exhibit 2-D, Map, The Forbidden Roads Regime, Aug. 2004.....................JA-1606

Exhibit 2-E, Map........................................................JA-1608

Exhibit 2-F, Palestinian Academic Society for the Study of International Affairs, 1947 and 1949 Maps................................. JA-1610

Exhibit 2-G, Palestinian Academic Society for the Study of International Affairs, 1947 and 1967 Maps................................. JA-1612

Exhibit 2-H, Map, The Near East after the 1967 June War..........................JA-1614

Exhibit 2-I, Map, Oslo II, 1995 ...................................JA-1616

# TABLE OF CONTENTS

Exhibit 2-J, Timeline 1993-2004 ...................................................................JA-1618

Exhibit 4, Itamar Marcus Deposition Transcript, Nov. 7, 2013 ....................JA-1621

Exhibit 5, Expert Report of Itamar Marcus, Sept. 16, 2013 ..........................JA-1705

Exhibit 6, World Bank Data on West Bank and Gaza.....................................JA-1738

Exhibit 7, Translated Article regarding Report by Abu Mazen ....................JA-1740

Exhibit 8, Translated Article regarding Christmas and Mourning
of a Martyr ......................................................................................................JA-1752

Exhibit 9, Archive photographs from Archives of Palwatch.org ..................JA-1757

Exhibit 10, Expert Report of Dr. Matthew Levitt, Mar. 22, 2013.................JA-1763

Exhibit 11, Curriculum Vitae of Dr. Matthew Levitt ....................................JA-1790

Exhibit 12, Dr. Matthew Levitt Deposition Transcripts, Vol. I & II,
Sept. 24-25, 2013 ...........................................................................................JA-1823

Exhibit 13, Expert Report of Dr. Jeffrey F. Addicott, Mar. 22, 2013 ...........JA-1957

Exhibit 14, Dr. Jeffrey F. Addicott Deposition Transcript, Oct. 2, 2013 ......JA-1985

Exhibit 15, Expert Rebuttal Report of Dr. Jeffrey F. Addicott ,
Yasser Arafat's Responsibility for Terror Attacks ........................................JA-2061

Exhibit 16, Expert Report of Prof. Efraim Karsh, Mar. 20, 2013 .................JA-2078

Exhibit 17, Curriculum Vitae of Prof. Efraim Karsh ...................................JA-2120

Exhibit 18, Articles by Prof. Efraim Karsh .................................................JA-2130

Exhibit 19, Prof. Efraim Karsh Deposition Transcript, Oct. 15, 2013 ..........JA-2137

Exhibit 20, Article, Israel: Jerusalem Suspends Process Until
Arafat Fights, Mar. 23, 1997..........................................................................JA-2211

Exhibit 21, The Jerusalem Report Article, Can Arafat Switch Off
Terror?, Apr. 17, 1997 ....................................................................................JA-2213

# TABLE OF CONTENTS

Exhibit 22, Washington Post Article, Street Army Spearheads
Arab Riots, Oct. 4, 2000 ................................................................................JA-2217

Exhibit 23, Alon Eviatar Deposition Transcript, Oct. 22, 2013 ....................JA-2222

Exhibit 26, Plaintiffs' Letter to Hon. Ronald L. Ellis regarding substitution
of expert, dated May 16, 2013 .......................................................................JA-2266

Exhibit 30, Israel Shrenzel Deposition Transcript, Oct. 23, 2013.................JA-2273

Exhibit 31, Article, Operation for the confiscation of terror funds
– Background, Feb. 26, 2004 ........................................................................JA-2315

Exhibit 32, Book Excerpt, 9/11 and the Search for a Policy  ........................JA-2321

Exhibit 33, Expert Report of Nick Kaufman, Apr. 10, 2013.........................JA-2323

Exhibit 34, Expert Rebuttal Report of Nick Kaufman, Sept. 16, 2013 .........JA-2356

Exhibit 35, Nick Kaufman Deposition Transcript, Oct. 20, 2013 .................JA-2362

Exhibit 36, Book, Backyard Proceedings, The Implementation of
Due Process Rights in the Military Courts in the Occupied Territories,
Dec. 2007 ......................................................................................................JA-2436

Exhibit 37, Expert Report of Adv. Michael Sfard, July 15, 2013 .................JA-2620

Exhibit 38, Michael Sfard Deposition Transcript, Oct. 24, 2013..................JA-2666

Exhibit 39, Plaintiffs' Letter to Hon. Ronald L. Ellis regarding Request
for Enlargement regarding Expert Disclosure Deadline, Mar. 20, 2013.......JA-2742

Exhibit 40, Defendants' Letter to Hon. Ronald L. Ellis regarding
Request for Conference regarding Plaintiffs' Experts, May 6, 2013 ............JA-2746

Defendants' Response to Plaintiffs' Rule 56.1 Statement, June 6, 2014 ................JA-2752

Excerpt from Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, June
6, 2014...............................................................................................................JA-2760

x

# TABLE OF CONTENTS

Exhibit A.558 to Declaration of K. Yalowitz in Support of Opposition to
Defendants Motion for Summary Judgment, Background Document
on Terrorist Organizations Fighting in Israel, Sept. 2, 2004 .........................JA-2762

Exhibit C.18 to Declaration of K. Yalowitz in Support of Opposition to
Defendants Motion for Summary Judgment, Excerpt of Elise
Gould Deposition Transcript, June 28, 2012 .................................................JA-2809

Exhibit D to Declaration of K. Yalowitz in Support of Motion for Sanctions,
Declaration of Prime Minister Salam Fayyad, Oct. 30, 2007 .......................JA-2812

Transcript of Hearing before the Hon. George B. Daniels, July 22, 2014 ..............JA-2821

Defendants' Notice of New Second Circuit Authority Interpreting Diamler
and Compelling Dismissal, Sept. 30, 2014....................................................JA-2973

Exhibit A, *Gucci America v. Bank of China* Opinion, Sept. 17, 2014 ..........JA-2981

Transcript of Hearing before the Hon. George B. Daniels, Nov. 20, 2014 .............JA-3033

Order re Plaintiffs' Objection to Denial of Motion for Sanctions,
filed Nov. 21, 2014 ........................................................................................JA-3079

Plaintiffs' Trial Exhibit 1119, Chart, Summary of Defendants'
Statements to U.S. Media Regarding Political Objectives ............................JA-3080

Defendants' Letter to Hon. George B. Daniels re Israeli Court
Documents, Dec. 12, 2014..............................................................................JA-3083

Order regarding Statement of Unavailable Witnesses, Dec. 16, 2014 ....................JA-3090

Order regarding Guilty Pleas, Dec. 16, 2014...........................................................JA-3091

Transcript of Hearing before the Hon. George B. Daniels, Dec. 16, 2014..............JA-3092

Order Denying Motion to Stay, Dec. 18, 2014 ........................................................JA-3306

Order regarding Exhibits, Statements, and Redactions, Dec. 22, 2014 ...................JA-3307

Exhibit A to Plaintiffs Letter regarding Deposition Designations, Excerpt
from Mosaab Yousef Deposition Transcript, Jan. 10, 2012...........................JA-3309

# TABLE OF CONTENTS

Defendants' Letter to Hon. George B. Daniels regarding Substitute
Witnesses, Dec. 30, 2014.................................................................JA-3319

Plaintiffs' Trial Exhibit 559, Article, Israel Security Agency ISA and IDF
forces arrested terrorists suspected of shootings, Jan. 26, 2001 ....................JA-3320

Plaintiffs' Trial Exhibit 1109, Article, Force 17 Terrorist Mohand Said
Muniyer Diriya, Mar. 5, 2002.........................................................JA-3322

Plaintiffs' Trial Exhibit 325, Translation of Israel Police Memorandum,
dated Jan. 8, 2001 ....................................................................JA-3324

Exhibit 1 to Plaintiffs' Letter to Hon. George B. Daniels, Photographs
of Alleged Perpetrators and Aftermath.............................................JA-3335

Defendants' Letter to Hon. George B. Daniels regarding Defendants'
Motion in Limine to Preclude Expert Testimony, filed Jan. 5, 2015 ...........JA-3451

Plaintiffs' Letter to Hon. George B. Daniels regarding Security Magazines,
filed Jan. 7, 2015......................................................................JA-3460

   Plaintiffs Trial Exhibit 185, Movement Circular, Jan. 1, 2011 .....................JA-3467

   Plaintiffs Trial Exhibit 936, Humat Al-Areen, Issue 84 of 2001 ..................JA-3491

   Plaintiffs Trial Exhibit 937, Humat Al-Areen, Issue 93 of 2002 ..................JA-3504

   Plaintiffs Trial Exhibit 966, Humat Al-Areen, Issues 75-76 of 2000 ...........JA-3528

Plaintiffs' Letter to Hon. George B. Daniels regarding Videos, Jan. 12, 2015 .......JA-3563

Transcript of Conference before the Hon. George B. Daniels, Jan. 12, 2015 .........JA-3569

Defendants' Letter to J. Daniels regarding Objections to Trial Exhibits,
filed Jan. 13, 2015.....................................................................JA-3771

Trial Transcript before the Hon. George B. Daniels, Jan. 13, 2013 ........................JA-3777

Trial Transcript before the Hon. George B. Daniels, Jan. 14, 2013 ........................JA-3897

Trial Transcript before the Hon. George B. Daniels, Jan. 15, 2013 ........................JA-4107

# TABLE OF CONTENTS

Defendants' Letter to J. Daniels regarding Objection to Trial Exhibits, filed Jan. 16, 2015 ...............................................................................JA-4311

Trial Transcript before the Hon. George B. Daniels, Jan. 16, 2013 ........................JA-4317

Defendants' Letter to Hon. George B. Daniels regarding Objection to Trial Exhibits, filed Jan. 19, 2015 ...............................................................JA-4470

    Exhibit 1, Email from Plaintiffs.......................................................................JA-4471

    Exhibit 2, Plaintiffs' Trial Exhibit 192A, Statement by the National and Islamic Forces, Sept. 30, 2000 ............................................................JA-4474

    Exhibit 3, Plaintiffs' Trial Exhibit 655, Statement by Marwan Barghouti ...JA-4482

    Exhibit 4, Plaintiffs' Trial Exhibit 913, Declaration by the National and Islamic Forces, Aug. 12, 2001 .............................................................JA-4488

    Exhibit 5, Plaintiffs' Trial Exhibit 914, Declaration by the National and Islamic Forces, Aug. 27, 2001 .............................................................JA-4499

Defendants' Letter to Hon. George B. Daniels regarding Objections to Trial Exhibits, filed Jan. 20, 2015 ...........................................................JA-4506

    Exhibit 1, Email from Plaintiffs.......................................................................JA-4509

Trial Transcript before the Hon. George B. Daniels, Jan. 20, 2013 ........................JA-4540

Plaintiffs' Notice of Filing Trial Exhibits, filed Jan. 21, 2015 ...............................JA-4717

    Plaintiffs' Trial Exhibit 323, Reasons for Sentence for Munzar Mahmoud Khalil Noor, Dec. 1, 2014 ...........................................................JA-4718

    Plaintiffs' Trial Exhibit 468, Verdict for Munzar Mahmoud Khalil Noor, Sept. 28, 2005 .....................................................................................JA-4729

    Plaintiffs' Trial Exhibit 478, Indictment for Munzar Mahmoud Khalil Noor, June 25, 2002........................................................................................JA-4757

Trial Transcript before the Hon. George B. Daniels, Jan. 21, 2013 ........................JA-4782

## TABLE OF CONTENTS

Defendants' Letter to Hon. George B. Daniels regarding Objections to Trial
Exhibits, filed Jan. 22, 2015 ..................................................................JA-4942

Addendum, Plaintiffs Trial Exhibits, WAFA and Palestine News
Network Images and Translations ..................................................JA-4947

Exhibit 1, Email from Plaintiffs, dated Jan. 21, 2005 ...................................JA-5065

Exhibit 2, Chicago Tribune Article, Israel giving back remains of Palestinian
militants-army, Jan. 19, 2014......................................................JA-5070

Addendum, Plaintiffs Trial Exhibits, WAFA and Palestine News
Network Images and Translations ..................................................JA-5074

Trial Transcript before the Hon. George B. Daniels, Jan. 22, 2013 ........................JA-5146

Trial Transcript before the Hon. George B. Daniels, Jan. 23, 2013 ........................JA-5351

Trial Transcript before the Hon. George B. Daniels, Jan. 26, 2013 ........................JA-5515

Mandate from the Second Circuit, filed Jan. 28, 2015 ...........................................JA-5647

Trial Transcript before the Hon. George B. Daniels, Jan. 28, 2013 ........................JA-5648

Trial Transcript before the Hon. George B. Daniels, Jan. 29, 2013 ........................JA-5860

Trial Transcript before the Hon. George B. Daniels, Jan. 30, 2013 ........................JA-6072

Defendants' Letter to Hon. George B. Daniels regarding Objections to
Plaintiffs' Redirect of Shrenzel, filed Feb. 1, 2015 .......................................JA-6184

Exhibit A, Excerpt of Trial Transcript........................................................JA-6190

Trial Transcript before the Hon. George B. Daniels, Feb. 2, 2013..........................JA-6321

Trial Transcript before the Hon. George B. Daniels, Feb. 3, 2013..........................JA-6499

Trial Transcript before the Hon. George B. Daniels, Feb. 4, 2013..........................JA-6605

Plaintiffs' Proposed Supplemental Jury Instructions, filed Feb. 5, 2013 ................JA-6763

Trial Transcript before the Hon. George B. Daniels, Feb. 5, 2013..........................JA-6776

# TABLE OF CONTENTS

Trial Transcript before the Hon. George B. Daniels, Feb. 6, 2013..........................JA-6942

Defendants' Memorandum in Support of Motion for Judgment
     as a Matter of Law, filed Feb. 9, 2015................................................................JA-7057

Trial Transcript before the Hon. George B. Daniels, Feb. 9, 2013..........................JA-7080

Trial Transcript before the Hon. George B. Daniels, Feb. 10, 2013.........................JA-7264

Trial Transcript before the Hon. George B. Daniels, Feb. 11, 2013.........................JA-7463

Trial Transcript before the Hon. George B. Daniels, Feb. 17, 2013.........................JA-7669

Defendants' Memorandum in Support of Motion for Judgment as a
     Matter of Law, filed Feb. 18, 2015 ...................................................................JA-7807

Trial Transcript before the Hon. George B. Daniels, Feb. 18, 2013.........................JA-7833

Trial Transcript before the Hon. George B. Daniels, Feb. 19, 2013.........................JA-8000

Trial Transcript before the Hon. George B. Daniels, Feb. 20, 2013.........................JA-8179

Trial Transcript before the Hon. George B. Daniels, Feb. 23, 2013.........................JA-8245

Jury Verdict Form, filed Feb. 25, 2015...................................................................JA-8261

Defendants' Objections to Plaintiffs' Corrected Proposed Final Judgment,
     filed Mar. 2, 2015 ...........................................................................................JA-8282

Defendants' Objection to Plaintiffs' Revised Proposed Final Judgment,
     filed Mar. 16, 2015 .........................................................................................JA-8288

     Exhibit A, Expert Report of Gordon Klein, Mar. 16, 2015...........................JA-8315

     Exhibit 1, Table of Total Damages as Calculated by Mr. Soudry.................JA-8339

     Exhibit 2, Table Correcting Mr. Soudry's Calculation .................................JA-8340

     Exhibit 3, Table Correcting Mr. Soudry's Calculation .................................JA-8341

     Exhibit 4, Table Correcting Mr. Soudry's Calculation .................................JA-8342

     Exhibit 5, Table Correcting Mr. Soudry's Calculation .................................JA-8343

xv

## TABLE OF CONTENTS

Appendix A-1, Gordon Klein Summary.........................................................JA-8344

Appendix A-2, Gordon Klein Previous Testimoney ....................................JA-8350

Appendix B, List of Materials Relied Upon................................................JA-8352

Defendants' Memorandum in Support of Renewed Motion to Dismiss,
or Motion for Judgment or New Trial Under Rule 50(b) and 59,
May 1, 2015 ...............................................................................................JA-8355

Exhibit A, Table.........................................................................................JA-8417

Exhibit B, Table .........................................................................................JA-8421

Defendants' Memorandum in Support of Motion to Stay and to Waive the Bond
Requirement, May 4, 2015 .........................................................................JA-8422

Exhibit B, Financial Times Article, Palestinians Squeezed after
Israel Withholds Tax, Feb. 27, 2015..........................................................JA-8452

Exhibit C, Washington Post Article, Israel backs down and returns
frozen funds to Palestinians, Mar. 27, 2015 ..............................................JA-8455

Declaration of Shukry Bishara, May 4, 2015 .............................................JA-8459

Exhibit A-1, Table, Fiscal Operations: Revenues, Expenditures
and Financing, Jan. 2015) ..........................................................................JA-8486

Exhibit A-2, Table, Fiscal Operations: Revenues, Expenditures
and Financing, Feb. 2015............................................................................JA-8501

Exhibit A-3, Table, Fiscal Operations: Revenues, Expenditures
and Financing, Dec. 2014 ...........................................................................JA-8520

Exhibit A-4, West Bank and Gaza – IMF Assessment Letter for
the Norwegian Authorities, Apr. 8, 2015 ...................................................JA-8543

Exhibit A-5, Table, Fiscal Operations: Revenues, Expenditures
and Financing, Dec. 2013 ...........................................................................JA-8548

Exhibit A-6, Fiscal Developments: Fourth Quarter and Full Year
2014, Feb. 15, 2015 ...................................................................................JA-8572

## TABLE OF CONTENTS

Exhibit A-7, GFS Yearbook Questionnaire Statement I ................................JA-8590

Exhibit A-8, Fiscal Developments & Macroeconomic Performance:
Fourth Quarter and Full Year 2013 Report, Feb. 2014 ..................................JA-8598

Exhibit A-9, Fiscal Developments & Macroeconomic Performance:
Fourth Quarter and Full Year 2012 Report, Feb. 26, 2013 ..........................JA-8620

Exhibit A-10, Palestine Government's Reforms – Work in Progress
– Challenges and Risk, Jan. 2015 ....................................................JA-8634

Exhibit A-11, Fiscal Reforms, Entrenched Challenges and Future
Objectives, Apr. 8, 2015 ................................................................JA-8677

Exhibit A-12, BBC Article, Will ICC Membership help or hinder the
Palestinians' cause?, Apr. 1, 2015 ....................................................JA-8710

Exhibit A-13, The Economic Siege of Palestine, Feb. 26, 2015 ..................JA-8721

Exhibit A-14, International Monetary Fund Press Release, Statement at
the End of an IMF Mission to the West Bank and Gaza, Jan. 29, 2015........JA-8723

Exhibit A-15, Reuters Article, Qatar Lends Palestinians $100 Million to
Pay Salaries: Palestinians, Apr. 8, 2015 ........................................JA-8726

Exhibit A-16, Memorandum from Ministry of Finance, Improper
Retention of Funds Under the Paris Protocol and the Interim Agreement,
dated Apr. 9, 2015................................................................JA-8732

Exhibit A-17, International Monetary Fund, West Bank and Gaza
Report to the Ad Hoc Liaison Committee, Sept. 12, 2004............................JA-8735

Exhibit A-18, Commetments Reports, Mar. 24, 2015..................................JA-8768

Exhibit A-19, Bank of Palestine Account Statement, Mar. 31, 2015 ...........JA-8770

Exhibit A-20, Statement of Account, Apr. 12, 2015 ....................................JA-8777

Exhibit A-21, World Bank Economic Monitoring Report to the Ad
Hoc Liaison Committee, Sept. 22, 2014 ....................................................JA-8782

# TABLE OF CONTENTS

Exhibit A-22, International Monetary Fund, West Bank and Gaza
Report on Macroeconomic Developments and Outlook, Jun. 30, 2014........JA-8799

Exhibit A-23, Chart, Summary of main donors contrubutions ....................JA-8839

Exhibit A-24, Chart, Budget Projections for 2014 .......................................JA-8842

Exhibit A-25, Fiscal Operations: Revenues, Expenditures and
Financing, Mar. 2015..................................................................................JA-8850

Exhibit A-26, International Monetary Fund, West Bank and Gaza
Selected Issues, Sept. 11, 2013 ..................................................................JA-8873

Exhibit A-27, World Bank Global Financial Development Report ..............JA-8918

Exhibit A-28, Occupied Palestinian Territory: Gaza Emergency ................JA-8921

Exhibit A-29, Gaza Situation Report 90, Apr. 30, 2015 .............................JA-8931

Exhibit A-30, The Guardian Article, Gaza Homes 'Uninhabitable'
as tens of thousands come back to rubble, Aug. 11, 2014............................JA-8944

Exhibit A-31, Reuters Article, Palestinians put Gaza Reconstruction
Cost at $7.8 billion, Sept. 4, 2014..............................................................JA-8948

Exhibit A-32, International New York Times Article, Conference
Pledges $5.4 Billion to Rebuild Gaza Strip, Oct. 12, 2014 .........................JA-8952

Plaintiffs' Trial Exhibit 357, Amended Indictment of Ahmed Taleb
Moustafa Barghouti, Oct. 1, 2002 ...............................................................JA-8956

Plaintiffs' Trial Exhibit 452, Indictment of Abdullah Ghaleb Abdullah
Barghouti, May 29, 2003 ..............................................................................JA-9086

Plaintiffs' Trial Exhibit 496, Report Pursuant to Title VIII of Public Law
101-246 Foreign Relations Authorization Act for Fiscal Year 1990-
1991, as Amended..........................................................................................JA-9218

xviii

## TABLE OF CONTENTS

Plaintiffs' Trial Exhibit 512, The Law for Detainees and Released Detainees, its Systems and Regulations, as approved by the Palestinian Council Ministers, Dec. 22, 2004 ........................................................................JA-9231

Plaintiffs' Trial Exhibit 537, Department of State Public Notice 3955, Mar. 27, 2002 .........................................................................................JA-9262

Plaintiffs' Trial Exhibit 626, Arafat's and the PA's Involvement in Terrorism (According to Captured Documents), Apr 22, 2002 .....................................JA-9263

Plaintiffs' Trial Exhibit 631, Palestinian Authority Captured Documents, Main Implications, Apr. 22, 2002 ..........................................................JA-9286

Plaintiffs' Trial Exhibit 634, Report Pursuant to Title VIII of Public Law 101-246 Foreign Relations Authorization Act for Fiscal Year 1990-1991, as Amended.......................................................................JA-9301

Plaintiffs' Trial Exhibit 826, Jenin The Capital of the Palestine Suicide Terrorists, Apr. 18, 2002................................................................JA-9309

Plaintiffs' Trial Exhibit 829, The "Al Aqsa Martyrs Brigades" (on US State Department list of terror organizations) and the Fata Organization are one and the same, and Yasser Arafat is their leader and Commander, May 3, 2002 ...........................................................JA-9356

Plaintiffs' Trial Exhibit 830, The Palestine Authority Employs Fatah Activist Involved in Terrorism and Suicide Attacks ...................................JA-9393

Plaintiffs' Trial Exhibit 956, Statement by the President, Aug. 9, 2001 .................JA-9426

Plaintiffs' Trial Exhibit 962, Financial Aid Request, Sept. 19, 2001 ......................JA-9427

Plaintiffs' Trial Exhibit 963, Allocation of Funds to Warrior Brothers, Apr. 5, 2001 .........................................................................................JA-9431

Plaintiffs' Trial Exhibit 1120, Summary of Defendants Payments to Convicted Non-Employee Terrorists..............................................JA-9435

Plaintiffs' Trial Exhibit 1121, Pay and Promotions to Defendants' Employee Terrorists ........................................................................................JA-9436

# TABLE OF CONTENTS

Plaintiffs' Trial Exhibit 1128, Photograph....................................................JA-9437

Plaintiffs' Trial Exhibit 1142, Department of State, Report and Determinations
      Pursuant to Section 804 of the Foreign Relations Authorization Act,
      Fiscal Years 1990 and 1991, Dec. 16, 2014 .......................................JA-9438

Plaintiffs' Trial Exhibit 1143, Decree Number (1) of 2013 concerning the
      Amendment of the Prisoners and Released Prisoners Law Number
      (19) of 2004, Nov. 16, 2014 ............................................................JA-9450

Defendants' Reply in Support of Renewed Motion to Dismiss, or Motion for Judgment or
      New Trial Under Rule 50(b) and 59, June 02, 2015....................................JA-9458

Defendants' Reply in Support of Rule 62 Motion to Stay and Waive the Bond
      Requirement, June 15, 2015 ..............................................................JA-9496

      Exhibit A, Fiscal Operations: Revenues, Expenditures and Financing,
      Apr. 2015 ......................................................................................JA-9511

      Exhibit B, The Government of Palestine's Report to the Ad Hoc Liaison
      Committee , May 27, 2015 ..............................................................JA-9530

      Exhibit C, Supplemental Declaration of Prime Minister Salam Fayyad, June 12,
      2008 .............................................................................................JA-9557

            Exhibit D, General Accountant Loan Balances, June 11, 2008 ..........JA-9566

      Exhibit D, Bylaw of the Palestine Investment Fund Company of 2007
      and its Amendments .......................................................................JA-9569

      Exhibit E, Public Budget 2015 ..........................................................JA-9584

Plaintiffs' Trial Exhibit 9, Annual Personal Statements,Nov. 1, 2011 ....................JA-9589

Plaintiffs' Trial Exhibit 14, Administrative Order, Feb. 1, 2002............................JA-9598

Plaintiffs' Trial Exhibit 19, Social Examination of Al-Aqsa Martyr,
      Jan. 29, 2002 .................................................................................JA-9603

## TABLE OF CONTENTS

Plaintiffs' Trial Exhibit 88, Comprehensive Overview Statement for Ali Mounir Yusuf Ja'ara, Feb. 27, 2012 ........................................................JA-9622

Plaintiffs' Trial Exhibit 132, General Intelligence on Ali Munir Yousef Ja'arah, Dec. 8, 2012 ...........................................................................JA-9627

Transcript of Hearing before the Hon. George B. Daniels, July 28, 2015 ..............JA-9633

Defendants' Trial Exhibit 17, Israel-PLO Recognition: Exchange of Letters between PM Rabin and Chairman Arafat, Sept. 9, 1993 ..................JA-9772

Defendants' Trial Exhibit 71, Photograph ..............................................................JA-9774

Defendants' Trial Exhibit 72, Photograph ..............................................................JA-9775

Defendants' Trial Exhibit 73, Photograph ..............................................................JA-9776

Defendants' Trial Exhibit 74, Photograph ..............................................................JA-9777

Defendants' Trial Exhibit 75, Palestine Maps Oslo II, 1995 ...................................JA-9778

Defendants' Supplemental Reply in Support of Rule 62 Motion, Aug. 7, 2015 .....JA-9779

Declaration of Shukry Bishara in Support of Rule 62 Motion, Aug. 7, 2015 .........JA-9794

Exhibit 1, Table, Fiscal Operations: Revenues, Expenditures and Financing Sources, May 2015 .......................................................................JA-9822

Exhibit 2, Table, Fiscal Operations: Revenues, Expenditures and Financing Sources, June 2015 ......................................................................JA-9841

Exhibit 3, World Bank, Economic Monitoring Report to the Ad Hoc Liaison Committee, May 27, 2015 ........................................................JA-9864

Exhibit 4, World Bank Letter to Mr. Shukry Bishara, July 16, 2015............JA-9905

Exhibit 5, International Monetary Fund, West Bank and Gaza Report to the Ad Hoc Liaison Committee, May 18, 2015.............................JA-9908

Exhibit 6, International Monetary Fund, Statement at the end of an IMF Mission to the West Bank and Gaza, June 18, 2015 .....................................JA-9950

xxi

**TABLE OF CONTENTS**

Exhibit 7, Palestinian Authority Debt and Arrears, July 2015 ......................JA-9954

Exhibit 8, Washington Post Article, Israel backs down and returns
frozen funds to Palestinians, Mar. 27, 2015 ...................................................JA-9956

Exhibit 9, Country Reports on Terrorism 2014, June 2015 .........................JA-9960

Exhibit 10, International Monetary Fund, Donor Support Crucial to
West Bank and Gaza's Recovery, May 19, 2015 .......................................JA-10350

Exhibit 11, UNRWA Article, Where We Work .........................................JA-10355

Exhibit 12, The Government of Palestine's Report to the Ad Hoc
Liaison Committee, May 27, 2015 ..............................................................JA-10361

Exhibit 13, Bank of Palestine Loan Agreement, Aug. 17, 2014 .................JA-10388

Exhibit 14, Bank of Palestine Loan Agreement, Mar. 3, 2015 ...................JA-10393

Exhibit 15, Letter, Facilities to your account, July 21, 2013.......................JA-10401

Exhibit 16, The National Bank Loan Agreement, Aug. 14, 2014 ...............JA-10403

Exhibit 17, Annex to the Overdraft Facility Agreement, Mar. 4, 2015 ......JA-10408

Exhibit 18, Commetments Report, July 23, 2015.......................................JA-10412

Exhibit 19, Public Budget 2015.................................................................JA-10414

Exhibit 20, International Monetary Fund, West Bank and Gaza Select
Issues, Sept. 11, 2013.................................................................................JA-10419

Exhibit 21, World Bank, Global Financial Development Report ...............JA-10464

Exhibit 22, Minister of Finance Speech to the LDF, May 18, 2015 ...........JA-10467

Exhibit 23, Letter from Shukry Bishara to Moshe Kahlon,
July 15, 2015 .............................................................................................JA-10488

Exhibit 24, Palestinian Public Finance Under Crisis Management:
Restoring Fiscal Sustainability ...................................................................JA-10491

Exhibit 25, Chart of Local Loans .............................................................JA-10560

# TABLE OF CONTENTS

Declaration of Abdel Hamid Al Abwah in Support of Rule 62 Motion,
Aug. 5, 2015..................................................................................JA-10570

    Exhibit A, Bylaw of the Palestine Investment Fund Company of
2007 and its Amendments.......................................................... JA10576

    Exhibit B, Certification of Palestinian Investment Fund Company,
Aug. 3, 2013...............................................................................JA-10592

Declaration of Bilal Mousa Kamal in Support of Rule 62 Motion,
July 22, 2015 ..............................................................................JA-10596

Statement of Interest of the United States, Aug. 10, 2015....................JA-10599

    Declaration of Anthony J. Blinken, Aug. 10, 2015 ...................JA-10603

Order Granting Motion to Stay, Aug. 24, 2015 ..................................JA-10608

Transcript of Hearing before the Hon. George B. Daniels, Aug. 24, 2015 ...........JA-10609

Defendants' Notice of Appeal, Oct. 5, 2015.......................................JA-10653

Plaintiffs' Notice of Appeal, Oct. 7, 2015 .........................................JA-10656

Plaintiffs' Memorandum in Opposition to Defendants' Renewed Motion to
Dismiss, filed May 28, 2010......................................................JA-10658

Exhibit A-16, Excerpt of Mazen Jadallah Deposition Transcript,
June 15, 2010 .............................................................................JA-10682

Defendants' Letter to Hon. George B. Daniels regarding Proposed Revisions
to Jury Instructions, filed Feb. 12, 2015 ..................................JA-10686

    Addendum, Defendants' Requested Jury Instructions ...............JA-10696

Defendants' Letter to Hon. George B. Daniels regarding Additional Language
in Jury Charges, filed Feb. 20, 2015........................................JA-10701

    Plaintiffs' Trial Exhibit 428, Custodial Statement of
Abdullah Barghouti....................................................................JA-10708

**TABLE OF CONTENTS**

Plaintiffs Opposition to Defendants' Motion to Dismiss for Judgment
as a Matter of Law or for a New Trial ........................................................ JA-10756

Exhibit A, Photographs, Organizational Chart ............................................. JA-10827

F1CZSOK1                     Conference

THE COURT:  I'm sorry, which question are you at?

MR. YALOWITZ:  I flipped away from it.  48.  But I think, frankly, the bigger issue is the person expressed reservations about not wanting to lose the volunteer opportunity, and she said in question 60 that that would, that that would be a reason why she couldn't serve on the jury.

THE COURT:  Well, as I say, my view, standard view is that if the parties didn't want to make her stay because of that, I would let her go.  But if one side thinks there is a possibility that she might give answers to those or other questions that would make her a fair and impartial juror, you want to make her stay, I'll make her stay.

MR. HILL:  We do want her to return, your Honor.

THE COURT:  Let's put those four aside for now and let's see.  Mr. Yalowitz, did you want to go through this process also?

MR. YALOWITZ:  Not really.

THE COURT:  I posed it that way.  If you want me to --

MR. YALOWITZ:  Before we just do kind of tit for tat, let me understand what -- I mean because I got a lot.  I got a lot more than they do.

THE COURT:  Well it depends if it turns out to be to your advantage because --

MR. YALOWITZ:  That's what I'm trying to figure out.

THE COURT:  You know, I'm not going to just add

F1CZSOK1                        Conference

another 20 people.  I'm going to knock out some of the people

that got us to 50.  We're not going beyond 50.  All right.  So,

you know, maybe I'd be willing to throw these four in on top of

the 50 and then pull them out of the wheel today, and you could

seem who is going to be in the box.  But, you know, I'm not

going to add another 20 people.  I'm more inclined, as I say to

cut it down to 40.

          MR. YALOWITZ:  Here's what I'm thinking.

          THE COURT:  Because we have more than enough jurors

who could serve as fair and impartial jurors in this case.

          MR. YALOWITZ:  Here's what I'm thinking is, here's my

recommendation to the Court.

          THE COURT:  I may take it.

          MR. YALOWITZ:  All right.  I would think the Court

should remove the two jurors who gave personally identifying

information, so now we're down to 48.

          MR. ROCHON:  And we agree.  We know the numbers.  We

can get them to your Clerk.

          THE COURT:  Just write them on a piece of paper.

          MR. YALOWITZ:  Okay, so now we're at 48.

          THE COURT:  All right.

          MR. YALOWITZ:  The defendants have four that were

acceptable to them that the Court is willing to throw back into

the mix.  If the Court randomly selects four of the blank

jurors to swap those out, so that we wind up with equal

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                          **JA-3602**

F1CZSOK1                        Conference

treatment -- in other words, I'm not being disadvantaged, if you take -- if you take four that both sides said, well, we don't have an objection to, but we don't want them and you knock those out randomly -- I mean you'll decide that -- then given the Court's process that we've been through, we don't then to have to go through my side of the process, because I had so many more acceptable jurors in the pool than they did, and --

THE COURT:  Well, quite frankly, that's why I think this is pretty much an exercise in futility.  Because the only real fair way to do it is to knock out the last four jurors and make these the 50, to the extent they're ahead of the last four jurors.  Now, the last juror --

MR. ROCHON:  Judge --

THE COURT:  But the reality is is that we only went to 186, okay.  So I'm not sure why 190 needs to be in the mix at all, unless you want to substitute 190 for 186.  But 186 is somebody that the defense wants, and so was 172 -- 172, I mean no 172 was somebody that the plaintiff wanted I think, and 186 was somebody the defense wanted.  162 is -- 67 is somebody the plaintiff wanted, and 162 was somebody the plaintiff wanted.  I would knock out those four to substitute these four to get 50.

MR. YALOWITZ:  So then you're -- what you've done is you rewarded them.

THE COURT:  How have I rewarded them?  They want me to

F1CZSOK1                        Conference

substitute these.  I just knocked out one of the people they said they wanted.

MR. YALOWITZ:  Yeah, you've also knocked out two of the people that I wanted.

MR. ROCHON:  Your Honor, at one point this morning you had said that perhaps your approach would be to take the four that we said were acceptable that they did not object to, have four of theirs that --

THE COURT:  The first four.

MR. ROCHON:  Did not object.  That would be the first eight.

THE COURT:  Right.

MR. ROCHON:  And then the question is what do we do for the next ten.

THE COURT:  The next ten are going to be picked out of the wheel of the 50 that I had given you.

MR. ROCHON:  That's acceptable to us.  It also would be acceptable, if Mr. Yalowitz prefers, that the jurors that we have, for lack of a better phrase, rehabilitated or put back in be deemed now acceptable and not objected to.  But he would of course get an equal number of acceptable that we don't object to, and you would then have 16 or I think if my numbers are right, that would be eight, eight and eight, and we'd have to fill out of the wheel for the last two.

THE COURT:  I see what you're saying.  So these people

F1CZSOK1                    Conference

would qualify as someone that -- these three people would qualify as someone that you believe, you checked off were acceptable for voir dire.

MR. ROCHON:  Yes.

THE COURT:  And then I should add, so I do seven and seven.

MR. ROCHON:  That's, I think we may have had four, but eight and eight was how it might be.

THE COURT:  Well, four plus, four plus three is 7.

MR. ROCHON:  I think you might have four in your hand 25, 141, 154 and 190.

THE COURT:  We would never get to 190.

MR. ROCHON:  I see.

THE COURT:  And in any scenario to get 50 is much more than we need, we'll never get to 190.

MR. ROCHON:  I understand.

THE COURT:  We probably wouldn't even get to 154, but or -- well, we will because we want --

MR. ROCHON:  This does.

THE COURT:  186.

MR. YALOWITZ:  Look, the problem here is he's gaming the --

THE COURT:  I'll tell you what, why not just throw the three in the wheel.

MR. YALOWITZ:  That's fine?

THE COURT:  Wait a minute.

MR. YALOWITZ:  That's fine if -- look, if you --

THE COURT:  I gave you 48 names, this would make 51 okay.

MR. ROCHON:  Right.

THE COURT:  Why don't you just throw these three in there and we're going to spin the wheel, we're going to pull out.

MR. YALOWITZ:  Can you give me three more put in the wheel too?

THE COURT:  Everybody you asked for is in this wheel. Every single person you asked for is in this.

MR. YALOWITZ:  But there are people that -- there are people that they improperly -- I mean, if we go through the Hill exercise on my side, I'm going to have a lot more than three.

THE COURT:  You just said to me you didn't want to go through that.

MR. YALOWITZ:  I didn't, but if I'm going to get gamed by --

THE COURT:  I'm not gaming you.  Tell me what you think you suggest.  Are you suggesting throw people in the wheel?

MR. YALOWITZ:  All I'm saying is give me three more and we'll be done, give me there are more to put in the wheel

F1CZSOK1                     Conference

and we'll be done.

MR. ROCHON:  I think what he's saying is he'd like to do his three best challenges to our four causes.

THE COURT:  I understand that.  I'm not sure why --

MR. YALOWITZ:  My first three.  We can go through in numerical order, do the first three.

THE COURT:  If you'd like, I don't care, the bottom line --

MR. ROCHON:  Your Honor?

THE COURT:  Do you want to do that?

MR. ROCHON:  I don't want to do it, but respect Mr. Yalowitz think he's being treated unfairly.  I'll defer to the Court.  Under any system, the four that we said were acceptable would go in, their first four that they said were acceptable would go in.  We're talking about then are the next ten.  Am I correct?

THE COURT:  Yes.

MR. ROCHON:  We said that right, thank you.

THE COURT:  I mean I'm just talking about pulling ten out of the wheel of 50, approximately 50 people.

MR. ROCHON:  And that wheel, just for the record will still have vastly more that he finds acceptable than we haven't objected to than us.

THE COURT:  Right.

MR. ROCHON:  But I mean he's still -- that wheel is

F1CZSOK1                    Conference

going to be full of jurors that he found acceptable that we did not.

THE COURT:  Right.

MR. YALOWITZ:  I'd just like it a little more full.

THE COURT:  I'm sure you would.  But I mean, you know, look the bottom line is all you're entitled to is a fair and impartial juror, everybody --

MR. YALOWITZ:  I agree with that.

THE COURT:  Everybody on this list is qualified as that.  So I'm trying to give you some more flexibility in terms of what peremptory challenges you might have, want to exercise.  But the reality is I'm giving you more than you are really entitled to.  You're not entitled to pick the jurors.  You're entitled to challenge jurors.  So you only get three of those.  So, you know, I will -- if you want me to throw these back into the mix, I will throw these back into the mix.  But at this point I'm still going to stick with the four and four, unless you want me to make it seven and seven.

MR. YALOWITZ:  No, no.  I want you to make it four and four.

THE COURT:  Stick with the four and four.

MR. ROCHON:  Right.  We would prefer the seven and seven because now we I think overcome the challenges for cause, so we have jurors that we find acceptable that no longer have a valid change for cause.

F1CZSOK1                    Conference

THE COURT:  I mean, that's fine and dandy, but that just gives them a -- when you think about it, gives you some, but just gives them three more people.

MR. ROCHON:  He could challenge three of ours and then we'd have seven and seven that -- if I have bad challenges for cause, he should make that argument, get three and we have 14 and seven and seven, I'd be fine with that.

THE COURT:  All right.

MR. ROCHON:  Because that would be -- I think these are no longer valid challenges for cause, and Mr. Yalowitz should have the ability to challenge up to three of ours if he thinks that's they're bad challenges.

THE COURT:  What do you want, Mr. Yalowitz?

MR. YALOWITZ:  Look --

THE COURT:  Otherwise, I'll just withdraw my four and four and just throw everybody in the wheel and what you're going to get.

MR. YALOWITZ:  Let's do what you said, four and four, throw their additional three into the mix and we'll deal with the hardship issues and the cause issues if there are any.

THE COURT:  I mean, I do have some concern about throwing their three in the wheel because at least they've taken the position that they object to those.  Now whether I sustain the objection as a valid objection, if they come out of a different question, but it is unfair for me to put somebody

F1CZSOK1                    Conference

in there on the same par as somebody who was objected to on the same par as somebody who wasn't objected to.  I tried not to do that.  I tried to be fair.

MR. YALOWITZ:  Right.  So the Court's proposal is take the three quasi rehabilitated jurors --

THE COURT:  Throw them --

MR. YALOWITZ:  -- into the mix and move on.

THE COURT:  Right.

MR. YALOWITZ:  Okay.  I'm fine with that.

THE COURT:  Mr. Rochon.

MR. ROCHON:  We keep saying three.  We had 25, 141, 154 and 190.

THE COURT:  190 we never get to.

MR. ROCHON:  I see.

MR. HILL:  He withdrew his objection to that one, your Honor.

THE COURT:  All right, so I'm willing to put the 51 in the wheel, spin the wheel, pull out ten names.  Four, four, and ten are the people who we're going to voir dire initially.  If it turns out they have a problem and there is a valid challenge for cause or the parties agree that they shouldn't sit, then we'll take one of the others who are in the audience and put them in that seat, until we have 18 people who are qualified to serve as jurors, and you will exercise your three peremptory challenges as to those 18.

F1CZSOK1                        Conference

MR. ROCHON:  Yes, sir.  And the ones who will be brought back tomorrow will include everyone who is in the wheel?

THE COURT:  All 51.

MR. ROCHON:  Thank you.

THE COURT:  Even though we're going to pull the 18 now, I'm not going to say we already pulled the 18.  I'm just going to spin the wheel with the 18 in it, and we're going to pull out the names at random and seat them in that order, and those are the first people who we're going to voir dire.

MR. ROCHON:  Understood.

THE COURT:  Okay.  So that's what I'm going go do.

MR. YALOWITZ:  Bear with me, your Honor.  I just want to hand a note to Ms. Quirk about those two jurors I'm going to show Mr. Rochon.

MR. ROCHON:  I think I already --

MR. YALOWITZ:  Oh, did you give it?

THE COURT:  Make sure.

MR. ROCHON:  I gave her your last one.

MR. YALOWITZ:  Okay, that's fine.

THE COURT:  All right, so.

MR. YALOWITZ:  So your Honor, your Honor?

THE COURT:  Yes.

MR. YALOWITZ:  I have a request and a question with regard to this process.  The request is that if you could,

F1CZSOK1                       Conference

after the ten random, if you could give us the next ten just so we understand today where the jury lies, it just will help us evaluate, it will help both sides.  I'm sure Mr. Rochon would like that too.

MR. ROCHON:  Yeah, you want to know who is in the box.

THE COURT:  Right.  I have no problem about.

MR. YALOWITZ:  That's the first thing.

The second thing we would just like to know how the Court intends to deal with the foreperson.

THE COURT:  They going to elect their own.

MR. YALOWITZ:  That's all we want to know.

THE COURT:  All right, okay.  So what I'm going to do is I'm going to put these 43 names in the wheel.  We're going to pull out 20.  The first ten will be the ones who will be -- well, the first ten we're going to put back into the wheel tomorrow with the other eight.  I'm not going to put the additional ten in.  We will spin the wheel.  The order that they come out of the wheel tomorrow morning when they're here in our presence is the order they're we're going to seat them, and then we'll voir dire them.  If they're all qualified, then we're going to have you challenge, exercise your peremptory challenges.  If there are no challenges for cause -- if there are challenges for cause that I grant, then we'll refill that seat and until we have 18 people who are, there are no challenges for cause.  So let's --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
**JA-3612**

F1CZSOK1                          Conference

MR. YALOWITZ:  Your Honor, I apologize.  It's which numbers are the eight that are --

THE COURT:  Sure.  The numbers are --

THE DEPUTY CLERK:  4, 11, 20, 24, 78, 93, 186, 192.

THE COURT:  And that should be the --

MR. HILL:  I'm sorry, could I have it one more time?  I apologize.

THE COURT:  Yes.

THE DEPUTY CLERK:  It's not going to be the same order, but 78, 24, 20, 11, four, 186, 93, 192.

MR. ROCHON:  Thank you.

THE COURT:  All right.  We're now in the electronics age.

MR. ROCHON:  I like this.

MR. YALOWITZ:  They use those wheels in the Clerk's Office too?

THE COURT:  No.  They have computerized.

THE DEPUTY CLERK:  All right, 88, 28.

MR. ROCHON:  28.

THE DEPUTY CLERK:  28.  76.  85, 89, 48.

THE COURT:  48?

THE DEPUTY CLERK:  48 -- I'll read them all again at the end.  62, 44, 162, 37.  So that is 88, 28, 76, 85, 89, 48, 62, 44, 162, 37.

THE COURT:  Then you wanted an additional ten.  That's

F1CZSOK1                    Conference

going to be the 18.

MR. ROCHON:  Can I ask a stupid question?  It's my specialty.

THE COURT:  I have stupid answers too.

MR. ROCHON:  I take it Ms. Quirk had put in the salvaged jurors before we spun the wheel.

THE COURT:  Yes, yes.  That added up to 43.

MR. ROCHON:  Okay, thank you.

THE COURT:  Because the number was 51.

All right.  So those are the 18 jurors that we're going to put in the box.  We'll randomly select them in that same manner in the wheel tomorrow when they're here, call the names and tell them to take a seat.

Now, what I'll do is we'll call ten more names, and then if we have to replace a juror, we'll replace them in that order, okay.

All right go ahead.

THE DEPUTY CLERK:  159, 1, 43, 96, 7, 95, 41, 14, 57, 68.  So that's 159, 1, 43, 96, 7, 95, 41, 14, 68, 57.

MR. ROCHON:  Search I'm sorry.

MR. YALOWITZ:  68, 57 or.

THE COURT:  57, then 68.

MR. ROCHON:  That's what I have 57 and --

THE DEPUTY CLERK:  57, then 68, excuse me.

MR. YALOWITZ:  Probably an academic question.

F1CZSOK1                    Conference

THE COURT:  And as a matter of fact, I don't think any of ones we just argued about came out of the wheel.

MR. HILL:  Yeah, your Honor, we, just so the record is clear you have not sustained those challenges for cause.

THE COURT:  I have not.

MR. HILL:  So in our view those should go in the front of the box.  Because there was a challenge for cause made, your Honor has ruled that at this point it is no a valid challenge.  So we think those three people that you added back in should be the next, part of the next group of six.  Because otherwise what's happened is the plaintiffs have made a challenge for cause, you've overruled it and they've dropped out of the pool.

THE COURT:  Well, they didn't drop out of the pool.  They weren't randomly pulled out of the pool.  And I never said that I would seat in the box people that were rejected.  You had the opportunity to have them randomly selected, unless you want me to throw the four -- you can't have it both ways.  You can't ask me to give you the four and then --

MR. HILL:  I just want the record to be clear, your Honor.

THE COURT:  The record isn't clear because I don't know what you're objecting to because you asked me to put the four in the box.

MR. HILL:  Yes, your Honor.

THE COURT:  You didn't ask me to put the -- well, you

F1CZSOK1                         Conference

did ask me to put the seven in the box.

MR. HILL:  We did.

THE COURT:  But you never agreed that the seven that the people who were objected to were going to automatically go into the box.  That was never agreed upon.

MR. HILL:  I understand.

MR. YALOWITZ:  I agree with that, your Honor.

THE COURT:  All right.  So if you had wanted that and you insisted upon that, then I would have randomized everyone. But I gave you the advantage to have in the box those people who you said you wanted, you wanted to voir dire.  So I think at this point it's unfair for you to say that now you're disadvantaged by its process.

So, all right, so that's the way we're going to do it. We're going to notify the jury ten to 11:00.  They're going to start calling those individuals, those 50 -- those 51 individuals will be here tomorrow.  When they come in I'll speak to them initially, and then we'll randomly put them in the box.  Then I'll have some basic questions for them.  If you have some questions that you would like me to ask of particular jurors, again don't give me anything extensive.  I just want to have a little bit of dialogue with them.  If there's something that's been raised by the questionnaire that you think ought to be explored, just give me have a quick letter before the end of the night and I'll look at that and see if it's appropriate.

F1CZSOK1                    Conference

All right?

MR. ROCHON:  Thank you, your Honor.

THE COURT:  So we can move forward efficiently tomorrow.  All right?

Yes, sir.  Mr. Yalowitz.

MR. YALOWITZ:  Your Honor, if the Court is ready to move to another topic?

THE COURT:  Yes.

MR. YALOWITZ:  Ms. Romeo has a logistical issue I'm hoping we can raise and dispose of promptly.

THE COURT:  Okay.

MR. YALOWITZ:  Thank you.

MS. ROMEO:  So, your Honor, we have our lead translator here Rena Naman(phonetic), and I just wanted to make sure the Court is okay and approved with the set up that we're going to use tomorrow for trial.  So I have a question which I think might make it very easy.  Is the Court Reporter going to be sitting where the Court Reporter is today during the trial or is the Court Reporter going to be at the podium?

THE COURT:  The Court Reporter is going to be where the Court Reporter is.

MS. ROMEO:  Okay.

THE COURT:  They're going to be -- you're talking about the podium on the side?

MS. ROMEO:  Yes.

F1CZSOK1                         Conference

THE COURT:  They also utilizing that.  You've asked them for not just daily copy, I understand you've asked them for real time.  Is that not correct?  Just daily copy?

MR. ROCHON:  We did not ask for real time.

MS. ROMEO:  No.

MR. YALOWITZ:  I don't need real time either, but my translator needs it.  So when we have translation, she -- they need -- told us they need real time and we've committed to that.

MS. ROMEO:  We're going to have one computer with live note.

THE COURT:  So what do you want?

MS. ROMEO:  So -- well, the concern of the translator is that they need to see the witness in order to be interpreting.  And the way it was set up on Friday was that there was a -- the interpreters would be in the back of the witness box.  So we were hoping that potentially -- I'm not sure maybe we can just move the podium a little bit closer.

THE COURT:  What are you going to do about a monitor?

MS. ROMEO:  Well, what I was hoping is that we can maybe put a small folding table kind of on the side of the witness box and maybe just put the laptop right on top of there.  This way we don't have to move any, if your Honor --

THE COURT:  My suggestion would be this.

MS. ROMEO:  Sure.

F1CZSOK1                        Conference

THE COURT:  My suggestion is that your interpreter stand --

MS. ROMEO:  Okay.

THE COURT:  -- between that podium and the witness box; that you put the monitor on top of the podium.

MS. ROMEO:  Okay.

THE COURT:  Because the juror has -- jurors have to see.

MS. ROMEO:  Right.

THE COURT:  Not so much the witness, but the interpreter because the interpreter's the one that's giving them the English, so.

MS. ROMEO:  Sure.

THE COURT:  It would be easier for the jurors to follow if they can see the interpreter.  So the interpreter should stand right next to the witness.  And if she has to look at the monitor, she can look at the monitor.  I don't think the monitor will be in the way of the Court Reporter, since most of what the Court Reporter will be doing will be pretty much from that seat other than, you know, just going back and quickly within seconds doing something at the desk.

MS. ROMEO:  Right.  I understand, your Honor.  And are we also able to just put where that chair is right there, a small table for the second laptop that the second interpreter will have and the --

F1CZSOK1                        Conference

THE COURT:  I'm not sure why you need a second laptop. Why do you need a second interpreter?  You're going to use two interpreters at the same time?

MS. ROMEO:  They're going to be switching off, your Honor.

THE COURT:  Well, they can use the same monitor, I assume.

MS. ROMEO:  Do you mind if I just have the interpreter address that?

THE COURT:  I assume they're going to be listening to the witness, translating what the witness says.  If they have a problem about what the witness says, they're going to see the monitor to verify it.

MS. ROMEO:  Okay, so.

THE COURT:  The one who is going to be doing that is the one who is translating for the jury.

MS. ROMEO:  Right.  So my understanding, your Honor, is there is going to be the one laptop with the live note, and then the second laptop is going to have -- they use it like a glossary so that they're able to -- it's what they use when they interpret.  Second laptop is not going to be the live note.

THE COURT:  Well, I don't -- I'm not quite sure what the two interpreters have to do -- I mean, you're only using one interpreter at a time, right?

F1CZSOK1                    Conference

MS. ROMEO:  Correct, correct.

THE COURT:  Okay.

MS. ROMEO:  Right, but they're going to switch off during the testimony because it's going to be a long day and this way --

THE COURT:  No, I understand.

MS. ROMEO:  So just -- right.

THE COURT:  I'm just not quite sure why you need two lap tops, but.

MS. ROMEO:  If you want to give me a moment I can inquire to see if there is a way we can put it on one laptop and see if that's possible.

THE COURT:  Well, I would assume -- I'm not quite sure what kind of glossary you say is on the second laptop.

MS. ROMEO:  It's a glossary that they use in the course the interpreting with the witness.

THE COURT:  Of names or glossary of.

MS. ROMEO:  I believe it's of words.

THE COURT:  Words.

MS. ROMEO:  I believe it's both.  I believe it's both. But I can clarify that for the Court, because if we can condense it to one, I'm happy to make that work and do that.

THE COURT:  Well, I would prefer one.  We already have significant amount of laptops.

MS. ROMEO:  I understand.  So I propose that I'll

F1CZSOK1                      Conference

clarify that with the interpreter team and see what we can do. We'll put the live note laptop on the podium and we'll have one interpreter just sitting and the other one standing and they'll just have to switch off, if that sounds like it will work for the Court.

THE COURT:  That's fine.  I'm used to that.

MS. ROMEO:  Okay.  And then there is a second issue, your Honor.  The second issue has to do with splitting the costs of the interpreter.

THE COURT:  Yeah, I didn't know what you agreed to. You submitted an order to me, but neither side signed that order, so I don't know what you want me to do.  You agree or not agree?

MS. ROMEO:  So here's the issue.  The issue is we wrote to defendants back at the end of October.

THE COURT:  Stop.

MR. HILL:  We're fine.

MR. ROCHON:  We'll sign.

MR. HILL:  We'll sign for it.

MS. ROMEO:  Then we don't have a problem.

THE COURT:  Solved.

MR. YALOWITZ:  Solved.

MS. ROMEO:  Wonderful.  Thank you, your Honor.

THE COURT:  All right.  Okay.  Then let me -- we'll take a break in a little bit, ten minutes.  Let me just move to

F1CZSOK1                    Conference

some of the other substantive issues so we can get them out of the way.  Just keep myself organized.

I've looked at the deposition designations.  I don't have any problems with those designations to the extent they're consistent with my rulings.  I don't see any legitimate objections to the designations so I'm going to allow the designations.  If there's something that's really that I missed or something that is particularly prejudicial or in there that's inconsistent with the rulings that I made -- I looked at all these designations.  They don't seem to be particularly any really particular objection or somehow inadmissible, so.

MR. HILL:  We'll submit counter designations to the plaintiff's and we'll see if there is any disagreements.

MR. YALOWITZ:  Thank you, your Honor.

THE COURT:  Let me go to --

MR. ROCHON:  Your Honor?  I'm sorry.

THE COURT:  Yes.

MR. ROCHON:  Because there were two sets of -- there were two letters of designations, one that we sent on Palestinian officials and one on Mossab Yousef.

THE COURT:  Yousef, Fayyad, Abu-Libdeh, Shqbu'a, Al Seek Cheek(Phonetic), Jadallah.

MR. ROCHON:  Jadallah.

THE COURT:  Those are the ones.

MR. ROCHON:  I just want to make sure because there

F1CZSOK1                        Conference

was two letters -- the only one that we were going speak to

additionally today was one set of things as to Mossab Hassan

Yousef, Mr. Satin was going to address that was not addressed

last week, not to reargue last week, but there was one portion

of the conversation he was going to address today, and --

THE COURT:  And Yousef we already discussed in more

detail, the testimony about torture and all --

MR. ROCHON:  That was coming out.

THE COURT:  That was out.

MR. YALOWITZ:  That's out, your Honor.

Your Honor, as memory serves, the defendants have

provided us with their counter designations sometime ago and if

I could, just with the Court's permission, ask the defendants

to take another look at those and let me know by Friday if

there are any that they're withdrawing, then we can consult

with them and if there is a problem we can let you know

promptly.

THE COURT:  All right.

MR. ROCHON:  As long as it's not going to be this

week's stuff, better to address it later in the week instead of

today.

MR. YALOWITZ:  So with the Court's permission I don't

want to turn my back on the Court.

THE COURT:  That's all right.  You know when you might

call --

F1CZSOK1                    Conference

MR. YALOWITZ:  Yeah, if we can -- it would be extremely helpful if we can hear from the defendants by the end of this week.

THE COURT:  Okay.  They said fine.

MR. ROCHON:  Yeah.

MR. YALOWITZ:  Okay, thank you.

THE COURT:  All right.  Let me go to -- all right.

I think we already addressed the plaintiff's motions particularly with regard to certain kinds of evidence and expert testimony.  If we haven't, it's not clear, we can discuss it further.  So really what I want to deal with the defendant's objections to six, basically six witnesses.  Mr. Yalowitz, just remind me.  I think there were one or two of these experts you say that you on probably would not call in your case in chief.

MR. YALOWITZ:  So today as we speak there are three.

THE COURT:  Okay.

MR. YALOWITZ:  That would be Karsh and Addicott.

THE COURT:  Karsh and Addicott would not be presented in your case in chief.

MR. YALOWITZ:  Correct.  And then as we discussed last week Marcus, we're cognizant of the Court's earlier comments and rulings.  Based on that we've withdrawn him from our case in chief with the understanding that we reserve them for rebuttal.

F1CZSOK1                    Conference

THE COURT:  All right, okay.

MR. YALOWITZ:  If needed, if needed, and if the Court thinks it's appropriate, I mean obviously.

THE COURT:  We may have to come back to Marcus because you want to admit some statements that you say were printed in PA or PLO controlled media.  And if I were to consider allowing that, you would have to establish of some witness who is going to testify that in fact this is what it purports to be.  So I don't know if that's Marcus or if that's somebody else.

MR. YALOWITZ:  Yeah, Marcus -- right, Marcus can -- I mean, I would have thought that the defendants would know what was printed in the newspaper they owned and what was shown on the television station that they owned, if we --

THE COURT:  Two things.  One or two things; that either it was in fact printed and, two, whether it was printed by them, so.

MR. YALOWITZ:  So if we need to bring a witness who otherwise wouldn't testify in order to, in order to persuade the Court that these documents are authentic, which is I think what we're talking about here, then -- and we do it, then I think that some cost shifting would be in order here.  Because to bring a guy in, fly him from Israel, have him get on the stand -- doesn't even need not be in the presence of the jury because these are questions for the Court -- have him say yes, my organization recorded this from PA TV, and therefore it's a

F1CZSOK1                        Conference

real, you know, it's a document that is authentic, we watched it and this is our process and it's our business.

THE COURT:  I assume that you already had witnesses you at least put on the list that you intend to have at this trial who were in a position to testify to that.

MR. YALOWITZ:  That would be Marcus.

THE COURT:  Including Marcus.

MR. YALOWITZ:  That would be Marcus.

THE COURT:  Okay.

MR. YALOWITZ:  Right.

THE COURT:  Then they shouldn't have to pay for Marcus if Marcus --

MR. YALOWITZ:  If we're withdrawing him as a -- well, okay.  Look --

THE COURT:  It depends you're right, I will leave that up to you.  Clearly to the extent that you want to either stipulate or that the defense represents to you that they have no objection to the admissibility of the document and can come in without objection and without any further foundation, then you can just put it in.  Unless you have agreed that it can come in without any foundation, you're going to have at least lay a foundation for all your exhibits.  And minimal foundation is as the law requires it is what it purports to be.  So whatever you purport it to be you need someone to say where they got it from, and what it is.

F1CZSOK1                    Conference

MR. YALOWITZ:  Yeah.

THE COURT:  And how they know what it is.

MR. YALOWITZ:  Yeah, I think we can do that.

THE COURT:  And that's the guidance that I can give as to what the foundation is if I'm going to admit it over objection.

MR. YALOWITZ:  Right.

THE COURT:  Okay.

MR. YALOWITZ:  Okay.

THE COURT:  If you meet that foundational requirement for the other issues that I would allow in, I don't think that there is other legitimate objections unless there may be some hearsay objections with regard to some other issues.  But my attitude generally will be this, and then we can go back to all of these exhibits.

To the extent that you have something that you contend is a statement made by the PA or POL, its officials, or its agents on their behalf, and there is not any dispute about that statement or you've laid the proper foundation, it is probably going to come in.  That's the guidance.

MR. YALOWITZ:  I think we'll be able to address it with our existing witnesses.  And then if there's a problem we can reserve the right to call Marcus as a foundational witness.

THE COURT:  Well, as I say, I want you to be a prepared so we'll move forward efficiently and smoothly.

F1CZSOK1                    Conference

MR. YALOWITZ:  Very good.

THE COURT:  Figure out what you are really going to be fighting about.  To the extent that you, you know, there is an extensive fight about it that we haven't already addressed, let's raise it early so we don't waste the jurors' time with regard to that.

So then the question is -- I didn't know -- I didn't know where we ended up with Kaufman.

MR. YALOWITZ:  Kaufman, we spoke about Kaufman.  He is -- I thought -- my recollection, and I could stand corrected, my recollection is he's -- I described what he's going to do, which is summarize the convictions and summarize the facts found in the convictions, and provide the jury with some assistance in understanding where they can find the various attacks and the various convictions while I hand out binders of those convictions to the jury and have them walk them through it and --

THE COURT:  Okay.

MR. YALOWITZ:  -- my recollection is that the Court didn't have a problem with that.

THE COURT:  Well, I think that the dispute at one point, I just don't remember how we resolved the dispute, at one point was whether or not there was going to be testimony about the fairness or quality of the Israeli military courts, and it was unclear, I forget -- we discussed, if they raised

F1CZSOK1                    Conference

it, if they didn't raise it.  I didn't know where we ended up.

MR. YALOWITZ:  Again my recollection is, and this one I'm pretty sure -- I mean I can go back and check, but I'm pretty sure, is the Court said if I open that door, then the Court would give them a fair opportunity to respond.  But that, in general, that kind of testimony and examination is out of bounds.  Because the Court has ruled that these documents are admissible based on a reasonable evaluation of the system as a whole.  And so unless the door is open, there is not going to be inquiry about torture or apartheid justice or any of that kind of any of that kinds of attacks on the military system. And at one point I think the Court said to Mr. Satin, which one of these guys was tortured that you think is actually innocent, and he didn't have any anybody like that.

THE COURT:  You intend to raise this issue on cross-examination, in your opening or on your case in chief?

MR. ROCHON:  No.

THE COURT:  Okay.

MR. ROCHON:  And just to be -- I give that answer, but now the explanation after just briefly.  We, our position is that you ruled they can come in over our objections and our objections were on multiple bases, I don't need to repeat them here.  Now the decision has been made to allow them in, the defense is not going to raise a separate challenge to their due process challenge, to the quality of the justice, challenge --

F1CZSOK1                    Conference

THE COURT:  Wait a minute.  I ruled that what was going to come in?  The only issue --

MR. ROCHON:  The convictions.

THE COURT:  Oh, yeah.  But the only issue I'm addressing now right now is there was a question of whether or not I should allow this witness to testify about the quality of the Israeli military courts and other courts.

MR. YALOWITZ:  We're not offering that testimony.

MR. ROCHON:  And we're not going to open the door to it.

THE COURT:  Okay.

MR. ROCHON:  And, therefore, what I would expect pretty clean.  I will say on Kaufman, though, the biggest issue is that we received the proposed redactions that -- of the convictions that he would seek to use on Saturday afternoon.  It is I think close to a thousand pages.  I didn't count them, but it's massive.  We are going through those.  We do have concerns about some of those redactions and we want to find -- now is not the time -- I want to find the time to sit down with counsel to say where our concerns are, and then with the Court, and do it when the jury is not waiting.  You know, this is a case that has a lot of paper as opposed to live testimony.  So I apologize.  I know it can be inconvenient to the Court, but it's the nature of this case of massive paper.  We complained about it, the plaintiffs I'm sure feel it's necessary for the

F1CZSOK1                         Conference

case.  I'm not trying to get into who struck John.  We now need to go through the redactions, and it's a lot, and we're not going to agree on it -- what a surprise -- and we'll try to see if we can work it out with them, but if not we're going to need the Court's attention on some of these.  And so that is something we probably need to do before Kaufman testifies.

MR. YALOWITZ:  Kaufman is going on tomorrow, your Honor.

MR. ROCHON:  Well --

MR. YALOWITZ:  They've had these, look --

MR. ROCHON:  Wait, wait.  We had these since Saturday, these proposed redactions.  Let's just be clear, we've had these since Saturday.  We're a little busy this weekend because we got their opposition on motion for summary judgment just before or after 10:00 p.m. Friday night, got a thousand pages of proposed redactions.  It's not a surprise I haven't been through them by Monday morning.  We have people working on it, we're going to get through it, but we need time with to go through it.  I mean, if they want -- they said last Wednesday --

THE COURT:  What do you want to do?

MR. ROCHON:  I want to, after we go through them, see what the problems are, talk to you about them.

THE COURT:  Okay.  How do you want to do that?

MR. ROCHON:  Well, I think one way to do it would be

F1CZSOK1                    Conference

see how far we get today, pick a jury tomorrow.  We can open tomorrow and then see if time, either after opening or before we begin Wednesday to go through --

THE COURT:  Who is your first witness.

MR. YALOWITZ:  First witness is my Meshulam Pearlman.  He's an eye witness to one of the explosions.

THE COURT:  All right.  So --

MR. YALOWITZ:  He's a sure --

THE COURT:  -- it's not like we're going to get to Kaufman or these exhibits tomorrow.

MR. YALOWITZ:  I expect Pearlman to be done in half an hour.  We'll have Kaufman ready to go tomorrow.

THE COURT:  Kaufman is your second witness?

MR. YALOWITZ:  Second witness.  So it's up to the Court if you, you know, want to --

MR. ROCHON:  We're not going to be jammed this way.  We're getting jammed here.  This is --

THE COURT:  Let me know what you want to address.  Look, I'm not going to debate this, guys.  I'm going to rule.  You let me know what you want to address and when you want to address it.

MR. ROCHON:  I'd like to address it before he testifies.

THE COURT:  Well, then you better get it to me before he testifies.

F1CZSOK1                      Conference

MR. ROCHON:  Right.  I'll do that.  And we're working on it, but I just, you know, we may need some leeway from the Court.

THE COURT:  You get some leeway, so just what's reasonable.

MR. ROCHON:  Thank you.

MR. YALOWITZ:  May I be heard on this before I move to the next topic?

THE COURT:  If you want, but I think it is resolved.  So I don't know why we need to debate this further.

MR. ROCHON:  I had one more point on it.  Mr. Kaufman I think is going to be testifying as a summary witness for the convictions, not as an expert I think.

THE COURT:  They didn't qualify him as an expert.

MR. ROCHON:  I don't know if they are either, but I'd like to know.

THE COURT:  If you got an expert report, you can probably anticpate he's going to be an expert.

MR. ROCHON:  I know, but previously they indicated he's coming as a summary witness because there was talk about a Daubert challenge.  We don't object to him coming -- he's going to talk about the convictions and he's going to read them, but that's not expert testimony.  He is just --

THE COURT:  It depends.  I don't know if the jury needs some expert testimony about how convictions are laid out

F1CZSOK1                    Conference

and, you know, what the difference is between what a conviction would like look in Israel and what a conviction looks like in -- I don't know.  They could use some somebody that's familiar with that process.

MR. ROCHON:  If he's going to describe the process, we want to make sure he's not opining on the quality of the process, that's what --

THE COURT:  I thought we went past that.

MR. ROCHON:  I did too.  That's why I was wondering whether he's really an expert or just someone who just says here's the convictions of these individuals.

THE COURT:  Well, to the extent that he's going to explain to the jury, which would be beyond their lay person's knowledge, what these documents are and what form they're in and how they get generated, I would assume he has to be some kind of an expert to do that.  I assume that when you accept somebody familiar with the process, you can do that.  So to the extent -- I assume he's going to be qualified as an expert.

MR. ROCHON:  Right.  He was one of the experts we had a challenge to on Daubert and the Court never actually, because of the exchange about how they were going to use them, I don't know that you actually formally even ruled on that challenge.

THE COURT:  Well, I don't see -- I don't think I've seen any basis -- if you say they're going to talk about the process of prosecution and conviction in a civilian and

F1CZSOK1                      Conference

military court, I'm not sure I saw anything on that issue that

made me believe that he is somehow unqualified to do so.

          MR. ROCHON:  It does depend what the plaintiffs are

going to do with him.  We don't have a good sense of that.

          THE COURT:  Assume that's all they're going to do with

him.

          MR. ROCHON:  He's talking about the process and

getting these convictions were obtained, it's one thing.

          THE COURT:  You say this is an indictment and this is

a --

          MR. ROCHON:  Right.

          THE COURT:  -- judgment and the way you get the

judgment is usually they either plead guilty or sometimes don't

admit they're guilty but they admit facts and sometimes the

Court decides on its own, you know, whether or not the person

is guilty and they're not jurors here.

          MR. ROCHON:  Right.  That sounds all fine, your Honor.

          MR. YALOWITZ:  Have you been in the prep sessions,

your Honor?

          THE COURT:  I mean, this isn't rocket science, guys.

You guys will have a jurors that say break this down for me and

that's --

          MR. ROCHON:  If it's that, where the rub is going to

hit the road and the issues are if they get into interrogation

because that's where we have to be very careful that we're not

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                           **JA-3636**

F1CZSOK1                    Conference

opening the door back up to that which the plaintiff said they don't want to do and we said we would not open the door.

THE COURT:  I'm not even sure that -- I don't remember anything that was coming in that was an interrogation -- well, I guess there were interrogations that said I, you know, I did this.

MR. ROCHON:  Right.  And the documents we have from the plaintiffs -- that's why we're going through them, so we'll see.  Probably this is something we're going to want to need sometime from the court and we've got a process put in place we can talk bit hopefully tomorrow.

THE COURT:  Well, I assume what has been redacted is a statement by non -- PA employee or a non official or agent of the PLO in which the person is the accusing a third person of committing a crime.

MR. ROCHON:  Not all of those were redacted in our preliminary scan of them.

THE COURT:  Okay.

MR. ROCHON:  That's what we've talked about.

THE COURT:  That's what I would -- if you want to move forward efficiently, I would prepare a second set of documents that redacts all of that.

MR. ROCHON:  We can share our concerns with plaintiffs.  They may not agree with us, but we can tell them what our first skim -- we looked at some of them this weekend.

F1CZSOK1                      Conference

We've not looked at all of them.  I have people doing that while we're here, so its not like it's waiting on me to get back to.

THE COURT:  I mean, to the extent the person is a PA employee and the person is in some or official or stabbed that they are agent on behalf of the PLO or the PA, that person's statement can be admitted.

MR. ROCHON:  Most of the plaintiffs have offered this on a declaration against penal interest theory as to the interrogations.  As to -- I don't think any finding yet by the Court, and I don't think there could be that any of these people were speaking as agents of the PLO and they're being interrogated or questioned, because by the time you get arrested and charged with a crime, the agency relationship, whatever it was, is no longer primary.  The primary relationship is you're facing criminal charges.

THE COURT:  Not primary doesn't mean it's distinguished.

MR. ROCHON:  I'm just saying I think the theory that these are coming in as agent's statement hasn't been made out nor was it a basis for your allowing it.

THE COURT:  No, so but that wasn't the nature -- I mean we -- the nature of my indicating that they needed redaction was redactions of those individuals who profess that they were committing the crime and they want to say that an

F1CZSOK1                    Conference

agent of the, or an employee of the PA or PLO also committed that crime.

MR. ROCHON:  Those should be redacted.

THE COURT:  Those should be redacted.

MR. ROCHON:  We don't think all of them were.  That's what we're going to talk to plaintiffs about.  There is some other portion that we'll disagree about.

MR. YALOWITZ:  So when Mr -- when the Court is done with Mr. Rochon, I want to address some of the things that the Court and he discussed.

THE COURT:  Okay, go ahead.

MR. YALOWITZ:  Okay, thank you.  First of all, this redaction project took us quite a substantial effort.  You'll see the redactions.  They're very heavy.  Enormous amounts are blacked out.  I had assumed that the defendants understood when we were beginning trial and when the Court's ruling was and that they were actually looking at documents themselves to anticipate what should be redacted.

THE COURT:  Well, I don't need to debate that further.  Let's just move on.

MR. YALOWITZ:  Thank you.

The second thing is I'm very concerned about Mr. Rochon trying to back door torture into this case by saying to the extent the convictions were --

THE COURT:  It's not coming in.

F1CZSOK1                    Conference

MR. YALOWITZ:  Good, okay.  And the third thing is we do think that these individuals were employees after their arrest.  They stayed on the payroll.  We didn't make the redactions on that basis, but, but we certainly agree with the Court's views on that, that relationship is not extinguished.  So we'll reserve on that, but we did not make the redactions on that basis.

THE COURT:  I'm not concerned about individuals who are individuals who were at the time that they committed the acts, that you establish were either employees or agents of the PLO during the relevant period of time.  It doesn't matter to me that whether or not there is an agency relationship that continues beyond that.  Because if the person said, if that person said while I was, and the evidence established that while I was a PA employee or an agent acting on behalf of the PA, I committed a crime and I committed the crime with the person who detonated the bomb or fired the gun, I don't have a problem with that.  I don't have a problem with that.

I have a problem with a person who was involved directly in the crime who wants to point the finger at the PA or the PLO or at PA employee or a PLO agent official or anyone associated with them.

MR. YALOWITZ:  Okay.

THE COURT:  All right.  That's the basic of this.  The redactions should be consistent with that.

F1CZSOK1                        Conference

MR. YALOWITZ:  I believe that's how we approached it and if the defendants have a problem, then they better get ahold of us pretty fast.

THE COURT:  All right, so.

MR. YALOWITZ:  Thank you, your Honor.

THE COURT:  Let's just finish up and then we'll take a break.  Let's finish up on these experts.

I think generally I have no problems with Levitt testifying, if he is qualified to do so, with regard to the what he says the relationship is between the AAMB and Fatah and the funding mechanisms.  If he is learned in this area he can state, you know, what he believes it to be and the basis for which he believes that to be.  And if the defense wants to counter that with their own expert to say he's wrong, they can do so.  Atacott --

MR. YALOWITZ:  We've withdrawn Atacott.

THE COURT:  Okay, good.  Because I had a problem with Atacott.  Marcus, Atacott, all right.  So --

MR. ROCHON:  Karsh.

THE COURT:  Karsh is also off.

Eviatar, I'm not -- it's unclear to me what he's going to say.  He's going to say in relationship to the PA and PLO involvement in terrorism, I'm not sure.

MR. YALOWITZ:  So in large part Eviatar covers the same ground as Levitt, and that's why we have Levitt as a may

Case 15-3135, Document 62, 11/10/2015, 1639387, Page68 of 326

F1CZSOK1                    Conference

call.  Eviatar is extremely knowledgable about structure of the PA's policies and procedures with regard to how they deal with terror.  He is a 20 year field agent.

THE COURT:  Well, tell me, give me an example what he's going to say.

MR. YALOWITZ:  He's going to say the PA has a law that provides for the payment of money to anybody who is arrested for a crime of terrorism.

THE COURT:  Okay.

MR. YALOWITZ:  So that's a policy that they have and that he's going to explain, going to show how the law, and explain who it works.  As a example of what he's going to do, he's going to say I've studied the PA and the PLO and Fatah for many years and they treat themselves interchangeably.

THE COURT:  And he's basing that on what?

MR. YALOWITZ:  He's basing that on evidence in the case, documents that have been --

THE COURT:  Give me an example.

MR. YALOWITZ:  There is a deposition testimony that Fatah doesn't have its own money, they rely completely --

THE COURT:  Talking about the money trail of how to fund.

MR. YALOWITZ:  Right, right.  So he's going to say here's some documents that are from the PA's intelligence files that show that they knew that these particular individuals were

F1CZSOK1                        Conference

terrorists, and then here's another document that shows the PA approving payments to those individuals; follow the money trail.

THE COURT:  All right spoke.

MR. YALOWITZ:  So those are the kinds of things he's going to do.  He's going to also going to talk about the PA's material support for the Al Aqsa Martyrs Brigades, which is in the form of money and weapons.

THE COURT:  He's going to base that on what?

MR. YALOWITZ:  Again on the documents that we've just been discussing, government reports, convictions, the PA's own intelligence files like that.  He's also going to talk about the PA support for Hamas, and in particular the support material support for the Hebrew University bombing, which was a Hamas attack, again using convictions, policies, procedures.

THE COURT:  What's going to be the nature of the evidence of the material financial support for the two Hamas for the Hebrew University bombing?

MR. YALOWITZ:  I don't think they provided financial support to Hamas.

THE COURT:  Okay.  That's what I thought you said.

MR. YALOWITZ:  No.  They provided some financial support to the bomber.  They gave the bomber some money, but they didn't give the --

THE COURT:  Okay, okay.  I just misunderstood what you

F1CZSOK1                        Conference

just said.

MR. YALOWITZ:  They didn't cut a check, you know, Hamas, pay to the order of Hamas.

THE COURT:  Well, I have a question mark next to that not so much because I think that the testimony in general is inadmissible, but I'm not quite sure whether everything you said he's going to testify to is admissible or all of the documents that you say he's going to rely upon are going to be before this jury.  But I don't -- I'm not going to preclude him as a witness, but I will hear specific objection with regard to where he goes with this.  I mean, obviously, you know, there is enough out there so he can, if he's qualified, he could talk about, you know, payments and the policy of payments.  And, you know, both sides can debate why payments were made and that sort of thing.  So I don't have any problems in general, but we'll see more specifically.  So I'm not going to preclude him as a witness.

MR. YALOWITZ:  Thank you, your Honor.

THE COURT:  All right.  Shrenzel, I don't -- give me the primary testimony that you expect.

MR. YALOWITZ:  Sure.  So Shrenzel's got two things. He does -- first of all he takes those policies that we were talking about and looks at how they were applied in the, in six of the seven attacks, so payments to people convicted of terrorism.

F1CZSOK1                    Conference

THE COURT:  Is this going to be, is his analysis going to be based on evidence that's already going to be before this jury?

MR. YALOWITZ:  Correct, correct.

THE COURT:  All right.  In the form of?

MR. YALOWITZ:  Payroll records, intelligence files. It's very granular, take the jury through who participated in the attack, which is established by the convictions, and how did the PA treat them before and after they were arrested and convicted.

THE COURT:  All right.  And is there something you anticipate that he's going to rely upon that is not going to be evidence in this case before this jury?

MR. YALOWITZ:  I mean, obviously, an expert has some things that they rely on, but I'm not --

THE COURT:  Depends on what he has to say.

MR. YALOWITZ:  Yeah.  I mean, I'm not -- I don't think that we're going to have a problem with, okay, we didn't get something in because it was hearsay and now he's going to, you know, transmit it to the jury.  We don't need to do that.

THE COURT:  And is he primarily going to analyze the evidence before the jury with regard to the incidents and their connection to the PA or PLO?

MR. YALOWITZ:  Correct, correct.

THE COURT:  All right.

F1CZSOK1                      Conference

MR. YALOWITZ:  There is a second thing that he brings, your Honor, which is these police magazines.  Again, it goes to the scope of employment.

THE COURT:  You want him to go through the police magazines, tell them what they are, that sort of thing, he has familiarity, that kind of thing.

MR. YALOWITZ:  Right.

THE COURT:  And is he going to opine that there is these police magazines and/or other public printed material is put out by the PA or the PLO?

MR. YALOWITZ:  Correct, which I, until this weekend, I didn't think there would be a factual dispute about that, but now --

THE COURT:  There may be.  But my attitude would be, I don't see in the abstract any reason to exclude him as a witness.  If there's something that appears that he's getting ready to testify to he's not qualified to testify to, or no basis for or legitimate professional analysis, then I'm willing to hear the objection, but in general, I'm not going to exclude him as a witness.

MR. YALOWITZ:  Understood.  Thank you, your Honor.

THE COURT:  All right, yes sir.

MR. SATIN:  Can I be heard, your Honor, with respect to Mr. Shrenzel that Mr. Yalowitz and the Court just discussed?

THE COURT:  YES.

F1CZSOK1                    Conference

MR. SATIN:  I'll start with Mr. Shrenzel.  And what Mr. Yalowitz said in response to the question, what's his primary testimony, I think Mr. Yalowitz said to show how those so-called policies are applied.

But really what he's doing is he's taking the evidence in the case, to the extent it gets admitted, and he is just opining, based on that the defendants are liable for these particular attacks.  In other words, he is just summarizing documents that are going to be in front of the jury, if they are, which as the Court has said many times, which we agree, this is not rocket science.

THE COURT:  But have a witness come and summarizing evidence from the jury, he could make a chart, he can, you know, plenty of time witnesses are summary witness.

MR. SATIN:  That's fine.  And what I'm talking about now is whether or not this witness is going to be cloaked as an expert witness.  If they want him as a summary witness, then that's a separate conversation for us to have.  Certainly the evidence has to be admissible -- which some of these things that I think he's going to be talking about are not admissible, and he still has to have the basis for knowledge about those particular exhibits to give that summary testimony, which I don't know that he has.  These aren't documents that he has personally reviewed.  They were just given to him and he says this is what they said.  But at least -- but here's the danger

F1CZSOK1                        Conference

with Mr. Shrenzel.  His report is not -- it's a summary of documents, but on top of that it's his conclusion that the defendants are liable.  And that's why we're concerned about his testimony that they are, the plaintiffs are seeking to invade the province of the jury by having this person who is going to be, according to them, cloaked as an expert based on his intelligence and experience say I've looked at the documents in this case and I conclude that the defendants are liable, and that should not happen in this case.

THE COURT:  Well --

MR. SATIN:  Especially when the evidence at issue is not so complicated that they can't make their mind up on their own.

THE COURT:  I am less concerned about that, and I'll look at his report more thoroughly.  I'm less concerned about that because the reality is is that, you know, if his analysis and conclusions are based primarily and not exclusively on the evidence that's before this jury, that you have a full opportunity to argue he's a quack, doesn't know what he's talking about, and you have an expert to say just the opposite, and you have dueling experts.  Or even -- and I clearly intend to give the jury an instruction that it is not -- they need not accept the expert's opinion; that they have to make the final decisions and ultimate determinations in this case, and consider the opinions of experts and give it whatever weight

F1CZSOK1                      Conference

they deem is appropriate.

So I have less of a fear that somehow, one, that simply because he's going to opine upon the ultimate issue that that necessarily makes it automatically inadmissible and, two, whether or not that it will invade the jurors' province, which I'm sure you want to emphasize to the jury that it is their province. And I instruct them as to it's their province. And the bottom line is that regardless of what he says or your expert say they have to make that determination and decide whether or not it is a logical reasonable conclusion to draw consistent with the experts, or whether or not the evidence supports a different conclusion. So I'm not particularly persuaded that that, in and of itself, should preclude his opinions in this case.

MR. SATIN: Well, a couple things. First of all, I do want to say that there has been some discussion of the police magazines witness second opinion he's going to talk about. I'm not going to address that now, but I do want the Court to be aware that for two independent reasons that we discussed later number one the language in those magazines does not fit within the parameters of what is proper to be for a jury and, second, that those magazines are not in fact statements of a PA or PLO. So certainly he should not be allowed to testify about those things, if and when it is shown, and we believe we're already shown in our letter, but we can argue to the Court about it,

F1CZSOK1                    Conference

that they don't come in independently.

THE COURT:  Who do you contend generates these documents other than the PA or PLO?

MR. SATIN:  I'll defer to my colleague to address the issue if the Court would like to hear about it now.

THE COURT:  I just want to know the answer to that question, who outside the PA and PLO generates these?

MR. HILL:  There are a number of people in Palestine, as your Honor, would suspect, that have opinions, and only one of the magazines in issue is actually produced by the PA or PLO.  The others were not.

THE COURT:  All right.  Well, I don't know, to the extent that they say they have evidence that it is produced by the PLO.  Obviously if they have such evidence, they're allowed to offer it and you're allowed to offer evidence that contradicts that.  But if there is no legitimate evidence by a witness that could lead a reasonable jury to conclude that the PLO the PA or an arm or agent of the PLO or PA generates this information, then it cannot come in.

MR. YALOWITZ:  Your Honor, I don't think Mr. Hill answered the Court's question, which was who does produce these.

THE COURT:  You contend that there is someone else other than the PA?

MR. HILL:  Yes.  The plaintiff's burden, as you said,

F1CZSOK1                    Conference

to lay the foundation for them to come in as our statements. They're not going to able to do that.

THE COURT:  Do you contend there is someone else other than the PA who --

MR. HILL:  Publishes magazines in Palestine?  Yes, your Honor.

THE COURT:  Who do you contend that to be?

MR. HILL:  Well, the people that reported, produced the magazines, got their own name and their own banner, some group in Gaza that published one of them, and another one purports to be some other independent organization.

THE COURT:  Okay.  Well, you know, as they I say to the extent, I don't know what the evidence is that they wish to offer that it is a PLO or PA generated document.  If they offer legitimate evidence that it is a PA or PLO generated document, then it is an issue for the jury to resolve.  So we'll see where we go with that.

Let me take a short break, let me give the Court Reporter a break.  We'll take a ten minute break.

MR. YALOWITZ:  Thank you, your Honor.

(Recess)

(Continued on next page)

**JA-3651**

F1cdsok2

THE COURT:  Once again, it is up to the defense whether they want you to go through that process.

MR. YALOWITZ:  I understand.

THE COURT:  If it is not necessary, if that is the case, if you could establish that --

MR. YALOWITZ:  We will.

THE COURT:  -- find out whether they have an objection.

I didn't have a real problem with 337, but I wasn't exactly sure what it was and where it came from.

Mr. Yalowitz, can you sort of identify that?  It seems to be some sort of recitation.

MR. YALOWITZ:  Bear with me, your Honor.  I just want to consult on this.

(Pause)

You know, we are not going to use 337 based on the summary judgment.  Sorry about that, your Honor.

THE COURT:  That is all right.  So we could pass that.

Now, which takes me to 339 and similar documents. Although this purports to be something from the Israel Ministry of Foreign Affairs, and there are similar documents, I'm not quite sure what it is you contend these are and I'm not sure that I could make a finding that these are somehow some government reports that are based on some government investigation.  It just seems to be a summary recitation of

F1cdsok2

someone's position, opinion or known fact, which I can't tell

which, that the information that is stated here is somehow

true.  I'm not quite sure what this is supposed to read.

MR. YALOWITZ:  I just need one second, your Honor.

THE COURT:  Sure.

MR. YALOWITZ:  I am going to be able to find this.

THE COURT:  I have problems with all of those

documents that you retrieved from both the Israel Ministry of

Foreign Affairs and the Prime Minister's department.  It is

just making statements about events and there is no basis for

why these statements are being made.

MR. YALOWITZ:  Sure.  So with regard to the -- let me

start with the one about Zinni list, which is 354, your Honor.

THE COURT:  354?

MR. YALOWITZ:  Yes.

So this is a statement by the government of Israel

about the activities of the government of Israel.  So it is a

public report.

THE COURT:  OK.

MR. YALOWITZ:  I have somebody who can look at it and

say, you know, I've checked and it is what it purports to be.

And so this document says, "In December 2001, Israel presented

U.S. peace envoy Anthony Zinni with a list of 33 most wanted

terrorists, requesting their arrest by the Palestinian

authority."  That's a statement by the government of Israel

F1cdsok2

about the government of Israel's activities.

THE COURT:  All right.  So they gave this report to Zinni?

MR. YALOWITZ:  Yes.

THE COURT:  You have to give me more detail about Zinni.  You want to show that they were put on this list, and then there is going to be some testimony that was given to Yasser Arafat?

MR. YALOWITZ:  Yes.  So there is video of Yasser Arafat being asked about the Zinni list.  And then he says, yeah, I got it and I arrested some of the guys and other guys I didn't arrest and maybe I will, or whatever he says.  He extemporizes about it, but he admits he got it on video.  There is not going to be -- I don't know what they are going to do.  It looks like Yasser Arafat.  Maybe he says Yasser Arafat is like those Elvis lookalikes.  Maybe it was an actor pretending to be Yasser.  I don't know.

Then this next sentence, "The list was given by Zinni to the Palestinians."  That doesn't come in, I guess, if we are going to be rigid about it because that's about what Zinni did.

THE COURT:  But if you say you have an independent statement on videotape by Yasser Arafat saying that he received the list --

MR. YALOWITZ:  He did.  I do.

THE COURT:  I'm so sure why we are arguing about

F1cdsok2

whether or not that is a legitimate video or whether or not he in fact -- or they can even debate about whether or not he really did have the list or didn't have the list.  But I don't see that that goes to admissibility if that is the only purpose of this one document.

MR. YALOWITZ:  Then the final sentence, the final statement that I am interested in is:  "Five of these most wanted terrorists have been arrested by Israel during operation Defensive Shield."  Then it lists the names.

THE COURT:  OK.

MR. YALOWITZ:  And what do you know?  Two of the names are guys who between the time that they gave the list and between the time that Israel finally arrested them perpetrated attacks in our cases.

THE COURT:  OK.

MR. YALOWITZ:  So that's why I want that document, and it is a statement by Israel about Israel's activities.

THE COURT:  Yes.

MS. FERGUSON:  Your Honor, first, this document is being offered apparently for the truth of the matter that the PA somehow had notice that these particular people were on the Zinni list, and there is no evidence of what names were on the Zinni list.

THE COURT:  Well, he says he has a video of Yasser Arafat saying he got the Zinni list.  Are you disputing that

F1cdsok2

there is evidence that Yasser Arafat admitted he had the Zinni list?

MS. FERGUSON:  There is no further discussion of whose names are on the list.

THE COURT:  That is a different question.  The question is whether is there any genuine dispute that there is evidence that Yasser Arafat admitted that he received something referred to as the Zinni list?  I just wanted to know --

MR. HILL:  My recollection is they said he received a list from General Zinni.  The issue is who is on the list.  And there is no evidence of the content of the list apart from this hearsay document, and it's being offered to prove the content of the list.  That's the basis for the hearsay objection.

THE COURT:  But I don't understand what you contend he got, if this providing you with the Zinni list, what you contend he got other than this list.

MR. HILL:  He said he got a list from General Zinni. There is no evidence of who was on the list that was given --

THE COURT:  Isn't there a reasonable inference for a reasonable jury to conclude that he got -- if they say this is what the Zinni list is, that one can infer that he got this list?

MR. HILL:  Well, setting aside the relevance issue, I understand the relevance of it.  This is hearsay.  This is being offered to prove the content of the list, which will not

F1cdsok2

come into evidence.  This is being offered to prove that in fact the list contained these names.  It is offered for the truth of the matter asserted as to the content of the list.  That is why it is hearsay.

THE COURT:  And you --

MR. HILL:  It is not based on an Israeli government investigation or anything.

THE COURT:  No.  I'm going to overrule that objection.  I think that if they have evidence that Yasser Arafat said he got the Zinni list, I think it is appropriate for the jury to know who the Israel Ministry of Foreign Affairs says was on that list and whether or not there is some reasonable logical conclusion to reach that Yasser Arafat got something different than this.  It is up to the jury.

The question isn't whether or not -- I'm not even sure it qualifies as hearsay.  The question is not whether or not what's on this report -- activities on this report in fact happened.  The question is simply whether or not these were the names that were listed on the list that he got.

Now, do you have some reasonable argument to argue to the jury that he got some other list with a different set of names, then I think the jury is entitled to hear that.

MS. FERGUSON:  Your Honor, in addition, it is multiple levels of hearsay.  It is the Ministry of Foreign Affairs communicating what they heard from Israeli security forces

F1cdsok2

about this list that no one ever --

THE COURT:  I know.  But it takes it out of the realm of hearsay, at least those layers of hearsay by Yasser Arafat admitting that he got a Zinni list.  I mean, that is like saying that --

MS. FERGUSON:  It is still an out-of-court statement being offered for the truth.  It doesn't matter that --

THE COURT:  The truth of what.

MS. FERGUSON:  Well, apparently, it is being offered for the truth that there was a Zinni list that had 33 names that included --

THE COURT:  Well, we know there was a Zinni list because you admit there was a Zinni list.

MS. FERGUSON:  But I don't know anything about the content of the Zinni list.

THE COURT:  No, I disagree with that.  I think it is your burden.  If you contend that there was something different on the Zinni list, then you should be able to say so.  They say that this reflects, consistent with what -- if Yasser Arafat had to say that he got the Zinni list, I might have excluded it.  But if they have evidence of Yasser Arafat saying he got the Zinni list, I think you have the burden of convincing the jury there is some other Zinni list other than this one, if that is your legitimate position, and I don't know that is your legitimate position.

F1cdsok2

So, no, I don't think that this is hearsay simply because they list a list of names.  The only question is were these names on the Zinni list or weren't they on the Zinni list.  They say this is the Zinni list.  And Yasser Arafat said I got the Zinni list.  So it is logical, common sense.  If you have some other evidence that disputes that, I would -- I think it should go to the jury.

But I agree with them.  Initially, I didn't know exactly how it was connected.  But if they are going to connect this through an admission by Yasser Arafat that there is such a thing as the Zinni list -- and I doubt it -- I think it is admissible to say, OK, the Minister of Foreign Affairs said that they gave a Zinni list to the PA and this is the list that they gave them.  It doesn't give a recitation of a whole bunch of events.  It just says that these people are wanted.  I don't think that that is --

MS. FERGUSON:  Your Honor, can we go back to 339?

THE COURT:  Yes.

MR. YALOWITZ:  Actually --

THE COURT:  339, 350, 354, I still have some problems with those documents, or issues.

MR. YALOWITZ:  All right.  So 339 and 954, which -- is it 954?

THE COURT:  954?

MR. YALOWITZ:  Yes.  So 339 and 954, 954 is sort of a

F1cdsok2

PowerPoint presentation that goes with 339.

THE COURT:  OK.  Because it says "DVD."  I just don't know what the content of the DVD is.

MR. YALOWITZ:  I will explain it.

So those two documents are announcements of the seizure of funds from various individuals implicated in terrorism.

THE COURT:  OK.

MR. YALOWITZ:  So one of those individuals is Naef Abu Sharkh.

THE COURT:  Unfortunately, I don't see that name on 339.  Is that on 339?

MR. YALOWITZ:  He is on the second-to-last page, your Honor.

THE COURT:  The second-to-last page?

MR. YALOWITZ:  Yes.  Personal bank accounts from which fund were confiscated during --

THE COURT:  Tell me where.  I don't see the name.

MR. YALOWITZ:  So I am on page 4 of 5 of the --

THE COURT:  Page 4.

MR. YALOWITZ:  -- of the ECF.

THE COURT:  Yes.

MR. YALOWITZ:  Then it says, "Personal bank accounts from which funds were confiscated during the operation" in bold type, kind of a third of the way down the page.

F1cdsok2

THE COURT:  "Types of bank accounts from which funds were confiscated."

MR. YALOWITZ:  Maybe we are looking at different things.

THE COURT:  I have 339 it is from.

MR. YALOWITZ:  Yes, 339.  Should we test out the Elmo? I can put it up on the Elmo here.

THE COURT:  You can try.  My document is titled, "Operation for the Confiscation of Terror Funds background."

MR. YALOWITZ:  Correct.

THE COURT:  The first name that is bolded is Ahmed Sa'ari Hussein.

MR. YALOWITZ:  Right.  So now we flip -- I am just going to flip one, two, three more pages.

THE COURT:  OK.

MR. YALOWITZ:  And we've got a bold item that says "Personal bank accounts from which funds were confiscated during the operation."

THE COURT:  Yes.  I see that.  OK.

MR. YALOWITZ:  And then one of the guys is this Naef Abu Sharkh.

THE COURT:  OK.

MR. YALOWITZ:  And he is implicated by this document in the June 19, 2002 suicide bombing.

THE COURT:  Which is?

F1cdsok2

MR. YALOWITZ:  Which is one of the attacks in our case.

THE COURT:  June 19th -- which attack?

MR. YALOWITZ:  Mandelkorn.

THE COURT:  Mandelkorn, right.

So you want this document to prove what?

MR. YALOWITZ:  To prove that this individual, who other evidence indicates was a terror-financing individual associated with Al-Aqsa Martyrs Brigades was implicated in this attack.

THE COURT:  You don't have any other evidence that this person was involved in this attack?

MR. YALOWITZ:  He was liquidated.  So this is the -- he was liquidated after this but this is what we have --

THE COURT:  He's not a PA or PLO employee?

MR. YALOWITZ:  He was a PA or PLO employee, and they shifted him from the security forces to some other mysterious detail.  But --

THE COURT:  So what is the evidence that this is based on that he was involved in this attack?

MR. YALOWITZ:  We don't have the underlying evidence.

THE COURT:  All right.  That's what I am assuming.

MR. YALOWITZ:  I understand that.

THE COURT:  Who says this and why is the question that I have to ask?

F1cdsok2

MR. YALOWITZ:  Look, the only thing I have on this document and I would like this document in --

THE COURT:  I understand.

MR. YALOWITZ:  Of course.  What I have is it's like an OFAC press release.  So OFAC says, you know, we seized a bank account of a guy who was financing terror, and if he disagrees he can show up and appeal.  And it says that in the press release in the PowerPoint.  They only have a right of appeal.  This was conducted by the Attorney General and the IDF and the security --

THE COURT:  You don't have any of that?

MR. YALOWITZ:  I'm sorry.

THE COURT:  You don't have any of that?

MR. YALOWITZ:  No.  No.  We do.  It is in 954, it says that.

THE COURT:  954 is what?  You have to give me the context of 954.

MR. YALOWITZ:  OK.  So 954 is a more detailed presentation that was given together with 339 --

THE COURT:  So, again, do you have a witness who can tell me where it comes from and what it is supposed to be?

MR. YALOWITZ:  Yes.

THE COURT:  Where does it come from and what is it supposed to be?

MR. YALOWITZ:  It is a presentation given to the press

F1cdsok2

about the results of this investigation and seizure.

THE COURT:  And given by whom?

MR. YALOWITZ:  Given by the Ministry of Foreign Affairs.

THE COURT:  It is like a press conference?

MR. YALOWITZ:  Like a press release.

THE COURT:  A press release?

MR. YALOWITZ:  Right.  Like if, you know, Eric Holder made an announcement, we seized the bank account of this guy who is a terrorist.

THE COURT:  Let me say, this is a DVD.  I'm not sure, is it a video --

MR. YALOWITZ:  No.

THE COURT:  -- or is just a document?

MR. YALOWITZ:  It's a PowerPoint presentation.  And it is just -- the formating is kind of weird, and I'm sure we can get it printed out and we can look at it.

THE COURT:  And you want it to show that they basically seized his funds as being involved in this attack?

MR. YALOWITZ:  Correct.

THE COURT:  OK.

MR. YALOWITZ:  It links -- this guy, who is a known Al-Aqsa Martyrs Brigades financier to our attack.

THE COURT:  So what is the evidence that links him to this attack?

F1cdsok2

MR. YALOWITZ:  This is my evidence.

THE COURT:  What is the evidence that they rely upon that links him to the attack?

MR. YALOWITZ:  It is not disclosed.  They did not disclose this.

THE COURT:  So you don't know why they say he is involved?

MR. YALOWITZ:  Correct.  Just as sometimes we don't know why OFAC seized -- they may have had their own reasons for not disclosing the evidence.  This is the evidence I have.  I don't have --

THE COURT:  You don't have evidence that he is involved in this attack?

MR. YALOWITZ:  That I --

THE COURT:  And he is your key link to the PA and the PLO at this point?

MS. FERGUSON:  Your Honor, if I could just --

MR. YALOWITZ:  He is -- he was the only link to the PA and the PLO.  Your Honor ruled on summary judgment that that's not enough to do vicarious liability.

THE COURT:  Right.

MR. YALOWITZ:  I still want the document in because he is a known Al-Aqsa guy and it is Al-Aqsa attack, and it will help the jury understand the connection between Al-Aqsa and financing of terror and this case.

F1cdsok2

THE COURT:  How are they going to understand that if they have no idea why he is being accused?

MR. YALOWITZ:  Because our expert will explain what the operation was, what operations like this are, what the results were, the fact that he has an opportunity to come in and show up on appeal and say no, no, you've got the wrong guy --

THE COURT:  But that doesn't tell me what he did and who says he did it.

MR. YALOWITZ:  I can't dispute that, your Honor.

THE COURT:  All right.  And you say this and 9 --

MR. YALOWITZ:  954.

THE COURT:  -- 954 go together?

MR. YALOWITZ:  Correct.

THE COURT:  Did you want to respond to that?

MS. FERGUSON:  Your Honor, this is nothing like an OFAC document.  It comes from the Israeli Ministry of Foreign Affairs, and it is just making an accusation.  So going to Eric Holder's example, you wouldn't allow Eric Holder to announce in a press release about someone being arrested coming in for the truth of the matter that the person actually carried out the crime.  And as Mr. Yalowitz noted, this is the very document that you considered in deciding that the plaintiffs had no admissible evidence that Naef Abu Sharkh was involved in the Mandelkorn bombing incident.  It is just the Israeli Ministry

**JA-3666**

F1cdsok2

of Foreign Affairs relaying information communicated by the government press office about some operation that they made an accusation about something.  We don't know the basis.  This isn't some official finding of some investigation.

And the related PowerPoint, I can't tell who it is from, and it has no attribution that it was prepared by any particular government official.

THE COURT:  Does give any details of what this person's role was supposed to be?

MS. FERGUSON:  It gives no detail about who prepared --

THE COURT:  No.  I mean, any detail about what Sharkh's role was in the bombing?

MS. FERGUSON:  No.  It just says that -- it calls him a senior fugitive of the Tanzim infrastructure in Nablus who was behind a large number of suicide bombings, and then it lists this one.  But, again, there is no independent evidence Mr. Yalowitz has of involvement with Naef Abu Sharkh in the Mandelkorn incident.  That is why the respondeat superior claim has been dismissed from the Mandelkorn case.  So he is now trying to reargue that whole ruling.

THE COURT:  Mr. Yalowitz, do you know what he is alleged to have done?

MR. YALOWITZ:  I will say that I have custodial statements from co-conspirators saying I got money from Naef

F1cdsok2

Abu Sharkh to perpetrate terror activities, to recruit terrorists.  So we have a pretty good idea that he was a funder of terror.  But, you know, you have to kind of put some pieces together.  It is not -- I don't have a conviction.  I don't have a -- I mean, he is not a recruiter.  He doesn't film video wills of terrorists.  He is a money guy.  And they seized his bank accounts.

THE COURT:  And he was supposed to have given money to a terrorist who admitted the Mandelkorn incident?

MR. YALOWITZ:  That is a gap in my proof.

THE COURT:  OK.

MS. FERGUSON:  And the custodian statement Mr. Yalowitz is referring to would have to be redacted to remove Naef Abu Sharkh's name because it is only --

THE COURT:  I understand.

MS. FERGUSON:  There is no other evidence.

THE COURT:  All right.  I'm not convinced that this can go in for that purpose.

MR. YALOWITZ:  All right.  We will respect the Court's ruling on that and move on.

THE COURT:  Is there anything you want to say more about -- because I have similar problems with these just releases from the office.  You have the Prime Minister's office releasing statements about the PA.

MR. YALOWITZ:  If I can just walk through a few with

F1cdsok2

your Honor?

THE COURT:  353 is the next one I have.  I had a problem with 353.  As I said, I'll give you -- I'm sorry.  Yes, I'll give you 354, but I have a problem with the two before that, 339 and 353, for those reasons.

MR. YALOWITZ:  You've got to bear with me, your Honor, because I kind of put them out of order.

THE COURT:  Basically, it's all of the other documents that give factual recitations that I don't know if there is any underlying proof of or whether or not there is any other independent proof of --

MR. YALOWITZ:  OK.  353 I don't care about.

THE COURT:  All right.  Let's go past that.

MR. YALOWITZ:  Yes.

THE COURT:  Then I gave you 354.

MR. YALOWITZ:  OK.

THE COURT:  What about 365?  I mean, I'm not quite sure --

MR. YALOWITZ:  So 365 is a -- it's a recitation by the Israel Ministry of Foreign Affairs of what Israel did when it entered the City of Ramallah and what it seized, which was arms and weapons and individuals, including some of the individuals -- at least one of the individuals who perpetrated an attack in our case.  So like --

THE COURT:  Where is the fact that you want?

F1cdsok2

MR. YALOWITZ:  So the first fact that I want is starting on the morning of March 29, IDF Central Command forces entered the City of Ramallah, and then here's what they found. Large stores of weapons and arms were discovered during the sweep of the Mukataa compound and other locations in Ramallah as follows.  And they list all these weapons.

THE COURT:  OK.  And who are you trying to tie these weapons to?

MR. YALOWITZ:  To the PA.

THE COURT:  OK.  How do you tie it to anybody who committed any one of these --

MR. YALOWITZ:  This goes to PA policy of having illegal weapons and then we tie that, for example, to the conviction of Fuad Shubaki, who was the senior PA finance -- Arafat's senior finance associate who admitted and who was convicted of buying weapons for use in terror operations.

THE COURT:  OK.  So what terrorist attack are you tying this to?

MR. YALOWITZ:  I don't have a particular attack that any of these weapons were used in because they were seized.

THE COURT:  OK.

MR. YALOWITZ:  This goes more to policy of what are they doing collecting all of these weapons.

THE COURT:  Frankly, I don't think it is going to be a surprise to anybody on this jury that the PA accumulates

F1cdsok2

weapons.

MR. YALOWITZ:  Well, that's --

THE COURT:  Or the PLO accumulates weapons.

MR. YALOWITZ:  I think that's right but I've got to show them something.

THE COURT:  No.  You've got to show them a connection with the plaintiff's causation.

MR. YALOWITZ:  This is for policy.  This is not connected to any --

THE COURT:  A policy of accumulating weapons?

MR. YALOWITZ:  Correct.  Accumulating weapons that are inconsistent with the -- the defendants' thesis is that they're trying to tamp down violence.  OK?  The IDF goes in and seizes a whole bunch of weapons that are used for violence against civilians.  That's a tipoff that maybe they are not really trying to tamp down --

THE COURT:  The only thing you just said that I don't see any proof of is that any of these weapons that were seized why used against civilians.

MR. YALOWITZ:  I'm sorry, that they were used?  No, they weren't.  They were seized.

THE COURT:  So they weren't used against civilians.

MR. YALOWITZ:  I agree with that.

THE COURT:  So there is not any evidence that -- it is just as consistent with the next time they decided that they

F1cdsok2

are going to have a war, or as opposed to the next time that, you know, they are going to have a terrorist attack, I don't see it specifically advancing your argument that they were connected to these terrorist attacks, or that because they have weapons it makes it more likely than not that they were involved in either participating in these terrorist attacks or encouraging these particular terrorist attacks, or terrorist attacks at all.

MR. YALOWITZ:  So I don't want to argue that.  I don't want to debate that issue with you.  I do think that having a bunch of weapons laying around in places they shouldn't be is inconsistent with the policy of discouraging violence.  So, for example, we have --

THE COURT:  There are a lot of people who would discourage violence but feel that they have a right to arm themselves and protect themselves if necessary.

MR. YALOWITZ:  I think it definitely depends on the particularized facts and circumstances.  And, your Honor, I don't want to fight all that hard on this document.

THE COURT:  I just want to understand it.  You know, again, I still -- you know, I have the same problems with just general releases about what the Ministry of Finance for Foreign Affairs wants to tell the rest of the world about what they did and why they did it in cryptic, unspecific language, and we are supposed to infer from that, you know, that this must mean

F1cdsok2

that, you know, they are seizing weapons that were used in terrorist attacks or weapons that were used in these particular terrorist attacks, because that is not the reasonable inference.  So I have a problem with that.  I think I am going to stick with my ruling.

MR. YALOWITZ:  I am fine with that.  I just want to be very clear that this document is a very generalized document about weapons that actually weren't used in any terrorism.

THE COURT:  I understand.

MR. YALOWITZ:  So I have no problem with the Court's ruling based on that understanding.

THE COURT:  As I say, if some of the other documents that you say were seized I find that they have relevance and they are admissible if you can establish, you know, as I say, where it came from, what it purports to be, and the jury can determine whether or not in fact this is a statement by the defendant.

MR. YALOWITZ:  So the Court is sustaining the objection on 365?

THE COURT:  Yes.

MR. YALOWITZ:  OK.

THE COURT:  I have also -- I mean, my position would be the same, unless you have a different argument to make, on 539.

MR. YALOWITZ:  So 539 is an important one.  It

F1cdsok2

actually does have seized documents that we rely on.  And you can see them, your Honor.  Like, if you go to, just to give you an example -- a lot of these -- like, if you go to page 5 -- no, that is not a good example.  But if you go to page 9, here's a good example.  You can see that -- are you with me, your Honor?

THE COURT:  Yes.  Document number 2.

MR. YALOWITZ:  Right.  So document number 2 is a list of guys that we can show were engaged in terror and in which we can show that the defendants knew were engaged in terror.

THE COURT:  Are these documents in the other document that you had translated and seized?  You have a bunch of documents specifically you say which have you seized.

MR. YALOWITZ:  This is one of seized documents.

THE COURT:  Is it in one of the other exhibits?

MR. YALOWITZ:  I don't think so, your Honor.  I think this is my source for document number 2.

THE COURT:  And what do you say that it purports to say?

MR. YALOWITZ:  It shows -- it is a request from Marwan Barghouti to Yasser Arafat asking that these individuals be paid.

THE COURT:  OK.

MR. YALOWITZ:  And then our expert will confirm that this sort of text that is kind of angled off to the side in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
**JA-3674**

F1cdsok2

Arabic, that's Yasser Arafat's approval and Yasser Arafat's signature.

THE COURT:  Do you claim that any of these individuals were related to any of these, or you just in general want to show their support of terrorism?

MR. YALOWITZ:  Pattern of paying Al-Aqsa Martyrs Brigades members before they were designated to show that it continued after the designation.

THE COURT:  OK.  I mean, in the abstract, I thought -- the evidence itself I don't have a big problem with because I thought that there was going to be other evidence, if not plenty of evidence, that you intend to offer that financial support was given to the --

MR. YALOWITZ:  This is a really impactful example and there is other evidence, but, you know, we don't have, like, wire transfer instructions or checks saying pay to the order of the Al-Aqsa Martyrs Brigades.  You have to piece it together.

THE COURT:  Where do you say this document comes from?

MR. YALOWITZ:  This document was seized by the government of Israel in that operation Defensive Shield.

THE COURT:  Where do you say this exhibit comes from?

MR. YALOWITZ:  This exhibit is from the Ministry of Foreign Affairs.

THE COURT:  Well, I mean, how do you -- and how did you retrieve it?

F1cdsok2

MR. YALOWITZ:  The Israel Ministry --

THE COURT:  No.  How did you get it is what I want to ask you?

MR. YALOWITZ:  We got it from the Israel Ministry of Foreign Affairs' website.

THE COURT:  The website?

MR. YALOWITZ:  Yes.

THE COURT:  So this came off the Foreign Affairs' website.  And is there anything else other than a general discussion of the PLO and Arafat being involved in terrorism, is there anything else specifically in this report that you say is relevant other than this one document that is referenced on page --

MR. YALOWITZ:  That was an example.  It is just an example I happened to flip through --

THE COURT:  Do you have something else?

MR. YALOWITZ:  No.  For example, I will give you another example of a statement that I find very useful.  Based on the granular analysis of these documents, they've reached some summary conclusions.  For example, item number 2 on the very front page:  "The closest aides to Arafat responsible for terrorist activity are Head of General Intelligence Tawfiz Tirawi and financier Fuad Shubaki."  And Fuad Shubaki later was convicted of financing terror.

THE COURT:  OK.

F1cdsok2

MR. YALOWITZ:  And Tawfiq Tirawi is implicated as having had a role in the Wafa Idris attack.  He is the one that that letter is about.  He is implicated as having had --

THE COURT:  Which letter?

MR. YALOWITZ:  The letter -- 233, the letter saying Tirawi knew about it --

THE COURT:  Why do you need this report?

MR. YALOWITZ:  I like having it in the English language so the jury can see that I'm not the only one saying it.

THE COURT:  OK.  And so you say this is what?  What does this purport to be?

MR. YALOWITZ:  It is a report describing the results of a legally authorized factual investigation conducted by the government of Israel.

THE COURT:  OK.

MR. YALOWITZ:  And it states facts found in those and conclusions drawn from those facts.  You know, what some people call like meta facts or bigger facts.

MS. FERGUSON:  Your Honor, if I can just address Mr. Yalowitz's contention?

THE COURT:  Yes.

MS. FERGUSON:  The report is a Ministry of Foreign Affairs' website relaying a report prepared by somebody named Danny Neva (phonetic), who is a minister of parliamentary

F1cdsok2

affairs.  I don't know what his expertise is, whether he was legally authorized to conduct an investigation, how he conducted his investigation, how he came to these conclusions, and yet Mr. Yalowitz wants to put before the jury Danny Neva's conclusions.

THE COURT:  Well, I certainly read that these conclusions made the reference adopted.

MS. FERGUSON:  Can I ask you to turn to page 2, where right before Danny Neva's name it says, "All allegations made in this report" -- and then it says "allegations" -- not binding, "all allegations" -- this is the full material right under paragraph 35.  "All allegations" -- not binding -- "made in this report are true Israeli intelligence as a result of the Israel campaign to eradicate the sources of terror in the areas under the control of the Palestinian Authority."

So this is a political speech coming from the Ministry of Foreign Affairs, some report by somebody we have no idea what he basis it on, what his expertise was, and Mr. Yalowitz wants to offer it for these findings on the front page.  This is patent hearsay.  In addition, he wants to rely on this particular document -- in fact, I think he did pick the one that he thinks is his best one, and it doesn't say very much. It says at best that $350 was given to some individuals who had no connection with this attack.  That is his best document. This is Mr. Yalowitz's material support case.  He doesn't have

F1cdsok2

the documents.  He has Danny Neva's photocopies and summaries.
And he wants to have the PA found liable for terrorism based on
this?  This is his material support case he is looking at right
here.

THE COURT:  You know, Mr. Yalowitz, my position is
this, that if you -- I have confidence with regard to the
reliability and admissibility, at least for admissibility
purposes, of these other documents that the Israeli government
represented as being seized and they show the document and they
translate the document.  That gives me some degree of comfort
about its trustworthiness and its reliability to overcome the
objections that have been made by the defendant.  But this is a
different kind of a document.  And my position would be,
consistent with at least that theory -- and we can come back
and revisit it -- consistent with that approach, I don't think
that this document has a sufficient basis on which the
conclusions are being drawn that will give either me or the
jury reason to believe that somehow this is, you know, based on
some direct evidence, as you've referenced in these others.

Is there some reason why you have these other
documents and not this document?

MR. YALOWITZ:  I'm sorry.  I just didn't understand
The court's question.  I want to answer the Court's question.

THE COURT:  Yes.  I mean, for example, you give -- as
an example, you say that the document that was seized has

F1cdsok2

Arafat's signature on it approving payment to certain individuals. You have a lot of those documents, and you have a lot of translations of those documents at the end.

MR. YALOWITZ: Right.

THE COURT: Is there some reason why that document is not available to you?

MR. YALOWITZ: This is my source for that document.

THE COURT: Yes.

MR. YALOWITZ: So --

THE COURT: You have more direct sources for some of these other documents. You have given me the document and the English translation of the document.

MR. YALOWITZ: In some cases I have the document. In other cases I have a reproduction of a document in a government report. As long as I can use -- as I understand the Court's ruling, you don't want me to put in front of the jury the kind of ultimate analysis that the report is making, and I think I can -- I don't have a problem with that. If I can use the raw material that's embedded in the report, I think that's enough for me.

MS. FERGUSON: Your Honor, I don't know how this raw material got embedded in Danny Neva's, the Ministry of Finance, report. I think this is very different from something that more directly purports to reproduce the document.

MR. YALOWITZ: I have no problem, your Honor, giving

F1cdsok2

adequate foundation for that and making the link.  That is not going to be an issue.  I just want to use the documents.

MS. FERGUSON:  Mr. Yalowitz doesn't disclose a witness who will lay a foundation for these documents.

THE COURT:  How do you intend to demonstrate that these documents were documents seized -- I don't know even where these documents were gotten from.  Where do you contend these documents came from.

MR. YALOWITZ:  They came from the Palestinian Authority.  They are the Palestinian Authority's documents.

THE COURT:  How do you contend that they came into the hands of the person who wrote this report.

MR. YALOWITZ:  The IDF, the Israel Defense Forces, went into the PA headquarters in Oregon House (phonetic) and they went into the PA headquarters in the Mukataa, which is in Ramallah, and they seized the documents.

THE COURT:  Is that when they seized all these other documents, at the same time?

MR. YALOWITZ:  Correct.  Correct.

THE COURT:  All right.

MR. YALOWITZ:  And they inventoried -- and I've got a witness who can explain.  They inventoried them --

THE COURT:  You don't have any better view of this document?

MR. YALOWITZ:  I wish I did, your Honor, but, you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**JA-3681**

F1cdsok2

know, this is what I've got.  You know, the truth is, when we blow it up on the screen, the jury is going to be able to see it and an expert is going to be able to break it down for you.

THE COURT:  Look, you might convince me to be able to utilize the documents that purport to be seized and purport to be, those portions -- well, the documents themselves and the translation of the documents if you say that that is relevant, if the foundation can be laid that they were seized at the same time that these other things were seized and that is what the documents say.  The report itself I have a concern with.  Even the example that you reference, this statement, as the report is written, says in a letter addressed to Fuad Shubaki and then it says, quote, Arafat's crony and confidante.  That is not an objective, fair, you know, factual characterization of the relationship between the two.  He is asking somebody who has a perspective.  His perspective is irrelevant.  OK?

MR. YALOWITZ:  I get it.  Your Honor, I think I get the Court's ruling on this, and I think we can work with that.  That is not -- I don't need the commentary and analysis.

THE COURT:  If you can lay a foundation that these documents are documents that were seized from PLO offices and that these documents are identified as documents belonging to the PLO and the PA and/or identify, you know, that this is Arafat's signature on this document, I don't have a real problem -- I don't have the same problem that I had with the

F1cdsok2

rest of the report, the documents themselves.  I don't know if you can sufficiently lay the foundation as to why you say it is what it purports to be.  But if you can overcome that, as far as I am concerned, at that point it is simply a statement by a party opponent.

MR. YALOWITZ:  Correct.

MS. FERGUSON:  Your Honor --

MR. YALOWITZ:  I think we will be fine with that.

MS. FERGUSON:  I'm sorry.  There is a relevance objection because these documents have nothing to do with the attacks at issue.  These individuals have nothing to do with the attacks at issue.  And even as to this document, one, that Mr. Yalowitz wants to show the jury, it has got a parenthetical note.  The document number two, which Mr. Yalowitz highlighted, that lists individuals who allegedly received $350, it says: "Note, these activists are known FATA operational activists in Kulkar (phonetic) who were involved in lethal attacks."  Now, that is not something that was in the PA document, that was something that Mr. Neva has inserted.  I have a problem with these documents going to a jury.  They are irrelevant and it is part of a -- they are a politicized report that was prepared --

THE COURT:  If you can lay a little foundation that these documents are documents that were seized and that they appear to be or in fact are documents in the possession or were created by the PLO, the PA, depending on how you can do that --

F1cdsok2

with Arafat's signature, it probably is a little easier than somebody who is not known generally without it, but if you can lay that, I am going to allow you to offer the document -- the underlying document and its translation.  That is it.  Not any commentary by this person who wrote the report, not any assessment about whether or not he thinks these are Arafat's cronies, all of that.

MR. YALOWITZ:  That is how I understood the Court's ruling.  I am good with that.

THE COURT:  You look at that.  You put it in a form so that they can see it.  You give it with however you want to attach the translation, and I think I would be willing to give you that but not the exhibit as you have it.

MR. YALOWITZ:  Understood.

THE COURT:  All right.

MR. YALOWITZ:  All right.

THE COURT:  Also, my position is that I think 547 doesn't appear to be admissible for any purpose.

MR. YALOWITZ:  The reason -- there is only one reason I care about 547, your Honor, which is I want the jury to know the total number of fatalities during the years 2000 to 2004 in the series of terror attacks and that is these two graphs.

MS. FERGUSON:  Your Honor, that is just --

MR. YALOWITZ:  May I?

THE COURT:  Go ahead and finish.

F1cdsok2

MR. YALOWITZ:  I am perfectly happy to just put the graphs in front of the jury, but I think that there is nobody who understands better the number of terror fatalities and casualties than the Israeli Security Agency, which is the agency charged with preventing attacks.  Every single one of these numbers is a failure by that agency to prevent terror.

THE COURT:  Well, I can't accept that.  I can't -- one, I think that is more prejudicial than probative to simply try to say there is a high level of violence, let's make the PA personally responsible for each one, when that is not the case we're proving here, nor can that case be proven at all, that the PA or the PLO is legally responsible for every act of terrorism that you claim happened in Jerusalem over a ten-year period.  So I think that that is not appropriate.  I think that, no, the jury cannot come to the conclusion that simply because there are a lot of terrorist attacks, it makes it more likely that the PA was involved in the terrorist attacks here at issue.  I can't accept that.

MR. YALOWITZ:  I think it's useful -- look, I don't want to wallow on this.  It's not a critical point for the case.

THE COURT:  All right.

MR. YALOWITZ:  I think it is useful background for the jury to understand because part of my burden is to show that these attacks were to coerce and intimidate the civilian

F1cdsok2

population, and a sustained campaign of terror is an element of that --

THE COURT:  Yeah, but we can't go into a side trial on every other act of terror to try to prove whether or not the PA should be responsible for that.

MR. YALOWITZ:  All right.  I understand your ruling. Let's go to the next one.

THE COURT:  554 -- so we can move on, 554, I don't see why this is in this.

MR. YALOWITZ:  I am fine with 554 being out, your Honor.

THE COURT:  Again, I have the same issues as we discussed with regard to 559.

MR. YALOWITZ:  Look, your Honor, 559 and 1109 are very important documents for the Guetta case, and so I want your Honor to understand what they show.  I think I gave your Honor the demonstrative we created from these reports --

THE COURT:  OK.

MR. YALOWITZ:  -- which show the sort of spread of attacks in and around the area of Ramallah during the first --

THE COURT:  Yes, I did look at that.

MR. YALOWITZ:  -- 18 months.

THE COURT:  This is the MO that you say you want to rely upon now that you say you had withdrawn --

MR. YALOWITZ:  That is exactly right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
**JA-3686**

F1cdsok2

THE COURT:  -- the testimony identifying certain individuals?

MR. YALOWITZ:  Correct.  So these are the kinds of reports that experts rely on to show a pattern.  They are not -- none of the reports in this case are -- none of the attacks --

THE COURT:  I don't understand.  Tell me specifically, what is it in this report that would lead one to that conclusion?

MR. YALOWITZ:  This is a report saying here is the location of attacks by this cell, and these are the individuals in the cell who we've now captured and so we have solved this --

THE COURT:  Where does it say that in 559?

MR. YALOWITZ:  "The Israel Security Agency and IDF forces arrested a number of terrorists who are suspected of perpetrating many shootings that have killed and wounded Israelis."

THE COURT:  OK.

MR. YALOWITZ:  Then they say -- bear with me.  I am just having a little trouble reading my exhibit.

(Pause)

They say, "Six members of the terror cell are currently being interrogated.  The cell belongs to 417."

THE COURT:  OK.

F1cdsok2

MR. YALOWITZ:  "And its members are suspected of perpetrating shooting attacks in the Ramallah area and the Samaria area.

THE COURT:  All right.  And you say that is in conjunction with what exhibit?

MR. YALOWITZ:  1109.

THE COURT:  And 1109 supposedly represents what?

MR. YALOWITZ:  1109 is another statement communicated by an IDF spokesman saying that the IDF targeted a 417 terrorist and that that terrorist and one of his co-conspirators committed the following attacks.

THE COURT:  Right.

MR. YALOWITZ:  And so the question is whether it is reasonable for an intelligence analyst to rely on reports like this.

THE COURT:  Well, that is not exactly -- the answer to that is yes, they can rely on that.  But the biggest problem that I have with this and what you have left with the Guetta case is that they analyzed a bunch of terrorist attacks.  The one that is conspicuously absent is this one.  They never attributed this one or made any conclusion that this one had anything to do with, had any pattern that was consistent with, that they were suspected of -- because they did these others, they were suspected of doing this one.  That is a conclusion you want them to draw from their documents that don't draw that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
**JA-3688**

F1cdsok2

conclusion.

MR. YALOWITZ:  That sounds like if -- I hope Mr. Rochon was taking notes because that sounds like something that he ought to say to the jury in summation.  The fact that they didn't --

THE COURT:  You've got to convince me, in conjunction with that, that you have enough evidence that I shouldn't grant them summary judgment at this point in time because the main evidence that you were relying upon previously was an identification that they significantly and severely attacked a later identification by a witness who was going to tie a PLO associate or PA employee with this attack.  You have withdrawn that evidence.

MR. YALOWITZ:  I have.

THE COURT:  So now you want to say that this attack is consistent with an MO that should lead the jury to conclude that the people who committed those other terrorist acts must have also committed this terrorist act.  And you rely on an MO that, one, there is a shooting on a motorcycle, which, unfortunately -- I don't know if it was a motorcycle.

MR. YALOWITZ:  Auto.

THE COURT:  An auto shooting, which I don't want to be crass about it or insensitive about it, but it is not a particularly unusual set of circumstances in this area, and, two, that it covers an area of Jerusalem, in the environs of

F1cdsok2

Jerusalem, which, again, is not particularly unique with regard to any of the terrorist attacks that you are pointing out here, you know, what else you refer to as something being unique about this. But, also, the problem is is that it would be one thing if we were sitting here saying that the Israeli government did a report and they went through it and they analyzed it and they put these five, six, seven, I forget what number of terrorist attacks, on this list and said that these people are suspected of those and they put this terrorist attack on that list, but this terrorist attack is not on that list. There is nothing that they said that would lead to the conclusion that you want the jury to lead to.

I mean, I would think that if anyone had an interest and would swap such evidence that this is related to other attacks and a pattern of other attacks, it is exactly what the Israeli government went through, and they excluded this one after this one had occurred. So I'm not sure what is the -- other than you saying that this is a firing into cars, which, as you say, your chart before we talked about, I don't even know how many firings into cars there must be but I know there are numerous others. And because it happened in this area, I'm sure most of the attacks happened in this greater area. I'm not that sure --

MR. YALOWITZ: Actually, here's my issue. I mean, obviously, the question you raise is of great interest to me.

F1cdsok2

Are there a lot of shooting attacks of this MO in this area during this period of time? That was an interesting question you made. And we went and looked and we didn't see any. Now, maybe the defendants have done a better job than me and they'll come and say, well, here was one, here was one, here was one.

THE COURT: Well, there are a lot of shootings. You are aware of a lot of shootings.

MR. YALOWITZ: Yes.

THE COURT: Committed by different individuals.

MR. YALOWITZ: Look, what I'm telling you --

THE COURT: Shooting is not the unique part of this that makes it an MO.

MR. YALOWITZ: Correct. Shooting car to car, into cars in this area in this timeframe --

THE COURT: Is there some evidence that this is the only group that shoots into cars?

MR. YALOWITZ: I'm saying that in evaluating this evidence, my expert looked at are there other attacks with this MO that are attributable to other groups. That's a relevant question.

THE COURT: Well, and the MO that he analyzed was an MO, it's got to be a shooting of a car in this area --

MR. YALOWITZ: During this timeframe.

THE COURT: -- during this -- what timeframe are you talking about?

F1cdsok2

MR. YALOWITZ:  The first, you know, September of 2000 to spring of '02.

THE COURT:  And he concluded that there are no others?

MR. YALOWITZ:  He couldn't find any.

THE COURT:  No other what?

MR. YALOWITZ:  No other shooting attacks that have the MO that your Honor is describing.

THE COURT:  No.  There is no other MO.  He had to say that there is no other shooting attack in this area.  That is the only MO that you give me.  Into cars.  There are no other shooting attacks into cars in this area during this period of time, is that what he is going to say?

MR. YALOWITZ:  Attributable to other groups.

THE COURT:  What do you mean, "attributable to other groups?"

MR. YALOWITZ:  That is the question I ask.  So you are asking me a question that I don't know the answer to so I don't want to misrepresent.

THE COURT:  No, I understand that.

MR. YALOWITZ:  So I don't know the answer to that question.

THE COURT:  All right.

MR. YALOWITZ:  Was there ever a shooting?  You know, I don't know.

THE COURT:  So the proof on which you want to go to

F1cdsok2

the jury and have the jury conclude that the PA was involved in this shooting, is that 417 --

MR. YALOWITZ:  More likely than not --

THE COURT:  -- had been accused of several other shootings by the Israeli government.  A lot of those shootings you want to argue happened in a similar manner as this shooting.  So, therefore, the jury should conclude that 417 members were involved in this shooting and that the PA and the PLO had what to do with it?

MR. YALOWITZ:  Well, that is a second question.

THE COURT:  Right.

MR. YALOWITZ:  The question on which we have lost a significant portion of our case is the one you just said.  Is it more likely than not that this was a 417 shooting?  When we get past that, I don't think I have a big problem convincing the jury that members of 417 who committed shooting attacks were acting within the scope of their employment, for all the reasons that we have -- their policies, the statements in the police magazines, the discipline of 417.  I don't think that is a real concern.  I'm candidly telling you that without these two exhibits, at least -- either the exhibits or allowing my expert to rely on the exhibits, I don't see that I have a case left for her.

THE COURT:  And so you want these two exhibits to demonstrate what?

F1cdsok2

MR. YALOWITZ:  To demonstrate the location, timing and modus operandi of the attacks attributed by my expert to 417.

THE COURT:  What would you say -- I think I tried to figure it out.  But what would you say is the general geographic area, the size of the geographic area that you are using here?

MR. YALOWITZ:  I think that it's --

THE COURT:  Several miles?

MR. YALOWITZ:  Yeah.  The distance from Ramallah to Jerusalem is seven miles.  If you look at the spread on a map, most of these are within three to five miles of --

THE COURT:  Would it be accurate to say that most of the terrorist attacks, or at least most of the terrorist attacks at issue here and probably most of the terrorist attacks took place in that geographical area?

MR. YALOWITZ:  No.  No.  That is actually not accurate.

THE COURT:  OK.

MR. YALOWITZ:  The thousand people dead and the 5,000 people wounded were from all over Israel and from all over the West Bank.

THE COURT:  I know.  But the ones that -- I mean, of the ones that happened in and around Jerusalem, I mean, there are a significant number that happened in and around Jerusalem.

MR. YALOWITZ:  Yes, that's true.

F1cdsok2

THE COURT:  There is nothing unique about that.

MR. YALOWITZ:  Right.

THE COURT:  Because they happened in or around Jerusalem doesn't distinguish it as someone's, you know, MO.

MR. YALOWITZ:  Right.

THE COURT:  That it happened in and around Jerusalem. So that is not particularly compelling.

And the fact that it is a shooting doesn't distinguish it from probably most of the terrorist attacks in and around Jerusalem because probably most of them were shootings, not bombings, right?

MR. YALOWITZ:  I'm with you.

THE COURT:  And the fact that there was a shooting in a car, towards a car, or towards people in a car, are you saying that that is somehow unique to 417?

MR. YALOWITZ:  I believe that the MO of driving up to a car, cutting it off, and having four guys pop out with AK-47s and rake the car with bullets was the MO of 417.

THE COURT:  OK.  But it didn't -- nobody else does it that way?

MR. YALOWITZ:  I think that if the defendants have evidence that other people do it that way, my expert is not going to be very persuasive.  I couldn't find evidence like that.

MS. FERGUSON:  Your Honor, if I could just address

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
**JA-3695**

F1cdsok2

this MO point?

THE COURT:  Sure.

MS. FERGUSON:  Mr. Yalowitz's own exhibit, which should not come in as a public records exception, belies the notion that there is some sort of 417 MO.  If you look at 1109, which the Israeli Ministry of Foreign Affairs captions, "417 terrorist, known as Said Naderia (phonetic)," it describes attacks that they accused him of.  One is a shooting at the National Insurance Building, so not a car.  Another was a shooting attack on a bus.  If you move on, there is a reference to a roadside bomb.  I mean, there is no distinctive MO for 417, even according to the Israeli Ministry of Foreign Affairs.

And I would just emphasize again that there was no finding by the Israeli Ministry of Foreign Affairs that 417 even did any of these shootings that are identified; it is just they suspected people of it.  And a reasonable jury cannot find based on the fact that the Israeli Ministry of Foreign Affairs is reporting that some people were suspected of some shootings, so, therefore, a PA employee carried out an entirely different shooting.  I mean, this is -- it is almost incomprehensible that we are even debating whether this gets to a jury.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
**JA-3696**

F1czsok3                        Conference.

THE COURT:  I'm not sure what you say the pattern is with regard to Karsh.  I don't see such a pattern.

MR. YALOWITZ:  I think that your Honor's right here, it's shootings.

THE COURT:  So you have shootings in and around a several mile radius of Jerusalem.

MR. YALOWITZ:  Several mile radius of the 417 headquarters.

THE COURT:  Well, several mile radius of Jerusalem too.

MR. YALOWITZ:  Although it's the pattern is really more toward their headquarters, but.

THE COURT:  Which is --

MR. YALOWITZ:  They're so close that -- I mean we're debating semantics.

THE COURT:  But I mean like they're in the north and all these happened in the north or something?  I'm not sure what you're --

MR. YALOWITZ:  This one in a series happened within a few miles, within 3 miles of the Mukataa.

THE COURT:  Let me just look at, what we're going I'm trying to do is to go another 25 minutes unless --

MS. FERGUSON:  Your Honor, Mr. Yalowitz's experts testified it was a 15-mile radius, so we should get our facts straight.

F1czsok3                    Conference.

THE COURT:  I thought it was much.

MR. YALOWITZ:  Yeah, I mean I'm looking at -- I'm looking at the map.  It's not -- I mean, there are a couple of outliers, but if you look at the map they're very tightly clustered.

MS. FERGUSON:  We don't have a scale for the map, I mean the map's just frankly a little silly.

MR. YALOWITZ:  Your Honor --

THE COURT:  Well, the --

MR. YALOWITZ:  Ms. Ferguson I think knows that the Mukataa is 7 miles from Jerusalem.  She's been there, I'm sure.

THE COURT:  You know what, I have two real problems with this.  One is that, as I say, the conclusion you want them to draw from the Israeli reports are not the conclusions their Israeli reports draw.  And two, you know, most of these Israeli reports are -- they don't hesitate to, as they say, point the finger at the PA and the PLO when they say they have such evidence.

These reports don't do that.  These reports don't even say that the PA or PLO had anything to do with these.  So I mean -- which is, quite frankly, unusual rather than usual; that if they suspected the PA or PLO to be directly involved in that, I would have expected, given the nature of the reports that you produced, that it would have said that.  It doesn't say that the PA or PLO had any involvement in this.  It says

F1czsok3                    Conference.

that they think 417 did, but it doesn't say that 417, having known that this, the attack in this case had already taken place when this final report was written.  It doesn't say that oh, and by the way, let's add this other terrorist act and that is the same -- that we have a reason to believe is the same committed by the same individuals.

So they've not concluded in this report that this attack was committed by the same individuals, based on any evidence that they have, nor do they reach that conclusion based on the way you want the jury to reach that conclusion. They don't say -- and I, quite frankly, one would suspect that they would not be hesitant to say so, if there was a pattern that was clearly discernible that both a lay person and a professional would recognize.  And you're not asking the professional to recognize this, to accept this.  You're asking lay people to recognize this and accept this, when there is no conclusion whatsoever by this report that they have anything to do with any other attacks, other than the -- I mean, you have 12 attacks.  I mean, you have to admit that to say they have 12 attacks that were committed by these, by 417 as of March 2002 to have this attack not on that list is conspicuously absent.

MR. YALOWITZ:  So let me just try to make four points with you, your Honor, and I know you're thinking hard about it.

THE COURT:  I'm also thinking of it in the context of your summary judgment.

F1czsok3                     Conference.

MR. YALOWITZ:  I understand that.

THE COURT:  This is critical.

MR. YALOWITZ:  I understand that, that's -- and I mean in candor that's why, as soon as I understood what I was doing with that ID, I brought it to you, because I didn't want to --

THE COURT:  Right.

MR. YALOWITZ:  There was --

THE COURT:  Because this was not the main evidence that overcame their motion.

MR. YALOWITZ:  I agree with that.

THE COURT:  For summary judgment.

MR. YALOWITZ:  I agree with that.

THE COURT:  Initially.

MR. YALOWITZ:  That's why I brought it to your attention.  I agree with that and that's why we're having this discussion, because I brought it to your attention.

THE COURT:  Yes.

MR. YALOWITZ:  Okay.  Four items.  Item number one, the link between 417 and PA.  I'm being very candid, I'm not going to have a problem with that, okay.

THE COURT:  Right.  But I'll, for the purpose of this argument --

MR. YALOWITZ:  Grant me that for the purpose of this argument, okay.

Item number two, the absence of this attack on that

F1czsok3                         Conference.

list of 12.  I think is a cross question, it's a jury question.  If everything else about this list was great and it was the exact same MO of the exact same place, you know, I don't think we'd be having the conversation because this wasn't on the list.  That's what people do with attribution.  So I think that's a thing they can argue to the jury.  I don't think it's a thing that says no reasonable juror could say that that because it's not on the list it can't be that it's part of the same group.  Okay.

Number three is a professional, does a professional think that this is the same MO by the same group, and would a professional attribute it to this group.  You know --

THE COURT:  Not the professionals who wrote the report.

MR. YALOWITZ:  Not those professionals.  But my professional came from the same agency and who I said, look, you know, I need to -- I mean, I'm not going to -- he believes that, he believes, based on his professional experience, that this attack is attributable to 417 based on -- and he comes from that agency, so.

THE COURT:  And we're talking about who, Levitt?

MR. YALOWITZ:  Shrenzel.

THE COURT:  Oh, Shrenzel.

MR. YALOWITZ:  Shrenzel.  So I mean, I'm representing to you that he will say, without the ID, it is my professional

F1czsok3                    Conference.

opinion, based on this evidence, I'm telling you what the evidence is, that this was a 417 attack.

Now, that may not be an adequate -- ultimately, it's your conclusion and I understand that, but I want you to understand the facts that this is his professional judgment without the ID and -- I mean I have no doubt that that's going to be his testimony.

THE COURT:  Well --

MR. YALOWITZ:  And so --

THE COURT:  Go ahead.

MR. YALOWITZ:  So really the question for the Court is, given those three facts or given those three things, are you going to keep him out, because his opinion is going to be, subject to questions and -- I mean, I understand the questions, I understand the weakness of this case without the ID.  I really do.  The question is is it for the -- could a reasonable jury conclude that it is more likely than not.  It's not must have, it's not had, not beyond a reasonable doubt.  Could a reasonable jury listen to this professional, evaluate his views, and conclude that it is more likely than not that this was a 417 attack.  That's the question for the Court.

THE COURT:  Well, the problem, part of the problem I have is that I'm not sure that's a professional opinion.  I mean, all he's saying to us is what you said to us.  I accept your word as strongly as I would his.  You say because they're

F1czsok3                    Conference.

all in the same area and were shootings, drive-by shootings as we call them, that's what we'll say because they were in the same general area of where 417 is and within miles of each other, and were driveby shootings, that it must mean that the reasonable conclusion is the 417 did this.

MR. YALOWITZ:  And that we can't find others of a similar pattern.  In other words, if there were five gangs operating in the area, I mean this is -- I think this is the basis for his views.  If there are five gangs operating in a neighborhood in New York City, how do you know who did the crime?  But if there's one gang and they control the turf and it's their turf and the crime fits their profile, that -- I mean those kinds of attribution experts testify all the time even in criminal cases.

THE COURT:  But I don't assume that he's going to be able to say that there no driveby shootings other than these in this area.

MR. YALOWITZ:  Well --

THE COURT:  I mean, if you tell me that they're going to -- that he's going to say these are the only driveby shootings within this radius, that might be somewhat more compelling, but --

MR. YALOWITZ:  Well, let me find out what he would say to that question, because I don't know the answer, your Honor, but I can find out and send the Court a letter this afternoon.

F1czsok3                    Conference.

THE COURT:  It's sort of like saying to me, well, over the last two years in downtown Manhattan there were 12 robberies of banks, Chase banks in which the robbers used a gun and gave them a note saying put the money in the bag.  We find that there is a robbery of the Capital One Bank downtown, so the reasonable conclusion is the person who robbed the Capital One bank with a gun handing them a note saying put the money in the bag, it's got to be the same person people who did the other 12 that are scattered around the area.

MR. YALOWITZ:  Let me come -- I don't think it's the same.  I think it's more like -- I mean, I think that it's -- there is rivalries here between the PA and other groups like Hamas.  I don't think you get four guys popping out of the window shooting people with machine guns every, you know, just -- it's not street crime.

THE COURT:  See I don't think there is much detail in his report about that.  I have to go look at his report.  But I don't think his report really concentrates on that because that really wasn't the crux of your case, before --

MR. YALOWITZ:  It does.  His report does go through this issue.  He relies on these exhibits.

MS. FERGUSON:  Exactly.  He relies on these exhibits.

MR. YALOWITZ:  He does rely.

MS. FERGUSON:  And the identification.

MR. YALOWITZ:  If I may be heard, your Honor?

F1czsok3                    Conference.

THE COURT:  Let him finish, then I'll hear from you. Go ahead.

MR. YALOWITZ:  Thank you.  Look, I will ask my expert any question that the Court would like me to.  It is not in my interest to promise something --

THE COURT:  All right.

MR. YALOWITZ:  -- and then not deliver it tomorrow.

On the other hand, I do think that -- I do think that it is for the jury to decide how reliable his conclusion is based on the facts and circumstances which are I think different from bank robberies in Manhattan.

THE COURT:  I'm just not sure what it is in his expertise he knows that we don't know, and why it makes it an expert be able to say, oh, sounds the same to me as opposed to anybody else.

MR. YALOWITZ:  It's I know the territory, I know the groups that operate in the territory, and I'm telling you this was the group that operated in the territory, not them.  You know, the bloods didn't go up to that area at that time.  It's that kind.

THE COURT:  Did you want to add something?  Because I want to speed this up?

MS. FERGUSON:  Well, your Honor, I just want to emphasize that the core documents that Mr. Yalowitz wants to put in front of the jury are documents that come under the

F1czsok3                        Conference.

public records exception.

THE COURT:  Which documents?  These two documents.

MR. HILL:  The Ministry of Foreign Affairs Press Releases about accusations that the IDF has made that they've heard about them from an IDF spokesperson.  That's not a public record.  So the only thing Mr. Yalowitz has is Shrenzel who is relying on these very documents and Ms. Guetta's identification to say now we've drawn.  That other stuff was not disclosed to us in his expert report, and there simply isn't enough that a reasonable jury could find, based on these, evidence that shouldn't even get to them, these Ministry of Foreign Affairs website materials that a PA employee carried out this attack. I mean, if this makes it to a jury, I mean then anything can. There's nothing here.

THE COURT:  Well, is there a particular person that you say that there's evidence of that participated, who was associated with 417 that participated in this attack?

MR. YALOWITZ:  I don't have an ID.  So I know who the terror cell members were, but I can't link any of them.  I can't -- you know, I'm not going to present evidence to this Court and this jury that this guy was one of the four shooters.

THE COURT:  But is it your position --

MR. YALOWITZ:  I couldn't do that.

THE COURT:  I couldn't understand whether it was your position that every single person in 417 is a terrorist who

F1czsok3                         Conference.

committed terrorist acts.

MR. YALOWITZ:  No.  That is not my position.

THE COURT:  Okay.  So how do -- so that's even more difficult.  How do I pick which ones are you saying are supposed to be the ones that are responsible that are supposed to be connected to the PLO?

MR. YALOWITZ:  There was a pretty well defined group who were.  They were well known within the intelligence community.  It was understood who they were, and in fact the head of 417 actually went to jail for being involved in terrorist activity, so.

THE COURT:  Okay.  Finally, let me just ask, then we'll move on and then come back to you.

MR. YALOWITZ:  Okay.

THE COURT:  What is your reasonable or your expert's reasonable explanation for why no one associated, no one in Israeli government associated any of 417 to this attack?

MR. YALOWITZ:  I don't know the answer to that question, your Honor.  If I knew it, I would tell it to you.

THE COURT:  Okay.  No, that's candid.

I want to address -- I may have to address it in the context of the objection.

MR. YALOWITZ:  All right.

THE COURT:  So I don't see this summary of four years of conflict, I don't see that to be admissible for the time

F1czsok3                    Conference.

being.

MR. YALOWITZ:  Summary, I'm sorry, this is six?

THE COURT:  No 554.

MR. YALOWITZ:  554.  We're fine not using 554, your Honor.

THE COURT:  Okay.  So let me get to some things that I do find admissible.  559 is the same.  That's what we just --

MR. YALOWITZ:  We just spent quite a bit of time on 559.

THE COURT:  626.

MR. ROCHON:  Judge, is 559 in or out?

THE COURT:  559 is -- I hadn't made up my mind yet because I want to figure out whether the case is still around whether it's in or out, so I'm going -- I want to just address that in the same context we'll come back to that.

626 I'm prepared to give that if you could demonstrate that, you know, it was retrieved from a certain location, or I don't know where you got that this from.

MR. YALOWITZ:  We can authenticate it.

THE COURT:  Right.  You can show where it came from, and what it purports to be.  It is represented to be documents which the jury could look at to determine whether or not it appears to be documents that of the PA or PLO.

MS. FERGUSON:  Your Honor, if I could just be heard on 626?  It's mostly not reproducing documents captured.  It's

F1czsok3                    Conference.

called Arafat and PA's involvement in terrorism according to captured documents, and then it contains, you know, just a lot of discussion and summary and characterization. So I just want to be clear the document in its current form would not be admissible.

THE COURT: No, I disagree with that. Since it's only analyzing the documents themselves, and it's not making an independent analysis beyond the documents, I think it's an appropriate report and analysis and report. We know exactly what they're relying upon. If any of their conclusions are not consistent with these documents, I'm sure that you can point them out. So I don't see there's anything that I saw in the recitation and their evaluation of the document that would be an unfair characterization of what the documents are. And what conclusions might be drawn from it, you can argue that those conclusion should be drawn.

MS. FERGUSON: Your Honor, if I could just draw your attention to page seven.

THE COURT: Yes.

MS. FERGUSON: So it says on the top that several expressions of the direct support of terrorism provided by the GIA and other PA intelligent listed below as reflected in the document. Participation in terrorist attacks. From several documents that could be learned that intelligence personnel were directly involved in planning, preparing and carrying out

F1czsok3                          Conference.

terrorist attacks.

So I mean this is highly prejudicial and there's been no foundation laid for how this comes in under the public records exception.

THE COURT:  The foundation is they're saying that this is this one reason --either one worn can or can't.

MS. FERGUSON:  But who is saying --

THE COURT:  It doesn't matter who is saying it.  It's either a reasonable conclusion to draw from the documents or it's not a reasonable conclusion to draw from the documents.  The jury's going to say --

MS. FERGUSON:  But under the --

THE COURT:  Not this person.  I mean she -- obviously they jury's not going to be surprised that the Israeli government believes this is evidence of support of terrorism.  The fact is whether the documents do in fact support that position, that's not a fact.  It's an analysis, an analysis in an official report.

MS. FERGUSON:  But we don't know who prepared the report, how --

THE COURT:  Doesn't matter who prepared it.

MS. FERGUSON:  It doesn't manner the public records exception who prepared --

THE COURT:  No, because they're analyzing the documents.  They're not making reference to things that are not

F1czsok3                         Conference.

in --

MR. HILL:  But you're going to allow Mr. Yalowitz to --

THE COURT:  I mean if --

MS. FERGUSON:  -- present it to the jury as fact, the conclusion?

THE COURT:  That's not a fact, no.  It's not a fact.  That's their evaluation based on the document.  That's a conclusion.  You can say that that conclusion is not consistent with these documents so it should be rejected.  They could say that the conclusion is supported by the documents, it shouldn't be rejected.

MS. FERGUSON:  The other problem is that only a very small percentage of the supposedly captured documents are summarized here, so there could have been any number of other documents that were, you know, exculpatory that were not discussed, so it's are very selective misleading summary.

THE COURT:  Well, that's quite a hypothetical, but there is no evidence that there's some exculpatory documents that weren't considered.  I can't assume that that's the case.  You may want that to be the case, but there is no evidence that they say they seized these documents.  If the documents say I'm involved in terrorism, you know you can't argue that they didn't put in the documents that say I'm not involved in terrorism.

F1czsok3                        Conference.

MS. FERGUSON:  Just, there's a problem not, without knowing the process by which these few documents were picked and who prepared the analysis and --

THE COURT:  It doesn't matter because there is -- it's not analyzing these documents with some other evidence.  It's analyzing these documents and they're saying that's what those documents represent, and either these documents do support those conclusions or they don't support those conclusions.  It doesn't say along with something else it supports these conclusions.  So I can't accept those arguments.  I think that they lay the proper foundation, indicate that these documents were whatever they're taken from, were represented to be documents that were seized from the PA, or the PLO, the jury could look at the documents make their own assessment whether or not it's reasonable to conclude these are PA documents or not PA documents, and whether or not what's in the documents either is consistent with, inconsistent with or supports the plaintiff's theory that these support their position that they were involved in terrorist acts.

MS. FERGUSON:  But, your Honor, I mean findings and conclusions are being offered by an out-of-court declarant and we have no opportunity to cross-examine them who --

THE COURT:  Yeah, because they're totally irrelevant to the jury's determination.  They may agree with those conclusions.

**JA-3712**

F1czsok3                          Conference.

MS. FERGUSON:  Then they should be redacted, right?

THE COURT:  No, no.  I, as I say, I think this is an official report.  You don't redact conclusions in an official report if it qualifies as a official report simply because you disagree with the conclusion.

MS. FERGUSON:  I guess I'm questioning whether it qualifies as a official report.  I think the foundation's been laid to that, for that.

THE COURT:  And I think if they tell us where the document came from, and the documents entitled Arafat's and PLA's involvement in terrorism according to captured documents they purport that's what it is, and the jury can decide what weight they want to give it.  So I'm going to allow them to put that in.  And consistent with that I am also going to allow them to put in 631, same thing.

MR. ROCHON:  Could we have a proffer of which Israeli governmental entity or maybe it wasn't an Israeli Governmental entity, who prepared this document?

THE COURT:  Where you going to say this document came from?

MR. YALOWITZ:  It says right on the cover, IDF.  That stands for Israel Defense Forces.

THE COURT:  Okay.

MR. ROCHON:  So, yeah.  Upper right hand states IDF, so some IDF person prepared the document.  But --

F1czsok3                         Conference.

THE COURT:  Okay.

MR. ROCHON:  -- we don't know who, of course, and we don't know under what auspices.

THE COURT:  They didn't prepare the document that some PLO person prepared the document.

MR. ROCHON:  I wish.

THE COURT:  Prepared the underlying document.

MR. ROCHON:  There is only a few underlying documents. The rest are all these conclusions.  You read this report, there is all sorts of stuff in here that has nothing to do with the documents, Judge.  This is one you need to -- I know Mr. Yalowitz says this is a really important one when he thinks it's a really important one.  This one, Judge, I honestly think is -- this is somebody in the IDF spinning their theory about the role of Arafat supposedly in terror, not based solely on documents, and for that to go to --

THE COURT:  Well, I'm not sure what you're referring to.

MR. ROCHON:  Well, if you look at the language, that's why it's so -- this requires I think some of the Court's time. So if you look, for instance, they talk about Arafat utilizes the civilian apparatus, his personal associate Fuad Shubaki and middle man and senior fatah activist in the west bank.  It's on page five.  There is no documents cited for that.  There is places in here where they talk about --

F1czsok3                        Conference.

THE COURT:  I'm sorry, where are you on page five?

MR. ROCHON:  On page five of the actual document in subsection b.

THE COURT:  All right.

MR. ROCHON:  Where it says at the end, to this end, Arafat utilizes the PA civilian apparatus --

THE COURT:  I'm sorry, I'm looking at different page five.

MR. ROCHON:  I'm sorry?

THE COURT:  I'm looking --

MR. ROCHON:  It's says.

THE COURT:  Talking about 631 or about another document?  You're not talking about 631, you're talking about because --

MR. ROCHON:  626 is what we've just been talking about.

THE COURT:  Oh, because I went onto 631.

MR. ROCHON:  Oh, I was trying to belabor a point.

MR. YALOWITZ:  He was rearguing 626, your Honor.

THE COURT:  Okay.  On page five?

MR. ROCHON:  We all do that.

THE COURT:  What you did.

MR. ROCHON:  Just as an example at the end of paragraph it says, to this end Arafat utilizes the PA civilian apparatuses, his personal associate Fuad Shubaki and, quote,

F1czsok3                         Conference.

middle man, close quote, and senior fatah activist from the

West Bank.

THE COURT:  I know, but now I can't accept that.

Because it says -- the sentence before that says, according to

the captured documents, Arafat is involved personally and this

is why the report draws this conclusion.

MR. ROCHON:  So.

THE COURT:  That's the legitimate thing that could be

in any report.

MR. ROCHON:  What they say is involved personally.  If

they go with the actual documents, your Honor.

THE COURT:  No it says -- he personally, he signs

allocation of both the small and large amounts to Fatah

according to the documents.  That's what they say, it's

according to the captured document.  They're referring to the

analysis of the captured document.  If this -- I understand

your disagreement that this is an official report, but I do

cannot accept your position that if it is an official report

and is being admitted under that basis, that somehow this part

of the official report is inadmissible.  It's not.

MR. ROCHON:  Your Honor, if the court pours through

this thing you'll see this report consists of all sorts of --

it's a mixture of the documents and what they have to say about

them, and some spin by someone in the IDF written at a time of

great hostility between the two.

F1czsok3                    Conference.

THE COURT:  I'm sure the jury can understand that if you want to explain that to them.

MR. ROCHON:  Well, your Honor, but for it to come in it needs to meet standards for a public record and then all of the portions in it meet that be, and clearly --

THE COURT:  Official records are not necessarily unbiased official records.

MR. ROCHON:  Well but, they have to be of a constituted, a structure of an investigation.

THE COURT:  Right, structure of an investigation of this report is an analysis of the captured documents.  That's the --

MR. ROCHON:  It has to have indicia of trustworthiness, Judge.

THE COURT:  It has some indicia of trustworthiness because it has a bunch of documents that purport to look like PLO and PA documents and signatures that purport to look like signatures of PA and PLO officials.

MR. ROCHON:  Even if you assume those documents are what they appear to be, despite the fact that we have just photo copies of this report, even if you assume that --

THE COURT:  Unless you're denying it.

MR. ROCHON:  What?

THE COURT:  I'm assuming it for purposes of admissible, unless you're denying it.

F1czsok3                      Conference.

MR. ROCHON:  So you assume that for, if your Honor pleases of admissibility.

MS. FERGUSON:  The conclusions in the report clearly go beyond those documents, they -- you look at the report and compare it to --

THE COURT:  No, that's exactly the conclusion that the plaintiffs are going to ask the jury to draw.  So it's up to the jury to determine the whether or not to draw those conclusions.  I don't understand that.

MR. ROCHON:  The reason the standard is so high for public records is because we don't get to cross examine the maker.  So it has to have indicia of trustworthiness. Trustworthiness for the PA and the PLO to come to the United States, brought before a court, have people make claims against them for involvement in terror and to have the proof of that be some report from the IDF prepared at a time of great hostility with the client, but we don't even have the maker of the report available to cross-examine, is hearsay on top of hearsay. Eventually this trial becomes a trial of hearsay.

THE COURT:  Well, the final word on this is the reason I draw the distinction because I drew the distinction where it is, they were relying on documents that were claimed to have been seized from the PLO and the PA that purport and on a lay person's review one could reasonably conclude are documents from PA files or documents, more likely documents created by

F1czsok3                         Conference.

the PA.  That's what these documents are about.  I drew the line at all these summary reports, and I accept your argument with regard to we have no basis to know what the reports are based on, what those summary conclusions are based on, what their factual allegations -- where the factual allegations are coming from.

That's not true with regard to the, what is purported to be PA documents seized from the PA and it's not -- I draw the line at PA documents that are claimed to be PA documents either sized from the PA or the PLO, or PA or PLO documents that were turned over by the PA and the PLO.  I think that it has some indicia of reliability, unless you want to demonstrate to the jury that they should not accept it as what it purports to be because it is a forgery, it is not in fact what it purports to be, it was never taken from us, it was never produced by us, and that's not Arafat's handwriting.  If you want to dispute all of that, that's fine.  But in terms of my assessment of its reliability, without such evidence disputing those facts, it meets the minimum threshold of being admissible to put before the jury what is claimed to be PA documents either seized or obtained from the PA and PLO.

632 I think should be out because of the same consistent analysis.  You know what, let me just run through it and you could --

MR. YALOWITZ:  Bear with me, your Honor.  I'm sorry,

F1czsok3                    Conference.

622.  Okay.  I understand the Court's ruling.

THE COURT:  Same analysis.

MR. YALOWITZ:  I the Court's ruling.

THE COURT:  826 is in, based on the same analysis. 829 is in based on the same analysis.  830 is in based on the same analysis.

MS. FERGUSON:  Your Honor, can I just say something about 830?  It doesn't purport to be a government document.

MR. YALOWITZ:  I can establish that through testimony your Honor.

THE COURT:  All right.  Well, if they lay the proper foundation, my attitude will be that obviously the crux of this is that these are supposedly PA -- these are PA documents created or possessed by the PA or PLO.  He still has the burden of laying, as I say, proper foundation, where did this come from, what is it, why should one consider reasonably that it is what it purports to be, all right.  And I think, as I say, I'll skip 1109, come back.

My attitude is the same about 1118.  It should be out, not in.  325, I believe 325 can be admitted if the proper foundation is laid for what it's supposed to be, where it came from.  Same thing with 338.  I looked at 338 photos.  I don't see 338 photos to be a problem, so they can stay in.

The 473 the report.  Seems to me if you can lay the proper foundation, that's admissible; basically crime scene

F1czsok3                    Conference.

report.  474 is out based on the same rulings I made with regard to photographs.  476 is out.

THE COURT:  I'm sorry, I skipped 475.  Yes, 475 is out.

477.  477 can be admitted with -- let me just make sure -- yes, I didn't have a real problem with the photo.  I think most of these photos are photos that were in the other document.

And then 1125.  1125 should be out and I don't think you need that.  So then that should be that.  All right?

MR. YALOWITZ:  That's because of the photos.

THE COURT:  Yeah.

MR. YALOWITZ:  Yeah.

THE COURT:  It's --

MR. YALOWITZ:  I understand.  Okay.

THE COURT:  All right.  So, and also, you know, some of this is cumulative too since you have --

MR. YALOWITZ:  I'm sorry.  I apologize, your Honor. May I have permission to consult for one second?

THE COURT:  Yeah, sure.  Then I think we might be able to wind up.

MR. YALOWITZ:  Your Honor, what I'd like to do with 1125 is, and we don't have to do this today, but I'd like to come back to the Court with a kind of a version of 1125 that

F1czsok3                    Conference.

doesn't have some of the photos that I think concern the Court,

because there's some other useful information.

THE COURT:  What is it that you want out of this we

don't already have in this case?

MR. YALOWITZ:  Some of the, what I do want --

THE COURT:  You want the text or the photos?

MR. YALOWITZ:  I want some of the other photos.

THE COURT:  I think most of these photos I've already

ruled on.  Almost all, if not everyone of these photos was in

the other binder of photos that we went through one by one.  I

think most of these photos already came in in that other

binder.

MR. YALOWITZ:  Let me go back.

THE COURT:  The only I remember specifically that

didn't come in was the first three pages.

MR. YALOWITZ:  Right.

THE COURT:  Pretty much the other photos --

MR. ROCHON:  You went through them one at a time.

MR. YALOWITZ:  Right.  So 1125 comes in, but we

just -- without those photos that the Court has excluded.

THE COURT:  You said 1125 comes in.

MR. YALOWITZ:  I'm asking.

THE COURT:  1125 is two things.  It's a report and

photographs.  What are you asking for?  I already gave you the

photographs, so.  And you didn't give it me to in this context.

F1czsok3                    Conference.

There is something in this written report that you want?

MR. YALOWITZ:  I don't think so.  I think all I want is the photos.

THE COURT:  All right.

MR. YALOWITZ:  I got to look at the text.

THE COURT:  Check the other photos I went through one by one, I told you which ones are in.  I know that the first -- I do have a recollection of the first three pages seeing those photos before in that binder and saying that those photos shouldn't come in.

MR. YALOWITZ:  Yeah.  No, no, your Honor, I don't mean to need the text.  The text just foundationalizes the photos, so.

THE COURT:  I understand.

MR. YALOWITZ:  So the photos that the Court has said are in are in, the photos that the Court has said are out are out, and I don't need the document other than for admissible purpose.

THE COURT:  So that's the way I think you should prepare for that.

MR. YALOWITZ:  Great.

MR. ROCHON:  Did your Honor rule on 631?

THE COURT:  Which one is --

MR. ROCHON:  You've similar sorts of rulings, but I don't know you if said the number.  We objected on the same, it

F1czsok3                      Conference.

says --

THE COURT:  Yeah, that's where I was, I was going to allow that, 631.

MR. ROCHON:  Right.

THE COURT:  Then I find it's pretty much an analysis of the, what they contain to be original documents that were seized from the --

MR. ROCHON:  We won't repeat our arguments on that one, your Honor, but they would be similar to the previously made arguments on the similar types of reports.

THE COURT:  Sure.  I understand.

Then let me wind up.

Did you resolve the videos?  I don't want no more information.

MR. ROCHON:  On the videos there's one portion, it's videos of the two women and in general --

THE COURT:  Have you resolved it is really all I want.

MR. ROCHON:  We haven't resolved it.  We might be able to.

THE COURT:  Okay.  Take your time.

MR. ROCHON:  I'll tell them what my objection is at the break.  Maybe who knows we might agree.

THE COURT:  Okay.  Have you come to some agreement about the demonstratives you want to use in opening?  I should rule on that so you can prepare for that.

F1czsok3                    Conference.

MR. ROCHON:  We don't seem to have come to an agreement because I've come to a disagreement.

THE COURT:  All right.  I have a list somewhere.  All right.  So you objected to -- you objected to using the GIS is materials about Ahmed Garghouti?  I'm not sure, I mean I think you acknowledged that.  I already said that can come in.

MR. ROCHON:  I know you ruled on authenticity and we're not objecting on the basis of authenticity or whether it's in fact the document that it purports to be.  The objection that hadn't been at least dealt with was relevance as to this?

THE COURT:  It seems to me Ahmed Barghouti is a critical piece of that case, so I can't say that doesn't have relevance.

MR. ROCHON:  I understand your ruling.

THE COURT:  Okay.  So they can use that if they want to, unless there is a real chance they're not going to be able to get that in evidence.

MR. ROCHON:  201.

THE COURT:  201, I'm not quite sure what your objection was.

MR. ROCHON:  Well, this is among the documents that we have indicated we object to that are not our publication.  And Mr. Yalowitz sent a letter saying, in essence, yes it is, and we should withdraw the remark.  And Mr. Yalowitz attached to

F1czsok3                    Conference.

his letter something about this institute on whatever it's

called National Political Moral Guidance, whatever it's called

and --

THE COURT:  You really need this in opening, Mr.

Yalowitz, something we can --

MR. YALOWITZ:  Do I really need it?

THE COURT:  Yes?

THE COURT:  Something we can resolve later?

MR. YALOWITZ:  We can resolve it later.

THE COURT:  Just hold back on it.

MR. YALOWITZ:  Got it.

THE COURT:  Assume you're -- look, to the extent that you can establish through expert testimony or otherwise that certain publications or publications generated, controlled or otherwise owned by the PA and the PLO, I'm going to allow those statements in those publications.

MR. ROCHON:  But your Honor had said what kind of statements would come in.  This is partly has to do with that rhetoric of incitement versus something related to a specific act, and so --

THE COURT:  Well, I was more concerned -- look, there is some -- I got to give them, concede to them there is some relevance about heightened rhetoric that they claim that is by the PLO or the PA that they claim is urging people to commit violence.  I got to concede there is some relevance to that.

F1czsok3                    Conference.

What we, the context in which we discussed it before was about statements by other people. I think, you know, there was a -- I think it was even some little girl saying that you ought to kill all the people or something. I mean those kinds of statements. But, you know, I'm not -- look, the fact that they -- the fact that they want to argue there's certain statements or inciting others to violence, I can't say that they can't present some of that evidence.

MR. ROCHON: Right. And the rubber hits the road when we talk about which particular --

THE COURT: Right.

MR. ROCHON: -- ones.

THE COURT: Right.

MR. ROCHON: And the Court had indicated that hateful rhetoric was not going to come in; that it needed to be tied to encouragement of specific acts of violence. That was the standard last week when we're before you. And the plaintiffs offered in a separate letter what they thought met that standard. But for purposes of opening that Mr. Yalowitz isn't using 201, we don't need to address it.

THE COURT: All right, so we'll come back to all those. But as I say I'm going to give them some leeway, but it's got to be something that one logically would be able to conclude that it is in fact -- one, as I say, I don't know again, I don't know what you're going to -- your position is

F1czsok3                         Conference.

going to be about what the PA and the PA's position generally, you know, I don't know we're going to get into this debate of your saying, look, the PA and the PLO is seeking peace and is trying to --

MR. ROCHON:  I'll tell you what I'm going to say.  I'm going to say -- try this as a tort case, as whether or not there is evidence to tie to the specific incidents.  I'm not going to try this as a second taffadal, the peace, lack of peace.  I'm going to try a tort case.  I'm not going to say my clients sought peace.  I'm not going to be introducing specific denunciations even.  And that's why I don't want them to inject that into this case.  I'm trying to try a tort case.

THE COURT:  Well, that's fine.  And if that's the intent, your intent, then I'm going to give them less leeway in that regard.

But the original discussion we had was that there was a -- they would say, oh, they released people and you would say, no, they arrest people, you know.  And they would say, no, they encourage violence and you would say, no, look they say don't do any violence.  So if you guys are going to go back and forth with that, it's a moving target for me.

MR. ROCHON:  I've been pretty clear I think.  What I'm trying is the case is a respondeat superior for material support for the seven incidents, hopefully less than seven, when we're done down to it, that are going to be on trial.

F1czsok3                          Conference.

THE COURT:  All right.

MR. ROCHON:  And not --

THE COURT:  We'll.

MR. ROCHON:  And I won't be reserving opening so Mr. Yalowitz won't feel like he's sand bagged and he'll know after my opening where we are.

THE COURT:  They'll have a better feel for both sides here, all right.  So let's put that on the shelf and until not -- let's go beyond opening on that.

I'm not sure why you object to 512 being referenced in opening, used in opening if it's going to be admitted.

MR. ROCHON:  Actually, your Honor, what I said was that the first part of 512 we recognize, we didn't object to about the 2004 law.

THE COURT:  So.

MR. ROCHON:  So the document itself includes subsequent laws as well, which is from 2006 and therefore is not proximate.  Actually didn't object to the 2004.  We previously noted our concerns about the -- you pretty much ruled that that's coming in.  But the payment information that's relevant should be the one that was contemporaneous, the two.

THE COURT:  I'm not sure what's the difference between 2006 and 2004.

MR. YALOWITZ:  Your Honor, I can't even tell what he's

F1czsok3                    Conference.

talking about.  I'm flipping through the exhibit.  Maybe he can clarify for the Court and for me.

MR. ROCHON:  Sure.  The articles through 13 start the 2004 law, and then the next one starts with article one, you'll see at the end they say proposed 2006 law.  They don't even indicate whether --

THE COURT:  What's the difference?

MR. ROCHON:  More money.

THE COURT:  And I'm sorry?

MR. ROCHON:  I mean, boil it down there is more money paid according to the draft 2006 law than the 2004.

THE COURT:  I see.  So they accounted for inflation and now a larger sum of money.

MR. ROCHON:  That's it.  And the real measure of how much people got paid, of course we've provided in discovery the payment records that show how much.  So I don't know that we need possibly not an act of law when the real thing is how much did you pay these guys.

THE COURT:  Well, the real thing is not even how much.  Couldn't careless how much.  The question is was there payment, what was the reason for it.  Whether they got paid $100 or $1,000 is not particular relevant to the jury's assessment, whether it was a legitimate payment or --

MR. ROCHON:  So that's our position, it's simply that the second part.

F1czsok3                        Conference.

THE COURT:  Are you going to reference any of the 2006 stuff in your opening?

MR. YALOWITZ:  No, your Honor.

THE COURT:  All right.  Are you going to show the jury any part of that 2006 photo?

MR. YALOWITZ:  No, your Honor.

THE COURT:  All right.

MR. ROCHON:  Good.

THE COURT:  We'll see.

MR. YALOWITZ:  Okay.

THE COURT:  Then we can see whether or not all of the documents are --

MR. YALOWITZ:  We're just dealing with opening.

THE COURT:  Whether legitimate basis for excluding that.

Okay, then we're dealing with 1060.

MR. ROCHON:  We didn't object.

THE COURT:  And then we're dealing with the photographs and other demonstrative.  You said there was -- you want to show them a picture of a funeral in opening?

MR. YALOWITZ:  I'll withdraw it, your Honor.

THE COURT:  All right.  And --

MR. ROCHON:  The photographs of the victims, your Honor, I do want to correct one thing.  I believe some of the photographs that we objected to were of people who actually

F1czsok3                        Conference.

were hurt in the incidents, but they're not plaintiffs.  We'll withdraw that objection.  I mean if they're actually hurt in the incident, it's --

THE COURT:  Some of the --

MR. ROCHON:  Some of the victims in this -- people were hurt in these incidents are not plaintiffs.

THE COURT:  Right.

MR. ROCHON:  And there are photographs in there.  Initially we objected and frankly --

THE COURT:  You're not talking about gory bloody photographs.  You're just talking about identifying certain individuals who might be witnesses or --

MR. ROCHON:  They're family photos and --

THE COURT:  Okay.

MR. ROCHON:  -- we don't object to those where the people -- I mean they were hurt in the incidents, I can see where counsel wanted to use them.

THE COURT:  All right.  And then there were photos of convicted perpetrators.  Is there some reason why you objected to that?

MR. ROCHON:  Well, you'd have to I think look at them, your Honor.  So I think this begins -- the papers aren't numbered, but it starts on -- it would be page 26, but these are the so-called terror cell.

THE COURT:  Well, you object to the photographs

F1czsok3                        Conference.

themselves or just -- I know you objected to them being referred to as terror cell.  You object.

MR. ROCHON:  We don't object to the photos.  We do object to the fact that the plaintiffs have put some client insignia next to them, presumably thinking they're employees.  One of them, as far as we know, wasn't even an employee, but still has one of those insignia.

But the core prejudice on this is the reference to terror cells.  The reason being of course it's not just word terror, know we're in a terror trial, but the idea of a cell, that these were some kind of organized cells starts to assume facts that -- actually for some of these these are pretty loosely, plaintiffs don't proper --

THE COURT:  Is there some proof in this case of terror cells or is that just your --

MR. YALOWITZ:  I think that's just a fair -- I thought that was kind of a description of a bunch of people who ban together to commit terrorism.  It's a cell.  I mean, you know, unit sounds more organized to me, terror unit sounds like they're regimented.

THE COURT:  Well, what are you trying to describe them as, what is the demonstrative?

MR. YALOWITZ:  They're a group of --

THE COURT:  You are going to put up a demonstrative and going to show what, it's going to say these guys --

F1czsok3                    Conference.

MR. YALOWITZ:  Right.  So the demonstrative is very helpful to the jury to put a face to the name, to organize the evidence and to think about, okay, what was -- what were the different roles of these people in the attack.

THE COURT:  Can you tell them terrorist group?

MR. YALOWITZ:  Sure.

THE COURT:  Can we live with that?  If that's what he says, the proof's going to show, they were grouped together?

MR. ROCHON:  I would -- I actually would object.  They weren't a group.  Some of these people didn't even know each other.

THE COURT:  Well, but that's a question whether they're going to meet their promise.  They say that they're going to prove that they worked together as a group.

MR. YALOWITZ:  But I don't want to be restricted, if I'm talking and I say, well, this cell.

THE COURT:  Why do you call it a cell?  There's no witness is going to call it a name cell.

MR. YALOWITZ:  Okay, just because --

THE COURT:  If you say that some expert is going to say they're, quote, cell, then you can do that.

MR. YALOWITZ:  I think what's happening here is the defendants are trying to micro manage my opening.

THE COURT:  Well, that's -- I assume this does not significantly restrict your opening.

F1czsok3                    Conference.

MR. YALOWITZ:  There is nothing wrong --

THE COURT:  Another word other than cell.

MR. YALOWITZ:  All right, I'll do that.

THE COURT:  My suggestion would be is pick a word that's consistent with what the witnesses are going to characterize it as, all right.

MR. YALOWITZ:  That's for sure.

THE COURT:  So then if your witnesses are going to say, you know, this terrorist group organization whatever they are going to call it, then that's what the evidence is going to be and you have a right to comment on that evidence.

MR. YALOWITZ:  Right.

THE COURT:  If that's what the evidence is going to be.  But if you have nobody in this case who is going to call it a cell, then you're not a witness and you don't get to call it a cell.

MR. YALOWITZ:  Okay.  I'm good with that.  I don't want them popping up saying, oh, I object to the word cell. I'm going to talk to my witnesses, if that's their view and I feel like that's the right word based on their views, I might use that word.

THE COURT:  No, you're only going to use that word if an expert is going to come in and describe these as cells and say why in his expert opinion these constitute cells.

MR. YALOWITZ:  I agree with --

F1czsok3                          Conference.

THE COURT:  I don't know what a cell is supposed to be.  Do you?

MR. YALOWITZ:  Yeah, I mean that's --

THE COURT:  Do you have -- is there some legal definition of a cell?

MR. YALOWITZ:  It was the natural common sense definition of a group of guys that get together, hatch a terror attack.  But you know, I'm going to talk to my witnesses, and if it's something that's consistent with --

THE COURT:  I think it's a loaded word.  You have the word terrorist, you don't need the loaded word cell.  It sounds like we're dealing with Al Qaeda and Osama Bid Laden.  We're not.  That's not what this case is about.  So I understand their objection.

MR. YALOWITZ:  I'm going to call it a terror attack, because that's what it was.

THE COURT:  Okay.

MR. ROCHON:  I have no problem with that.

MR. YALOWITZ:  Terror attack.

THE COURT:  I don't know why attack and cell -- I think you're talking about the group, but terror attack is fine.

MR. YALOWITZ:  Right, okay.

MR. ROCHON:  There is only two other things, your Honor.  One is one of these is a photo, all of them are photos

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
**JA-3736**

F1czsok3                         Conference.

of the convicted or the perpetrator, except for one, there is a photo, a guy named Tawfiq Tirawi who is neither.

THE COURT:  So what is Tirawi's role, what are you going to say, why are you showing his photo, who is he?

MR. ROCHON:  Tawfiq Tirawi was a senior PA official, your Honor, head of the intelligence service.

THE COURT:  You're going to say he's the one that directed some of these attacks.

MR. YALOWITZ:  Correct, provided materials --

THE COURT:  Some reason why they cant' show his picture?

MR. ROCHON:  He wasn't convicted of that.

THE COURT:  Well, it doesn't matter.  Is there some reason why they can't show his picture?

MR. ROCHON:  The picture is not the problem.  It's what they say about him.

THE COURT:  What?

MR. ROCHON:  They say provided weapons, freedom to operate.  They characterize, you know, him.

THE COURT:  That's either going to be a fair characterization or what the evidence is going to show or that's going to be a promise that he made that he couldn't keep.

MR. ROCHON:  I understand your ruling.  But the last, your Honor --

F1czsok3                    Conference.

THE COURT:  The eagle graphics, is there some reason why it's appropriate to put graphics on the pictures as if you've already established that they somehow officially are part of the --

MR. YALOWITZ:  It's my promise, I will prove that all these people were employees.  I'm promising to prof that.

THE COURT:  But you make the pictures appear as if that's somehow an official picture of them being associated with the PA or PLO and that's not.  You created that.

MR. YALOWITZ:  Look, okay, that's -- I created it, that's true.  I'll be very candid about that.  I created.  It's my demonstrative, it's my representation.  But I want boards in here with these pictures so the jury can see them and understand who they are when all the witnesses are testifying.  And one of the things I'm going to prove is that the guys with little eagle emblems were employees.  So it's my demonstrative.  I'm going to represent it's not an official picture.  But to tell me I can't put a symbol on my demonstrative to help the jury remember which ones were employees, I mean I think they're really reaching there, your Honor.

THE COURT:  Well, I don't know what the picture looks like with this demonstrate so I don't know what --

MR. YALOWITZ:  May I hand, I could hand up an example if it would be helpful to the Court.

MR. ROCHON:  I've got --

F1czsok3                    Conference.

THE COURT:  I don't have a strong feeling one way or the other.  I understand their concern that I am --

MR. ROCHON:  I have a colored one if that helps.

THE COURT:  I think our jury's probably going to be a little more intelligent than have to be misled by this.  Let me see.  Are you going to explain to them what these symbols mean?

MR. YALOWITZ:  Of course.

THE COURT:  What does the first symbol mean?

MR. YALOWITZ:  The little eagle?

THE COURT:  No, the other one.  There is another one on the, is that some kind of symbol?

MR. YALOWITZ:  You know, you have again my only copy.

THE COURT:  Oh.

MR. YALOWITZ:  I'm sorry.

THE COURT:  It has a different symbol other than the, what's in that picture.

MR. YALOWITZ:  Oh, that's just part of the picture.  I don't know that's not --

THE COURT:  That's not a symbol of any kind?

MR. YALOWITZ:  Right.  That's just part of the picture.

THE COURT:  All right, okay.

You know what, now I'm not going to restrict you, as long as you make clear that you put those to indicate to them which ones you contend are -- you're going to tie to the PLO.

F1czsok3                    Conference.

MR. YALOWITZ:  Okay.  Thank you, your Honor.

MR. ROCHON:  Then the last one, your Honor, if I could tender, this is the last one.  In our view this is sort of the --

MR. YALOWITZ:  Is that 201?

MR. ROCHON:  It is 201.

MR. YALOWITZ:  Yeah, I already told him I'm not going to use it.

MR. ROCHON:  That takes care of that one.

THE COURT:  Okay, good.

MR. ROCHON:  I'm on a roll.

THE COURT:  So that's opening.

Again, with regard to -- it's not likely I'm just going to allow you to put in newspaper articles.

MR. YALOWITZ:  I understand that.

THE COURT:  I think we went through that.

MR. YALOWITZ:  I think I get it.

THE COURT:  To the extent, as I say, you say that these are communications of the PA and PLO made by the PA and PLO, that's one thing.  But in terms of New York Times and Time Magazine.

MR. YALOWITZ:  Look, the only thing I'll tell you, your Honor, the only thing that's coming up, and I haven't decided for sure I'm going use it, but there is -- one of the perpetrators in our attacks whose name is Nasser Aweis, was

F1czsok3                              Conference.

quoted in Reuters as saying he was proud that he was a member of Al Aqsa Martyrs Brigades and he was proud that the United States had designated Al Aqsa Martyrs Brigades as a terrorist organization. Reuters carried that story. He's a member, he's an employee of the intelligence service, and so I don't really --

THE COURT: Is he a member of that Al Aqsa Brigade?

MR. YALOWITZ: He is. There is independent evidence of that. There is independent evidence that he's a member of the intelligence service. I just think it's interesting that a guy gets quoted in the newspaper and the intelligence service which, you know, you think a normal intelligence service would know when their employees are getting quoted in the newspaper, doesn't fire him, doesn't say anything about it, doesn't discipline him, so.

THE COURT: May be interesting, but I'm not sure it advances your cause of action.

MR. YALOWITZ: Okay. Well, that's -- I mean I think it does. If you're going to keep it out as hearsay, that's useful information for me to know. I'm not offering it --

THE COURT: I'm more concerned about its relevance than it's hearsay. You want them to conclude from that that they must be approving of that statement because he's making that personal statement?

MR. YALOWITZ: No. They don't care; that the fact

F1czsok3                        Conference.

that the guy goes in the press and admits he's a terrorist, doesn't bother him.

THE COURT:  You know, I'm not going to do it on the basis -- and this is going to be my ruling as a general principle -- I'm not going to do it on the basis of just your saying this was out there, they probably knew about it so they didn't do anything about it.  If you have some direct evidence that he made this statement, that they were aware of it, that somehow in the deposition you asked somebody, well, when you heard him make statement, what was your reaction, if you have some evidence of that, then fine I probably would let you do it.  But just the fact that now it was in yesterday's Wall Street Journal -- well, I didn't read yesterday's Wall Street Journal so I don't know what was in yesterday's Wall Street Journal.

MR. YALOWITZ:  Okay, fine.  We can move on.  That's your ruling.  I'll move on.

THE COURT:  All right.

MR. YALOWITZ:  Not agreeing with it, but --

THE COURT:  No.

MR. YALOWITZ:  But I don't think it's, you know.

THE COURT:  I just want you to understand my position.  You don't have to agree with it.

MR. YALOWITZ:  Right.  I get it.

THE COURT:  All right, so this is about as I can do.

**JA-3742**

F1czsok3                    Conference.

I'm going to try to give you, before the end of the day, what I am working on as a rough draft of the jury instruction. Quite frankly, it's kind of early in a case that's ten weeks, you know, away from jury selection for me to have a final draft of the jury instruction. Quite frankly, I'm not even sure what this case is going to look like.

MR. YALOWITZ: Feels very early, your Honor. I mean --

THE COURT: I agree.

MR. YALOWITZ: I appreciate it, but --

THE COURT: What I've done is -- maybe I can give you my general instructions, which are taken mostly out of Sand, on you know, about credibility and those kind of things and burden of proof. Those are really important.

I fashioned some instructions with regard to the substantive claims, with regard to harboring, with regard to providing material support, with regard to respondeat superior. I have some standard instructions which shouldn't be a surprise to you. So I'll give that to you as quickly as I can. But just understand it's rough and it doesn't have any of your objections that you might have to the language, and we'll work on it over the weeks as we get closer, but at least you'll have an idea where I'm thinking at this point in terms of how I started to approach that.

Now with regard to -- I guess I need to deal with

F1czsok3                    Conference.

summary judgment.  You know, with regard to --

All right.  I guess the four that are now at issue are Guetta, Hebrew University, Sokolow and Mandelkorn; are those the ones that they've renewed their objection?

MS. FERGUSON:  Yes, your Honor.

MR. YALOWITZ:  That is correct, your Honor.

MS. FERGUSON:  And as to the PLO for all.

THE COURT:  Yes.

MR. YALOWITZ:  I mean, they didn't technically renew their objection to Guetta, but I came to you because of the change in --

THE COURT:  They did in the subsequent letter.

MR. YALOWITZ:  Anyway, but whatever it's.  I understand it's an open issue.

THE COURT:  Yeah, well --

MR. YALOWITZ:  But I want credit for it.

THE COURT:  You may not want -- as they way, you may not want credit for it, because that's the one that I think is just as much as I struggled with it to see that, you know, whether or not it's appropriate to at least let the jury first evaluate that before I make any determination, without the identification, and solely on the basis of what you want to describe as an MO, that nobody has described prior to your coming up with it, I just don't -- I just can't see that that's enough for a reasonable jury to conclude that the PLO is

**JA-3744**

F1czsok3                        Conference.

involved in that.  I mean, it was significantly determinative when I ruled that the identification could come in, because I said you have an identification and that person is a PA or PLO employee or associate, then that would be enough to withstand a summary judgment and go to the jury and let them make the determination of whether or not that's a reliable identification, and I did so over the defendant's objection.

That identification now being represented for whatever reason that it's not going to be evidence before this jury, there's really no evidence, there is clearly no direct evidence that would point to a 417, the PLO or the PA, and the circumstantial evidence is so weak that I could not sustain a verdict if the jury were to say that we're holding the PA or the PLO liable for this terrorist attack simply because there were a bunch of other terrorist attacks that were done that sounded a lot like this one.  And so since the Israeli government thought, quite frankly without any proof that I know that's going to come before the jury, thought that they were involved in these other terrorist attacks, that that's enough for me to convince me that because it was a shooting in the general area close to each other, close to the headquarters, that they must have been involved in this one too.  And as I indicated, you know the problems I have with it in terms of the what is really purported to be the pattern here.  And the fact that there is not even an -- even more liberally allowing you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**JA-3745**

F1czsok3                      Conference.

to rely on the Government's, Israeli Government's determination that they believed that they're involved in terrorist attack, the Israeli government made no determination that they thought this was one of the attacks they were involved in.  And that also weighs heavily in my evaluation of this and whether it's reasonable for the jury to conclude this when there is absolutely no evidence that the Israeli government indicated that they had that would point to this attack or lead them to put this attack on the list of a dozen acts that they obviously analyzed and had an opportunity to analyze.

So I think that given the paucity of evidence with regard to that, the MO evidence is not sufficient for a reasonable jury.  Accordingly --

(Continued on next page)

F1cdsok4

MR. YALOWITZ:  Your Honor, let me just say, I understand the Court's ruling.  I suspect that it was not a happy moment to write that --

THE COURT:  I understand.

MR. YALOWITZ:  -- letter.  I do want to find out the answers to some of the questions the Court asked me.  I don't know that it would make a difference.  I'm not saying it would or wouldn't.  But I want to reflect on it.  And if I think it does, I will come back to the Court and at least say what those answers are and say why I think it makes a difference.

THE COURT:  Sure.

MR. YALOWITZ:  I understand the Court's ruling.  I'm not -- I just want to make sure that I have really an accurate record --

THE COURT:  Sure.

MR. YALOWITZ:  -- as best I can --

THE COURT:  You can write me a letter later today or if you want to --

MR. YALOWITZ:  It may not be today.  It may be in the next day or two.

THE COURT:  Yes.

MR. YALOWITZ:  But it's -- you know, this is a family that I've lived with.

THE COURT:  I understand.

MR. YALOWITZ:  And that I care about, and I want to do

F1cdsok4

everything I can to save their case.  And I understand the Court's ruling.  I just want to make sure that I have all the facts.

THE COURT:  Yes.

MR. YALOWITZ:  And if there is something I can bring to the Court, I know you will entertain it.

THE COURT:  I'm sure that they must understand.  You have explained to them that their case has gotten significantly weaker rather than stronger since the last time I had considered the summary judgment motion because we had a identification --

MR. YALOWITZ:  Even a simple country lawyer like me understands that.

THE COURT:  I just want to make sure they understand it.

Now, with regard to the other claim, you know, I think it is close.  I think that I don't have necessarily confidence that the plaintiff will meet its burden with regard to those cases, but at this point I am not compelled to grant summary judgment as to any of those others.  I think that there are certain facts and factors that we'll to weigh in depending on how the evidence comes in.  I think that with regard to the -- I will just give you some examples rather than try to go through them in detail.

I think with regard to the Hebrew University

F1cdsok4

circumstance, I think the evidence with regard to Ahmed is

critical to them being able to overcome the hurdles that are

required in order to, as I say, connect the dots on this one.

I weighed the fact and have gone back and forth with regard to

the different -- if the plaintiff wants to argue MO, the

different MOs with regard to the Hebrew University bombing and

some of the other incidents.  The fact that even the plaintiffs

attribute that pretty much to Hamas rather than to the AMB.  So

it is a different set of facts.

        But I think that I am not significantly persuaded

about the material support, that it has to be further evaluated

because pretty much -- there are two things that I give you my

concerns, but, as I say, it depends on what Ahmed's evidence,

how that comes out.  But, obviously, one, you are relying

heavily on the providing of weapons but not any weapons that

were associated with the bombing.  You say Ahmed gave him a gun

and you claim that he committed a bombing.  Well, there is a

little disconnect there.  You can't say that they are providing

him with a gun unless something else is disclosed during this

trial necessarily to follow that they are supporting a bombing.

        You've indicated and you say there was some evidence,

but it was only from him that I had excluded, indicating that

he was -- that -- well, two things:  One, that they left some

bombing materials at his apartment.

        MR. YALOWITZ:  I didn't think you excluded that, your

F1cdsok4

Honor.

THE COURT:  Well, the reason I excluded it, because he was the only one that says so, and the reality is he was in jail.  He has no way to know that.  That is clearly hearsay.  He doesn't know whether or not they found and deliberately threw out his bombing material.  I don't know what that statement is based on.  I am not sure that statement is admissible.

Now, if you can convince me that you can get that in, I may give that some weight.  But at this point I am assuming that, wait a minute.  No.  The guy who is sitting in jail can't tell me what happened in his house when the search was done.

MR. YALOWITZ:  All right.  We will have to look at it during the trial.  I understand that.  I understand what your Honor is saying.  We will have to look at it during the trial.  I think he is a percipient witness, but I understand your summary judgment is based on you are assuming he is not.

THE COURT:  Now, if you say that there is some other independent evidence or some evidence that would indicate there is such nonhearsay evidence, you also contend that -- I assume you contend that they didn't know, they didn't find any.  You contend that they stopped bomb making materials and they didn't seize it.  I assume they are going to want to dispute that.  I don't know how they are going to dispute that and what evidence, if at all, that they are going to dispute that.

F1cdsok4

MR. YALOWITZ:  We'll see what the evidence brings on that.  I think we are better on that than you might think.

THE COURT:  That is the phrase.  It is harder for me on summary judgment to say in my mind I know what this trial is going to look like eight weeks from now.  OK?

MR. YALOWITZ:  All right.

THE COURT:  As I say, I think that, you know, it is a closer question and there is a possibility that, obviously, I am going to have to assess when you rest whether or not this case is going to the jury or when they rest whether or not that case is going to go to the jury.

MR. YALOWITZ:  I understand that.

THE COURT:  And even I have to assess, if there is a verdict in your favor, whether or not the evidence does support such a verdict.  So I have plenty opportunity to do that.  I have also made an assessment that I don't think presenting that evidence is so unduly prejudicial to the defendant that I should be more concerned about making sure the jury doesn't hear this.

The fact is that I have taken significant steps to minimize the prejudice with regard to the evidence in that case.  I have excluded, you know, gory photographs, etc., certain types of things that would take this -- you know, make this somehow significantly more prejudicial than the other six -- five or six terrorist attacks that the jury is going to

F1cdsok4

consider.

So I believe, as I said, Ahmed's involvement and whether or not you can establish and what you establish Ahmed's involvement to be and the pivotal connection between -- he seems to be the bridge between the individuals who perpetrated terrorist attacks and your proof that the PA or the PLO was involved, and I have determined that you should have an opportunity to at least attempt to --

MR. YALOWITZ:  One thing I think we should be thinking about as this evidence comes in and as your Honor thinks about the evidence, I know in the summary judgment motion your Honor expressed concern about supplying the personnel under the material support.  And, remember, we are talking about 2339(b), which is -- Hamas is a designated organization.  So my state of mind --

THE COURT:  Right.  But your issue is greater than that.  Your issue is causation.

MR. YALOWITZ:  Causation.

THE COURT:  You are doing this in the context of these particular --

MR. YALOWITZ:  Correct.  Correct.

THE COURT:  -- attacks.  So you are going to have to show me the relationship between that.  You can't -- everybody can't recover simply because you showed that they gave support to Hamas.  They can only recover if they are in fact a victim

F1cdsok4

of that support.

MR. YALOWITZ:  You are right.  If there is a specific -- if the material support was a substantial contributing factor, I agree with that.

But what I was going to say is in the context of the Al-Aqsa Martyrs Brigades, I think the Court was concerned about saying the fact that a guy is in the PA police force, PA is a member of the Al-Aqsa Martyr Brigades, I don't want to say that that person -- that that is providing personnel.  I read that ruling and I understand it, and I think there are other reasons why personnel could be an issue.

THE COURT:  You have to tell me what they did.  It is not a membership.  It is determinative of the activity.

MR. YALOWITZ:  So as we think about the evidence with Abdullah Barghouti, I just want you to be cognizant of the special -- first of all, there is a special definition of personnel under 2339(b) which I think cured some of the problems that Judge Koeltl was concerned about with the definition of personnel under 2339(a).  But, also, when we're talking about letting a bomb maker out of jail and giving him a safe house, that kind of sounds like supplying personnel in a way that's different from my employee went off and did a crime and I'm trying to link the employer to the crime.  That is a more classical respondeat superior issue.  So I'm not saying -- I'm just saying this is an issue --

F1cdsok4

THE COURT:  I will give you an opportunity to attempt to make whatever appropriate argument you want to make in that regard.  The fact is that, look, you cannot simply say that because they release somebody from jail a year and a half before the person committed a terrorist act, that somehow that there is some -- you don't even have temporal proximity when you do that.  So you can't say, oh, everything that the person -- but for the person being released from jail, he would have never been out there to commit a terrorist act.  That is not the way you can prove this case.

You have to demonstrate that in anticipation of him committing a future terrorist act, and may have to establish that anticipation of him committing this particular terrorist act, they let him go so he could in fact commit that act.  You know, I can't -- you know, it is like saying, well, Judge, why did you release someone accused of a crime from jail on bail and that person went out, you know, six months later and they robbed a bank.  So it is your fault that they robbed the bank.  Wait a minute.  That is not the way it works.  That is not the cause of his committing the crime, because I released him, you know, on bail six months later, unless you could establish the reason I released him is so he could go out and rob the bank.

MR. YALOWITZ:  I think we are good on that.  I think it is a Thelma and Louise kind of story, you know.  He starts and goes on a crime spree.

F1cdsok4

OK.  I think the jury is going to be able to get there

MS. FERGUSON:  Your Honor, if I could just have a clarification on the Yeshiva University?

THE COURT:  Go ahead.

MS. FERGUSON:  With some of the incidents like the Mandelkorn, you distinguish between the respondeat superior theory and the material support.  So with Hebrew --

THE COURT:  I am not making a distinction at this point because I don't think it is necessary, I think, because the evidence is going to come in, and it is going to come in, you know, whether it is one theory or another.  So I am not here to define the theory.  I am here to say whether or not I am going to dismiss the claims, but I am not going to dismiss --

MS. FERGUSON:  It is our contention that there is no evidence of any employee who was involved of Yeshiva University.  Ahmed Barghouti was convicted of a number of things but not for any involvement in the Hebrew University bombing, and he is the only employee in the mix here.  So there is no evidence of an employee's involvement in the bombing. They say they have evidence of an employee helping someone who was involved in the bombing later but not of any involvement in the bombing itself.

THE COURT:  All right.  Well, since I'm not dismissing any of the claims as they are alleged in the complaint, I don't

F1cdsok4

think I have to reach that issue and I am not going to reach that issue.  But you may be right that it may be very simple for me when the evidence is in or when the plaintiffs rest to go ahead and put one or both aside at that time.  But quite frankly, even the complaint as written is not clearly distinguishable of those claims.  So I am still in the process of evaluating how these individual claims can go to the jury and identifying which ones.  And that is a process that I am still working on that you won't have yet, which is my process of thinking about the verdict form.  So as soon as I get some handle on how I am going to pose these questions with regard to each one of the events and each one of the theories that apply to that, I will have a better feel hopefully within the next couple of days or weeks to address that.

With regard to Sokolow, I think that there it is a close one.  What has tipped me in the direction of giving you an opportunity to present that case is the evidence -- primarily the evidence that you want to offer that the GSS was aware of the female bomber before it was announced.  I think you have to give that some weight in conjunction with the other circumstantial evidence that you want to offer.  Whether or not that is going to come out in a form that is going to be sufficient to meet your burden or for a reasonable jury to conclude liability, it is impossible for me to say at this point.  But I will let you rely on that and other evidence that

F1cdsok4

you have argued that does seem to effectively maybe not -- one of the reasons why I didn't grant summary judgment.

Now, with regard to the Mandelkorn, I think that the significant issue still remains with regard to the funding of the AAMB. I think that -- I can imagine a scenario that you could present that might make a reasonable jury conclude that they were responsible for funding the AAMB who went on to committing that terrorist attack and providing financial assistance to them, and I do so given the nature of the documents that we have been talking about and some of the testimony. Again, whether or not it is going to come in in a way that is going to be sufficient for a reasonable jury to conclude any liability against the defendants I think remains to be seen. But with regard to those issues and those cases, that is going to be in my ruling with regard to the summary judgment, and the parties should be prepared to move forward on that basis with those cases and the relevant evidence with regard to those cases.

I think pretty much that's as much guidance as I can give you now. I don't know what else is still outstanding.

MS. FERGUSON: There is the question of the PLO. Your Honor already held that their respondeat superior claims against the PLO are dismissed if there is no evidence of any PLO involvement, and the plaintiffs have not identified any PLO material support for these particular attacks.

F1cdsok4

THE COURT:  I'm sorry.

MS. FERGUSON:  The plaintiffs have not identified any admissible evidence of PLO support for these attacks.

THE COURT:  Well, I think that you've routinely argued to me that I should make a distinction between the PA and the PLO, a distinction that may or may not be an appropriate distinction to draw.  I am not in a position to make that distinction at this point because the plaintiffs contend that they are going to demonstrate that there is a direct link hand-in-hand with the activities and decision making of the PLO and the PA and that they are going to demonstrate the same people made the same decisions, and they are the same officials that consistently made those decisions on behalf of the PA, the PLO.  Now, whether they are going to be able to establish that, I don't know, but I am not in a position now to say that the decision making and the activity that they may end up attributing to certain individuals, particularly Yasser Arafat and other individuals, that when Yasser Arafat signs off on something, that technically it is only a sign off for the PLO with regard to an issue that he signed off for the PA and PLO. I think it depends on the nature of the decision making process and it depends on the nature of whether or not there are others who are making individual decisions that could be independent or inconsistent with those decisions.

So at this point I am not in a position to make a

F1cdsok4

factual determination with regard to distinguishing the decision making process, the activities, or the involvement of the PA, particularly direct involvement in PA and PLO.  I think it is a factual determination to be addressed by the jury, and I think depending on whether or not they can establish a unitary decision making process and a unitary involvement in these alleged -- these terrorist attacks, I think that is an issue for the jury to evaluate and not a legal question that the Court can as a matter of law determine at this point

MS. FERGUSON:  There is a legal standard as to whether one entity can be deemed an alter ego of another, and the plaintiff have not proffered facts so it doesn't share leadership at the Yasser Arafat level, which is insufficient for alter ego status.

THE COURT:  I am not even addressing specifically the legal relationship of alter ego.  And it is a factual determination with Yasser Arafat, or others, who make decisions, sign off on issues, provide funding, if they say they can establish that, whether it is a decision being made on behalf of the PA or it is a decision made on behalf of the PLO.

MS. FERGUSON:  But there is no evidence of any Yasser Arafat sign-off related to any of these attacks at issue.

THE COURT:  There is clearly at least evidence of Yasser Arafat's sign-off on some payment of monies to people that they contend are people or entities involved in the

F1cdsok4

terrorist attacks.  So there is -- you know, if they say that Yasser Arafat approved providing money to the AAMB for the AAMB to commit a terrorist act, there is a factual determination, not a legal one, whether or not he was doing that on behalf of the PA or he was doing that on behalf of the PLO if he serves as dual roles in both organizations.  I don't know what the evidence is.

MS. FERGUSON:  Even the plaintiffs acknowledge there is no evidence of PA or PLO payments to an organization called the Al-Aqsa Martyrs Brigade.  The only thing they are relying on is -- the classic example is that letter we looked at earlier where $350 to this group of people unrelated, and we have no evidence that it is for terrorism or that there is any effort to reward terrorism.

THE COURT:  That is a different issue than the issue you are raising now.  The issue you are raising now is that somehow I should make a legal determination that the PA and the PLO are different entities so that any activity that the PA was involved in the PLO can't be responsible for that, or any activity that the PLO is involved in the PA can't be responsible for that.  I do not have a record to make that kind of a determination.

MS. FERGUSON:  So the absence of evidence against the PLO, the PLO is going to file based on evidence against the PA?

THE COURT:  Well, you know the answer to that is no.

F1cdsok4

As I am saying, the answer to that is no.

MS. FERGUSON:  I mean, the PA is an elected government.  So the whole alter egoness doesn't apply.  At one point Hamas was running the PA government and they are not even part of the PLO.

THE COURT:  I'm not sure what -- I'm sorry, go ahead.

MS. FERGUSON:  They definitely do not meet the alter ego test.

THE COURT:  OK.  So I am not sure what decision you are asking me for at this point.

MS. FERGUSON:  But in the absence --

THE COURT:  You want me to rule what?

MS. FERGUSON:  I want you to dismiss the PLO because there is an absence of evidence as to the PLO, and the PLO should not be tried based on attributing PA evidence to it based on an alter ego theory.

THE COURT:  But there is separate evidence that they say that they are going to rely upon that they say would independently make the PLO responsible on not only a respondeat superior theory but on the theory that they are PLO agents and individuals who were acting at the direction of the PLO to commit these terrorist acts.  I mean, that doesn't get them out of the case.  I mean, it may end up being that they can't attribute both theories to both sides, and clearly I have already indicated that they can't attribute both theories to

F1cdsok4

both sides because the PLO was not the employer and the PA is the employer so that respondeat superior theory only applies to the PA.

But any evidence that they want to offer that the PLO was directly involved in, supportive, provided material support, harbored terrorists who committed these acts, or any of their agents that they say were involved in participating in the accomplishment of these acts is direct evidence against the PLO, and the PLO would have to -- the jury would have to assess whether that evidence is strong enough to make the PLO independently liable or not. And they still have the burden and they will have the burden of demonstrating the independent liability of the PA and the independent liability of the PLO.

Now, if they want to establish that with the same evidence, that is another question. But if they -- you know, I don't think that there is anything that I have ruled that is inconsistent with that. And I don't think that there is any basis for me to conclude that there isn't sufficient evidence that they intend to try to present to indicate that PLO employees and PLO officials, the jury has evidence to consider as to whether or not they were either directly involved in any of these terrorist acts or involved in the decision that supported these terrorist acts. All right?

Anything else that we need to address before we go and prepare for tomorrow?

F1cdsok4

MR. YALOWITZ:  I have two items, your Honor.  I have three items.  One of them we don't need to address right this minute, but it is an open issue that I just want to make sure we can get back from you.  The defendants have offered two depositions for these late-substituted witnesses.  We would like --

THE COURT:  If you want to do the depositions and you have agreed to it, go ahead and do the depositions.

MR. YALOWITZ:  And I would like one of al-Bakri also, who we talked about before.  He was one of the claims that Abdullah Barghouti escaped.  I would like to do him in New York so that we don't have to have somebody running out to Israel to take these depositions.

THE COURT:  The two depositions that you agreed to, you can do the al-Bakri deposition.  I am not going to do that deposition at the same time unless you want to agree to that.  If you want to agree to that, I don't see it at this point.

MR. YALOWITZ:  All right.  Can we have the Court order them to be done in New York so we don't have to send somebody out --

THE COURT:  Are these people coming here as witnesses?

MR. ROCHON:  Exactly.  They would have to be here as witnesses, yes, your Honor.  I should tell you that we may come to a point in this trial where some of our people are denied visas and we are having problems with that and have to do some

F1cdsok4

testimony by videotape from there.  They have applied for visas but --

THE COURT:  How do you want to do depositions of these two people?  You agree to do the depositions?

MR. ROCHON:  I agreed to do them.

THE COURT:  How?

MR. ROCHON:  I don't know when they are going to get here right now.  You will have to give me time to figure out the travel plans, your Honor.

THE COURT:  All right.

MR. ROCHON:  I will obviously try to get them here a couple of days before they testify so he can do their depositions.

THE COURT:  Let me see if I can solve your problem.

MR. YALOWITZ:  Thank you.

THE COURT:  You have two choices.  You can get them here the week before they are going to testify, in that week, to do the deposition.  So they should be here sometime before the Friday before the Saturday or Sunday.  If they are going to do the deposition, do the deposition so they can have it, they can review it over the weekend, and they can further prepare for the witness the next day.  If that is not possible, then you should both consider whether or not you are going to do -- you can make arrangements for some kind of video deposition of these witnesses immediately -- immediately within the next two

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**JA-3764**

F1cdsok4

to three weeks so that they still have an opportunity to do that if they want to convince me, after they have done that, that somehow that is inadequate and I can hear that.

But it seems to me that you either should give them a very early video deposition within the first two or three weeks of this trial or give them a live deposition a week before they are supposed to testify -- the week -- the week before -- during the week before they are supposed to testify so they can have a full opportunity to be fully prepared for the witness. And you should let them know within a week which one of that could happen.  So see if you two could work it out.

MR. ROCHON:  Understood.  So within a week I will let them know which it is going to be.  If it is going to be by video, we will set it up several weeks beforehand.  If it is going to be live, it will be the week before they testify.

THE COURT:  If it is going to be by video, you should set it up with within three weeks.

MR. ROCHON:  OK.

THE COURT:  So if you have a week to tell them, then within the next two weeks just go ahead and do it by video and get it over with so you can concentrate on this job.

MR. ROCHON:  That is fine.  Thank you.  We might be able to arrange to have those taken for defendants by someone other than Mr. Yalowitz and myself so that we can do them even while we are in court, if that is OK with --

F1cdsok4

THE COURT:  Sure.

MR. YALOWITZ:  Your Honor, I'm not --

THE COURT:  Do you want to agree to do it on the weekend, that is fine.

MR. ROCHON:  I'm sure that we are going to want to have someone else take it that is going to be other than I.

THE COURT:  I'm not sure that this is going to be critical to either case.

MR. YALOWITZ:  I agree.  OK.  Two other really quick logistical things.

THE COURT:  Yes.

MR. YALOWITZ:  Number one.  For the convictions, we have prepared five little binders that are organized by the five attacks for which there are convictions.  We will give the Court a courtesy copy today.  We will give the defendants a courtesy copy today.  And we would like the Court's permission during the course of Mr. Kaufman's testimony to hand those out to the jury so they can page through them and see them.

THE COURT:  As long as you have laid the foundation and they are all admitted into evidence, you can do that.

MR. YALOWITZ:  Thank you, your Honor.

MR. ROCHON:  So I take it five binders, one of the five -- one for each of the five is where there are convictions?

MR. YALOWITZ:  That is correct.

**JA-3766**

F1cdsok4

MR. ROCHON:  OK.  Again, we have this issue with redactions, your Honor.  I mentioned it earlier.  This comes up until we get through it.  I am going to mention that to remind you.

THE COURT:  You can remind me but I can't do anything with it until you tell me what your problem is.

MR. ROCHON:  I understand but I got them Saturday --

THE COURT:  I understand.

MR. ROCHON:  I'll tell you, tomorrow morning I am sure I will be able to inform you on that issue.

MR. YALOWITZ:  It sure would be helpful, your Honor, if defendants would talk to me and let me know what their problems are.  It might save the Court some time.

THE COURT:  It is always helpful for the lawyers to talk.

MR. YALOWITZ:  That is my philosophy, but, you know, you learn something new with every case, I guess.

The final thing is, your Honor, we have a request to the Court for permission to play certain videos.  We haven't given the Court that request yet.  We will file the letter --

THE COURT:  Is this the videotape we are talking about?

MR. YALOWITZ:  This is different videos.

THE COURT:  A different video?

MR. YALOWITZ:  So these are videos primarily of PA

F1cdsok4

senior officials speaking on tape, and we are going to file a

letter and -- but I wanted to give the Court courtesy copies of

the videotapes.  And one of the videotapes --

THE COURT:  Do you have the transcripts?

MR. YALOWITZ:  I don't know if we have transcripts.

But they are translated -- none of them are very long and they

are like --

THE COURT:  I think we discussed this several weeks

back.

MR. YALOWITZ:  Yes.

THE COURT:  That is fine.

MR. YALOWITZ:  Then one of them is something that we

would like to play with Mr. Pearlman.  It is a news footage --

MR. ROCHON:  He sent it to us.  We didn't object to

it.

MR. YALOWITZ:  OK.  So we are fine with that.

THE COURT:  If you are both happy, I am happy.

MR. ROCHON:  Exhibit 49.

MR. YALOWITZ:  49, as edited to take out the sound.

THE COURT:  That is fine.  If you are both happy, I am

happy.

MR. YALOWITZ:  The two live witnesses are translated.

MR. ROCHON:  We are not going to object as they are

having a claim of present sense impression or spontaneous

utterance, given that these people are being interviewed live

F1cdsok4

on the scene.

I just want the Court to know and we are aware of this.  There are some graphic scenes there in the sense of bodies but they are in bags and there is some blood but it is at a distance.  Just so you are aware, we are calibrating our objection to that kind of evidence.  So we recognize that this is --

THE COURT:  You know --

MR. ROCHON:  They can laugh but I didn't object.

MR. YALOWITZ:  They are quick learners.

THE COURT:  I will do whatever is necessary to minimize the undue influence of that kind of thing.  But, look, I note, you know, the jury is not going to be surprised that there is some blood.  OK?  It just depends on the nature of we know what the most extreme photos are and we know what the least extreme photos are.  So that is usually the rule of reason guides that.

MR. YALOWITZ:  If your Honor will permit, I will hand two copies of the CD to this Court.

MR. ROCHON:  I guess he has a got separate one.

MR. YALOWITZ:  Yes. (handing)

THE COURT:  All right.  I will let you adjourn.  And if I can get you something before the end of the day, if you would like the jury instructions, I will.

MR. ROCHON:  So, Mr. Yalowitz, these are the

F1cdsok4

additional videos and -- I don't know which videos we are getting at this point.  I want to make sure that we are not going to use them tomorrow.

MR. YALOWITZ:  No, we are not going to use them tomorrow.

MR. ROCHON:  Except Mr. Pearlman's.

MR. YALOWITZ:  Pearlman, yes, but it is not in there.

Is one sufficient for the Court?

THE COURT:  That is fine.  All right.

Anything else?

MR. ROCHON:  No.  Thank you.

THE COURT:  Go prepare.  I will see you tomorrow morning at 9:30.  I am going to send the jury to a different courtroom.  When they've all gathered, I'm going to have them brought here and then we will begin that process.

MR. ROCHON:  9:30 for us?

THE COURT:  Yes, please.

MR. ROCHON:  Thank you, Judge.

MR. YALOWITZ:  Thank you, your Honor.

- - -



## MILLER CHEVALIER

Brian A. Hill
Member
(202) 626-6014
bhill@milchev.com
January 13, 2015

**Via ECF**
Hon. George B. Daniels
United States District Judge
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007-1312

      Re: *Sokolow v. Palestine Liberation Organization et al.*
         04-CV-397(GBD)(RLE)

Dear Judge Daniels,

      I write to object to the admission or display to the jury of the following 21 exhibits and photographs with Plaintiffs' expert witness Alon Eviatar: PTE 5, 6, 15, 20, 104, 105, 106, 108, 171, 173, 212, 215, 224, 241, 512, 532, 628, 889, 958, 1127, and 1143 and photographs of Fuad Shubaki, Tawfiq Tirawi, Mohamed Dahlan, Jibril Rajoub, Issa Qaraqe and a chart with Hebrew subtitles contained on page 20 of Mr. Eviatar's expert report. Plaintiffs' counsel sent a list of these exhibits and photographs to defense counsel this evening at 7:25 pm. Ex. 1. Plaintiffs should be precluded from utilizing all of the documents and photographs listed in Exhibit 1 at trial tomorrow because they were first identified to Defendants for use with Mr. Eviatar less than 24 hours prior to their testimony. Jan. 6, 2015 Tr. at 115; Jan. 13, 2015 Tr. at 4-11. In any event, Plaintiffs should not be allowed to use a photograph of Issa Qaraqe, because no such photograph has even been produced to Defendants.

      Furthermore, Plaintiffs apparently intend to utilize 10 exhibits (PTE 171, 212, 215, 224, 241, 628, 889, 958, 1127 and 1143) and 5 photographs of individuals with Mr. Eviatar even though none of these exhibits or the photographs of these individuals were referenced in Mr. Eviatar's expert report (DE 500-25) or his corrected report (DE 500-29), or even disclosed obliquely as part of a list of thousands of pages of material which Mr. Eviatar reportedly reviewed "*inter alia.*" *See* DE 500-25 at 2-3. Plaintiffs should not be allowed at this late date to use these exhibits or photographs with Mr. Eviatar because they were not disclosed in his expert reports as "facts or data considered by the witness" or "exhibits that will be used to summarize or support" "all opinions the witness will express." Fed. R. Civ. P. 26(a)(2)(B)(i)-(iii).

      Rule 26(a)(2)(B) requires a party to produce "a written report" "prepared and signed by the witness," which "must contain," *inter alia*, "a complete statement of all opinions the witness will express," "the facts or data considered by the witness in forming them" and "any exhibits

Miller & Chevalier Chartered

655 Fifteenth Street, N.W., Suite 900 · Washington, D.C. 20005-5701 · 202-626-5800 · 202-626-5801 FAX · millerchevalier.com

**JA-3771**



Hon. George B. Daniels
January 13, 2015
Page 2


that will be used to summarize or support them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(iii).  Rule 37(c)(1) provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Courts in this Circuit have barred experts from testifying at trial regarding documents not disclosed in their expert reports. *See, e.g., In re In re Omeprazole Patent Litig.*, No. M–21–81, 1291, 2002 WL 287785, *1, 3-6 (S.D.N.Y. Feb. 22, 2002)  (precluding experts from providing any opinions at trial concerning the documents or relying on the documents where such opinions or reliance were not disclosed during discovery) *(*citing *Fund Comm'n Serv. II, Inc. v. Westpac Banking Co.,* 1996 WL 469660, at *3 (S.D.N.Y. Aug.16, 1996) (describing Rule 37(c)(1) as an "automatic sanction" for failure to comply with Rule 26(a)(2)(B)); *Bristol-Myers Squibb Co. v. Rhone-Poulenc Porer, Inc.*, No. 95 CIV 8833 RPP,  2000 WL 356412, at * 2 (S.D.N.Y. Apr. 5, 2000) (limiting direct testimony by expert witnesses at trial to the contents of their expert reports unless the witness can show that the material was not available to him or retaining counsel as of the date of his report).

Here, Plaintiffs produced an expert report for Mr. Eviatar on June 14, 2013 and a corrected report for Mr. Eviatar on September 16, 2014.  Ten of the documents at issue (PTE 171, 212, 215, 224, 241, 628, 889, 958, 1127 and 1143), and the 5 photographs of individuals, were not disclosed in either Mr. Eviatar's original or corrected reports.  Plaintiffs never served a further supplemental expert report for Mr. Eviatar or otherwise informed defense counsel that Mr. Eviatar would testify regarding documents or photographs other than those disclosed in his expert reports until 7:35 pm this evening.  Accordingly, pursuant to Rule 37(c), Plaintiffs are not permitted to utilize those 10 documents or 5 photographs with Mr. Eviatar unless they can make a showing of substantial justification or harmlessness.

Moreover, at least 3 of these exhibits (PTE 224, 512 and 1127), and all 6 of the photographs were not produced by the Plaintiffs during fact discovery in this matter, and should not be admitted at trial for that reason as well.  The parties have long been on notice, and have even agreed on the record, that documents that were not produced during fact discovery would not be admissible at trial.  DE 740 at 2-5.  Today, the Court confirmed that "We are going to have what the rule was as I set down, Judge Ellis set down, and it was clear for both sides.  If you were going to produce something that you want before the jury at trial as an exhibit, it should be produced during discovery.  If it wasn't produced during discovery, then it's not going to be before this jury."  Jan. 13, 2015 Tr. at 6-7.  PTE 512 and 1127, and the 5 photographs at issue, were not produced by Plaintiffs during fact discovery.  Accordingly, Plaintiffs should not be allowed to utilize PTE 224, 512 or 1127, or the 5 photographs of individuals, at trial with any witness.

Miller & Chevalier Chartered

**JA-3772**



MILLER
CHEVALIER

Hon. George B. Daniels
January 13, 2015
Page 3

    Accordingly, Plaintiffs should not be allowed to use any of these documents at trial
tomorrow, or PTE 171, 212, 215, 224, 241, 628, 889, 958, 1127 and 1143 or the 5 photographs
of individuals with Mr. Eviatar on any other date.

                                    Sincerely,

                                    Brian A. Hill

Miller & Chevalier Chartered

# EXHIBIT 1

## Hill, Brian

| | |
|---|---|
| **From:** | Machnes, Tal <Tal.Machnes@aporter.com> |
| **Sent:** | Tuesday, January 13, 2015 7:25 PM |
| **To:** | Rochon, Mark; Hill, Brian; Ferguson, Laura; Satin, Michael |
| **Cc:** | Yalowitz, Kent A.; Horton, Philip W.; McMillan, Lucy S.; Hashimoto, Ken L.; Pildis, Sara K.; Romeo, Carmela; Kientzle, Michael; Mordechai Haller; Rachel Weiser |
| **Subject:** | Sokolow v. PLO/PA |

Counsel,

Below is a list of the exhibits we plan to use with Alon Eviatar tomorrow.  We also plan to use photographs of Fuad Shubaki, Tawfiq Tirawi, Mohamed Dahlan, Jibril Rajoub, and Issa Qaraqe, which have been previously disclosed to you.  Finally, we plan to use a photograph that appears on page 20 of Mr. Eviatar's expert report.

We expect that he will be on the stand for the remainder of the week.

Regards,
Tal

**Exhibit #**

5
6
15
20
104
105
106
108
171
173
212
215
224
241
512
532
628
889
958
1127
1143

Tal Machnes

1

**JA-3775**

Arnold & Porter LLP
399 Park Avenue
New York, NY  10022-4690

+1.212.715.1125 (office)
+1.781.307.2288 (mobile)
Tal.Machnes@aporter.com
www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter LLP, click here:
http://www.arnoldporter.com

**JA-3776**

1

F1D8SOK1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MARK I. SOKOLOW, et al.,

                Plaintiffs,

        v.                              04 CV 397 (GBD)

PALESTINE LIBERATION
ORGANIZATION, et al.,

                Defendants.

------------------------------x

                                        New York, N.Y.
                                        January 13, 2015
                                        9:30 a.m.

Before:
                HON. GEORGE B. DANIELS,

                                        District Judge

                        APPEARANCES

ARNOLD & PORTER LLP
     Attorneys for Plaintiffs
BY:  KENT A. YALOWITZ
     PHILIP W. HORTON
     TAL MACHNES
     SARA PILDIS
     CARMELA T. ROMEO
     RACHEL WEISER

MILLER & CHEVALIER, CHARTERED
     Attorneys for Defendants
BY:  MARK J. ROCHON
     LAURA G. FERGUSON
     BRIAN A. HILL
     MICHAEL SATIN


Also present:  RACHELLE AVITAL, Hebrew interpreter
               RINA NE'EMAN, Hebrew interpreter


                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

**JA-3777**

F1D8SOK1

(case called)

THE COURT:  We are gathering the prospective jurors together.  We may have one issue with regard to a juror that's not among the first 28.  We may have an issue with regard to a juror that's in the first eight.  But I think that the information I have been given so far is that one of the jurors had a serious heart condition and was rushed to the hospital for some procedure or operation.  That juror is obviously not going to be available for this trial.  It is not a juror, as I said, that's in the first 28 that was pulled out of the wheel so that shouldn't be an issue.  I have sketchy information right now, but I think that juror is number 17.

Also, I am getting some information now about another juror.  I will discuss it in a second.  If this juror is here, then it's not a problem.  As I get some information about whether or not they are all here, I should get that in the next five to ten minutes.

I have received some letters this morning.  Let me first go to the letter that I received from the defense about an objection to some attached exhibits.  I received the letter from Mr. Hill.

MR. HILL:  Yes, your Honor.

THE COURT:  You haven't seen any of these exhibits that are proposed to be used with Mr. Kaufman.

MR. HILL:  With respect to the ones we attached, which

3

F1D8SOK1

are photographed as the car and the stone building, the one that looks like a map with some writing on it, and the one that has a stone building on it, we have never received those prior to last night.

THE COURT:  Is that what you're objecting to?

MR. HILL:  Yes, your Honor.

THE COURT:  The stone building photograph?

MR. HILL:  The first three attached to my letter, your Honor.

THE COURT:  Mr. Yalowitz, what is the situation with these?

MR. YALOWITZ:  This is one of those things, your Honor, where if the parties talked to each other, we wouldn't have to waste the Court's time.  These are demonstratives that I prepared to help the jury put a location to Mr. Pearlman's testimony.  Mr. Pearlman is an eyewitness.  I took a map off Google maps.  Mr. Pearlman drew a box of where his flower shop is and where the bus blew up and that's what that map is.

Then the two photographs are from Google street view. I pulled them off the Internet so that Pearlman can show a scene of what his flower shop is and where the bus was just so the jury can understand it.  They are demonstratives.  I am not offering them in evidence.  We can offer them in evidence.

THE COURT:  My ruling is this.  If you're not offering them in evidence, they are not shown to the jury.  They are not

F1D8SOK1                                                          4

a demonstrative; they are substantive evidence.

MR. YALOWITZ:  Then consistent with your rule,
Mr. Pearlman will foundationalize them.

THE COURT:  Is there any reason why these pictures
weren't produced in a more timely manner?

MR. YALOWITZ:  The reason is because I thought we
would use them as demonstratives.  We met with Pearlman about
three weeks ago in Israel and pulled them off the Internet and
I just didn't think they needed to be produced.  So it's my
fault, my personal fault.

THE COURT:  Mr. Hill, you tell me, is there some
reason we should be fighting about these photographs?

MR. HILL:  Timing, your Honor.  It's the day before
trial.  If you don't stop this now, I assume every night before
trial I am going to get new stuff.

THE COURT:  You don't have to assume that.

The bottom line is that my position is this.  I am
going to start strictly enforcing the rule.  I don't
particularly see any undue prejudice with regard to these
photographs, and I don't know what you or he might want to do
with these photographs, but at this point in time, as I say,
it's time for me to start strictly enforcing the rule.

As you say, Mr. Yalowitz, it would be more helpful if
the parties would talk, but that burden is on you, not on them,
when you have an exhibit that you say you want to offer and you

F1D8SOK1

have never shown them that exhibit prior to the first day of trial.  I can't fault them for that.  I fault you for that.

MR. YALOWITZ:  I accept responsibility, your Honor.  I misunderstood the Court's views.

THE COURT:  I didn't make these rules up.  These are the rules of the court.

MR. YALOWITZ:  I accept responsibility.  I don't see any prejudice to them.  I will not let that happen again.  We are talking about a three-week delay.  What we are talking about is photographs that the witness can say, this is my flower shop, this is what it looks like.

THE COURT:  The witness could have said that during deposition, during discovery.  As I say, I agree with you, I see minimal prejudice to the defense with regard to these photographs, but I am going to start strictly enforcing the rule.

Mr. Hill, if you want these photographs out, they are going to be out.

MR. HILL:  I want them out.  I also want the PowerPoint that I received last night out as well.

THE COURT:  That's what I asked you.  I asked you if you had an objection and you said you had objection to the first three.

MR. HILL:  You asked about the photographs.

THE COURT:  I asked you what you had objection to.

F1D8SOK1

You said you just had an objection to the first three.

MR. HILL:  I also object to the PowerPoint, which I also received for the first time last night.

THE COURT:  Is there anything else you object to?

MR. HILL:  We object to the materials that are referenced in the PowerPoint that were not produced during discovery as well as the other exhibits that were not produced during discovery that they intend to use with Mr. Kaufman and Mr. Pearlman.

THE COURT:  Mr. Yalowitz, is there some reason why you didn't produce this PowerPoint that you apparently had generated by your expert?

MR. YALOWITZ:  First of all, the PowerPoint wasn't done until after court yesterday.  We had to adjust it based on some of the Court's rulings.

I have been practicing law for 25 years, trying cases for almost that long.  I have never had an adversary say, I object to your PowerPoint with an expert.  You're not going to let me use these photographs.  I think you're giving them something they don't deserve.  But if we are going to start having every day objections to expert PowerPoints, that's ridiculous.

THE COURT:  We are going to have what the rule was as I set down, Judge Ellis set down, and it was clear for both sides.  If you were going to produce something that you want

F1D8SOK1

before the jury at trial as an exhibit, it should be produced during discovery.  If it wasn't produced during discovery, then it's not going to be before this jury.  This was not produced during discovery.

My position is this.  With regard to the photographs, if the defendants are objecting to these photographs, since these photographs could have been obtained and a decision could have been made and they could have been provided to the defense during discovery, or at least even if it wasn't during discovery at a significantly earlier time than the day of trial, I am going to exclude those photographs.

My position is different with regard to the map.  The map is something that the witness could create in the middle of the trial.  It would not have to have been an existing map prior to.  If you want to show him a map and have him mark on a map where his flower shop was, then I think that's appropriate and the witness can create such an exhibit during trial.  I see very a little prejudice with regard to the defense, and I think the intent of the rule that's set down, that's not in violation of the intent, giving both sides notice of what they can anticipate as evidence to be put before the jury.

With regard to the PowerPoint, I am not going to allow the PowerPoint during the witness's testimony to be used by the witness.  If you want to create a PowerPoint that is truly demonstrative, then a demonstrative exhibit is an exhibit that

F1D8SOK1

the lawyer wants to utilize during summation which summarizes the evidence or the testimony during the trial.

Now, if you want to create a PowerPoint that you want to use during your summation, that's based on the testimony that's put before the jury and/or exhibits that are put before the jury, I have no problem with you using such a PowerPoint as a demonstrative aid during your arguments if it reflects the evidence that is already before the jury.

With regard to the witness now creating a PowerPoint to reflect what he did before he got here and his analysis of the situation, if you want to utilize such a PowerPoint, then they should have had some notice of it.  My rule would have been the same if their expert pops up with a PowerPoint that they want to put before the jury during their testimony.

So my suggestion to both sides is, if you have something that you think that's going to go before this jury that the other side hasn't seen, then you better very promptly show it to them because I am going to start strictly enforcing the rule, that if they have not seen it prior to today, it's not coming in.

MR. YALOWITZ:  Let me just understand the Court's ruling on this because I have to say it really comes as a surprise to me.

THE COURT:  It should not.

MR. YALOWITZ:  OK.  I accept that you're saying that,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
**JA-3784**

F1D8SOK1

but I am telling you I think we have been candid with each other, your Honor.

THE COURT:  I agree, but I think you violated this rule.

MR. YALOWITZ:  I am telling you this comes as a serious surprise to me, and I wouldn't say that if I didn't believe it.

THE COURT:  What do you think the rule means that you can't put an exhibit before the jury unless the other side has previously seen it prior to the beginning of the trial?

MR. YALOWITZ:  My understanding was demonstrative aids can be used during witness testimony.  That is a pretty common practice.

THE COURT:  A photograph is not a demonstrative aid. There is no difference between your photograph where you want to put before them today and the photographs that we discussed over the last several weeks that are exhibits.  These are not demonstrative aids.

MR. YALOWITZ:  I am not talking about the photographs. I accept the Court's ruling on that and moving on.  I am talking about the PowerPoints because it's not just this expert, it's experts coming down the road.

THE COURT:  This expert is supposed to testify today or tomorrow.  You think it's fair for you to give it to them less than 24 hours before the witness is going to utilize it

F1D8SOK1

for them to review it and decide how they are going to react to it?

MR. YALOWITZ:  I had a discussion with the defendants about demonstratives.  We offered to give demonstratives significantly in advance of the day before.  They didn't want to do that.  So the idea that now we go to no demonstratives, as long as it's equal.

THE COURT:  Oh, it's equal.  If there is something you want to show this jury during the presentation of evidence, if the other side has not seen it, I am not allowing it to be admitted as an exhibit to show the jury.  It can't be shown to the jury during the trial unless it is admitted in evidence.  All right?  To be admitted in evidence means it is not a demonstrative.  It means it is substantive evidence that the jury should consider in making its determination.

If you are going to offer something other than what you claim summarizes the testimony and the evidence that they have seen, and you want to use it to demonstrate your argument during your summation, then that's a demonstrative aid and that can be utilized.  But if it doesn't reflect the testimony or the evidence that's already before the jury, you cannot put it in for the jury's review to use as substantive evidence.

That is what you're doing with this PowerPoint.  If this expert was going to try to convince the jury of his point of view with this demonstrative, then the other side had the

F1D8SOK1

right to know that that was going to take place, if you want the jury to be able to review that and utilize it, and if they wanted to ask to see it during their deliberations.  The rule is very simple that I did not make up, and I will instruct the jury this way, and you have seen it at the end of the draft of the instructions that I gave you.  No exhibit that was not admitted in evidence will go into the jury room for their review.  You can call it demonstrative, you can call it whatever you want to call it, but if it's not admitted into evidence, it does not go into the jury room for their consideration during deliberations.

Those are the rules.  Those are the rules that have been around for 100 years or more.  They are not my rules.  So that's the rule I am going to enforce.  I am no longer going to listen to the lawyers talk about they should have discussed it. The lawyer who is disadvantaged for not discussing it is the lawyer who wants to now put the evidence in, and they did not make sure that they shoved it in front of the face of the other lawyer to make sure that they had no objection or to make sure they could not raise a legitimate objection at the last minute. Whatever you think that you have that they haven't seen, you better show it to them or it's not coming in.

MR. YALOWITZ:  I hear you on that.  I need guidance from you, your Honor.

THE COURT:  My guidance is I mean what I say.

F1D8SOK1

MR. YALOWITZ:  I need you to separate out the timing and the substance, if you can for me.  Because I have other experts who it will be very helpful to the jury when the expert is talking about a perpetrator to see a photograph of the perpetrator.

THE COURT:  Well, if those photographs were shown to the defense --

MR. YALOWITZ:  They were.

THE COURT:  -- previously, then they don't have a legitimate objection.  If the expert pulls it out of his hat while he is sitting on the stand, and they say I have never seen this photograph, my rule is fairly simple.  It's not coming before the jury.

MR. YALOWITZ:  Agreed.  It will be very helpful for the jury, when the expert is testifying, to see the name of the person next to his photograph.

THE COURT:  That's different.  Those are things that are technically being created while the witness is testifying.  As long as whatever demonstrative you use reflects the evidence that's already before the jury, that's the way the rule works.

MR. YALOWITZ:  Right.

THE COURT:  There is no magic about this.  If it reflects the testimony or the other evidence before the jury in an exhibit, then you can represent it or create something that represents it any way you want and use it as a demonstrative by

F1D8SOK1

yourself or try to create an exhibit that shows a bunch of people's names and faces and show that to the jury, if those items of evidence are items of evidence that the party has seen and has been admitted into evidence.

MR. YALOWITZ: Well, that's what this PowerPoint is.

THE COURT: That's not what this PowerPoint is. The PowerPoint seems to represent what you say he is going to say. You want him to say it and show it at the same time. I am not going to allow that. We will listen to his testimony. As far as I am concerned, this doesn't fall outside of the category of any report that an expert does. This expert has created this in writing, and has created this in writing prior to the beginning of this trial. You have an obligation to give them everything that this expert has created prior to trial that relates to his testimony, particularly if it's going to be utilized during his testimony and shown to the jury.

You didn't do that. That's the guidance that I can give you. We are not going to start doing this. If you think that some things you want to use, in an excess of caution, you should make sure that they have seen it, and they have seen it in plenty of time so I don't have to hear an argument that you didn't show this to them, and you had an opportunity to do so, and now you want to do so. No, it's not fair for you to give them something 12 hours before we are supposed to get it before the jury and say, here, now you look at it and figure out what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**JA-3789**

F1D8SOK1

you want to do with it.  I am not going to do it.

MR. YALOWITZ:  We have got another expert coming tomorrow.  We will get them his PowerPoint as soon as we can. It doesn't refer to any evidence that they haven't seen, number one.  Number two, he is going to build it on the fly.  So we will get it to them this morning as soon as we can, but you're going to really hamstring me if you don't let the expert -- it's just like a flip chart.  If the expert was going to write on a flip chart --

THE COURT:  You can let him write on a flip chart, because you did not produce the exhibit that you created prior to this witness getting on the stand that you decided prior to the witness's testimony that you wanted to put physically before the jury for the jury's review.  I am not going to allow you to do that.  If you have some other things that you think they have not seen, I don't care how you describe it, if they haven't seen it prior to trial, I am not going to admit it at this trial.  If they haven't shown you something prior to trial, if you have an objection to that, I am not going to admit it.  That's the rule we set down months ago, if not years ago.  It's time to strictly enforce that rule.  No one has any excuse for having something that they say they are going to put before the jury at this point and the other side has not seen it.  No excuse.

MR. YALOWITZ:  They are bamboozling the Court.  They

F1D8SOK1

haven't seen it in the order, but this is a summary of documents that they have had for years.

THE COURT:  My attitude is very simple and this is the last word on it.  If you say that not having the PowerPoint is sufficient for them to have prepared for this trial and to understand this case, then that's sufficient for the jury, and you're not going to give the jury something different or more than the other side has at this point.

That's the rule for everybody.  I am not talking to you.  I am talking to everyone.  All right?  I am not going to spend a lot more time on these kinds of issues.  If you say you haven't seen it and the other side cannot tell me that they have produced this either during discovery or in a timely manner after discovery, which gave the other side plenty of time to prepare for this and utilize it in whatever manner they wanted to utilize it, it is not coming in.

MR. YALOWITZ:  I think, your Honor, I understand the Court's ruling.  I understand it applies to both sides.  Before we reach a final conclusion on this, I think Mr. Rochon and I should consult at a break because we may be able to come to agreement on it.  If we can't, both sides will follow the Court's ruling.

THE COURT:  If you can come to agreement that's fine, but otherwise this is the final ruling.

I am going to put that aside.  Let me see where we are

F1D8SOK1

with the jurors.

MR. ROCHON:  I have one quick issue with the jurors.

Obviously there is a lot of interested people in this case.  Many of them are in the audience today, lawyers or plaintiffs.  Obviously, contact with jurors is a very serious issue.  This morning the lead lawyer for the plaintiffs in Israel came out of the jury assembly room.  Fortunately, as I understand it, our jurors were not instructed to go there.  But it is obviously a grave risk for counsel, especially experienced counsel, to be going into the jury assembly room. I am not asking for any relief because our jurors could not have been tainted because as I understand it they were not sent there, but the risk is extraordinary.  I do think that the defendants would at least benefit from the Court instructing people about the importance of having no contact with the jurors.  That could have been a significant problem.

THE COURT:  I intend to do that, and I have taken steps to assure that we can minimize that.  I can tell you at this point you're right.  I did not have the jurors return to the central jury room; I had them return to a different courtroom.  They have been amassing in that different courtroom.  I have made arrangements with the court officers to make sure that the court officers are able to escort the jurors off of this floor during our breaks so that no one gets in the elevator with the juror.  I want no one hanging out in the hall

F1D8SOK1

when the jurors are arriving, and there will be a court officer who is going to be assigned to make sure there is no contact between jurors, parties, or any other interested spectators.

I have taken serious precautions for that. I intend to emphasize that. I will tell the jurors what I am going to say right now, that I expect that no one will speak to these jurors, no one will speak around these jurors, no one will talk about this case while they are in this building. That rule goes for everyone who steps into this courtroom and everyone who has any interest whatsoever in this case. If I find out that that's the case, I will take some action against that party, whether it be a lawyer, their client or a spectator.

You can minimally anticipate that if someone violates that rule, they will not be attending this trial on any further days during this trial. So let me emphasize that. That's the first step that I will take. They will forfeit their right to attend this trial if I find out that anyone is speaking about this case while they are in this courthouse or they have spoken or attempted to have contact with the jury.

Let's move forward so we can finish jury selection and be prepared hopefully this afternoon to begin with opening statements.

MR. ROCHON: If we have a down moment, if it's OK to address something.

THE COURT: Yes.

F1D8SOK1

MR. ROCHON:  I know you're going to be bringing the jurors in.  Obviously, there are a lot of people here already.

THE COURT:  I am moving everyone out of this side of the courtroom and the jurors are going to utilize that side of the courtroom.  Everyone will have to find seats on the other side or they will have to stand.

MR. YALOWITZ:  Your Honor, I have a couple of things.

First of all, do you mind if counsel wanders away from the podium?

THE COURT:  Down the street?

MR. YALOWITZ:  Some people walk around a little bit.  Some judges don't like that.

THE COURT:  I will give you as much leeway in that regard as you would like.

MR. YALOWITZ:  Second of all, as your Honor has observed, both sides have advisors about jury selection.  I would like mine as close to me as possible because I am not very good at it.  But I don't want him here if the Court is going to introduce him as a jury consultant.

THE COURT:  I am not going to introduce any of the parties at this point.  I am going to let you introduce yourselves and introduce the parties when you do your openings.

MR. YALOWITZ:  That is perfect.

The third thing is, the Court wanted the names of plaintiffs who are here for opening.  You want to deal with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**JA-3794**

F1D8SOK1

that after?

THE COURT:  Let's deal with that after.

MR. HILL:  Before we bring the jurors in there were letters last night from us and one this morning from the plaintiffs about prospective questions.  I think we have some objections to the plaintiffs' proposed questions so maybe you could rule on those before the jurors come in.

THE COURT:  Sure.

MR. HILL:  Your Honor, I believe one of the witnesses may also be in the courtroom.  I think at this point any witnesses should be excused, other than parties.

THE COURT:  The basic rule is anyone who is not a party, a plaintiff or a defendant's representative or anyone who is not an expert should be excluded.

MR. YALOWITZ:  I don't know if he is here yet.  Our first witness is here.  He saw the bus blow up.

THE COURT:  I don't care what kind of witness he is. If they want him excluded then that's going to be the general rule.  All witnesses will be excluded until it's time for them to testify.

MR. YALOWITZ:  Unless they are a party or an expert?

THE COURT:  Yes.  If there is such a witness, fact witness, then that witness can wait in the witness room.

MR. YALOWITZ:  OK.  Fine.  Thanks.

THE COURT:  I don't have any problems with the

F1D8SOK1

substance of the defense questions that they want.

I don't have significant problems with most of the substance of the questions that the plaintiff wants me to ask except I am still not going to ask jurors specifically about their assessment of damages.  I rarely have to do that.  The jurors said they can follow my instructions on the law.  They have already been instructed that that is what this case is about.  I don't need to emphasize that point one way or the other.

Also, that was probably, in essence, the only thing that I didn't think that there was some question with regard to the subject matter that I could ask, but I didn't know if you had any other objection.

MR. HILL:  Three issues.  One, we had requested in our letter with respect to the two jurors that had lost loved ones, that they would be allowed to answer those questions at the bench.

THE COURT:  I am not quite sure what you want me to ask, the ones who lost loved ones in 9/11 or lost loved ones --

MR. HILL:  No, I don't believe these were 9/11.

THE COURT:  Then I am not sure which ones we are talking about.

MR. HILL:  Number 20 and Number 162, one has indicated they are widow and one has indicated that they had a -- I can't

F1D8SOK1

remember the exact relation -- who was killed in a crime.

THE COURT:  What do you want me to ask people about that?

MR. HILL:  Would you please tell us when you lost your loved one and what happened?

THE COURT:  Why?

MR. HILL:  Because it may affect their ability to be impartial in the case and it may affect our desirability to choose them.

THE COURT:  I am not quite sure why it's relevant to their qualifications as a juror.

MR. HILL:  It's not only qualifications, it would be peremptories.  The reason they lost people, that may affect whether or not we want them on the jury and want to exercise one of our peremptories.

THE COURT:  Mr. Yalowitz, do you have a position one way or the other about the nature of that inquiry?

MR. YALOWITZ:  It seems far afield to me and intrusive.  I don't think it's necessary.  I defer to the Court's judgment.  I am not going to fight it, but I don't think it's appropriate.

THE COURT:  What do you want to know?

MR. HILL:  Just the circumstances of the deaths, if they were killed in an act of violence, for example, that is something that we would like to know about.  One of these

F1D8SOK1

people indicated they were killed as a result of a crime.  We would like to know what happened so we can make a judgment about whether or not that rises to the level of a cause challenge or whether or not we want to use a peremptory.

THE COURT:  I will make some initial inquiry in that regard but I am not going to do it at sidebar.  I will ask the juror if they feel comfortable saying something and if they want to tell us there, they can just tell us in general what happened; if they want to do so privately, then I will bring them up to sidebar.

MR. HILL:  Thank you, your Honor.

The only other two issues I had was with respect to the questions the plaintiffs wanted to pose to Juror Number 57 where they wanted to ask about a particular organization that they are a member of.  It is my understanding it is a religious organization.  Given the Court's decision to not allow any inquiry about religious views, I would ask that this particular juror not be asked about their religious views.

THE COURT:  Quite frankly, I don't have a real problem with asking about this from my perspective.  And my perspective is, I don't know anything about this organization or what it does and I don't think it's inappropriate for me to ask, if they say they belong to this organization, if they can explain to me what kind of organization this is and what kind of involvement they have in the organization.

F1D8SOK1

MR. HILL:  The only other issue I had is with respect to the question that the plaintiffs wish to pose to Juror Number 186 which is the very last one.  It's about the burden of proof.  I don't think it's appropriate to --

THE COURT:  I am not going to ask that question.

MR. HILL:  Thank you, your Honor.

THE COURT:  I will give the jury appropriate instructions.  I think there may even be some language in the final instructions that I am working on.

Let me tell you where we are.  We have several jurors absent.  I think it's appropriate to move forward.

As I indicated, Number 17 has a serious medical problem so that juror is going to be excused.

There is a juror, though, in the first eight who we are missing.  That's Juror Number 93.  I will just give you some basic information as I have it.  We attempted to reach out to that juror yesterday to notify the juror to come in.  I was told that the telephone has been disconnected and that juror could not be reached.  We did some research and it appears that the juror may be homeless at this point.  The juror may be staying at the YMCA.  We are not quite sure what the situation is but we sent out some information to try to reach that juror.  There has been no contact with that juror.  As I say, the contact information we have, the phone is disconnected and there is no way to contact the juror.  I think we did send some

F1D8SOK1

information to the local YMCA to try to have them reach out to this juror but we have not heard from this juror and this juror is not here today.  That's Juror Number 93.

So my suggestion is that we move forward, replace Juror Number 93 with the first person that you said that you wanted me to pull out of the wheel as the second ten.

MR. HILL:  That would be Juror Number 25 numerically.

THE COURT:  No.  That's not what I have.  That would be the first juror whose name was pulled out of the wheel after we did the 18 which was Juror Number 159.  You said you wanted me to pull an extra ten because you wanted to know who the next juror would be if we replaced a juror.  The next juror would be the juror whose name was pulled out of the wheel and that would be 159.

MR. HILL:  The reason why I am asking for 25 is that 25 is the next juror that we had designated acceptable.  93 who has not appeared for whatever reason is one of the jurors we had designated acceptable.

THE COURT:  That's not of the first 28 that we picked.  It's not a juror in the first 28.

MR. HILL:  Number 159 is a juror that plaintiffs have designated as acceptable.

THE COURT:  No.  You told me you wanted me to pick a second ten so that if we lost one of the 18, we would replace one of those jurors with one of those ten.  That's what I

F1D8SOK1

intend to do.  This is what you agreed upon.

MR. HILL:  I don't believe we agreed to it.

THE COURT:  Why did I pick ten extra?

MR. HILL:  So we would know who was in the batting order.

THE COURT:  He is in the batting order.  That is the whole point.  Now it is time that he is at bat.  Let's go, guys.

MR. HILL:  Your Honor, I just want the record to reflect that what has happened is, the juror that we designated as acceptable has not appeared and that person is being replaced with a juror the plaintiffs designated as acceptable.

THE COURT:  So do you want me to chuck the second ten that you say were on deck that you asked me to put on deck because you asked me to do this -- I didn't do this.

MR. HILL:  No, your Honor.  I would like it to be replaced with the juror that we designated as acceptable; that is what I am asking because we are losing one that we designated as acceptable.

THE COURT:  The fact is, you wouldn't have gotten that in any case.  You would have gotten a random selection of jurors.  That's what we did, a random selection of jurors.  I put all of the people that you designated in the wheel.  They did not come out of the wheel.  That's not my fault or your fault.  That's the luck of the draw.  The luck of the draw is,

F1D8SOK1

this is the way you asked that the jurors be drawn to be seated and questioned.  Now to try to change that process, unless the two of you want to agree with that, I am going to do what you agreed to and what you asked me to do which was to figure out 18 who we are going to put in the box, that if we lost one of those 18, you would know who is on deck and who would fill that slot.  We have lost 93 so 159 is on deck.

MR. HILL:  I understand, your Honor.

THE COURT:  We are missing four jurors.  One other juror who is not in the 20, I think we are missing three other jurors and I don't believe any of those jurors are within that first group.  One is in the second ten that you pulled but that is the ninth person.  I doubt we are going to get to that person.  So at this point I think that without any further delay we should bring the jurors down.  We should put the 18 in the wheel.  We should spin the wheel and seat those jurors in the order as we discussed previously.

MR. HILL:  Your Honor, just so I have got it clear, are you saying number 57 is also absent?

THE COURT:  Number 57 is absent.

MR. HILL:  Thank you, your Honor.

THE COURT:  I would like that side of the courtroom cleared.  Find seats over there or find places to stand if you want to stay during the jury selection.  Then we will bring in the jurors and we will seat those jurors.

F1D8SOK1

As I say, I don't want anybody lingering in the hallway.  Anyone who comes to this floor, they either come into this courtroom or they leave the floor.  I don't want people hanging around in the hallway.

(Pause)

THE COURT:  Those people in front of the door, could you move over to the side, please.

We have a slight change.  Number 57 has arrived.

Do the parties have an extra copy of the letters about voir dire so that I can give a copy to my law clerk?

The jurors are entering.

(Prospective jurors enter courtroom)

THE COURT:  Please be seated, ladies and gentlemen.

Good morning, ladies and gentlemen.

First, let me thank you both for your patience and for your cooperation in this jury selection process.

We brought your number back.  From your number we are going to choose the 12 jurors who will be sitting on this case. I appreciate your efforts in filling out the questionnaires. We already have a significant amount of information about you so I just have a few follow-up questions.  And I want to ask each of you finally, before I move on to the next juror, if you still feel that you could be a fair and impartial juror to both sides, all sides, and that you can assure us all that you can be fair and impartial jurors.

F1D8SOK1

Let me just make a couple of comments first.

First of all, a lot of people think that this process is technically a process for us to decide whether you can be a fair and impartial juror in this case. Quite frankly, it's for you to decide because we can only go by what you say. We can only go by your honest assessment of your ability to put aside any preconceived notions, anything that you think you might have heard outside of this courtroom and to decide this case solely on the evidence presented in this courtroom.

I am being told that everyone is not in the room.

(Prospective jurors enter courtroom)

THE COURT: For now, ladies and gentlemen, just come in and stand on the side. We will get you seats in a second. We will be filling the jury box in a minute.

Come up to the front. Just give me five minutes and I will find seats for everyone. Please stay on this side so we can keep count of you.

(Continued on next page)

F1D3SOK2

THE COURT:  Is there anything we should address before we adjourn for lunch?

MR. ROCHON:  We did have an issue with redactions.  We are going to talk about it only if they are going to use the things in opening.  Just the redaction goes to the convictions and the statements at sentencing.  And I should ask if Mr. Kaufman is here, this does relate to his actual testimony.  He is an expert and I defer to the Court on your rules.  If this is a discussion that relates to his testimony, whether he can remain or not.

THE COURT:  Is he here?

MR. ROCHON:  He was here before the break.

THE COURT:  He is an expert.  He comments upon whatever he comments upon in his expert opinion.  So I think he can stay.

MR. ROCHON:  We appreciated the opportunity to look at the redactions.  This is an example of why we really do need to get these things sooner.  As it turns out, there was one thing in here that I'm sure the plaintiffs inadvertently left in which was a direct reference to the Abu Talal name, about which we fought so much.  And I've confirmed it is an oversight, but it is why we need a lot of time.

In addition, there are other references in there that we think should not be in there.  They're not properly redacted in light of your rulings.

F1D3SOK2

THE COURT:  What is the nature of them?  I don't need the substance.

MR. ROCHON:  If we get in the weeds, Mr. Satin will address it.  I'll give you the big picture which is all I'm capable of.

There are direct references that implicate Yassir Arafat in that people are saying he did this, he did that.  Not general references to him as leader, but pointing the finger at him.  So there are those kinds of references we discussed. There are statements in one file of what specifically another individual said.  Muhammad Hashaika.  We recognize that the names of suicide bombers aren't being redacted, but if it is Muhammad Hashaika said X, Y, or Z, then we have the hearsay problems.

THE COURT:  This is part of the indictment or part of the judgment?

MR. ROCHON:  I believe, in that instance, part of the indictment.  And I've now -- those are the major problems.  I didn't spend my time looking at these redaction.  There are some other things.

THE COURT:  Before we get into the details of that, do you understand the nature of their objections?

MR. YALOWITZ:  This is the first time I'm hearing about it, your Honor.

MR. ROCHON:  We had a call last night with your team,

F1D3SOK2

at your request.

THE COURT:  Do you know about the Yassir Arafat objection?

MR. YALOWITZ:  First time I'm hearing about it.  But yes, look, if they have proposed redactions, they should send them to us and we'll look at them.  I can't comment.

THE COURT:  I don't know why I have to be the one to say that.  I assumed that's common sense at this point, even appropriate lawyering.  Look, talk to each other.  Tell them what you want out, and have him agree that it's coming out or have him say I refuse to take that out.  And then we will discuss it as soon as we get back.  But I am not going to spend a lot of time on it.

MR. ROCHON:  Judge, just so you know, we've had that conversation not with Mr. Yalowitz.  With part of the army of lawyers.  We had it last night.

THE COURT:  Mr. Yalowitz, have your lawyers had that conversation?

MR. YALOWITZ:  I haven't seen any particular redactions that they proposed.  I had a generalized conversation, your Honor, in which they said we hate everything you've done and you've got to redo everything.

MR. ROCHON:  No.

MR. YALOWITZ:  That is not a useful conversation.

THE COURT:  Gentlemen, this is not a useful

F1D3SOK2

conversation.

MR. YALOWITZ:  I agree.

THE COURT:  As we say, what we have is a failure to communicate.

MR. YALOWITZ:  I agree.

MR. ROCHON:  One of my favorite movies.

THE COURT:  My suggestion is some representatives from one side offer themself up as the person who will resolve this issue.  Get it resolved.  Otherwise, I am going to resolve this in 30 seconds when we get back here.  So resolve what you can. Key it up for me what the disagreement is.  And let's move forward.  It is a little late in the day for us to be arguing about this and for you to be telling me that the two of you haven't even discussed this.

MR. ROCHON:  I just want to say we did -- we sent an e-mail.  We had the discussion last night.

THE COURT:  I assume they didn't give you a response that was satisfactory.

MR. SATIN:  May I?

MR. YALOWITZ:  Why don't we have a conversation not in front of the Court, and see if we can come to an agreement. And if we can, that would be great.  And if we can't, then maybe we'll have some specific things and we can stick a document in front of you and you can say take that out, keep that in.

F1D3SOK2

THE COURT:  That seems like a very proper discussion.

MR. YALOWITZ:  Thanks.

MR. ROCHON:  It sounds great.  We did all that. Except he wasn't involved.  It was -- who was it?

THE COURT:  I don't care.  It doesn't matter to me. Make sure you have an understanding of what it is you want out, and I want an understanding of what it is that you're refusing to take out.

MR. ROCHON:  We're happy to have that conversation with them again.

THE COURT:  You have to represent to me that you asked them to take out X and they have refused.  Okay?

MR. ROCHON:  Yes.

THE COURT:  You put yourself in a position to represent that, and you should put yourself in a position, if somebody from your team has reviewed that and they've taken the position that they will take it out, or they won't take it out. That's the position that you both should be in, and neither one of you are in.  So until you advance that for me, there is not much for me to do with it.

Take your lunch hour.  I suggest you start concentrating on the presentation of your opening statements and the witnesses to the jury, rather than this.

Look, we've spent days, week, months, trying to resolve issues so you can move forward efficiently.  I'm not

F1D3SOK2

going to spin my wheels resolving issues that should have been resolved long before this, and now you're telling me on the first day of trial you that you don't know what direction you are going to go.  Talk to each other.  Resolve it.  I'll see everyone in this courtroom at 2 o'clock.

MR. YALOWITZ:  Thank you.

MR. ROCHON:  Thank you.

(Recess)

(Continued on next page)

F1D3SOK2

                        AFTERNOON SESSION

                            2:00 p.m.

          (In open court; jury not present)

          THE COURT:  As we're waiting for all the jurors to arrive, let me ask you if you've agreed on where you disagree.

          MR. ROCHON:  We've agreed on where we disagree, I think, but we don't agree.  We at least have found --

          THE COURT:  I'm not surprised.  What is it that you want out that's not out?

          MR. ROCHON:  Because I was focusing on the opening, Mr. Satin will address that.

          THE COURT:  Mr. Satin, what should be out?

          MR. SATIN:  Last night we received from plaintiffs three separate exhibits of court records that contained the name in unredacted form of Abu Talal.  This is the one we discussed over a significant period of time before.  So they've given us an unredacted version containing the name Abu Talal which is the name implicated by Munzar Noor when he was convicted.  We want those --

          THE COURT:  In what kind of document?

          MR. SATIN:  There is an indictment, a sentencing, it looks like a sentencing hearing or explanation, and an appellate opinion, which are separate, just so the Court knows, from the binder of documents that have been sent by the plaintiffs previously of those records of convictions they were

F1D3SOK2

seeking to introduce.  This is what we received last night.  That's one issue.

THE COURT:  Let me address that issue.  Mr. Yalowitz, why isn't their name redacted?

MR. YALOWITZ:  Your Honor, these are three documents, I'll tell you they're Exhibit 325, 468, and 478.  And I would like to offer those not for the truth, but for notice of Abu Talal's name.

THE COURT:  Notice of name about what?

MR. YALOWITZ:  That this was an individual who was publicly implicated as having been the organizer of --

THE COURT:  What evidence do you have that they were put on notice by the document that you want to offer?

MR. YALOWITZ:  My only notice that I'm relying on would be those documents.

THE COURT:  How does that put them on notice?

MR. YALOWITZ:  Because it is a public document and they are the intelligence service.

THE COURT:  We've been through this on other documents.  I'm not going to accept your notice argument simply based on the fact it is a public document.

MR. YALOWITZ:  I understand.

THE COURT:  If you have some evidence that they were provided with a particular document or a particular information, that's notice.

F1D3SOK2

MR. YALOWITZ:  I do not have that evidence.

THE COURT:  As I say, I don't know what was in The Wall Street Journal yesterday.  So that you can't say that I'm put on notice of what they claim about any fact that happened yesterday.

MR. YALOWITZ:  The only thing I'm going to do is -- I understand the Court's ruling.  We'll move on.  If those three documents are not in the record, I'll just file them as a proffer.

THE COURT:  So you're going beyond the redactions.  It is of no use to you with the redaction is the bottom line.

MR. YALOWITZ:  The only purpose of those documents would be for notice.  Based on the Court's ruling, we won't put them in front of the jury.  I want to make sure they're in the record.

THE COURT:  If you have some document that someone showed this document to somebody at the PA or the PLO so that they have notice of it.  But if it was in The New York Times in 2002 on Sunday, February 1st, doesn't necessarily put them on notice.

MR. YALOWITZ:  Okay.  I understand the Court's ruling.  I think the Court understands my position on that.

THE COURT:  I understand.  What else?

MR. SATIN:  The second one, now we're still talking about a record related to Munzar Noor involving Abu Talal.

F1D3SOK2

This one is Exhibit 322.

THE COURT:  What kind of a document?

MR. SATIN:  It is a verdict.  And this is the one that they had sent in redacted form, Abu Talal's name appears three times.

THE COURT:  I don't need that much detail.  Is it in an indictment in which the defendant who is pleading guilty is trying to implicate a third party?

MR. SATIN:  Yes.  So let me be clear about what we're seeking here.  We want not just Abu Talal's name redacted, which they have agreed to, although they did miss one of them but they've corrected it.

In addition, when Abu Talal was implicated by the declarant Munzar Noor, he used the name Abu Talal, and his position, which was a senior --

MR. YALOWITZ:  What page are we on, Mr. Satin?

MR. SATIN:  -- a senior operative of the PA's military intelligence.  This is on page two of Exhibit 322.

THE COURT:  You want his name and his title redacted.

MR. SATIN:  Correct.

THE COURT:  Can we do that, Mr. Yalowitz?

MR. YALOWITZ:  We understood the Court's ruling, and this is something that is expressed throughout, that the defendants asked for this.  They said we want the circumstances, the name, their position, all kinds of

identifying information.  And as I recall the Court's ruling, it was the name comes out, and that's what we've done.  But the fact that the individual worked in a certain place.

THE COURT:  The fact that he's accusing a PA or PLO employee or agent is the issue.  As I say, this is not rocket science here.  If you say "I accuse Mr. Obama," there is not much difference than saying "I accuse the president of the United States."  All right?

So, let's use common sense here.  You can understand why they would have a legitimate objection in that regard.  So the identifying information is the position of the person at the PA or the PLO.  That's an accusation against that individual.  That's an identification of that individual. That's an accusation against the PA, the PLO.  There is an out-of-court statement of someone you do not intend to bring in here as a witness to be cross-examined under oath.  That identifying information should also be redacted.

MR. YALOWITZ:  All right.  I'm perfectly willing, your Honor, to take out the thing they've identified that your Honor has said is coming out.  I think we need to take it document by document.

THE COURT:  Well, it should be taken out in every document.  If you want document by document, if it is the name of the person or the title of the person, it is clearly identifying an individual, a third person that one would

F1D3SOK2

readily identify that they're accusing then, you should take it out. As I say, you can't say "I accused the president of the United States" and nobody knows who you're talking about.

MR. YALOWITZ:  Well --

THE COURT:  Just because you didn't say the name "Obama."

MR. YALOWITZ:  Look, I don't want to relitigate.  I thought we had a different ruling.  We faithfully applied it, and it was a lot of work.  If your Honor is going to do that, then we'll follow your Honor's ruling.

THE COURT:  Obviously the rationale for the ruling is I'm sure very obvious to you and everybody in this courtroom. So you can understand that, no, it can't just be that I didn't mention him by name, but I accused this guy who is standing in front of me at the plaintiffs' table who is arguing the case for the plaintiff.  That's you.  Everybody knows it is you.  So you can't do it that way.

All right.  Anything else before I bring this jury back in here?

MR. SATIN:  There are a number of other ones.  Do you want me to go through it now or wait?

THE COURT:  You can wait.  I won't make the jury wait.

Mr. Yalowitz, approximately how long do you think you'll be on opening?

MR. YALOWITZ:  Slightly less than an hour.

F1D3SOK2

THE COURT:  Mr. Rochon?

MR. ROCHON:  The same.

MR. YALOWITZ:  One other thing.  During opening, I would like the Court's permission to give the jury copies of a little cheat sheet card so they can keep track of the attacks. I think it would be helpful.  If I could hand it up. Mr. Rochon has it.  He objects.  If I can hand --

MR. ROCHON:  I might not object.

THE COURT:  Mr. Yalowitz, let's not fight about it. Are you going to say yes or no?

MR. ROCHON:  I thought he was going to give it for the entire trial.  If he wants to use it in opening.  The idea that jurors are walking around with it.

THE COURT:  You want to utilize this in opening?

MR. YALOWITZ:  Yes, sir.

THE COURT:  You'll utilize it in opening.  When you finish with the opening, we can collect it back.  If you want to give it to the jury under some other circumstances, then it will be done so as an exhibit.

MR. ROCHON:  I don't mind them keeping them for mine, as long as they'll have them for his.

THE COURT:  Then leave them on the seat.  That's what I do with any exhibits they examine when they get up.

MR. YALOWITZ:  Thank you, your Honor.

THE COURT:  All our jurors are here.  I am going to

F1D3SOK2

bring them in, swear them in, and give them preliminary instructions and then we'll have opening statements.

MR. YALOWITZ:  Your Honor, would the Court like a copy?

THE COURT:  Sure.

I think that podium could be moved a little bit more.

MR. ROCHON:  It is pretty beholden to an electrical cord, your Honor.

(Jury present)

THE COURT:  Can we swear in the jurors.

(A jury of 12 is sworn)

THE COURT:  Members of the jury, at this point I'm required by law to instruct you generally concerning your basic functions, duties, and certain rules which apply to every jury, so that you will better be able to assess and weigh the evidence as it's presented and reach a proper verdict.

Now, the trial has commenced with the selection of the jury.  The next step in the trial will be an opening statement by the parties, if they wish to make an opening statement, to outline for you what they intend to prove by way of evidence to be presented in the case.

Now, after the plaintiffs' attorney makes his opening statement, the defendants' attorney, if he desires, may also, but is not required to, make an opening statement.

What counsel for either side says in an opening

F1D3SOK2

statement is not evidence.  You may consider it, consider the opening statements a preview of what each side intends to prove by way of evidence in the case.

After the opening statement or statements, the plaintiffs' attorneys will present one or more witnesses who will be questioned by them.  This is called direct examination. After the plaintiffs' attorney completes their questioning of the particular witness, defendants' attorneys will be given an opportunity to question the witness.  This is called cross-examination.

After the plaintiffs have concluded the calling of their witnesses and the introduction of any exhibits which are admissible into evidence, the defendants may, but are not required to, offer evidence in their own defense.

After both sides rest, the defendants' attorney may make a closing argument followed by the closing argument of the plaintiffs' attorney.  Then I will charge you on the law, and you will retire to deliberate for the purpose reaching a verdict.  This is a general outline of the trial procedure.

You may not take notes during the trial, I ask you to listen carefully.  The court reporter will be taking everything down.  If you want any testimony read back during your deliberations, we'll have a court reporter read it back to you verbatim and whatever you may require.

The evidence consists of testimony of witnesses under

F1D3SOK2

oath and exhibits which are admitted into evidence plus any stipulations agreed upon by the attorneys.

Questions in and of themselves are not evidence. Therefore, you cannot infer any fact from the mere asking of a question. It is the answer coupled with the question that constitutes evidence. For example, if a witness was asked a question "Don't you own an automobile?" And the witness answers, "No," you may not infer from the mere asking of the question that the witness does own an automobile.

During the course of the trial, the plaintiffs' attorneys or the defendants' attorneys may object to a question or an answer on the ground that it is somehow legally improper or inadmissible. If I sustained the objection, this means I believe that the question or the answer was in some way improper. If an answer has already been given, I will instruct you to disregard it, and therefore the answer is no longer evidence in the case. If I overrule the objection, then it means that the question is proper, and I will permit it to be answered. Or if already answered, I will permit the answer to remain as evidence in the case.

Please do not resent the fact that either attorney makes objections. This is their duty. And do not hold it against either side if I rule against them.

As I'll explain to you in detail in my instructions at the end of the case, as jurors in this case, you are the sole

F1D3SOK2

judges of the facts, and I am the sole judge of the law.  You must accept the law as I give it to you without hesitation or reservation, even if you privately disagree with it.

You must keep an open mind throughout the trial.  You must not converse among yourselves or with anyone else upon any subject connected with the trial.  You must neither offer nor express an opinion or reach any conclusion about what the verdict should be until I finally give the case to you.

You must not read or listen to any accounts or discussions of the case in the event that it is reported by newspapers or other news media.

You must not visit or view any premise or place described during the trial or any other place or premise involved in the case.

You must not do any research or investigation about the case on your own.  You must decide this case solely on the evidence presented at this trial.

You must not speak to anyone about the case until the trial is completely ended.  You must promptly report to the Court any incident within your knowledge involving an attempt by any person to speak with any member of the jury about the case.

During the trial, again, you should not speak with any of the parties in this case nor any individuals associated with it.  They're instructed not to speak with you.  So don't

F1D3SOK2

consider it rude if they see you outside this courtroom and they don't acknowledge your presence. Obviously, if someone would see you speaking to one of the parties involved in the case, they might draw an improper inference, even though it might be a perfectly innocent conversation unrelated to the case.

As I indicated to you, it is my best estimate at this point that this case should take approximately six to eight weeks to present the evidence. I will do my best to keep us on schedule and even get ahead of schedule and shoot for a goal of making this six weeks or less, rather than of the goal of making this eight weeks or more. By the end of this week, depending upon how much progress we can make this week, I'll start to get a feeling for where I think we are and what else I think is anticipated in this case to be presented to you and how long it might take. As I say, I will keep you continuously informed about what the schedule will be, and whether I think we are ahead of schedule, behind schedule, or on schedule.

As I indicated, we will have some holidays in between that I will honor, so I'll give you an opportunity to make your own personal and professional plans around those holidays.

With those preliminary instructions, at this point we'll now proceed with the next step in the trial which will be an opening statement by the plaintiff. Mr. Yalowitz.

MR. YALOWITZ: Thank you so much, your Honor.

F1D3SOK2                        Opening - Mr. Yalowitz

March 21, 2002, was cold and rainy in Jerusalem.  Alan Bauer took his oldest child, seven-year-old Yoni, to the doctor and then stopped by the office.  A little after four, Alan took Yoni by the hand and headed for home.  Their walk took them through a busy downtown neighborhood.  They walked down Jaffa Road, one of the busiest streets in Jerusalem, and they turned left on to King George Street.

In the meantime, a Palestinian ex-cop by the name of Muhammad Hashaika had snuck into Jerusalem.  Hashaika had a bomb hidden under his clothing.  The bomb had powerful explosives in it and homemade shrapnel, a bag of Phillips head screws.

A woman led Hashaika to King George Street.  She told him, "Allah will show you favor.  Allah willing, you will reside in paradise."

Hashaika went up behind Alan and Yoni and set off the bomb, killing himself instantly.  The blast hit Alan from behind, threw him to the ground.  He had just been holding his seven year old by the hand.  Now Yoni was missing.

The scene was chaotic, filled with smoke and fog. Three people were dead.  81 wounded.

Alan ran back and found Yoni.  He was on the ground gurgling.  Minutes passed.  They got Yoni into an ambulance. The paramedics checked his arms, his legs, his torso.  They couldn't see what was wrong.  Then they took a towel out from

F1D3SOK2                          Opening - Mr. Yalowitz

behind the back of his head, and the towel was soaked in blood.

Suddenly, Alan realized what had happened.  Something had

penetrated his little boy's brain.

Now, Yoni survived, but his life is not the life you

would wish for your child.  He can walk, but he can't walk the

way you and I can walk.  He can talk, but he can't talk the way

you and I talk.  He can use his arms, but not the way we can.

Ladies and gentlemen, my name is Kent Yalowitz.  I

have the privilege of representing the Bauer family and nine

other American families who survived terror attacks in

Jerusalem, Israel.  My colleagues will help me try this case,

Tal Machnes, Phil Horton, Carmela Romeo, Sara Pildis, Rachel

Weiser.  We'll be together over the coming weeks, and we will

prove to you that the defendants, the Palestine Liberation

Organization and the Palestinian Authority, bear the

responsibility for six brutal attacks.

With the Court's permission, I am going to hand you a

summary which we also see up on the screen, of these attacks.

May I, your Honor?

THE COURT:  Yes.

MR. YALOWITZ:  Thank you so much.  If you can just

pass them around, that would be great.  Thank you.

The evidence will show that killing civilians was

standard operating procedure for the Palestine Liberation

Organization and the Palestinian Authority.  We will ask you at

F1D3SOK2                         Opening - Mr. Yalowitz

the end of the trial to award money damages for economic

losses, physical injuries, emotional losses, pain, suffering,

and the loss of a loved one.  We will ask you to award these

damages under the Anti-terrorism Act which allows Americans,

United States citizens, who have been injured by terrorism

anywhere in the world, to recover money damages in a United

States court of law.

          I want to begin by telling you about the families who

have come to court today seeking justice.  I already told you

about the Bauer family.  That's Alan, circled in red.  He is

the one who had his little boy by the hand.  Yoni, also circled

in red, was seven at the time of the attack 12 years ago.  Mom,

Revital Bauer, and three younger children who will not be

testifying, but who are plaintiffs in this case.

          Next I want to tell you about Shayna Gould.  Shayna's

circled in red there down at the bottom of the picture of her

family.  Shayna was 19, studying abroad for a year in Israel.

She was waiting at a bus stop when a Palestinian Authority

police officer with an M-16 assault rifle shot her in the

chest.  She bled out.

          By the time she got to the hospital, she was listed as

dead on arrival, but a doctor saved her life by breaking open

her rib cage and giving her cardiac massage.

          Her family back in Chicago received a call to come

urgently.  Get on a plane and come urgently, because she might

F1D3SOK2                         Opening - Mr. Yalowitz

not survive the night.  They raced to Israel, and when they got there, the doctors told them "She's alive, she's in a coma, and when she comes out of it, we don't know if you're going to get the same girl back."

She lost a lung, she had severe damage to three ribs, she has severe scarring, she has severe physical pain to this day, and she has even worse emotional pain.

Let me tell you about the Waldman family.  Shmuel Waldman was on that same street that same day.  Shmuel and his wife Henna are here in the courtroom.

Stand up, Shmuel and Henna.  Thank you so much.

Shmuel and Henna were young newlyweds.  Shmuel was 20 that terrible day.  He was on his way home from work, waiting on a bus to meet his beautiful wife.  He heard the scream "Allahu akbar" and then he got shot in the leg.  He prepared himself for death and he thought he was going to die, but he didn't die.  Instead began a 13-year nightmare for this man. Terrible leg injuries, multiple leg surgeries, terrible emotional, disabling emotional injuries.  He lost his business.

Let me tell you about the Sokolow family.  The Sokolow family are here, too.  Mark, Rena, stand up, Mark and Rena. Elana, Jamie, Lauren.  I think Jamie and Lauren are here. Stand up if you're here.  Jamie, Lauren, Elana.

The Sokolow family was visiting Elana.  She was studying abroad in Israel.  The family decided to take a trip

F1D3SOK2                         Opening – Mr. Yalowitz

to see her.  They were in Jerusalem on that same busy downtown shopping street, Jaffa Road, when a terrorist set off a bomb and blew herself up behind them.  Rena, Jamie, Lauren, Mark, they were all wounded.  They all had shrapnel.  They were separated by blast.  They went to three different hospitals, each one not knowing whether the other ones were alive or dead.  Not knowing if any one in the family was okay.  Jamie was 12 years old.  Rena actually saw the head of the suicide terrorist.  She had horrible damage to her leg.

Let me tell you about the Mandelkorn family.  Shaul, Leonard, Nurit.  Shaul was 18, he had been away on a school trip for a weekend.  He was taking a bus home, and he got off the bus, and he walked into the path of a suicide bomber.  He had shrapnel over a lot of his body.  He had horrific pain.  He was in the hospital for more than a month, and his parents bore a heavy, heavy burden of caring for this young boy.  And they still bear that burden, because he was destroyed by emotional injuries.

This is the Goldberg family.  They were a beautiful, close-knit family.  They did everything together, they sang together, they went everywhere together.  Even family chores were a fun game for these kids when their dad was around.  Scotty Goldberg was the glue that held this family together.

On the morning of January 29, 2004, Scotty didn't take his usual bus to work.  No one knows why.  He wound up on a

different bus, and he never made it to work that day.  The bus he was on was blown up by a PA police officer.  He left a widow and seven children.  The oldest child, Chana, was only 16.  The youngest was a baby.  This family's lives were torn apart. You're going to meet them, other than the younger kids.  And you're going to see they're still trying to pick up the pieces.

Ben Blutstein was in his early 20s.  He was studying abroad.  He was in Israel to study to become an educator.  On the Sunday before he died, he called his parents.  He told his mother, "I am the happiest I have ever been.  I finally know what my place is in life."  He was supposed to take a test Wednesday for his school and then come home that evening.

He stopped off for lunch at the Frank Sinatra cafeteria at Hebrew University, sat down at a table for lunch, and that was his last meal.  He never even made it to the test. A hidden bomb ripped through that cafeteria and killed Ben and eight others.

This is Diane and Larry Carter.  Larry is a veterinarian from North Carolina.  His daughter Diane had left home and she had cut off contact with the family.  Her dad hoped and prayed for a reunion.  He loved that daughter.  And the day he found out that she had been killed by a terrorist bomb, that day his hope died too.

Here is the Coulter family.  Janis Coulter lived in Brooklyn.  She worked in Manhattan for a study abroad program.

F1D3SOK2                     Opening - Mr. Yalowitz

She was the apple of her dad's eye.  She was her sister's best friend.  Her boss got sick, and she had to substitute in for a three-day business trip.  She was one of the Americans killed at the Frank Sinatra cafeteria that day.  Her dad turned on the news that morning and he saw her beautiful hair spilling out of a body bag on television.  The family had to travel down from Massachusetts to J.F.K. Airport to pick up Janis's body in a cardboard box.

Here's David Gritz.  David's parents also learned about it from the morning news.  They were in New York, too, staying with friends.  They tried desperately to call David, he didn't answer his phone.  He was a beautiful soul.  He was musical, he was philosophical, he became interested in religion although he hadn't had much when he was young, either from his mom or from his dad.  His mom was Catholic, his dad was Jewish.  Israel was interesting to him because he was trying to learn about religion.  He went to Jerusalem to study for a year.

The day he died, his parents spent the whole day in New York waiting, calling the authorities, trying to get information.

His dad passed a couple years later.  Now his mom Nevenka is alone in the world.  Before David died, she had never been to Jerusalem.  Now she goes there as often as she can because she wants to walk where her son walked.

Now I want talk to you about who perpetrated these

F1D3SOK2                        Opening - Mr. Yalowitz

violent crimes.  I want to start with the group that attacked Alan and seven-year-old Yoni that cold day in March 2002.  The evidence will show that the suicide bomber who attacked Alan and Yoni did not act alone.  It turns out that he was a -- bear with me.  I think -- well, I'll show you the cell anyway.

It turns out he was assisted by a whole group of people.  You can see a picture of Muhammad Hashaika, the suicide bomber down there at the bottom.  I am going to prove to you that all of these individuals had a role in his suicide attack.

It turns out that Hashaika was a known and specifically identified threat.  Five weeks before he attacked Alan and Yoni, the Palestinian Authority itself arrested him because he was planning a suicide attack.

Some of you may have heard of the Palestinian Authority.  Sometimes we're going to call it the PA for short. It is the local government in the Gaza Strip and West Bank. Let me show you a map.  The West Bank and the Gaza Strip are these brown areas.  At the time of the events, they were the local government in these two areas.  It was created, the Palestinian Authority was created by the Palestine Liberation Organization, sometimes called the PLO.  The PLO is a political entity that represents the Palestinian people.  The evidence will show that the PLO is in charge of the PA.

So, the PA, the Palestinian Authority, provided local

F1D3SOK2                         Opening - Mr. Yalowitz

government services, including police and security services. The Palestinian Authority had a local police force, it had a presidential guard, it had an intelligence service, it even had a preventive security service.  They were armed.

Now let me show you some more about the terror group that planned and executed the bombing of Alan and Yoni.  Up at the top, you see a Palestinian Authority officer named Abdel Karim Aweis.  He's at the top right.  Next to Aweis you see a little eagle emblem.  I put that there, because I'm going to prove to you that he was an employee of the Palestinian Authority.  That little eagle is a symbol that the Palestinian Authority uses on their documents.  It is like their little shield.  I put it there because that will help you remember that I'm going to show you that he was a Palestinian Authority employee.

I already mentioned down at the bottom you see Muhammad Hashaika.  He was the suicide bomber.  Now, Aweis, the evidence will show, up at the top, got Hashaika released from jail, and teamed up with the fellow at the top on the left named Nasser Shawish to plan the attack.  The terror group also included two women who snuck Hashaika into Jerusalem past all those security points.  You see them there in the middle of the chart.

The evidence will show that these people got help from a man named Toufik Tirawi.  You'll hear a lot about Tirawi.  He

F1D3SOK2                          Opening – Mr. Yalowitz

was the head of the intelligence service where Aweis worked.
In other words, the evidence will show that he was one of the
top officials for the defendant Palestinian Authority.  We're
going to show you that he provided support for this terror
group.

Tirawi's direct boss was Yassir Arafat.  Some of you
may have heard of Arafat.  He was chairman of the PLO for
decades.  He was president of the Palestinian Authority from
the day it was created to the day he died.

The evidence will show that Arafat was the epitome of
one-man rule.  You'll hear testimony and see documents showing
that he controlled the money.  Indeed, all of the PLO's money
came from the Palestinian Authority.  For all intents and
purposes, the evidence will show, the PLO and the PA were one.

Now, I want to give you an example of Arafat's
personal control.  It is Exhibit 1060.  It is in the original
Arabic and came from the files of the Palestinian Authority.
It is from Tirawi, the fellow I just mentioned, the head of the
PA's general intelligence service.  You'll see his signature
down there at the bottom.  It is addressed to Yassir Arafat.

We've translated it to show how they addressed Arafat.
"His excellency, brother, president and general commander, may
Allah protect him."  That's Yassir Arafat, the evidence will
show.

Now, we've translated the document to show that

F1D3SOK2                        Opening - Mr. Yalowitz

Hashaika is specifically discussed as a suicide terrorist.
Here we see that Arafat was personally informed of the arrest,
and we see at the bottom Tirawi writes to Arafat, "the matter
is at your excellency's discretion."  Five weeks later,
Hashaika was out of jail with a bomb strapped around his body.

Now, the PA and the PLO never provided us with a
direct order from Arafat saying release Hashaika.  Arafat
didn't work that way.  Such was his control that a simple,
quiet nod of the head was enough.  You won't see anything else.

Let me tell you about the other six attacks -- excuse
me, the other five attacks.  You see them on your chart.
January 22, 2002, was the attack against Shmuel Waldman and
Shayna Gould.  The evidence will show that they were shot by
the man at the bottom, Said Ramadan.  There you see him with
his M-16 rifle.  He was a PA police officer.  This group had
six Palestinian Authority security officials.  I put the little
eagle emblems to show you which ones were PA employees.

You see the same pattern as in the attack on the Bauer
family.  Commanders, someone who recruited the suicide
terrorists, people who prepared him, videotaped him reading his
suicide will, people who transported him to the scene.  These
people were convicted of murder.  And after they were
convicted, the Palestinian Authority either kept them on the
payroll while they're in jail, or they went on the payroll
after they were arrested.

F1D3SOK2                          Opening – Mr. Yalowitz

I want to make sure you understand that.  These are people convicted of murder, and they are still on the payroll today.

As for Ramadan, the shooter, he died committing his crimes, and the Palestinian Authority and the PLO declared him an Al Aqsa martyr.  Al Aqsa is the name of a mosque in Jerusalem which the Palestinian Authority co-opted as a symbol of the terror campaign.  Ramadan's family gets money every single month from the PLO because he died as a suicide terrorist.

Five days after Ramadan committed his crime, a bomber named Wafa Idris blew herself up behind Mark Sokolow and his family.  The evidence will show that an official of the PA's intelligence apparatus recruited Idris as a confidential informant.  In fact, you will personally see a document from the Palestinian Authority's own files showing that intelligence head Tirawi, the same fellow we just talked about, had advance knowledge of the attack before it became public.

As for the suicide bomber, she was declared an Al Aqsa martyr.  Her family gets money every month from the PLO because she died as a suicide terrorist.

Let's go to January 29, 2004.  Scott Goldberg was riding a bus to work.  That bus he wasn't supposed to be on.  And a PA police officer named Ali Ja'ara blew himself up murdering Scott and 10 others.  This group had four PA security

F1D3SOK2                          Opening - Mr. Yalowitz

officials.  You see the same pattern again.  A commander of the cell, someone who recruited the suicide terrorist, people who prepared him, people who transported him past the checkpoints in Israel.  These people were convicted of murder, and they either stayed on the payroll as police and security officers even while they sit in jail, or they went on the payroll after they were arrested.

As for Ja'ara himself, he had been fired a couple of weeks before he blew himself up.  After he died, the police department reinstated him as a member of the force in good standing.  He was declared an Al Aqsa martyr officially.  His family gets money every month because he died as a suicide terrorist.  And eventually, he was even given a full dress state funeral by the Palestinian Authority.

So we see in these attacks a pattern in which groups of PA employees band together to organize terror attacks.  The organizers get caught, they get arrested, they get tried, convicted, sentenced, put in jail, and then they're rewarded by the Palestinian Authority with pay and with promotions and with glorification.  The families of the suicide terrorists get money from the PLO.

Now, I want to talk a little bit about what is terrorism.  Judge Daniels will direct you on the law, but your common sense tells you that terrorism is different from random street crime.  The evidence will show that these terror attacks

F1D3SOK2                          Opening – Mr. Yalowitz

were violent and dangerous crimes with the apparent purpose of intimidating and coercing the population of Israel, and influencing the government of Israel and even influencing the government of the United States of America.

If you want to intimidate a civilian population, killing randomly selected civilians can be pretty effective. The evidence will show that this killing was indeed random. Christians and Jews, Israelis, Americans, people from all over the world.

Now, I want to start to tell you a little bit more about how we're going to prove the things that I've told you. You're going to see documents. You're going to see personally the convictions for murder and attempted murder. These are people who are convicted of their crimes in the Israeli criminal justice system, they went to jail, and some of them are still in jail. While they sit in jail, performing no services whatsoever, they draw a generous salary from the Palestinian Authority. You are personally going to be able to look at those payroll records. You'll see promotion records for employee convicts people who are promoted in rank while they're in jail.

These records will prove that even after these people are convicted of murder, the Palestinian Authority keeps them on as security employees. It celebrates their crimes as having been as a result of their fight for their country. The

F1D3SOK2                         Opening – Mr. Yalowitz

Palestinian Authority did this over and over and over again. Keeping convicted murderers on the payroll, promoting convicted murderers while they sit in jail, glorifying the murders in Palestinian press.

Not only that, when people who are not employees were convicted of terror crimes, the Palestinian Authority actually went ahead and put them on the payroll. You'll see those records too. Showing the terrorists got put on the payroll when they were arrested, and stayed on the payroll after they were convicted.

Now, these employees were not rogue employees. As I said, this was standard operating procedure. And I'm going to bring you three forms of evidence that will show you how deeply the Palestinian Authority embraced these crimes.

Official policies, widespread practices, number one. Number two, evidence of material support. And number three, the defendants' own words from their own official intelligence documents, from their own official prisoner ministry records, from their own official publications, from their own top leadership.

Let's first start with reason number one, official policies and widespread practices. You'll see evidence that the PLO has something called the Martyrs Institute. The Martyrs Institute pays families of suicide terrorists. They pay every month to the family of every suicide bomber. They do

F1D3SOK2                    Opening - Mr. Yalowitz

this as a matter of official policy.

You'll also see and hear about a Palestinian Authority law that provides for money for anyone who is convicted of a terror crime against an Israeli. In other words, as a matter of law and policy, anyone who is convicted of murder for political purposes gets paid.

You'll see evidence and hear evidence that the Palestinian Authority has a whole ministry of prisoners to serve the needs of these convicts, providing them legal assistance, making solidarity visits to their families, even negotiating for their release.

Now, I want to show you one thing about the law, the Palestinian Authority law that is especially important. And that's their definition of a prisoner. A prisoner is somebody who is qualified to get that money. And here's how they define prisoner. "Anyone who is kept in the prisons of the occupation for offenses of participating in the struggle against the occupation."

Now, this definition has an important phrase that I want to speak about candidly. "The struggle against the occupation." What is the occupation? There is a political conflict in Israel. As I said before, during the relevant years, Israel and the Palestinian Authority divided responsibility for governing in the West Bank and the Gaza Strip. Some people were against the Palestinian Authority

F1D3SOK2                         Opening – Mr. Yalowitz

gaining additional power, and others believed that the Palestinian people should have their own country immediately. One word that people with that perspective used for the shared power arrangement was "occupation." And you will see and hear the PLO and the PA documents and maybe witnesses, if they bring any, talking about the struggle against the occupation or resistance of the occupation.

Now, think about what that means in the context of this prisoners law. They refer to someone who is in jail for murdering civilians as a person who was participating in the struggle against the occupation and therefore worthy of getting paid money every month while they sit in jail.

I want to be very clear. Great minds might disagree about the political issues between these peoples. That's not what this case is about. It is not about who is right and who is wrong in that debate.

The plaintiffs in this case are 10 innocent American families. Not the government of Israel. What was seven-year-old Yoni Bauer's crime. What did he do wrong? He was walking with his dad home from work. Did Scotty Goldberg do something wrong by getting on that bus? Shayna and Shmuel and Shaul. All they were doing was getting on and off buses, just like you and I do. The Sokolow family was buying shoes for their 12-year-old daughter. Four Americans in the Frank Sinatra cafeteria were sitting down to lunch.

F1D3SOK2                        Opening - Mr. Yalowitz

This case is not about whose land it is.  This case is about the consequences of murdering and maiming innocent civilians to achieve a political objective.

No matter what your political beliefs, killing innocent civilians is morally unacceptable.  No matter what your political beliefs, shooting young people with an M-16 assault rifle on a busy downtown shopping street is morally unacceptable.  No matter what your political beliefs, making a homemade bomb out of homemade explosives and a bag of Phillips head screws and sending people on suicide missions is morally unacceptable.

You're also going to see evidence of widespread practices supporting terror.  You will see evidence that Yassir Arafat and top PA and PLO officials used PA money to finance terrorism.  Time and time again, the evidence will show, Arafat and other PA and PLO officials approved and directed payments to people engaged in terrorism, knowing that this was what these terrorists were up to.

You will see convictions of top and midlevel officials for this conduct.  You will see documents from the Palestinian Authority showing the funding of terrorists, and the knowledge of the Palestinian Authority intelligence apparatus about these terror operations.  You will see government reports from the United States government and from the government of Israel detailing the terror financing operations, and you will hear

**JA-3840**

F1D3SOK2                     Opening - Mr. Yalowitz

personally from experts in the Palestinian arena who have spent their careers fighting terror.  They will help you understand these documents.

You will also see evidence that the Palestinian Authority and the PLO did their best to control the supply of weapons in the West Bank and the Gaza Strip, and then they used those weapons to support terror operations.

The evidence here again will include convictions and confessions and expert analysis.  You'll also see evidence about a revolving door of the Palestinian Authority's own prison system.  In fact, the release of Hashaika, the ex-cop who blew himself up behind Alan and Yoni, was not an isolated event.  You'll see evidence that the PA released other terrorists from prison, and that they failed to arrest known terrorists, even when those known terrorists were on their own payroll and worked as their own employees.

You'll also see and hear evidence that engaging in terror attacks was common for security employees of the Palestinian Authority security apparatus.  The defendants' own websites reveal hundreds of their security employees are in jail for those "struggle against the occupation" crimes.

Let me turn to the evidence on reason number two, the evidence of material support.  The evidence here will show that there were several terror groups operating in Israel at that time, including one called the Al Aqsa Martyr Brigades named

F1D3SOK2                         Opening – Mr. Yalowitz

after that mosque Al Aqsa, and another called Hamas.  These were terror groups that were designated by the United States government as designated foreign terrorist organizations. Hamas got that designation in the 1990s, and the Al Aqsa Martyr Brigades was officially designated on March 25, 2002, three days after the attack on Alan and Yoni for which that organization took credit.

We're going to bring you evidence that the PA closely supported the Al Aqsa Martyr Brigades, both before and after its designation, with weapons and money and freedom to operate within territory patrolled by the Palestinian Authority's own security forces.

We'll show that you Al Aqsa Martyr Brigade was just another name for a thing called Fatah, which was controlled and dominated by Yasser Arafat.

(Continued on next page)

**JA-3842**

F1D8SOK3                         Opening – Mr. Yalowitz

MR. YALOWITZ:  And financed by the Palestinian Authority.

We will show you that two of the attacks in this case were carried out by the Al Aqsa Martyr Brigades after the designation.  One of them took place on June 19, 2002 at French Hill, killing seven, wounding 39, including Mandelkorn.  The other one, the bus attack that took the life of Scotty Goldberg, January 29, 2004.

We will also bring you evidence that the PA and PLO officials provided support to Hamas in the form of freedom to operate, bomb-making equipment, communications equipment.

The evidence will show that the PA arrested a notorious bomb maker named Abdullah Barghouti, but released him only three weeks later.  PA employees let him keep his bomb-making equipment and took him to a safe house.

Then Abdullah Barghouti went on a killing spree.  He was not caught by the Israeli authorities until his bombs had murdered 66 innocent civilians.

After he was caught, he openly confessed his crimes. He pled guilty.  At his sentencing he told the court:  I do not regret any of the acts that I have carried out.

One of his bombings was the Frank Sinatra cafeteria, Hebrew University, July 31, 2002.  That bomb killed nine and wounded 81.  Four of my client families lost a child or a sibling that day.

F1D8SOK3                         Opening – Mr. Yalowitz

Now, let me take you to reason number 3.  The defendants' own words.

You are going to see the defendants' intelligence files, their prisoner ministry files, their martyr files. Those files are filled with words of praise for the murderers. I want to just give you one example.  That's Ahmed Barghouti.

Ahmed Barghouti organized the January 22 attack on Jaffa Road in downtown Jerusalem.  You see him up there on the right at the top.  That's the one in which Said Ramadan used an M-16 assault rifle to shoot Shayna Gould in the chest and Shmuel Waldman in the leg.

Ahmed Barghouti is also the one who took that Hamas bomb maker, the one who bombed the Frank Sinatra cafeteria, to a safe house.

In a criminal proceeding in Israel Barghouti was convicted following a guilty plea of murder and attempted murder for his role in those attacks.  Immediately before he was sentenced for his crimes, Barghouti said:  I have no regrets.

Now, the PA has intelligence files on Barghouti and the other convicted murderers I have shown you.

One report on Barghouti says this.  It says he was arrested by the Israeli Occupation Forces and was sentenced to 15 life terms plus 50 years.  He is currently serving his prison sentence in the Al-Naqab prison.  He is good in terms of

F1D8SOK3                         Opening - Mr. Yalowitz

security and morals.

Good in terms of security and morals.  Consistent with those words, the PA has kept Barghouti on their payroll and they have promoted him through the ranks of their officers three times since his arrest and conviction.

You will also see police magazines.  The PA has something called the Institute for Political Guidance.  We don't have anything like it here in the United States.  The evidence will show that this institute puts out monthly magazines that it uses to educate the police forces.  The magazines are called things like The Police or The Martyrs.

The education that these magazines provide to the police is incitement.  You will see evidence of these magazines telling PA police officers to engage in violence, either directly or indirectly.

This is the PA's and the PLO's official political guidance to their armed security officers.

Now, I have told you about some of the documents you are going to see in this case -- convictions, confessions, payroll records, promotion records, ministry of prisoner records, martyr files, intelligence files, police magazines, statements of senior PLO and PA officials, government reports.

You are also going to hear from witnesses.  One thing I want you to watch out for is which witnesses the defendant brings.  Watch and see who they bring and who does not show up

F1D8SOK3                          Opening – Mr. Yalowitz

for the PA and the PLO.

Here is who we will bring.  We are going to bring you eyewitnesses who will tell you what they saw and heard.

We are going to bring you experts, people who have spent a career working in their fields.

You are going to meet intelligence agents who spent a career fighting terror.  You are going to meet practicing lawyers, psychiatrists, rehab doctors, accountants who will help you with damages, experts who will help you understand the evidence.

And you will meet the families.  These families can be very emotional.  Some of them have trouble expressing their emotions, and I want you to understand that.  When you lose a piece of your own body to terrorists or, God forbid, a child, something terrible happens to you and you can't always express it.  Terrorism tore these families apart, not just physically but in many cases emotionally.

Of course, you will see the physical scars that some of the survivors carry.  You will hear about the physical pain that some of the survivors bear.  But you and I have lived long enough to understand that sometimes the worst scars we carry are the scars that no one can see.

You will hear about emotional losses that so many of these families have suffered.  You will hear how these acts of terror ripped apart these families' lives.  You will hear from

F1D8SOK3                          Opening – Mr. Yalowitz

the survivors.  But I also want to take a moment with you to think about those who did not survive and what they meant to the loved ones who they left behind.

(Photographs shown)

Ladies and gentlemen, your Honor, thank you.

THE COURT:  Ladies and gentlemen I am going to give you a ten-minute break.

Don't discuss the case.  Keep an open mind.  We will proceed in ten minutes.

(Jury exits courtroom)

THE COURT:  We will continue in ten.

MR. ROCHON:  I have some matters to address about the opening.  I did not want to object during Mr. Yalowitz's opening.  I could do it now or after the break.

THE COURT:  What do you prefer?

MR. ROCHON:  I know you prefer me to do neither, but whatever you prefer.  I can tell you what they are.

THE COURT:  Sure.

MR. ROCHON:  Number one, I am concerned that after all the promises about trying to keep the occupation, all the political rhetoric out of the case, that it's being injected in the opening and some of the evidentiary rulings.  I have been clear, I have been saying we are not going to do that, and I think it was directly implicated by the opening.

I can list them all and then have the Court's comment.

Number two, there was reference to evidence that you have ruled inadmissible, the bomb-making materials that were supposedly left in Abdullah Barghouti's apartment that have always not been allowed in and your recent enunciation on that was yesterday.

The testimony about the nature of the release of Abdullah, the hearsay on that, was also restricted because it was in the nature of implicating others.

So, your Honor, I think that the arguments -- finally, he said that Ahmed Barghouti was convicted in the Hebrew University bombing.  He was not.  That's a PA employee.  There is no other PA employee.  There is no PA employee convicted in that.  And in his opening statement he just told the jury Ahmed Barghouti was convicted of those attacks.  That's not so.

I want to use a pejorative.  I am obviously extremely upset about it, but there is no excuse for that.  They know he wasn't convicted.  He just said he was convicted.  That is a PA employee in the four person, dead person, saddest case, worst case in this case, as you pointed out.  He just said that my client was convicted of it.  That was inaccurate at best.

I would ask for a mistrial.  I'm sorry.  This obviously is a very moving opening, a very well-presented opening, a very emotional case.  That is one of the most emotional incidents, and he just falsely told the jury that an employee of my client was convicted.

F1D8SOK3

THE COURT:  I am not going to grant your application for a mistrial at this point in time.  We had simply the first party's opening statement.  I will let you give an opening statement and then I will consider the presentation of the evidence, and to the extent that the evidence is inconsistent with the opening statement, I am sure you will have an opportunity to point out that he made promises that he could not keep.  To the extent that some other sanction, either evidentiary sanction, becomes appropriate or a basis for a mistrial becomes appropriate, I will consider that at that point in time.

The first thing I have already done and I have already emphasized to the jury is that what the lawyers say is not evidence, and I will emphasize that again.  There is a basic principle of trying a case.  Promises made, promises kept.  Promises made, promises not kept.  So I will be very careful and watchful as to whether or not there is some other evidence.

I have to characterize it slightly different than how you characterized it.  I did not rule that the evidence was inadmissible.  I ruled that the evidence he was going to offer to prove that point was not admissible.

Now, whether or not he has some other evidence that he intends to present during this trial to support that statement, that is to be seen.  But if an appropriate sanction needs to be imposed during the trial or an ultimate sanction of mistrial, I

F1D8SOK3

will consider it at the appropriate time.  But at this point in time I think it is appropriate for you to make your opening statement and for us to see what in fact is the evidence or lack of evidence that's presented to the jury and see whether or not that in and of itself is a basis for the jury to render a fair and just verdict.

MR. ROCHON:  Yes, sir.

THE COURT:  We will take a short break.

(Recess)

THE COURT:  Mr. Rochon, are you ready to go?

MR. ROCHON:  Yes, I am.

THE COURT:  Then let's bring in the jury.

(Jury present)

THE COURT:  Mr. Rochon, would you like to make an opening statement?

MR. ROCHON:  Yes, sir.

May it please the court.

Ladies and gentlemen, my name is Mark Rochon.  I am a lawyer.  I am a lawyer from Washington, D.C., and I stand before you today on behalf of the Palestine Liberation Organization and the Palestinian National Authority, which is sometimes called the PA.  I am grateful for the opportunity to represent them.

I hope that I do them justice during this case.

I know you will do justice in this case even if I fall

F1D8SOK3                          Opening - Mr. Rochon

short.

I hope I bring to you in this opening statement the additional evidence you haven't heard yet that will give you the full context of what happened here. But let me first tell you first of all what we can all agree on.

These acts happened. There is no dispute of that. These acts were horrific. We are not defending those acts. Those acts are condemnable, they were wrong, intolerable. We are not defending these acts as a proper part of resistance against an occupation or a struggle or any of that political stuff that you were just hearing about.

Ladies and gentlemen, this case is also not about that occupation that you just heard about from Mr. Yalowitz. Yes, there are extremely strong feelings on both sides. Yes, a lot of things could be said about that from both sides. Yes, there's people who have wildly different views as to what is right and wrong. But I have got good news for you. We are not asking you to figure that out.

So what I want you to do, if you would, after having heard such an emotional opening statement and knowing what these facts are going to be like is take a deep breath because we are not going to ask you to like what happened. We are going to ask you to decide whether or not the government that I represent is responsible for that, should be held liable for that, for things that it did not do. That's what we are going

F1D8SOK3                              Opening - Mr. Rochon

to do.  And with your help, with the court's help on the law, we are going to get through that.

At the end of that process, if you take a deep breath and you don't just think about the pain but you think about bringing a government to the United States of America for a trial for things that happened over there and to hold the government responsible for what in some instance its employees did but in many instances no employees did, you are going to find that the evidence doesn't support that.

So if you will join with me, ladies and gentlemen, the first thing I would ask you to do is take a deep breath.  We are going to be here for a while.  It's not going to be easy.  OK?  I am not telling you it's going to be easy.  People are going to come into court and get on that witness stand and there is going to be painful testimony, and no one defends what happened.  But the people who did it aren't here.

I am here today with the representatives of the Palestine Liberation Organization for the trial, and I would like to introduce them to you.

First of all, on behalf of the Palestinian Authority, Hind Khouri.  Ms. Khouri is the adviser to the minister of finance and is here on behalf of the Palestinian Authority.

On behalf of the PLO, Mr. Husam Zomlot, who is a roving ambassador for the PLO.

The government and the political party are here,

F1D8SOK3                          Opening - Mr. Rochon

brought to the United States for a trial for what others did.

The men and women who did this aren't here.  The Al Aqsa

Brigades is not sued here.  Hamas, which was by all accounts

responsible for that Hebrew University bombing, is not sued

here.  Fatah is not sued here.

This case is about whether one can hold on these facts

a government of over 100,000 employees responsible for what a

few of them did during a period of the most intense, passionate

conflict.  And the evidence is going to show that they fall way

short on that.

So we take a deep breath.  We get ready to talk about

the case.  One thing I want to do is tell you a little bit more

about who we are because you talk about the Palestinian

Authority, you talk about the PLO and some people have some

associations with that.  Some people say PLO and they think

Yasser Arafat or they think bad things.  I hope you don't.

But if you ever did, I am not worried about it.  You

know why?  Because you have already told me you're going to be

fair.  And we believed you.  The court believed you.  And we

trust you to be fair.  To treat the Palestine Liberation

Organization and the Palestinian Authority like any other

defendant, any other government that would be brought before

you, where people are seeking to hold them liable for what

their employees did, or in many instances where no employee was

involved.

F1D8SOK3                         Opening - Mr. Rochon

It's important as we talk about this to realize that you have two defendants in this case.  And we will talk a little bit about each of them.  Plaintiffs' counsel already did that a little bit.  I am going to do it a little bit more.

The first thing I want you to know, not all Palestinians are alike.  It's an important thing to think about.  They are not just some lump of things called Palestinian people.  Not all Palestinians are alike.

There are a lot of names they throw around.  Fatah, Al Aqsa Martyrs Brigades, Hamas.  And they want to say they are all the same.  That Fatah is Al Aqsa, that the PA is the PLO, is Hamas.  And why do they want to do that?  Because the evidence will show that there is not evidence connected to the defendants who are here.

In our system of justice we don't do something called guilt by association.  If your friend does something wrong, you didn't do something wrong, even if it's your friend.  If your enemy does something wrong, it is definitely not you who did it.  And not every time that an employee of a company or a government does something is the company liable.

When you think about it with a common sense attitude, you will know when the evidence comes in and your common sense applies, how would you hold an employer responsible for what its employees did?

So we talk about who we are.  I want you to start my

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**JA-3854**

F1D8SOK3                         Opening - Mr. Rochon

clients off with a clean slate.  It may be hard to do.  It's a foreign country.  With the word Palestinian some people have connotations.  That's what you said you were going to do and that's what we know you're going to do.

So there's two sides to this story, right?  You don't need to worry about it.  We are not asking you to decide to make peace to result in a two-state solution.  You don't need to pick a side.  Your only job is to listen to the evidence and decide whether or not the PA or PLO are responsible for the shootings and bombings at issue.

So the PLO, they were created first.  The PLO has been around for a long time.  It was created in 1964, 51 years ago, to represent the cause of the Palestinian people around the world.  The Palestine Liberation Organization represents all Palestinians around the world.  It is international.

Ten years after it was created the United Nations represented the PLO as the legitimate representative of the Palestinian people, including here in the United States where the PLO represents the Palestinian people at the United Nations and in Washington, D.C.

Mr. Yalowitz said the PLO created the PA.  The evidence is going to show that the Palestinian Authority was created in an agreement between the PLO and Israel, brokered by the United States that said that the Palestinian people needed a government in the West Bank, and that government in the West

F1D8SOK3                          Opening - Mr. Rochon

Bank and Gaza is called the Palestinian Authority.  So it was created out of some agreements that were negotiated in the '90s.  They called them the Oslo Accords.  Their name doesn't matter.  The fact is they were created by agreement.  A lawful government pursuant to an agreement.

Under this agreement that was created, it was very important.  You remember the map.  The Palestinian Authority does not have full authority even over the West Bank.  Under the agreements, the Palestinian Authority, they created three areas.  A, B and C.  In area A, which is only about 20 percent of the West Bank, Palestinians have civil and security control.  They both run the government and have security control.  That is not where any of these things happened.

Area B is also about 20 percent.  The Palestinians had civil but no security control.  It's not where any of this happened.

In area C, where essentially it is mostly controlled by Israel even though they call it the West Bank, it's about 60 percent of it and Israel has civil and security control.

But that's not even where these things happened.  These things happened in Jerusalem, outside of the security control or political authority of the PA.  So it's a case in which these people went to a place outside of the governing region of the government and did these horrible things.

In Jerusalem, the PA has no jurisdiction.  So these

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
**JA-3856**

cases come out of a very troubling period between this conflict called the Second Intifada, where also horrible things happened, condemnable things. But the question is, did we cause them to happen?

I want to turn shortly to the evidence that they say shows what happened.

First, so you have got two defendants. You have got two trials. You are going to have to do double duty. When you hear evidence, you will have to decide is it coming in against the PLO or Palestinian Authority. At the end of the case when you come back with your verdict, you are going to be asked how do you find on the PLO and then how do you find on the Palestinian authority. Two verdicts. A breakdown on the incidents, and you will learn in a little bit even as to the PLO the theories are somewhat different. But the idea is you have got two trials going on. You don't get double pay, double duty. You don't get double anything. It's double service, two defendants.

With these different theories, however, they will have the same result.

So let's move to the evidence. Let's talk about what the plaintiffs have talked about a little bit here.

Now, you had those little cards that Mr. Yalowitz gave you. If you want to pull them out, you can pull them out.

We will talk about these incidents because I want to

F1D8SOK3                        Opening - Mr. Rochon

be clear.  So the January 27, 2002 Jaffa Road bombing.  The

Sokolow incident.  The evidence will show that not any

Palestinian Authority person was involved in that incident.  A

woman blew herself up.  She worked for the Red Crescent, which

is like the Red Cross.  She didn't work for the PA.

A man was convicted for helping her.  He didn't work

for the PA.  He worked for the Red Crescent.

No Palestinian Authority employee was convicted in

these military tribunal trials that he was talking about before

that incident.

And in this case, the plaintiffs have a theory called

respondeat superior.  It's Latin, I think.  I don't really

know.  I am a lawyer, but I don't know much Latin.  What it

means is you're responsible for what your employees do.

Respondeat superior.

In this case that theory about you're responsible for

what your employees did doesn't apply to the PLO at all.  They

don't even allege a single PLO person employee was here

involved.  The allegation is that PA employees were involved.

So as to this incident, no PLO person employee

convicted.  No PA employee convicted.  And therefore, ladies

and gentlemen, the evidence is going to be, I suggest to you,

it's going to be hard because you're going to have to listen to

the horrible facts of the injuries, but nobody from my client

was convicted for doing it.

**JA-3858**

F1D8SOK3                          Opening - Mr. Rochon

So let's go to another one.  Mandelkorn.  That's June 19th, French Hill.  If you heard the opening, you would have thought all these employees were convicted in all of these things.  Those employees were involved in all of those.  No. You will hear, ladies and gentlemen, that in the Mandelkorn incident, of course no PLO employee is alleged to be involved in any of them.  It's not their theory.

As to the Palestinian Authority, the same thing.  No PA employee convicted.

Let's go to Hebrew University, that horrible incident in what is called the Frank Sinatra cafeteria, the one where four separate families were injured.  A man named Abdullah Barghouti was convicted for that.  PA employee?  No.  The evidence will show he wasn't.

The evidence will show he was from Hamas, as to which it's safe to say my clients have a difficult relationship. Hamas isn't even in the PLO.

So, ladies and gentlemen, even on the theory about our employees, you have to break it down and look at these incident by incident or you will reach an unfair result, and you don't want to do that.  The stakes are too high.

When you look at the other incidents where there are PA employees who were convicted, you are going to see no evidence that they were in their uniforms, used PA equipment, were on the job at the time, were operating in the area where

F1D8SOK3                          Opening - Mr. Rochon

they actually had authority.  There is no evidence that they used any PA materials to commit those offenses.

They were acting on their own for their own reasons. Crazy, wrong, contemptible, but not my clients.

I want to talk about this employees/nonemployees.

So you already heard they are suing under this thing called the Antiterrorism Act.  And under that the burden of proof falls on the plaintiffs.  So they have the burden of proof to prove what they say against my clients.  We don't have the burden of proof.  They do.

They are trying to do that in two ways.  They are trying to say the PA is liable for what the employees did and liable for something called direct support or material support. They somehow helped even if the employees weren't involved. Those are the two theories as to the PA.  As to the PLO they only have the second theory.

Now as to the first theory, the PA employees did it and therefore you're responsible.  You will hear even in the three incidents where there were PA employees convicted, no evidence of them in uniform, participating, in using any equipment from their employer in these attacks, no evidence that they were directed in regard to doing it by their employers.

I think what I would like to do is discuss with you what is the law that Judge Daniels will tell you about that

F1D8SOK3                        Opening - Mr. Rochon

respondeat superior, when are you liable for that?  And roughly speaking.  We will work out the final law later.  An act of a person can only be held against his employer if it's within the scope of employment.  So employers aren't automatically liable for everything their employees do.  If you're a business owner, you would be happy to hear that because how could you run a business otherwise.

Basically what it says is an act is within the scope of employment if it is in furtherance of the employer's business and it is within the scope of the employee's authority.

An employer's business in this context is its regularly conducted activities, whether commercial or non-commercial.  An act is within the scope of an employee's authority if it is performed while he is engaged generally in the performance of his or her assigned duties or if the act is reasonably necessary or incidental to the employment.

Now the employer doesn't need to specifically authorize the act to get liability, but it's got to be within the scope of their employment, and there will be no evidence even as to those incidents where employees were convicted that it was within the scope of their employment.

Now, this material support theory.  Really this gets down to the money that he was talking about.  Remember all this stuff about there's three kinds of payments.  There's payments

F1D8SOK3                        Opening - Mr. Rochon

made to prisoners.  There's payments called martyr payments, and then there are payments made to employees where their employment salary continues while they are incarcerated.

The first thing you need to understand is that these payments did not cause these events to occur.  These payments were not made because of these events.  These payments are routine in my client's society.  My client is essentially a social welfare state.

I will give you an example.  In the course of this martyr society that he talked about, the thing that pays for so-called martyrs, the first thing you might say is, well, martyrs, is that everybody who kill themselves.  That is anyone injured whatsoever in the course of this conduct.  You don't even have to be killed.  Any injury.

40,000 different people received those payments. These payments aren't being made specially to the three or four people who are involved in this case.  This is something if any Palestinian is hurt, injured, whatsoever in connection with this conflict, the Palestinian Authority or the PLO -- in this instance the money comes from the PLO -- provides payment.

Now, how much was that payment?  I will give you an example.  One of the people that they talked about in this case was a guy named Ali Ja'ara, one of the suicide bombers in this case.  He was the Palestinian police officer and you will actually see the evidence that he in fact had been removed from

F1D8SOK3                         Opening - Mr. Rochon

the force about two weeks before this happened.  How much did his family get?  About $100 a month.

Ladies and gentlemen, the man did not blow himself up so his family could get $100 a month.  The martyr's payments didn't cause that event to occur.  When someone is lost in that society, they provide a variety of ways to make up for it.  And in that case, the evidence will show he left behind numerous siblings, five or six, a mentally ill father, and the house of the family was destroyed because of his act.  So they are put out of their home as a punishment for the act and the family received after he blew himself up $100.

The martyr's payments are not evidence of anything that caused someone to do this.  They are for the people left behind.  That 24-year-old man, awful what he did, he didn't do it so his family could get martyr's payments.

The prisoner payments that he talked about.  Every single Palestinian who is incarcerated as a result of this conflict receives from the Palestinian Authority a payment.  Whether you're arrested and incarcerated for throwing stones at a tank or anything else, you get those payments.

Now, how does this system work?  You first need to be certified as a security prisoner.  The International Committee of the Red Cross certifies them as a security prisoner.  Not the PA.  Because it's a conflict, these people don't get along, and a lot, thousands and thousands and thousands of

F1D8SOK3                        Opening - Mr. Rochon

Palestinians have been locked up in the course of this conflict.

MR. YALOWITZ:  Objection.

THE COURT:  Overruled.

MR. ROCHON:  Each of them received these payments if the International Committee of the Red Cross certifies them as a security prisoner.

The evidence will show that those payments didn't cause these acts to occur.  They didn't reward these acts.  You get them no matter what.  And the evidence will also show that it's not that much money.

So the payments to prisoners didn't cause anybody to decide to go as a Palestinian to an Israeli prison for the rest of their life so they can get some money.  When you think about it, your common sense tells you who would want to sit in prison.  The reason people did these things is not because of the money.

The last one of these is that if an Palestinian has got a job in the security services and he is locked up by the other side, they don't take his job away and they continue to pay him.

Now, you may not agree with this system.  You may say these people are crazy the way they are doing things over there.  But that's not causing these acts to occur.  If you're a Palestinian security person and you're arrested by the

F1D8SOK3                         Opening - Mr. Rochon

Israelis and put in one of their prisons, you don't lose your job, and you continue to get promotions.

Now, I am not equating this conflict to any conflict we have ever been in, but any time there is a conflict between two countries, that's the rule.  John McCain didn't lose his rank or his money when he was locked up by the Vietnamese.  He continued to get his salary.  He continued to collect it.

The evidence, ladies and gentlemen, is that the PA treats its security personnel who are locked up by Israelis the same no matter what.

So these payments that they want to talk about did not cause these acts to occur.  These prisoner payments did not cause these acts to occur.

And, ladies and gentlemen, when you get down to what the evidence will show here in this case, the evidence will show that no witness will come to court and fill the gaps in their evidence sufficiently.

Now, they are going to have payment records.  They got them from us.  All these martyrs' payments, those are our records.  We gave them to them.

They have got these horrific incidents and they have got these convictions from the Israeli military tribunal prosecutions.  You will hear about them.  I think a guy will testify tomorrow about them and how they work and what they are convicted of.  Those convictions don't establish any guilt or

F1D8SOK3                          Opening – Mr. Rochon

responsibility to the PA or the PLO.  The payment records don't establish any such.

They actually don't have witnesses who come to court who know about these incidents from firsthand knowledge and implicate the PA or the PLO.  So they try to fill it up with people who will give you some opinion testimony.  Opinion testimony comes from people who are considered experts.

So they will call some witnesses, two, three, maybe four, to give their opinions on the evidence.  Well, you won't need someone's opinion on the evidence to reach your own opinion on the evidence.  These kinds of witnesses, they are called expert witnesses, and they basically get hired to provide an opinion that supports one side or the other.

In this case, listen to those witnesses carefully.  Listen to these so-called expert or opinion witnesses carefully to see if they are giving you anything you can't figure out on your own.  Listen to see if their opinions are theirs or they were fed to them.

You may say, Mr. Rochon, what do you mean their opinions were fed to them?  Just wait.  Wait and see if their opinions were theirs or they were fed to them.

And listen, ladies and gentlemen, to see if they know anything about this case as opposed to general information that serves the other side, and listen to see if they just might have some bias against my clients.

F1D8SOK3                          Opening - Mr. Rochon

And at the end, you know what you will be instructed on, that you should not substitute those opinion witnesses for your own reason, judgment or common sense.

So this case will move your emotions, but it's still not about those emotions.  These were tragic and sad and senseless events, and I am not going to ask you to turn your hearts away and ignore that sadness.  But I am going to tell you that even when the emotions run high, even when people are sharing these sad and heartbreaking events, remember, take that deep breath and remember we are not here to decide whether these are bad or sad things.  You're here to decide whether the PA or the PLO should be liable for what the evidence will show they did not do.

The perpetrators aren't on trial.  Hamas is not sued here, though the evidence would show that they are the ones that are responsible for that Hebrew University bombing.  So don't let emotion get the best of you.  You get the best of it.

And, ladies and gentlemen, passion.  Passion will claim this trial too.  Both sides will confuse passion, which means intensely believing something with proof, both sides will confuse passion with proof.  Passion ain't proof.  Passion is an intense belief in something, but it's not proof.  Passion clouds the judgment, it doesn't help it, and it infects your reason.  Don't let hatred or passion affect you from hearing the evidence.  I know you won't.  And be careful to watch out

F1D8SOK3                          Opening - Mr. Rochon

for when passion on either side, mine or his, gets in the way

of a fair decision.

It's reason that we ask of you, your reasoned and fair

judgment, not infected by emotion or passion.  As you listen to

the evidence, your reason will help you.  There will be a

natural tendency in this case for you to want to do what you

can to address the plaintiffs' pain.  It's very human to want

to help.  But that's not what we are here to do, to let our

good desires to take over our reason.  It may be a basic

instinct to want to right this wrong, but you can't do it by

holding liable the wrong party.  We are here to see if the PA

or the PLO should be made to pay for what these others, all

dead or punished already, did.

So, ladies and gentlemen, our justice system.  These

incidents happened way over there, but they are being tried

here in the United States District Court for the Southern

District of New York.  The evidence, a lot of it is going to

come from way over there, but it's not going to be judged by

those standards.  My client is not on trial in Israel.  My

client is on trial in the United States.  We benefit from the

United States justice system.  We benefit from the jury system.

We benefit from you because you have agreed to take on this

task.

There may be some bias with some of that evidence, but

you will see through it and discount it.  We don't judge

defendants in our system by their name.  If my client was the Fredricksburg National Authority and the Fredricksburg Liberation Organization, they should get the same quality of justice as they do with their name having the word Palestine in it.

So this case is not being tried in front of just anyone.  It's being tried in front of you, jurors who will get the evidence only the way it deserves, jurors who will not be swayed by opinions from biased witnesses, jurors that will not let the PA or the PLO have their fate determined by anonymous reports from those with whom they are in conflict, jurors who like their evidence of liability to be something they can test.  So these defendants have been brought to you and to our justice system.  That's why we picked you.

Now, I want to tell you a little bit more about how this trial is going to go.  There is going to be a lot of witnesses.  I am going to make a little bit of a deal with you. I am not going to ask and my colleagues aren't going to ask a lot of these people questions.  When these victims testify, I will often say or one of my colleagues will say no questions after the examination.  I don't do that to belittle their pain. It doesn't help to ask about those things.  It doesn't help to remove the pain.  And ultimately those people, those people who suffered this can't help you with the liability issues, because we all agree terrible things happened.  So if you don't hold it

F1D8SOK3                              Opening - Mr. Rochon

against the defense, we will frequently say after a witness

testifies, no questions.  Because we want to focus on the

evidence that might have something to do with the actual

liability part of the case, not whether something bad happened.

So as the trial unfolds, I think maybe we will hear

from a witness today, maybe tomorrow for the first time, and

then the plaintiffs will start getting into some of these

so-called opinion or expert witnesses, not witnesses who

directly have knowledge.  And after them a lot of the

plaintiffs will testify.

Ladies and gentlemen, when you get to the end of the

trial and you look at what the evidence is, it will not

establish the liability we are talking about.

So the way this works is I have had the pleasure to

speak to you today, and I appreciate your attention and the

attention you give this case.  I appreciate that you will

provide the justice that's appropriate, a verdict that is

appropriate.

I won't get to talk to you again directly until the

very end of the trial, it could be in five or six weeks, and I

will get to speak to you again.  And when I speak to you again

in closing argument to discuss what the evidence has been and

how it compares to the law, that will be the last time.  The

way this works is I don't get the last word.  Plaintiffs'

counsel doesn't get the last word.  Even Judge Daniels doesn't

F1D8SOK3                        Opening - Mr. Rochon

get the last word.  You, ladies and gentlemen, have the last word.  It is with your collective voice that you will present the last word, and based on the law and the facts, based on the evidence that neither the PA nor the PLO are liable under our law for what happened over there, they are not liable for what these other people did.  So we look forward to hearing your voice at the end of this trial and a verdict that the defendants are not liable.

Thank you.

THE COURT:  Mr. Yalowitz, would you call the plaintiffs' first witness.

MR. YALOWITZ:  Yes, your Honor.

Your Honor, the plaintiffs call Meshulam Perlman.

We may have to get him from outside the courtroom so we may be just a moment.

MESHULAM PERLMAN,
    called as a witness by the plaintiffs,
    having been duly sworn, testified as follows:
DIRECT EXAMINATION
BY MR. YALOWITZ:
Q.  Good afternoon, Mr. Perlman.  Thank you for coming in today.

Could you tell the jury where you are from?
A.  I am from Jerusalem.
Q.  Where did you grow up?

Case 15-3135, Document 62, 11/10/2015, 1639387, Page298 of 326

Case 1:04-cv-00397-GBD-RLE   Document 833   Filed 03/04/15   Page 96 of 120

96

F1D8SOK3                    Perlman - direct

A.   In Jerusalem.

Q.   Of what country are you a citizen?

A.   The State of Israel.

Q.   What kind of work do you do there in Jerusalem?

A.   I have a flower shop.

Q.   I want to take you to the morning of January 29, 2004, but before I do I would just like you to show us on a map where your flower shop is in relation to the terror attack at issue in this case.

A.   Shall I point to it?

Q.   I think we need you to use words to describe where the flower shop is and where the bombing took place.

A.   The flower shop is on the corner of Ben Maimon and Arlozorov.

Q.   Is that where we have drawn a little square and written flower shop in English?

A.   Correct.

Q.   Can you describe for the jury --

        MR. YALOWITZ:  I apologize, your Honor.  I am actually color blind.  Maybe one of my colleagues can use it.

        THE COURT:  There is a red button on the top and you push it and point it.

        MR. YALOWITZ:  I won't be able to see it, but I know one of my colleagues will be able to.

Q.   Are we looking at the intersection where the bombing took

(212) 805-0300

**JA-3872**

F1D8SOK3                        Perlman - direct

place?

A.   Yes.

Q.   Now, what time of day did the attack take place?

A.   Approximately 8:30, maybe a little later, in the morning.

Q.   About how far is it from your shop to the intersection?

A.   Approximately 15 meters.

Q.   Where were you when the bombing took place?

A.   I stood behind a wall that hid the garbage receptacle made out of stone.

Q.   Were you inside the shop or outside the shop?

A.   I was outside the shop.

Q.   In what direction were you looking as you were standing behind that garbage receptacle?

A.   I was looking in the direction of Aza Street.

Q.   Please tell the jury what you saw as you were looking in the direction of Aza Street.

A.   I have an iron column there about two meters high on which I hang hooks.  And on the hooks I hang plants and similar objects.  And at the time that I was at eye level, I was holding the iron hook in order to hang it on the column, and all of a sudden I heard an explosion, and I saw that the roof of a bus completely opened up and there were white and red pyrotechnic displays above on top of the bus.  On the basis of my experience from the military, I knew that it was a terrorist attack, and I immediately told myself, this is a terrorist

F1D8SOK3                        Perlman - direct

attack.  And I said a few words and I went outside and the street was empty, with a very few people who were outside on the street, to try and help the passengers on that bus.

(Continued on next page)

F1D3SOK4                    Perlman - direct

BY MR. YALOWITZ:

Q.   Could you describe the scene as you saw it inside the bus.

A.   The bus was destroyed.  The seats were almost entirely gone.  People were lying dead underneath the seats of the bus, and injured people as well.  A very few people were thrown out of the bus.  And passersby who had been walking in proximity to the bus, they had also been injured.

What we, as civilians, as citizens could do, we could only help those who were not on the bus.  Because there is a danger that there might be an additional bomb, and who knows what could be there.

Q.   Could you describe the scene outside the bus as you perceived it that day.

A.   The scene outside the bus was one of utter destruction.  Bodies, corpses were flying.  They were flying onto balconies and rooftops.  Parts of body, body parts.  People were severed into two, severed into pieces.  The first day, the ambulances arrived within two to three minutes and they took body parts on stretchers with them.  And it was a worse scene than a scene of war.

People who were visibly injured and you could see blood and flesh on their -- the outside of their bodies, it was internal organs of people who had been killed.

I saw the driver during the time of the terrorist attack.  I saw him slumped, fall over the wheel.  Since the

F1D3SOK4                    Perlman - direct

terrorist attack had taken place and the entire bus had

changed, it was possible for the driver to turn entirely around

in his chair facing the passengers who were sitting.  And when

he saw the magnitude of the tragedy, he -- he fell prostrate.

And I want to say that I know the fellow.  And on the

day of remembrance, on the 29th of January every year, I

participate in their day of remembrance.  And that driver never

came back to work.

Q.  Could you describe the bus mirror for the jury.

A.  As I stated, I was standing behind the wall of the garbage

receptacle.  The height of the wall was almost up to my head.

The external frame of the mirror of the bus smashed into that

wall.  And had that wall not been there to protect me, I would

have not -- I would not have emerged alive from the attack.

And on that Sabbath, on that Shabbat, I gave a prayer of

deliverance in the synagogue.

Q.  I'd like to show you a couple of photographs.  We'll begin

with 1123.

Can you identify that photograph for the court.

A.  That's the bus at the scene of the terrorist attack, and

you can see that its roof is blown open.

Q.  Does that photograph accurately depict the scene as you

recall it?

A.  Definitely.  We can see corpses of people there.  We can

see corpses of people that are being placed into body bags.

F1D3SOK4                    Perlman - direct

MR. YALOWITZ:  Plaintiffs offer 1123 in evidence.

MR. ROCHON:  No objection to 1123.

THE COURT:  It will be admitted into evidence.

(Plaintiff's Exhibit 1123 received in evidence)

MR. YALOWITZ:  Why don't we go to 1124 for identification.  Ms. Machnes, can we enlarge that on the screen or is that as large as we can get?  Thank you.

Q.  Mr. Perlman, do you recognize those photos?

A.  Definitely.

Q.  Can you describe them for the jury, please.

A.  In the left-hand picture, we see the evacuation of either person who was injured or the corpse of a person.

And that is not the roughest, most grave picture.  I remember a picture of the stump of a young woman who was severed from the hip down.  And she remained with her tights on, on the stretcher, when she was being evacuated, and it was a scene of horror.

MR. YALOWITZ:  Your Honor, plaintiffs offer 1124 in evidence.

MR. ROCHON:  No objection to 1124.

THE COURT:  It will be admitted into evidence.

(Plaintiff's Exhibit 1124 received in evidence)

Q.  Mr. Perlman, I would like also to play a video.  I just ask have you had the opportunity to review a video with me in advance of your testimony?

F1D3SOK4                        Perlman - direct

A.  Yes.

Q.  Does that video accurately depict the scene as you recall it?

A.  Yes.

          MR. YALOWITZ:  Your Honor, plaintiffs offer Exhibit 489 in evidence.

          MR. ROCHON:  No objection to 489, your Honor.  We've seen it previously.

          THE COURT:  489 will be admitted in evidence.

          (Plaintiff's Exhibit 489 received in evidence)

          MR. YALOWITZ:  Thank you, your Honor.  Let's play the video when you're ready.

          (Video playing)

          MR. YALOWITZ:  Thank you, your Honor.  I have nothing further for Mr. Perlman.

          THE COURT:  Any questions?

          MR. ROCHON:  No questions, your Honor.

          THE COURT:  Thank you, sir.  You can step down.

          (Witness excused)

          THE COURT:  Can we move forward with your next witness?

          MR. YALOWITZ:  Your Honor, I need to consult with the Court about that for a moment.

          (Continued on next page)

F1D3SOK4

(At the sidebar)

MR. YALOWITZ:  Okay, your Honor, we can begin the next witness, get him qualified and so forth, but the binders with the redactions, because I recall your Honor's ruling differently than what you gave me this morning.  I respect the Court's ruling, we've got to adjust to it.

THE COURT:  We must have all been in a different room than you.

MR. YALOWITZ:  I'm not arguing with you.  I respect the Court's ruling.  I'm telling you I didn't understand it the way you articulated it this morning, so I'm going to need tonight to get those binders adjusted.

THE COURT:  How much testimony can you give us before you go to the binders?

MR. YALOWITZ:  We can probably get 10 minutes out of him to get him qualified.

MR. ROCHON:  I'm open to whatever Mr. Yalowitz prefers.  We've had a pretty good day.

THE COURT:  I'd like to use that 10 minutes because I want to get the jury to understand that we're using the time efficiently.  So why don't you take the 10 minutes, and when you're ready go to the binders, then we can adjourn for the day.

MR. YALOWITZ:  Your Honor, what is your rule once a witness goes on the stand?  Are we able to consult with him?

F1D3SOK4

MR. ROCHON:  Actually, your Honor, this question is a good one.  In light of the ruling and making sure the witness understands the ruling, I would greatly prefer us not start with him.  So we don't have a witness on the stand issue, Mr. Yalowitz can make sure to communicate the ruling, and we don't have any inadvertent mistakes.  Give him the night.

THE COURT:  You haven't been able to do that, right?

MR. YALOWITZ:  I've been a little occupied.

THE COURT:  Really?  Where you been?

MR. ROCHON:  In light of that, I know you're moving us along, but safety would suggest to give him a full opportunity.

MR. YALOWITZ:  Or we can qualify him.

THE COURT:  Whatever you're comfortable with.

MR. YALOWITZ:  As long as I can communicate with him tonight, we get the 10 minutes done, and as long as the cloak of privilege remains on my communications with him tonight, I'm fine with that.

MR. ROCHON:  To accommodate things, we won't invoke the rule.  So he can get his 10 minutes.

MR. YALOWITZ:  Thank you.

(Continued on next page)

F1D3SOK4

(In open court)

MR. YALOWITZ:  Your Honor, the map that we put up, we didn't sticker it and identify it in evidence.

THE COURT:  Do you have a number?

MR. YALOWITZ:  Consistent with the Court's ruling, I think we should number it as --

MR. ROCHON:  Is that the flower shop document?  No objection to whatever number they give it.

MR. YALOWITZ:  We'll mark it as 1149 and offer it in evidence, your Honor.

MR. ROCHON:  No objection.

THE COURT:  Plaintiff's 1149 will be admitted into evidence.

MR. YALOWITZ:  Plaintiffs call Nick Kaufman.

(Plaintiff's Exhibit 1149 received in evidence)

(Witness sworn)

NICHOLAS KAUFMAN,

    called as a witness by the Plaintiffs,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. YALOWITZ:

Q.  Mr. Kaufman, thank you for coming in this afternoon.

Could you describe for the jury what you plan to cover in your testimony.

A.  What I plan to cover in my testimony is to submit and

F1D3SOK4                      Kaufman - direct

present to the honorable members of the jury a number of court

documents, originating from the Israel military courts on the

West Bank, and other places.  And I will explain those court

documents, I will explain the convictions which one finds

therein.  And that's about it.

Q.  Would you please tell the jury where you were educated.

A.  Well, if we exclude my secondary education, I was educated

at Cambridge University in the United Kingdom.  That was from

1986 until 1989.  And after that, I went to study to become a

lawyer at the Inns of Court School of Law in London.  That was

in 1989 until 1990.  And I was there qualified to become a

barrister.

Q.  What does a barrister do in the English court system?

A.  Well, it is basically like you, Mr. Yalowitz, except we

wear wigs in England.

Q.  So, were you admitted -- I think you may have said this,

but I want to make sure.  Were you actually admitted to the bar

of England and Wales?

A.  That's correct.  In February 1991 if I remember correctly.

Q.  Did there come a time when you left England and moved

somewhere else?

A.  Indeed I did.  In 1993 I left England and I moved to

Israel.

Q.  What did you do when you moved to Israel?

A.  Well, being a lawyer, I immediately enlisted in the Israel

F1D3SOK4                        Kaufman - direct

Defense Force.  There I did my articles or internship, and I served my compulsory military service, because I was by then an Israeli citizen, in the Israel Defense Force in the Military Advocate General's Office.

Q.  What does the Military Advocate General do?

A.  Well, I think it is similar to the Judge Advocate General here in the United States.  Basically, the Military Advocate General is responsible for all the legal work of the army.

Q.  Is that what you did as part of the Office of the Military Advocate General?

A.  That's correct.  I performed my compulsory military service in the Military Advocate General's Office.  I was in the international law department.

Q.  Did you gain admission to the bar of Israel?

A.  Yes, I did.  After my release from my compulsory military service in 1995, I studied for a year, I did internship, and I took the bar exams, and I was admitted to the bar of Israel as well.

Q.  Now, following your admission to the bar, what kind of work did you do in Israel?

A.  Well, after a period of a year or so in a commercial law firm, which didn't really interest me that much, in 1996 I joined the Office of the District Attorney of Jerusalem.

Q.  As a lawyer in the Office of the District Attorney, did you prosecute crime?

F1D3SOK4                      Kaufman - direct

A.  Yes, I did.

Q.  What kinds of crimes did you prosecute during your period of service in the District Attorney's Office?

A.  Well, there I was there for a long time.  I started off in 1996 prosecuting the most minor of offense, small-time drug offenses, car theft, minor assaults.  And by the time I left in 2010, I was prosecuting the most serious types of offenses, whether it be serious sexual crime, murder, or offenses against the security of the state.

Q.  What kinds of crimes did you prosecute that were security crimes?

A.  Well, crimes like the crimes we've been discussing today.  I also dealt with at least one espionage case.  Those are the types of offenses which are considered offenses against the security of the state.

Q.  When you were practicing in the District Attorney's Office, did you work in the English language or the Hebrew language?

A.  Only in the Hebrew language.

       May I just qualify that?

Q.  Please.

A.  Sometimes, of course, if there was a tourist or somebody who spoke English or French, which I speak pretty well, I would handle the case in English or French with the victim.

Q.  During your course of service in the District Attorney's Office, were you given leave to take some special assignments?

F1D3SOK4                         Kaufman - direct

A.   Yes, I was, on two occasions.  In 2004, I left the Office of the District Attorney in Jerusalem, and I became a prosecutor at the International War Crimes Tribunal in the Hague, that's in the Netherlands.  There I was involved in the prosecution of a Serbian general, who had committed war crimes in Dubrovnik.  That's a seaside resort in Croatia.  That was for a period of a year or so.  Then I went back to the Office of the District Attorney in Jerusalem.

Q.   Was there a second special assignment that you did as well?

A.   Yes.  Once again, it is not as if it is an assignment on behalf of the State of Israel.  This is a personal decision. And I left for another period of a year between 2008 until 2009, I joined the International Criminal Court.  That's also a war crimes tribunal in the Hague, in the Netherlands.  And there I was involved in prosecuting African warlords for war crimes and crimes against humanity.

Q.   When did you leave the District Attorney's Office?

A.   In 2010.

Q.   What kind of work have you been doing since then?

A.   Well, I entered into private practice.  And because of my experience at the international war crimes tribunals, I have, when I can get the work and when the clients want me, involved myself heavily in defending war criminals, and other types of crime in the national jurisdiction.

Q.   Now, did you have occasion to serve as a judge in Israel?

F1D3SOK4                          Kaufman - direct

A.   Yes, I did.  But I qualify, in the courts in the West Bank.

Q.   Would you just explain what you did in that capacity, and would you explain how it came about that you had that opportunity and what did you in that capacity?

A.   Well, this was in about 2002.  A call went out for people who were serving in the Office of the Military Advocate General doing their reserve duty, because every male citizen in Israel has to do compulsory reserve duty as well after he's released from his obligatory army service.  A call went out to lawyers asking whether they would like to become judges.  I thought, well, I've been a prosecutor, I've been a defense counsel, because I had been defending soldiers.  So I said, why not have a go at being a judge as well.  So I did.  I answered the call.  And in 2002 or thereabouts, I was appointed a judge at the rank of captain in the reserve corps of the Israeli Defense Force.

Q.   In preparation for your testimony here today, can you just tell the jury in general what you did.

A.   Well, I reviewed a number of case files which were given to me by the plaintiffs, through lawyers.  These case files originated from the Israel military courts in the West Bank.  I reviewed them, and I reviewed the convictions.  I read the judgments.  I read the case files.  And afterwards, I went back to the military courts on my own, to make sure that what I had received from the lawyers for the plaintiffs exactly reflected what was actually in those court files.

F1D3SOK4                         Kaufman - direct

MR. YALOWITZ:  Your Honor, may I have a moment to consult with my colleagues?

THE COURT:  Sure.

MR. YALOWITZ:  Thank you so much.

(Pause)

MR. YALOWITZ:  Your Honor, we're at a good breaking point, if it suits the Court.

THE COURT:  Surely.  Ladies and gentlemen, we're going to take a break for the day.  Don't discuss the case.  Keep an open mind.  If you have the cards that were given to you by Mr. Yalowitz during his opening, just leave them on the seat. Or if they are in the jury room, just leave them in the jury room.

I am going to ask you to be in the jury room by 9:30 tomorrow morning.  I think we've gotten a good start.  I want to keep us on pace.

Don't discuss the case, keep an open mind.  I'll see you at 9:30 tomorrow morning.

(Jury excused)

(Continued on next page)

F1D3SOK4

THE COURT:  Anything we need to address before we adjourn?

MR. ROCHON:  We had not finished with exhibits that were related to this witness.  Mr. Satin will address any remaining issues.

THE COURT:  Mr. Satin, is there a category of documents?

MR. SATIN:  Yes, your Honor.  One issue, and this happens repeatedly, in at least three of them, is that the name Yassir Arafat is within those records.  We certainly believe that same principle that has guided the Court's ruling to other individuals applies to Yassir Arafat.

THE COURT:  Is a reference to a person making some accusation against Yassir Arafat?

MR. SATIN:  It is.  In the various cases it is individuals implicating him in criminal activity.  In fact, that was the defense of one of the defendants in one of the cases.

MR. YALOWITZ:  If Mr. Satin would give me a particular example, I'll look at it.  I think I understand the Court's ruling, which is, let me just articulate it to make sure I've got it right.  That if it says Yassir Arafat signed a check for me to commit an act of terror, the Court's ruling is that's not coming in in this conviction.  We'll have to prove that some other way.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
**JA-3888**

F1D3SOK4

Do I have that right?

THE COURT:  Well --

MR. YALOWITZ:  I think that's what Mr. Satin is talking about.

THE COURT:  Well, I think you're being too specific about the rule.  The rule is much more general and to be applied across the board.  To the extent that you have people who have made self-incriminatory statements, those statements come in as statements against interest.

To the extent those same people say "I did it and Mr. Yalowitz did it too," those statements accusing Mr. Yalowitz don't come in through that witness, because that is not an exception to the hearsay rule.

If you want someone to come in and accuse Mr. Yalowitz of committing the crime, then you should put that person in the courtroom under oath and have that person give that testimony.

That's the basic rule.  This isn't a fancy rule.  So, I thought it was clear that if you had some statement that you were offering, and a basis for offering that statement was it was a statement against interest, that you could offer the statement that the person admitted their own participation. You cannot offer a statement by some person who was being interrogated or was pleading guilty or was accused of doing it with somebody else, and they stand there accusing the somebody else.  I don't care whether it is Yassir Arafat or anybody

F1D3SOK4

else.

So, if that is the nature of the statement, no, you can't use that person's out-of-court statement as evidence that the other person that he's talking about in that out-of-court statement committed the offense that you're trying to tag him with.

I don't know why we didn't have a clear understanding about that.

MR. YALOWITZ:  All right.  I think I need to consult with one of my colleagues who wants to talk to me.

THE COURT:  All right.

MR. YALOWITZ:  Thank you, your Honor.  Bear with me.

THE COURT:  Okay.

(Pause)

MR. YALOWITZ:  Your Honor, Ms. Romeo has an issue that she's better at explaining than I am.

MS. ROMEO:  So I just want to be clear so we're redacting the documents correctly and we can keep moving tomorrow.

THE COURT:  I'm obviously not explaining myself well.

MS. ROMEO:  We have the two sets of documents.  We have the IMC conviction binder, which has documents that have come in as records of conviction under the hearsay exception. We took the Court's rulings after looking at the transcripts to be that we needed to redact all names and corresponding

F1D3SOK4

identifying information for that name.

THE COURT:  Accusing a third party of committing a crime.

MS. ROMEO:  Of witnesses and -- oh, actually witnesses and accomplices was used, the term was used in a couple of conferences.  So we went through all the documents, and any time a name popped up, we redacted that.  We also redacted, with the exception that we've discussed with the Court where there is the independent corroborating evidence.

THE COURT:  I am not sure what you mean by "witnesses," because I don't think we had a specific discussion about witnesses.  The discussion was whether or not you wanted to use someone's out-of-court statement admitting their own guilt and accusing a third party at the same time that you wanted to use the accusation against the third party as evidence in this case, even though it does not meet a hearsay exception, particularly if it is not a statement against interest.

I don't know how many times I can say this.  And I don't understand why you don't understand what I'm saying.  If it is accusing a third party by someone's statement out of court, then it is not coming in.  And I don't care what form it is.  All right?

MS. ROMEO:  Okay.

THE COURT:  You make sure that whatever document you

F1D3SOK4

want to offer does not have in it, that you want to use for that purpose, an accusation against a third party which no one has the ability to test because that person is not a witness in this courtroom.

MS. ROMEO:  Okay.  Can I just ask for one clarification?

THE COURT:  Sure.

MS. ROMEO:  That rule, is that qualified by the exception if we have the independent corroborating evidence that that person was in fact involved in that crime in the manner described?  Because we discussed a few exceptions to that in one of the conferences.  I believe it was last week. Because this issue of Yassir Arafat has been raised before as well as I believe --

THE COURT:  Well, let me put it this way.  I might extend some leeway in that regard, if the evidence is already independently before the jury.  If the argument is that, oh, you can't believe that evidence, it may or may not be relevant that someone else said it too.  Not for its truth.  But if someone else said it too.

But we don't have that at this point.  All right?  So if you want to put somebody on the stand to say "I was there and I saw Yassir Arafat do it," then you're right, I'm not particularly concerned about a third party also saying Yassir Arafat did it, if it is offered for some other purpose than to

F1D3SOK4

independently prove that fact.

But right now what you're doing is you have a bunch of convictions, and the issue was you cannot prove the criminal activity of third parties by just taking people who have their own interest in accusing third parties out of court or during interrogations or in another court not subject to cross-examination here, by saying that person must be guilty of this because this other person when he pled guilty accused that person.

That's the rule.  Okay?  So you can figure out where that rule applies.

MS. ROMEO:  We understand, your Honor.

THE COURT:  I didn't ask you to do a ministerial task. I asked you to look through your documents, figure out where that person is accusing a third party, and take out the references that would be in any way accusatory of the third party.

MS. ROMEO:  We understand.

THE COURT:  Whether it is an accusation directly by name or whether that is an implication and an accusation by circumstantial evidence that you want the jury to rely solely on that statement to conclude that that person did it.

MS. ROMEO:  We understand.  Okay.

THE COURT:  I don't know how else to explain this 10 more times.

F1D3SOK4

MS. ROMEO:  We understand the Court's ruling.  I just have one question.  So the question is obviously these are translations of Hebrew language documents.  Should we also go -- it is going to be extraordinarily difficult to do the Hebrew overlay.  So what would be possible is to do the redactions on the translations for tomorrow.

MR. ROCHON:  That's going to serve for tomorrow because this witness speaks English.  And if we are going to show him the English versions, we don't have to worry about it.

THE COURT:  You can discuss that first and see if there is a problem.  But, I have to go back over the jury questionnaires, but my recollection is I don't think anybody on this jury speaks Hebrew or Arabic.

MR. ROCHON:  We were pretty careful on that one, your Honor.

THE COURT:  I'm not particularly concerned about that issue.  I'm more concerned they are going to rely on you for the accuracy of the English translation, what that English translation says, means, and for what purpose you're offering it to them.  That's what I'm concerned about.

Okay.  So I think that you both have to do a little bit more analysis to make sure that the purpose of why I said you should redact it appropriately is being addressed.  All right?

MS. ROMEO:  We understand, your Honor.

F1D3SOK4

THE COURT:  Anything else other than that?

MR. ROCHON:  No, sir.

THE COURT:  All right.  Then I think we got a good start.  Let's try to keep moving along.  If there are any issues we need to address before the jury comes out, let me know right away at 9:30 so we don't keep them waiting.

MR. YALOWITZ:  I do have one issue, your Honor.  It is a little warm in the room.

THE COURT:  You want me to --

MR. ROCHON:  I'm with you.  I agree with him.

MR. YALOWITZ:  It wouldn't be bad if we cooled it down a little bit.

THE COURT:  I'll have them lower the temperature for you tomorrow.  I guarantee you after we do that, you'll be telling me it's too cold.  That's what happens.  I'll make sure we have a lower temperature.

(Adjourned until January 14, 2015, at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

MESHULAM PERLMAN

Direct By Mr. Yalowitz . . . . . . . . . . . . .95

NICHOLAS KAUFMAN

Direct By Mr. Yalowitz . . . . . . . . . . . . 105

PLAINTIFF EXHIBITS

Exhibit No.                                   Received

 1123    . . . . . . . . . . . . . . . . . . . 101

 1124    . . . . . . . . . . . . . . . . . . . 101

 489    . . . . . . . . . . . . . . . . . . . 102

 1149    . . . . . . . . . . . . . . . . . . . 105

F1E3SOK1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

MARK I. SOKOLOW, et al.,

                Plaintiffs,

        v.                          04 CV 397 (GBD)

PALESTINE LIBERATION
ORGANIZATION, et al.,

                Defendants.

------------------------------x

                                    New York, N.Y.
                                    January 14, 2015
                                    9:30 a.m.

Before:

                    HON. GEORGE B. DANIELS,

                                    District Judge

                        APPEARANCES

ARNOLD & PORTER LLP
        Attorneys for Plaintiffs
BY:  KENT A. YALOWITZ
        PHILIP W. HORTON
        TAL MACHNES
        SARA PILDIS
        CARMELA T. ROMEO
        RACHEL WEISER

MILLER & CHEVALIER, CHARTERED
        Attorneys for Defendants
BY:  MARK J. ROCHON
        LAURA G. FERGUSON
        BRIAN A. HILL
        MICHAEL SATIN

Also present:  RACHELLE AVITAL, Hebrew interpreter
               RINA NE'EMAN, Hebrew interpreter

                    SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

**JA-3897**

F1E3SOK1

(In open court; jury not present)

THE COURT:  I received some letter objections.  First of all, let me just go right to it, Mr. Yalowitz.  When for the first time did you provide to the defendants Exhibit 1150?

MR. YALOWITZ:  Exhibit 1150 is a photograph we received yesterday?

THE COURT:  Yes.

MR. YALOWITZ:  Your Honor, we received it yesterday for the first time.  And we provided it to them yesterday for the first time.

THE COURT:  It's out.

MR. YALOWITZ:  All right.  I understand the Court's ruling.

THE COURT:  I'm not wasting any time.  When is the first time you provided Exhibits 362, 451, 889?

MR. YALOWITZ:  Bear with me, your Honor.

THE COURT:  Yes.

MR. YALOWITZ:  Okay.  Your Honor, let me begin with 362.  362 is the verdict of Nasser Aweis.  That document was translated between -- that document was originally provided, as I understand it, it was before I came in the case, was provided by the defendants to my predecessor counsel in about 2007.  It was filed on the docket in the Knox case before Judge Marrero like six or seven years ago.

When we filed our initial disclosures in 2011, it was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
**JA-3898**

F1E3SOK1

filed on the docket by the defendants.  When we filed our initial disclosures in 2011, again before I came in the case, we said we're going to rely on convictions that you already have.  We then --

THE COURT:  Which exhibit are you talking about?

MR. YALOWITZ:  362.

THE COURT:  You gave me a binder of convictions, more than one binder of convictions as I remember.  Was this in it?

MR. YALOWITZ:  I believe, yes, sir, yes.  Yes.  I got a lot of exhibit numbers.  I'm doing my best here.

THE COURT:  Well, I'm doing my best too.

MR. YALOWITZ:  You're doing great.

THE COURT:  I need to know when they were aware that this was a conviction that you had and possibly you might use.

MR. YALOWITZ:  I think they were aware that it was a conviction when they filed it in front of Judge Marrero in another case.  They were aware of what it was because they had it translated.

THE COURT:  When did you indicate you would utilize that conviction at this trial?

MR. YALOWITZ:  Certainly no later than January 2013.

THE COURT:  In what form did you give that?

MR. YALOWITZ:  '14.  We put it on our exhibit list.

THE COURT:  It was on the exhibit list?  I want to make sure what your representations are.  It was on the exhibit

F1E3SOK1

list, they produced it to you, it is in the binder of convictions when I went through the binder of convictions to determine which convictions would be admissible and which were not.

Is that an accurate statement or what part is not accurate?

MR. YALOWITZ:  The only part I don't know is the part about your binder.  I'm not sure what the timing of your going through the binder is.

THE COURT:  I'm trying to figure out whether it was in the binder.  You gave me a binder of all the convictions.

MR. YALOWITZ:  Today?

THE COURT:  No, you gave it to me when we were arguing.

MR. YALOWITZ:  Yes, it was in that binder.

THE COURT:  That was weeks ago.

MR. YALOWITZ:  Yes.  Yes, it was in that binder.  Yes.  Of course.

THE COURT:  It was in that binder?

MR. YALOWITZ:  Yes, sir.

THE COURT:  All right.  Because I can guarantee if you it was in that binder, I reviewed it.  It was in the binder of convictions that you said you wanted to use before we resolved the issue of whether or not convictions would be admitted as statements against interest.