# 15-3135(L)

## 15-3151(Con)

# United States Court of Appeals

## FOR THE

# Second Circuit

◆━◆

**EVA WALDMAN, REVITAL BAUER, individually and as natural guardian of plaintiffs YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, minor, by his next friend and guardian VARDA GUETTA, VARDA GUETTA, individually and as natural guardian of plaintiff OZ JOSEPH GUETTA, NORMAN GRITZ, individually and as personal representative of THE ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, individually and as a natural guardian of plaintiff JAMIE A. SOKOLOW, RENA M. SOKOLOW, individually and as a natural guardian of plaintiff JAIME A. SOKOLOW, JAMIE A. SOKOLOW, minor, by her next friends and guardian MARK I. SOKOLOW and** *(Additional Caption on the Reverse)*

On Appeal From The United States District Court
for the Southern District of New York, Case No. 04-cv-0397 (GBD)

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANTS-APPELLANTS

Gassan A. Baloul
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 872-9800

Mitchell R. Berger
Pierre H. Bergeron
John A. Burlingame
Alexandra E. Chopin
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

*Attorneys for Defendants-Appellants*

**RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, individually and as natural guardian of plaintiffs YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, minor, by his next friend and guardians DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, minor, by his next friend and guardians DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL BAUER, minor, by his next friend and guardians DR. ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, minor, by his next friend and guardians DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD MANDELKORN, KATHERINE BAKER, individually and as personal representative of THE ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN, individually and as personal representative of THE ESTATE OF BENJAMIN BLUTSTEIN, LARRY CARTER, individually and as personal representative of THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR., individually and as personal representative of THE ESTATE OF JANIS RUTH COULTER, CHANA BRACHA GOLDBERG, minor, by her next friend and guardian KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, minor, by her next friend and guardian KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, minor, by her next friend and guardian KAREN GOLDBERG, KAREN GOLDBERG, individually, as personal representative of THE ESTATE OF STUART SCOTT GOLDBERG/natural guardian of plaintiffs CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG,TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, minor, by her next friend and guardian KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, minor, by her next friend and guardian KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, minor, by her next friend and guardian KAREN GOLDBERG, YITZHAK SHALOM GOLDBERG, minor, by her next friend and guardian KAREN GOLDBERG, NEVENKA GRITZ, sole heir of NORMAN GRITZ, deceased,**

*Plaintiffs - Appellees - Cross - Appellants*,

v.

**PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY AND OR PALESTINIAN COUNCIL AND OR PALESTINIAN NATIONAL AUTHORITY,**

*Defendants - Appellants - Cross - Appellees*,

**YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESATATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, deceased, ESTATE OF MUHANAD ABU HALAWA, deceased, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,**

*Defendants*.

-i-

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, Counsel for Appellants the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") hereby certify the following: the PA and the PLO are not corporations and thus have no parent companies and no publicly held corporation that owns 10% or more of stock.

Dated: November 10, 2015     /s/Gassan A. Baloul
                             Gassan A. Baloul

                             *Attorney for Defendants-Appellants, The Palestinian Authority and The Palestine Liberation Organization*

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................I

PRELIMINARY STATEMENT ...................................................................1

JURISDICTIONAL STATEMENT .............................................................5

STATEMENT OF THE ISSUES PRESENTED....................................................6

STATEMENT OF THE CASE....................................................................7

I.    THE PLO AND THE PA FUNCTION AS PALESTINE'S
GOVERNMENT. .................................................................................7

    A.    The PA and PLO Are Non-Sovereign, Foreign Entities
Headquartered In Ramallah, Palestine. ...............................................7

    B.    The PA Is the Governing Authority In Palestine. ................................8

    C.    The PLO Engages In Diplomacy Around The World On Behalf
Of The Palestinian People; Defendants' Only Relevant U.S.
Contacts Stem From A Single, Small PLO Diplomatic Office. ........10

    D.    The Terrorist Attacks at Issue. ..........................................................13

    E.    Defendants Timely Moved To Dismiss For Lack of Personal
Jurisdiction Nine Separate Times.....................................................14

    F.    The District Court Allowed Plaintiffs' Experts To Summarize
The Facts For The Jury, And Give Opinions On Intent, State Of
Mind, And The Ultimate Issue..........................................................19

    G.    The Verdict And Post-Trial Motions. ...............................................21

SUMMARY OF THE ARGUMENT ....................................................................24

STANDARDS OF REVIEW ................................................................................27

ARGUMENT .......................................................................................................28

I.    *DAIMLER'S* "AT HOME" TEST MANDATES DISMISSAL FOR
LACK OF GENERAL JURISDICTION. ...............................................28

A.  The "Singular" Principle: There Is No Fact Dispute That Defendants' Are "At Home" Only In Palestine. ...............................29

B.  The Proportionality Principle: The District Court Misapplied *Daimler* By Refusing to Examine Defendants' Global Contacts. .....32

C.  The Universality Principle: *Daimler's* "At Home" Test Applies Equally To All Defendants....................................................34

D.  The "Exceptional" Principle: The District Court Misapplied *Daimler* In Holding That Defendants Are The "Exceptional" Case. ........................................................................39

E.  The District Court Misapplied *Daimler* By Shifting the Burden of Proof to Defendants And Changing The Test................................42

II.  THERE IS NO SPECIFIC JURISDICTION BECAUSE THERE IS NO SUBSTANTIAL CONNECTION BETWEEN THE ATTACKS AND THE UNITED STATES GIVING RISE TO PLAINTIFFS' CLAIMS; THE D.C. COURTS HAVE ALREADY REJECTED PLAINTIFFS' THEORY OF SPECIFIC JURISDICTION.........................45

A.  Defendants Engaged In No Claim-Related Activity In or Directed At the United States.............................................46

B.  Three Federal Courts Rejected In Parallel Cases The Same Specific Jurisdiction Theory Advanced By Plaintiffs Here. ..............48

III.  THE TRIAL COURT ALLOWED ULTIMATE-ISSUE EXPERTS TO SUMMARIZE THE EVIDENCE AND CONJECTURE AS TO MENTAL STATES. ................................................................50

A.  The District Court Is Charged With Stopping Experts From Summarizing The Evidence And Offering Improper Opinions.........52

B.  The District Court Allowed Plaintiffs' Experts To Narrate Speculative Stories To The Jury That Blamed The PA For The Attacks...................................................................54

C.  The District Court Improperly Allowed Plaintiffs' Experts To Testify That The PA's Social Welfare Programs Cause Terrorism, Despite The Lack Of Any Data or Methodology.............62

-iii-

-iv-

D.      Plaintiffs' Heavy Reliance On The Improper Expert Testimony In Closing Arguments Demonstrates The Need For A New Trial. ...................................................................................65

CONCLUSION .............................................................................66

CERTIFICATE OF COMPLIANCE.................................................68

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3rd Eye Surveillance, LLC v. City of Irving*,
No. 14-535, 2015 U.S. Dist. LEXIS 6263 (E.D. Tex. Jan. 16, 2015) ...............43

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)..................................................................................36, 51

*Burnham v. Superior Court of Calif.*,
495 U.S. 604 (1990)..........................................................................................51

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
350 F.3d 316 (3d Cir. 2003) .............................................................................63

*Credit Lyonnais Sec. (USA), Inc. v. Alcantara*,
183 F.3d 151 (2d Cir. 1999) .............................................................................47

*Daimler AG v. Bauman*,
134 S. Ct. 746 (2014).................................................................................*passim*

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993)..................................................................................57, 69

*Dynegy Midstream Servs. v. Trammochem*,
451 F.3d 89 (2d Cir. 2006) ...............................................................................31

*EEOC v. Kaplan Higher Educ. Corp.*,
748 F.3d 50 (6th Cir. 2014) ..............................................................................69

*Est. of Klieman v. Palestinian Auth.*,
82 F. Supp. 3d 237, 245-46 (D.D.C. 2015), *appeal docketed*, No.
15-7034 (D.C. Cir. Apr. 8, 2015) .........................................................22, 41, 54

*In re Fosamax Prods. Liab. Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009) ...............................................................63

*GE v. Joiner*,
522 U.S. 136 (1997)..................................................................................67, 69

*Gilmore v. Palestinian Interim Self-Government Authority*,
53 F. Supp. 3d 191 (D.D.C. 2014), *appeal docketed*, No. 14-7129
(D.C. Cir. Aug. 29, 2014) ................................................................58, 64, 65

*GSS Group Ltd. v. Nat'l Port Auth.*,
680 F.3d 805 (D.C. Cir. 2012) ...................................................................39

*Gucci Am. v. Bank of China*,
768 F.3d 122 (2d Cir. 2014) .................................................................21, 40

*Iragorri v. United Techs. Corp.*,
274 F.3d 65 (2d Cir. 2001) .........................................................................49

*Keeton v. Hustler Magazine, Inc.*,
465 U.S. 770 (1984)...............................................................................44, 45

*Klinghoffer v. S.N.C. Achille Lauro*,
937 F.2d 44 (2d Cir. 1991) ...................................................................16, 40

*Krishanti v. Rajaratnam*,
No. 09-05395, 2014 U.S. Dist. LEXIS 58314 (D.N.J. Apr. 28,
2014) ............................................................................................................42

*Laydon v. Mizuho Bank, Ltd.*,
No. 12-3419, 2015 U.S. Dist. LEXIS 44005 (S.D.N.Y. Mar. 31,
2015) (Daniels, J.).......................................................................................34

*Linde v. Arab Bank, PLC*,
No. 04-2799, Doc. 954 (E.D.N.Y. May 28, 2013) ............................................68

*Livnat v. Palestinian Auth.*,
82 F. Supp. 3d 19, 30 (D.D.C. 2015), *appeal docketed*, No. 15-
7024 (D.C. Cir. Mar. 18, 2015)
..................................................................................................22, 41, 43, 54

*Marine Midland Bank, N.A. v. Miller*,
664 F.2d 899 (2d Cir. 1981) .......................................................................47

*Martinez v. Aero Caribbean*,
764 F.3d 1062 (9th Cir. 2014) ....................................................................51

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013) ................................................................55

*Mwani v. Osama Bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005) ...............................................................41

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
    676 F.3d 521 (6th Cir. 2012) .............................................................70

*Nimely v. New York*,
    414 F.3d 381 (2d Cir. 2005) .......................................................*passim*

*O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on September 11, 2001)*,
    714 F.3d 659 (2d Cir. 2013) ..............................................................40

*Parlant Tech. v. Bd. of Educ.*,
    No. 2:12-417, 2014 U.S. Dist. LEXIS 139064 (D. Utah Sept. 29, 2014) ...............................................................................................43

*Perkins v. Benguet Consol. Mining Co.*,
    342 U.S. 437 (1952)............................................................44, 45, 46, 47

*Reich v. Lopez*,
    13-cv-5307, 2015 U.S. Dist. LEXIS 56955 (S.D.N.Y. Apr. 30, 2015) ...............................................................................................49

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...............................................55

*Safra v. Palestinian Auth.*,
    82 F. Supp. 3d 37, 48 (D.D.C. 2015) (same), *appeal docketed*, No. 15-7025 (D.C. Cir. Mar. 18, 2015) ....................................................22

*Shovah v. Roman Catholic Diocese of Albany*,
    745 F.3d 30 (2d Cir. 2014) ................................................................42

*Sokolow v. Palestine Liberation Organization*,
    2011 U.S. Dist. LEXIS 36022 (S.D.N.Y. Mar. 30, 2011)..........16, 35, 48

*Sokolow v. Palestine Liberation Organization*,
    583 F. Supp. 2d 451 (S.D.N.Y. 2008) ..............................................12

*Sokolow v. PLO*,
   Appeal 15-2709, Doc. 100 (2d Cir. Oct. 14, 2015) .............................................27

*In re Terrorist Attacks on September 11, 2001*,
   538 F.3d 71 (2d Cir. 2008) ..........................................................................41, 51

*Toumazou v. Turkish Republic of Northern Cyprus*,
   71 F. Supp. 3d 7 (D.D.C. 2014).........................................................................42

*United States v. Amuso*,
   21 F.3d 1251 (2d Cir. 1994) ..............................................................................57

*United States v. Mejia*,
   545 F.3d 179 (2d Cir. 2008) ........................................................................*passim*

*United States v. Pink*,
   315 U.S. 203 (1941).............................................................................................39

*Walden v. Fiore*,
   134 S. Ct. 1115 (2014)................................................................................*passim*

*Wessmann v. Gittens*,
   160 F.3d 790 (1st Cir. 1998)..............................................................................70

*Wray v. Johnson*,
   202 F.3d 515 (2d Cir. 2000) .........................................................................57, 70

*Zadvydas v. Davis*,
   533 U.S. 678 (2001)..........................................................................................39

**Statutes**

28 U.S.C. § 1291 ......................................................................................................9

Anti-Terrorism Act, 18 U.S.C. § 2331 ..................................................................18

Anti-Terrorism Act, 18 U.S.C. § 2333(a) ................................................................9

Foreign Missions Act. JA-395-97.........................................................................15

**Other Authorities**

59 Fed. Reg. 37121 (July 20, 1994)......................................................................15

Fed. R. Civ. P. 50(a)......................................................................................22

Fed. R. Evid. 702 ...............................................................................58, 62, 69

Fed. R. Evid. 703 ...........................................................................................62

von Mehren & Trautman, Jurisdiction to Adjudicate: A Suggested
    Analysis, 79 Harv. L. Rev. 1121, 1144 (1966).......................................45

## PRELIMINARY STATEMENT

The Palestinian Authority ("PA") is the non-sovereign government of portions of the West Bank and the Gaza Strip, and the Palestine Liberation Organization ("PLO") is the diplomatic representative of the Palestinian people. It is self-evident that both are "at home" in Palestine under *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), and not in the United States. The district court misapplied *Daimler* and exercised general jurisdiction on the basis that the PA and PLO were "at home" in the United States. The district court's error resulted in a judgment against the PA and PLO exceeding $655 million, which must be reversed for lack of jurisdiction over the PA and the PLO.

There is no fact dispute that the seat of Palestinian government—including the PA's President, legislature and courts—is located in Ramallah, Palestine. The PA and the PLO make all key governing decisions from Palestine, and employ more than 100,000 civil servants there to implement public safety, health care, education, foreign affairs, infrastructure, economic development, and public housing programs for the benefit of the Palestinian people.[1] Defendants' relevant presence in the United States, in contrast, is the PLO's small diplomatic mission to the U.S., which is proportionately insignificant to their presence in Palestine.

---

[1] JA-8465 (¶22); JA-7407 (3112:1-8).

The district court misapplied *Daimler*'s substantially narrowed general jurisdiction test because it failed to heed *Daimler*'s key guiding principles:

(i)      the *singular* nature of the "at home" jurisdiction, which "ordinarily indicates only one place," one that is "easily ascertainable," *Daimler*, 134 S. Ct. at 760;

(ii)      *proportionality*—namely, the requirement that the district court appraise Defendants' activities "in their entirety, nationwide and worldwide," in proportion to in-forum activities, *id.* at 762 n.20;

(iii)      *universality*—that the *Daimler* rule applies equally to all entities, whether individuals, corporations, or unincorporated associations like Defendants, because "[s]imple jurisdictional rules . . . promote greater predictability," *id.* at 760; and,

(iv)      that only in *exceptional* circumstances will an entity be "at home" somewhere other than its principal place of business or an "equivalent place."

The court below compounded those errors when it improperly shifted to Defendants the burden of proof on jurisdiction, and insisted that Defendants must establish an "at home" jurisdiction in a second place, that is, other than their home in Palestine, in order to avoid the general jurisdiction of a U.S. court. Notably, despite their burden of proof, Plaintiffs have never attempted to establish that

Defendants are "at home" in the United States, or defended the district court's decisions to that effect.

Instead, Plaintiffs have elided *Daimler* by invoking an array of groundless waiver, due process and specific jurisdiction arguments, all of which the district court correctly rebuffed. The United States does not recognize Palestine as a sovereign state, and the PA and the PLO therefore are not recognized as foreign sovereigns. Under the law of this Circuit, the PA and PLO therefore are entitled to due process. As a result, the district court correctly framed its decisions under *Daimler*,[2] and Plaintiffs rightly abandoned their due process challenge after trial.[3] Likewise, given that the PA and PLO raised their personal jurisdiction defense no less than nine times before and after *Daimler*, the district court regarded Plaintiffs' waiver argument as insubstantial and dispatched it in a footnote. The court below similarly declined Plaintiffs' request to exercise specific jurisdiction because their only allegations of suit-related conduct were Defendants' participation in the peace process in the U.S., along with related media interviews. None of those contacts created "a substantial connection with the forum State" under *Walden v. Fiore*, 134 S. Ct. 1115, 1121-22 (2014).

---

[2] SPA-5 (applying due process); SPA-49-50 (same).
[3] *See* JA-10818.

The district court also made pervasive and prejudicial evidentiary errors meriting a new trial. Plaintiffs' liability case was grounded entirely in the narratives and personal advocacy of three ultimate-issue experts—and not a single lay witness. Plaintiffs' expert witnesses admitted they were advocates telling a "story" that "contributes to *our* case." JA-5289-90 (emphasis added). That "story" included unsupported speculation that Defendants used Soviet mind control techniques and social welfare programs to turn ordinary Palestinians into terrorists focused on killing Israelis. Plaintiffs' ultimate-issue experts constructed elaborate narratives that summarized the facts, offered opinions on the intent and state of mind of Defendants' officials and the non-party individual terrorists, and informed the jury that Defendants were responsible for the attacks. Compounding the prejudice, Plaintiffs emphasized this improper testimony in closing arguments to the jury. If the judgment is not reversed for lack of jurisdiction, then these evidentiary errors require that the judgment be vacated, and the case remanded for a new trial.

-5-

## JURISDICTIONAL STATEMENT

Following the district court's resolution of the parties' dispositive motions, it exercised jurisdiction over the remaining claims under the Anti-Terrorism Act, 18 U.S.C. § 2333(a). The court entered final judgment on October 1, 2015, SPA-61, and Defendants filed a timely notice of appeal on October 5, 2015, JA-10653. This Court has appellate jurisdiction under 28 U.S.C. § 1291. As explained in this brief, however, the district court lacked personal jurisdiction over the PA and the PLO, such that the judgment should be reversed.

## STATEMENT OF THE ISSUES PRESENTED

1. Whether the district court improperly exercised general personal jurisdiction under the narrow "at home" standard set out in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), over unincorporated associations that are headquartered in and governs the West Bank and Gaza, and, solely in furtherance of that governmental function, maintains a proportionately insignificant presence in the United States. Further, whether there is no specific jurisdiction over Defendants on the basis of their public statements in the U.S. in support of the Israeli-Palestinian peace process because, under *Walden v. Fiore*, 134 S. Ct. 1115 (2014), that conduct was unrelated to terrorist attacks and therefore did not create a "substantial connection with the forum State."

2. Whether a new trial is required when the district court improperly allowed Plaintiffs' expert witnesses, who were Plaintiffs' only witnesses on liability, to: (a) provide ultimate-issue testimony that simply summarized the facts and imputed states of mind to PA officials and individual terrorists; (b) give their personal opinions, which were not founded on any studies or methodology, that the PA's social welfare programs promote terrorism; and, (c) advocate to the jury that Defendants were responsible for the attacks.

## STATEMENT OF THE CASE

**I.     The PLO and the PA Function as Palestine's Government.[4]**

**A.     The PA and PLO Are Non-Sovereign, Foreign Entities Headquartered In Ramallah, Palestine.**

The PA was established in 1993 by the Oslo Accords as the interim and non-sovereign government of parts of the West Bank and the Gaza Strip ("Palestine").[5] Since its inception, the PA has been headquartered in Ramallah in the West Bank, the Palestinian seat of government.[6] The Palestinian legislature, the Palestinian President, and all of the PA's ministries also reside in Ramallah.[7]

The PLO was founded in 1964 to represent the Palestinian people on the international stage.[8] At all relevant times, the PLO was headquartered in Ramallah, the Gaza Strip, and Amman, Jordan.[9] Because the Oslo Accords did not give the PA any governing authority outside of Palestine,[10] the PLO is charged with

---

[4] This appeal is from the final judgment of the district court in favor of Plaintiffs entered on October 1, 2015 by Judge George B. Daniels. *See* SPA-61.

[5] JA-1275 (30:22-1:8) and JA-1278 (200:12-22); JA-7578-80; JA-4192-93 (416:25–417:2).

[6] JA-5279 (1158:16–17).

[7] JA-4189-90 (413:20–414:2); JA-4036 (260:2-7); JA-7126-28 (2831:14-2832:1).

[8] JA-1274 (25:20-24); JA-7576 (3281:10–13).

[9] JA-7407 (3112:20-23); JA-1276 (105:9-17); JA-1284 (32:22-33:10); JA-1287 (167:21-168:23); JA-446 (PLO Registration Statement).

[10] JA-1278 (200:23-24).

conducting Palestine's foreign affairs from its headquarters in Ramallah, and through its diplomatic missions around the world.[11]

The PA and the PLO are foreign, unincorporated associations.[12] The United States does not recognize the PA as a sovereign government. JA-359 ("Palestine, whose statehood is not recognized by the United States, does not meet the definition of a 'state'").[13] Even so, the United States recognizes Defendants as key partners for peace in the region, particularly "[a]t a time when the United States is leading international efforts to counter extremism and degrade and defeat the Islamic State," and has provided "billions of dollars in assistance to strengthen Palestinian institutions" to promote security and help create conditions for peace. JA-10605-06 (¶¶7 and 9).

**B. The PA Is the Governing Authority In Palestine.**

Since the Oslo Accords, the PA has been the governing authority in Palestine with sole responsibility for managing Palestinian civil affairs and finances. JA-1277 (120:9-16) (at the time of its creation in 1993, "[t]he Palestinian Authority assumed the responsibility and accepted responsibility in the various spheres of life of the Palestinian people for the interim period, which covered the

---

[11] JA-1278 (200:23-201:2); JA-7407 (3112: 14-23) .

[12] JA-1203-04 (¶¶23-28).

[13] *Sokolow v. Palestine Liberation Organization*, 583 F. Supp. 2d 451, 457-58 (S.D.N.Y. 2008).

social, cultural, sports, economics, and other attributes of the Palestinian society")

and JA-1278 (200:12-22); JA-1290 (47:2-11) (under the Oslo Accords, the PA is

"charged a task specifically with managing the affairs of the Palestinian people in

the occupied Palestinian territory"); JA-1286 (132:6-9) (the PA represents only

"those people that happen to be in those territories designated as the West Bank

and Gaza.").

The PA's central function and purpose has always been domestic: its

workforce in 2002 and 2003 of over 100,000 employees provided critical

government services *in Palestine*.[14]  During this same period, the PA employed

approximately 40,000 security personnel in the West Bank and Gaza.[15] The PA

coordinated its security apparatus with Israel to help combat terrorism.[16]  In light of

its security efforts, the U.S. Government has praised the PA as "essential to key

U.S. security and diplomatic interests, including advancing peace between Israel

and the Palestinians, supporting the security of U.S. allies such as Israel, Jordan,

and Egypt, combatting extremism and terrorism, and promoting good governance."

JA-10606.

The PA's character and functions, which are defined by the Oslo Accords,

have not changed since 1993. The PA continues today to "develop[] infrastructure,

---

[14] *See* JA-1277 (120:9-16); JA-7127 (2832:19-21).

[15] JA-10682 (175:22-177:2); JA-7126-28 (2831:14–2833:1).

[16] JA-7129 (2834:22-25).

-9-

public safety and the judicial system; health care; public schools and education; foreign affairs; economic development initiatives in agriculture; energy; public works; and public housing" programs for the West Bank and Gaza,[17] and to fund salaries for its approximately 155,000 employees.[18] The PA develops an annual budget, which is funded (albeit, with substantial deficits) by revenues it earns from the sale of exports and billions of dollars in foreign donor aid.[19]

### C. The PLO Engages In Diplomacy Around The World On Behalf Of The Palestinian People; Defendants' Only Relevant U.S. Contacts Stem From A Single, Small PLO Diplomatic Office.

The PLO conducts foreign policy on behalf of Palestine.[20] The PLO maintains its headquarters in the Palestinian Ministry of Foreign Affairs in Ramallah, Palestine,[21] and, during the relevant time period, supported a network of more than 1,300 employees assigned to approximately 75 embassies, missions and delegations around the world.[22] To enable the PLO to perform this function, the PA provides the PLO with the PLO's exclusive source of funding under a budget

---

[17] JA-8465 (¶22); JA-7407 (3112:1-8).

[18] JA-8465 (¶¶22-23); JA-8527-28; JA-8576-77; *see also* JA-4444-45 (662:24-663:2); *compare* JA-10685 (Jadallah Dep.) at 175:22-175:21.

[19] In 2014, donations and foreign aid accounted for 30% of the PA's expenditures. JA-4682-83.

[20] JA-1278 (200:23-201:2); JA-7378 (3083:2-5), JA-7397 (3102:15-16).

[21] JA-1284 (32:22-33:21).

