# 15-3135(L)

## 15-3151(XAP)

*To Be Argued By:*
KENT A. YALOWITZ

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

Eva Waldman, Revital Bauer, individually and as natural guardian of plaintiffs Yehonathon Bauer, Binyamin Bauer, Daniel Bauer and Yehuda Bauer, Shaul Mandelkorn, Nurit Mandelkorn, Oz Joseph Guetta, minor, by his next friend and guardian Varda Guetta, Varda Guetta, individually and as natural guardian of plaintiff Oz Joseph Guetta, Norman Gritz, individually and as personal representative of the Estate of David Gritz, Mark I. Sokolow, individually and as a natural guardian of Plaintiff Jamie A. Sokolow, Rena M. Sokolow, individually and as a natural guardian of plaintiff Jaime A. Sokolow, Jamie A. Sokolow, minor, by her next friends and guardian Mark I. Sokolow and Rena M. Sokolow, Lauren M. Sokolow, Elana R. Sokolow, Shayna Eileen Gould, Ronald Allan Gould, Elise Janet Gould, Jessica Rine, Shmuel Waldman, Henna Novack Waldman,

(*Caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLEES-CROSS-APPELLANTS

KENT A. YALOWITZ
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
(212) 715-1000

*Attorneys for Plaintiffs-Appellees-
Cross-Appellants*

Morris Waldman, Alan J. Bauer, individually and as natural guardian of plaintiffs Yehonathon Bauer, Binyamin Bauer, Daniel Bauer and Yehuda Bauer, Yehonathon Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Binyamin Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Daniel Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Yehuda Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Rabbi Leonard Mandelkorn, Katherine Baker, individually and as personal representative of the Estate of Benjamin Blutstein, Rebekah Blutstein, Richard Blutstein, individually and as personal representative of the Estate of Benjamin Blutstein, Larry Carter, individually and as personal representative of the Estate of Diane ("Dina") Carter, Shaun Coffel, Dianne Coulter Miller, Robert L Coulter, Jr., Robert L. Coulter, Sr., individually and as personal representative of the Estate of Janis Ruth Coulter, Chana Bracha Goldberg, minor, by her next friend and guardian Karen Goldberg, Eliezer Simcha Goldberg, minor, by her next friend and guardian Karen Goldberg, Esther Zahava Goldberg, minor, by her next friend and guardian Karen Goldberg, Karen Goldberg, individually, as personal representative of the Estate of Stuart Scott Goldberg/ natural guardian of plaintiffs Chana Bracha Goldberg, Esther Zahava Goldberg, Yitzhak Shalom Goldberg, Shoshana Malka Goldberg, Eliezer Simcha Goldberg, Yaakov Moshe Goldberg, Tzvi Yehoshua Goldberg, Shoshana Malka Goldberg, minor, by her next friend and guardian Karen Goldberg, Tzvi Yehoshua Goldberg, minor, by her next friend and guardian Karen Goldberg, Yaakov Moshe Goldberg, minor, by her next friend and guardian Karen Goldberg, Yitzhak Shalom Goldberg, minor, by her next friend and guardian Karen Goldberg, Nevenka Gritz, sole heir of Norman Gritz, deceased,

*Plaintiffs-Appellees-Cross-Appellants,*

—against—

Palestine Liberation Organization, Palestinian Authority, a/k/a Palestinian Interim Self-Government Authority and or Palestinian Council and or Palestinian National Authority,

*Defendants-Appellants-Cross-Appellees,*

Yasser Arafat, Marwin Bin Khatib Barghouti, Ahmed Taleb Mustapha Barghouti, a/k/a Al-Faransi, Nasser Mahmoud Ahmed Aweis, Majid Al-Masri, a/k/a Abu Mojahed, Mahmoud Al-Titi, Mohammed Abdel Rahman Salam Masalah, a/k/a Abu Satkhah, Faras Sadak Mohammed Ghanem, a/k/a Hitawi, Mohammed Sami Ibrahim Abdullah, Esatate of Said Ramadan, deceased, Abdel Karim Ratab Yunis Aweis, Nasser Jamal Mousa Shawish, Toufik Tirawi, Hussein Al-Shaykh, Sana'a Muhammed Shehadeh, Kaira Said Ali Sadi, Estate of Mohammed Hashaika, deceased, Munzar Mahmoud Khalil Noor, Estate of Wafa Idris, deceased, Estate of Mazan Faritach, deceased, Estate of Muhanad Abu Halawa, deceased, John Does, 1-99, Hassan Abdel Rahman,

*Defendants.*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................... iv

TABLE OF TRIAL EXHIBITS NOT IN THE JOINT APPENDIX ................... xvii

INTRODUCTION ..............................................................................1

ISSUES ...........................................................................................2

STATEMENT OF THE CASE..............................................................3

    A.    Personal Jurisdiction Decision ...........................................3

    B.    Summary Judgment Decision.............................................4

    C.    Mandamus Petition...........................................................5

    D.    Judgment ........................................................................5

FACTS ............................................................................................6

    A.    Combating PLO Terrorism Has Long Been U.S. Policy ......6

    B.    Defendants Intended to Use Their Terror Campaign to
Influence U.S. Policy .......................................................8

    C.    Defendants' Terror Campaign Threatened U.S. Interests....11

    D.    Defendants' Terror Attacks Killed and Injured U.S. Citizens............12

        1.    January 22, 2002 Machine-Gun Attack ...................13

        2.    January 27, 2002 Bombing ...................................14

        3.    March 21, 2002 Bombing .....................................14

        4.    June 19, 2002 Bombing .......................................15

        5.    July 31, 2002 Bombing .......................................16

        6.    January 29, 2004 Bombing ...................................17

        7.    January 8, 2001 Machine-Gun Attack .....................18

SUMMARY OF ARGUMENT .............................................................18

ARGUMENT ....................................................................................23

I.    The Court Lawfully Exercised Jurisdiction Because Defendants Have No Due Process Rights ........................................23

II.    Even if Defendants Enjoy Due Process Rights, The Court May Constitutionally Exercise Personal Jurisdiction over Defendants.................27

    A.    *International Shoe* Created a Flexible Standard, Requiring Consideration of Legitimate Government Interests ...........................28

    B.    The Court Has Specific Jurisdiction ........................................32

        1.    Defendants Meet the "Effects Test" ...........................33

        2.    Defendants Meet the "Purposeful Availment" Test .................39

        3.    Defendants Consented to Personal Jurisdiction Under the ATA by Appointing an Agent.................................40

    C.    The Court Has General Jurisdiction.......................................44

        1.    Defendants Forfeited Their At-Home Defense.......................44

        2.    *Daimler* Did Not Concern a Federal Statute Like This One ....................................48

        3.    This Is an "Exceptional Case" ....................................51

III.    No New Trial Is Warranted .....................................................52

    A.    Plaintiffs' Expert Testimony Was Proper ...........................53

        1.    Background ...................................................53

        2.    The Experts Gave Classic Testimony Allowed by Rule 702 ...............................................54

        3.    The Experts Did Not "Narrate Speculative Stories".................57

        4.    Expert Testimony About Defendants' So-Called "Social Welfare" Programs Was Proper.................................60

        5.    Defendants' *Ad Hominem* Attacks on the Experts Are Meritless.........................................64

    B.    Even if Plaintiffs' Experts Had Offered Inadmissible Testimony, It Was Harmless ...............................................65

IV.    The Court Should Reinstate Plaintiffs' Non-Federal Claims.......................68

    A.    Defendants Are Not "Unincorporated Associations" .........................69

B.      Defendants May Be Sued Under New York Law ................................ 70

V.     The Court Should Reinstate the Guetta Claims ............................................. 72

CONCLUSION .......................................................................................................... 74

iii

# TABLE OF AUTHORITIES

**Page(s)**

<u>C</u>ASES:

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,*
    305 F.3d 120 (2d Cir. 2002) ................................................................20, 39

*Bendix Autolite Corp. v. Midwesco Enters.,*
    486 U.S. 888 (1988) ..........................................................................40, 41

*Boim v. Holy Land Found. for Relief & Dev.,*
    549 F.3d 685 (7th Cir. 2008) ..............................................................61, 73

*Bracewell v. Nicholson Air Servs.,*
    680 F.2d 103 (11th Cir. 1982) ..................................................................40

*Brecht v. Abrahamson,*
    507 U.S. 619 (1993) ..................................................................................65

*Burnet v. Brooks,*
    288 U.S. 378 (1933) ..................................................................................43

*Busch v. Buchman, Buchman & O'Brien,*
    11 F.3d 1255 (5th Cir. 1994) ....................................................................43

*Calder v. Jones,*
    465 U.S. 783 (1984) ..................................................................................34

*Chatman-Bey v. Thornburgh,*
    864 F.2d 804 (D.C. Cir. 1988) ..................................................................44

*Chloe v. Queen Bee of Beverly Hills, LLC,*
    616 F.3d 158 (2d Cir. 2010) ......................................................................39

*City of E. St. Louis v. Circuit Ct. for Twentieth Judicial Circuit, St.
    Clair Cnty., Ill.,*
    986 F.2d 1142 (7th Cir. 1993) ..................................................................24

*City of New York v. City Civil Serv. Comm'n.,*
    60 N.Y.2d 436 (1983) ................................................................................71

iv

*Cmty. Bd. 7 of Borough of Manhattan v. Schaffer*,
  84 N.Y.2d 148 (1994) .................................................................71

*Cook v. Tait*,
  265 U.S. 47 (1924)......................................................................43

*Daimler AG v. Bauman*,
  134 S. Ct. 746 (2014)............................................................*passim*

*Estate of Kleiman v. P.A.*,
  82 F. Supp. 3d 237 (D.D.C. 2015), *appeal filed*...........................38, 47

*Fagiola v. Nat'l Gypsum Co. AC & S., Inc.*,
  906 F.2d 53 (2d Cir.1990) .........................................................57

*Fitzsimmons v. Barton*,
  589 F.2d 330 (7th Cir. 1979) ....................................................43

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan
  Republic*,
  582 F.3d 393 (2d Cir. 2009) ...............................................19, 23, 24

*Genetic Implant Sys. v. Core-Vent Corp.*,
  123 F.3d 1455 (Fed. Cir. 1997) ................................................40

*Gill v. Arab Bank, PLC*,
  893 F. Supp. 2d 523 (E.D.N.Y. 2012) .......................................55

*Gilmore v. Palestinian Interim Self-Government Auth.*,
  53 F. Supp. 3d 191 (D.D.C. 2014),
  *appeal filed*, 14-7129 (D.C. Cir. Aug. 29, 2014)...........................64

*Gilmore v. Palestinian Interim Self-Government Auth.*,
  8 F. Supp. 3d 9 (D.D.C. 2014), *appeal filed*, 14-7129 (D.C. Cir.
  Aug. 29, 2014) ..........................................................................47

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  131 S. Ct. 2846 (2011)..........................................................*passim*

*Graziano v. Cnty. of Albany*,
  3 N.Y.3d 475 (2004) .................................................................71

v

*GSS Group Ltd. v. National Port Authority*,
  680 F.3d 805 (D.C. Cir. 2012)...............................................................27

*Gucci Am., Inc. v. Li*,
  768 F.3d 122 (2d Cir. 2014) .............................................45, 47, 48

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004)...........................................................28, 30

*Hamilton v. Atlas Turner, Inc.*,
  197 F.3d 58 (2d Cir. 1999) ...........................................21, 44, 45, 46

*Handley v. Ind.& Mich. Elec. Co.*,
  732 F.2d 1265 (6th Cir. 1984) ...............................................43

*Harman v. City of Ft. Lauderdale*,
  134 Misc. 133 (Sup. Ct. N.Y. Co. 1929) ...........................................71

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
  466 U.S. 408 (1984)...........................................................32

*Hess v. Pawloski*,
  274 U.S. 352 (1927)...........................................................41

*Hilton v. Guyot*,
  159 U.S. 113 (1895)...........................................................52

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010)...........................................................30

*Holzsager v. Valley Hosp.*,
  646 F.2d 792 (2d Cir. 1981) ...............................................44, 46

*Hygh v. Jacobs*,
  961 F.2d 359 (2d Cir. 1992) ...............................................67, 68

*In re Hohorst*,
  150 U.S. 653 (1893)...........................................................50

*In re Roman Catholic Diocese of Albany, N.Y.*,
  745 F.3d 30 (2d Cir. 2014) ...............................................45, 46

*In re Scott Cable Commc'ns, Inc.*,
259 B.R. 536 (D. Conn. 2001) ....................................................24

*In re Terrorist Attacks on Sept. 11, 2001*,
714 F.3d 659 (2d Cir. 2013) ..........................19, 34, 36, 38

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
456 US 694 (1982) ....................................................33, 41

*International Shoe Co. v. Washington*,
326 U.S. 310 (1945) ..........................................*passim*

*IUE AFL-CIO Pension Fund v. Herrmann*,
9 F.3d 1049 (2d Cir. 1993) ....................................40, 41

*J. McIntyre Mach., Ltd. v. Nicastro*,
131 S. Ct. 2780 (2011) ..........................27, 28, 29, 32

*Johnson v. Celotex Corp.*,
899 F.2d 1281 (2d Cir. 1990) ....................................38

*Jund v. Town of Hempstead*,
941 F.2d 1271 (2d Cir. 1991) ....................................69, 70

*Keeton v. Hustler Magazine, Inc.*,
465 U.S. 770 (1984) ..........................................20, 30, 42

*Kennedy v. Mendoza-Martinez*,
372 U.S. 144 (1963) ....................................................32

*Klinghoffer v. SNC Achille Lauro*,
937 F.2d 44 (2d Cir. 1996) ....................................25, 70

*Knox v. PLO*,
306 F. Supp. 2d 424 (S.D.N.Y. 2004) ....................................52

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013) ..........................................*passim*

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
673 F.3d 50 (2d Cir. 2012) ....................................................23

*Linde v. Arab Bank PLC,*
706 F.3d 92,112 (2d Cir. 2013) ........................................................30

*Linde v. Arab Bank, PLC,*
922 F. Supp. 2d 316 (E.D.N.Y. 2011) ..............................................55

*Livnat v. PA,*
82 F. Supp. 3d 19, 26-27 (D.D.C. 2015) ..........................................27

*Mariash v. Morrill,*
496 F.2d 1138 (2d Cir. 1974) ...........................................................43

*Martin v. Curran,*
303 N.Y. 276 (1951) ....................................................................69, 70

*Mathews v. Diaz,*
426 U. S. 67 (1976) ...........................................................................29

*Mathirampuzha v. Potter,*
548 F.3d 70 (2d Cir. 2008) ..........................................................68, 72

*Max Daetwyler Corp. v. R. Meyer,*
762 F.2d 290 (3d Cir. 1985) .............................................................43

*McCullock v. H.B. Fuller Co.,*
61 F.3d 1038 (2d Cir. 1995) ........................................................52, 56

*Mendelsohn v. Meese,*
695 F. Supp. 1474 (S.D.N.Y. 1988) .............................................19, 26

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.,*
84 F.3d 560 (2d Cir. 1996) ..........................................................28, 29

*Mount v. Tuttle,*
183 N.Y. 358 (1906) .........................................................................69

*Murray's Lessee v. Hoboken Land & Improvement Co.,*
59 U.S. 272 (1855) ............................................................................24

*Mwani v. Bin Laden,*
417 F.3d 1 (D.C. Cir. 2005) ...................................................34, 37, 38

*Neirbo Co. v. Bethlehem Shipbuilding Corp.*,
  308 U.S. 165 (1939) ..................................................................41

*Nimely v. City of N.Y.*,
  414 F.3d 381 (2d Cir. 2005) ......................................................57

*Olberding v. Illinois Cent. R.R. Co.*,
  346 U.S. 338 (1953) ..................................................................41

*Pa. Fire Ins. Co. v. Gold Issue Mining & Milling Co.*,
  243 U.S. 93 (1917)....................................................................41

*Palestine Info. Office v. Shultz*,
  674 F. Supp. 910 (D.D.C. 1987),
  *aff'd*, 853 F.2d 932 (D.C. Cir. 1988) ......................................26

*Palestine Info. Office v. Shultz*,
  853 F.2d 932 (D.C. Cir. 1988)....................................................6

*Parker v. Reda, C.O.*,
  327 F.3d 211 (2d Cir. 2003) ..............................................*passim*

*Perkins v. Benguet Consolidated Mining Co.*,
  342 U.S. 437 (1952)............................................................49, 50

*Price v. Socialist People's Libyan Arab Jamahiriya*,
  294 F.3d 82 (D.C. Cir. 2002)...............................24, 25, 26, 27

*Principality of Monaco v. Miss.*,
  292 U.S. 313 (1934)............................................................24, 26

*Pub. Administrator v. Royal Bank of Canada*,
  19 N.Y.2d 127 (1967) .........................................................47, 48

*Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*,
  59 F. Supp. 2d 310 (D.P.R. 1999) ............................................24

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
  290 F. Supp. 2d 54 (D.D.C. 2003)............................................35

*Richardson Greenshields Secs., Inc. v. Metz*,
  556 F. Supp. 131, 133 (S.D.N.Y. 1983) ...................................48

ix

*Roberts v. Karimi*,
    251 F.3d 404 (2d Cir. 2001) ...................................................................36, 38

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966),
    *abrogated on other grounds by Shelby Cnty., Ala. v. Holder*,
    133 S. Ct. 2612 (2013).........................................................................24

*St. Clair v. Cox*,
    106 U.S. 350 (1882).............................................................................50

*State of Washington v. Superior Ct. of Wash.*,
    289 U.S. 361 (1933).............................................................................50