[22] JA-1270 (Areikat Decl.) at ¶¶17-18.

ratified by the PA Cabinet and Legislative counsel.[23]  Since the Oslo Accords, the

PA has provided the PLO with its exclusive source of funding; during the relevant

time period, this accounted for approximately one percent of the PA's budgeted

expenditures.[24]

The PLO is registered with the U.S. Government as a foreign agent.[25] The

PLO's U.S. presence is limited to two small diplomatic offices: its Mission to the

United States in Washington, D.C.[26] and its Mission to the United Nations in New

York.[27] Other than the office housing the PLO's U.N. Mission in New York,

neither the PA nor the PLO owned any real property in the United States during the

relevant time period.[28] The district court held that only the D.C. Mission's

activities are relevant to the jurisdiction analysis, because the activities of the

---

[23] *See* JA-1371 (Shaqba'u Dep.) at 31:15-32:9; JA-846 (¶18); *see also* JA-8110 (3789:7-10).

[24] JA-8110 (3789:7-10); JA-1367(Shaqba'u Dep.) 31:15-32:9; JA-8464 (¶18); *see also* JA-8110 (3789:7-10). For example, in 2002, the PA's total expenditures were 6,392,000,000 NIS, or, $1,347,135,713.81 applying the average exchange rate of 4.744882 NIS per dollar for the year 2002 (http://www.usforex.com/forex-tools/historical-rate-tools/yearly-average-rates).  In 2002, the PA, which is the PLO's sole source of funding, provided the PLO with its total funds of $13 million, representing only 0.97% of the PA's total budget. JA-1369-72 (21:25-22:2; 31:15-32:9; and 73:15-74:9).

[25] JA-446-49; http://www.fara.gov/annualrpts.html (last visited 11.10.15).

[26] At all relevant times, the PLO's Mission to the United States in Washington, D.C. was designated as a "foreign mission" by the U.S. Statement Department in accordance with the Foreign Missions Act.  JA-395-97; *see* 59 Fed. Reg. 37121 (July 20, 1994).

[27] JA-7408 (3113:2-10).

[28] JA-417.

-11-

PLO's United Nations Mission were exempted from consideration under the jurisdictional exception articulated by this Court in *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 51-52 (2d Cir. 1991) (participation in the United Nations affairs by a foreign organization may not properly be considered as a basis of jurisdiction).[29]

According to PLO Ambassador to the United States Maen Areikat, "[t]he primary objective of the PLO Delegation is to protect and promote the interests of the Palestinian people in the United States."[30] Between 2002 and 2004, the PLO's D.C. Mission had 14 employees (though not all at once),[31] while the PLO's U.N. Mission in New York had 21 employees (again, not all at the same time).[32] This comprised less than 1% of the PLO's total, worldwide workforce during the relevant time period. Although the head of the PLO Mission could be authorized to speak for the PA, none of the Mission employees in the United States were permanent employees of the PA.[33] Moreover, between 1998 and 2004, the PLO's D.C. Mission was smaller than most of its other embassies, missions and

---

[29] *See* SPA-1-16 (*Sokolow v. Palestine Liberation Organization*, 2011 U.S. Dist. LEXIS 36022, at *25 (S.D.N.Y. Mar. 30, 2011)).

[30] JA-1268("Areikat Decl."), ¶16.

[31] JA-405-06.

[32] JA-407.

[33] JA-1267, ¶9-10, ¶19; JA-406-07; JA-474; *see also* JA-7408 (3113:11-15).

delegations offices, including those in Jordan, Egypt, Lebanon, France, Chile, the People's Republic of China, Japan, South Africa, Germany, Russia, and Brazil.[34]

The two PLO Missions in the United States engaged solely in diplomatic activities during the relevant period, and neither the PA nor the PLO conducted any fundraising or engaged in commercial activity in the United States.[35] The PLO employed a consulting and lobbying firm, which participated in office and lunch meetings with U.S. government officials in Washington, D.C., promoted the PA's interests through occasional radio and television appearances, and prepared weekly memoranda summarizing relevant developments in Washington, D.C.[36] PLO Mission employees—primarily the PLO's former ambassador to its Mission to the U.N.—appeared on CNN, Fox News, ABC, and NBC in interviews regarding the peaceful resolution Palestinian-Israeli conflict.[37]

### D. The Terrorist Attacks at Issue.

Plaintiffs sued the PA and PLO in 2004 alleging violations of the Anti-Terrorism Act, 18 U.S.C. § 2331. JA-274. At trial, Plaintiffs sought to hold Defendants responsible for six attacks committed by nonparties during a period of sustained hostilities and armed conflict between Israelis and Palestinians. Plaintiffs did not allege or submit any evidence that they were targeted because of

---

[34] JA-1270-71 (Areikat Decl.), ¶19.

[35] JA-1267 (Areikat Decl.), ¶11.

[36] SPA-9-10.

[37] JA-412-15; SPA-11; R.84-22, R.84-23 and R.84-24.

their U.S. citizenship, or that Defendants engaged in any conduct in the United States related to the attacks.

Instead, Plaintiffs were either Israeli residents or tourists in public places in Jerusalem at the time of each the attacks at issue: (1) a January 22, 2002 shooting on Jaffa Road in Jerusalem; (2) a January 27, 2002 bombing on Jaffa Road; (3) a March 21, 2002 King George Street bombing in central Jerusalem; (4) a June 19, 2002 bombing on French Hill in East Jerusalem; (5) a July 31, 2002 bombing at Hebrew University in Jerusalem; and, (6) a January 29, 2004 bus bombing in central Jerusalem. *Id*.

### E. Defendants Timely Moved To Dismiss For Lack of Personal Jurisdiction Nine Separate Times.

Defendants repeatedly argued below that dismissal for lack of personal jurisdiction was appropriate in light of their minimal presence in, and the lack of any nexus of the facts underlying Plaintiffs' claims with, the United States. Indeed, Defendants moved to dismiss for the lack of personal jurisdiction on nine separate occasions and sought interlocutory review on the issue, including within weeks of the Supreme Court's substantial narrowing of the general jurisdiction test in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014).

Defendants first moved to dismiss for lack of jurisdiction in July 2007. JA-328. The court denied the motion, subject to renewal after jurisdictional discovery,

-14-

on September 20, 2008. JA-352. Defendants renewed their motion during jurisdictional discovery. JA-366. On March 11, 2010, the district court denied that motion because discovery was not yet complete. JA-463. Defendants renewed the motion after the close of jurisdictional discovery. JA-464. The district court denied Defendants' renewed motion, holding that they had a "continuous and systematic presence in the United States" on the basis of the activities of the PLO's Washington, D.C. Mission. SPA-1 (March 2011 Order). The court also held that Defendants bore the burden of proof on jurisdiction, particularly to identify an alternate forum in which Plaintiffs could bring their claims and grant an ATA-like remedy. *See id.*, SPA-16.

Defendants moved for reconsideration and sought dismissal of Plaintiffs' claims for want of personal jurisdiction for the fourth time on January 31, 2014, following the Supreme Court's *Daimler* decision. JA-635. Although *Daimler* had announced a new, much-circumscribed rule on general jurisdiction, at the hearing on the motion in April 2014, the district court held that *Daimler* did not represent "a significant change in the law," declined to revisit its pre-*Daimler* holding that Defendants' "continuous and systematic" activities justified a finding that they are subject to general, all-purpose jurisdiction in the United States, and denied

-15-

Defendants' motion.[38]  While the district court acknowledged that Defendants'

home is in Palestine, along with their more than 100,000 employees, it ruled that

Defendants could avoid general jurisdiction in the United States only if they could

prove that they were generally amenable to jurisdiction in another forum—other

than their home in Palestine.[39]

The court below repeatedly stated that it was hesitant to be the first court to

find under *Daimler* that the PA and PLO were not subject to general, all purpose

jurisdiction in the U.S.[40]  Given that concern, the district court stated that it would

reevaluate its determination if other district courts presiding over cases against the

PA and PLO concluded that there was no personal jurisdiction under *Daimler*,

because that "would be a significant change in the law.  Then [the PA and PLO]

might have a real opportunity at that point to renew [their] application [on the

general jurisdiction argument]."[41]

Defendants sought dismissal for lack of personal jurisdiction for a fifth time

in their May 6, 2014 summary judgment motion.  JA-1196.  Before the court ruled

on the motion, Defendants alerted the trial court to this Court's decision in *Gucci

Am. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014), and reiterated their argument

---

[38] JA-1142-46 (68:2-5, 72:1-7).

[39] JA-1143 (69:17-24); *see also* SPA-24.

[40] JA-1104 (30:9-12) and JA-1137 (63:4-13).

[41] JA-1137 (63:8-13).

-16-

that the court lacked jurisdiction. JA-2973. The district court denied Defendants' motion for summary judgment on December 1, 2014, and held, without explanation, that this action was "an exceptional case" as referenced by *Daimler*.[42] The court gave no weight to the fact that the PLO and PA are "at home" under *Daimler* only in Palestine, and once again shifted the burden to Defendants to prove they were "at home" somewhere else.[43]

The case proceeded to trial the following month, in January 2015. At trial, Plaintiffs presented evidence confirming Defendants' home is in the West Bank, but presented no evidence of Defendants' activities in the United States.[44] At the conclusion of Plaintiffs' case in chief, the PA and PLO moved for judgment as a matter of law under Fed. R. Civ. P. 50(a), arguing among other grounds that the district court lacked personal jurisdiction. JA-7057-79. The PA and PLO renewed that motion at the close of evidence and again asserted lack of personal jurisdiction. JA-7807-32.

During and immediately after trial, the U.S. District Court for the District of Columbia entered three separate decisions dismissing similar claims for lack of personal jurisdiction by similar plaintiffs in parallel cases against the PA and PLO.

---

[42] SPA-50.
[43] SPA-51.
[44] *See* Trial Tr., at JA-4188-90, JA-4851, JA-4889, JA-5294, JA-5429-30.

Those decisions were grounded on a review of much the same evidence as in the case below. In dismissing the cases, the D.C. courts ruled that "[i]t is common sense that the single ascertainable place where a government such as the Palestinian Authority should be amenable to suit for all purposes is the place where it governs. Here, that place is the West Bank, not the United States." *Livnat v. Palestinian Auth.*, 82 F. Supp. 3d 19, 30 (D.D.C. 2015), *appeal docketed*, No. 15-7024 (D.C. Cir. Mar. 18, 2015); *Safra v. Palestinian Auth.*, 82 F. Supp. 3d 37, 48 (D.D.C. 2015) (same), *appeal docketed*, No. 15-7025 (D.C. Cir. Mar. 18, 2015); *see also Est. of Klieman v. Palestinian Auth.,* 82 F. Supp. 3d 237, 245-46 (D.D.C. 2015) (dismissing because "the PA is based in the West Bank and the Gaza Strip," and "governs a portion of the West Bank," and is therefore not "at home" in the U.S.), *appeal docketed*, No. 15-7034 (D.C. Cir. Apr. 8, 2015).

Because the trial court had previously stated such dismissals under *Daimler* would represent a "significant change in the law" so as to justify reconsideration of Defendants' jurisdictional challenges,[45] Defendants renewed their motion to dismiss for lack of personal jurisdiction on May 1, 2015. JA-8355. At a hearing on the renewed motion, the court acknowledged that, "having disagreed" with the U.S. district court judges in Washington, it was in an "awkward position because it's difficult for me to say that [the PA and PLO's] arguments [on *Daimler*] are

_____

[45] JA-1137 (63:8-13).

-18-

unreasonable. They're not unreasonable. Judges I know and respect take similar positions."[46] The court below acknowledged that the issue would need to be addressed by this Court on appeal.[47] Nevertheless, the court restated its belief that it was Defendants' burden to demonstrate they are at home somewhere "[o]ther than Palestine, the West Bank, or Gaza strip"[48] and denied the motion on August 24, 2015 "[f]or the reasons articulated in" its prior orders. SPA-54.

**F. The District Court Allowed Plaintiffs' Experts To Summarize The Facts For The Jury, And Give Opinions On Intent, State Of Mind, And The Ultimate Issue.**

At trial, ten of the twenty-one days of witness testimony were devoted to Plaintiffs' claim that Defendants are liable for the attacks. During that ten-day period, Plaintiffs articulated their entire liability case only through three experts, Kaufman, Shrenzel, and Eviatar, and offered no lay witnesses. Shrenzel and Eviatar presented the vast majority of the total liability testimony at trial.[49] Indeed, Shrenzel and Eviatar constituted about half of the total trial testimony by all of Plaintiffs' witnesses.[50]

Before the trial began, the district court stated that liability was a straightforward issue in this case and that the experts would not be permitted to

---

[46] JA-9703 (71:11-17).

[47] JA-9712 (80:13-16).

[48] JA-9710 (78:9-12).

[49] JA-3281, 3288;JA-4139—JA-5717; JA-7879-85.

[50] *See* JA-4139—JA-5717; JA-7879-85.

summarize the facts for the jury or opine that the facts create liability.[51] The lower court also held that opinions on intent, state of mind, and Palestinian political rhetoric against Israel were not admissible at trial. JA-3187 ("[t]hat's a given that these folks disagree"), JA-3192 ("Under no scenario can you advance liability by saying they were glad that it happened."), and JA-3276-78 ("heightened rhetoric does not make it more or less likely that the defendants were involved in any of the particular acts").

The district court did, at times, enforce these rulings against Kaufman, Plaintiffs' first expert witness.[52] But, as the trial progressed, and over Defendants' objections, the court allowed Shrenzel and Eviatar to give summary narratives to the jury, which included opinions on intent, state of mind, rhetoric against the Israeli occupation, and the ultimate issue, that is, Defendants' asserted liability for Plaintiffs' injuries.[53] For example, the court allowed Shrenzel to give a long narrative opining that the PA created an "atmosphere" of violence that caused one of the non-party attackers to believe "my superiors expect . . . me to go out and . . . shoot indiscriminately in the streets of Jerusalem."[54] He also testified, without support from studies or methodology, that the PA used techniques from the "Soviet

---

[51] JA-3282-84, JA-3291-97.
[52] JA-3924, JA-3929-34.
[53] JA-4692-94, JA-5222, JA-5238-46, JA-5284-90, JA-5326-29, JA-5596, JA-5716-17.
[54] JA-5690-92.

Union . . . to educate people, to control their minds and thoughts" to commit attacks.[55]  The court similarly allowed Eviatar to give his personal, unsupported opinion that the PA's social welfare programs "represent[] a positive incentive that multiplies [the terrorist's] motivation" and "prod and assist the [terrorist] to go ahead and carry out . . . terror attacks."[56]

Plaintiffs' counsel focused heavily on this testimony during closing, arguing that the social welfare programs prove that the PA is "providing material support" for terrorism.[57]  They also relied extensively on their experts' narrative descriptions of the attacks and their discussions of intent and state of mind.[58]  Plaintiffs' counsel urged the jury, without limitation from the court, that the PA was automatically responsible for the actions of any employee, including a "beat cop walking the street" or "a customer service rep."[59]  Defendants asked for instructions to counter the prejudice from Plaintiffs' closing, but the district court refused.[60]

## G.    The Verdict And Post-Trial Motions.

On February 23, 2015, the jury returned a verdict awarding $218.5 million to Plaintiffs, which was automatically trebled by the district court under the ATA to

---

[55] JA-5329 (1208:9-12).

[56] JA-4374.

[57] JA-8104-08, JA-8124, JA-8134-36.

[58] JA-8145-46, JA-8148, JA-8152-55.

[59] JA-8102-06, JA-8110.

[60] *See* JA-7915-15; JA-10702; JA-10690-91.

-21-

$655.5 million. *See* SPA-61-67 (Final Judgment). On May 4, 2015, Defendants moved for a stay pending appeal without a bond based on the strength of their personal jurisdiction arguments and the irreparable injury that immediate enforcement would inflict on Defendants, the Palestinian people, and the international community. The United States filed a Statement of Interest in support of Defendants' position that a large bond requirement "would likely severely compromise the PA's ability to operate as a governmental authority."[61] The United States explained that the resulting "vacuum in governance and security could be filled by violent Palestinian groups . . . [and would] likely fuel anger and frustration, and could lead to widespread violence in the West Bank." JA-10605 (¶8). The World Bank and International Monetary Fund underscored these points, explaining that a substantial bond or other similar obligations could cause the collapse of the PA as a working government and cause regional instability.[62]

On August 24, 2015, the district court granted a stay pending appeal and required Defendants to deposit $10 million immediately and $1 million per month thereafter into the court's registry. JA-10608. Plaintiffs filed an interlocutory appeal and this Court affirmed, finding that "the district court did not abuse its discretion in setting the amount of the bond upon which execution of the judgment

---

[61] JA-10605-06 (¶¶7–9).
[62] JA-8546; JA-8793-95.

-23-

would be stayed." *Sokolow v. PLO*, Appeal 15-2709, Doc. 100 (2d Cir. 10/14/15).

In the meantime, the district court entered final judgment and both Defendants and

Plaintiffs timely filed respective notices of appeal.[63]

---

[63] SPA-61, JA-10653, JA-10656.

**SUMMARY OF THE ARGUMENT**

Because the PA and PLO are "at home" only in Palestine under the narrow general jurisdiction standard established by *Daimler v. Bauman*, 134 S. Ct. 746 (2014), the district court erred in exercising general personal jurisdiction over Defendants. There is no fact dispute that Defendants are a non-sovereign government, whose seat is located in Ramallah, Palestine. Defendants make all key governing decisions from Palestine, and employ the majority of their employees in Palestine. Applying the global contacts comparison that *Daimler* requires, and even considering *Daimler*'s allowance for an "exceptional case," Defendants are unquestionably "at home" only in Palestine and not in the United States.

Instead, the court below incorrectly shifted to Defendants the burden of proof on jurisdiction, and demanded that they establish an "at home" jurisdiction other than their home in Palestine. In doing so, the district court disregarded that the "at home" jurisdiction "ordinarily indicates only one place," one that is "easily ascertainable," *id.*, 134 S. Ct. at 760, and failed to appraise Defendants' activities "in their entirety, nationwide and worldwide"—that is, to make a comparison that included their activities in Palestine. Although the *Daimler* rule applies equally to all entities, moreover, the district court improperly constructed a different "at home" analysis for Defendants because they are a non-sovereign foreign

-24-

government. *Daimler* instructs instead that only in *exceptional* circumstances will an entity be "at home" somewhere other than its principal place of business or an "equivalent place." None of those exceptional circumstances is evident in this case.

Although Defendants challenged personal jurisdiction six times following *Daimler*, Plaintiffs never addressed, much less satisfied, their burden of proof to show that Defendants are "at home" in the United States—and, indeed, have never defended the district court's decision that Defendants are "at home" in the U.S. Instead, Plaintiffs responded to the jurisdictional challenges with hollow due process, waiver and specific jurisdiction arguments. The district court properly rejected each of these because: 1) the law of this Court is that Defendants, who are a non-sovereign government, are entitled to due process; 2) Defendants timely raised their personal jurisdiction defense nine times before and after *Daimler*; and, 3) because Defendants' participation in the peace process in the U.S., along with related media interviews, is not suit-related activity that creates "a substantial connection with the forum State" under *Walden v. Fiore*, 134 S. Ct. 1115, 1121-22 (2014).

The district court committed prejudicial error, moreover, when it admitted ultimate-issue expert testimony at trial that was comprised heavily of elaborate narratives that summarized the facts, and of opinions on the intent and state of mind of Defendants' officials and the non-party individual terrorists. These

-26-

ultimate-issue experts admitted they were personal advocates for Plaintiffs, and were telling a "story" that "contributes to *our* case."[64]  They instructed the jury that Defendants were responsible for the attacks and opined on the psychological impact of Defendants' government programs without any supporting scientific or peer-reviewed studies or methodology. Compounding the prejudice, Plaintiffs emphasized this improper testimony in closing arguments to the jury.

---

[64] JA-5289-90 (emphasis added).

-27-

## STANDARDS OF REVIEW

This Court reviews a district court's assertion of personal jurisdiction *de novo*. *Dynegy Midstream Servs. v. Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006). Claims that the trial court improperly admitted expert testimony are reviewed under the abuse of discretion and manifest error standards. *United States v. Mejia*, 545 F.3d 179, 193 (2d Cir. 2008). A new trial is required when, as here, there is a "distinct possibility" that "the jury would not have reached the verdict it did" without the improper expert testimony. *Nimely v. New York*, 414 F.3d 381, 400 (2d Cir. 2005).

**ARGUMENT**

**I.** ***Daimler's* "At Home" Test Mandates Dismissal For Lack Of General Jurisdiction.**

It is self-evident that Defendants are resident in and operate predominantly from the West Bank and Gaza, Palestine.  Even so, Defendants submitted extensive evidence to the district court of Defendants' roots in Palestine—the seat of the Palestinian government, and the place where all key governance decisions are made.  In Palestine, Defendants employ more than 100,000 Palestinians in government jobs; house and staff their government offices; implement and oversee government programs and global diplomatic efforts and personnel; train and deploy security forces; apply for and receive foreign aid; obtain and service government loans and other public debt; and, provide financial assistance to Palestinians living in the West Bank and Gaza.  *See supra* Statement of the Case, Part I.B.

The court below consistently discounted the significance of Defendants' evidence that they are "at home" in Palestine, because it read into *Daimler* a requirement that Defendants (and not Plaintiffs, in accord with their burden of proof) must establish that there is a forum other than their home in Palestine in which Plaintiffs could bring their claims.[65]  Wrestling with how to apply *Daimler*,

---

[65] The district court's various decisions post-*Daimler* denying Defendants' challenge to personal jurisdiction are embodied in the court's April 11, 2014 oral

-28-

the district court misapplied *Daimler*'s chief principles: (i) the *singular* nature of the "at home" jurisdiction, which "ordinarily indicates only one place," one that is "easily ascertainable," *Daimler*, 134 S. Ct. at 760; (ii) *proportionality*—namely, the requirement that the district court appraise Defendants' activities "in their entirety, nationwide and worldwide," in proportion to in-forum activities, *id.* at 762 n.20; (iii) *universality*—that the *Daimler* "at home" rule applies equally to all entities, whether individuals, corporations, or unincorporated associations, like Defendants, because "[s]imple jurisdictional rules . . . promote greater predictability," *id.* at 760 (citation omitted); and, (iv) that only in *exceptional* circumstances will an entity be "at home" somewhere other than its principal place of business or an "equivalent place." *Id.*

### A. The "Singular" Principle: There Is No Fact Dispute That Defendants' Are "At Home" Only In Palestine.

After *Daimler*, the PA and PLO can only be at home in a single, "unique . . . as well as easily ascertainable" location. *Daimler*, 134 S. Ct. at 760. Seeking "[s]imple jurisdictional rules" that would "promote greater predictability" and "the efficient disposition" of jurisdictional questions "expeditiously at the outset of

---

argument (JA-1075); its June 16, 2014 Order on Defendants' motion for reconsideration of a pre-Daimler order on jurisdiction (SPA-24); its December 1, 2014 Order on summary judgment (SPA-48); its July 28, 2015 oral argument on the renewed motion to dismiss (JA-9633); and, its August 24, 2015 Order on Defendants' renewed motion to dismiss (SPA 54).

litigation," *Daimler* created a short list of "at home" locations. *Id*. at 760, 762 n.20.[66]

Defendants are "at home" in Palestine where they govern. It is undisputed that Defendants govern in and from Palestine. *See supra* Statement of the Case, Part I.A-B.; JA-1202 (Defs' Statement of Undisputed Facts), ¶¶13-14 ("The PLO's governmental functions involve representing the state of Palestine at the international level."); *id.* at ¶16 ("The PA carries out the kinds of functions that governments normally do in administering certain of the territories of the state of Palestine."); *see also* JA-4851, JA-4889 (PA is "the government in the West Bank"). Indeed, both Plaintiffs and Defendants submitted evidence that Palestine is the "center of government" for the PA and PLO, that the PA's "role and authority [are] limited to West Bank and Gaza," and that it has no "offices . . . anyplace other than those two places."[67] Plaintiffs' trial witnesses testified that Ramallah, West Bank, and not the United States, is where the "heads of the security apparatuses, and various other organs of the Palestinian Authority" are located.[68] Plaintiffs' witnesses also confirmed that "Ramallah represents the place where all the Palestinian governmental ministries and entities and agencies

---

[66] The district court confirmed *Daimler*'s emphasis on the "unique" nature of the "at home" location in *Laydon v. Mizuho Bank, Ltd.*, No. 12-3419, 2015 U.S. Dist. LEXIS 44005, *17-18 (S.D.N.Y. Mar. 31, 2015) (Daniels, J.).

[67] JA-7126-28.

[68] JA-5279, JA-5294; JA-5429-30, JA-5444.

-30-

reside,"[69] including "where the Palestinian president resides, as well as the government, the Parliament, the security services, and all the official agencies that are in charge of the Palestinian territories."[70]

The district court acknowledged that Defendants' "home" is Palestine, and that Defendants govern in and from the West Bank and Gaza.[71] The district court disregarded those facts, however, because it misinterpreted *Daimler* to mean that Defendants must prove that there exists—other than in Palestine—"an alternative forum where Plaintiffs' claims could be brought, and where the foreign court could grant a substantially similar remedy."[72]

Aside from improperly shifting Plaintiffs' jurisdictional burden of proof to Defendants, by insisting that Defendants establish a second "at home" forum for Plaintiffs' claims, the district court erred by expanding *Daimler*'s test to require more than a single, "unique . . . as well as easily ascertainable" location. In doing so, the court below ignored *Daimler*'s insistence on "[s]imple jurisdictional rules," which "promote greater predictability" and "promote the efficient disposition" of the jurisdiction question.

---

[69] JA-4188-90

[70] JA-4189-90 (413:20-414:2) (Eviatar); *see also* JA-4036 (260:2-7) (PA headquarters is "in Ramallah").