*Strauss v. Credit Lyonnais, S.A.*,
    242 F.R.D. 199 (E.D.N.Y. 2007).........................................................30

*Ungar v. PLO*,
    402 F.3d 274 (1st. Cir. 2005)...............................................................25

*United States v. Ahmed*,
    94 F. Supp. 3d 394 (E.D.N.Y. 2015) ...................................................35

*United States v. Al Kassar*,
    660 F.3d 108 (2d Cir. 2011) .........................................19, 34, 35, 38

*United States v. Amuso*,
    21 F.3d 1251 (2d. Cir. 1994) ...............................................................54

*United States v. Bennett*,
    232 U.S. 299 (1914)............................................................................43

*United States v. Blum*,
    329 F.2d 49 (2d Cir. 1964) ..................................................................68

*United States v. Bornscheuer*,
    563 F.3d 1228 (11th Cir. 2009) ...........................................................62

*United States v. Cardinal Mine Supply, Inc.*,
    916 F.2d 1087 (6th Cir. 1990).............................................................24

*United States v. Carlton*,
    534 F.3d 97 (2d Cir. 2008)............................................................72, 73

*United States v. Chavez*,
229 F.3d 946 (10th Cir. 2000) .................................................................62

*United States v. Curtiss-Wright Exp. Corp.*,
299 U.S. 304 (1936)................................................................................31

*United States v. Defreitas*,
2011 WL 317964 (E.D.N.Y. Jan. 31, 2011),
*aff'd sub nom. United States v. Kadir*,
718 F.3d 115 (2d Cir. 2013) .............................................................55, 73

*United States v. Farhane*,
634 F.3d 127 (2d Cir. 2011) .............................................................22, 54

*United States v. Feliciano*,
223 F.3d 102 (2d Cir. 2000) ...................................................................73

*United States v. Johnson*,
54 F.3d 1150 (4th Cir. 1995) ...................................................................57

*United States v. Kassir*,
2009 WL 910767 (S.D.N.Y. Apr. 2, 2009) .............................................55

*United States v. Locascio*,
6 F.3d 924 (2d Cir. 1993) ........................................................................54

*United States v. Mejia*,
545 F.3d 179 (2d Cir. 2008) ....................................................................58

*United States v. Mercedes*,
401 F. App'x 619 (2d Cir. 2010) .............................................................65

*United States v. Mostafa*,
965 F. Supp. 2d 451 (S.D.N.Y. 2013) .....................................................35

*United States v. Paracha*,
2006 WL 12768 (S.D.N.Y. Jan. 3, 2006) ................................................55

*United States v. PLO*,
695 F. Supp. 1456 (S.D.N.Y. 1988) ..........................................................6

*United States v. Scophony Corp. of Am.*,
333 U.S. 795 (1948)..............................................................21, 39, 40, 50

xi

*United States v. Sherry*,
100 F.3d 943 (2d Cir. 1996) ................................................................57

*United States v. Yousef*,
327 F.3d 56 (2d Cir. 2003) ...............................................19, 34, 38

*Van Horn v. Kittitas Cnty., Wash.*,
28 Misc. 333 (Sup. Ct. N.Y. Co. 1899) ............................................71

*Vilkhu v. City of New York*,
2009 WL 537495 (E.D.N.Y. Mar. 3, 2009) .......................................73

*Virgin Islands v. Miller*,
2010 WL 1790213 (Super. Ct. V.I. May 4, 2010) .............................24

*Walden v. Fiore*,
134 S. Ct. 1115 (2014) ..............................................................*passim*

*Warner Bros. Inc. v. Dae Rim Trading, Inc.*,
877 F.2d 1120 (2d Cir. 1989) ...........................................................70

*Westport Bank & Trust Co. v. Geraghty*,
90 F.3d 661 (2d Cir. 1996) .........................................................23, 33

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980) ....................................................................28, 43

## CONSTITUTION, STATUTES, RULES AND REGULATIONS:

U.S. CONST. art. I § 8 .........................................................................43

U.S. CONST. art. I § 10 .......................................................................43

U.S. CONST. art. II § 2 ........................................................................43

U.S. CONST. amend. IV .......................................................................25

U.S. CONST. amend. V ..................................................................*passim*

U.S. CONST. amend. XIV ..............................................................*passim*

5 U.S.C. § 7342 ..................................................................................26

15 U.S.C. § 22 ....................................................................................50

18 U.S.C. § 2331(1)(B).................................................................37, 40

18 U.S.C. § 2333(a) .........................................................................1

18 U.S.C. § 2334(a) ...................................................................*passim*

22 U.S.C. §§ 611 *et. seq.*............................................................ *passim*

22 U.S.C. § 611(e) .........................................................................25

22 U.S.C. § 2656f...........................................................................7

22 U.S.C. §§ 4301 *et seq.*............................................................26

Pub. L. 100-204, 101 Stat. 1406 (1987)
   (*codified at* 22 U.S.C.A. § 5201).............................................*passim*

Pub. L. 103-07, 107 Stat 931 (1993).............................................7

Pub. L. 103-125, 107 Stat. 1309 (1993).........................................7

Pub. L. 103-306, 108 Stat. 1608 (1994).........................................7

Pub. L. 104-107, 110 Stat 704 (1996)...........................................7

Pub. L. 106-113, 113 Stat 1501 (1999)
   (*codified in a note to* 22 U.S.C. § 2656f)...................................7

Pub. L. 107-228, 116 Stat 1350 (2002)..........................................11

Pub. L. 113-235, 128 Stat. 2130 (2014).........................................25

31 C.F.R. §2.37 ..............................................................................26

31 C.F.R. § 2.43(f) .........................................................................26

52 Fed. Reg. 37,035-02 (1987) ...................................................6, 26

59 Fed. Reg. 4,777 (1994) ..............................................................7

59 Fed. Reg. 37,121-03 (1994) ......................................................26

Exec. Order 12947, 60 Fed. Reg. 5079 (Jan. 23, 1995)................8

66 Fed. Reg. 12,658 (2001) ..........................................................26

80 Fed. Reg. 36,580 (2015) ...............................................................25

Fed. R. Civ. P. 4 ........................................................................40, 41

Fed. R. Civ. P. 12 ......................................................................21, 46

Fed. R. Civ. P. 17 ...........................................................................68

Fed. R. Civ. P. 49 ...........................................................19, 37, 38, 40

Fed. R. Evid. 403 ......................................................................10, 37

Fed. R. Evid. 702 ......................................................................54, 55

Fed. R. Evid. 704 ...........................................................................56

N.Y. CPLR 1025 .............................................................................70

**OTHER AUTHORITIES:**

Brief for the United States, *Daimler AG v. Bauman*,
2013 WL 3377321 (2013)..............................................................49

Charles Doyle, Congressional Research Service, "Extraterritorial
Application of American Criminal Law" (Feb. 15, 2012),
http://fas.org/sgp/crs/misc/94-166.pdf............................................31

FBI, Most Wanted Terrorists,
https://www.fbi.gov/wanted/wanted_terrorists .................................31

H.R. Hearing 102-110
Before the House Judiciary Committee (Sept. 18, 1992)
(Sen. Grassley)............................................................................31

H.R. Rep. 102-1040 (1992)........................................................1, 31. 35

International Convention for the Suppression of Terrorist Bombings,
Dec. 15, 1997, S. Treaty Doc. No. 106-6, 2149 U.N.T.S. 256.........................52

International Convention for the Suppression of the Financing of
Terrorism, Dec. 9, 1999, T.I.A.S. No. 13075, 2178 U.N.T.S. 197 ...................52

Remarks on the Terrorist Attack in Israel and an Exchange With
Reporters in Taylor,
1996 Pub. Papers 359 (Mar. 4, 1996) ..................................................8

Remarks Prior to Discussions With Chairman Yaser Arafat of the
Palestinian Authority and an Exchange With Reporters,
1996 Pub. Papers 671 (May 1, 1996) ..................................................8

Remarks Prior to Discussions With Chairman Yaser Arafat of the
Palestinian Authority and an Exchange With Reporters,
1997 Pub. Papers 227 (Mar. 3, 1997) ..................................................8

Remarks on the Terrorist Attack in Jerusalem and an Exchange With
Reporters in Martha's Vineyard,
1997 Pub. Papers 1129 (Sept. 4, 1997)................................................8

Remarks Prior to Discussions With Chairman Yaser Arafat of the
Palestinian Authority and an Exchange With Reporters,
1998 Pub. Papers 106 (Jan. 22, 1998) .................................................8

Remarks Prior to Discussions With Chairman Yaser Arafat of the
Palestinian Authority and an Exchange With Reporters,
1999 Pub. Papers 1579 (Sept. 23, 1999)..............................................8

Remarks Prior to Discussions With Chairman Yaser Arafat of the
Palestinian Authority and an Exchange With Reporters,
2000 Pub. Papers 92 (Jan. 20, 2000) ...................................................8

Remarks Prior to Discussions With Chairman Yaser Arafat of the
Palestinian Authority and an Exchange With Reporters,
2000 Pub. Papers 754 (Apr. 20, 2000)..................................................8

Remarks Prior to Discussions With Chairman Yaser Arafat of the
Palestinian Authority and an Exchange With Reporters,
2000 Pub. Papers 1147 (June 15, 2000) ...............................................8

Remarks on the Situation in the Middle East,
2000 Pub. Papers 81 (Feb. 14, 2001)..................................................11

Remarks Announcing Action Against Terrorist Financial Support
Networks,
2001 Pub. Papers 1532 (Dec. 20, 2001) ..............................................11

Remarks Following Discussions With Prime Minister Ariel Sharon of
  Israel and an Exchange with Reporters,
  2002 Pub. Papers 190 (Feb. 7, 2002)....................................................................11

Remarks on the Middle East,
  2002 Pub. Papers 1059 (June 24, 2002) .............................................................12

*Restatement (Third) of Foreign Relations Law* § 404, comment (a)
  (1987) ..................................................................................................................52

Statement on the Implementation of the Israel-Palestine Declaration of
  Principles,
  1994 Pub. Papers 844 (May 4, 1994) ...................................................................8

Statement on the Terrorist Bombing in Tel Aviv, Israel,
  2001 Pub. Papers 606 (June 1, 2001) ................................................................11

Statement on the Terrorist Bombing in Jerusalem,
  2001 Pub. Papers 953 (Aug. 9, 2001).................................................................11

Statement on the Bombings in Israel,
  2001 Pub. Papers 1465 (Dec. 1, 2001) ..............................................................11

Statement on Tel Aviv and West Bank Terrorists Attacks,
  2002 Pub. Papers 1263 (July 17, 2002) .............................................................11

Statement on Signing the Homeland Security Act of 2002,
  2002 Pub. Papers 2128 (Nov. 25, 2002)............................................................11

4 Charles A. Wright & Arthur R. Miller, *et al.*, *Personal Jurisdiction
  in Federal Question Cases*,
  Fed. Practice & Procedure, Civ. § 1068.1 (4th ed.)...........................................43

Jim Zanotti, Congressional Research Service: "U.S. Foreign Aid to
  the Palestinians" (July 3, 2014),
  http://fpc.state.gov/documents/organization/ 217502.pdf ..................................7

xvi

# TABLE OF TRIAL EXHIBITS NOT IN THE JOINT APPENDIX

## Admitted Exhibits

Plaintiffs' Trial Exhibit ............................................................................... Docket Entry

PTE 2 ................................................................................................... DE 927-2

PTE 3 ................................................................................................... DE 927-3

PTE 7 ................................................................................................... DE 927-5

PTE 8 ................................................................................................... DE 927-6

PTE 10 ................................................................................................. DE 927-8

PTE 17 ............................................................................................... DE 927-11

PTE 22 ............................................................................................... DE 927-14

PTE 23 ............................................................................................... DE 927-15

PTE 26 ............................................................................................... DE 927-17

PTE 36B ............................................................................................ DE 927-18

PTE 36C ............................................................................................ DE 927-19

PTE 48 ............................................................................................... DE 927-24

PTE 58 ............................................................................................... DE 927-27

PTE 60 ............................................................................................... DE 927-28

PTE 62 ............................................................................................... DE 927-30

PTE 75 ............................................................................................... DE 927-37

PTE 89 ............................................................................................... DE 927-45

PTE 96 ............................................................................................... DE 927-47

PTE 109 ............................................................................................. DE 927-52

xvii

PTE 112............................................................................................DE 927-53

PTE 113............................................................................................DE 927-54

PTE 114............................................................................................DE 927-55

PTE 116............................................................................................DE 927-56

PTE 128............................................................................................DE 927-59

PTE 142............................................................................................DE 927-70

PTE 153............................................................................................DE 927-77

PTE 175..............................................................................................DE 907-3

PTE 178..............................................................................................DE 907-4

PTE 200..............................................................................................DE 907-8

PTE 233..............................................................................................DE 907-9

PTE 260............................................................................................DE 907-21

PTE 261............................................................................................DE 927-83

PTE 275............................................................................................DE 927-84

PTE 295............................................................................................DE 907-27

PTE 313............................................................................................DE 907-30

PTE 354............................................................................................DE 907-46

PTE 356.......................................................................................DE 907-47-52

PTE 358.......................................................................................DE 907-75-76

PTE 361............................................................................................DE 907-88

PTE 362....................................................................................DE 907-91-100

PTE 375.......................................................................................DE 908-31-33

PTE 384......................................................................................DE 9908-41-46

PTE 419..................................................................................................DE 908-69

PTE 431..................................................................................................DE 927-94

PTE 451.................................................................................................DE 909-1-57

PTE 465.................................................................................................DE 909-77-80

PTE 467.................................................................................................DE 909-81-84

PTE 532................................................................................................DE 909-92-103

PTE 635..................................................................................................DE 910-12

PTE 1052.................................................................................................DE 910-52

PTE 1193...................................................................................................DE 911-8

## Excluded Exhibits

PTE 179..................................................................................................DE 547-139

PTE 199..................................................................................................DE 547-147

PTE 644..................................................................................................DE 547-430

PTE 910..................................................................................................DE 547-534

## **INTRODUCTION**

The Anti-Terrorism Act ("ATA") provides an express, extraterritorial private right of action that allows United States ("U.S.") nationals injured by "international terrorism" to sue in federal court. 18 U.S.C. § 2333(a). Motivated by the Palestine Liberation Organization's ("PLO") infamous murder of American citizen Leon Klinghoffer, and seeking to create meaningful remedies against terrorists and the organizations that support them, Congress enacted the ATA to create an "extraterritorial" "civil legal cause of action for American victims of terrorism." H.R. Rep. 102-1040, at 5 (1992).

In this ATA action, eleven American families sued the PLO and the Palestinian Authority ("PA") ("Defendants") for orchestrating a terror campaign designed to influence U.S. policy, in which terrorists wielding machine guns and bombs murdered and maimed American citizens. After a seven-week trial, a jury found that the PA, acting through its "security" employees, perpetrated the attacks; the jury also found that Defendants knowingly provided material support to U.S.-designated foreign terror organizations ("FTOs"). JA-8261-68. The jury found Defendants liable for substantial damages. JA-8270-81.

On appeal, Defendants seek to overturn the jury's verdict by arguing that the Constitution forbids the exercise of personal jurisdiction over them. To avoid jurisdiction, Defendants claim it would be fundamentally unfair to hold them to account in a U.S. court for murdering Americans and providing material support to U.S.-designated FTOs for the purpose of influencing U.S. foreign policy. They

also claim their indisputably longstanding, continuous presence in the U.S.—and their receipt of billions of dollars in U.S. aid—is irrelevant to the exercise of jurisdiction over them, even though a federal statute, by its terms, authorizes jurisdiction based on that presence.

Defendants' arguments place the ATA's continued viability as a federal response to international terrorism squarely at issue. The question is whether the ATA will function as intended or become a dead letter, inapplicable to the very fact pattern Congress designed it to address. Under Defendants' theory, they may come to the United States to extract funds from our government on the understanding that they will live up to their promise to renounce terror, open a lobbying office in Washington, D.C., then murder U.S. citizens and support U.S.-designated FTOs to provide teeth to their U.S. lobbying efforts—and yet avoid facing justice in the U.S. courts. That position is as meritless as it is offensive, and this Court should reject it.

## ISSUES

I.   Whether Defendants have due process rights.

II.   If so, whether the District Court constitutionally exercised personal jurisdiction.

III.   Whether the District Court abused its discretion by allowing certain testimony by two expert witnesses.

IV.   Whether Defendants are immune from liability on supplemental non-federal claims under New York law as "unincorporated associations."

V.     Whether there is sufficient evidence to submit the claims of Plaintiffs Oz
       and Varda Guetta to a jury.

### STATEMENT OF THE CASE

In a seven-week trial, the jury heard 24 days of testimony from 48 witnesses and reviewed 327 exhibits.  The jury answered special interrogatories, finding Defendants liable for multiple terror attacks, and awarded damages totaling $218.5 million.  After automatic trebling under the ATA, the District Court entered a judgment of $655.5 million.  SPA-67.

### A.     Personal Jurisdiction Decision

In 2011, the District Court found that Plaintiffs had obtained personal jurisdiction over Defendants by serving process in accordance with 18 U.S.C. § 2334(a) on an "agent."  SPA-5.  The District Court also found "by a preponderance of the evidence" that Defendants had "a continuous and systematic presence within the United States" justifying the exercise of traditional general personal jurisdiction.  SPA-7 & n.10 (agreeing with "every federal court to have considered the issue").  Finally, the Court found that the exercise of jurisdiction over Defendants did not offend "traditional notions of fair play and substantial justice" under *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny. SPA-15-16.  Having found general jurisdiction, the Court did not address specific jurisdiction.