[71] JA-1104 (30:9-12); JA-1134 (60:19-24); and JA-1137 (63:4-13).

[72] SPA-15-16 (*Sokolow v. PLO*, 2011 U.S. Dist. LEXIS 36022, at *30-31 (S.D.N.Y. Mar. 30, 2011)).

**B.    The Proportionality Principle: The District Court Misapplied
*Daimler* By Refusing to Examine Defendants' Global Contacts.**

*Daimler* explained that "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there," and rejected as "unacceptably grasping" the old rule that general jurisdiction will lie wherever a party "engages in a substantial, continuous, and systematic course of business." 134 S. Ct. at 760-61.  *Daimler* substantially narrowed the application of general jurisdiction, among other reasons, because it sought to "permit out-of-state defendants 'to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *Id.* at 761-62 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). To that end, and because an entity that "that operates in many places can scarcely be deemed at home in all of them," *Daimler* required the district court to "apprais[e]" Defendants' "activities in their entirety, nationwide and worldwide." *Daimler*, 134 S. Ct. at 762 n.20.

By asserting jurisdiction over Defendants based on the far fewer contacts Defendants have in the United States in proportion to Palestine, the district court ignored *Daimler*'s instruction that "a particular quantum of local activity" in the forum does not create general jurisdiction over a "far larger quantum of . . . activity" outside the forum.  *Id.* at 762 n. 20.  Had the district court made that

-32-

global comparison, it would have readily observed that the "far larger quantum of . . . activity" was in Palestine—the undisputed seat of Defendants' government, from which Defendants make all key decisions, and the site of its executive, legislative and judicial branches and the vast majority of its employees. *See supra* at Statement of the Case, Part I.A-B. The district court repeatedly refused to make this global "appraisal" of Defendants' contacts, however, and specifically, to compare Defendants' presence in and contacts with Palestine to its activities in the U.S. *See* JA-1096-97 ("The Court: I'm not supposed to compare [defendant's activities in the United States] to the principle [sic] place of business."); JA-1096 ("The Court: The answer to that is yes, you can [assert jurisdiction], if those contacts are continuous and systematic to the extent that it makes them at home in the jurisdiction. [PA counsel]: Compared to—. The Court: Not compared to anything.").

When it failed to do so, the court below improperly applied the defunct pre-*Daimler* contacts test, which *Daimler* specifically warned would yield the "unacceptably grasping" assertion of jurisdiction that the Supreme Court sought to curb. *See* 134 S. Ct. at 762 n. 20 (holding that, without a global appraisal of contacts, "'at home' would be synonymous with 'doing business' tests framed before specific jurisdiction evolved in the United States"); *see also* SPA-50 (relying on its pre-*Daimler* analysis of Defendants' business and commercial

contacts in the U.S. to hold that "the PA and PLO's continuous and systematic business and commercial contacts within the United States are sufficient to support the exercise of general jurisdiction") (citing its March 2011 Order, SPA-1).

## C. The Universality Principle: *Daimler's* "At Home" Test Applies Equally To All Defendants.

*Daimler* crafted a jurisdiction test that applied equally to all defendants, whether an individual or corporate entity. *See Daimler*, 134 S. Ct. at 760 ("Simple jurisdictional rules . . . promote greater predictability"). It gave examples of the paradigm "at home" location for each type of defendant: "the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home," typically, the corporation's place of incorporation and principal place of business. *Id*.

Nowhere does *Daimler* state or even intimate that a different due process analysis is required depending on the type of entity. With a non-corporate entity of the type at issue here, *Daimler* instructed instead that courts should look for "an equivalent place" to the corporate and individual paradigm in order to make the "at home" determination. *Id*. Yet, because Defendants are not corporations, the district court refused to examine Defendants' "equivalent place" where they are "at home," that is, where Defendants govern. The district court explained that it could not "look at the place of incorporation and say that that's the test that's going to apply

-34-

to both a corporation and a non corporation." JA-9702. Instead, the court held that "you look at other factors which may be exceptions to that analysis." *Id.* The "other factors" that applied to non-corporations, however, turned out to be the same prior "continuous and systematic" analysis the district court applied in its pre-*Daimler* decisions. JA-1104 (30:9-12) & JA-1137 (63:4-13).

In fact, *Daimler*'s "at home" test applies equally to entities and individuals, consistent with longstanding due process principles. This is particularly the case for a foreign entity, such as Defendants. The Supreme Court has long held that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *United States v. Pink*, 315 U.S. 203, 246 (1941) ("[T]he benefits of [due process under the Fifth Amendment] extend to alien friends as well as to citizens."); *see also GSS Group Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 816 (D.C. Cir. 2012) (a foreign defendant is "forced to appear in the United States" and "must appoint a representative to act for it—that is, an attorney"; the defendant is present in the United States "for that limited purpose," and is thus "entitled to the protection of the due process clause").

Consistent with these due process principles, the Second Circuit has already recognized that *Daimler* applies equally to corporate and non-corporate "entities" in *Gucci Am. v. Bank of China*, 768 F.3d 122, 134 n.12 (2d Cir. 2014). *See also*

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione*, 937 F.2d 44, 50 (2d Cir. 1991) ("However, because the form of organization by which a defendant does business is irrelevant to any policy governing acquisition of jurisdiction, we see no reason to distinguish between corporate and non-corporate organizations in this regard.") (internal citation, quotation marks omitted).

The *Gucci* Court declined to exercise general personal jurisdiction in accord with *Daimler* over the Bank of China, a non-party bank majority owned by the Chinese government, because "the essence of general personal jurisdiction is the ability to entertain 'any and all claims' against <u>an entity</u> based solely on the <u>entity's</u> activities in the forum, rather than on the particulars of the case before the court." *Id.* at 134 n.12 (quoting *Daimler*, 134 S. Ct. at 762 n.20) (emphasis added). Notably, the *Gucci* Court spoke of "entities," avoiding a limitation of *Daimler*'s rule just to corporations and individuals. *See also O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on September 11, 2001)*, 714 F.3d 659, 679-81 (2d Cir. 2013) (applying due process minimum contacts test to four foreign defendants in ATA case); *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 93 (2d Cir. 2008) (same); *see also Mwani v. Osama Bin Laden*, 417 F.3d 1, 11-14 (D.C. Cir. 2005) (same).

The D.C. district courts have thoroughly examined the application of *Daimler*'s "at home" test to foreign, non-sovereign governments, and particularly

to the PA and the PLO. Those courts have held that "there is no indication that the Supreme Court intended [the *Daimler*] framework" to be limited only to the corporate context, and it "never suggested that this particular inquiry would be any different for a defendant that was neither an individual nor a corporation." *Livnat*, 82 F. Supp. 3d at 28; *Safra*, 82 F. Supp. 3d at 46; *see also Est. of Klieman*, 82 F. Supp. 3d at 245-46.

Ruling that the PA is not "at home" in the United States after evaluating the same contacts reviewed by the lower court here, the D.C. district courts explained: "It is common sense that the single ascertainable place where a government such as the Palestinian Authority should be amenable to suit for all purposes is the place where it governs. Here, that place is the West Bank, not the United States." *Livnat*, 82 F. Supp. 3d at 30; *Safra*, 82 F. Supp. 3d at 48 (same); *Klieman*, 82 F. Supp. 3d at 245-46 (applying *Daimler* to Defendants without distinguishing their non-corporate status, and holding that "Defendants' activities in the United States represent a tiny fraction of their overall activity during the relevant time period, and are a smaller proportion of their overall operations than Daimler's California-based contacts. The fact that defendants maintain a small office in Washington does not save plaintiffs' argument."); *see also Toumazou v. Turkish Republic of Northern Cyprus*, 71 F. Supp. 3d 7, 15 (D.D.C. 2014) (holding that foreign, non-sovereign government, Turkish Republic of Northern Cyprus, is "at home" in

Northern Cyprus where it governs the northern third of the island of Cyprus through a President, Prime Minister, legislature, and judiciary).

*Daimler* provides a simple jurisdictional rule, one that makes for the efficient and early resolution of the jurisdiction question. *Daimler*, 134 S. Ct. at 760, 762 n.20. The district court's decision has confounded that simplicity by improperly creating two sets of rules: one for individuals and corporations, and one for everything else.

Instead, as the great weight of cases have done, the lower court should have searched for Defendants' "equivalent place"—the place where the PA and PLO, a non-sovereign government, are "at home." *See Shovah v. Roman Catholic Diocese of Albany*, 745 F.3d 30, 40 (2d Cir. 2014) (applying *Daimler* to a church entity); *Krishanti v. Rajaratnam*, No. 09-05395, 2014 U.S. Dist. LEXIS 58314, at *6, *19-21 (D.N.J. Apr. 28, 2014) (dismissing claims against a Sri Lankan-based non-governmental organization that allegedly generated funds for a U.S.-designated terrorist organization, because a local fundraising office, fundraising events and website did not establish the NGO was "at home" under *Daimler*); *see also 3rd Eye Surveillance, LLC v. City of Irving*, No. 14-535, 2015 U.S. Dist. LEXIS 6263, at *5-6 (E.D. Tex. Jan. 16, 2015) (dismissing claims against City of Irving because its commercial contracts with businesses and meetings inside the jurisdiction did not make it "at home"); *Parlant Tech. v. Bd. of Educ.*, No. 2:12-417, 2014 U.S.

Dist. LEXIS 139064, at *12-13 (D. Utah Sept. 29, 2014) (dismissing claims against New York City Board of Education, despite sending teachers to Utah for training, purchasing products from Utah businesses, and other contacts). As the D.C. courts readily held, "[h]ere, that place is the West Bank, not the United States." *Livnat*, 82 F. Supp. 3d at 30; *Safra*, 82 F. Supp. 3d at 48 (same).

>    **D.      The "Exceptional" Principle: The District Court Misapplied *Daimler* In Holding That Defendants Are The "Exceptional" Case.**

While *Daimler* was focused on defining a simple, predictable and "easily ascertainable" general jurisdiction rule, it allowed that defendants might, in an "exceptional" case, be "at home" in a place that was not their usual home. *Daimler*, 134 S. Ct. at 761, 761 n.19. The Supreme Court gave one example of the "exceptional case," *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952), describing it as the "textbook" case of general jurisdiction exercised over a foreign entity that has not consented to suit in the forum. *Daimler*, 134 S. Ct. at 755-56.

*Perkins* involved a mining corporation located in the Philippines that had to suspend its operations during the Japanese occupation during World War II. 342 U.S. 437, 447 (1952). The "president of Perkins, who was also general manager and principal stockholder of the company, returned to his home in Ohio where he carried on 'a continuous and systematic supervision of the necessarily limited wartime activities of the company.'" *Keeton v. Hustler Magazine, Inc.*, 465 U.S.

770, 779 n.11 (1984) (quoting *Perkins*, 342 U.S. at 448). During that period, the company, Benguet, made "all key business decisions" in Ohio. *Id.*; *see also* 342 U.S. at 447-48 (describing extensive business activities, including paying employees, use of bank accounts, holding directors meetings, supervision of policies related to company properties, and payment for machinery).

When Justice Sotomayor, writing separately, suggested "that Benguet had extensive operations in places other than Ohio," the *Daimler* Court was quick to emphasize the key fact that made *Perkins* the "exceptional case":

> Justice Sotomayor's account overlooks this Court's opinion in *Perkins* and the point on which that opinion turned: All of Benguet's activities were directed by the company's president from within Ohio.

*Daimler*, 134 S. Ct. at 756 n.8. What made Perkins the "exceptional case," moreover, was "the diminution in operations resulting from the Japanese occupation and the ensuing shutdown of the company's Philippine mines." *Id.*

The *Perkins* exception has no application here, and did not open the door to the type of freelancing "exception" to *Daimler* that the district court devised. The West Bank and Gaza have been the consistent center of Palestinian government operations ever since the Oslo Accords; neither the PA nor PLO ever have decamped from Palestine in the way that Benguet did from the Philippines to Ohio. The enduring Israeli occupation of Palestinian territory, and the pervasive hostilities and armed conflict have never dislodged the PA and the PLO from

-40-

Palestine, nor obliged them to find a temporary home elsewhere since the 1993 Oslo Accords—not even during a war that caused damage that the U.N. described as "unprecedented since the beginning of the Israeli occupation in 1967." JA-8481 at ¶64.

For its part, Benguet had made Ohio "the corporation's principal, if temporary, place of business." *Daimler*, 134 S. Ct. at 756 (quoting *Keeton*, 465 U.S. at 780, n.11). *Daimler* explained: "Given the wartime circumstances, Ohio could be considered "a surrogate for the place of incorporation or head office." *Id.* at 756, n.8 (citing von Mehren & Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv. L. Rev. 1121, 1144 (1966) for the proposition that *Perkins* "should be regarded as a decision on its exceptional facts, not as a significant reaffirmation of obsolescing notions of general jurisdiction" based on nothing more than a corporation's 'doing business' in a forum").

The continuity of PA and PLO operations in Palestine is confirmed by the more than 100,000 employees in Ramallah, where the PA also maintains bank accounts, creates budgets and financial records, operates government healthcare, education, infrastructure and welfare programs for Palestinians, trains and deploys security forces, and the PLO oversees diplomatic efforts from Palestine. *See supra* Statement of the Case, Part I.A-B (describing extensive governance operations in Palestine). Plaintiffs have submitted no evidence to the contrary.

-41-

In comparison, Defendants' contacts with the United States are modest and unexceptional, *see supra* Statement of the Case, Part I.C, and are nothing like the temporary, but wholesale, removal of the core business of Benguet in *Perkins*. Indeed, the court below exercised jurisdiction solely based on the presence of a twelve-employee office in Washington, D.C. and Defendants' media appearances in the U.S. discussing the peace process.[73] These comparatively insignificant U.S. contacts are not equivalent to the *Perkins* "exceptional case," and cannot sustain general jurisdiction.

### E. The District Court Misapplied *Daimler* By Shifting the Burden of Proof to Defendants And Changing The Test.

Plaintiffs failed to meet their burden to prove that Defendants are "at home" in the United States "by a preponderance of the evidence, either at an evidentiary hearing or at trial." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir. 1999); *see also Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) (same). In fact, Plaintiffs did the opposite, offering evidence that "all the Palestinian governmental ministries and entities and agencies reside" in Palestine.[74] Indeed, Plaintiffs raised objections during trial when Defendants so much as mentioned the PLO's presence in the United States.[75] Nor did Plaintiffs ever argue that Defendants are actually "at home" in the United States, much less

---

[73] SPA-8-10 and SPA-13; SPA-50.

[74] JA-4188-90.

[75] *See* JA-7408.

anywhere other than in Palestine. Instead, Plaintiffs responded to the jurisdictional challenges with specious due process, waiver and specific jurisdiction arguments, all of which the district court correctly rejected.

When Defendants raised this failure of proof, the district court repeatedly disagreed, insisting that the burden was Defendants' own. *See, e.g.,* JA-1132 (Counsel: "Respectfully, your honor, it's the plaintiffs' burden to establish personal jurisdiction." Court: "No."). Incredibly, the court then imposed the burden that Defendants identify a country—other than Palestine—in which they have "greater business and commercial activities than are conducted in the United States." SPA-51; *see also, e.g.,* JA-9709-10 ("[N]o one has really established that the contacts are particularly greater in another country than the United States –[PA counsel]: Well, they're plainly greater in Palestine. The Court: I say another country. . . I'm not talking about Palestine."); JA-9710 ("Other than Palestine, the West Bank, or Gaza Strip, no one has proffered with any particularity any position, place in the world, where some other country other than the U.S. meets the test of the PA or the PLO being at home."); JA-1131 ("I don't have any basis to conclude that the Palestinian Authority or the PLO's activity is any greater, more continuous or systematic in any other country than in the United States. Do I have a basis to conclude that? [PA counsel]: The West Bank. The Court: I said other than the Palestinian territory, other than the West Bank.").

-43-

Compounding that error, the lower court also required Defendants "to identify an alternative forum where Plaintiffs' claims could be brought, and where the foreign court could grant a substantially similar remedy." *Sokolow*, 2011 U.S. Dist. LEXIS 36022, *30-31 (cited in Dec. 1, 2014 post-*Daimler* decision); *see also* JA-9710 ("I'm not talking about Palestine. I'm talking about a jurisdiction where you can give me a country in which you say that they are subject to lawsuit under *Daimler* given the nature of their activity."). *Reich v. Lopez* recently rejected that same approach, however, because

> The Court need not, and does not, decide whether Venezuela is a valid alternative forum for Plaintiffs claims because, for the purpose of establishing general jurisdiction . . . the mere fact that Venezuela may be an inadequate forum is insufficient to confer jurisdiction on this Court. The question in a general jurisdiction case is whether the defendants' contacts render them 'essentially at home' in the forum state. Because [defendants'] contacts with New York are insufficient to render them at home in New York, the contention that Venezuela may not provide Plaintiffs the relief they seek is irrelevant.

13-cv-5307, 2015 U.S. Dist. LEXIS 56955, at *15 (S.D.N.Y. Apr. 30, 2015) (emphasis added).[76] *Daimler* establishes the narrow circumstances under which a

---

[76] The district court's improper focus on an alternative forum appears borrowed from *forum non conveniens* jurisprudence, which requires a review of both the plaintiff's connections to the forum and the laws of an alternate jurisdiction. *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001). The test for jurisdiction under *Daimler* does not require the district court to examine a plaintiff's connections to the forum, however, but rather to compare a defendant's "activities in their entirety, nationwide and worldwide" with its activities in the

-44-

foreign defendant can be compelled to litigate in the U.S. courts without regard to suit-related conduct. What *Daimler* does not do is bound that jurisdiction with a proviso that a defendant must demonstrate an alternate forum for a plaintiff's redress.

**II.   There Is No Specific Jurisdiction Because There Is No Substantial Connection Between the Attacks and the United States Giving Rise to Plaintiffs' Claims; The D.C. Courts Have Already Rejected Plaintiffs' Theory of Specific Jurisdiction.**

A month after deciding *Daimler*, the Supreme Court emphasized the constraints of specific jurisdiction in *Walden v. Fiore*, 134 S. Ct. 1115, 1121-23 (2014).  Under *Walden*, to justify specific jurisdiction, a plaintiff must prove by a preponderance of evidence that "the defendant's suit-related conduct . . . create[s] a *substantial connection* with the forum State," 134 S. Ct. at 1121 (emphasis added). In setting out that test, *Walden* instructed, first, that "the relationship must arise out of contacts that the defendant himself creates with the forum State," and second, that the "minimum contacts analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* at 1122 (internal quotation marks omitted). The district court did not err by refusing to adopt Plaintiffs' theories of specific jurisdiction.

---

forum. *Daimler*, 134 S. Ct. at 762 n.20.  Neither does *Daimler* impose on the court to review the advantages or disadvantages of an alternative jurisdiction. *Id*.

A. **Defendants Engaged In No Claim-Related Activity In or Directed At the United States.**

Plaintiffs were either Israeli residents or tourists in public places in Israel who were injured when terrorists initiated their attacks. *See supra* Statement of the Case, Part.I.D. Although Plaintiffs have connections to the United States, "the mere fact that [the] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction," *id*. at 1126, because those contacts are "random, fortuitous, or attenuated." *Id*. at 1123 (citing *Burger King*, 471 U. S. at 475); *see also id*. at 1125 ("a plaintiff's forum connections" cannot be "'decisive' in the jurisdictional analysis").

Plaintiffs submitted no evidence, either before or during trial, that the attacks at issue targeted the United States. *Walden*, 134 S. Ct. at 1125-26; *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 95 (2d Cir. 2008) (attacks that injure Americans do not create a substantial connection because foreseeability of harm to Americans is insufficient for specific jurisdiction).[77] Plaintiffs similarly submitted

---

[77] That Plaintiffs effected service on the PLO's Washington, D.C. Mission office cannot suffice for specific jurisdiction, because there is no evidence the served party was designated by the PA or PLO to be an agent to accept service for claims arising overseas. *See Daimler*, 134 S. Ct. at 759. Plaintiffs similarly cannot satisfy the *Daimler* "at home" standard applicable to "tag" or "transient" jurisdiction. *See Martinez v. Aero Caribbean*, 764 F.3d 1062, 1064, 1067-68 (9th Cir. 2014) (*Daimler* confirms that "tag" or "transient" jurisdiction set forth in *Burnham v. Superior Court of Calif.*, 495 U.S. 604, 610, n.10 and 612, does not apply to corporations unless they are "at home").

no evidence that Defendants engaged in any claim-related activity in or directed at the United States.

Instead, Plaintiffs theorized that specific jurisdiction should lie because, during the relevant time period, Defendants participated in American-mediated peace talks with Israel and related media interviews. *See supra* Statement of the Case, Part I.C.; *see also* JA-1118-19. Those activities plainly do not constitute "suit-related conduct" creating "a substantial connection with the forum," *Walden*, 134 S. Ct. at 1121, such that the district court correctly declined to exercise specific jurisdiction.[78]

The district court was skeptical of the claim, and rejected it, first, because Defendants' participation in U.S.-based discussions regarding peace efforts between Israel and Palestine could not create a "substantial connection" to the forum for claims pertaining to unrelated terrorist attacks in Israel. *See* JA-1119 ("The Court: What conduct in the United States intimidated citizens of Israel? A plea to stop the violence? [Plaintiffs' counsel]: Right. The Court: Why is a plea to stop the violence and intimidation?"); *id.* at JA-1120 ("The Court: They do that in the United States in a peaceful, nonviolent way. [Plaintiffs' counsel]: That is correct. The Court: You say that constitutes what actionable action in the United States under specific jurisdiction? [Plaintiffs' counsel]: It does two things: Number

---

[78] JA-1117-28 (43:20-54:16).

-47-

one, it is influencing the policy of the United States. The Court: To try to create peace.").

The court below also declined to exercise specific jurisdiction because Plaintiffs had not asserted the claim in their complaint, *see id.* at JA-1123-24, and further, because Plaintiffs' theory of specific jurisdiction is not grounded in recognized legal principles or case law: "Other than you wanting it to be this way, I'm not sure where you get this legal theory of specific jurisdiction . . . ." JA-1126, JA-1128. Plaintiffs were unable to address these deficiencies, and the district court appropriately rejected Plaintiffs' unsupported argument that mere discussion of an issue in the United States creates specific jurisdiction over *all* claims that might relate to that issue.

### B. Three Federal Courts Rejected In Parallel Cases The Same Specific Jurisdiction Theory Advanced By Plaintiffs Here.

The D.C. federal courts have applied Walden's specific jurisdiction standard in parallel cases against Defendants, and have recently rejected the same specific jurisdiction theory Plaintiffs raise here. In doing so, one of those courts explained: "In *Walden*, the Supreme Court clarified that the relevant contacts for Constitutional purposes are with the forum itself, not with people connected with the forum. Therefore, the happenstance that some of the direct victims of the attack underlying this action . . . were U.S. citizens cannot establish jurisdiction." *Safra*,

82 F. Supp. 3d at 52 ("Effectively, Plaintiffs claim that by attacking a group of Jewish worshippers in the West Bank—without any actual knowledge or even a reason to believe that those victims were connected to the United States—the Palestinian Authority was attempting to influence U.S. government policy towards Israel."). *Id.* at 51; *see also Livnat*, 82 F. Supp. 3d at 33 (same holding).

The D.C. courts considered the same theory that Plaintiffs espoused below, and concluded that the relationship between Defendants' activities in the United States and attacks in Israel was "simply too attenuated to pass Constitutional muster." *Safra*, 82 F. Supp. 3d at 54 (describing theory as "by attacking a discrete group of Jewish worshippers in the West Bank without any reason to believe that the attack would affect U.S. property or citizens or that it would directly influence U.S. policy"); *see also Klieman*, 82 F. Supp. 3d at 247 (rejecting Plaintiffs' theory that an attack in Israel "relates to" Defendants' activities in the U.S. because they share the same political goal as having "no support in the relevant case law").

Plaintiffs' argument that Defendants' diplomatic efforts in the United States somehow "relates to" unconnected violent acts committed in Israel supports specific jurisdiction defies logic and the law, and this Court should reject it as did the D.C courts and the court below.

### III. The Trial Court Allowed Ultimate-Issue Experts To Summarize The Evidence And Conjecture As to Mental States.

Plaintiffs' presented their entire liability case at trial using three ultimate-issue expert witnesses,[79] and no lay witnesses on liability. Plaintiffs' ultimate-issue experts openly admitted they were advocates for the Plaintiffs, and that they were telling a "story" that "contributes to *our case*."[80] Two of Plaintiffs' chief liability witnesses, Shrenzel and Eviatar, accounted for the vast majority of the liability case testimony, and indeed, for more than half of all of the trial testimony. *See supra* Statement of the Case, Part I.F, n.51.

Although the district court announced limitations on the scope of expert testimony, the court below ultimately permitted Plaintiffs' ultimate-issue experts to construct elaborate narratives for the jury that summarized the facts, and to opine on the state of mind and intent of PA officials and the individual terrorists. Experts are not allowed to speculate regarding state of mind, intent, or motive—those questions are left to the jury. *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (holding that experts may not "speculate as to the motivations and intentions of certain parties"); *In re Rezulin Prods. Liab. Litig*., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony").

---

[79] *See* JA-3673-4138 (Kaufman), JA-4139-4310, JA-4317-4469, JA-4540-4716, JA-4782-4932 (Eviatar), JA-4932-41, JA-5146-5717 (Shrenzel).
[80] JA-5289-90 (emphasis added).