Shortly after the District Court rendered its jurisdiction decision, the Supreme Court decided *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846 (2011).  *Goodyear* announced a new limitation on jurisdiction imposed by

the Fourteenth Amendment: a state court may only "assert general jurisdiction over foreign…corporations" that are "at home in the forum State." 131 S. Ct. at 2851. Defendants recognized *Goodyear*'s new "at home" test in *other* cases, arguing that it blocked "general jurisdiction" (JA-736-41). In *this* case, however, they chose not to raise it, embarking instead on a two-year campaign of discovery and motion practice. *See infra* p. 45-46 & n.39.

Years later, after the District Court directed them to prepare for trial, Defendants moved to reconsider the Court's jurisdiction decision as having been abrogated by the "at home" test as announced in *Goodyear* and clarified by *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). The Court denied the motion, holding that it "should have been made much earlier in this case" because "there was case law from which one could have made such an argument." SPA-19. The District Court also held that Defendants failed to provide a factual record to even attempt to apply the "at home" test. SPA-19-20.

## B. Summary Judgment Decision

Following discovery, the parties cross-moved for summary judgment. The District Court held that the evidence of vicarious liability and material support to U.S.-designated FTOs was sufficient to present to the jury. SPA-25-26, 39, 44.

Defendants also moved for summary judgment on the issue of personal jurisdiction under the "at home" test. This time, the District Court addressed the motion on the merits rather than denying it based on forfeiture (SPA-50 n.2). The Court held that this case presents the kind of "exceptional case" contemplated in *Daimler*. SPA-50. Because Defendants are stateless entities, the Court explained,

4

exercising jurisdiction over them "does not conflict with any foreign country's applicable law or sovereign interests, nor is it in contravention of the laws of any foreign country." SPA-51.

In addition, the District Court curtailed Plaintiffs' case, holding that Plaintiffs' supplemental non-federal claims should be dismissed because Defendants are "unincorporated associations that lack the capacity to be sued under New York law." SPA-46-47. (The Court held earlier that it had supplemental jurisdiction over these claims, which arose from the same attacks as the ATA claims. DE-251).[1] The Court, therefore, dismissed six non-citizen Plaintiffs. SPA-60. And, shortly before trial, the District Court dismissed the claims of one family for lack of evidence sufficient to sustain a verdict. SPA-60.

### C.    Mandamus Petition

After losing their summary judgment motion, Defendants sought *mandamus* on the personal jurisdiction issue in Case No. 14-4449. Plaintiffs responded not only that the District Court's decision was correct, but also that Defendants lack due process rights, that the Court has specific jurisdiction, and that Defendants had waived the "at home" defense by failing to raise it earlier in the case. This Court summarily denied Defendants' petition.

### D.    Judgment

Following the verdict, the District Court denied Defendants' post-trial motions, set security for a stay pending appeal, and entered judgment. DE-957,

---

[1] "DE-__" refers to Docket Entries in the District Court.

5

958; SPA-54-59, 61-67. In Case No. 15-2739, this Court affirmed the terms of the stay and expedited this appeal.

## FACTS

### A.    Combating PLO Terrorism Has Long Been U.S. Policy

PLO terrorism has been a U.S. concern for decades. In 1987, Congress found that the PLO is "a terrorist organization and a threat to the interests of the United States," and "should not benefit from operating in the United States."[2] The government closed the PLO's U.S. offices and shut down its U.S. activities "because of U.S. concern over terrorism."[3]

In 1993, the PLO renounced terrorism in an agreement signed on the White House lawn. JA-7400-7405; JA-9772-73. In a second agreement signed in 1995, also at the White House, Defendants agreed that their security forces would work to end Palestinian terrorism. Plaintiffs' Trial Exhibit ("PTE") 532; *see* JA-4193-4201.[4] According to Defendants' own witness, these agreements arose from negotiations that took place "under the sponsorship of the Americans." JA-7397.

In response to Defendants' anti-terror commitments, Congress authorized the President to suspend the ban on the PLO maintaining an office and agents in

---

[2] Anti-Terrorism Act of 1987, Pub. L. 100-204, § 1002, 101 Stat. 1406 (1987) (*codified at* 22 U.S.C.A. § 5201).

[3] 52 Fed. Reg. 37,035-02 (1987); *see Palestine Info. Office v. Shultz*, 853 F.2d 932, 935 (D.C. Cir. 1988); *United States v. PLO*, 695 F. Supp. 1456, 1471 (S.D.N.Y. 1988).

[4] For a cross-reference to the Docket for each PTE, *see* Table of Trial Exhibits Not in The Joint Appendix exhibit.

the U.S.—subject to continued certification by the President that doing so was consistent with U.S. national interests.[5] Congress repeatedly instructed the Secretary of State to report on the PLO's compliance with its anti-terror commitments, as well as to provide detailed information about Defendants' connections to terror attacks and the effects of such attacks on American citizens.[6] Congress began giving the PLO financial assistance on the understanding that the PLO had committed to renounce terrorism.[7] Congress has provided approximately $5 billion to the Palestinians in foreign aid.[8]

The President also engaged in extensive efforts to suppress Palestinian terrorism. In 1995, President Clinton invoked his emergency powers to designate certain Palestinian entities—including Hamas—as terror organizations, explaining that "grave acts of violence committed by [these] foreign terrorists…constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Exec. Order 12947, 60 Fed. Reg. 5079 (Jan. 23,

---

[5] Middle East Peace Facilitation Act of 1993, Pub. L. 103-125, §§ 2, 3(d)(3), 107 Stat. 1309 (1993); *see* 59 Fed. Reg. 4,777 (1994) (lifting certain restrictions on PLO).

[6] *E.g.*, Pub. L. 106-113, § 805, 113 Stat. 1501 (1999) (*codified in a note to* 22 U.S.C. § 2656f); Pub. L. 104-107, § 604, 110 Stat. 704 (1996).

[7] *E.g.* Pub. L. 103-07, § 545, 107 Stat. 931 (1993); Pub. L. 103-125, § 578, 107 Stat. 1309 (1994); Pub. L. 103-306, § 565, 108 Stat. 1608 (1994); Pub. L. 104-107, § 555, 110 Stat. 704 (1996); Pub. L. 106-113, § 554, 113 Stat. 1501 (1999).

[8] Jim Zanotti, Congressional Research Service: "U.S. Foreign Aid to the Palestinians" (July 3, 2014), http://fpc.state.gov/documents/organization/217502.pdf

1995); *see* JA-4619-20. Arafat repeatedly flew to Washington seeking assistance,[9] and the President repeatedly urged him to "do more" to combat terror.[10]

In July 2000, Arafat returned to the U.S. to negotiate with representatives of Israel under U.S. supervision at Camp David, but the talks failed. JA-7409.

## B. Defendants Intended to Use Their Terror Campaign to Influence U.S. Policy

In October 2000, soon after the failure of the Camp David talks, Defendants began orchestrating a terrorist onslaught in Israel that became known as the "al Aqsa Intifada." JA-4190-91, 5405. Arafat's Fatah faction of the PLO formed a division called the Al-Aqsa Martyrs Brigades ("AAMB") to carry out terror attacks: according to the PLO's website, AAMB "is the military wing of the Fatah movement." PTE-1052. The State Department found that Defendants made "direct payments from the PA to Fatah party activists, some of whom were also affiliated with the Al-Aqsa Martyrs Brigade, who had been involved in violence," and that the payments were "likely made with the knowledge that the intended recipients had been involved in violence and terrorism." JA-9222 (PTE-496).

Defendants' goal in conducting the Intifada was to bring about an Israeli withdrawal from certain territory. As Arafat himself wrote: "our Palestinian

---

[9] 1996 Pub. Papers 671 (May 1, 1996); 1997 Pub. Papers 227 (Mar. 3, 1997); 1998 Pub. Papers 106 (Jan. 22, 1998); 1999 Pub. Papers 1579 (Sept. 23, 1999); 2000 Pub. Papers 93 (Jan. 20, 2000), 754 (Apr. 20, 2000), 1147 (June 15, 2000).

[10] *E.g.*, 1994 Pub. Papers 844 (May 4, 1994) ("I stressed to Chairman Arafat the importance of moving without hesitation to make this agreement"); 1996 Pub. Papers 359, 360 (Mar. 4, 1996); 1997 Pub. Papers 1129 (Sept. 4, 1997).

8

people are persevering in the glorious Intifada…in the cause of realizing their legitimate aspirations of ending the Israeli occupation of our land and holy places.…" PTE-175. The State Department reported that senior PLO and PA leaders "encouraged acts of violence and an atmosphere of incitement to violence in the Palestinian media and through the public statements of Palestinian officials." JA-9221 (PTE-496).

Defendants' intended their terror campaign to influence not merely Israel, but also the U.S.—a key player in the balance between Defendants' interests and those of Israel. PLO and PA officials met with U.S. officials on "scores" of occasions during the Intifada to discuss U.S. policy toward Israel and Defendants. JA-7161, 7410-11, 7480. Defendants' intent to use the Intifada to influence U.S. policy to achieve Israeli concessions is obvious from what they were telling their own security forces—in magazines written, edited, and published by Defendants' "Political Guidance" apparatus and distributed to security and police personnel for the purpose of "educating" them. JA-5327-30. According to these "political guidance" magazines:

- "[A]ll efforts by Palestinian forces should be turned towards inflaming the popular Intifada [to achieve]… needed additional U.S. and European pressure on Israel…." PTE-200.

- "The European nations and the U.S., who have strategic interests in the region, are called upon to see the necessity of urgent and immediate action to stop Israeli practices against the Palestinian people. Without this, their vital interests shall be directly jeopardized." PTE-175.

9

- "America disregards the consequences of its aggression on our Arab and Islamic Nation and on the whole living conscience of the world, and…our Nation's patience will soon run out…[and] U.S. interests in the region are in danger."  PTE-178.

- "[T]he Palestinian people reject the yellow policy of the U.S. and its leader Bush, and our people shall continue the popular struggle and Intifada until achievement of the sought-after and historical goal…which we have taken on through…waterfalls of blood that Palestinian people have offered up on a daily basis.…"  PTE-200.

- "All these measures have brought about the blessed Al-Aqsa Intifada, and sparked great popular anger, in all the Arab capitals, over the U.S. Ambassador's favoritism for its ally Israel, and the U.S.'s failure to play the role of honest broker in the peace process." PTE-175.

Plaintiffs had much more evidence along the same lines, but the District Court excluded it under Rule 403.  JA-4911-14.[11]

---

[11] One PA propaganda magazine characterized the Intifada as a "clear response confirming to the politicians at the White House that American interests will not be impervious to being affected directly."  PTE-910.  Another stated that the only way that the "U.S. and Israel" would contemplate "establishing a Palestinian state" would be "an increase in the number of human casualties inflicted upon Israel, in the Palestinian battle to attain rights."  PTE-199.  A third called a speech by U.S. Secretary of State Colin Powell "the direct result of the glorious Intifada."  PTE-179.  Yet another urged "open, bloody and fierce" "action…letting the United States of America know that the continuation of their flagrant bias toward the interests of the Zionist entity and against the rights of our people, will be an incentive for our Nation's masses to move in earnest to threaten U.S. interests in the region in all their economic, political and security forms."  JA-4489-98 (PTE-913).  Official PA Television ran programming encouraging viewers to "kill those Jews and those Americans who are like them and those who stand with them.

*Footnote continued on next page*

10

### C. Defendants' Terror Campaign Threatened U.S. Interests

Defendants' actions threatened U.S. interests. In 2002, the State Department designated the AAMB as an FTO because it "has committed, or poses a serious risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States." JA-9262 (PTE-537). Defendants were aware of the designation. JA-7343. The State Department also concluded that "members of [PA] security forces were frequently involved in acts of violence" against civilians. JA-9220 (PTE-496).

Congress demanded that the President sanction the PLO if it did not comply with its promise to renounce terrorism,[12] and the President did so. PTE-635. The President repeatedly condemned the terror attacks,[13] demanded that Arafat and the PA "demonstrate through their actions, and not merely their words, their commitment to fight terror,"[14] repeatedly sent envoys to the region,[15] and vowed to use "American power" against "suicide bomb[ers] [in] Israel."[16] U.S.

---

*Footnote continued from previous page*
They are all together against the Arabs and the Muslims." JA-1715 (Report of Itamar Marcus).

[12] Pub. L. 107-228, § 556, 116 Stat 1350 (2002).

[13] *E.g.*, 2001 Pub. Papers 81 (Feb. 14, 2001), 606 (June 1, 2001), 953 (Aug. 9, 2001); 2002 Pub. Papers 1263 (July 17, 2002), 2128 (Nov. 25, 2002).

[14] *E.g.*, 2001 Pub. Papers 1465-66 (Dec. 1, 2001); 2002 Pub. Papers 190 (Feb. 7, 2002) ("we will continue to keep pressure on Mr. Arafat to convince him that he must take serious, concrete, real steps to reduce terrorist activity in the Middle East").

[15] JA-7161.

[16] 2001 Pub. Papers 1532 (Dec. 20, 2001).

representatives met "hundreds of times" with PA officers in an effort to stop the terror campaign. JA-7130, 7410-11, 7428-29.

Defendants were defiant. They made "extensive" U.S. media appearances[17] in which they threatened to continue their terror campaign unless their territorial objectives were met. For example, "Yasser Arafat essentially told Colin Powell over the weekend that we're not going to talk about any kind of ceasefire until the Israelis pull out of the occupied territories," according to a senior PLO official. DE-84-25 at 333. Defendants said the same thing in other U.S. media appearances: "If the Israelis move out of our territories and leave us alone…then I assure you that they will have peace." DE-84-23 at 277.

Ultimately, the President called on the Palestinian people "to elect new leaders, leaders not compromised by terror."[18]

### D. Defendants' Terror Attacks Killed and Injured U.S. Citizens

This case involves seven out of hundreds of terror attacks that took place during the Intifada, in which PA "security" employees acting within the scope of their employment, and members of Hamas and AAMB receiving material support and assistance from Defendants, killed and injured Americans.

---

[17] SPA-10.

[18] 2002 Pub. Papers 1059 (June 24, 2002).

12

### 1. January 22, 2002 Machine-Gun Attack

On January 22, 2002, a PA police officer opened fire on a crowded pedestrian mall with an assault rifle. PTE-60; JA-3943-44. He shot Shmuel Waldman of Brooklyn, a U.S. citizen. PTE-1193. Waldman recalled: "He took out his M-16 and he raised it up, and I was his target.… He screamed out *Allahu Akbar*. When he did that, I knew what it meant." JA-6587. The terrorist then walked down the street shooting others, including Shayna Gould, a U.S. citizen. PTE-1193. Shayna arrived at the hospital with no pulse. JA-6621. Her doctors told her family in Chicago that she had a 5% chance of surviving until morning, and that there was no "guarantee [of] any brain activity even if she does make it through the night." JA-6621. The family raced to Israel to be at her side. When they arrived, Shayna lay unconscious; her face was a "gray-green color." JA-6623. Her sister took her hand and told her "I'm here because you're going to live, not because you're going to die." JA-6624. Shayna did live, though she lost a lung. JA-6631-32.

Six members of the PA police force planned that shooting. JA-8956-9085 (PTE-357); PTE-60, 361, 362, 384, 419. One of the primary architects was Nasser Aweis, a member of the PA's National Security Forces with a long history of terrorist crime. PTE-112, 362. He was on a list of most-wanted terrorists that U.S. envoy Anthony Zinni presented to Arafat prior to the attack (the "Zinni List"). PTE-354; JA-4615-17; JA-5245-46.

13

Even today, Defendants continue to employ, pay, and promote Aweis and the other five surviving employees responsible for the shooting, while they sit in jail for their crimes.  PTE-3, 36B, 36C, 75, 96, 109, 112, 113.

### 2. January 27, 2002 Bombing

On January 27, 2002, a PA intelligence informant named Wafa Idris blew herself up on a crowded street in Jerusalem in an AAMB attack.  PTE-17; JA-3989-90.  Shrapnel ripped into the bodies of Mark and Rena Sokolow, and their children Lauren and Jamie of Cedarhust, New York, all U.S. citizens.  PTE-1193. Rena recalled: "I looked over to my right and I saw a severed head of a woman about 3 feet away from me.  And I looked and there was this little girl looking down at me and I wasn't sure if it was Jamie.  Her face was all disfigured and bleeding.…"  JA-6425.  That little girl was Jamie, who testified: "Right away I knew what happened.  I knew a bomb went off.  And I kept saying to myself no, I'm 12 years old and I'm from New York and I'm going to stay alive."  JA-6399.

The bombing was planned by a PA intelligence officer who worked in the PA's headquarters, and extensive documentary evidence linked Defendants to the crime.  PTE-17, 26, 233, 465, 467.

### 3. March 21, 2002 Bombing

On March 21, 2002, Mohammed Hashaika, an ex-PA police officer, blew himself up on a street in Jerusalem in an AAMB attack.  PTE-23; JA-4003-04; JA-4031.  Screws from the homemade bomb exploded into the arm of Chicago native Alan Bauer and brain of his seven-year-old son, Yehonathon, both U.S. citizens. Yehonathon suffered a disabling, permanent brain injury.  JA-6021-22; JA-6458-

14

59. Yehonathon's mother testified: "Somebody wanted to kill my family. Somebody wanted to kill a 7-year-old child. Alan saw the terrorist and the terrorist certainly saw Yehonathon. He saw a 7-year-old child, and he saw that he was going to kill or injure a little boy, a 7-year-old child." JA-6489.