Although none of these ultimate-issue experts were qualified in any relevant scientific discipline, such as psychology or sociology, and none had performed any studies employing accepted methodologies, these ultimate-issue experts were allowed to conclude for the jury that various actions of the PA (such as creating social welfare programs) were meant to promote terrorism and provoked the specific attacks in this case. *Nimely* cautioned that, "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Id.* at 399 n.13. Further, experts that "tell the jury what result to reach" are improperly trying "to substitute the expert's judgment for the jury's." *Id.* at 397.

The district court abused its discretion by admitting this highly improper and impactful expert testimony that formed the entirety of Plaintiffs' case on liability. The jury's verdict was necessarily prejudiced by the testimony of these expert-advocates. A new trial is required when, as here, there is a "distinct possibility" that "the jury would not have reached the verdict it did" without the improper expert testimony. *Nimely v. New York*, 414 F.3d 381, 400 (2d Cir. 2005). Compounding that prejudice, Plaintiffs emphasized the improper testimony in their argument to the jury, creating an echo-chamber effect. *See Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000) (holding that testimony is presumed to influence the verdict where it is material and "emphasized in arguments to the jury").

-51-

**A.** **The District Court Is Charged With Stopping Experts From Summarizing The Evidence And Offering Improper Opinions.**

Trial courts are the gatekeepers of expert witness testimony under *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993). To that end, the district court must not admit expert testimony when its "subject matter . . . is not beyond the ken of the average juror." *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994).

This Court has repeatedly held under *Daubert* that summary and ultimate-issue testimony from expert witnesses creates prejudice warranting a new trial; *United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008), is particularly instructive. The *Mejia* Court ordered a new trial because the expert testimony was "more like a summary of the facts than an aide in understanding them." *Id.* When the expert witness summarizes the facts for the jury, the expert "transforms into the hub of the case, displacing the jury by connecting and combining all other testimony and physical evidence into a coherent, discernible, internally consistent picture of the defendant's guilt." *Id.* at 190-91. An expert is permitted to provide background, but may not summarize facts that require no specialized knowledge, because that summary invades the jury's province. *See id.* at 196.

This Court likewise ordered a new trial in *Nimely*, 414 F.3d at 393-94, because a forensic pathologist expert witness summarized other witnesses' testimony and opined on their intentions and honesty. In excluding the testimony,

this Court explained that the expert was "driven by the need to find a way of explaining the admitted facts in light of his own instinct that the officers were not lying." *Id.* at 399. Plaintiffs' ultimate-issue witnesses here are driven, as they have admitted, by that same need—to advocate their personal feelings and interpretations of "our" case. In excluding that testimony, this Court accordingly rejected the *Nimely* expert's conclusions as "the essence of unverifiable subjectivity, amounting to the sort of *ipse dixit* connection between methodology and conclusion that the district court has the duty to exclude under Rule 702." *Id.*

Significantly, Eviatar's testimony was excluded for these same reasons in a look-alike case against these same Defendants called *Gilmore v. Palestinian Interim Self-Government Authority*, 53 F. Supp. 3d 191 (D.D.C. 2014), *appeal docketed*, No. 14-7129 (D.C. Cir. Aug. 29, 2014). *Gilmore* granted summary judgment to Defendants after rejecting Eviatar's testimony that the PA was "more likely than not" responsible for an attack. *Id.* at 212. As in *Mejia* and *Nimely*, the *Gilmore* Court concluded that Eviatar was "reviewing and weighing the evidence," but had not provided any "particular methodology" other than the "commonsense and general deductive principles that any non-expert finder of fact would rely on." *Id.* at 212.

The district court stated its intent before trial to prevent Plaintiffs' experts from claiming "that the PA and the PLO were involved in this based on my review

of the evidence, that you review it, and you should take my word for it? . . . No expert has any greater ability to conclude that than the jury."[81] As trial progressed, however, the court below only sporadically enforced this rule, and only against Kaufman, Plaintiffs' first expert witness. JA-3930-31. Unfortunately, it stopped enforcing this rule entirely once Shrenzel and Eviatar, Plaintiffs' chief liability experts, took the stand.

> **B. The District Court Allowed Plaintiffs' Experts To Narrate Speculative Stories To The Jury That Blamed The PA For The Attacks.**

The district court abused its discretion by allowing Plaintiffs' ultimate-issue experts to summarize facts for the jury and speculate about the intent and motive of Defendants and the attackers. Because they lacked independent personal knowledge of the facts of the six attacks, the ultimate-issue experts assumed the roles of storytellers and advocates. The ultimate-issue experts' testimony in this regard became critical to Plaintiffs' liability case. The district court erred in admitting the testimony, because if these statements could have been proven factually, rather than by surmise, then they should have been admitted through "lay witness testimony, arrest records, death certificates, and other competent evidence of the highly specific facts, and the jury could have intelligently interpreted and understood it." *Mejia*, 545 F.3d at 195.

---

[81] JA-3283-84; *see also* JA-3292-93; JA-3186, JA-3192, JA-3277-78.

For example, Shrenzel admitted to acting as a partisan narrator when discussing the March 21, 2002 attack, explaining that he would tell a "*complicated story*" because "*I think it contributes to our case* so I will go on and describe it." JA-5287-90 (emphasis added). During the retelling, he described the attacker's state of mind, characterizing him as "look[ing] for opportunities to carry out a suicide attack." *Id*. Discussing a prior attempted attack, Shrenzel speculated that "*[p]robably* it was some kind of a joint venture between the PIJ and Fatah" to link the PA to the attacks. *Id*. (emphasis added). He also described what the attackers were thinking when they decided not to go forward. *Id.* ("*probably* because of Israeli checkpoints and other obstacles. . . . *Promise me to complete the story*"). *Id*. (emphasis added).

The district court also let the expert-advocates tell the jury that the PA uses techniques from the "Soviet Union . . . to educate people, to control their minds and thoughts and lead them in a specific way that is desired by . . . the PLO/PA." JA-5329. This testimony necessarily swayed the jury, although Plaintiffs' experts lacked any expertise in psychology or other relevant social science, and the testimony was not based in any accepted or verifiable methodology.[82] *See Nimely*, 414 F.3d at 399.

---

[82] The trial court qualified Shrenzel and Eviatar as experts on "terrorism as it relates to the policies and practices of the PA and the PLO." JA-5197 (Shrenzel);

-55-

Building on his testimony about Soviet mind control techniques, for further example, Shrenzel gave a long narrative about how he believed the PA uses the media to turn Palestinians into terrorists. He began by discussing a vague "atmosphere" that infected all PA employees: "*This is the crucial issue. There was an atmosphere*, either those were employees of the PA, either they read it, either they were exposed to announcement by the commanders." JA-5690-92 (emphasis added). Shrenzel then told the jury he would give them "the point of view of the potential reader or the potential employee of the PA," and then said that, "as an employee of the PA," individuals believed they should "contribute to that wide-scale attack [on Israel]." JA-5690-92. Using derogatory language to further poison the well with the jury—and thereby advocate "our" case—Shrenzel discussed a Palestinian magazine comparing "Jews and descendants of monkeys and pigs." JA-5690-92.

Although Shrenzel admitted that Palestinian media do not instruct Palestinians to "please go out and kill all Jews or all the Israeli citizens," he conjectured to the jury that PA employees believe otherwise. He said "it is the explicit, but no less than that, *the implicit messages*" to kill Israelis, and that this was "a contributing factor" that caused the attacks in this case. *Id.* Taking on the

JA-4185 (Eviatar is an expert on "the policies and practices of the Palestinian Authority and the PLO, as they relate to support of terrorism").

-56-

juror's burden of determining liability, Shrenzel said that *the PA "creat[ed] the proper atmosphere"* that caused Sa'id Awada, the June 19, 2002 bomber (JA-5484, JA-5681-82), to "*go out and detonate himself.*" JA5690-92 (emphasis added). He also explained that Said Ramadan, the January 22, 2002 shooter (JA-5162) believed that the PA wanted him to commit the attack: "*for him it was clear, this is what my superiors expect from me. . . . They want me to go out and . . . shoot indiscriminately in the streets of Jerusalem.*" JA-5690-92.

Shrenzel performed no studies, collected no reviewable data, did not interview the attackers, and used no methodology to support his undisguised advocacy that the PA "controlled the minds" of Palestinians—and specifically controlled the attackers in this case. *Contra* Fed. R. Evid. 702(b)-(d), 703. Nor did Shrenzel have the technical expertise to evaluate such data or opine that the PA's actions caused the attacks—an ultimate issue that belonged to the jury, not to purported experts. *Id.*, 702(a). Instead, Shrenzel was given great freedom by the court below to spin theories to the jury about what motivated individual attackers. This path toward a liability determination was plainly improper. *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) ("[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.") (citations omitted); *Calhoun v. Yamaha*

*Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003) ("specific knowledge is required to support more specific opinions").

Like Shrenzel, Eviatar provided summaries of the evidence for the jury and filled in the gaps with his speculative opinions about the motives and thoughts of the terrorists. For example, Eviatar summarized Plaintiff's position about one the terrorists: "Ibrahim Hamed gave the order to perpetrate this terrorist attack. *He led it, he planned it, he helped by providing the resources*." JA-4691-92. Without evidence in support, Eviatar filled in the rest of the story from his own speculations: "*He gave instructions to members of the cell, and he in essence was the conductor, in quotation marks, of that terrorist attack.*" *Id*. He gave a similarly biased summary of terrorist Marwan Barghouti, and then added his own conjecture about what other terrorists were thinking: "Central terrorist operatives in Fatah and its military wing viewed Marwan Barghouti as more than an authority; they viewed him as the link between them and Yasser Arafat." JA-4583.

More importantly, Eviatar was not shy about telling the jury what to decide, substituting his judgment for theirs. For example, he instructed the jury as to how to interpret a statement in a PA document: "I consider that statement to constitute strong political support and common interests" between the PA "and Marwan Barghouti [a terrorist] himself." JA-4589. A few minutes later, Eviatar told the jury that the PA's security forces supported terrorism: "My well-founded

-58-

assessment is that many hundreds from among the Palestinian security apparatuses were involved in terrorist activities." JA-4597. Eviatar repeatedly returned to that theme, claiming that the PA and PLO were in "cooperation and coordination in the perpetration of joint acts of terror" with Hamas. JA-4619; *see also* JA-4598 (same regarding the PA's security forces and terrorist groups).

The *Gilmore* district court excluded Eviatar's testimony on this same subject after a compelling evaluation. *Gilmore*, 53 F. Supp. 3d at 211-14. As in *Mejia* and *Nimely*, the *Gilmore* court called Eviatar's testimony overly speculative, because he was doing little more than "reviewing and weighing the evidence in precisely the same manner as would an ordinary trier of fact." *Id.* at 212 (internal quotation marks omitted). *Gilmore* further criticized that Eviatar had no "particular methodology" other than the "commonsense and general deductive principles that any non-expert finder of fact would rely on." *Id.*

Plaintiffs also used Eviatar and Shrenzel to improperly bring the inadmissible conclusions about liability from Israeli sources into evidence, without any discernable methodology or unique expertise.[83] Both ultimate-issue experts spoon-fed the possible implications of many of Plaintiffs' documents to the jury. For example:

---

[83] *See, e.g.,* JA-4403, JA-4585, JA-4657, JA-4691-94.

Q.     So, Mr. Shrenzel, have you had a chance to consider the role of Tawfiq Tirawi [a PA intelligence official] in connection with the Wafa Idris suicide bombing based on Exhibit 233?

A.     Yes. . . . *This very document cannot provide us with a conclusive final proof of his prior knowledge of the attack. But given our overall knowledge* about. . . the profound involvement of Tirawi during the whole period, in the series of attacks, of covering up, of providing weapons, for example, the explosives used in the Hashaika attack, *if we take all of the Tirawi file in consideration, I think it's more likely than not that he had prior knowledge and involvement in that attack. That's my professional assessment.*

JA-5716 (emphasis added). It was manifest error to allow these "experts" to summarize the evidence, and then give their "professional" opinions that PA officials were "more likely than not" responsible for the attacks. *Gilmore,* 53 F. Supp. 3d at 211-12.

In addition, the district court improperly allowed Plaintiffs' "experts" to introduce highly inflammatory denunciations of the attackers, whom they tied in conclusory fashion to the PA and PLO, further prejudicing the jury. *See* JA-4076-77 (Kaufman testifying: "This guy was a professional murderer. Yes. He admitted [to] 66 counts of murder. That would be 66 people"); JA-5596-97 (discussing a circular authored by Fatah—not the PA: "From the muzzle of your guns genuine pace will swoop into the sat and suffering land . . . if they want to negotiate, let them negotiate with the sound of your Intifada . . . the sound of your memory witnessing a massacre and carnage. The screams in the city and village hunger.");

-60-

JA-4062-76 & JA-4826 (Kaufman discussing JA-9086, a 109-count indictment from an Israeli tribunal against one of the attackers that *post-dates the relevant attack by one year*); JA-3966-67, JA-4661-62 & JA-4824-25 (same from Kaufman and Eviatar regarding JA-8956, a 53-count Israeli indictment).

The improper testimony was hardly episodic or immaterial. Plaintiffs presented no lay witnesses on liability, and the vast majority of their liability case depended on Shrenzel's and Eviatar's testimony. Plaintiffs' liability case therefore prevailed because of the district court's decision to allow them to provide such speculative summaries and narrations. *See* JA-5222 (Shrenzel editorializing that the PA "considers such an attack against civilians in the center of Jerusalem as a performance of a national duty" and that the PA "is really very disappointing"); JA-5284 (Shrenzel providing a summary, mixed with commentary and speculation, that the PA supported the terrorist organization Al-Aqsa Martyr Brigades); JA-5326-27 (same); JA-5302 (Shrenzel discussing an attacker: "his love of his nation was reflected by killing civilians in central Jerusalem"). Despite its expressed intention to be a stringent gatekeeper, the court below allowed these ultimate-issue experts to essentially make Plaintiffs' closing argument for them.

**C.    The District Court Improperly Allowed Plaintiffs' Experts To Testify That The PA's Social Welfare Programs Cause Terrorism, Despite The Lack Of Any Data or Methodology.**

Compounding these errors, the district court allowed Shrenzel and Eviatar to testify, without any supporting data or methodology, that the PA's social welfare programs were also responsible for the attacks. Those opinions were created "only by the *ipse dixit* of the expert." *GE v. Joiner*, 522 U.S. 136, 146 (1997); *Nimely*, 414 F.3d at 399 (same). The welfare programs in question support Palestinians imprisoned by Israel, as well as their families—no matter what allegation led to their incarceration, including political or administrative allegations. JA-7184-90; JA-7539-44. These programs were created by the PA, with input from the United States and other donors of foreign aid, during discussions about how to rehabilitate offenders and integrate them back into society. JA-7184-85. These social welfare programs are aimed at preventing detainees from being further "exploited" by "extremist organizations" and to combat recidivism, and have been "very, very successful." JA-7360.

Without any training in economics or psychology, or any studies or surveys, however, Plaintiffs' ultimate-issue experts were allowed to offer their unsupported personal opinions that the PA's welfare programs were intended to support terrorism, and that they successfully incentivize Palestinians to commit terrorism. Eviatar essentially, and improperly, gave a closing argument to the jury on this

issue, arguing that the welfare payments "represent[] a positive incentive that multiplies his motivation" and that "*prod and assist the prisoner to go ahead and carry out . . . terror attacks and terror incidents of this type.*"  JA-4374; *see also* JA-4385; *see also Linde v. Arab Bank, PLC*, No. 04-2799, Doc. 954 at 1 (E.D.N.Y. May 28, 2013) (excluding expert that essentially gave a closing argument). Shrenzel similarly expounded to the jury that the PA intends that its welfare programs "praise," "appreciate[e]" and "endors[e]" terrorist attacks, and that welfare payments are "a token of appreciation" for killing Israelis. JA-5699-700; JA-5230-31. He further speculated that prisoners receiving welfare "perform[] services" for the PA by continuing "terrorist activity."  JA-5253.

No evidence, data, or methodology supports these conclusions, nor were the experts qualified to opine on the effects of the PA's welfare policies in any case. Fed. R. Evid. 702(a)–(b).  Plaintiffs' submitted no evidence that these experts' speculative theories or techniques: (1) could and had been tested; (2) were subjected to peer review; (3) possessed a knowable error rate (and what that error rate indeed was); or (4) were generally accepted by the relevant community. *See Daubert*, 509 U.S. at 593-94.

Under the best of circumstances, economists differ on the effect of social welfare payments on crime as a *general* matter—yet the trial court improperly allowed Shrenzel and Eviatar to lard the record with their ultimate-issue opinions

that the PA's social welfare programs specifically caused the individual terrorists in this case to attack Plaintiffs.[84] These ultimate-issue opinions were not admissible: "[T]here is simply too great an analytical gap between the data and the opinion proffered." *GE*, 522 U.S. at 146.

*Daubert* sets a high bar for experts that claim a particular policy has a specific effect—as shown by the many cases excluding cause-and-effect testimony based on far more extensive methodology and data than was presented in this case. *See, e.g., EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3d 50, 754 (6th Cir. 2014) (excluding expert claims that defendants' use of credit checks disproportionately excluded minorities because the opinion lacked a testable methodology and reliable sampling); *Wessmann v. Gittens*, 160 F.3d 790, 804-05 (1st Cir. 1998) (excluding testimony about the effects of an affirmative-action policy due to overreliance on anecdotal evidence and personal experience); *see also Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 528 (6th Cir. 2012) ("red flags" for causation testimony include "anecdotal evidence, improper extrapolation, failure to consider other possible causes, and, significantly, a lack of testing"). The trial court's decision to allow these unqualified witnesses to opine that the PA's social welfare programs contributed to the attacks overwhelmed the

---

[84] *See, e.g.,* JA-4361-63, JA-4370-74, JA-4384-85, JA-4693-94 (Eviatar); JA-5210, JA-5227-28, JA-5238-39, JA-5246, JA-5251, JA-5258, JA-5282, JA-5305, JA-5315-16, JA-5545, JA-5551, JA-5557, JA-5564, JA-5569-70 (Shrenzel).

jury, particularly in the absence of any other testimony to support Plaintiffs' liability theories.

**D.      Plaintiffs' Heavy Reliance On The Improper Expert Testimony In Closing Arguments Demonstrates The Need For A New Trial.**

Plaintiffs improperly bootstrapped their experts' ultimate-issue testimony to drive their liability theories home during their closing arguments on liability.   It was error for the district court to allow Plaintiffs to magnify their experts' advocacy with their own advocacy.  *See Nimely*, 414 F.3d at 397; *Wray*, 202 F.3d at 526 (prejudice is more apparent where improper testimony "was emphasized in arguments to the jury").   Plaintiffs' ultimate-issue experts submitted the only testimony as to the impact of Defendants social welfare programs. Plaintiffs' counsel repeatedly argued that their experts' testimony was sufficient, by itself, to prove that the PA's social welfare programs caused the attacks in this case:  "[I]f you set up a program in which you say if you commit a terrorist act we will pay your family, that is providing material support, and you can't do that." JA-8108. Plaintiffs' counsel told the jury that the thinking on the issue was already done: "Anytime that there's martyr payments, you can check yes [as to material support]. You don't have to find that those payments preceded the attack."  JA-8110.  This social welfare argument were repeated again and again during the closing.[85]

---

[85] JA-8104-08, JA-8110, JA-8124, JA-8134-36.

Unsurprisingly, Plaintiffs' other chief basis for liability was the testimony of Plaintiffs' ultimate-issue experts about the motives of Defendants and the terrorists. Plaintiffs' counsel quoted Shrenzel in closing: "What was expected from me as a member of the [PA] security apparatuses? And the answer is, you should participate. His understanding was I should take an active role in the attacks." JA-8125. Plaintiffs' counsel also emphasized the testimony from his ultimate-issue experts that the PA intended and expected to create terrorism, including the attacks in this case, through its propaganda and support.[86]

Plaintiffs' closing argument shows that they founded their liability case on Eviatar and Shrenzel's improper and misleading testimony. The trial court's manifest error in allowing this testimony can only be remedied by a new trial.

## CONCLUSION

The district court misapplied *Daimler* and improperly exercised general jurisdiction over Defendants, who are properly "at home" in Palestine. The judgment must accordingly be reversed. If the judgment is not reversed on jurisdictional grounds, this Court should remand for a new trial.

---

[86] JA-8125-28, JA-8145-46, JA-8148, JA-8152-55.

November 10, 2015

Respectfully submitted,

/s/Gassan A. Baloul
Gassan A. Baloul
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 872-9800
gassan.baloul@squirepb.com

Mitchell R. Berger
Pierre H. Bergeron
John A. Burlingame
Alexandra E. Chopin
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC  20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
mitchell.berger@squirepb.com
pierre.bergeron@squirepb.com
john.burlingame@squirepb.com
alexandra.chopin@squirepb.com

*Attorneys for Defendants-Appellants
Palestinian Authority and Palestine
Liberation Organization*

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned certifies that this brief complies with the type-volume limitations of Rule 32(a)(7)(B)(i).

1.    Exclusive of the exempted portions of the brief, as authorized by this Court's Order Authorizing Oversized Briefs, ECF. No. 49, this brief contains 14,397 words, including footnotes and headings, according to the word-count function provided by Microsoft Word, the word-processing system used to prepare the brief.

2.    This brief has been prepared in 14-point Times New Roman typeface in Microsoft Word. As permitted by Rule 32(a)(7)(C), the undersigned has relied on the word count of this word-processing system in preparing this certificate.

/s/Gassan A. Baloul
Gassan A. Baloul

*Attorney for Defendants-Appellants the Palestinian Authority and the Palestine Liberation Organization*

# SPECIAL APPENDIX
# TABLE OF CONTENTS

Memorandum Decision and Opinion Denying Defendants' Motion to
Dismiss for Lack of Personal Jurisdiction, filed Mar. 30, 2011 ........................ SPA-1

Excerpt of Transcript of Hearing before the Hon. George B. Daniels,
Apr. 11, 2014 ........................................................................................................ SPA-17

Order Denying Defendants' Motion for Reconsideration,
filed June 16, 2014 .............................................................................................. SPA-24

Order Denying Defendants' Motion for Summary Judgment,
filed Nov. 19, 2014 .............................................................................................. SPA-25

Memorandum Decision and Order Denying Defendants' Motions for
Dismissal and Summary Judgment, filed Dec. 1, 2014 .................................. SPA-48

Order Denying Defendants' Renewed Motion for Summary Judgment,
filed Feb. 11, 2015 .............................................................................................. SPA-53

Order Denying Defendants' Renewed Motion to Dismiss,
filed Aug. 24, 2015 .............................................................................................. SPA-54

Order Granting Summary Judgment for Certain Plaintiffs,
filed Aug. 31, 2015 .............................................................................................. SPA-60

Judgment ...................................................................................................................... SPA-61

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3 0 MAR 2011
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, individually and as a natural guardian of plaintiff Jamie A. Sokolow; RENA M. SOKOLOW, individually and as a natural guardian of plaintiff Jamie A. Sokolow; JAMIE A. SOKOLOW, minor, by her next friends and guardian Mark I. Sokolow and Rena M. Sokolow; LAUREN M. SOKOLOW; ELANA R. SOKOLOW; SHAYNA EILEEN GOULD; ELISE JANET GOULD; JESSICA RINE; SHMUEL WALDMAN; HENNA NOVACK WALDMAN; MORRIS WALDMAN; EVA WALDMAN; DR. ALAN J. BAUER, individually and as a natural guardian of plaintiffs Yehonathon Bauer, Binyamin Bauer, Daniel Bauer, and Yehuda Bauer; REVITAL BAUER, individually and as a natural guardian of plaintiffs Yehonathon Bauer, Binyamin Bauer, Daniel Bauer, and Yehuda Bauer; YEHONATHON BAUER, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer; BINYAMIN BAUER, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer; DANIEL BAUER, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer; YEHUDA BAUER, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer; RABBI LEONARD MANDELKORN; SHAUL MANDELKORN; NURIT MANDELKORN; OZ JOSEPH GUETTA, minor, by his next friend and guardian Varda Guetta; VARDA GUETTA, individually and as natural guardian of plaintiff Oz Joseph Guetta; DR. KATHERINE BAKER, individually and as personal representative of the Estate of Benjamin Blutstein; REBEKAH BLUSTEIN, DR. RICHARD BLUSTEIN, individually and as personal representative of the Estate of Benjamin Blutstein; DR. LARRY CARTER, individually and as personal representative of the Estate of Diane ("Dina") Carter; SHAUN COFFEL; DIANNE COULTER MILLER; ROBERT L. COULTER, JR.; ROBERT L. COULTER, SR., individually and as personal representative of the Estate of Janis Ruth Coulter; CHANA BRACHA GOLDBERG, minor, by her next friend and guardian Karen Goldberg; ELIZER SIMCHA GOLDBERG, minor, by her next friend and guardian Karen Goldberg; ESTHER ZAHAVA GOLDBERG, minor, by her next friend and guardian Karen Goldberg; KAREN GOLDBERG, individually, as pers. rep. of the Est. of Stuart Scott Goldberg/ nat. guard. of pltffs Chana Bracha Goldberg, Esther Zahava Goldberg, Yitzhak Shalom Goldberg, Shoshana Malka Goldberg, Eliezer Simcha Goldberg, Yaakov Moshe Goldberg, Tzvi Yehoshua Goldberg; SHOSHANA MALKA GOLDBERG, minor, by her next friend and guardian Karen Goldberg; TZVI YEHOSHUA GOLDBERG, minor, by her next friend and guardian Karen Goldberg; YAAKOV MOSHE GOLDBERG, minor, by her next friend and guardian Karen Goldberg; YITZHAK SHALOM GOLDBERG, minor, by her next friend and guardian Karen Goldberg; NEVENKA GRITZ, individually and as personal representative of the Estate of David Gritz; NORMAN GRITZ, individually and as personal representative of the Estate of David Gritz,

　　　　　　　Plaintiffs,

　　v.