Abdel Karim Aweis—a senior PA intelligence officer who was also on the Zinni List—orchestrated the attack. PTE-356, Count 39; PTE-354; JA-4616-17. Instead of answering the U.S. call to arrest Aweis, Defendants kept him as an employee. PTE-2; JA-4617; JA-5310-3. After the Israeli authorities caught Aweis and brought him to justice for murder and attempted murder, Defendants still kept him on the payroll and promoted him repeatedly. PTE-58, 128.

### 4.    June 19, 2002 Bombing

On June 19, 2002, a suicide bomber blew himself up in another AAMB attack at a bus stop in Jerusalem; the bomber was 17 years old. JA-9603-21 (PTE-19); JA-5481-83; JA-5486-88. Defendants' material support of AAMB was in full force at the time. JA-8261-68. The terror cell killed seven and wounded 35, including plaintiff Shaul Mandelkorn, age 18. PTE-1193. Shaul's father, Leonard Mandelkorn, a U.S. citizen from New Jersey, testified: "My son was the first one to leave the bus. He wanted to get home fast....He was the only boy on the bus who was wounded because the bus had moved up." JA-6522. When Shaul's parents got to the hospital, they prayed, and his father "cried quietly, very quietly." JA-6542. Today, "on every side, in every direction, [Shaul] has patchwork and scars" on his body. "He doesn't have a single square centimeter of his body that is not scarred. It's awful." JA-6547.

15

### 5. July 31, 2002 Bombing

On July 31, 2002, at lunchtime, Hamas operatives detonated a massive bomb in the Frank Sinatra Cafeteria at Hebrew University in Jerusalem. JA-9148-56 (PTE-452); JA-4062-64, 4072-75. The explosion killed nine, including Benjamin Blutstein of Pennsylvania, Diane Carter of North Carolina, Janis Coulter of New York, and David Gritz of Massachusetts and Paris, France—all U.S. citizens. PTE-1193; JA-4074-76.

Ben Blutstein's mother learned of the bombing while watching CNN at home in Pennsylvania. She saw a "blood-stained pair" of pink basketball sneakers—Ben's signature shoes—and she knew "it meant he had either been injured or was dead." JA-7015. Ben had been scheduled to come home the next day. JA-6979-80. A police convoy escorted his body home from JFK airport. JA-6984.

In Massachusetts, Janis Coulter's father learned about her death from the news, too: "It was a terrible thing to see, but they brought a body bag out on the TV station, right on it, and went right down to where she was laying and I knew it was a girl, had blond hair. I said, oh, my goodness, that's Janice." JA-6852.

David Gritz's parents were in New York City when they heard the news. They flew home to Paris immediately to bury their only child. JA-7039-40. That night, his mother recalled, "I took a newspaper in the plane, and there was the picture of the cafeteria, and I saw David.… I saw just half of his face and his leg, and it was David." JA-7040.

16

Diane Carter's father Larry was at home in North Carolina when he got the news. He could not get it out of his mind: "In the newspaper, five Americans dead, four are named. Diane is not named. And then it dawned on me, she was so badly mutilated they had to use her fingerprints to identify her. I talked to the FBI. They said she took the full brunt of the blast." JA-6925.

Hamas operative Abdullah Barghouti manufactured the bomb and delivered it to his Hamas co-conspirators. PTE-431; JA-9148-56 (PTE-452). Hamas was (and remains) a U.S.-designated FTO.

Defendants had been notified by Israel and/or the U.S. before August 2001 to arrest Barghouti, JA-4626, but they did not do so. JA-4626-27. President Bush eventually called on the PA to arrest Barghouti. JA-9426 (PTE-956); JA-4674-75. Instead, a PA police officer provided Barghouti with a safe house. JA-9028-29 (PTE-357); PTE-358; JA-4661-62. That police officer is still a PA employee despite his conviction for providing material support to Hamas; and Defendants put Barghouti and the other Hamas perpetrators on their payroll after the attack, as well. JA-9435 (PTE-1120); JA-9436 (PTE-1121).

### 6. January 29, 2004 Bombing

On January 29, 2004, a PA police officer blew himself up on a crowded bus in an AAMB attack, killing Scott Goldberg and ten others. PTE-22; JA-4084-86; JA-5543. Eyewitness Meshulam Perlman testified: "The bus was destroyed. The seats were almost entirely gone.… People were severed into two, severed into pieces.… [I]t was a worse scene than a scene of war." JA-3875. Defendants left Goldberg's wife and seven children—all U.S. citizens—without a husband or

17

father. When his widow and his oldest child, Chana, went to retrieve his belongings, Chana recalled: "[w]e found a watch that had blood on it. We found his knapsack, his side knapsack with his books, and everything had a smell of burnt flesh and blood." JA-6752.

The mastermind, the bomber, and two other members of the terror cell were members of the PA police force. *See* PTE-7, 8, 10, 116. These convicted murderers remain on the PA payroll to this day while they sit in jail. PTE-48, 116, 114, 260, 261, 275, 295, 313.

### 7.     January 8, 2001 Machine-Gun Attack

On January 8, 2001, four men armed with machine guns opened fire on Varda Guetta and her twelve-year-old son Oz as they drove home from soccer practice. Thirty bullets hit the car; Oz, a U.S. citizen, was severely wounded. SA-2-3. The shooters remain unidentified, but Plaintiffs' expert identified the attack as involving tactics characteristic of "Force 17," a PLO/PA paramilitary unit, whose members perpetrated a series of similar shooting attacks against civilians in the same area. *See* JA-2770 (PTE-558); JA-3320 (PTE-559); JA-3322-23 (PTE-1109); JA-732 (Report of Israel Shrenzel).

### SUMMARY OF ARGUMENT

Defendants' chief argument on appeal is that it is fundamentally "unfair" for the United States to exercise personal jurisdiction over them. Doing so, they contend, violates the Due Process Clause of the Fifth Amendment. That argument fails.

18

**1.** Defendants—like all governments—are not "persons" entitled to claim the protections of the due process clause. *See Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 399 (2d Cir. 2009); *Mendelsohn v. Meese*, 695 F. Supp. 1474, 1480-81 (S.D.N.Y. 1988) (holding that the PLO is "a foreign power with no constitutional rights."). Granting such entities constitutional rights is inconsistent with the law in this Circuit and would impermissibly constrain the foreign-relations powers of the political branches.

**2.** Even if Defendants somehow have due process rights, the Court's exercise of personal jurisdiction over them is consistent with due process.

**a.** This is an easy case for the exercise of specific jurisdiction—especially given the extraordinary federal interests at stake, the jury's answers to special interrogatories, and the District Court's express and implied findings of fact under Fed. R. Civ. P. 49(a). The facts leave no doubt that Defendants' conduct was "expressly aimed" at U.S. citizens and U.S. interests. The jury expressly found that Defendants' employees who murdered and maimed U.S. citizens were acting within the scope of employment; the jury expressly found that Defendants provided material support to U.S.-designated FTOs; and under Fed. R. Civ. P. 49(a), Defendants indisputably killed Americans and supported U.S.-designated FTOs for the apparent purpose of influencing U.S. government policy. This Court has repeatedly upheld the exercise of federal jurisdiction over persons whose conduct was "expressly aimed at" U.S. citizens or interests from abroad. *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 678 (2d Cir. 2013); *United*

19

*States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011); *United States v. Yousef*, 327 F.3d 56, 112 (2d Cir. 2003).

Defendants also engaged in claim-related conduct inside the United States: they established a continuous presence here, accepted U.S. Government money on the understanding that they would not engage in terrorism, and used their U.S. presence to threaten the U.S. government with continued terror if their political demands went unmet—an element of the ATA claim. Even if these U.S. activities did not "directly give [] rise to the plaintiff's cause of action"—and they did— "they certainly 'relate to' it," which is enough for jurisdiction. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002) (Sotomayor, J.).

Moreover, Defendants consented to jurisdiction in this ATA case through the appointment of an agent. Congress provided in the ATA for personal jurisdiction over any defendant with an agent in the United States, and Defendants thereafter appointed an agent under the Foreign Agent Registration Act ("FARA") as a condition to returning to the United States. Defendants "chose to enter" the United States and "can be charged with knowledge of its laws." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779 (1984).

**b.** The Court also has general jurisdiction over Defendants, because the "at home" test does not govern this case. To begin with, Defendants forfeited their "at home" argument by waiting too long to raise it. The Supreme Court announced the "at home" test in 2011; Defendants knew of the "at home" test in 2011 and invoked it in other cases, but elected not to do so here until 2014. In the interim,

20

Defendants engaged in costly and burdensome discovery and motion practice. Jurisdictional defenses are forfeited if not timely asserted. *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999); Fed. R. Civ. P. 12(g).

In addition, *Daimler* did not involve a defendant served under a federal service-of-process statute. Contrary to Defendants' theory, the Supreme Court has specifically upheld the exercise of personal jurisdiction under a federal statute authorizing service on a foreign defendant "found" in the U.S. where, as here, the defendant engaged in a "continuous course of business." *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 818 (1948). Even where a foreign defendants is merely "found" in the U.S., International Shoe is satisfied so long as, in addition, a Federal statute authorizes service on such a defendant. *See id.* Defendants maintained a "continuous and systematic presence" (SPA-7) at a time when Congress made such conduct jurisdictionally dispositive. Nothing in *Daimler* purported to extend the "at home" test to render the exercise of personal jurisdiction under such *Federal* statutes unconstitutional.

Finally, if nothing else, this case falls within the exceptional circumstances contemplated in *Daimler*. As the District Court held, these Defendants are stateless entities—they do not have a jurisdictional "home" where they can be sued for their terrorist conduct—and exercising jurisdiction over them "does not conflict with any foreign country's applicable law or sovereign interests, nor is it in contravention of the laws of any foreign country." SPA-51.

**3.** Defendants' fall-back argument—that Judge Daniels abused his discretion in monitoring and limiting two experts' testimony—is meritless. These

21

experts were former law-enforcement officials who gave the kind of expert testimony that is common in terror cases, explaining the relationships among various terror organizations that were unfamiliar to the jury and explaining the meaning of documents in evidence—such as "Martyr Files"—with which the average juror is unfamiliar. *United States v. Farhane*, 634 F.2d 127, 158 (2d Cir. 2011). Judge Daniels kept a close watch on the expert testimony, carefully evaluating the objections. Moreover, the jury's liability findings are independently supported by the 327 admitted documentary exhibits to which Defendants make no objection before this Court. Even if Judge Daniels *had* abused his broad discretion over expert testimony—and he did not—his rulings cannot possibly have been "so clearly prejudicial to the outcome of the trial [that this Court will be] 'convinced the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Parker v. Reda, C.O.*, 327 F.3d 211, 213 (2d Cir. 2003).

4. This Court should reinstate Plaintiffs' non-federal claims. Six Plaintiffs who are not U.S. citizens pled only non-federal claims. The dismissal of the non-federal claims meant these Plaintiffs did not get their day in court. The District Court premised its dismissal of those claims on the theory that Defendants were "unincorporated associations," but Defendants correctly conceded below that they are not unincorporated associations.

5. Finally, the Court should reinstate the ATA claim of U.S. citizen Oz Guetta and the supplemental claims of his mother, who were shot by unidentified members of Defendants' "Force 17" Presidential Guard, according to expert testimony proffered in the District Court.

22

## **ARGUMENT**

### I.    THE COURT LAWFULLY EXERCISED JURISDICTION BECAUSE DEFENDANTS HAVE NO DUE PROCESS RIGHTS

The "lawful exercise of personal jurisdiction by a federal court requires satisfaction of three primary requirements.  First, the plaintiff's service of process upon the defendant must have been procedurally proper.…  Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective.… Third, the exercise of personal jurisdiction must comport with constitutional due process principles." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012).

Defendants do not dispute that service was properly effected under 18 U.S.C. § 2334(a), as the District Court found.  SPA-5.  They argue only that the exercise of jurisdiction over them violated the Due Process Clause of the Fifth Amendment.  Defendants' argument requires this Court to decide the threshold question of whether they are "persons" within the protection of the Due Process Clause, allowing them to claim the protections of our Constitution.  The relevant facts on this issue are undisputed, so this Court considers this issue *de novo*.  *See Frontera*, 582 F.3d at 395.[19]

---

[19] The District Court did not reach this issue.  However, plaintiffs raised it below, and this Court may "affirm the judgment of the district court 'on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely.'"  *Westport Bank & Trust Co. v. Geraghty*, 90 F.3d 661, 668 (2d Cir. 1996).

It is settled law that all government entities lack due process rights. This Court has held that a foreign sovereign government lacks such rights because it "'lies outside the structure of the Union.'" *Frontera*, 582 F.3d at 399 (quoting *Principality of Monaco v. Miss.*, 292 U.S. 313, 330 (1934)); *accord Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002) (followed in *Frontera*). The rule applies equally to States of the Union,[20] U.S. Territories,[21] municipalities,[22] and other governmental bodies.[23]

The Due Process Clause is a restraint on government, protecting those subject to its authority. *See Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 276-77 (1855). Accordingly, its protections do not extend to foreign governments—sovereign or not. In *Price*, a foreign sovereign objected to personal jurisdiction on due process grounds. 294 F.3d at 95. The D.C. Circuit flatly rejected this argument, based on "the reality that foreign nations are external to the constitutional compact." *Id.*

---

[20] *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966), *abrogated on other grounds by Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612 (2013).

[21] *See Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*, 59 F. Supp. 2d 310, 325 (D.P.R. 1999); *Virgin Islands v. Miller*, 2010 WL 1790213, at *5 (Super. Ct. V.I. May 4, 2010).

[22] *City of E. St. Louis v. Circuit Ct. for Twentieth Judicial Circuit, St. Clair Cnty., Ill.*, 986 F.2d 1142, 1144 (7th Cir. 1993); *United States v. Cardinal Mine Supply, Inc.*, 916 F.2d 1087, 1091 (6th Cir. 1990).

[23] *In re Scott Cable Commc'ns, Inc.*, 259 B.R. 536, 543 (D. Conn. 2001) ("Government entities have no right to due process under the Fifth Amendment's due process clause.").

Granting constitutional rights to foreign governments would create serious policy concerns. Would they have Fourth Amendment rights against electronic surveillance, or Fifth Amendment rights against economic sanctions, or the use of military force? The concern, as articulated in *Price*, is that "the power of Congress and the President to freeze the assets of foreign nations, or to impose economic sanctions on them, could be challenged as deprivations of property without due process of law." 294 F.3d at 99. If constitutional rights are extended to foreign governments, "[t]he courts would be called upon to adjudicate these sensitive questions, which in turn could tie the hands of the other branches as they [seek] to respond to foreign policy crises." *Id.*

These concerns apply equally to foreign non-sovereign governments. Defendants are not sovereigns,[24] but they state affirmatively that they "function as Palestine's Government" and are a "non-sovereign government." Defs.' Opening Br. ("Br.") 7, 24. They declare allegiance to no sovereign and our political branches deem them a foreign government. As such:

- They must file FARA registrations as representatives of a "government of a foreign country."[25]
- They are subject to fiscal transparency requirements for "government-to-government assistance."[26]

---

[24] *Klinghoffer v. SNC Achille Lauro*, 937 F.2d 44, 47-48 (2d Cir. 1996); *Ungar v. PLO*, 402 F.3d 274, 288-91 (1st Cir. 2005). Because they are not sovereigns, they do not enjoy foreign sovereign immunity, even if they aspire to sovereign status. *Id*.

[25] 22 U.S.C. § 611(e).

[26] Pub. L. 113-235, § 7031, 128 Stat. 2130 (2014); *see* 80 Fed. Reg. 36,580 (2015).

- They are a "foreign government" from which federal employees may not accept gifts.[27]

- They are a "foreign government" under the Foreign Missions Act.[28]

- They are a "country of concern" with respect to classified national security information. *See* 31 C.F.R. §§ 2.37, 2.43(f).

Two District Courts have held directly that the PLO cannot invoke constitutional rights in our courts for this reason.[29] As explained in *Mendelsohn v. Meese*: "A 'foreign state lies outside the structure of the Union.' The same is true of the PLO, an organization whose status, while uncertain, lies outside the constitutional system. It has never undertaken to abide by United States law or to 'accept the constitutional plan.'" *Id.* at 1481 (quoting *Principality of Monaco*, 292 U.S. at 330). As with *sovereign* governments, giving constitutional rights to non-sovereign foreign governments would raise serious policy concerns and needlessly constrain the political branches. To put it as the Court did in *Price*, it would,

> break with the norms of international law and the structure of domestic law were we to extend a constitutional rule meant to protect individual liberty so as to frustrate the United States government's clear statutory command that [a foreign sovereign] be subject

---

[27] 5 U.S.C. § 7342; *see, e.g.*, 66 Fed. Reg. 12,658 (2001).

[28] 22 U.S.C. §§ 4301 *et seq.*; *see* 52 Fed. Reg. 37,035-02 (1987) (closing mission); 59 Fed. Reg. 37,121-03 (1994) (reopening mission).

[29] *Mendelsohn*, 695 F. Supp. at 1480-81; *Palestine Info. Office v. Shultz*, 674 F. Supp. 910, 919 (D.D.C. 1987) (holding that a "foreign political entity" such as the PLO "has no due process rights under our Constitution."), *aff'd*, 853 F.2d 932 (D.C. Cir. 1988).

26

to the jurisdiction of the federal courts in the
circumstances of this case.