PALESTINE LIBERATION ORGANIZATION; and PALESTINE AUTHORITY, also known as Palestine Interim Self-Government Authority and/or Palestine Council and/or Palestinian National Authority

　　　　　　　Defendants.

**MEMORANDUM DECISION**
**AND OPINION**

04 CV 00397 (GBD)

1

**SPA-1**

**GEORGE B. DANIELS, District Judge:**

In the above-captioned action brought under the Antiterrorism Act of 1991, 18 U.S.C. §

2331 et. seq. ("ATA"), United States citizens and guardians, family members, and personal

representatives of the estates of United States citizens, are suing the Palestine Liberation

Organization ("PLO") and the Palestinian Authority[1] ("PA") for injuries and death allegedly

suffered as a result of a series of seven terrorist attacks occurring over a three year period in or

near Jerusalem from January 8, 2001, to January 29, 2004.  See Complaint ¶¶ 54-125.  Plaintiffs

assert causes of action for international terrorism, pursuant to 18 U.S.C. § 2333,[2] and various

state law claims including wrongful death, pain and suffering, battery, assault, loss of

consortium, negligence, and infliction of emotional distress.  Defendants move to dismiss the

Amended Complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).

Defendants' motion is DENIED.

## PROCEDURAL HISTORY

In response to Plaintiff's motion for a default judgment pursuant to Fed. R. Civ. P. 56,

Defendants moved to dismiss the Amended Complaint for lack of subject matter and personal

jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1) and (2), and to dismiss the pendant state law

causes of action for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6).  See Docket ##

22, 45.  Plaintiffs opposed Defendants' prior motion to dismiss for lack of personal jurisdiction,

and, in the alternative, sought jurisdictional discovery.  See Docket # 50.  This Court denied

---

[1] The Palestinian Authority is also known as "The Palestinian Interim Self-Government Authority," "The Palestinian Council" and "The Palestinian National Authority."

[2] Section 2333 is the civil provision of the ATA, which provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors or heirs may sue therefore . . ." 18 U.S.C. § 2333(a).

2

**SPA-2**

Defendants' motion to dismiss for lack of subject matter jurisdiction with prejudice, and denied their motion to dismiss for lack of personal jurisdiction and failure to state a claim without prejudice to renew after limited jurisdictional discovery. See Sololow v. Palestine Liberation Org., 583 F. Supp. 2d 451 (S.D.N.Y. 2008), available at Docket # 58.

The parties engaged in jurisdictional discovery under the supervision of Magistrate Judge Ronald L. Ellis. See Docket # 61. Defendants prematurely renewed their motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) during jurisdictional discovery, and this Court denied the motion without prejudice to renew after the completion of jurisdictional discovery. See Docket ## 66, 79. After the Magistrate Judge declared discovery complete, Defendants properly filed the instant motion to dismiss. See Docket ## 80, 67.

## STANDARD OF REVIEW

To withstand a 12(b)(2) motion to dismiss, the plaintiff "bears the burden of showing [by a preponderance of the evidence] that the court has jurisdiction over the defendant." In re Magnetic Audiotape Antitrust Lithog., 334 F.3d 204, 206 (2d Cir. 2003); Landoil Resources Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990). The showing necessary to satisfy this burden is more demanding when, as is the case here, the parties have completed jurisdictional discovery.[3] Whereas legally sufficient allegations are alone sufficient to make a prima facie showing where no evidentiary hearing has been held, or when the parties have not engaged in jurisdictional discovery, "[a]fter discovery, the plaintiff's prima facie showing . . . must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant."[4] Ball v. Metallurgie Hoboken — Overpelt S.A., 902

---

[3] It is appropriate to apply the higher burden in the present case regardless of how dissatisfied Plaintiffs may be with Defendants' productions. The appropriate time to seek relief for such grievances has expired now that jurisdictional discovery is complete.

[4] Plaintiffs have not provided an exhaustive list of the facts that they believe confer jurisdiction over the Defendants. However, Plaintiffs have provided all of the materials

3

**SPA-3**

F.2d 194, 197 (2d Cir. 1990); see also Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 163 (2d Cir. 2010). The Court is to accept all averments of jurisdictional facts as true, and construe the pleadings, affidavits, and any doubts in plaintiff's favor. See In re Magnetic Audiotape, 334 F.3d at 206; PDK Labs. Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997); see also Whitaker v. American Telecasting Inc., 261 F.3d 196, 208 (2d Cir. 2001) (quoting A.I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993)).

## GENERAL JURISDICTION

In the context of ATA litigation, a plaintiff makes a prima facie showing of personal jurisdiction if: (1) service of process was properly effected as to the defendant, see Fed. R. Civ. P. 4(k)(1)(C) ("Serving a summons . . . establishes personal jurisdiction over a defendant . . . when authorized by a federal statute"); 18 U.S.C. § 2334(a) (providing for nationwide service of process and venue); and (2) the defendant has sufficient minimum contacts with the United States as a whole to satisfy a traditional due process analysis. See Estates of Ungar v. Palestinian Auth., 153 F. Supp. 2d 76, 87, 95 (D.R.I. 2001); see also In re Terrorist Attacks on September 11, 2001, 392 F. Supp. 2d 539, 556-58 (S.D.N.Y. 2005); Burnett v. Al Baraka Inv. & Dev. Corp., 349 F. Supp. 2d 765, 806-07 (S.D.N.Y. 2005); Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 179 (D.D.C. 2004).

Here, Defendants do not assert that service was defective. Defendants do not even dispute that, during the relevant time period, they maintained sufficient contacts with the United States to satisfy the traditional due process analysis for general jurisdiction. Rather, Defendants contend that their contacts with the United States qualify as jurisdictional exceptions and may

---

submitted in Estates of Ungar v. Palestinian Auth., 325 F. Supp. 2d 15 (D.R.I. 2004), as well as additional materials relevant to post-2002 activities.

4

**SPA-4**

not be relied upon to support the exercise of general jurisdiction over them.  They contend that any remaining contacts are insubstantial.

## A.  SERVICE

Plaintiffs' properly served the PLO and the PLA.  Fed. R. Civ. P. 4(h)(1)(B) provides that a foreign association "must be served[] . . . in a judicial district of the United States . . . by delivering a copy of the summons and of the complaint to an officer, a managing or general agent."  Here, Plaintiffs personally served Hassan Abdel Rahman at his home in Virginia.  See Pls.' Opposition Memo, Ex. B ("Affidavit of Service").  Rahman, based upon the overwhelming competent evidence produced by Plaintiffs,[5] was the Chief Representative of the PLO and the PA in the United States at the time of service.  Rahman was thus a valid agent for service of process on the PLO and the PA.[6]

## B.  DUE PROCESS

To determine whether the exercise of jurisdiction comports with due process, the Court must engage in a two part analysis: "the 'minimum contacts' inquiry and the 'reasonableness' inquiry."  Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 171 (2d Cir. 2010).  The court must first determine whether a defendant has minimum contacts with the forum such that

---

[5] See Pls.' Opp. Mem., Exs. C (business card identifying him as "Chief Representative" to the "Palestine Liberation Organization" and the "Palestine National Authority"), D (letter written by him to Congressman Abercrombie in which he identifies himself as "Chief Representative of the PLO and PNA"), E (letter sent to him by Richard C. Massey of the United States Department of State identifying him as "Chief Representative PLO & PNA), M (10/30/2003 Senate Hearing Transcript identifying Rahman as "chief representative of the PLO and the PA in the United States" at 13 and speaking on behalf of "[w]e, the Palestinian Authority" at 28); see also Declaration of David J. Strachman, Ex. 1  (reproducing evidence of Rahman's dual agency from Unger, 325 F.Supp.2d at 55-59).

[6] This finding is consistent with other federal courts.  See, e.g., Kliman v. Palestine Authority, 547 F.Supp.2d 8, 13-14 (D.D.C. 2008) (considering Haman's successor); Ungar, 325 F. Supp. 2d at 55-59 (considering Haman); Biton, 310 F. Supp. 2d at 179-190 (same).

5

**SPA-5**

maintenance of the action does not offend traditional notions of fair play and substantial justice.

See State Oil Co. of Azerbaijan Republic v. Frontera, 582 F.3d 393, 396 (2d Cir.2009) (citation

omitted). The court must then determine whether it would be reasonable, under the

circumstances of the particular case, to exercise jurisdiction over the defendant. See Metro. Life

Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996).

### 1.   Minimum Contacts[7]

The minimal contacts inquiry necessitates "a distinction . . . between 'specific'

jurisdiction and 'general' jurisdiction." Chloe, 616 F.3d at 165. Whereas specific jurisdiction

applies where a defendant's contacts are related to the litigation, general jurisdiction applies

where they are unrelated, and involves a more stringent minimal contacts test. See Helicopteros

Nacionales de Columbia., S.A. v. Hall, 466 U.S. 408, 414, 415 n.9; see also Metro Life, 84 F.3d

at 568. General jurisdiction requires that each[8] defendant's contacts with the forum are

continuous and systematic. Id. In determining the strength of those contacts, the court is to

examine the totality of the defendant's contacts with the forum over a period of time that is

---

[7] This Court conducts a *de novo* review of the minimal contacts of the PLO and the PA. Upon first considering the issue of personal jurisdiction in the above-captioned action, this Court recognized that "[a] number of federal courts [had already] concluded that both the PA and PLO have sufficient minimum contacts with the United States to justify the exercise of personal jurisdiction under the Due Process Clause." Sololow, 583 F. Supp. 2d at 460 (citations omitted). This Court, nevertheless, held that "[p]ersonal jurisdiction must be determined on a case-by-case basis because it is dependent upon the defendants' contacts with the [United States] at the time the lawsuit was commenced." Id. at 460. This Court thus declined to entertain Plaintiffs' arguments that the principles of collateral estoppel and/or the presumption of continuity preclude or otherwise limit Defendants' litigation of the personal jurisdiction issue.

[8] "Each defendant's contacts with the [United States] must be assessed individually," and "jurisdiction cannot be implied or imputed from one defendant to another." Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n.13 (1984); Langenberg v. Sofair, 2006 U.S. Dist. LEXIS 65276, at *21 (S.D.N.Y. Sept. 11, 2006); see also Rush v. Savchuk, 444 U.S. 320, 331-32 (1980).

**SPA-6**

reasonable under the circumstances, up to and including the date the suit was filed.[9] See Chloe, 616 F.3d at 164; Porina v. Marward Shipping Co., 521 F.3d 122, 128 (2d Cir. 2008) (citation omitted). Additionally, the defendant must be found to have purposely availed himself of the privilege of conducting activities in the forum. See Hanson v. Denckla, 357 U.S. 235, 253 (1958).

### a.   *Traditional Jurisdictional Analysis*

After carefully reviewing the competent evidence produced, this Court finds that Plaintiffs have gone beyond the allegations in the Amended Complaint to demonstrate by a preponderance of the evidence that the PLO and the PA purposely engaged in numerous activities that resulted in both entities having a continuous and systematic presence within the United States. Therefore, this Court agrees with every federal court to have considered the issue that the totality of activities in the United States by the PLO and the PA justifies the exercise of general personal jurisdiction.[10]

---

[9] For the purpose of discovery, the parties agreed that the relevant time period was the six-year period preceding the filing of the complaint, i.e. January 16, 1998, to January 16, 2004. See Pls. Opp. Mem., at 5; Defs. Opening Mem., at 7-8. Such periods have been found to be reasonable by the Second Circuit. See Metro Life, 84 F.3d at 569-70 (collecting cases).

[10] See, e.g., Knox v. PLO, 248 F.R.D. 420, 427 (S.D.N.Y. 2008); Estate of Klieman v. Palestinian Auth., 467 F. Supp. 2d 107, 113 (D.D.C. 2006); Ungar, 325 F. Supp. 2d at 59; Biton v. Palestinian Authority, 310 F. Supp. 2d at 179; Estates of Ungar v. Palestinian Auth., 153 F. Supp. 2d 76, 88 (D.R.I. 2001); Klinghoffer v. S.N.C. Achille Lauro, 795 F. Supp. 112, 114 (S.D.N.Y. 1992); United States v. Palestine Liberation Organization, 695 F. Supp. 1456, 1471 (S.D.N.Y. 1988); cf. Knox, 229 F.R.D. at 67-70; Mohamad v. Rajoub, 2008 U.S. Dist. LEXIS 117400 (S.D.N.Y. Sept. 29, 2008) (finding jurisdictional discovery against the PA and PLO in Washington, D.C. would be unnecessary and cause undue delay and expense as previous courts in Washington, D.C. have reviewed at length the PA and PLO's Washington, D.C. contacts); Estate of Esther Klieman v. Palestinian Auth., 547 F. Supp. 2d 8, 15 (D.D.C. 2008) (Defendants moved to dismiss for lack of personal jurisdiction due to insufficient service of process); Gilmore v. Palestinian Interim Self-Government Auth., 422 F. Supp. 2d 96, 102 n.4 (D.D.C. 2006) ("Defendants did not move to dismiss the PLO and the PA from this action for lack of personal jurisdiction.").

It is undisputed that the PLO maintained an office in Washington, D.C., during the relevant period. See Defs.' Opening Mem., at 8-9; Pls.' Opp. Mem., at 10; see also Strachman Declaration, Ex. 1 Part 5 ("Revised Notice"), Ex. KK (3/10/1998 Registration Statement Pursuant to the Foreign Agents Registration Act of 1938, as amended ("FARA"), by "PLO Washington Office"); id., Exs. 2-12 (FARA Supplemental Statements filed by the PLO from September 1998 to September 2003). It is also undisputed that most of the individuals who worked in the D.C. office were PLO employees. See Defs.' Opening Mem., Ex. 3 (Interrogatories) (listing twelve employees during the relevant period), at 5-6.[11] The evidence suggests that the majority of the twelve employees were present for the entirety of the relevant period. See id., Ex. 3, at 9.

The parties disagree over whether the PA maintained an office in Washington, D.C.; however the weight of the evidence indicates that the D.C. office simultaneously served as an office for the PLO and the PA.[12] The initial registration statement states that "[t]he PLO offices in Washington, D.C. shall represent the PLO and the Palestinian Authority in the United States" and that "[t]he PLO and the Palestinian Authority will pay for the expenses of the office and salaries of its employees." Strachman Declaration, Ex. 1 Part 5, Ex. KK. Rahman, the Chief

---

[11] Defendants did not provide precise dates of employment. Construing all facts in a light favorable to Plaintiffs, the lack of duplication amongst the titles and job descriptions of the PLO employees suggests that the majority of the twelve employees were present for the entirety of the relevant period. See Defs.' Opening Mem., Ex. 3, at 9.

[12] Defendants' argument that only the PLO had the authority to conduct foreign affairs is unpersuasive. The fact that the PA should not have been operating an office in the United States does not mean that it did not or could not have done so. Moreover, even if Defendants' are right, "there is nothing in the Oslo Accords . . . prohibit[ing] the PA from conducting other non-diplomatic activities (such as commercial, public relations, lobbying, or educational activities) through its representatives, officers and agents abroad." Unger, 325 F.Supp.2d at 54. Also the fact that only 2 of the 14 employees at the D.C. office were employed by the PA does not demonstrate that D.C. office was not working on behalf of the PA. See Defs.' Opening Mem., Ex. 3 (Interrogatories), at 6, 10-11.

8

**SPA-8**

Representative of the PLO and the PA, used and was contacted at a single address -- that of the D.C. office. See Pls.' Opp. Mem., Exs. C-E. The PA entered into a substantial commercial contract that repeatedly described the D.C. office as an office of the PA. See id., F (retainer agreement for 1999-2002). Finally, the PA's Ministry of Finance – rather than the PLO Headquarters in Gaza – provided the vast majority of the D.C. office's income. See Strachman Declaration, Exs. 2-12. Accordingly, the activities of the D.C. office are attributable to both the PLO and the PA.[13]

The Defendants, through the D.C. office, had a substantial commercial presence in the United States. The Defendants operated a fully and continuously functional office in Washington, D.C., during the relevant period. Defendants had thirty-five land line telephone and cell phone numbers and two bank accounts from 2002-2004.[14] See Defs.' Opening Mem., Ex. 3, at 20-22. The Defendants had a CD account as late as January 2003. Id., Ex. 3, at 20. Defendants also had ongoing commercial contracts and transactions with numerous U.S.-based businesses, including for office supplies and equipment, postage/shipping, new services/subscriptions, telecommunications /internet, IT support, accountant and legal services, and credit cards. See id., Ex. 4 ("Document Requests"), at 9-10. Defendants even paid for certain living expenses of Rahman. See id., Ex. 4, at 10.

Furthermore, the PA retained a consulting and lobbying firm through a multi-year, multi-million dollar contract. See Pls.' Opp. Mem., Ex. F. That contract resulted in the performance of services from November 1999 to at least April 2004. See id., Ex G. (11/29/1999 FARA

---

[13] Defendants have not offered any evidence or other basis to attribute particular D.C. office activities to a single entity.

[14] The D.C. office does not have telephone or bank records for 1998-2001.

9

**SPA-9**

Registration Statement filed by Firm for services to the PA); id., Ex. H-L (FARA Supplemental

Statements filed by Firm from April 2000 to April 2004) (indicating that services were

continuous and continued after 2002).  In particular, these American agents engaged in

numerous political activities on behalf of the PA such as office and lunch meetings with various

U.S. government officials and departments.[15]  Id., Exs. H-L (listing each of the activities during

every six month period).  These agents also promoted the PA's interests through television and

radio appearances on occasion,[16] and pursuant to the Retainer Agreement, provided the PA with

consulting and public relations services that would not have been disclosed in the required public

filings as such.  Id., Ex. F.  This included the preparation of "weekly memoranda on

developments in Washington which are relevant to the Palestinian Authority" and "[r]egular

contacts . . . between personnel of the Firm and the Washington Office of the Palestinian

Authority."  Id., Ex. F, ¶¶ 3-4.

The Defendants also had a substantial promotional presence in the United States, with the

D.C. office having been permanently dedicated to promoting the interests of the PLO and the

PA.  Based upon required disclosures to federal authorities, the D.C. office engaged in extensive

public relations activities throughout the United States, ranging from interviews and speeches to

attending and participating in various public events.  See Stachman Declaration, Exs. 2-12.

---

[15]   Approximate total are as follows: 36 activities in the six month period ending April 2000.  See Pls.' Opp. Mem., Ex. H Part 1.  46 activities in the six month period ending October 2000.  Id., Ex. H Part 2.  30 activities in the six month period ending April 2001.  Id., Ex. I Part 1.  35 activities in the six month period ending October 2001.  Id., Ex. I Part 2.  29 activities in the six month period ending April 2002.  Id., Ex. J Part 1.  37 activities in the six month period ending October 2002.  Id., Ex. J Part 2.  33 activities in the six month period ending April 2003.  Id., Ex. K Part 1.  50 activities in the six month period ending October 2003.  Id., Ex. K Part 2.  33 activities in the six month period ending April 2004.  Id., Ex. L

[16]  17 activities in the six month period ending October 2000.  See id., Ex. H Part 2.

10

Defendants not only participated in a substantial number of events,[17] but also Defendants expended substantial amounts of money – often exceeding $200K every six months – on these activities.   See id., Exs. 2-12; see also Unger, 325 F.Supp.2d at 4950 (summarizing the millions of dollars spend on media and public relations activities from 1999-2001).  Rahman, the Chief Representative of the PLO and the PA in the United States, participated in at least 158 public interviews and media appearances between January 1998 and January 2004.[18]  See Stachman Declaration ¶ 18 (listing events); id., Ex. 13 (providing transcripts).  Most were broadcasted on major national news networks such as CNN, Fox News Channel, ABC, and MSNBC.

c.      *Jurisdictional Exceptions*

Certain activities fall under jurisdictional exceptions and may not be properly considered as a basis of jurisdiction.  See Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione, 937 F.2d 44, 51 n.7 (2d Cir. 1991) (noting examples).  However, there is not a presumption that a jurisdictional exception applies where a dispute exists over excluding particular contacts.  A plaintiff is not required to disprove the applicability of a jurisdictional exception simply because one is asserted by a defendant.  A defendant bears the burden of demonstrating that it is entitled to the benefits of a jurisdictional exception, triggering a re-assessment of the sufficiency of a

---

[17]  Approximate total are as follows: 14 events in the six month period ending September 1998.  See Strachman Declaration, Ex. 2.  13 events in the six month period ending March 1999.  Id., Ex. 3.  20 events in the six month period ending September 1999.  Id., Ex. 4.  15 events in the six month period ending March 2000.  Id., Ex. 5.  19 events in the six month period ending September 2000.  Id., Ex. 6.  27 events in the six month period ending March 2001.  Id., Ex. 7.  18 events in the six month period ending September 2001.  Id., Ex. 8.  23 events in the six month period ending September 2002.  Id., Ex. 10.  10 events in the six month period ending March 2003.  Id., Ex. 11.  21 events in the six month period ending September 2003.  Id., Ex. 12.

[18]  Many of these events do not appear to have been disclosed in the required filings.

11

**SPA-11**

plaintiff's prima facie case. Unsupported allegations and assertions are simply insufficient after the parties have engaged in jurisdictional discovery.

With respect to foreign entities such as the PLO and the PA engaging in activities in the United States, two exceptions may be applicable. First, jurisdiction in the District of Columbia over a person or entity may not be grounded on the defendant's "contacts with a federal instrumentality," including where contacts only consist of "lobbying activity before federal agencies to secure their own proprietary interests." Bechtel & Cole v. Graceland Broadcasting, 1994 U.S. App. LEXIS 4468, at *3 (D.C. Cir. Mar. 9, 1994) (citing Environmental Research Int'l, Inc. v. Lockwood Greene Engineers, Inc., 355 A.2d 808, 813 (D.C. 1976) (en banc)); id. (citing Naartex Consulting Corp. v. Watt, 232 U.S. App. D.C. 293, 722 F.2d 779, 787 (D.C. Cir. 1983) (citing Rose v. Silver, 394 A.2d 1368, 1373-74 (D.C. 1978))).[19] The "government contacts" exception does not apply where the defendant is engaged in substantial activity beyond lobbying the federal government.

The Second Circuit has also held that participation in the United Nation's affairs by a "foreign organization" may not properly be considered as a basis of jurisdiction in New York. See Klinghoffer, 937 F.2d at 51-52. With respect to the PLO's New York office, the parties have produced little evidence, but no factual dispute appears to exist. The PLO operated and owned an office in New York City during the relevant period, in addition to the residence used by the Permanent Observer Mission of Palestine to the United Nations. See Dfs.' Opening Mem., Ex. 3, at 19-20. The PLO employed twenty employees at the New York office for all or a portion of the relevant period, and the PA employed one. Id., Ex. 3, at 6. The New York office

---

[19] See also Klinghoffer, 937 F.2d at 51 (noting that the government contacts exception covers non-resident's "getting information from or giving information to the government, or getting the government's permission to do something.") (quoting Investment Co. Inst. v. United States, 550 F. Supp. 1213, 1216-17 (D.D.C. 1982)).

12

had a checking account and at least two telephone lines. Id., Ex. 3, at 20, 22. Finally, Nasser Al-Kidwa, the ambassador during the relevant period, participated on behalf of the PLO in at least 73 media appearances and interviews between 2000 and 2003 on a mix of major national news networks and local stations. See Strachman Declaration ¶ 20 (listing events); id., Ex. 14 (transcripts).

Defendants assert that none of the contacts associated with the D.C. and New York offices can be considered for purposes of establishing personal jurisdiction pursuant to the aforementioned exceptions. Defendants do not, however, provide any evidence demonstrating that either office exclusively and solely dealt with the federal government or the UN. Nor have Defendants made an effort to demonstrate that their activities in Washington, D.C., and New York were commensurate with their special diplomatic need for being present in those cities. See, e.g., Fandel v. Arabian American Oil Co., 345 F.2d 87, 89 (D.C. Cir. 1965). With respect to the activities involving the New York office, Defendants are entitled to the Klinghoffer jurisdictional exception. Plaintiffs have failed to identify any contacts that raise a dispute over the exclusivity of the activities conducted from the New York office, and, in any event, the evidence indicates that the activities were primarily related to the PLO's UN affairs.

With respect to the activities involving the D.C. office, Defendants have failed to demonstrate by a preponderance of the evidence that any of the contacts should be excluded by either jurisdictional exception. The Klinghoffer jurisdictional exception is inapplicable because there is no evidence that the D.C.-based activities involved UN affairs,[20] and because the

---

[20] Defendants never assert that they were conducting UN affairs from the D.C. office. In fact, the evidence – namely, the deposition testimony of Said M. Hamad, Deputy Chief in the D.C. office – indicates that they had no involvement with UN activities.