294 F.3d at 98. Those concerns apply equally to non-sovereign foreign
governments.

To be sure, some courts have *assumed* without deciding that Defendants do
have due process rights, *see* SPA-7 n.10, but only one of those courts engaged in
any analysis of the question. *Livnat v. PA*, 82 F. Supp. 3d 19, 26-27 (D.D.C.
2015). That court reasoned that its conclusion was controlled by *GSS Group Ltd.
v. National Port Authority*, 680 F.3d 805, 817 (D.C. Cir. 2012), which held that
foreign state-owned corporations have due process rights if they are sufficiently
separate from their foreign-government owners. *GSS Group* has no application to
Defendants, who obviously are not *owned* by a foreign government.

Because Defendants lack due process rights, they are entitled only to the
protections of applicable statutes and rules, which no one contends were violated
here.

## II. EVEN IF DEFENDANTS ENJOY DUE PROCESS RIGHTS, THE COURT MAY CONSTITUTIONALLY EXERCISE PERSONAL JURISDICTION OVER DEFENDANTS

Even if Defendants somehow enjoy the protections of our Constitution, the
Court may exercise both specific jurisdiction and general jurisdiction over them.
Under due process principles, a sovereign may exercise jurisdiction over a
defendant who has "sufficient contacts with the sovereign 'such that the
maintenance of the suit does not offend 'traditional notions of fair play and

27

substantial justice.'" *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2787 (2011) (quoting *Int'l Shoe*, 326 U.S. at 316).

### A. *International Shoe* Created a Flexible Standard, Requiring Consideration of Legitimate Government Interests

On the constitutional question, Defendants recognize, as they must, that *International Shoe* has given rise to two categories of jurisdiction: general jurisdiction and specific jurisdiction. Defendants attempt to escape the exercise of specific jurisdiction by invoking *Walden v. Fiore*, 134 S. Ct. 1115 (2014). They attempt to escape the exercise of traditional general jurisdiction by invoking *Daimler*. Defendants rely on a wooden and expansive reading of selective snippets from those two cases, without regard to their facts, their legal context, or any other controlling cases since *International Shoe*.

The broader analysis, which Defendants miss, requires that the standard for personal jurisdiction be a "flexible" one. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980). Specifically, *International Shoe* requires weighing the various interests at stake, in light of all the facts and circumstances, to determine whether it is fundamentally "fair" and "reasonable" for a particular sovereign to adjudicate a particular claim. *World-Wide Volkswagen*, 444 U.S. at 292, 294.[30] "There is no talismanic significance to any one contact or set of

---

[30] This is consistent with the law's approach to the Due Process Clause generally— not just in the personal-jurisdiction context—which involves a balancing of the individual's liberty interest against the interests of the Government. *Hamdi v. Rumsfeld*, 542 U.S. 507, 528-29 (2004).

contacts that a defendant may have with a forum state; courts should assess the defendant's contacts as a whole." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 570 (2d Cir. 1996); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) ("we evaluate the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test").

On one side of *International Shoe*'s "fairness" scale, persons protected by due process have a liberty interest in being subject to judgment "only by the exercise of lawful power." *McIntyre*, 131 S. Ct. at 2786. In this case, the liberty interest must be considered in light of the fact that *these* Defendants are alien entities that our government could and (for a time) did exclude altogether. *See supra* p. 6. Their excludability arises from the government's sovereign power over foreign affairs. Therefore, if they have due process rights at all, those rights are weak: the government may subject excludable aliens to restrictions that would be "unacceptable" if applied to U.S. citizens. *See Mathews v. Diaz*, 426 U.S. 67, 79-81 (1976).

On the other side of the "fairness" scale lie the interests of the federal government. The federal interests come into the equation because the due process test requires a "sovereign-by-sovereign analysis." *McIntyre*, 131 S. Ct. at 2789. Where federal interests are strong, the United States can assert personal jurisdiction even where no state can. *Id.* Defendants do not acknowledge that this Court must consider the federal government's strong interest in adjudicating the claims in this case, even though that interest is of obvious relevance to the

29

"fairness" inquiry. *See Keeton*, 465 U.S. at 775-76 ("the 'fairness' of haling respondent into a New Hampshire court depends to some extent on whether respondent's activities relating to New Hampshire are such as to give that state a legitimate interest in holding respondent answerable on a claim related to those activities").

The federal interest in this case weighs heavily on the fairness scale. "[T]he Government's interest in combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 4 (2010); *see Hamdi*, 542 U.S. at 534-35 ("full protections" of Due Process Clause "may prove unworkable" in anti-terror military cases, but flexible due process balancing test allows government to base determination of U.S. citizen's enemy-combatant status on hearsay and shift burden of proof to the accused); *see also Holder*, 561 U.S. at 6 (content-based restriction on speech imposed by criminal ATA provisions survives strict scrutiny because liberty interests in speech were outweighed by "sensitive interests in national security and foreign affairs" and "Government's interest in preventing terrorism"). The civil provisions of the ATA are an exercise of federal power to protect American lives and American interests. They reflect our nation's "profound and compelling interest in combating terrorism at every level, including disrupting the financial underpinnings of terrorist networks." *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 214 (E.D.N.Y. 2007); *see Linde v. Arab Bank PLC*, 706 F.3d 92, 112 (2d Cir. 2013).

An additional factor that is not present in *Walden* or *Daimler* also weighs heavily in the balance. This is a case in which Congress has spoken explicitly

30

about the relevant jurisdictional contacts. Congress passed the ATA to "remove the jurisdictional hurdles in the courts confronting victims." H.R. Hearing 102-110 Before the House Judiciary Committee, at 10 (Sept. 18, 1992) (Sen. Grassley). Congress intended to extend civil jurisdiction to "the same extra-territorial reach as American criminal law," H.R. Rep. 102-1040, at 5, which includes extraterritorial criminal statutes, some basing jurisdiction solely on the victim's status as a U.S. national.[31] Extraterritorial statutes are important to U.S. law enforcement. Most fugitives on the FBI's most-wanted terrorist list committed their crimes outside the U.S. *See* https://www.fbi.gov/wanted/wanted_terrorists.

To protect Americans anywhere in the world, Congress defined "international terrorism" in the ATA with express extraterritorial reach and determined that service of process on a defendant "found" or having an agent in the U.S. would be sufficient to obtain jurisdiction. 18 U.S.C. § 2334(a). The judgments of our political branches in matters touching national security are entitled to special consideration. "We should hesitate long before limiting or embarrassing such powers." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 321-22 (1936). Indeed, the government filed a Statement of Interest in this case, stating that it "strongly supports the rights of victims of terrorism to vindicate their interests in federal court and to receive just compensation for their injuries," JA-10603, and that doing so "advances U.S. national security interests," "reflects

---

[31] *See* Charles Doyle, Congressional Research Service, "Extraterritorial Application of American Criminal Law" (Feb. 15, 2012), at 40 *et seq.*, http://fas.org/sgp/crs/misc/94-166.pdf.

31

our nation's compelling interest in combating and deterring terrorism," and "contributes to U.S. efforts to disrupt the financing of terrorism and to impede the flow of funds or other support to terrorist activity." JA-10604.

The due process question, then, is whether—despite the significant federal interests at stake—exercising jurisdiction in this case was fundamentally unfair to these Defendants. The answer is no. The Constitution is no bar to holding an excludable non-citizen accountable in a federal court for murdering Americans and providing material support to U.S.-designated FTOs for the purpose of influencing U.S. government policy—particularly where that non-citizen uses its U.S. presence to leverage a terror campaign and takes billions of dollars from the government on the understanding that it will live up to its promise to renounce terror. "While the Constitution protects against invasions of individual rights, it is not a suicide pact." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159-60 (1963).

## B. The Court Has Specific Jurisdiction

This is an easy case for specific jurisdiction. A defendant's "contact with and activity directed at a sovereign may justify specific jurisdiction 'in a suit arising out of or related to the defendant's contacts with the forum.'" *McIntyre*, 131 S. Ct. at 2788 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). Courts have developed two tests for evaluating specific jurisdiction over foreign defendants: the "effects test" and the "purposeful availment" test. Under the "effects test," a defendant acting entirely outside the United States is subject to jurisdiction "if the defendant expressly aimed its conduct" at the United States. *Licci*, 732 F.3d at 173. Under the "purposeful

32

availment" test, if the defendant's claim-related "in-forum activity sufficiently reflects the defendant's 'purposeful availment' of the privilege of carrying on its activities here, minimum contacts are established, even if the effects of the defendant's entire course of conduct are felt elsewhere." *Id.* Defendants meet both tests.[32]

Moreover, Defendants consented to personal jurisdiction under the ATA by their appointment of an agent in the United States. "A variety of legal arrangements have been taken to represent express or implied consent to the personal jurisdiction of the court." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). Congress permitted Defendants to enter the United States, but on legal conditions: by statute, Congress required them to appoint an agent under FARA; and Congress further provided that if they killed or injured Americans through international terrorism, service on an agent would be sufficient for personal jurisdiction under § 2334(a). Defendants voluntarily entered the United States on those conditions and appointed an agent. They can fairly be said to have consented to jurisdiction when that agent was served.

### 1. Defendants Meet the "Effects Test"

The federal courts may exercise jurisdiction in antiterrorism cases where foreign defendants—even defendants acting entirely overseas—"expressly aimed"

---

[32] Because the District Court rested its decision on general jurisdiction, it did not reach the question of specific jurisdiction. The record here is sufficient "to permit conclusions of law, including grounds upon which the district court did not rely." *See Westport Bank*, 90 F.3d at 668.

33

their conduct at U.S. citizens or interests. *See Licci*, 732 F.3d at 173 ("the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum") (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)). Thus, in *In re Terrorist Attacks on September 11, 2001*, this Court upheld the exercise of personal jurisdiction over individuals outside the U.S. who provided material support to a designated FTO at a time when "it was publicly known" that the organization "was engaged in a global terrorist agenda directed at the United States." 714 F.3d at 678. Direct support to the designated FTO was sufficient to hold that the defendants "expressly aim[ed] their conduct at the United States," even though they did not even enter the United States. *Id.* Similarly, in *Mwani v. Bin Laden*, 417 F.3d 1, 13 (D.C. Cir. 2005), the court upheld jurisdiction where the defendant "orchestrated the bombing of the American embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States."

This Court has applied the effects test in criminal cases, as well. In *United States v. Yousef*, this Court upheld, against a Fifth Amendment due process challenge, the prosecution of individuals who conspired to bomb a foreign airline flight—even though no U.S. national was injured—because it was a "test-run" in furtherance of a larger conspiracy to "inflict injury on [the United States] and its people and influence American foreign policy." 327 F.3d at 112. And in *United States v. Al Kassar*, this Court rejected a Fifth Amendment due process challenge to a prosecution for the sale of arms abroad "with the understanding that they

34

would be used to kill Americans and destroy U.S. property," because "the aim therefore was to harm U.S. citizens and interests and to threaten the security of the United States." 660 F.3d at 118. The fact that the "sting operation" took place "entirely outside the United States and involv[ed] solely foreign citizens" did not deprive U.S. courts of jurisdiction: "For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests." *Id.*; *see also United States v. Ahmed*, 94 F. Supp. 3d 394, 410 (E.D.N.Y. 2015) (rejecting due process challenge because "aim of [defendants'] activity, in materially assisting [designated FTO], was to cause harm inside the United States or to U.S. citizens or interests"); *United States v. Mostafa*, 965 F. Supp. 2d 451, 460 (S.D.N.Y. 2013) ("[T]he only cases to have found violations of due process on jurisdictional nexus grounds have done so where there was no allegation of harm to U.S. persons or interests.").[33]

The cases thus establish that the United States may exercise specific personal jurisdiction in antiterrorism cases where the foreign defendants—even defendants acting entirely overseas—aimed their conduct at U.S. persons or interests.

---

[33] Congress intended to extend civil jurisdiction to "the same extra-territorial reach as American criminal law," H.R. Rep. 102-1040, at 5, and it makes sense that the effects test applies in both civil and criminal cases: "if federal courts may constitutionally exercise criminal jurisdiction over [foreign terrorists], the Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil *in personam* jurisdiction over those same individuals for the same acts." *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 59 (D.D.C. 2003).

35

In response, Defendants contend that there is "no evidence" that they engaged in any claim-related activity "directed at the United States." Br. 46-47. That contention cannot be squared with the jury's verdict and the evidence supporting it. The jury decided many key facts expressly in the special verdict. For example, the jury concluded that Defendants provided material support to designated FTOs, and that Defendants' employees acting within the scope of their employment killed and injured U.S. citizens. JA-8261-68. Other relevant facts, such as Defendants' intent to influence U.S. policy were in issue during the trial, but not put to the jury expressly in the special verdict. Rule 49(a)(3) provides that in such cases, "it 'shall be deemed' that a finding was made 'in accord with the judgment on the special verdict,' unless the court makes a finding to the contrary." *Roberts v. Karimi*, 251 F.3d 404, 407 (2d Cir. 2001) (emphasis omitted).

Under the jury's verdict and the evidence supporting it, Defendants' conduct was indisputably aimed at the United States. Defendants do not challenge the jury's express finding that they knowingly provided material support to AAMB and Hamas, U.S.-designated FTOs. JA-8261-68. Defendants knew of these designations. JA-4450-52, 4620, 5327, 5489-90, 5584-85. The government deemed these two FTOs "a serious risk" that threatened "the security of U.S. nationals or the national security, foreign policy, or economy of the United States." *See supra* pp. 7-8, 11. Just as in *September 11*, Defendants' direct, knowing provision of material support to designated FTOs is enough—standing alone—to sustain specific jurisdiction because they knowingly aimed their conduct at U.S. interests. *See* 714 F.3d at 678-79.

36

Moreover, it was Defendants themselves who killed and injured U.S. citizens, since the jury found expressly that the terrorists in this case were Defendants' own employees, acting within the scope of their employment. JA-8261-68. Although Judge Daniels used Rule 403 to protect Defendants by keeping the most direct and powerful evidence of instructions to "kill Americans" from the jury (*see supra* pp. 10-11 n.11), there was sufficient evidence for the jury to conclude that Defendants' terror campaign continuously hit Americans because the campaign was being conducted in a place where many Americans lived and visited. *E.g.*, JA-6672 ("Everybody was American"); JA-6974 (victim attended a school "established by an American designed for Americans"). It is a fair inference that Defendants *intended to* hit American citizens by continuing a terror campaign that continuously hit Americans, including traumatizing family members back home in America. As in *Mwani*, jurisdiction is appropriate because Defendants orchestrated a terror attack not only to kill Americans, "but to cause pain and sow terror in…the United States." 417 F.3d at 13.

Plaintiffs alleged in the Complaint that Defendants' terror campaign was "intended to…influence the policy of the United States…in favor of accepting defendants' political goals and demands." JA 299-300; *cf.* Br. 48 (claiming complaint lacked such an allegation). Defendants' intent to influence U.S. policy is an element of the ATA claim. *See* 18 U.S.C. § 2331(1)(B). Defendants chose not to ask Judge Daniels to submit the factual question of their intent to influence U.S. policy to the jury in the special verdict. *See* JA-8261-68. Therefore, under Rule 49(a)(3), the District Court "is considered to have made a finding consistent

37

with its judgment on the special verdict"—that is, that Defendants *did* intend their conduct to influence U.S. policy. *See Roberts*, 251 F.3d at 407. That deemed finding is supported by the evidence, which included Defendants' propaganda magazines decrying "the yellow policy of the U.S.," while praising the Intifada's "waterfalls of blood" and urging "Palestinian forces" to "inflam[e] the popular Intifada" to exert "U.S.…pressure on Israel." PTE-200. As one propaganda magazine put it, "U.S. interests in the region are in danger." PTE-178. *See supra* pp. 9-10. This Court has upheld jurisdiction in other cases where terrorists intended to influence U.S. policy, such as *Yousef* and *Al Kassar*.

Defendants do not acknowledge the jury's verdict, the evidence supporting it, or the effect of Rule 49(a)(3). They have nothing of substance to say about *Licci*, *September 11*, *Yousef*, *Kassar*, or *Mwani*. Instead, they rely on a case in which a district court dismissed a complaint because the complaint failed to allege that Defendants intended to use violence to influence the U.S. government. *See Estate of Kleiman v. P.A.*, 82 F. Supp. 3d 237, 250 (D.D.C. 2015), *appeal pending*. That case was wrongly decided and is on appeal. In any event, the record *in this case* permits no such holding. This Court is not dealing with a complaint supposedly lacking specific allegations, but with an appeal from a jury verdict, in which the facts must be viewed in the light most favorable to the prevailing party and in which the District Court is deemed to have found facts consistent with the judgment in favor of Plaintiffs, including Defendants' intent to influence U.S. policy. *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1286 (2d Cir. 1990); *Roberts*, 251 F.3d at 407.

38

## 2. Defendants Meet the "Purposeful Availment" Test

Although Defendants' extraterritorial conduct standing alone is enough to support the exercise of specific jurisdiction, there is more. Defendants' conduct *within* the U.S.—purposeful availment of the privilege of carrying on their activities here—also supports the exercise of jurisdiction. There can be no dispute that "physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Walden*, 134 S. Ct. at 1122. As this Court has explained, purposeful activities within the forum that are "related to" the claim are relevant even if they did not "directly give [ ] rise to the plaintiff's cause of action." *See Bank Brussels Lambert*, 305 F.3d at 128; *Chloe v. Queen Bee of Beverly Hills, LLC,* 616 F.3d 158, 167 (2d Cir. 2010) ("nexus requirement" "merely requires the cause of action to 'relate to' defendant's minimum contacts with the forum"). A defendant's purposeful "in-forum activity" can establish minimum contacts "even if the effects of the defendant's entire course of conduct are felt elsewhere." *Licci*, 732 F.3d at 173.