Q: And the office in New York, are you involved with that office at all? Do you

13

**SPA-13**

exception does not provide for a blanket immunization of all contacts in the United States. Defendants have failed to demonstrate by a preponderance of the evidence that their activities from the Washington, D.C. office exclusively involved contacting some branch of the federal government. Outside of New York, Defendants are no different than any other political organization based in Washington, D.C.,[21] and yet the record contains overwhelming evidence that Defendants were primarily in Washington, D.C. pursuing their political interest, but were not solely conducting diplomatic activities with our government.

Nevertheless, even after excluding activities conducted in furtherance of the PLO's observer status and contacts with the federal government, the remaining contacts would still provide a sufficient basis to exercise general jurisdiction over the Defendants. See, e.g., Unger, 325 F. Supp. 2d at 53; see also Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione etc., 795 F. Supp. 112, 114 (S.D.N.Y. 1992). The PLO and the PA were continuously and systematically present in the United States by virtue of their extensive public relations activities. Whether characterized as diplomatic public-speaking or proselytizing, the forums and audiences clearly indicate that the vast majority of these appearances were not directly communicating to or

---

        communicate with them?
A  No.;
Q  Why is that?
A  Because they have their own business at U.N.
Q  And you don't coordinate any activities?
A  Well, there's no activities to coordinate. They have their own business. Their mission is the United States. We have nothing to do with them, they have nothing to do with us, except hello and all.

See Strachman Declaration, Ex. N, at 31.

[21] Palestine, as discussed in this Court's 9/30/2008 Memorandum Decision and Order, "is not recognized, under United States law, as a 'foreign state.'" Sokolow, 583 F. Supp. 2d at 458. "[D]efendants cannot derivatively secure sovereign immunity as agencies and/or instrumentalities of Palestine," and "the PA is [not] . . . entitled to immunity as a political subdivision of Israel." Id.

14

sponsored by the federal government or the United Nations General Assembly. These appearances were separate from Defendants' diplomatic foreign affairs functions in the United States, such as the PLO's right to speak at the United Nations General Assembly meetings, or the PLO or the PA's efforts to petition the United States government. This alone is a sufficient basis to decline to ignore the entire physical presence, commercial transactions, and other activities of the D.C. office. Thus, as found in Unger, "even if the court excludes from its consideration contacts by the Washington Office of the PLO with the federal government [or by the New York office with the UN], the other activities of that office are sufficient to allow this court to find minimum contacts." 325 F. Supp. 2d at 53; see also Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione, 795 F. Supp. 112, 114 (S.D.N.Y. 1992).

### 3.   Reasonableness

The second part of the jurisdictional analysis asks "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice' – that is, whether it is reasonable under the circumstances of the particular case." Metro. Life, 84 F.3d at 568 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)). Where a plaintiff makes the threshold showing of the minimum contacts required to meet the first test, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Id. (quoting Burger King, 471 U.S. at 477). Courts are to consider five factors in evaluating reasonableness: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." Id.

15

**SPA-15**

at 568 (citing <u>Asahi Metal Indus. Co. v. Superior Court</u>, 480 U.S. 102, 113-14 (1987); <u>Burger King</u>, 471 U.S. at 476-47)).

Here, neither the PLO nor the PA has presented a compelling case that exercising jurisdiction over them in the present action will offend the Constitution or federal law. The reality is that ATA litigation often involves foreign individuals and entities, and thereby, a statutory cause of action for international terrorism exists. There is a strong inherent interest of the United States and Plaintiffs in litigating ATA claims in the United States. The Defendants have not demonstrated that this case would impose a more significant burden than can typically be expected, particularly in light of the fact that they have vigorously engaged in such litigation several times before. The Defendants have also failed to identify an alternative forum where Plaintiffs' claims could be brought, and where the foreign court could grant a substantially similar remedy.

## CONCLUSION

Defendants' motion to dismiss for lack of personal jurisdiction is DENIED.


Dated: New York, New York
       March 30, 2011


                                  SO ORDERED:

                                  _George B. Daniels_
                                  GEORGE B. DANIELS
                                  United States District Judge


16

**SPA-16**

E4bgsokc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MARK I. SOKOLOW, et al.,

                    Plaintiffs,

          v.                              04 CV 00397(GBD)

PALESTINIAN LIBERATION
ORGANIZATION, et al.,

                    Defendants.

------------------------------x

                                          New York, N.Y.
                                          April 11, 2014
                                          2:00 p.m.

Before:

                    HON. GEORGE B. DANIELS,

                                          District Judge

                         APPEARANCES

ARNOLD & PORTER, LLP
     Attorneys for Plaintiffs
KENT YALOWITZ
KEN HASHIMOTO
PHILIP HORTON
TAL MACHNES

MILLER & CHEVALIER CHARTERED
     Attorneys for Defendants
LAURA FERGUSON
BRIAN HILL
MARK ROCHON

E4bgsokc

cases, and terrorism cases include the 9/11 cases here.  The Courts vigorously applied the same due process test, and, in fact, dismissed 60-something defendants for lack of personal jurisdiction, even though it was a terrorism case.

The parade of horribles about how criminal terrorists can't be prosecuted here is completely irrelevant.  Criminal jurisdiction is different from civil jurisdiction.  So, there's no basis for distinguishing *Daimler*.

Plaintiffs knew they could not meet the *Daimler* test. That's why they have spent all of their energy trying to argue about their wacky specific jurisdiction theory that speech in the U.S. condemning terrorism somehow caused the violence here.

Respectfully, your Honor, *Daimler* redefines the scope of general personal jurisdiction.  It says only in an exceptional case should the Court exercise jurisdiction over a foreign organization that doesn't make its home here.  There is no such exceptional case here.

The PLO has offices in every country and is predominately based in the West Bank.  This is not the sort of case that the United States should be taking jurisdiction over. It has no U.S. connection, other than the nationality of the U.S. plaintiffs, and that's simply not enough for the exercise of jurisdiction.

Thank you.

THE COURT:  At this point, I'm going to deny the

E4bgsokc

motion to reconsider.

At this point I don't think there has been such a significant change in the law that now makes this case not an appropriate case for litigation here on this record.

I think the activities are continuous and systematic. I think that the arguments with regard to jurisdiction, the defendants want to argue that the law has significantly changed, but a motion based on jurisdiction was an argument to be made much earlier in this case and that argument was not made with regard to the lack of due process, even though there was case law from which one could have made such an argument.

I think at this point on the record that I have before me, whether or not I'm applying the proportionality test or a qualitative test, I don't see that I have a basis to conclude that somehow that the PLO's activity outside of the West Bank, and the nature of their activities here in the United States, would not qualify as a continuous and systematic activity and contact to make it at home in the United States.

Quite frankly, I don't have, on this record, any basis to believe that they're engaged in any significant activity of the kind that they're continuously and systematically involved in in the United States than any other country. I don't have such a record that wasn't the issue, but because that wasn't the issue, it's not a basis for a motion to reconsider. I don't have those facts now. The motion to reconsider was made

E4bgsokc

without those facts.  So, I don't think that that is a basis.

I think there is no reason at this point, given the litigation that the PLO has continuously been involved in in the United States, they're involved without assertions of lack of jurisdiction and involved in even beyond any assertion of a lack of jurisdiction, that somehow I have a record before me to be the first Court to say that there's no basis to sue the PLO in the United States on the basis of their continuous and systematic contact that its at home in this jurisdiction.

If some factual analysis is done in a case or cases that have such a record to produce such a result, then I'm willing to consider that if that is compelling or binding case law, but I don't have such a record.  Quite frankly, the activity that is at issue here seems to be significant, and significantly different, even than the activity in the West Bank.

Given its continuous and ongoing activity here and no indication that worldwide it has greater activity than its home base, someplace else other than the West Bank, I have no basis on this record to reconsider this and make a factual determination that the contacts are so not continuous and significant and systematic enough to make it at home in this this country to be expected to be sued based on its continuous and significant contact and activity in this country.

I don't think there's anything nor has it ever been

E4bgsokc

demonstrated, and if it's to be argued someplace else and convincingly, then I'd like to see it, but I have no basis to conclude that a successful argument lies that it's somehow violative of their due process rights for them to be expected to be sued in the United States based on what is, obviously, its greatest level of PR and political activity as the record is before me at this point in the United States other than anyplace else, so I'm going to deny the motion.

We're going to move forward. If the law significantly changes, then we will address that. But I don't think *Daimler* stands for the proposition that I should do anything other than make an independent factual evaluation of the significance of the contact in its continuous and systematic nature to make a determination of whether or not it makes the PLO at home in the United States.

To the extent that it can be sued in the United States rather than simply only be sued in the West Bank, where really the only argument that's being made is that it's an alternative forum that would have jurisdiction over the PLO or the Palestinian Authority, I think it raises other issues which I think are not ripe for determination now. It may not be ripe for determination during this litigation. It's a little awkward to argue that the only place that they can be sued is the place where they govern, even though they have what's expected to be ongoing, continuous, significant activity in the

E4bgsokc

United States, that activity is insufficient contact to make them at home in any place other than the West Bank.

I'm not aware of any greater level of activity over a longer time period and the type of activity that's continuously engaged in in the United States, on this record or on any record.  I'm not aware of any jurisdiction in which that level of activity is more continuous, more systematic, and is more significant on an ongoing basis than in the United States.

I think unless the test is that they can only be sued in their home base, and I won't even use the term "their principal place of business" because I don't think that's an appropriate term to use – this is not the corporation doing business.

I don't think that the result of it, somehow that that's the only place, given what one of the defendant would characterize as an insignificant rather than a significant level of activity than the United States, insignificant to the extent that it does not make them at home in the United States, I don't think that argument compels saying they cannot be sued here, that they should not expect to be sued here, and that their activity is insufficient for them to be sued here.

I'm not particularly compelled by some of the plaintiffs' other arguments, but I think some of them might still apply, even if that were the case.

But at this point, given the limited evaluation that

E4bgsokc

I'm supposed to give to a motion to reconsider, I don't believe that *Daimler* or *Goodyear* themselves make such a pronouncement that it compels a different decision based on a significant change in the law in order to make a different determination that somehow the contacts and activity of the PLO do not meet the test as it has been articulated.

I'm going to deny the motion, and we're going to move forward on the schedule that we have already agreed to.

Let me give the court reporter a break and then I want to address some basic issues. We're not going to address all of the issues that the parties have raised, but there are a couple of issues that should be addressed today so we can move forward efficiently in this case.

Thank you.

(Recess)

THE COURT: I want to stay about 20 minutes to talk about some issues. You have a whole list of issues you're liable to address. I want to address a couple of issues in general to give you some guidance.

Let me first use the document that's at issue, the original document at issue, with regard to confidentiality. My position is this, and you can explain to me why it should be a different position.

My position is that there's a confidentiality agreement and protective order in this case. The

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x

MARK I. SOKOLOW et al.,
                              Plaintiffs,

                -against-

PALESTINE LIBERATION ORGANIZATION, et al.,

                            Defendants.