Here, Defendants came to America, established a continuous presence, and pressured the U.S. government by threatening that their terrorism would end only if Israel would "pull out of the occupied territories." *See supra* pp. 8, 11-12. Defendants' continuous U.S. presence is especially important because Congress made a legislative judgment that such presence is dispositive under the ATA. Congress did so by providing for service of process under the ATA in any district in which a defendant is "found." 18 U.S.C. § 2334(a). A defendant is "found" anywhere it is engaged in a "continuous course of business." *Scophony*, 333 U.S.

39

at 818; *see* SPA-7 (Defendants maintained a "continuous and systematic presence" in the United States.). Service under a federal statute establishes personal jurisdiction. Fed. R. Civ. P. 4(a)(1)(C); *IUE AFL-CIO Pension Fund v. Hermann*, 9 F.3d 1049, 1057 (2d Cir. 1993).

In addition, Plaintiffs' claims in this case "arose from" Defendants' U.S.-based lobbying and threats during the Intifada because the ATA in part requires proof of—and Plaintiffs alleged—an apparent intent to influence the U.S. government by coercion or intimidation. 18 U.S.C. § 2331(1)(B)(ii); JA-299-300. Here, intent is deemed inferred under Rule 49(a)(3) from Defendants' U.S. conduct, threatening that their terrorism would end only if Israel would "pull out of the occupied territories." *See supra* pp. 11-12; JA-3080-82 (proposed PTE-1119).

Finally, Defendants purposely availed themselves of the privileges of conducting activities in the United States because they used their U.S. presence to obtain $5 billion from the U.S. government—an effort by our government to make Defendants live up to their commitment to renounce terrorism. *See supra* p. 7. A defendant's receipt of "substantial revenue" from the forum is relevant to the minimum-contacts analysis. *See Genetic Implant Sys. v. Core-Vent Corp.*, 123 F.3d 1455, 1458 (Fed. Cir. 1997); *Bracewell v. Nicholson Air Servs.*, 680 F.2d 103, 105 (11th Cir. 1982).

### 3. Defendants Consented to Personal Jurisdiction Under the ATA by Appointing an Agent

Where local law so provides, the appointment of an agent empowered to accept service of process will subject a foreign defendant to jurisdiction. *See*

40

*Bendix Autolite Corp. v. Midwesco Enters.*, 486 U.S. 888, 892-93 (1988).[34] Appointing such an agent is one of the "variety of legal arrangements [that] have been taken to represent express or implied consent to the personal jurisdiction of the court." *Ins. Corp. of Ireland*, 456 US at 703. Where the legislature so provides, mere entry into a jurisdiction can be deemed "the equivalent of appointment" of an agent to accept service of process for a particular purpose. *Hess v. Pawloski*, 274 U.S. 352, 356-57 (1927).

Here, § 2334(a) permits service of process (and thus personal jurisdiction) in any district "where any defendant…has an agent." After the political branches permitted them to enter the U.S., Defendants duly registered under FARA.[35] The registration statement confirms that "[t]he PLO offices in Washington, D.C., shall represent the PLO and the Palestinian Authority," and that their agent will "[c]onduct discussions with U.S. governmental agencies and departments on behalf of the Foreign Principles." JA-327. The District Court found that service on Defendants' FARA-registered agent was valid service under § 2334(a), and Defendants do not challenge this holding. Service establishes personal jurisdiction here. *See* Fed. R. Civ. P. 4(k)(1)(C); *IUE AFL-CIO Pension Fund*, 9 F.3d at 1057.

Defendants' FARA registration was a consent to jurisdiction for purposes of the ATA. Permitting such service as a condition to entering the U.S. comports

---

[34] *See Olberding v. Illinois Cent. R.R. Co.*, 346 U.S. 338 (1953); *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 175 (1939); *Pa. Fire Ins. Co. v. Gold Issue Mining & Milling Co.*, 243 U.S. 93, 95-96 (1917).

[35] 22 U.S.C. §§ 611 *et seq.*

41

with "traditional notions of fair play and substantial justice," since service on an agent is a traditional method of establishing jurisdiction. Defendants "chose to enter" the United States and "can be charged with knowledge of its laws." *Keeton*, 465 U.S. at 779. They were on notice that their FARA agent could be served with process under the ATA if they used terrorism against Americans.

\* \* \*

Defendants rely almost exclusively on *Walden* to defeat specific jurisdiction, but *Walden* actually highlights why there *is* jurisdiction here. In *Walden*, the defendant was a TSA agent who temporarily seized cash from travelers passing through the Atlanta airport. The plaintiffs, who had Nevada contacts, alleged that the seizure was wrongful and filed suit in Nevada. But the defendant, Mr. Walden, had "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada" and "none of [his] challenged conduct had anything to do with Nevada." *Walden*, 134 S. Ct. at 1124. Mr. Walden had not "aimed [his conduct] at" Nevada; he had not carried on activities in Nevada; he had not appointed an agent in Nevada. Defendants did all those things, as described above. Given the record in *this* case, and the jury's findings, no fair-minded person could say that Defendants had *nothing* to do with the U.S., as in *Walden*.

*Walden* highlights another important matter: that case concerned the limits of state judicial power imposed by the Fourteenth Amendment. 134 S.Ct. at 1121. In cases concerning *state* judicial power, the Fourteenth Amendment acts "as an instrument of interstate federalism" to "ensure that the States, through their courts,

42

do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World-Wide Volkswagen Corp.*, 444 U.S. at 291-92, 294.[36]

By contrast, this case arises under a nationwide service of process statute and therefore constitutes an exercise of *federal* judicial power. *See Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974).[37] Rote application of constitutional limits on *state* power to those on *federal* power would incorrectly "shut[] [the United States] government off from the exertion of powers which inherently belong to it by virtue of its sovereignty." *United States v. Bennett*, 232 U.S. 299, 306-07 (1914).[38] The danger of limiting federal judicial power is especially high in a case that the government has told the Court "advances U.S. national security interests," "reflects our nation's compelling interest in combating and deterring terrorism," and "contributes to U.S. efforts to disrupt the financing of terrorism and to impede the flow of funds or other support to terrorist activity." JA-10604; *see supra* pp. 29-31.

---

[36] This limitation is "implicit in ...the original scheme of the Constitution," *id.* at 293, which allocates responsibility for foreign affairs and national security to the federal government. *Compare* U.S. CONST. art. I § 8; art. II § 2 *with* art. 1 § 10.

[37] *Accord Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 294 (3d Cir. 1985); *Handley v. Ind. & Mich. Elec. Co.*, 732 F.2d 1265, 1271 (6th Cir. 1984); *Fitzsimmons v. Barton*, 589 F.2d 330, 333 (7th Cir. 1979); *see generally* 4 Charles A. Wright & Arthur R. Miller, *et al.*, *Personal Jurisdiction in Federal Question Cases*, FED. PRACTICE & PROCEDURE, Civ. § 1068.1 (4th ed.).

[38] *Accord Burnet v. Brooks*, 288 U.S. 378, 403-05 (1933); *Cook v. Tait*, 265 U.S. 47, 55-56 (1924); *Busch v. Buchman, Buchman & O'Brien*, 11 F.3d 1255, 1258 (5th Cir. 1994).

43

### C. The Court Has General Jurisdiction

The District Court found that the totality of Defendants' activities reflected a "continuous and systematic presence within the United States," justifying the exercise of "traditional general personal jurisdiction." SPA-7.

Defendants do not contest the District Court's factual findings. Rather, they argue that they are not subject to general jurisdiction under a new legal test limiting the exercise of general jurisdiction under the Fourteenth Amendment to forums in which a corporation "is fairly regarded as at home," *i.e.*, its place of incorporation or principal place of business. *See Goodyear*, 131 S. Ct. at 2853-54.

But the "at home" test does not defeat jurisdiction here for three independent reasons: (1) Defendants forfeited any "at home" defense; (2) *Daimler* and *Goodyear* do not control cases like this one, involving the exercise of federal judicial power, under a federal statute, governed by the Fifth Amendment rather than the Fourteenth; and (3) even if the "at home" test applies, this is an "exceptional case" carved out from its general rule.

### 1. Defendants Forfeited Their At-Home Defense

Defendants forfeited their at-home defense by waiting too long to raise it. A personal jurisdiction defense may be "'forfeited' if not timely asserted." *Hamilton*, 197 F.3d at 61. Previously unavailable defenses must be raised "as soon as their cognizability is made apparent." *Holzsager v. Valley Hosp.*, 646 F.2d 792, 796 (2d Cir. 1981). A defense is "available" unless "it was for all practical purposes impossible for the defendants to interpose [the] defense." *Chatman-Bey v. Thornburgh*, 864 F.2d 804, 813 (D.C. Cir. 1988). Put another way, a defense is

44

available unless "directly contrary to controlling precedent." *Gucci Am., Inc. v. Li*, 768 F.3d 122, 135-36 (2d Cir. 2014).

Judge Daniels held that Defendants should have raised the defense "much earlier in the case" when "there was case law from which one could have made such an argument." SPA-19. This Court reviews that decision for abuse of discretion. *Hamilton*, 197 F.3d at 60.

Following the Supreme Court's decision in *Goodyear*, in 2011, diligent litigants invoked the "at home" test. For example, the defendant in *In re Roman Catholic Diocese of Albany, N.Y.*, 745 F.3d 30, 37 (2d Cir. 2014), not only moved to dismiss under *Goodyear*'s new "at home" test, but timely and successfully petitioned this Court for a writ of mandamus, arguing (pre-*Daimler*) that "the district court simply disregarded [*Goodyear*'s] strict 'at home' standard for general jurisdiction." Mandamus Petition at 1, Case No. 13-4736. Indeed, these Defendants *themselves* knew the defense was available in the wake of *Goodyear*, invoking the "at home" test in a motion to dismiss for lack of personal jurisdiction in another case. JA-736-41.

In this case, on the other hand, Defendants slept on their rights, waiting to raise the "at home" test for two-and-a-half years. During that time, they embarked on a costly, time-consuming course of discovery.[39] Defendants also made an

---

[39] Defendants made requests for foreign judicial assistance [DE-134], demanded medical records [DE-174 at 5], performed dozens of medical and psychological examinations [DE-171, DE-227 at 65, DE-244 at 7-8], demanded and received documents and interrogatory answers [DE-244 at 2, DE-298], served requests for admission [DE-298], took depositions of all plaintiffs [DE-162, DE-244 at 3, 7-8],

*Footnote continued on next page*

unsuccessful motion for judgment on the pleadings under Rule 12(c), without asserting the "at home" defense. DE-186, 251. Defendants' conduct was indisputably a forfeiture. *See Hamilton*, 197 F.3d at 60-61; Fed. R. Civ. P. 12(g)(2).

In a ham-handed attempt to justify their obvious failure to raise the "at home" defense "as soon as [it was] made apparent," *Hotzsager*, Defendants pretend that *Daimler* announced the "at home" test as a "new...rule on general jurisdiction." Br. 15. That is wrong. *Daimler* itself identified *Goodyear* as the "pathmarking opinion." 134 S. Ct. at 748 & 760 n.16 (2014); *accord In re Roman Catholic Diocese of Albany*, 745 F.3d at 37 ("at home" test was "set forth in *Goodyear*" and "clarified in *Daimler*"). And even though Defendants (remarkably) do not cite *Goodyear* before this Court, they conceded below that *Daimler* merely "clarified" *Goodyear*. JA-644.

Instead of candidly addressing Judge Daniels' ruling that they waived their "at home" defense, Defendants claim—without explanation or citation—that the District Court "rebuffed" and "rejected" Plaintiffs' forfeiture argument. Br. 3, 25. Not so. Judge Daniels was clear that Defendants should have made the argument "much earlier in the case." SPA-19. While Judge Daniels later addressed Defendants' "at home" defense on the merits rather than denying it "based on a

---

*Footnote continued from previous page*
issued contention interrogatories [DE-171, DE-174 at 17-18], demanded extensive documentary discovery from plaintiffs' experts [DE-320 at 15-17], took more than a dozen expert depositions, and repeatedly sought the District Court's intervention to obtain more discovery [*e.g.*, DE-198].

46

theory of waiver" (SPA-50 n.2), his original forfeiture ruling was an alternative ground for rejecting the "at home" defense.

This is not the only case in which these Defendants forfeited their "at home" defense. In *Gilmore v. Palestinian Interim Self-Government Authority*, these Defendants also argued that the "at home" test was unavailable until *Daimler*. 8 F. Supp. 3d 9, 14-16 (D.D.C. 2014). The *Gilmore* court rejected this argument and found that Defendants forfeited the defense: "they are flat-out wrong that *Daimler* was the genesis of that rule. The 'at home' standard was unmistakably announced in [*Goodyear*], more than two and a half years before Defendants filed the instant Motion." *Id.* at 15. The *Gilmore* court also noted that, in other cases, these Defendants had "twice invoked *Goodyear's* 'at home' standard before *Daimler* was decided." *Id.*[40]

This Court's decision in *Gucci Am. v. Li* does not require a contrary result. In *Gucci*, this Court excused the failure of a non-party bank with a New York branch office to raise the "at home" test in response to a subpoena. *Gucci* emphasized the bank's non-party status and the long-standing rule that "a foreign bank with a branch in New York was properly subject to general personal jurisdiction here." 768 F.3d at 136 & n.14. That rule—established in *Pub.*

---

[40] Another District Court held that these Defendants did not forfeit their "at-home" defense when "the activity in [the] case largely [was] confined to discovery matters initiated by plaintiff." *Estate of Kleiman*, 82 F. Supp. 3d at 243. Here, in contrast, Defendants initiated extensive discovery and motion practice. *See supra* p. 45-46 n.39.

47

*Administrator v. Royal Bank of Canada*, 19 N.Y.2d 127, 131 (1967)—was not expressly abrogated in *Goodyear*. It would have been unfair to hold the non-party subpoena recipient in *Gucci* to a standard of clairvoyance about the unstated abrogation of a controlling case. Here, in contrast, Defendants actually knew of and invoked the "at home" rule in other cases.

Defendants did not timely raise the "at home" defense in this case for their own strategic reasons: shortly before *Goodyear* came out, Defendants had stipulated to remain in the Southern District of New York in exchange for Plaintiffs' withdrawal of their motion to change venue to the Eastern District (DE-106). Defendants knowingly "waive[d] their objections to venue in the Southern District of New York in order to allow the case to proceed before this Court." JA-729. On top of Defendants' failure to timely raise the "at home" defense, their waiver of objections to venue was sufficient to waive personal-jurisdiction objections. *See Richardson Greenshields Secs., Inc. v. Metz*, 556 F. Supp. 131, 133 (S.D.N.Y. 1983).

### 2. *Daimler* Did Not Concern a Federal Statute Like This One

The "at home" test does not apply in this case. *Daimler* applied the "at home" test under the Fourteenth Amendment, not the Fifth. It did not address the traditional exercise of jurisdiction based on a defendant's "continuous presence" in the U.S. in a case arising under a federal service-of-process statute making such presence a jurisdictionally dispositive fact.

48

*Daimler* limited state judicial power, not Federal power. As discussed above, constitutional limits on the states must not be applied blindly to the Federal Government. *See supra* pp. 42-43 & nn.36-38.

The Supreme Court was well aware of this distinction in deciding *Daimler*. The Solicitor General explained to the Court that the unique circumstances of *Daimler* implicated the Fourteenth Amendment, not the Fifth. *Brief for the United States in Daimler AG v. Bauman* at 4, 2013 WL 3377321. The government went on to say that in cases arising under the Fifth Amendment, on the other hand, "the United States' special competence in matters of interstate commerce and foreign affairs, in contrast to the limited and mutually exclusive sovereignty of the several States, would permit the exercise of federal judicial power in ways that have no analogue at the state level." *Id*. at 3 n.1. The government cited *Scophony* for the proposition that, in cases invoking the federal judicial power, the Supreme Court had a "practice of looking to and respecting legislative judgments" about the relevant jurisdictional contacts. *Id*. at 26. The government urged the Court to "reserve[] the question of whether its Fourteenth Amendment personal jurisdiction precedents would apply in a case governed by the Fifth Amendment." *Id*. at 3 n.1. The Supreme Court did so, stating the question presented as "whether the Due Process Clause of the Fourteenth Amendment precludes the District Court from exercising jurisdiction over Daimler." 134 S. Ct. at 751.

Although *Daimler* expressly abrogated a line of New York cases under the Fourteenth Amendment and limited *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952) (another Fourteenth Amendment case) it did *not* limit

49

*Scophony* (cited with approval in the government's brief), which arose under the federal service-of-process statute on which § 2334(a) was modeled.[41]

Here, the ATA permits service of process (and thus personal jurisdiction) in any district where the defendant "is found." 18 U.S.C. § 2334(a). The statute thus invokes a traditional basis for jurisdiction—continuous presence—which has been the rule for more than a century.[42] It is thus consistent with traditional notions of fair play and substantial justice to hold Defendants subject to personal jurisdiction based on that continuous presence where Congress made such presence dispositive in a statute invoking urgent federal interests. *Daimler* simply did not address potential Fifth Amendment limitations on such a statute.

For their part, Defendants have no legitimate complaint of being treated unfairly. They decided that the billions of dollars in aid and the prospect of gaining U.S. support in their efforts to achieve their territorial goals were worth the price of subjecting themselves to jurisdiction in terror cases. That is obvious from the fact that they maintained a U.S. presence in the face of a statute subjecting them to personal jurisdiction, as well as holding after holding by various courts that they *were* subject to general jurisdiction in the U.S. courts for terror cases. SPA-7 n.10.