------------------------------------- x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED: JUN 16 2014
```

ORDER
04 Civ. 397 (GBD)(RLE)

GEORGE B. DANIELS, United States District Judge:

For the reasons articulated at the April 11, 2014 oral argument, Defendants' motion for reconsideration of this Court's Opinion and Order of March 30, 2011 denying Defendants' motion to dismiss for lack of personal jurisdiction is DENIED.

The clerk of the court is directed to close the motion at ECF No. 421.

Dated: June 16, 2014
      New York, New York

SO ORDERED:

*George B. Daniel*

GEORGE B. DANIELS
United States District Judge

**SPA-24**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARK I. SOKOLOW, et al.,                         :

                        Plaintiffs,        :

              -against-                      :

THE PALESTINE LIBERATION                         :
ORGANIZATION, THE PALESTINIAN                     :
AUTHORITY, et al.,                               :

                       Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: NOV 19 2014

ORDER
04 Civ. 397 (GBD)

GEORGE B. DANIELS, United States District Judge:

      Plaintiffs brought this case pursuant to the Antiterrorism Act of 1992, 18 U.S.C. § 2331,

*et. seq.* ("ATA"), as well as several non-federal causes of action.   Defendants, the Palestine

Liberation Organization ("PLO") and the Palestinian Authority ("PA"), move for summary

judgment in their favor to dismiss all of the counts in the First Amended Complaint.   (Def.

Mem., ECF No. 497.)   Plaintiffs are United States citizens and the guardians, family members,

and personal representatives of the estates of United States citizens who were killed or injured

during terrorist attacks that occurred between January 8, 2001 and January 29, 2004 in or near

Jerusalem.

      Defendants' motion for summary judgment is DENIED with respect to the ATA claims

of vicarious liability against the PA, except it is GRANTED as to the Mandelkorn Plaintiffs'

ATA claim of vicarious liability.

      Defendants' motion for summary judgment is GRANTED with respect to the ATA

claims of vicarious liability against the PLO.

      Defendants' motion for summary judgment is DENIED with respect to the ATA claims

1

Case 15-3135, Document 87, 11/10/2015, 1639434, Page105 of 147

of direct liability.

Defendants' motion for summary judgment is GRANTED with respect to all of Plaintiffs' non-federal claims.[1]

**ALLEGATIONS**

Plaintiffs allege that the "PLO has funded, planned and carried out thousands of terrorist bombings and shootings, resulting in the deaths of hundreds of innocent civilians and the wounding of thousands more," and the "PA has planned and carried out hundreds of terrorist bombings and shootings, resulting in the deaths of hundreds of civilians and the wounding of thousands more." (Am. Compl., ECF No. 4, ¶¶ 49-50.)

Plaintiffs further allege that Defendants "planned and carried out terrorist attacks against civilians through their officials, agents and employees." (*Id.* ¶ 51.) Among these attacks are the seven bombings and shootings at issue.[2] Plaintiffs allege that these attacks were planned and carried out by individuals "acting as agents and employees of the PLO and PA and within the scope of their agency and employment, pursuant to the prior authorization, instructions, solicitation and directives of defendants PLO and PA, in furtherance of the goals and policies of defendants PLO and PA, and using funds, weapons, means of transportation and communication and other material support and resources supplied by defendants PLO and PA for the express purpose of carrying out [these] attack[s] and terrorist attacks of this type." (*Id.* ¶¶ 60, 76, 85, 99, 107, 115, 116, 125.) Plaintiffs allege that "[t]he actions of defendants violate, or if committed

---

[1] Plaintiffs also move for summary judgment on Defendants' affirmative defense that they lack the capacity to be sued on the non-federal claims. (Pl. Mot., ECF No. 489.) That motion is denied.

[2] Specifically, a shooting on January 8, 2001 (Am. Compl. ¶¶ 54-60); a shooting on January 22, 2002 (*id.* ¶¶ 61-76); a bombing on January 27, 2002 (*id.* ¶¶ 77-85); a bombing on March 21, 2002 (*id.* ¶¶ 86-99); a bombing on June 19, 2002 (*id.* ¶¶ 100-07); a bombing on July 31, 2002 (*id.* ¶¶ 108-17); and a bombing on January 29, 2004 (*id.* ¶¶ 118-25).

2

within U.S. jurisdiction would violate literally scores of federal and state criminal statutes." (*Id.* ¶ 127.)

In addition to the ATA claims, Plaintiffs bring non-federal law claims, including: wrongful death (count two); battery (count four); assault (count five); loss of consortium and solatium (count six); negligence (count seven); intentional infliction of emotional distress (count eight); and negligent infliction of emotional distress (count nine).

## FACTUAL BACKGROUND[3]

The PLO was founded in 1964 by the Arab League and was recognized as the representative of the Palestinian people by Israel as part of the Oslo Accords in 1993. (Def. 56.1, ECF No. 498, Ex. A, ¶ 1.)[4] The PA was established by the PLO after the Oslo Accords to serve as the governing authority in the West Bank and Gaza Strip. (*Id.* ¶ 2.) Neither the PLO nor the PA is an individual, corporation or partnership. (*Id.* ¶¶ 17-22.) Defendants state that "[i]n 2002, the PA had over 100,000 employees." (*Id.* ¶ 40.)

Seven separate attacks occurred in or near Jerusalem between 2001 and 2004. The parties dispute almost all of the facts concerning who was responsible for these attacks. Defendants argue that Plaintiffs cannot meet their burden to show which individuals were responsible for the attacks, that they were employees or agents of Defendants, that they acted within the scope of any employment by Defendants, or that they received any material support from Defendants causally related to the attacks. The information hereafter is from Plaintiffs' recitation of the facts, which

---

[3] Defendants argue that in the absence of any admissible evidence supporting Plaintiffs' claims, no reasonable jury could find Defendants liable. This opinion assumes the admissibility of Plaintiffs' evidence. If certain evidence is deemed inadmissible prior to or during trial, and is necessary for Plaintiffs to prove their claims by a preponderance of the evidence, Defendants may be entitled to a directed verdict.

[4] All citations accompanying the disputed facts are to the parties' statements of fact pursuant to Federal

3

Case 15-3135, Document 87, 11/10/2015, 1639434, Page107 of 147

they note are largely in dispute.[5]

The attacks at issue involve two shootings and five bombings. Plaintiffs contend that at least one PA "security" employee was involved in each of these attacks, and that Defendants provided material support to the attackers or to the terrorist groups backing the attacks, Hamas and the al-Aqsa Martyrs Brigades ("AAMB").

Plaintiffs claim that following these attacks, Defendants demonstrated support for those involved by, *inter alia*, keeping them on their payroll and promoting them after their convictions, declaring suicide terrorists "al-Aqsa Martrys," providing their families with cash payments, and glorifying the attackers through PA-owned and controlled media outlets. (Pl. 56.1, ECF No. 546, ¶ 13.)

## MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when "it 'might affect the outcome of the suit under the governing law.'" *Id.*

The moving party has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In turn, to

---

Rule of Civil Procedure 56.1. (Def. 56.1 (ECF No. 498, Ex. A); Pl. 56.1 (ECF No. 546).)

[5] The facts that Plaintiffs intend to prove at trial relevant to these attacks are discussed in greater detail in Section I.A.

4

defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it "'must do more than simply show that there is some metaphysical doubt as to the material facts,'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (citations and quotations omitted). Rather, the non-moving party must produce admissible evidence that supports its pleadings. *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968). In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor. *See Niagara Mohawk*, 315 F.3d at 175. Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Summary judgment is therefore inappropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286 (citation omitted).

While courts do assess the admissibility of evidence to determine if a party is entitled to summary judgment, *see Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009), at this stage, this Court limits its analysis to whether the probative force of Plaintiffs' proffered proof is such that there is a genuine need for trial.[6]

---

[6] Defendants object to the admission of all of Plaintiffs' liability experts and virtually all of Plaintiffs'

5

**SPA-29**

I.  **THE ANTI-TERRORISM ACT**

The Anti-Terrorism Act, 18 U.S.C. § 2333(a), provides:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.[7]

To prevail under the ATA, Plaintiffs must prove "three formal elements: unlawful *action*, the requisite *mental state*, and *causation.*"  *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 553 (E.D.N.Y. 2012) (emphasis in original) (citation and quotation omitted).

To establish an "unlawful action," Plaintiffs must show that their injuries resulted from an act of "international terrorism."  The statute defines "international terrorism" as activities that, among other things, "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State."  18 U.S.C. § 2331(1)(A).

Plaintiffs advance two theories to support their claim that Defendants committed predicate acts and should therefore be found liable by a jury under the ATA.  First, Plaintiffs contend that Defendants could be found vicariously liable under a theory of respondeat superior for the criminal activities of their employees during the scope of their employment.  Second, Plaintiffs contend that Defendants could be found liable for their direct violations of the anti-terrorism laws by providing material support and resources to the terrorist groups behind the

---

trial exhibits, and have refused to stipulate to the authenticity of 177 exhibits produced from Defendants' records.

[7] To be eligible for civil relief under the ATA, a plaintiff must be either a U.S. national or an estate, a survivor, or an heir of a U.S. national.  A U.S. national is "a citizen of the United States" or "a person who, though not a citizen of the United States, owes permanent allegiance to the United States."  8

6

attacks.

The predicate crimes that Plaintiffs assert Defendants are responsible for under their respondeat superior theory include: murder and attempted murder (18 U.S.C. §§ 1111, 2332), use of a destructive device on a mass transportation vehicle (18 U.S.C. § 1992), detonating an explosive device on a public transportation system (18 U.S.C. § 2332f), and conspiracy to commit those acts (18 U.S.C. § 371). Although criminal convictions under these statutes require proof beyond a reasonable doubt, where the statutes are the basis for civil liability under the ATA, Plaintiffs need only demonstrate proof by a preponderance of the evidence. *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 491 (1985) (collecting cases).

In addition, Plaintiffs claim that Defendants are responsible for directly violating the ATA by providing support to Fatah's AAMB, Hamas, and individual terrorists in order for them to commit terrorist acts. Specifically, Plaintiffs argue that Defendants provided known terrorists or terrorist organizations with personnel, weapons, funds, and protection in violation of 18 U.S.C. §§ 2339A, 2339B, 2339C, and 2339. (Pl. Opp'n Mem., ECF No. 545, at 22-27.)

To establish the requisite mental state, Plaintiffs must show that Defendants committed a terrorist act intentionally, knowingly or recklessly, that injured Americans.

To establish causation, Plaintiffs must show that their injuries were proximately caused by Defendants' predicate criminal acts. *See Rothstein v. UBS AG*, 708 F.3d 82, 95-97 (2d Cir. 2013). The ATA specifically requires that the harm to Plaintiffs occur *by reason of* an act of international terrorism, which has been interpreted to "require something more than 'but for' causation." *See Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 36 F. Supp. 2d 560, 569 (E.D.N.Y. 1999) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268

---

U.S.C. § 1101(a)(22); *see also Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 43 (D.D.C. 2010).

SPA-31

(1992)).  "[C]ourts have always utilized the concept of foreseeability as a touchstone for proximate cause analysis." *Blue Cross*, 36 F. Supp. 2d at 580 (citation omitted).  This Court "rejects the contention that *any* reckless contribution to a terrorist group or its affiliate, no matter how attenuated, will result in civil liability, without the demonstration of a proximate causal relationship to the plaintiff's injury." *Gill v. Arab Bank, PLC*, 891 F. Supp. 2d 335, 382 (E.D.N.Y. 2012) (citations omitted), *amended and superseded on other grounds by Gill*, 893 F. Supp. 2d at 744.  Thus, Plaintiffs must demonstrate by a preponderance of the evidence that it was reasonably foreseeable that Defendants' actions would cause the resulting injuries.  The more attenuated the cause and effect, and the more inferential leaps the jury would have to make to find that Defendants' actions resulted in Plaintiffs' injuries, the less likely it is that Plaintiffs can meet their burden with respect to causation.  *See In re Terrorist Attacks on September 11, 2011*, 714 F.3d 118, 124 (2d Cir. 2013) (holding that allegations that defendants "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda" were insufficient to allege causation and survive a Rule 12(b)(6) motion to dismiss).

The ultimate question as to Plaintiffs' ATA claim is whether a reasonable jury could find that Defendants, acting with the requisite scienter, committed predicate crimes which proximately caused injuries to American citizens, either vicariously through the acts of their employees or directly through their own actions.[8]

---

[8] Defendants argue that recovery under the ATA is limited to (1) U.S. nationals physically, rather than emotionally, injured by acts of international terrorism; or (2) heirs or survivors of U.S. nationals killed by acts of international terrorism.  Courts that have considered this issue universally allow ATA claims based on the emotional distress that U.S. nationals experience as a result of the death or injury of their family members. *See, e.g., Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 426 (E.D.N.Y. 2009) ("The history and structure of the statute suggest that Congress intended to include non-physical injuries in the phrase 'injured in [their] person.'"); *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172,

8

## A. <u>Vicarious Liability</u>

The ATA was "intended to incorporate general principles of tort law," of which respondeat superior is unquestionably one. *See Wultz*, 755 F. Supp. 2d at 55; *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 148 (D.C. Cir. 2011) (Brown, J., concurring) ("Respondeat Superior liability is an elementary principle of tort law and must therefore inform our interpretation of the federal torts created in the [ATA]. Thus, the [PA] is liable for the acts of its employees committed within the scope of their employment.") (citation omitted); *see also Gill*, 893 F. Supp. 2d at 558 (finding that plaintiff was correct in contending that the ATA provides for liability on a theory of respondeat superior); *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 649-50 (S.D. Tex. 2011).[9]

To prevail under a theory of respondeat superior, Plaintiffs must establish sufficient evidence of causation and scienter as to the individuals who carried out the seven attacks. The attacks at issue were the foreseeable cause in fact of Plaintiffs' injuries. Moreover, there is no genuine dispute as to whether these individuals executed these bombings and shootings with the intent to cause serious harm.

Defendants argue that the standard articulated in *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), applies here, requiring that Plaintiffs prove by a

---

181-82 (D.D.C. 2004) ("The statute does not specifically require that a plaintiff suffer *physical* harm prior to filing suit.") (emphasis in original). Moreover, Plaintiffs do not need to be present during the attack to collect for their non-physical injuries under the ATA. *See id.*

[9] Defendants suggest that respondeat superior is unavailable where a statute—like the ATA—allows for treble damages. This Court agrees with Judge Janice Rogers Brown's concurring opinion in *Estate of Parsons*, in which she explained that the ATA's allowance for treble damages has no bearing on a plaintiff's ability to pursue his respondeat superior theory. *See* 651 F.3d at 148. Treble damages in this context are statutory or liquidated—rather than punitive—damages. *See id.* Therefore, any heightened requirements for showing that punitive damages are available as articulated in *Kolstad v. ADA*, 527 U.S. 526, 542-43 (1999), are not applicable under the ATA.

9

preponderance of the evidence that the conduct of the individuals responsible for the attacks was pursuant to Defendants' official policy or custom. That standard was carved out as a specific exception to respondeat superior liability in the limited context of a Section 1983 action against a United States municipality. This is neither a Section 1983 case, nor are the PA or PLO United States municipalities.[10] Therefore, the illegal acts "of an individual PA employee acting within the scope of his employment suffice[] to make the PA itself liable" under the ATA. *Parson*, 651 F.3d at 150 (Brown, J., concurring).

Defendants next argue that Plaintiffs have no admissible evidence that any PA employees acted within the scope of their employment. Plaintiffs dispute this assertion and claim that the evidence is sufficient under the relevant common law standard. Respondeat superior applies where the employee's tortious "conduct was not so 'unforeseeable' as to make it unfair to charge the [defendant] with responsibility." *Ira S. Bushey & Sons, Inc. v. United States*, 398 F.2d 167, 171 (2d Cir. 1968). Moreover, a defendant may be found liable even where his employee's conduct is intentional or at odds with his employer's stated policy. *See Kwon v. Yun*, 606 F. Supp. 2d 344, 363 (S.D.N.Y. 2009) (citing factors courts consider "[i]n determining whether a tortious act was committed within the scope of employment"); *see also Riviello v. Waldron*, 47 N.Y.2d 297, 304 (1979) ("[W]here the element of general foreseeability exists, even intentional tort situations have been found to fall within the scope of employment.") (citation omitted). Courts have held that "[b]ecause the determination of whether a particular act [is] within the

---

[10] Defendants cite, and this Court is aware of, only one case in which a court has extended the *Monell* rule to apply outside of the context of a Section 1983 action involving a municipality. *Tracy v. Islamic Republic of Iran*, No. 01-2517 (TFH), 2003 U.S. Dist. LEXIS 15844, at *23-24 (D.D.C. Aug. 21, 2003) (citing *Monell*, 436 U.S. at 694-95). The court in *Tracy* was faced with a claim against a foreign state under the Foreign Sovereign Immunity Act, and did not explain why the *Monell* exception should extend beyond the limited context for which it was designed.

10

scope of the servant's employment is so heavily dependent on factual considerations, the question is ordinarily one for the jury." *Bruce v. Port Auth. of N.Y. and N.J.*, 531 F. Supp. 2d 472, 476 (E.D.N.Y. 2008) (quoting *Riviello*, 47 N.Y.2d at 303).

This Court identifies below certain alleged and disputed facts that Plaintiffs intend to present to the jury. If this evidence is deemed admissible, all of the Plaintiffs, except the Mandelkorn Plaintiffs, have demonstrated that a reasonable jury could find the PA vicariously liable under Plaintiffs' ATA claims.

### i.      *The Guetta Plaintiffs (January 8, 2001 Attack)*

On January 8, 2001, Varda Guetta and her son, Oz Guetta, were attacked by four gunman (Pl. 56.1 ¶ 1); in February 2013, Varda Guetta identified one of the shooters from a photo array as Fawzi Murar, a Lieutenant in the PA's Force 17 (the commando unit responsible for protecting Yasser Arafat) (Pl. 56.1 ¶¶ 99, 103, 108, 110); perpetrators of other attacks between October 2000 and February 2002 confirmed that Murar was involved in attacks similar to the January 8 shooting (*id.* ¶ 105); following Murar's death in March 2002, the PA's and PLO's Institute for the Care of the Families of Martyrs and the Wounded granted Murar the post-death status of "martyr" and made payments to his family (*id.* ¶ 107).[11]

### ii.     *The Gould and Waldman Plaintiffs (January 22, 2002 Attack)*

On January 22, 2002, Shayna Gould and Shmuel Waldman were injured during a shooting carried out by Sa'id Ramadan, a PA maritime police officer, who conspired with five

---

[11] Plaintiffs seem to argue that Defendants' post-attack "ratification" of their employees' actions is itself a violation of the ATA. (Pl. Opp'n Mem. at 22.) A showing of support—even post-attack financial support to the families of terrorists—is not sufficient to demonstrate that Defendants were somehow responsible for the attacks. However, this information may be presented to a jury—assuming it is otherwise admissible—as relevant circumstantial evidence in further support of Plaintiffs' argument that the PA employees were acting within the scope of their employment.

11

other PA employees to carry out the attack (*id.* ¶¶ 119-20); several of those involved confessed or were convicted for their roles in the attack (*id.* ¶¶ 133-37); following the attack, the PA continued to pay and promote certain of these individuals (*id.* ¶¶ 145, 157); official PA documents describe two of the employees involved in the attack as having been "detained in the prisons of the Israeli occupation as a result of [their] fight for [their] country" (*id.* ¶ 146); and the shooter was martyred in part because he was "performing his national duty" (*id.* ¶ 152).

### iii. *The Sokolow Plaintiffs (January 27, 2002 Attack)*

On January 27, 2002, Mark, Rena, Jamie, and Lauren Sokolow were injured by a suicide bomber, Wafa Idris, who conspired with a Lieutenant in the PA's Military Intelligence Unit, "Abu Talal" (*id.* ¶¶ 161, 164-67); Talal coordinated with another individual, Munzar Noor, to have Wafa Idris perform the suicide bombing (*id.* ¶¶ 162, 167); numerous senior PA General Intelligence Service ("GIS") employees were aware that Idris was the suicide bomber before the medics or press identified her (*id.* ¶ 169); Idris was subsequently given martyr status and her family was given monthly payments (*id.* ¶ 172); Noor's family received monthly payments while he was serving his prison sentence in Israeli prison for his conviction (*id.* ¶ 175); Talal was promoted to the rank of major after the attack in 2008 (*id.* ¶ 165).

### iv. *The Bauer Plaintiffs (March 21, 2002 Attack)*

On March 21, 2002, Alan and Yehonathon Bauer were injured by a suicide bomber, Mohammed Hashaika, a PA police officer, although there is a question as to whether he was employed at the time of the attack (*id.* ¶¶ 180-82); on February 10, 2002, Hashaika was arrested by the PA because he wanted to perpetrate a suicide operation, but was released prior to the bombing (*id.* ¶¶ 183-85); the attack was planned by a lieutenant in the PA's GIS, Abdel Karim Aweis (*id.* ¶ 187); the day before the attack, Aweis communicated his intentions to Marwan

12

Case 15-3135, Document 87, 11/10/2015, 1639434, Page116 of 147

Barghouti, who gave him money for the attack (*id.* ¶¶ 194-95); Aweis admitted to his role in open court (*id.* ¶ 197); Hashaika was recognized as a martyr and his family was given money (*id.* ¶¶ 199, 202); Aweis remained on the PA payroll and has been promoted four times since his conviction (*id.* ¶ 204).

### v.        *The Mandelkorn Plaintiffs (June 19, 2002 Attack)*

On June 19, 2002, Shaul Mandelkorn was injured by a suicide bomber, Sa'id Awada, who was not an employee of the PA or PLO. (*Id.* ¶ 215.) The Mandelkorn Plaintiffs' only evidence linking the PA to the relevant attack is that Naef Abu Sharkh, an officer of the GIS and PA's Director of Civil Personnel in the West Bank, was deemed to be "behind" the attack by an Israeli Ministry of Foreign Affairs report without any explanation as to the circumstances of his individual involvement. (*Id.* ¶ 225.) With this information alone, a reasonable jury would not have a sufficient basis to conclude that Sharkh was acting within the scope of his employment when Awada executed the bombing. Therefore, the Mandelkorn Plaintiffs cannot proceed under a theory of respondeat superior.

### vi.       *The Coulter, Carter, Blutstein, and Gritz Plaintiffs (July 31, 2002 Attack)*

On July 31, 2002, Hamas operatives detonated a bomb at Hebrew University which killed nine people, including Benjamin Blutstein, Diane Carter, Janis Coulter, and David Gritz (*id.* ¶ 63); Abdullah Barghouti, the individual responsible for the Hebrew University bombing, was a member of the Az A-Din Al Qassam Brigades of Hamas (*id.* ¶ 229); following a separate bombing that preceded the Hebrew University bombing, the head of the PA Preventative Security Force in the West Bank arrested Abdullah Barghouti (*id.* ¶ 237); PA authorities seized from Abdullah Barghouti's laboratory prepared devices but did not seize other bomb-making materials found in his possession (*id.* ¶ 240); during his detention, a PA Preventative Security Officer gave

13

Abdullah Barghouti a mobile phone (*id.* ¶ 245); after less than three weeks in custody, Abdullah Barghouti was released to the custody of *Marwan* Barghouti who, along with PA employee *Ahmed* Barghouti, provided Abdullah Barghouti with a safe house, materials for bomb making, and weapons (*id.* ¶¶ 248-49); *Ahmed* Barghouti was convicted of sheltering and aiding Abdullah Barghouti by providing him with a safe house and weapons (*id.* ¶ 251); *Marwan* Barghouti also provided Abdullah Barghouti with financial assistance (*id.* ¶ 252); Abdullah Barghouti admitted he was responsible for creating the bomb that was detonated in the cafeteria at Hebrew University after his March 5, 2003 arrest in Israel (*id.* ¶¶ 268-84); Defendants, through the Ministry of Detainees' Affairs, began making monthly payments to Abdullah Barghouti's family, as well as the families of others who were convicted for their part in the attack (*id.* ¶¶ 290, 294).

### vii.      *The Goldberg Plaintiffs (January 29, 2004 Attack)*

On January 29, 2004, Stuart Goldberg was killed by a suicide bomber (*id.* ¶ 299); those responsible for the bombing included four members of the PA police and security forces (*id.* ¶ 300); one of the men, Abdul Rahman Maqdad, was previously convicted for terrorist activity, after which the PA continued to employ him in its police forces (*id.* ¶¶ 304-05); Maqdad prepared the suicide bomb used in the January 29, 2004 bombing, which he admitted in open court (*id.* ¶¶ 306-08); GIS documents state that Maqdad admitted to "planning, preparing and executing acts of martyrdom" in connection with the bombing (*id.* ¶ 309); Ahmed Salah and Hilmi Hamash, who assisted in making the bomb and executing the attack, were convicted for their roles in the attack and Salah admitted to his role in open court (*id.* ¶¶ 311-19); the PA continued to pay the salaries of Salah, Hamash, and Maqdad after their arrests, and they were promoted through the ranks while in jail (*id.* ¶¶ 320-21, 333, 337-40); the suicide bomber, Ali Ja'ara, was a PA police officer at the time; however, he was to be fired in January 2004 due to

14

Case 15-3135, Document 87, 11/10/2015, 1639434, Page118 of 147

"lack of commitment towards work" (*id.* ¶ 325); Ja'ara was recognized as an "al-Aqsa Martyr," and his family received monthly payments (*id.* ¶¶ 326-28).

*    *    *

Based on the above disputed facts offered by Plaintiffs to support their claims for vicarious liability under the ATA, a reasonable jury could find the PA liable as to all Plaintiffs, except the Mandelkorn Plaintiffs because there is insufficient evidence that a PA employee was involved in the June 19, 2002 attack or acted within the scope of his employment.

Plaintiffs' claims are based on actions by PA employees acting within the scope of their employment for the PA, not the PLO. Plaintiffs have not provided any factual basis for a reasonable jury to find the PLO liable for violating the ATA under a theory of vicarious liability as an employer.[12] Therefore, all Plaintiffs but the Mandelkorn Plaintiffs are able to proceed on their theory of vicarious liability against the PA.

## B. **Direct Liability**

Plaintiffs also claim that Defendants directly violated federal and state antiterrorism laws, including 18 U.S.C. §§ 2339, 2339A, 2339B, and 2339C, by providing support to Fatah's AAMB, Hamas, and individual terrorists. (Pl. Opp'n Mem. at 22-26.)

Plaintiffs argue that Defendants violated 18 U.S.C. § 2339A by "provid[ing] material support or resources . . . knowing or intending that they are to be used in preparation for, or in

---

[12] The only possible support for implicating the PLO under this theory is that Plaintiffs refer to Marwan Barghouti in at least one section of their memorandum in opposition to Defendants' motion as a "Senior PLO leader." (Pl. Opp'n Mem. at 25.) However, in their Rule 56.1 statement, Barghouti is identified as a member of the AAMB and the Fatah Secretary General, not a PLO employee. (Pl. 56.1 ¶¶ 6, 39-44). If Plaintiffs' argument here is premised on the interconnectedness between Fatah and the PLO, that is not sufficient evidence for a reasonable jury to conclude that as a function of his association with Fatah, the PLO is liable for his actions.

15

Case 15-3135, Document 87, 11/10/2015, 1639434, Page119 of 147

carrying out, a violation of" specific violent crimes.[13,14]   According to Plaintiffs, Defendants provided support to terrorist groups by providing personnel, weapons, funds, and a safehouse.

Plaintiffs also rely on 18 U.S.C. § 2339B on the grounds that Defendants knowingly provided, attempted to provide, or conspired to provide material support or resources to a foreign terrorist organization ("FTO"), as designated by the Secretary of State under Section 219 of the Immigration and Nationality Act.[15]   "Material support" under this section has the same meaning as under Section 2339A.

Under 18 U.S.C. § 2339C, it is illegal "by any means, directly or indirectly, unlawfully and willfully [to] provide[] or collect[] funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out" certain terrorist activities.  18 U.S.C. § 2339C(a)(1).

Section 2339 makes it unlawful to harbor a person who Defendants knew or had reasonable grounds to believe committed or was about to commit an offense relating to acts of terrorism.  *See* 18 U.S.C. § 2339.

---

[13] "Material support or resources" includes "currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation." 18 U.S.C. § 2339A(b)(1).

[14] Section 2339A itself requires that Defendants' support be for a specific violent crime.  Plaintiffs claim that the violent crimes at issue here include bombing in violation of §§ 832, 2332a, and 2332f, or murder in violation of §§ 956 and 2332. (Pl. Opp'n Mem. at 23.)  Certain of these statutes were enacted after the attacks at issue.  Thus, Plaintiffs have no triable claim to present to the jury under Section 2339A insofar as it is premised on a violent action that was not criminal at the time of the relevant attacks.  In other words, this Court will not apply retroactively the predicate criminal acts to support a Section 2339A claim.

[15] "To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d) (2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)." 18 U.S.C.A. § 2339B(a)(1).

As with Plaintiffs' claims of indirect liability under a theory of respondeat superior, the evidence must be sufficient for a reasonable jury to find that Defendants violated these provisions with the requisite mental state and that the support provided to terrorist groups proximately caused Plaintiffs' injuries.

### i.     Support to Hamas[16]

Plaintiffs allege that Defendants violated the ATA (specifically Sections 2339, 2339A, 2339B, and 2339C) by providing material support in the form of money, a phone, weapons, bomb-making supplies, and a safehouse to Abdullah Barghouti who was a Hamas operative and known terrorist. (Pl. Opp'n Mem. at 26-27; Pl. 56.1 ¶¶ 72-79.) Based on the cited evidence, a reasonable jury could conclude that the PA's support of Abdullah Barghouti was accompanied by the requisite mental state and proximately caused the July 2002 Hebrew University bombing. (Pl. 56.1 ¶ 79); *see also supra* Section I.A.vi. Therefore, the Coulter, Carter, Blutstein, and Gritz Plaintiffs have raised a triable issue of fact for the jury regarding Defendants' support of Hamas via their direct support for Abdullah Barghouti. (*See id.* ¶¶ 228-68.)

### ii.     Support to the AAMB

*Personnel*

Plaintiffs claim that because the PA employees, specifically its police and security forces, assisted the AAMB with the attacks at issue, the PA provided material support in the form of personnel in violation of Section 2339A. However, Plaintiffs' argument is premised on the fact that some PA employees are AAMB members, (*see* Pl. 56.1 ¶¶ 80-82), which is insufficient to prove that the PA provided their employees to the AAMB with the knowledge or intent that they would assist in terrorist acts. Thus, Plaintiffs may not proceed under Section 2339A on the

---

[16] The U.S. designated Hamas as an FTO in 1997. *Goldberg*, 660 F. Supp. 2d at 415.

17

grounds that Defendants provided the AAMB with personnel.

*Weapons*

To show that Defendants provided the AAMB with weapons, Plaintiffs rely primarily on the Israeli Military Court conviction of Fouad Shubaki and his custodial statements, including that "[a]ll of the al-Aqsa Martyrs organizations used the weapons which were supplied by the security forces which carried out the massive procurement." (*Id.* ¶ 88.) He further explained that the PA Finance Office acquired these weapons at the direction of Yasser Arafat "so that he himself would be able to control everything that happened." (*Id.*) If this evidence is admissible, a jury could reasonably conclude that Defendants had the requisite knowledge under Section 2339A that their provision of weapons would be used in attacks perpetrated by the AAMB, satisfying the mental state and causation requirements.

Under Section 2339B, Plaintiffs can also proceed on their "material support to an FTO" claim. To demonstrate intent under Section 2339B, Plaintiffs must establish that Defendants had "knowledge about the organization's connection to terrorism," rather than "specific intent to further the organization's terrorist activities." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16-17 (2010); *United States v. Al Kassar*, 660 F.3d 108, 129 (2d Cir. 2011). Pursuant to the Second Circuit's recent decision in *Weiss v. National Westminister Bank PLC*, the question here is whether Defendants had knowledge that, or exhibited deliberate indifference to whether, they were providing support to a terrorist organization, rather than whether their support aided terrorist activities of the terrorist organization. 768 F.3d 202, 205, 208 (2d Cir. 2014) (citations omitted) ("[A] defendant has knowledge that an organization engages in terrorist activity if the defendant has actual knowledge of such activity or if the defendant exhibited deliberate indifference to whether the organization engages in such activity."). Defendants still argue that a

18

reasonable jury would be unable to find that the provision of weapons proximately caused Plaintiffs' injuries. However, a direct connection between providing material support to the terrorist organization and injury to Plaintiffs is not required. *Cf. Gill*, 893 F. Supp. 2d at 556 ("[T]he money alleged to have changed hands need not be shown to have been used to purchase the bullet that struck the plaintiff.") (citations and quotations omitted). Instead, the question is whether the resulting harm to Plaintiffs was foreseeable. Thus, it is a factual issue for the jury whether Defendants provided weapons to the AAMB with the requisite knowledge of the AAMB's connection to terrorism (as provided in Section 2339B(a)(1)).[17]

*Funds*

Plaintiffs also argue that the PA provided funds to the AAMB and individuals involved in terrorist acts in violation of the ATA (specifically Sections 2339A, 2339B, and 2339C). While Plaintiffs' evidence demonstrates an attenuated connection in some instances between the provision of funds and the terrorist acts at issue, there is sufficient evidence for a jury to determine if the requisite scienter and causation requirements are met under the relevant statutes. For example, Plaintiffs cite a report stating that "[d]ocuments . . . show direct payments from the PA to Fatah party activists, some of whom were also affiliated with the [AAMB]" and "[t]he payments were likely made with the knowledge that the intended recipients had been involved in violence and terrorism." (Pl. 56.1 ¶ 83; *see also id.* ¶ 84 (citing evidence to support that the PA gave funds to Fatah activists, including AAMB commanders and individuals involved in violent attacks); *id.* ¶ 85 (citing evidence supporting that in early 2002, Arafat signed a check for then-fugitive Nasser Shawish, who later carried out the January 22, 2002 shooting at issue in this

---

[17] A reasonable jury could conclude that support in the form of weapons provided to the AAMB violated Section 2339B at the earliest on March 27, 2002, at which time the AAMB was designated as an FTO. Similarly, and as discussed below, a jury could reasonably conclude that Defendants violated Section

19

SPA-43

case)).  Plaintiffs also intend to show that Fatah leader Marwan Barghouti served as the direct line between Yasser Arafat, chairman of the PA, and the AAMB for purposes of obtaining PA funds to support AAMB members.  (*Id.* ¶ 86; *see also id.* ¶¶ 87, 195).  Therefore, assuming this evidence is admissible, Plaintiffs may proceed on these claims.

### *Harboring Terrorists*

Finally, Plaintiffs argue that support was provided to the AAMB in the form of harboring terrorists.  Plaintiffs rely primarily on evidence that Defendants at times had known terrorists in custody or had the capacity to arrest known terrorists and released or failed to arrest them.  (*See* Pl. 56.1 ¶¶ 114-15, 121, 170, 190-93.)  Viewing the disputed facts in the light most favorable to Plaintiffs, that is a factual issue that may be presented to the jury.

Therefore, Plaintiffs have demonstrated triable issues under 18 U.S.C. 2339, *et seq.*, regarding Defendants' support of the AAMB and Hamas.

### II.    Non-Federal Law Claims

Defendants claim under their fourth affirmative defense that they lack capacity to be sued on non-federal claims.  (Pl. Mem., ECF No. 492.)  Plaintiffs assert that under New York choice of law rules, this Court should apply Israeli law in determining that Defendants have capacity.  In the alternative, Plaintiffs contend that Defendants should be sued as "public bodies" under New York law.  Defendants argue that New York law applies, and under New York law, they are "unincorporated associations" and therefore may not be sued on Plaintiffs' non-federal claims.

Pursuant to Federal Rule of Civil Procedure 17(b)(3) and N.Y. C.P.L.R. § 1025, Defendants do not have the capacity to be sued on Plaintiffs' non-federal claims under New York law.

---

2339B insofar as they provided any funds to the AAMB after the AAMB was designated an FTO.

20

Federal Rule of Civil Procedure 17(b) addresses the applicable law to determine if a defendant has the capacity to be sued. If the defendant is an individual sued in her individual capacity, the law of the defendant's domicile determines capacity. Fed. R. Civ. P. 17(b)(1). If the defendant is a corporation, the law under which it was organized determines capacity. Fed. R. Civ. P. 17(b)(2). Finally, "for all other parties," the law of the state where the court is located determines whether the defendant has the capacity to be sued. Fed R. Civ. P. 17(b)(3); *see also La Russo v. St. George's Univ. of Med.*, 747 F.3d 90, 95 (2d Cir. 2014). Here, the parties agree that Defendants are neither individuals nor corporations. Thus, they are captured by the catch-all language of Rule 17(b)(3), and the law of the forum state applies—i.e., New York law.[18]

Thus, applying New York law, the parties dispute whether Defendants are "unincorporated associations," pursuant to N.Y. C.P.L.R. § 1025,[19] or "public bodies," pursuant to N.Y. C.P.L.R. § 1023.[20]

Courts that have considered this issue agree that Defendants are most appropriately treated as unincorporated associations. *See Estate of Parsons v. Palestinian Auth.*, No. 07-cv-

---

[18] Plaintiffs argue that applying New York law requires that this Court apply New York's choice of law rules. Under New York's choice of law rules, Plaintiffs contend that Israeli law applies, and that under Israeli law, Defendants have the capacity to be sued as to all of Plaintiffs' claims. Even applying New York's choice of law rules, Plaintiffs do not articulate why Israel would have a greater interest where U.S. citizens are the victims of terrorism. Moreover, Rule 17(b) is itself a choice of law provision, and does not require that this Court take the additional step of determining if New York choice of law requires application of foreign law as to the issue of capacity. Moreover, the record does not support a conclusion that Plaintiffs have complied with Federal Rule of Civil Procedure 44.1 by timely indicating their written intent to rely on foreign law. *See* Fed. R. Civ. P. 44.1.

[19] "[A]ctions may be brought by or against the president or treasurer of an unincorporated association on behalf of the association in accordance with the provisions of the general associations law." N.Y. C.P.L.R. § 1025.

[20] "When a public officer, body, board, commission or other public agency may sue or be sued in its official capacity, it may be designated by its official title, subject to the power of the court to require names to be added." N.Y. C.P.L.R. § 1023.

SPA-45

1847, ECF No. 14 at 13-14 (D.D.C. Sept. 30, 2008) (treating the PA and PLO as unincorporated associations and dismissing the non-federal claims); *see also Estate of Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107, 113 (D.D.C. 2006) ("It has also been determined by other federal courts that the PLO qualifies as an unincorporated association under Rule 4(h) of the Federal Rules of Civil Procedure for purposes of service of process, because it is 'composed of individuals, without a legal identity apart from its membership, formed for specific objectives.'") (quoting *Estate of Ungar v. Palestinian Auth.*, 153 F. Supp. 76, 89 (D.R.I. 2001)); *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 739 F. Supp. 854, 858 (S.D.N.Y 1990), *vacated and remanded on other grounds by* 937 F.2d 44 (2d Cir. 1991) ("Rather, as its name indicates, the PLO is an organization . . . composed of individuals, without a legal identity apart from its membership, formed for specific objectives. For present purposes, it may be treated as an unincorporated association."). "At common law, an unincorporated association is not an entity, and has no status distinct from the persons composing it, but is, rather, a body of individuals acting together for the prosecution of a common enterprise without a corporate charter but upon methods and forms used by corporations." 6 Am. Jur. 2d Associations and Clubs §1.[21]

Defendants are therefore unincorporated associations that lack the capacity to be sued

---

[21] Plaintiffs are correct that Defendants do not fit perfectly within the description of an unincorporated association as described in cases such as *Martin v. Curran*, 303 N.Y. 276, 280-81 (N.Y. 1951). For example, Defendants explain: "[S]ince its creation by the PLO, the PA has provided many government services, including local policing and civil authority over traditional matters such as agriculture, banking, employment, environment protection, unclaimed property, health, labor, zoning, postal services, social welfare, telecommunications, transportation, water and sewage, and that the PA has a police force and levies taxes." (Def. Reply to Pl. 56.1, ECF No. 523-1, at 6.) However, Defendants advance these arguments to support a finding that they are a non-recognized foreign government, and are therefore immune from suit. This Court again rejects this argument.

22

under New York law as to Plaintiffs' non-federal claims.[22]

## CONCLUSION

Defendants' motion for summary judgment is DENIED with respect to the ATA claims of vicarious liability against the PA, except it is GRANTED as to the Mandelkorn Plaintiffs' ATA claim of vicarious liability.  Defendants' motion for summary judgment is GRANTED with respect to the ATA claims of employer vicarious liability against the PLO.  Defendants' motion for summary judgment is DENIED with respect to the ATA claims of direct liability. Defendants' motion for summary judgment is GRANTED as to Plaintiffs' non-federal claims.

Dated: November 19, 2014
    New York, New York

                       SO ORDERED:

                       *George B. Daniels*
                       GEORGE B. DANIELS
                       United States District Judge

---

[22] Five plaintiffs are not pursuing ATA claims, namely: Varda Guetta, Revital Bauer, Shaul Mandelkorn, Nurit Mandelkorn, and Scott Goldberg. (Pl. Objections to Def. Proposed Jury Instructions, ECF No. 591, at 46.)  Therefore, these plaintiffs are dismissed from this case.

23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARK I. SOKOLOW, et al.,                            :

                    Plaintiffs,         :

    -against-                                      :

THE PALESTINE LIBERATION               :
ORGANIZATION, THE PALESTINIAN     :
AUTHORITY, et al.,                                  :

                   Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MEMORANDUM DECISION
AND ORDER
04 Civ. 397 (GBD)

GEORGE B. DANIELS, United States District Judge:

    Defendants, the Palestine Liberation Organization ("PLO") and the Palestinian Authority

("PA"), each moved for summary judgment in part on the grounds that this Court lacks personal

jurisdiction over them in light of the Supreme Court's decision in *Daimler AG v. Bauman*, 134 S.

Ct. 746 (2014). Defendants' motions for dismissal and summary judgment based on lack of

personal jurisdiction are DENIED.

    Prior to the *Daimler* decision, Defendants moved to dismiss arguing that this Court did

not have jurisdiction over them on the basis that the PLO and PA had insufficient contacts with

the United States. (*See* ECF Nos. 66 & 81.) This Court denied those motions and "agree[d] with

every federal court to have considered the issue that the totality of activities in the United States

by the PLO and the PA justifie[d] the exercise of general personal jurisdiction." (*See* ECF No.

87 at 7 (March 30, 2011).)[1]

---

[1] This Court's previous decision laid out Defendants' systematic and continuous contacts and
activities with the United States and stated:

> The reality is that ATA litigation often involves foreign individuals and
> entities, and thereby, a statutory cause of action for international terrorism
> exists. There is a strong inherent interest of the United States and Plaintiffs

1

Following the Supreme Court's decision in *Daimler*, Defendants filed motions for reconsideration of this Court's March 30, 2011 denial of Defendants' motions to dismiss. (*See* ECF No. 421 (Jan. 31, 2014).) Defendants argued that *Daimler* served as "an intervening change in the controlling law," requiring a different conclusion because Defendants were not "at home" in the United States. (*Id.* at 1, 7.) On April 11, 2014, this Court denied Defendants' motions for reconsideration ruling that *Daimler* did not warrant dismissal of this case against either Defendant. (Oral Argument (Apr. 11, 2014); *see also* ECF No. 537.) Defendants' motions to certify this issue for interlocutory appeal were similarly denied, and the case was scheduled for trial. (ECF No. 543.)

Defendants renewed their *Daimler* argument in their motions for summary judgment. (*See* ECF Nos. 496 & 497.) Defendants thereafter submitted to this Court the Second Circuit's decision in *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014), arguing that the *Gucci* Court's interpretation of *Daimler*, as changing the controlling precedent in this Circuit, requires dismissal of this case. In *Gucci*, the court reiterated the holding in *Daimler*:

> [A] corporation may . . . be subject to general jurisdiction in a state only where its contacts are so 'continuous and systematic,' judged against the corporation's national and global activities, that it is 'essentially at home' in that state. Aside from 'an exceptional case' . . . a corporation is at home (and thus subject to general jurisdiction, consistent with due process) only in a state that is the company's formal place of incorporation or its principal place of business.

---

in litigating ATA claims in the United States. The Defendants have not demonstrated that this case would impose a more significant burden than can typically be expected, particularly in light of the fact that they have vigorously engaged in such litigation several times before. The Defendants have also failed to identify an alternative forum where Plaintiffs' claims could be brought, and where the foreign court could grant a substantially similar remedy.

(ECF No. 87 at 16.)

2

**SPA-49**

*Id.* at 135 (citing *Daimler*, 134 S. Ct. at 761-62 & n.19).  The court in *Gucci* went on to explain

that the Supreme Court in *Daimler* "expressly warned against the 'risks to international comity'

of an overly expansive view of general jurisdiction inconsistent with 'the fair play and substantial

justice' due process demands."  768 F.3d at 135 (citing 134 S. Ct. at 763 (citation and quotation

omitted)).

Under a post-*Daimler* and -*Gucci* analysis, this Court has personal jurisdiction pursuant

to the Antiterrorism Act, 18 U.S.C. § 2331, *et. seq.*, over the PA and PLO.  Defendants' motions

asserting lack of personal jurisdiction are denied because this action presents such "an

exceptional case," as alluded to in *Daimler* and *Gucci*.[2]

Defendants by their own admission are not foreign corporations and therefore are not

subject to the traditional analysis of determining a defendant's place of incorporation or principal

place of business.[3]  Under both *Daimler* and *Gucci*, the PA and PLO's continuous and systematic

business and commercial contacts within the United States are sufficient to support the exercise

of general jurisdiction.  (*See* ECF No. 87 (analyzing Defendants' business and commercial

contacts with the United States following extensive jurisdictional discovery).)

Each Defendant argues that its own individual contacts with the United States are

minimal, especially when compared to their contacts elsewhere.  The PLO contacts that

Defendant PLO identifies outside of the United States—namely that "there were several

---

[2] Defendants argue that they did not waive their personal jurisdiction objections because *Daimler* and *Gucci* changed the controlling precedent in this Circuit.  However, Defendants' motions asserting lack of personal jurisdiction are not denied based on a theory of waiver.

[3] Defendants point out that they are not individuals, partnerships or corporations.  (ECF No. 498, Ex. A., ¶¶ 17-22.)  In their memorandum in support of their motions for summary judgment, Defendants describe both the PA and PLO as "foreign organizational defendant[s]."  (ECF No. 497 at 49.)  In their memorandum in opposition to Plaintiffs' motion for summary judgment, Defendants are self-described as "(1) unincorporated; (2) foreign governmental organizations; of (3) an unrecognized foreign state."  (ECF No. 523 at 6.)

3

**SPA-50**

embassies, missions and delegations maintained by the PLO around the world that were larger than the PLO Delegation [in the United States]"—do not lead to the conclusion that the PLO is "at home" in any one of those countries, nor does the PLO make such a claim. (ECF No. 497 at 49.)  Defendant PLO does not specify the nature or extent of its contacts or activities in other countries; it relies on the collective number of personnel in foreign embassies, missions and delegations around the world, but does not identify any one of those countries as a place where the PLO is "at home" based on greater business and commercial activities than are conducted in the United States.[4]  Similarly, Defendant PA estimates that it had over 100,000 employees in 2002, but it does not identify which, if any, of those employees engaged in activities in any country outside of the "Palestinian Territories in the West Bank and Gaza Strip." (*See* ECF No. 498, Ex. A., ¶¶ 2, 40.)  This record is therefore insufficient to conclude that either defendant is "at home" in a particular jurisdiction other than the United States.

Undertaking a comity analysis further supports asserting personal jurisdiction because doing so does not conflict with any foreign country's applicable law or sovereign interests, nor is it in contravention of the laws of any foreign country.[5]

---

[4] The chief representative of the PLO to the United States asserts: "[T]he PLO employed at various times approximately 1,300 persons to work in its embassies, missions and delegations in countries or organizations outside the United States." (ECF No. 497, Ex. A-71, ¶ 18.)

[5] Defendants do not argue in their memorandum in support of their motions for summary judgment that this Court should engage in a comity analysis, nor do they cite foreign laws that conflict with the exercise of general jurisdiction pursuant to the ATA. (*See* ECF No. 497 at 49-50.)

4

## CONCLUSION

Defendants' motions for summary judgment on the ground that this Court does not have personal jurisdiction over the PA or PLO are DENIED.

Dated: December 1, 2014
    New York, New York

SO ORDERED:

_____
GEORGE B. DANIELS
United States District Judge

5

**SPA-52**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MARK I. SOKOLOW, et al.,                          :
                                                  :
                              Plaintiffs,          :
                                                  :
          -against-                               :
                                                  :
THE PALESTINE LIBERATION                          :
ORGANIZATION and THE PALESTINIAN                  :
AUTHORITY,                                         :
                                                  :
                              Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
┌─────────────────────────────┐
│ USDC SDNY                    │
│ DOCUMENT                     │
│ ELECTRONICALLY FILED         │
│ DOC #:                       │
│ DATE FILED: FEB 1 1 2015     │
└─────────────────────────────┘
```