---

[41] 15 U.S.C. § 22.

[42] *E.g.*, *State of Washington v. Superior Ct. of Wash.*, 289 U.S. 361, 364-65 (1933); *In re Hohorst*, 150 U.S. 653, 663 (1893); *St. Clair v. Cox*, 106 U.S. 350, 356 (1882).

### 3. This Is an "Exceptional Case"

Finally, the District Court correctly held that *Daimler* does not govern this exceptional case even on its own terms. JA-9724-5. This case is exceptional because Defendants are stateless. *Daimler* contemplates that litigants will have "at least one clear and certain forum in which a corporate defendant may be sued on any and all claims." 134 S. Ct. at 760. Yet these Defendants have no such place, as the District Court found (SPA-16; JA-9708-09). This makes them an exceptional case under *Daimler*. As the District Court explained, the "home" contemplated in *Daimler* cannot be a place "in which there is no legal basis on which to sue" (JA-9705), and "[y]ou can't just say that I'm at home in no place where you could possibly sue…me" (JA-9707). Although Defendants devote many pages to *Daimler*, they offer no reasoning to explain *why* that case should be extended to stateless defendants with no juridical "home" other than to provide "certainty" for such entities. But extending *Daimler* to stateless entities that cannot be sued *anywhere* would make no sense.

Under Defendants' view, a stateless terror group could take over an uninhabited island in the ocean—or a city in a war-torn region—use it as its home base, launch terrorist strikes against U.S. citizens traveling abroad, and even have an agent present in the United States—but it would not be subject to suit under the ATA in the U.S., despite the fact that it likewise would not be subject to suit where it is "at home." That is an absurd position.

In addition, in the case of a stateless terrorist entity, there is no concern about "risks to international comity," and it was those concerns that drove the

51

decision in *Daimler*. 134 S. Ct. at 763. International comity is "the recognition which one nation [affords] to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience." *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895). Defendants are not entitled to invoke "comity" because they are not a recognized sovereign state or citizens of a recognized sovereign state. *Knox v. PLO*, 306 F. Supp. 2d 424, 439-48 (S.D.N.Y. 2004) (rejecting Defendants' "comity" claims). Moreover, terrorism is universally condemned. *See* International Convention for the Suppression of Terrorist Bombings, Dec. 15, 1997, S. Treaty Doc. No. 106-6, 2149 U.N.T.S. 256; International Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, T.I.A.S. No. 13075, 2178 U.N.T.S. 197; *Restatement (Third) of Foreign Relations Law* § 404, comment (a) (1987).

As the District Court observed, exercising jurisdiction over Defendants "does not conflict with any foreign country's applicable law or sovereign interests, nor is it in contravention of the laws of any foreign country." SPA-51.

## III. NO NEW TRIAL IS WARRANTED

Defendants alternatively seek a retrial, contending that Judge Daniels erroneously allowed Plaintiffs' experts to provide certain testimony. Br. 50-66. "The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995). Even in cases of manifest error, this Court grants a new trial "only if the introduction of inadmissible evidence was a clear abuse of discretion and was so clearly prejudicial to the outcome of the trial

52

that [the jury] reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Parker*, 327 F.3d at 213. Defendants do not meet that standard.

### A. Plaintiffs' Expert Testimony Was Proper

#### 1. Background

Israel Shrenzel ("Shrenzel") and Alon Eviatar ("Eviatar") are former Israeli law enforcement officials, fluent in Arabic. JA-4140; JA-5191. Shrenzel served in an agency charged with prevention of terrorism for nearly two decades; for ten years, he was the "head of the department that dealt with the analysis of Palestinian affairs, especially the policies of the PLO [and] PA." JA-4933-34. His job was "to understand the ideas, the ideologies, the motivation and…deeds of the PA." JA-4935. He was qualified as an "expert on terrorism as it relates to the policies and practices of the PA and the PLO." JA-5197 (Defendants' counsel: "I have no objection to that.").

Similarly, Eviatar served in an elite unit charged with "the entire system of coordination and liaising with the [PA]" for 15 years. JA-4142. He was qualified as an expert on the PLO, PA, Fatah, AAMB, and Hamas; the policies and practices of the PA and the PLO as they relate to support of terrorism; the relationship between Defendants and the AAMB; and the relationship between Defendants and Hamas. JA-4185 (Defendants' counsel: "No voir dire.").

Shrenzel and Eviatar provided background about Defendants' functions and policies (*e.g.*, JA-4191-94), relevant terror organizations, such as AAMB and Hamas, and those organizations' activities during the Intifada (*e.g.*, JA-4450-51,

53

4190-91). They explained how Defendants' policies affected those FTOs, as well the perpetrators of the six terror attacks (*e.g.*, JA-4453-54). They also explained the purpose of documents created by Defendants, such as "Martyr Files," and terminology in them that was unfamiliar to the jury (*e.g.*, JA-4385, 5212, 5219-20, 5286-87). This type of testimony was helpful for a jury hearing a complex case involving six terror attacks, two FTOs, at least 30 perpetrators with unfamiliar names, and hundreds of documents like "Martyr Files," all of which are unfamiliar to ordinary jurors.

**2.  The Experts Gave Classic Testimony Allowed by Rule 702**

Shrenzel and Eviatar gave routine law-enforcement expert testimony. Rule 702 permits experts to testify from their "knowledge, skill, experience, training or education" if their "scientific, technical *or other specialized knowledge*" will help the trier of fact. Fed. R. Evid. 702 (emphasis added). Law-enforcement personnel often have "specialized knowledge" about the workings of criminal enterprises that juries lack. *See, e.g.*, *United States v. Amuso*, 21 F.3d 1251, 1263-64 (2d Cir. 1994) (relied on by Defendants) (affirming law-enforcement expert's testimony on existence, structure, and terminology of organized crime families as "beyond the knowledge of the average citizen"); *United States v. Locascio*, 6 F.3d 924, 937 (2d Cir. 1993). Thus, in *Farhane*, this Court affirmed the admission of expert testimony to explain the history and structure of al Qaeda. 634 F.3d at 158. As with organized crime families, the Court explained, the operational methods of terrorist organizations are "beyond the knowledge of the average juror." *Id.* at 159.

54

Indeed, courts in this Circuit regularly allow expert testimony on terror organizations.[43]

Consistent with the role of experts in case after case, Eviatar and Shrenzel testified about specialized topics that were beyond the jury's ken and within their areas of qualification (*see supra* pp. 53-54), based on methodologies commonly employed by law-enforcement experts. *See* JA-4184 (Eviatar: "collecting information, cross referencing it, verifying it, researching it, processing it, and drawing the correct conclusions from that data" and never relying on only a single source), JA 4936, 5195-96 (Shrenzel: same); *see also United States v. Kassir*, 2009 WL 910767, at *6 (S.D.N.Y. Apr. 2, 2009) (upholding similar methodology); *United States v. Paracha*, 2006 WL 12768, at *22-23 (S.D.N.Y. Jan. 3, 2006) (same).

Most of the testimony Defendants challenge was classic expert testimony well within Rule 702. For instance, Defendants complain about Shrenzel educating the jury regarding the role of the PA's "Political Commissioner." Br. 55 (citing JA-5329). This testimony helped the jury understand the link between

---

[43] *See, e.g., United States v. Defreitas*, 2011 WL 317964, at *7 (E.D.N.Y. Jan. 31, 2011) (it is "highly unlikely that the average layperson has even heard of [terror organization at issue]" or "its leadership, structure, or history"), *aff'd sub nom. United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013); *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 329–31 (E.D.N.Y. 2011) (permitting former Israeli security officials to testify about "establishment and organizational structure of Hamas"); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 530-34 (E.D.N.Y. 2012) (Weistein, J.) (complexities of terrorism are "remote from the normal life experience upon which jurors rely").

55

Defendants and their propaganda magazines admitted into evidence. *See* JA 5330-37, 5390-94; *supra* pp. 9-10 (quoting excerpts). In explaining the organizational structure and leadership within an entity unfamiliar to the jury, Shrenzel analogized the PA's "Political Commissioner" position to similar functions in the Soviet Union. JA-5329. There is nothing wrong with an expert using an analogy. Defendants could have cross examined Shrenzel on the analogy, but chose not to. *See, e.g.*, *McCullock*, 61 F.3d at 1043 (quibbles with expert's shortcomings proper for cross-examination).

Defendants also take issue (Br. 58-59) with classic expert testimony from Eviatar, such as background on leaders of Intifada (JA-4583, 4589), the relationship among the various organizations at issue (JA-4619, JA-4598), and the extent of PA security officers' involvement in the Intifada (JA-4597). As with Shrenzel, this testimony fell squarely within the areas about which Eviatar was qualified to testify, helped the jury, and was supported by other record evidence. *See, e.g.*, PTE-451 (conviction of Marwan Barghouti detailing leadership role during Intifada); JA-9218-24 (PTE-496) (State Department report detailing relationship between AAMB, Fatah, and Defendants).

Finally, Defendants complain that Eviatar and Shrenzel were "ultimate issue" experts, but "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). Defendants use the phrase "ultimate issue" at least fifteen times, yet do not acknowledge Rule 704. The phrase is empty rhetoric anyway: *none* of the expert testimony constituted an opinion on whether Defendants materially supported or were vicariously liable for the attacks.

56

### 3. The Experts Did Not "Narrate Speculative Stories"

Defendants' chief complaint about the substance of the experts' testimony is that they "narrated speculative stories." Br. 54-61. This argument mischaracterizes the case law and distorts the record. The experts summarized evidence in the record and then gave their opinions based on that evidence—not "speculative stories."

Allowing summary testimony about admitted evidence, particularly in a complex case, is well within the trial judge's discretion. *See, e.g.*, *Fagiola v. Nat'l Gypsum Co. AC & S., Inc.*, 906 F.2d 53, 57 (2d Cir. 1990) (allowing expert's "quintessential summary, used to facilitate the jury's deliberations and to avoid forcing the jury to examine boxes of documents in order to make simple calculations"); *United States v. Sherry*, 100 F.3d 943, at *2 (2d Cir. 1996) (expert permitted to refer to other evidence in his role as expert and summary witness); *United States v. Johnson*, 54 F.3d 1150, 1156-61 (4th Cir. 1995) (detective permitted, under Rule 611(a), to present expert testimony concerning drug conspiracy *and* summarize evidence in part because length of trial, complexity of case, and "accompanying confusion that a large number of witnesses and exhibits may generate" for jury).

Defendants' cases (allegedly) to the contrary are inapposite. In *Nimely v. City of N.Y.*, 414 F.3d 381, 398 (2d Cir. 2005), this Court found expert testimony improper where a *medical expert* opined that police officers were "telling the truth." Plaintiffs' experts offered no such testimony.

57

In *United States v. Mejia*, 545 F.3d 179, 191, 195 (2d Cir. 2008), a pattern of predicate murders was an element of the charged RICO offense. Instead of introducing direct evidence of the murders—such as arrest records and death certificates—the government offered testimony from an investigating case agent as the only evidence of the murders. The case agent testified both as an expert *and as a percipient fact witness* about facts that had no other basis in the record. That is, the Government "substitute[d] expert testimony for factual evidence." *Id.* at 194-95. This Court explained that expert testimony can be helpful "in establishing the relationship between the[] facts and [a gang]," but it is "not helpful in establishing the facts themselves." *Id.* at 195.

Here, neither Shrenzel nor Eviatar investigated or had personal knowledge of any of the terror attacks at issue, making them *incapable* of offering percipient factual testimony. Both proffered testimony within their areas of expertise, about "the relationship between the[] facts and [Defendants]," *id.*, and based on documentary evidence in the record.

To the extent that Eviatar or Shrenzel offered "narrative" testimony at all, it merely summarized information *already in evidence*. For instance, Defendants' lead-off example of supposedly improper narration testimony is Shrenzel's summary of the suicide bombing that inflicted brain damage on seven-year-old Yehonathon Bauer. Br. 55 (citing JA-5287-90). Each piece of Shrenzel's summary was supported by documentary evidence. The fact that a "terrorist equipped with an explosive belt detonated himself in the King George Street in Jerusalem" was in the conviction record of PA employee Abdel Karim Aweis

58

(PTE-356 at 39) and the "Martyr File" of the suicide bomber himself. PTE-23. (As Eviatar explained (JA-4375-66, 4385-86), Defendants' "Martyr Files" serve as the basis for Defendants' payments to families of suicide terrorists.) The other facts explained in that passage similarly came from documents that were literally in the hands of the jury, in binders, during the testimony.

Several other portions of testimony about which Defendants complain are of this type, in which the expert summarized facts set forth in admitted documents.[44] Such summaries are permitted in complex cases (*see supra* p. 57), were helpful to the jury in organizing the complex facts, and concerned facts that Defendants *never* disputed at trial. Allowing such testimony cannot possibly be deemed to have been "so clearly prejudicial to the outcome of the trial that [the jury] reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Parker*, 327 F.3d at 213.

Defendants even complain about the experts' use of *direct quotes* from Defendants' own documents. They accuse Shrenzel of "editorializing" when he testified that the Defendants consider a terror attack to constitute the "performance of [one's] national duty." Br. 61 (quoting JA-5222). However, that phrase came directly from Defendants' own documents. Suicide terrorist Sa'id Ramadan's

---

[44] *E.g.*, Br. 57 (citing JA 5484, where Shrenzel identifies the individual in a photograph as suicide bomber in June 19, 2002 attack); *id.* 58 (citing JA-4691-92, where Eviatar summarizes role of Ibrahim Hamed, leader of Hamas cell that perpetrated the Hebrew University bombing); *id.* 60-61 (citing examples of experts walking jury through various lengthy records of convictions).

Martyr File states: "He was martyred while performing his national duty." PTE-60 at 2.[45] Defendants cannot possibly establish error on the ground that Judge Daniels allowed testimony that repeated Defendants' own words in admitted documents. The remaining examples Defendants cite as improper narratives are similarly meritless.[46]

### 4. Expert Testimony About Defendants' So-Called "Social Welfare" Programs Was Proper

Defendants next argue that Plaintiffs' experts improperly "lard[ed] the record" with (supposedly) "causal" or "state of mind" testimony about Defendants' pay and promotion policies. Br. 62-65. They cannot show that admission of the testimony they cite amounted to an abuse of discretion.

Contrary to Defendants' argument, it was appropriate to offer expert testimony on Defendants' benefits to terrorists, such as their policy of paying and promoting convicted terrorists, "Martyr" payments, and promotions in rank to

---

[45] For more of the same, *see* Br. 61 (JA-5301: Shrenzel reading from PTE-23, a Martyr File that describes a suicide bomber as having been "raised to love [the] nation"); *id.* 59 n.83 (JA-4584, 4691-95: testimony quoting government reports and Defendants' own files).

[46] *See* Br. 60 (citing JA-5596-97, criticizing testimony about "a circular authored by Fatah—not the PA," without acknowledging that Plaintiffs linked Fatah to the PA through evidence such as PTE-496 (JA-9218-30); *id.* (citing JA-5716, where Shrenzel, *on re-direct*, responds to implication on cross-examination that senior PA official was innocent of any involvement in Intifada); *see also* JA-5719-22 (Judge Daniels explaining why redirect testimony at JA-5716 was admissible).

convicted terrorists.[47] These policies were relevant to prove material support[48] and scope of employment.[49] Moreover, the testimony fell well within Shrenzel and Eviatar's expertise (*see supra* pp. 53-54), and was supported by admitted documentary evidence. For example, Eviatar testified about Defendants' "Prisoners' Law" (JA-9231-61 (PTE-512)), which institutionalizes payments *specifically and only to* "[a]nyone who is kept in prisons of the occupation for offenses of participating in the struggle against the occupation." In this context, Eviatar explained that the phrase "struggle against the occupation" is a euphemism for political violence, including terror attacks against civilians. *E.g.*, JA-4270-71; JA-4370-71 (discussed in Br. 63-64). This is not terminology that would have been familiar to the average juror. Similarly, the District Court correctly allowed expert testimony that prisoners on Defendants' payroll continue to receive their salaries pursuant to the Prisoners' Law, even without performing any services in jail—to say the least, a policy that most jurors would find unfamiliar. *See* JA-4371; JA-5253 (discussed in Br. 63).

---

[47] Br. 63 (JA-4385: expert testimony, without objection, about "Martyr" payments to families of suicide terrorists), (JA-5230-31: Defendants' post-mortem promotion of suicide terrorist "enabled[d] his family to get a little bit more money").

[48] *See, e.g.*, *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 711 (7th Cir. 2008) (after-the-fact payments can constitute material support because money is fungible).

[49] *See, e.g.*, JA 8220-21 (jury charge listing "history of the relationship between the PA and its employee as spelled out in actual practice" as relevant to scope of employment).

61

In addition, Defendants opened the door to testimony about their policies toward convicted terrorists. During opening statements, Defendants argued: "These payments are routine in my client's society. My client is essentially a social welfare state." JA-3862. "It is widely recognized that a party who raises a subject in an opening statement 'opens the door' to admission of evidence on that same subject by the opposing party." *See United States v. Chavez*, 229 F.3d 946, 952 (10th Cir. 2000) (collecting cases). In light of Defendants' opening statement, Judge Daniels did not abuse his discretion to allow Plaintiffs to respond with documents and expert testimony to the contrary.