ORDER
04 Civ. 00397 (GBD)

GEORGE B. DANIELS, United States District Judge:

Defendants' Renewed Motion for Summary Judgment dismissing Plaintiff Oz Guetta's

claims is GRANTED.  Defendants' Renewed Motion for Summary Judgment is DENIED as to

all other Plaintiffs' claims.

The Clerk of the Court is respectfully requested to close the motion at ECF No. 681.

Dated: February 11, 2015
       New York, New York

                                        SO ORDERED:

                                        _George B. Daniel_
                                        GEORGE B. DANIELS
                                        United States District Judge

1

**SPA-53**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: AUG 24 2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARK I. SOKOLOW, et al.,                      :

       Plaintiffs,         :

   -against-                              :

PALESTINE LIBERATION ORGANIZATION    :
and PALESTINIAN AUTHORITY,             :

       Defendants.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

           ORDER
          04 Civ. 397 (GBD)

GEORGE B. DANIELS, United States District Judge:

Defendants renew their motion to dismiss for lack of personal jurisdiction, and, in the alternative, move for judgment as a matter of law or new trial under Federal Rules of Civil Procedure 50(b) and 59.

*Personal Jurisdiction*

This Court has considered several times the issue of personal jurisdiction over Defendants, and it has reviewed the cases cited by Defendants from the United States District Court for the District of Columbia.[1]  This Court's position remains unchanged.  For the reasons articulated in this Court's memorandum decision and order, dated December 1, 2014, and at the oral argument, dated July 28, 2015, Defendants' "renewed motion to dismiss" for lack of personal jurisdiction is denied.  (*See* Memorandum Decision and Order, ECF No. 657.)

---

[1] *See Safra v. Palestinian Auth.*, No. CV 14-669 (CKK), 2015 WL 567340, at *1 (D.D.C. Feb. 11, 2015); *Livnat v. Palestinian Auth.*, No. CV 14-668 (CKK), 2015 WL 558710, at *1 (D.D.C. Feb. 11, 2015); *Estate of Esther Klieman v. Palestinian Auth.*, No. 04-1175, 2015 U.S. Dist. LEXIS 25167, at *1 (D.D.C. Mar. 3, 2015).

1

**SPA-54**

*Sufficiency of the Evidence*

Defendants also move for judgment as a matter of law under Rule 50(b), arguing that Plaintiffs failed to meet their burden at trial. A "district court can grant the motion only if after viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in favor of the non-moving party, it finds that there is insufficient evidence to support the verdict." *Fabri v. United Tech. Int'l, Inc.*, 387 F.3d 109, 119 (2d Cir. 2004) (citation omitted). The jury in this case had "a legally sufficient evidentiary basis to find" Defendants liable for the six attacks at issue. *See* Fed. R. Civ. P. 50(a)(1).

Defendants argue that judgment as a matter of law is appropriate because the Antiterrorism Act, 18 U.S.C. §§ 2331, *et. seq.*, does not allow for respondeat superior liability. This Court addressed this issue in connection with Defendants' motion for summary judgment and rejected Defendants' argument. Again, this Court's position remains unchanged. (*See* Order, ECF No. 646, at 9-11.)

Having reviewed the testimony and evidence admitted in support of Plaintiffs' claims that Defendants provided material support and resources to the terrorists and terror groups who committed the six attacks at issue in this case, and that employees of the Palestinian Authority committed or supported five of those six attacks within the scope of their employment, this Court holds that the evidence is legally sufficient under Rule 50.

*Evidentiary Rulings*

Defendants also move for new, separate trials under Rule 59, arguing that there were substantial errors during trial that created unfair prejudice to Defendants. "[F]or a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously

2

**SPA-55**

erroneous result or the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence." *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003) (citations and internal punctuation omitted); *see also Ricciuti v. N.Y. City Transit Auth.*, 70 F. Supp. 2d 300, 305 (S.D.N.Y. 1999) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 133–34 (2d Cir.1998)) ("A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is egregious.").

First, Defendants argue that this Court allowed Plaintiffs to present improper expert testimony. The testimony of Plaintiffs' experts Israel Shrenzel and Alon Eviatar complied with both Federal Rule of Evidence 702 and the requirements under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Moreover, Defendants were given ample opportunity to cross examine both experts, and the jury charge included an expert witness instruction that stated in part:

> You may give the expert testimony whatever weight, if any, you find it deserves in light of all the evidence in this case. You should not, however, accept an expert's opinion testimony merely because he or she is an expert. Nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you.

(Tr. 3881:7-13 (Feb. 20, 2015).)

Second, Defendants argue that this Court admitted evidence that was more prejudicial than probative under Federal Rule of Evidence 403, without allowing Defendants to admit evidence that provided context and lessened the prejudice. Nearly every piece of evidence was objected to in this trial. This Court considered Defendants' objections to almost every category of evidence and document and carefully engaged in the Rule 403 analysis. The documents that

3

Defendants deem unduly prejudicial—namely, "circulars, television clips, photographs, and 'police magazines'"—were determined by this Court to be both relevant and more probative than prejudicial. (*See* Defendants' Memorandum, ECF No. 896, at 19.)   Defendants argue further that this Court "compounded this error" by limiting Defendants' ability to highlight "the political and social context" at the time. (*See id.* at 21.)   While Defendants concede that this Court "did not preclude all testimony on these subjects," it argues more evidence of "the Palestinian perspective on the Israeli occupation" was proper "to understand the PA's actions." (*See id.* at 22.)   As this Court stated multiple times during the course of this trial, this case was not about the "Israeli-Palestinian conflict."   Thus, evidence of the nature that Defendants describe was improper and it was accordingly excluded.

### *Separate Trials*

Third, Defendants argue that the six attacks should have been tried separately.   The jury charge included a specific instruction that the six attacks should be treated separately.   In addition, the verdict form was organized in such a way that it was clear that liability as to each defendant should be assessed on an attack-by-attack basis.   This Court considered carefully the issue of prejudice when it first denied Defendants' motion for separate trials.   The jury rendered a separate, specific verdict as to each plaintiff regarding each terrorist attack. (*See* Tr. 3925:12-3937:22 (Feb. 23, 2015).)   There was no "spillover prejudice" to Defendants as a result of trying the six attacks in one trial.

### *Jury Instructions*

Fourth, Defendants argue that the jury instruction on agency was inaccurate and that the jury instructions were unable to cure improper statements of the law by Plaintiffs' counsel.   "A

**SPA-57**

jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury of the law." *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994) (citations omitted). Defendants must show that "they were prejudiced by the error." (*Id.*) Defendants' arguments in this regard were previously raised during conferences at which the parties addressed the proposed jury instructions with the Court. This Court considered Defendants' arguments regarding the proper agency instruction, and, after considering proposals from both sides, included the final language. (*See* Tr. 3859:6-3867:2 (Feb. 20, 2015) (discussion regarding agency instruction); *see id.* 3897:12-3899:17 (final agency instruction).) To the extent Defendants argue that Plaintiffs' counsel misstated the law in closing, this Court instructed the jury as follows: "You must take the law as I give it to you. If any attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow." (*Id.* 3871:19-3872:2.)

Finally, Defendants argue that Plaintiffs should not have been able to present to the jury proposed damages awards. In ruling that Plaintiffs could suggest specific dollar amounts for non-economic damages, this Court carefully considered the Second Circuit's decision in *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 912 (2d Cir. 1997), which leaves this determination "to the discretion of the trial judge." *Id.* Moreover, this Court required that Plaintiffs share with Defendants the figures they would suggest to the jury before doing so. Ultimately, the jury provided an award in an amount less than that proposed by Plaintiffs' counsel in his closing statement. This Court instructed the jury regarding the amounts suggested by Plaintiff's counsel as follows:

During his closing remarks, counsel for Plaintiffs suggested a specific dollar

amount to be awarded to Plaintiffs.   An attorney is permitted to make suggestions as to the amount that should be awarded, but those suggestions are argument only and not evidence and should not be considered by you as evidence of Plaintiffs' damages.   The determination of damages is solely for you, the jury, to decide.

(Tr. 3904:10-16 (Feb. 20, 2015).)   The final award is not excessive, nor is it against the weight of the evidence.   *See Lore v. City of Syracuse*, 670 F.3d 127, 176-77 (2d Cir. 2012) ("It is well established that the trial judge enjoys discretion to grant a new trial if the verdict appears to the judge to be against the weight of the evidence, and that this discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification.") (citation, internal quotation marks, and alterations omitted).

This Court has considered all of the arguments raised by Defendants in support of their Rule 50 and Rule 59 motions, as well as their renewed motion to dismiss for lack of personal jurisdiction.   Defendants' motions are denied.   Judgment in this case shall be entered in Plaintiffs' favor against Defendants.

The Clerk of the Court is instructed to close the motion at ECF No. 895.

Dated: August 24, 2015
New York, New York

SO ORDERED:

_George B. Daniels_
GEORGE B. DANIELS
United States District Judge

6

**SPA-59**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: AUG 31 2015

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

MARK I. SOKOLOW, et al.

          Plaintiffs,

    v.

THE PALESTINE LIBERATION
ORGANIZATION and
THE PALESTINIAN AUTHORITY,

          Defendants.

Civil Action No. 04 Civ. 397 (GBD)

**ORDER**

In accordance with the Court's summary judgment decision of November 19, 2014 and bench ruling of January 12, 2015, all claims of plaintiffs Revital Bauer, individually; Eva Waldman; Varda Guetta; Shaul Mandelkorn; Nurit Mandelkorn; and Estate of Stuart Scott ("Yechezkel") Goldberg, by Karen Goldberg, as personal representative; and Oz Joseph Guetta have been dismissed.

Dated: New York, New York
       August ____, 2015

AUG 31 2015

**SO ORDERED:**

*George B. Daniels*

THE HONORABLE GEORGE B. DANIELS
UNITED STATES DISTRICT JUDGE

**SPA-60**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
MARK I. SOKOLOW, et al.,

              Plaintiffs,

    -against-

THE PALESTINE LIBERATION
ORGANIZATION and THE PALESTINIAN
AUTHORITY,
              Defendants.
-----------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: OCT 01 201
```

04 CIVIL 00397 (GBD)

**JUDGMENT**

A Jury Trial before the Honorable George B. Daniels, United States District Judge, began on January 14, 2015, and at the conclusion of the trial, on February 23, 2015, the jury rendered a verdict in favor of each Plaintiff and against both Defendants the Palestine Liberation Organization and the Palestinian Authority resulting in the following judgment:

I. JANUARY 22, 2002 - JAFFA ROAD SHOOTING:

1.   A jury verdict in favor of Plaintiff Elise Gould in the amount of $3,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$9 million**;

2.   A jury verdict in favor of Plaintiff Ronald Gould in the amount of $3,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$9 million**;

3.   A jury verdict in favor of Plaintiff Shayna Gould in the amount of $20,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$60 million**;

1

**SPA-61**

4.   A jury verdict in favor of Plaintiff Jessica Rine in the amount of $3,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$9 million**;

5.   A jury verdict in favor of Plaintiff Henna Novack Waldman in the amount of $2,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$7.5 million**;

6.   A jury verdict in favor of Plaintiff Morris Waldman in the amount of $2,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$7.5 million**;

7.   A jury verdict in favor of Plaintiff Shmuel Waldman in the amount of $7,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$22.5 million**;

## II. JANUARY 27, 2002 - JAFFA ROAD BOMBING:

1.   A jury verdict in favor of Plaintiff Elana Sokolow in the amount of $2,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$7.5 million**;

2.   A jury verdict in favor of Plaintiff Jamie Sokolow in the amount of $6,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$19.5 million**;

3.   A jury verdict in favor of Plaintiff Lauren Sokolow in the amount of $5,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$15 million**;

4.    A jury verdict in favor of Plaintiff Mark Sokolow in the amount of $5,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$15 million**;

5.    A jury verdict in favor of Plaintiff Rena Sokolow in the amount of $7,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$22.5 million**;

III.  MARCH 21, 2002 - KING GEORGE STREET BOMBING:

1.    A jury verdict in favor of Plaintiff Alan Bauer in the amount of $7,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$21 million**;

2.    A jury verdict in favor of Plaintiff Binyamin Bauer in the amount of $1,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$3 million**;

3.    A jury verdict in favor of Plaintiff Daniel Baur in the amount of $1,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$3 million**;

4.    A jury verdict in favor of Plaintiff Yehonathon Bauer in the amount of $25,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$75 million**;

5.    A jury verdict in favor of Plaintiff Yehuda Bauer in the amount of $1,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$3 million**;

**SPA-63**

IV.   JUNE 19, 2002 - FRENCH HILL BOMBING:

1.    A jury verdict in favor of Plaintiff Leonard Mandelkorn in the amount of
$10,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act,
18 U.S.C. § 2333(a), for a total award of **$30 million**;

V.   July 31, 2002 - HEBREW UNIVERSITY BOMBING:

1.    A jury verdict in favor of Plaintiff Katherine Baker in the amount of $6,000,000.00,
which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. §
2333(a), for a total award of **$18 million**;

2.    A jury verdict in favor of Plaintiff Benjamin Blutstein in the amount of
$2,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18
U.S.C. § 2333(a), for a total award of **$7.5 million**;

3.    A jury verdict in favor of Plaintiff Rebekah Blutstein in the amount of
$4,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18
U.S.C. § 2333(a), for a total award of **$12 million**;

4.    A jury verdict in favor of Plaintiff Richard Blutstein in the amount of
$6,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18
U.S.C. § 2333(a), for a total award of **$18 million**;

5.    A jury verdict in favor of Plaintiff Diane Carter in the amount of $1,000,000.00,
which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. §
2333(a), for a total award of **$3 million**;

6.    A jury verdict in favor of Plaintiff Larry Carter in the amount of $6,500,000.00,
which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. §
2333(a), for a total award of **$19.5 million**;

**SPA-64**

7.    A jury verdict in favor of Plaintiff Shaun Choffel in the amount of $1,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$4.5 million**;

8.    A jury verdict in favor of Plaintiff Robert L. Coulter Jr. in the amount of $3,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$9 million**;

9.    A jury verdict in favor of Plaintiff Diane Coulter Miller in the amount of $3,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$9 million**;

10.   A jury verdict in favor of Plaintiff Robert L. Coulter Sr. in the amount of $7,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$22.5 million**;

11.   A jury verdict in favor of Plaintiff Janis Ruth Coulter in the amount of $2,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$7.5 million**;

12.   A jury verdict in favor of Plaintiff David Gritz in the amount of $2,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$7.5 million**;

13.   A jury verdict in favor of Plaintiff Nevenka Gritz in the amount of $10,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$30 million**;

**SPA-65**

14.   A jury verdict in favor of Plaintiff Nevenka Gritz, as successor to Norman Gritz, in the amount of $2,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$7.5 million**;

VI.   JANUARY 29, 2004 - BUS NO. 19 BOMBING:

1.   A jury verdict in favor of Plaintiff Chana Goldberg in the amount of $8,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$24 million**;

2.   A jury verdict in favor of Plaintiff Eliezer Goldberg in the amount of $4,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$12 million**;

3.   A jury verdict in favor of Plaintiff Esther Goldberg in the amount of $8,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$24 million**;

4.   A jury verdict in favor of Plaintiff Karen Goldberg in the amount of $13,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$39 million**;

5.   A jury verdict in favor of Plaintiff Shoshana Goldberg in the amount of $4,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$12 million**;

6.   A jury verdict in favor of Plaintiff Tzvi Goldberg in the amount of $2,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$6 million**;

7.    A jury verdict in favor of Plaintiff Yaakov Goldberg in the amount of $2,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$6 million**;

8.    A jury verdict in favor of Plaintiff Yitzhak Goldberg in the amount of $6,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$18 million**.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED:** That Plaintiffs have a judgment as against Defendants the Palestine Liberation Organization and the Palestinian Authority jointly and severally in the amounts specified above for a total jury verdict of $218.5 million, trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$655.5 million**.

**DATED:** New York, New York
        October 1, 2015

**So Ordered:**

_George B. Donald_
U.S.D.J.

7

**SPA-67**