Indeed, Defendants continued to invite expert testimony on the purpose and effect of Defendants' policies on cross-examination.[50] Defendants now complain that Shrenzel answered their questions.[51] But a party cannot base an appeal on testimony elicited through *its own* questioning. *See, e.g., United States v. Bornscheuer*, 563 F.3d 1228, 1238 (11th Cir. 2009).

---

[50] *See* JA-5682-84 ("Q. You would agree that those payments to prisoners and their families were not the direct cause of the perpetration of these attacks, correct?...Q. The people who committed these crimes didn't do so in order to get payments for their family while they were in prison, right?...Q. Sir, you would agree that the payments to prisoners and their families were not the primary objective for committing the crime, right?...Q. You would agree that payments of money to families of martyrs did not motivate the suicide attackers to do the attacks, right?").

[51] *See* Br. 56-57 (citing JA-5681-82, JA-5690-92: Shrenzel, on cross and redirect examination, opining on what motivated terrorists), 63 (citing JA-5699-700: Shrenzel, on re-direct, opining on Defendants' policies as a motivation for terrorism).

Moreover, Defendants' contention that Plaintiffs' experts "submitted the only testimony as to the impact of Defendants' social welfare programs" (Br. 65) is false. Defendants advanced their own explanation of so-called "social welfare" policies during their defense. *See* JA-7184-90, 7360 (defense witness Majed Faraj); JA-7539-44 (defense witness Shawqi Issa). In addition, Defendants had an expert, *in the courtroom*, available to further their explanation of the pay and promotion policies, but chose not to call him. *Compare* JA-1549 (expert report stating the prisoner payments are "a form of social welfare") *with* JA-7601 (Defendants decide not to call the expert). Defendants' problem is not that Judge Daniels allowed only one side to discuss these payments, but that the jury did not accept Defendants' excuses.

Finally, Defendants complain that the experts did not have an adequate basis to testify about the effects of paying terrorists, but the cited testimony (Br. 64 n.84) does not support the accusation. The testimony merely describes the *fact* of payment, from admitted documents. To take one example, Defendants complain about Shrenzel's identification of a suicide terrorist's payroll, promotion, and intelligence records (PTE-60, 62, 89, 153), but these exhibits were in evidence and literally in the jury's hands when Shrenzel discussed them (without objection). JA 5227-28. Shrenzel was well-qualified to explain the documents' contents. It was for the jury to decide for itself the effect of those payments.

**5.    Defendants' *Ad Hominem* Attacks on the Experts Are Meritless**

Defendants round out their complaints about Plaintiffs' liability case with *ad hominem* attacks on Eviatar and Shrenzel. These are meritless.

First, the fact that a different court, in another case, decided that Eviatar could not testify as an expert on a different subject has no bearing on his testimony here. *Cf.* Br. 53 (citing *Gilmore v. Palestinian Interim Self-Government Auth.*, 53 F. Supp. 3d 191 (D.D.C. 2014), *appeal pending*). In *Gilmore*, the plaintiffs proffered Eviatar to identify an individual who perpetrated a terror attack, but the court had excluded, as hearsay, all other evidence linking that individual to that attack. *Id.* The court, therefore, concluded that Eviatar's testimony would be "simply repeating hearsay evidence without applying any expertise." *Id*. at 213. Here, by contrast, any attribution opinions offered by Eviatar were based on admitted documentary evidence, such as convictions, confessions, and Defendants' own intelligence reports. *See* JA-4181-84. None of the topics about which Eviatar testified here was excluded in *Gilmore*.

Similarly, Defendants try to smear Shrenzel as a "partisan." *See* Br. 55. Shrenzel was the consummate professional. *See* JA-5189-97. Defendants' attempt to portray him as a partisan is misplaced. For example, when Shrenzel testified about "our" case, he was obviously speaking of the entire courtroom collectively, including the jury and Defendants. JA-5289.

64

**B.** **Even if Plaintiffs' Experts Had Offered Inadmissible Testimony, It Was Harmless**

Even if all of Defendants' arguments concerning expert testimony had merit (none does), they would amount to harmless error in light of the *volumes* of unchallenged documents in evidence that tied Defendants to the six attacks at issue. An error is harmless unless it results in *actual prejudice*, which is demonstrated where the error in question had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *see, e.g.*, *Parker*, 327 F.3d at 215 (error was harmless because witness was available for cross-examination and record included ample evidence on both sides for jury to determine liability); *United States v. Mercedes*, 401 F. App'x 619, 621 (2d Cir. 2010) (defendant failed to establish prejudice from erroneous admission of evidence "because there was ample admissible evidence, including his own written statement, establishing his guilt").

The jury's verdict was supported by an overwhelming *documentary* record. The expert testimony that Defendants highlight as prejudicial based on Plaintiffs' reference to it during summation actually demonstrates the overall *harmlessness* of Plaintiffs' experts' testimony. For example, Defendants' highlight Plaintiffs' use in summation of Shrenzel's re-direct testimony that Defendants' created an "atmosphere" of an all-out attack against Israel. *See* Br. 66. But the conclusion that Defendants created an atmosphere of incitement to violence was also before the jury through an official State Department report, which both sides used

65

extensively. *See* JA-4702 (admitting PTE-496); JA-4707; JA-4894-98; JA-4900-02. The report states:

> [A]vailable evidence indicates that elements with varying degrees of affiliation with the PLO…were frequently involved in acts of violence against Israelis.… Moreover, some senior PLO and PA leaders did little to prevent—and in some cases encouraged—acts of violence and an *atmosphere of incitement to violence* in the Palestinian media and through the public statements of Palestinian officials.

JA-9220-21 (PTE-496) (emphasis added; punctuation altered for clarity). Even if it had been error for Shrenzel to offer the same conclusion as the U.S. State Department, that error did not result in any prejudice because the evidence was already before the jury.

Most of Defendants' other examples do not involve instances of "improper *testimony* [being] 'emphasized in arguments to the jury.'" Br. 65 (emphasis added). Rather, they are examples of counsel's *argument* that post-attack payments constitute material support, based on the undisputed *fact* of post-attack payments.

Defendants' remaining examples are all portions of the summation that drew on *documentary* evidence in the record—not on expert testimony. *See, e.g.*, Br. 65 n.85 (citing JA-8134, where Plaintiffs closed on PTE-62: "This is the payroll record of Said Ramadan from the year 2002. What do you notice about it that's strange? This is a man who died committing his crimes in January of 2002 and they kept him on the payroll in February, in March and April and May and on through December, they kept him on the payroll."); *id.* (citing JA-8135, where

66

Plaintiffs closed on PTE-36C, 113, 142, 357, 358: "Look at Ahmed Barghouti. 12 counts of murder. He is still on the payroll. He has been promoted twice.… Look at [Defendants'] intelligence files. It says what he did. He is on 15 life sentences.… He is good in terms of security and morals. Their words, not mine."); *id*. at 66 (citing JA-8148, where Plaintiffs closed on PTE-2, 58, 128, 356, and 375: "When they hired Aweis, he was already a convicted axe murderer. That's who you hire as a police officer, a convicted axe murderer?… He gets convicted of five counts of murder, and what do you do with him? You pay him and you promote him."). The record belies Defendants' claim that they were prejudiced by improper expert testimony; the overwhelming *documentary* evidence supported the verdict.

Further, Judge Daniels gave an exemplary charge on expert witnesses:

> You may give the expert testimony whatever weight, if any, you find it deserves in light of all the evidence in this case. You should not, however, accept an expert's opinion testimony merely because he or she is an expert. Nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you.

JA-8202. This instruction offset any risk associated with the experts' testimony and negated any possible argument that Judge Daniels abused his discretion. *See, e.g.*, *Hygh v. Jacobs*, 961 F.2d 359, 365 (2d Cir. 1992) (expert's "impermissibly conclusory testimony" was harmless because of "larger body of otherwise unobjectionable testimony…from which the jury could easily have drawn the same

conclusions" and "judge instructed the jury that it could reject expert testimony 'if, after careful consideration of the evidence, you simply disagree with it.'").

Finally, Judge Daniels exercised vigilance to ensure that the testimony was proper and did not prejudice Defendants. Defendants seek to create the impression that Plaintiffs' experts ran wild during the trial but, in fact, Judge Daniels sustained 115 of Defendants' 243 objections to the experts' testimony. Where appropriate, he instructed the jury to disregard certain answers. *E.g.*, JA-4216; JA-4389-91; JA-5305; JA-5426; JA-5585. Judge Daniels' careful rulings throughout Plaintiffs' case ensured that Defendants suffered no prejudice. *See, e.g.*, *United States v. Blum*, 329 F.2d 49, 51 (2d Cir. 1964) ("Whether or not [defendant's] objection[s were] well taken, the judge's action in striking the evidence and instructing the jury to disregard it cured any possible prejudicial error.").

## IV. THE COURT SHOULD REINSTATE PLAINTIFFS' NON-FEDERAL CLAIMS

Defendants persuaded the District Court to grant summary judgment as a matter of law that Defendants lacked the capacity to be sued on all non-federal claims (for assault, battery, negligence, and the like). SPA-44-47. Six Plaintiffs were not U.S. nationals and therefore had only non-federal claims; those Plaintiffs had no ATA claims. SPA-47, n.22; SPA-60. Those Plaintiffs took nothing as a result of the District Court's dismissal of their non-federal claims. This Court reviews that dismissal *de novo*. *Mathirampuzha v. Potter*, 548 F.3d 70, 74 (2d Cir. 2008).

Fed. R. Civ. P. 17(b)(3) provides that the law of the forum state (New York) determines a defendant's "capacity to be sued" on non-federal claims. JA-577.

Defendants alleged that they were "unincorporated associations" under New York law (SPA-44) and argued that New York law immunizes them from liability unless each and every member of the association approved of the unlawful conduct, under the rule expressed in *Martin v. Curran*, 303 N.Y. 276 (1951).

The District Court accepted this logic and granted summary judgment, holding that "Defendants do not have the capacity to be sued on Plaintiffs' non-federal claims under New York law." SPA-44. This Court should reverse that decision because under the undisputed material facts, Defendants are *not* "unincorporated associations," as they conceded below.

## A. Defendants Are Not "Unincorporated Associations"

Defendants originally premised their "capacity" defense on the factual assertion that they are "unincorporated associations." *E.g.*, DE-187 at 4. The District Court directed Defendants to come forward with "evidence in the record that's been developed during this litigation, that they are in fact an unincorporated association." DE-252 at 78. Put to their proof, Defendants conceded that they "are not…unincorporated associations." JA-2761. Despite the concession, the District Court still found that they are "unincorporated associations." SPA-45.

However, Defendants' concession was correct. Unincorporated associations exist purely on a voluntary or consensual basis and have no legal existence separate and apart from their members. *Jund v. Town of Hempstead*, 941 F.2d 1271, 1282 (2d Cir. 1991); *Martin*, 303 N.Y. at 280; *Mount v. Tuttle*, 183 N.Y. 358, 366-67 (1906). Except in limited circumstances not relevant here, they cannot

69

hold property, and they lack the capacity to contract absent ratification by all of their members. *Jund*, 941 F.2d at 1282; *Martin*, 303 N.Y. at 280.

Neither Defendant exists on a purely voluntary and consensual basis. The PA has a local police force, levies taxes, exercises law-enforcement functions, and provides municipal services. PTE-532, Art. IX (2) & Annex III. The PLO has an army, a legislature, and a "National Fund." JA-746-49 (PTE-1076). It negotiates and enters into international agreements without member ratification. Both Defendants hold property. JA-746-49. And both obviously have a distinct existence separate and apart from their members.

These attributes are not consistent with being unincorporated associations. *See Jund*, 941 F.2d at 1282. Rather, Defendants appear to be what they say they are—non-sovereign foreign government entities. *See supra* pp. 25-26. To be sure, this Court assumed that the PLO was an unincorporated association in the *Klinghoffer* case. 937 F.2d at 50. But the parties did not litigate the application of New York's immunity rule under *Martin*. Thus, *Klinghoffer* does not control, because "*stare decisis* is limited to actual determinations in respect to litigated and necessarily decided questions." *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1128 (2d Cir. 1989).

## B.    Defendants May Be Sued Under New York Law

Defendants' concession that they are not "unincorporated associations" is enough alone to reverse for lack of "capacity." As government entities, they can be sued in New York under CPLR 1025.

70

"Capacity to sue may be expressly granted in enabling legislation or it may be inferred from review of the entity's statutory functions or responsibilities." *Graziano v. Cnty. of Albany*, 3 N.Y.3d 475, 479 (2004).

The PA's capacity to sue and be sued is express in its organic document. PTE-532, Art. IX(2). That ends the inquiry for the PA. *See, e.g.*, *Harman v. City of Ft. Lauderdale*, 134 Misc. 133, 135 (Sup. Ct. N.Y. Co. 1929) ("The Florida statute…creating said Port Authority…specifically provides that said Port Authority 'shall constitute a body corporate and shall contract on behalf of said district and shall sue and be sued in that name.'"); *Van Horn v. Kittitas Cnty., Wash.*, 28 Misc. 333, 334 (Sup. Ct. N.Y. Co. 1899) ("The defendant is, by the statutes of the state of its domicile, a public corporation, capable of suing and of being sued.").

The PLO's capacity to be sued can be inferred. Under New York law, capacity may be inferred "as a 'necessary implication from [the government entity's] power[s] and responsibilit[ies],' provided, of course, that 'there is no clear legislative intent negating review.'" *Cmty. Bd. 7 of Borough of Manhattan v. Schaffer*, 84 N.Y.2d 148, 156 (1994) (quoting *City of New York v. City Civil Serv. Comm'n.*, 60 N.Y.2d 436, 444-45 (1983)); *see Graziano*, 3 N.Y.3d at 479. Here, the PLO exercised powers consistent with capacity to be sued, such as owning property and providing material support to terrorists. It can point to nothing "negating review."

71

The District Court's finding that Defendants were "unincorporated associations" was clearly erroneous, and as a matter of law they have capacity to be sued under New York law.

## V.     THE COURT SHOULD REINSTATE THE GUETTA CLAIMS

The District Court originally denied Defendants' motion for summary judgment to dismiss the claims arising from the attack on Oz and Varda Guetta (*see supra* p. 18), relying primarily on an eyewitness identification of one of the four shooters.  SPA-35.  Shortly before trial, however, Plaintiffs withdrew reliance on that identification, and the Court then held that the claims arising from this attack could not go to the jury.  JA-3745; SPA-60.  This Court reviews that decision *de novo*.  *Mathirampuzha*, 548 F.3d at 74.

The District Court should have sent the Guetta attack to the jury.  Although the specific gunmen were not identified, the shooting followed an established *modus operandi* of terrorists from a PLO-PA paramilitary unit called "Force 17":

1. They involved teams of multiple assailants shooting machine guns from a vehicle.

2. They occurred within a narrow radius of about 15 miles of the Force 17 headquarters.

3. They occurred between late 2000 and early 2002, during the beginning of the Intifada.

JA-733-35; JA-2770 (PTE-558); JA-3320 (PTE-559); JA-3322-23 (PTE-1109).  In the same narrow geographical area as the other attacks, and during the same time frame, the Guettas were fired at with machine guns from another vehicle.  SA-2-3; JA-3324-34 (PTE-325) (Guetta attack).  A reasonable jury could infer that Force 17 committed this attack.  *See United States v. Carlton*, 534 F.3d 97, 101 (2d Cir.

2008) (explaining that a series of similar crimes established the existence of a pattern that was probative of identity); *Vilkhu v. City of New York*, 2009 WL 537495, at *2-*3 (E.D.N.Y. Mar. 3, 2009) (similar act testimony in civil rights case was probative of identity of police officers who had assaulted plaintiff).

Plaintiffs' expert was prepared to testify that the attack was identical to other Force 17 shooting attacks, and that it was "very likely that the attack on the Guettas, too, was carried out by PA security forces." JA-733. Experts in cases involving terrorism, gangs and organized crime may properly testify as to whether a particular assault bears the hallmarks of a particular criminal organization. *See United States v. Feliciano*, 223 F.3d 102, 109-10 (2d Cir. 2000) (FBI agent appropriately testified to "practices" of criminal organization); *United States v. Defreitas*, 2011 WL 317964, at *7 (E.D.N.Y. Jan. 31, 2011) (allowing expert testimony on terrorist organizations' "methods"), *aff'd sub nom. United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013). Indeed, proof of uncharged crimes and the existence of a criminal enterprise is typically established through such testimony. Plaintiffs' expert, a former intelligence agent, was fully qualified to state his opinion as to Force 17's activities and method of operation. *See Boim*, 549 F.3d at 702-05 (law enforcement officer appropriately provided expert testimony regarding assailant's affiliation with Hamas).

## **CONCLUSION**

The Court should affirm the judgment, reinstate Plaintiffs' non-federal

claims, and reinstate the claims of Varda and Oz Guetta.

December 11, 2015

Respectfully submitted,

Kent A. Yalowitz
    *KENT.YALOWITZ@APORTER.COM*

Lucy S. McMillan
    *LUCY.MCMILLAN@APORTER.COM*
Carmela T. Romeo
    *CARMELA.ROMEO@APORTER.COM*
Tal R. Machnes
    *TAL.MACHNES@APORTER.COM*

ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022
(212) 715-1000

– and –

Baruch Weiss
    *BARUCH.WEISS@APORTER.COM*
Dirk C. Phillips
    *DIRK.PHILLIPS@APORTER.COM*

ARNOLD & PORTER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000

*Counsel for Plaintiffs-Appellees-Cross-Appellants*

74

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 18,879 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times Roman 14-point font.

Dated: December 11, 2015          Respectfully submitted,


                                  /s/ Kent A. Yalowitz
                                  Kent A. Yalowitz