# 15-3135(L)

## 15-3151 (XAP); 22-1060 (CON)

# United States Court of Appeals

### FOR THE

# Second Circuit

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR, BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA, NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW, JAMIE A. SOKOLOW, MINOR, BY HER

***(Caption Continued on Inside Cover)***

On Appeal from the United States District Court for the
Southern District of New York, Case No. 2004 Civ. 0397

## BRIEF OF DEFENDANTS-APPELLEES

NEXT FRIENDS AND GUARDIAN MARK I. SOKOLOW AND RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD MANDELKORN, KATHERINE BAKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, LARRY CARTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR., INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JANIS RUTH COULTER, CHANA BRACHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STUART SCOTT GOLDBERG/NATURAL GUARDIAN OF PLAINTIFFS CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG, TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM

GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, NEVENKA GRITZ, SOLE HEIR OF NORMAN GRITZ, DECEASED,

*PLAINTIFFS - APPELLANTS,*

UNITED STATES OF AMERICA,

*INTERVENOR - APPELLANT,*

v.

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY AND OR PALESTINIAN COUNCIL AND OR PALESTINIAN NATIONAL AUTHORITY,

*DEFENDANTS - APPELLEES,*

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESATATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, DECEASED, ESTATE OF MUHANAD ABU HALAWA, DECEASED, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,

*DEFENDANTS.*

Gassan A. Baloul
Mitchell R. Berger
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

PRELIMINARY STATEMENT ............................................................ 1

STATEMENT OF THE ISSUES .......................................................... 3

STATEMENT OF THE CASE ............................................................. 4

I.    The Defendants Are Headquartered in Palestine and Cannot Operate in the United States. .......................................................................... 4

II.   Over Six Years Ago, This Court Held that the Exercise of Personal Jurisdiction Over Defendants Violates Due Process. ...................... 6

III.  Congress Passed the ATCA After This Court's Decision in *Waldman*. ........... 8

IV.   Congress Passed the PSJVTA After the Decision in *Waldman II*. .................. 9

V.    Three Courts Agree It Is Unconstitutional To Exercise Personal Jurisdiction Over Defendants Under the PSJVTA. .......................... 11

SUMMARY OF ARGUMENT ............................................................. 12

ARGUMENT ..................................................................................... 20

I.    Exercising Personal Jurisdiction Over Defendants Would Violate Due Process. ....................................................................................... 20

      A.    Defendants Lack Sufficient Contacts with the United States to Support the Exercise of Personal Jurisdiction. .......................... 20

      B.    Defendants Have Not "Consented" to Personal Jurisdiction in the United States. ....................................................................... 28

            1.    Consent to Personal Jurisdiction Must Be Knowing and Voluntary. ............................................................................ 28

            2.    Defendants Have Not Knowingly and Voluntarily Consented to Personal Jurisdiction. ..................................................... 40

      C.    Permitting Congress to Impose "Deemed Consent" to Personal Jurisdiction Based on Constitutionally-Inadequate Conduct Would Eviscerate Due Process Protections. ...................................... 55

II.   This Court Should Reject Appellants' Attempts to Avoid the Requirements of Due Process and Binding Circuit Precedent. .................................. 60

      A.    Courts Do Not Defer to Congress on Constitutional Issues. .................. 60

i

B.    Neither the War on Terror Nor the Alleged Need for Lawsuits Against Defendants Justifies Ignoring Due Process. .................................63

C.    *Waldman* Correctly Held that Jurisdictional Due Process Protects Individual Liberty Interests. ........................................................65

III.   The PSJVTA Violates Separation of Powers.................................................68

A.    The PSJVTA's "Deemed Consent" Provisions Violate Separation of Powers. ...........................................................................68

B.    Interpreting the PSJVTA to "Restore" Jurisdiction in Closed Cases, as Plaintiffs Suggest, Would Violate Separation of Powers.....................70

IV.   The Court Should Not Recall Its Six-Year-Old Mandate. .............................73

A.    Finality Interests Overwhelmingly Support Leaving the Mandate Undisturbed ...........................................................................73

B.    Recalling the Mandate Would Be Futile Because the District Court's Judgment Is Void. ..................................................................76

V.   Improper Expert testimony necessitates a new trial......................................79

A.    The District Court Allowed Plaintiffs' Experts to Weigh the Evidence Rather Than Apply Any Particular Methodology.....................80

B.    Plaintiffs' Experts Constructed Inflammatory, Speculative Narratives and Then Told the Jury What to Decide. ...............................83

CONCLUSION ........................................................................................88

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Dep. of Defense*,
  543 F.3d 59 (2d Cir. 2008) ................................................................75

*ACLU v. Dep. of Defense*,
  901 F.3d 125 (2d Cir. 2018) ..............................................................67

*Afoa v. China Airlines*,
  396 F. Supp. 3d 984 (W.D. Wash. 2019) ...........................................75

*Amara v. CIGNA Corp.*,
  775 F.3d 510 (2d Cir. 2014) ..............................................................79

*Armstrong v. Pomerance*,
  423 A.2d 174 (Del. 1980) ..................................................................37

*AT&T Communs. v. BellSouth Telecom.*,
  238 F.3d 636 (5th Cir. 2001) .............................................................35

*Atchley v. AstraZeneca UK Ltd.*,
  22 F.4th 204 (D.C. Cir. 2022)............................................................27

*Bank Markazi v. Peterson*,
  136 S. Ct. 1310 (2016)........................................................18, 68, 71

*Bano v. Union Carbide*,
  273 F.3d 120 (2d Cir. 2001) ..............................................................67

*Benjamin v. Jacobson*,
  172 F.3d 144 (2d Cir. 1999) ..............................................................71

*Boerne v. Flores*,
  521 U.S. 507 (1997)......................................................62, 68, 70

*Brewer v. Williams*,
  430 U.S. 387 (1977)..............................................................18, 68

iii

*Brown v. Lockheed Martin Corp.*,
814 F.3d 619 (2d Cir. 2016) ............................................................13, 17, 28, 36

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985).................................................................................*passim*

*Burnham v. Superior Court*,
495 U.S. 604 (1990)...................................................................................47, 76

*Calderon v. Thompson*,
523 U.S. 538 (1998)....................................................................................19, 73

*Carnival Cruise Lines v. Shute*,
499 U.S. 585 (1991).........................................................................................59

*Carrington v. United States*,
503 F.3d 888 (9th Cir. 2007) ..........................................................................76

*Carrizosa v. Chiquita Brands Int'l*,
47 F.4th 1278 (11th Cir. 2022) .......................................................................82

*Caterpillar v. Lewis*,
519 U.S. 61 (1996)...........................................................................................78

*Chen v. Dunkin' Brands*,
954 F.3d 492 (2d Cir. 2020) ...........................................................................17

*City of NY v. Mickalis Pawn Shop*,
645 F.3d 114 (2d Cir. 2011) ...........................................................................40

*Cole v. Carson*,
935 F.3d 444 (5th Cir. 2019) ..........................................................................79

*Collazos v. United States*,
368 F.3d 190 (2d Cir. 2004) ...........................................................................43

*College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense*
*Bd.*,
527 U.S. 666 (1999)..................................................................................*passim*

*Daimler AG v. Bauman*,
571 U.S. 117 (2014)...................................................................7, 22, 36, 58

*Daubert v. Merrell Dow Pharm.*,
509 U.S. 579 (1993)......................................................................79

*Dickerson v. United States*,
530 U.S. 428 (2000)......................................................................70

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
46 F.4th 226 (5th Cir. 2022) ........................................................66

*Ford Motor v. Mont. Eighth Jud. Dist. Ct.*,
141 S. Ct. 1017 (2021).....................................................38, 55, 66

*Fuld v. PLO*,
578 F. Supp. 3d 577 (S.D.N.Y. 2022) .....................................*passim*

*G.L. v. D.L.*,
406 P.3d 367 (Haw. App. 2017) ..................................................77

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
53 F. Supp. 3d 191 (D.D.C. 2014)....................................81, 82, 88

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
843 F.3d 958 (D.C. Cir. 2016)........................................20, 81, 82

*Gilson v. Republic of Ire.*,
682 F.2d 1022 (D.C. Cir. 1982) ...................................................61

*Gondeck v. Pan Am. World Airways*,
382 U.S. 25 (1965).................................................................. 74-75

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011)......................................................................21

*Grupo Dataflux v. Atlas Global Group*,
541 U.S. 567 (2004)......................................................................79

*H & D Tire & Auto. Hardware v. Pitney Bowes*,
227 F.3d 326 (5th Cir. 2000) ................................................... 77-78

*Hammond Packing Co. v. Arkansas*,
212 U.S. 322 (1909)...............................................14, 32-33, 42-43

v

*Herederos De Roberto Gomez Cabrera v. Teck Res. Ltd.*,
43 F.4th 1303 (11th Cir. 2022) .............................................................. 65

*Hess v. Pawloski*,
274 U.S. 352 (1927) ................................................. 14, 15, 36, 52

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .................................................................................. 61

*Hovey v. Elliott*,
167 U.S. 409 (1897) .............................................................................. 32

*Hygh v. Jacobs*,
961 F.2d 359 (2d Cir. 1992) ................................................................. 83

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
456 U.S. 694 (1982) ...................................................................... *passim*

*INS v. Chadha*,
462 U.S. 919 (1983) .............................................................................. 62

*Jesner v. Arab Bank*,
138 S. Ct. 1386 (2018) .......................................................................... 66

*Estate of Klieman v. Palestinian Auth.*,
140 S. Ct. 2713 (2020) .......................................................................... 11

*Estate of Klieman v. Palestinian Auth.*,
923 F.3d 1115 (D.C. Cir. 2019) ................................................... *passim*

*Klinghoffer v. S.N.C. Achille Lauro*,
937 F.2d 44 (2d Cir. 1991) ..................................................... 4, 49, 64

*Laker Airways v. Sabena*,
731 F.2d 909 (D.C. Cir. 1984) ............................................................. 44

*Leonard v. USA Petroleum*,
829 F. Supp. 882 (S.D. Tex. 1993) ........................................ 38, 39, 52

*Licci v. Lebanese Canadian Bank*,
732 F.3d 161 (2d Cir. 2013) ................................................................. 27

vi

*Litecubes v. N. Light Prods.*,
   523 F.3d 1353 (Fed. Cir. 2008) ........................................................44

*Livnat v. Palestinian Auth.*,
   139 S. Ct. 373 (2018)........................................................................ 8

*Livnat v. Palestinian Auth.*,
   851 F.3d 45 (D.C. Cir. 2017)....................................................*passim*

*Mallory v. Norfolk Southern Ry. Co.*,
   No. 21-1168 (cert. granted April 25, 2022)......................................36

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) .........................................................70

*Marvel Characters, Inc. v. Kirby*,
   726 F.3d 119 (2d Cir. 2013) ...........................................................84

*McCulley v. Brooks & Co. Gen. Constr.*,
   816 S.E.2d 270 (Va. 2018) ..............................................................77

*Mendelsohn v. Meese*,
   695 F. Supp. 1474 (S.D.N.Y. 1988) ................................................48

*In re Mid-Atl. Toyota*,
   525 F. Supp. 1265 (D. Md. 1981)...............................................37, 38

*Mullaney v. Anderson*,
   342 U.S. 415 (1952)........................................................................79

*Mwani v. bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005).............................................................26

*Nat'l Equip. Rental, Ltd. v. Szukhent*,
   375 U.S. 311 (1964)........................................................................29

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012)........................................................................61

*Newman-Green, Inc. v. Alfonzo-Larrain*,
   490 U.S. 826 (1989)........................................................................78

*Nimely v. NYC*,
414 F.3d 381 (2d Cir. 2005) ....................................................*passim*

*Peabody Coal v. Dir., Office of Workers' Comp. Programs*,
857 F.3d 310 (6th Cir. 2014) ..............................................72

*In re Pfizer Inc. Sec. Litig.*,
819 F.3d 642 (2d Cir. 2016) ..............................................80

*Plaut v. Spendthrift Farm*,
514 U.S. 211 (1995)........................................... 18, 68, 70-72

*"R" Best Produce v. DiSapio*,
540 F.3d 115 (2d Cir. 2008) ..............................................19, 77

*Roeder v. Islamic Republic of Iran*,
195 F. Supp. 2d 140 (D.D.C. 2002)...........................19, 71

*Roell v. Withrow*,
538 U.S. 580 (2003)........................................................28, 30

*Roman Cath. Archdiocese v. Feliciano*,
140 S. Ct. 696 (2020)...................................................76, 77

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013) ...............................................72

*Ruhrgas AG v. Marathon Oil Co.*,
526 U.S. 574 (1999)........................................................77

*Sargent v. Columbia Forest Prods*,
75 F.3d 86 (2d Cir. 1996) ................................................74, 75

*Sartor v. Toussaint*,
70 F. App'x 11 (2d Cir. 2002) ...........................................78

*Schwartz v. Merrill Lynch*,
665 F.3d 444 (2d Cir. 2011) .............................................71

*Shatsky v. PLO*,
955 F.3d 1016 (D.C. Cir. 2020)...................................*passim*

viii

*Shatsky v. PLO*,
   No. 18-cv-12355, 2022 WL 826409 (S.D.N.Y. Mar. 18, 2022) ....................... 12

*Shumway v. UPS*,
   118 F.3d 60 (2d Cir. 1997) ................................................................. 50

*Siemer v. Learjet Acquisition Corp.*,
   966 F.2d 179 (5th Cir. 1992) .............................................................. 59

*Snyder v. Massachusetts*,
   291 U.S. 97 (1934) ............................................................................ 67

*Sokolow v. PLO*,
   138 S. Ct. 1438 (2018) ......................................................................... 8

*Sokolow v. PLO*,
   140 S. Ct. 2714 (2020) ................................................................. 10, 79

*South Carolina v. Moore*,
   447 F.2d 1067 (4th Cir. 1971) ........................................................... 77

*Stern v. Marshall*,
   564 U.S. 462 (2011) .......................................................................... 69

*Sun Forest Corp. v. Shvili*,
   152 F. Supp. 2d 367 (S.D.N.Y. 2001) ................................................ 29

*Swenson v. Thibaut*,
   250 S.E.2d 279 (N.C. Ct. App. 1978) ................................................. 37

*In re Terrorist Attacks on Sept. 11, 2001*,
   741 F.3d 353 (2d Cir. 2013) .............................................................. 75

*TGX Corp. v. Simmons*,
   62 F.3d 666 (5th Cir. 1995) ............................................................... 72

*United States v. Amuso*,
   21 F.3d 1251 (2d Cir. 1994) ........................................................ 20, 82

*United States v. Davis*,
   139 S. Ct. 2319 (2019) ....................................................................... 72

ix

*United States v. Dukagjini*,
    326 F.3d 45 (2d Cir. 2003) ....................................................82, 83, 86

*United States v. Escobar*,
    462 F. App'x 58 (2d Cir. 2012) ..........................................................88

*United States v. Klein*,
    80 U.S. 128 (1871)..............................................................................68

*United States v. Mejia*,
    545 F.3d 179 (2d Cir. 2008) ................................................82, 83, 85

*United States v. PLO*,
    695 F. Supp. 1456 (S.D.N.Y. 1988) ..................................5, 16, 48, 49

*United States v. Tapia*,
    816 F. App'x 619 (2d Cir. 2020) ................................................ 75-76

*United States v. Zhong*,
    26 F.4th 536 (2d Cir. 2022) ...............................................................85

*United Student Aid Funds v. Espinosa*,
    559 U.S. 260 (2010).............................................................................67

*V&A Collection, LLC v. Guzzini Props.*,
    46 F.4th 127 (2d Cir. 2022) ...............................................................30

*Verlinden B.V. v. Cent. Bank of Nigeria*,
    461 U.S. 480 (1983).............................................................................61

*Volkart Bros., Inc. v. M/V Palm Trader*,
    130 F.R.D. 285 (S.D.N.Y. 1990) .......................................................43

*Walden v. Fiore*,
    571 U.S. 277 (2014)........................................................................7, 21

*Waldman v. PLO*,
    835 F.3d 317 (2d Cir. 2016) .....................................................*passim*

*Waldman v. PLO*,
    925 F.3d 570 (2d Cir. 2019) .....................................................*passim*

*Wellness Int'l Network, Ltd. v. Sharif*,
    575 U.S. 665 (2015).............................................................13, 28, 29, 31

*WorldCare Ltd. Corp. v. World Ins. Co.*,
    767 F. Supp. 2d 341 (D. Conn. 2011)...............................................60

*Wray v. Johnson*,
    202 F.3d 515 (2d Cir. 2000) .............................................................88

*Wuchter v. Pizzutti*,
    276 U.S. 13 (1928).............................................................................36

**Statutes**

18 U.S.C. § 2333(a) .......................................................................*passim*

18 U.S.C. § 2334(e) ...............................................................10, 50, 51, 53

22 U.S.C. § 5201(b) .......................................................................5, 16, 48

22 U.S.C. § 5202 .............................................................................5, 16, 48

22 U.S.C. § 5203 ..........................................................................................50

Anti-Terrorism Clarification Act, Pub. L. No. 115-253, 132 Stat. 3183
    (2018)..................................................................................*passim*

Promoting Security and Justice for Victims of Terrorism Act, Pub. L.
    No. 116-94, div. J, tit. IX, § 903(b)(5), 133 Stat. 3082, 3083 ...................*passim*

Taylor Force Act, 22 U.S.C. § 2378c-1 ..................................................43

**Other Authorities**

18 Moore's Fed. Pract. § 130.06 (2022) .................................................77

138 Cong. Rec. S17260 (daily ed. Oct. 7, 1992) .................................74

Antiterrorism Act of 1990: Hearing on S. 2465 Before the S. Comm.
    on the Judiciary, 101st Cong. 46-47 (1990) .......................................74

Aaron Simowitz, *The Private Law of Terror*, 126 Penn St. L. Rev. 159
    (2021) .................................................................................................63

Antiterrorism Act of 1990: Hearing on S. 2465 Before the S. Comm. on the Judiciary, 101st Cong. 46-47 (1990) ........................................................64

Brookings Institution, *Why the discourse about Palestinian payments to prisoners' families is distorted and misleading* (2020), https://www.brookings.edu/blog/order-from-chaos/2020/12/07/why-the-discourse-about-palestinian-payments-to-prisoners-families-is-distorted-and-misleading/ ......................................45, 46

Carnegie Endowment for Int'l Peace, *Palestinian Prisoner Payments* (2021), https://carnegieendowment.org/specialprojects/breakingtheisraelpalestinestatusquo/payments ........................................5, 45, 46

W. Dodge & S. Dodson, *Personal Jurisdiction and Aliens*, 116 Mich. L. Rev. 1205 (2018) ..........................................................................67

Jerusalem Post, *Terror victims' families to collect NIS 500 m. from Palestinian Authority* (4/26/2020), https://www.jpost.com/arab-israeli-conflict/court-orders-collection-of-nis-500-m-from-pa-for-second-intifada-625930 ..........................................................64

Programme of Work, UN Committee on the Exercise of the Inalienable Rights of the Palestinian People, UN Doc. A/AC.183/2020/1 (Feb. 7, 2020) ..........................................................50

Report, UN Committee on the Exercise of the Inalienable Rights of the Palestinian People, UN Doc. A/75/35 (Oct. 13, 2020) ................................50

Shurat Hadin, Press Release (11/19/2018), https://israellawcenter.org/legal_actions/shurat-hadin-wins-precedent-setting-ruling-in-achille-lauro-terror-case/ ........................................64

Times of Israel, *High Court: PA liable for terrorism due to money it pays attackers; victims can sue* (4/10/2022), https://www.timesofisrael.com/high-court-pa-liable-for-terrorism-due-to-stipends-to-attackers-victims-can-sue/ ....................................64

## PRELIMINARY STATEMENT

The PSJVTA is the latest legislative attempt to undo an unbroken line of cases—including this Court's prior decision in this very case—holding that Defendants are not subject to personal jurisdiction in the United States for their alleged involvement in terrorist attacks in Israel and Palestine. Time and again, courts have held that exercising personal jurisdiction over Defendants would violate due process because the attacks did not target Americans, and Defendants and their actions lack any constitutionally-sufficient connection to the United States. Because jurisdictional due process protections are rooted in the Constitution, these decisions cannot be undone by legislation.

In enacting the PSJVTA, Congress attempted an end-run around this Court's settled constitutional analysis through the long-discarded fiction of "deemed consent." The PSJVTA purports to impose personal jurisdiction where it is otherwise lacking by declaring that Defendants always shall be "deemed" to "consent" to personal jurisdiction when they engage in the same conduct the courts have previously held <u>insufficient</u> to support jurisdiction under the Due Process Clause. The PSJVTA accordingly seeks to elide the constitutional boundaries of due process established by this Court, the D.C. Circuit in look-alike cases, and the Supreme Court.

1

The district court saw through this ruse, holding—like every other federal court to consider the issue—that the fiction of "deemed consent" cannot paper over the lack of any constitutionally-meaningful connection between Defendants, the forum, and the conduct that gave rise to Plaintiffs' claims. Defendants have taken no actions that could be understood as "knowing and voluntary" submission to jurisdiction under the Due Process Clause. The PA and PLO did not sign a contract agreeing to jurisdiction, accept any funding or other benefit from Congress in exchange for submission to personal jurisdiction, or otherwise voluntarily agree to litigate Plaintiffs' claims in this forum. Rather, the PA and PLO have challenged personal jurisdiction at every stage, and this Court has already held they lack the forum-contacts necessary to confer jurisdiction. Because Defendants have not taken any actions demonstrating knowing and voluntary consent to personal jurisdiction in the United States, the district court properly concluded it would be unconstitutional to exercise jurisdiction over them.

Allowing Congress to impose "consent" on Defendants in these circumstances would swallow the traditional due process test. If due process required nothing more than "fair warning" of legislatively-imposed jurisdictional consequences, then nothing would stop Congress from decreeing that a foreign defendant shall be "deemed" to have "consented" to personal jurisdiction by engaging in <u>any</u> activity <u>anywhere</u> in the world. That the conduct "reasonably advances legitimate

2

government interests," as Appellants propose, is hardly a limiting factor. Personal jurisdiction could be legislatively imposed even in the absence of "minimum contacts" or "knowing and voluntary" consent, despite this Court's prior ruling rejecting the same conduct as a constitutionally-insufficient basis for jurisdiction. These are not merely theoretical concerns. That is precisely what the PSJVTA purports to do here.

More troubling still, Congress passed the PSJVTA more than three years after the issuance of this Court's mandate, which directed the district court to dismiss Plaintiffs' claims for lack of personal jurisdiction. Congress violates separation of powers and improperly usurps the judicial role when it attempts to reopen final judgments or dictate jurisdictional outcomes without regard to constitutional standards to be applied by the courts. Accordingly, given the institutional and finality interests at stake, this Court should decline to recall the mandate.

## STATEMENT OF THE ISSUES

1.     Whether Congress violates the Constitution when it imposes "consent" to personal jurisdiction on Defendants based on conduct previously held insufficient to satisfy due process, without requiring a substantial connection between Defendants, Plaintiffs' claims, and the forum (the United States), and without Defendants' knowing and voluntary submission to the jurisdiction of U.S. courts.

3

2.     Whether the Court should interpret the PSJVTA to restore jurisdiction in a closed case after final judgment and to dictate when courts must find "consent" to personal jurisdiction in violation of separation of powers under Article III.

3.     Whether the Court should disrupt finality, recall its six-year-old mandate in a closed case, and resurrect a void judgment entered without jurisdiction when Plaintiffs have preserved their claims against Defendants in a separate action.

4.     Whether a new trial would be required in any event because Plaintiffs' experts gave testimony without any reliable methodology and usurped the jury's role.

## STATEMENT OF THE CASE

## I.     The Defendants Are Headquartered in Palestine and Cannot Operate in the United States.

The Palestinian Authority ("PA") is the domestic government of parts of the West Bank and the Gaza Strip (collectively, "Palestine"). The Palestine Liberation Organization ("PLO") is the overseas diplomatic representative of the Palestinian people. *See Waldman v. PLO*, 835 F.3d 317, 322-23 (2d Cir. 2016), *cert. denied sub nom. Sokolow v. PLO*, 138 S. Ct. 1438 (2018). The PA is headquartered in the West Bank. *Id.* Since its founding in 1964, the PLO has been headquartered in Ramallah, the Gaza Strip, and Amman, Jordan. *Id.* at 323.

The United States does not recognize the PA or PLO as a sovereign government. *Id.*; *see also Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 47-48

4

(2d Cir. 1991) (holding PLO not a "state" under Foreign Sovereign Immunities Act). But the PA is the "governing authority in Palestine." *Waldman*, 835 F.3d at 323. The PA "funds conventional government services," including "public safety and the judicial system; health care; public schools and education; foreign affairs; economic development initiatives … the payment of more than 155,000 government employee salaries and related pension funds; transportation; and, communications[.]" *Id.* The PA also administers a social welfare program for Palestinians designed to provide a "social safety net in the face of brutal and oppressive living conditions under Israeli military occupation."[1] *See infra* at 45-46.

The PA and PLO have long been forbidden from operating in the United States. *See* 22 U.S.C. §§ 5201(b), 5202; *United States v. PLO*, 695 F. Supp. 1456, 1465-68, 1471 (S.D.N.Y. 1988); *infra* at 48-49. The UN Headquarters Agreement and UN guidance implementing it affords the sole exception, by which Palestine is an "invitee" of the UN, permitted to conduct activities in the United States in furtherance of Palestine's role as a Permanent Observer at the United Nations. *Id.* The PLO's diplomatic mission in Washington, D.C. closed in October 2018. *Estate*

---

[1] Carnegie Endowment for Int'l Peace, *Palestinian Prisoner Payments* (2021), https://carnegieendowment.org/specialprojects/breakingtheisraelpalestinestatusquo/payments.

*of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1130 (D.C. Cir. 2019). Palestine's UN Mission in New York remains open. *Id.*

## II. Over Six Years Ago, This Court Held that the Exercise of Personal Jurisdiction Over Defendants Violates Due Process.

This Court has already held that exercising personal jurisdiction over Defendants based on the same alleged conduct at issue now—UN-related activities in the United States, and domestic payment programs in Palestine—is unconstitutional. Plaintiffs alleged violations of the Anti-Terrorism Act ("ATA") for attacks committed in Israel by nonparties allegedly assisted by Defendants. *Waldman*, 835 F.3d at 324. Although a jury found for Plaintiffs in a seven-week trial in 2015, Plaintiffs failed to prove the attackers targeted Americans. *Id.* at 322, 337-38. Plaintiffs themselves conceded the "killing was indeed random." *Id.*

At trial, Plaintiffs' liability case was presented entirely through the expert testimony of three former Israeli intelligence and military officials. Over Defendants' objections (JA-1427-58), the trial court allowed those purported experts to speculate about the intent, state of mind, and motivations of the attackers. *See* JA-5690-92, JA-3926. None of the experts could identify a methodology—they instead simply summarized the evidence and then opined that Defendants were responsible for the attacks. *See* JA-5716, JA-4597-98. The jury found Defendants liable for six attacks and awarded $218.5 million, which was automatically trebled under 18 U.S.C. § 2333(a), to $655.5 million. *Waldman*, 835 F.3d at 327.

This Court held the exercise of personal jurisdiction over Defendants violated the Fifth Amendment Due Process Clause, vacated the judgment, and directed dismissal of Plaintiffs' claims. *Id.* at 330, 332-344. It held that Defendants were "persons" under the Fifth Amendment entitled to due process. *Id.* Defendants were not subject to general jurisdiction under *Daimler AG v. Bauman*, 571 U.S. 117, 127-28 (2014), because they were not "essentially at home" in the United States. *Id.* Nor was there specific jurisdiction under *Walden v. Fiore*, 571 U.S. 277, 284 (2014), because there was no evidence Defendants took actions in the United States related to the attacks, and the attacks "were not expressly aimed at the United States." *Waldman*, 835 F.3d at 337. The fact that Americans were injured was "'random [and] fortuitous.'" *Id.* at 344.

Soon afterward, the D.C. Circuit reached the same constitutional conclusion, holding that plaintiffs in three look-alike cases "failed to carry their burden of demonstrating that personal jurisdiction over the Palestinian Authority in this case would meet the requirements of the Fifth Amendment's Due Process Clause." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 58 (D.C. Cir. 2017); *see also Klieman*, 923 F.3d at 1127 (same); *Shatsky v. PLO*, 955 F.3d 1016, 1037-38 (D.C. Cir. 2020) (same).

This Court's mandate issued on November 28, 2016 (2d Cir. No. 15-3135, Dkt 248), and the case was dismissed on December 2, 2016 (Order, Dist. Ct. Dkt

1003).  Plaintiffs sought *certiorari*, and the Solicitor General recommended the Supreme Court deny Plaintiffs' petition because *Waldman* did not "implicate any conflict among the courts of appeals, or otherwise warrant [the Supreme] Court's intervention."  Br. of U.S. as Amicus Curiae ("CVSG Br.") at 7, *Sokolow v. PLO*, No. 16-1071 (Feb. 22, 2018).  The Supreme Court denied *certiorari* in this case, *Sokolow v. PLO*, 138 S. Ct. 1438 (2018), and in a parallel case from the D.C. Circuit, *Livnat v. Palestinian Auth.*, 139 S. Ct. 373 (2018).

## III.  Congress Passed the ATCA After This Court's Decision in *Waldman*.

In response to *Waldman*, Congress passed the Anti-Terrorism Clarification Act ("ATCA"), Pub. L. No. 115-253, 132 Stat. 3183 (2018).  The ATCA provided that defendants shall be "deemed" to have "consented" to personal jurisdiction in civil ATA cases if they either: (1) accept certain U.S. foreign assistance, or (2) maintain a U.S. office pursuant to an Executive Branch waiver.  *See infra* at 51-52.  Following the ATCA's passage, Plaintiffs moved to recall this Court's mandate, arguing that the ATCA created personal jurisdiction over Respondents.  *Waldman v. PLO*, 925 F.3d 570, 573-74 (2d Cir. 2019) ("*Waldman II*"), *vacated on other grounds*, 140 S. Ct. 2714 (2020).

In *Waldman II*, this Court denied Plaintiffs' motion to recall its mandate.  The Court held neither of the factual predicates for jurisdiction under the ATCA had been satisfied:  Defendants were not accepting U.S. foreign assistance or maintaining a

U.S. office pursuant to an Executive waiver. *Id.* at 573-74. Defendants therefore had not "consented" to personal jurisdiction under the ATCA. *Id.* The D.C. Circuit agreed. *See Klieman*, 923 F.3d at 1128.

This Court further held that the "[c]ourt's interest in finality ... weighs against recalling the mandate." *Waldman II*, 925 F.3d at 575. The Court explained that recalling the mandate more than two years after it directed the dismissal of Plaintiffs' claims for lack of jurisdiction "would offend the need to preserve finality in judicial proceedings." *Id.* (internal quotations omitted). Noting that Plaintiffs had filed a case to take advantage of supposedly new jurisdictional facts, the court determined that "[t]o the extent that there are any developments in the activities of the PA or the PLO that may subject them to personal jurisdiction under the ATCA, they can be raised in that case." *Id.* at 576 n.2. Plainitffs petitioned for certiorari from this Court's refusal to recall the mandate.

## IV. Congress Passed the PSJVTA After the Decision in *Waldman II*.

In response to *Waldman II* and while Plaintiffs' petition for certiorari was pending, Congress intervened again by passing the Promoting Security and Justice for Victims of Terrorism Act ("PSJVTA"), Pub. L. No. 116-94, div. J, tit. IX, § 903(b)(5), 133 Stat. 3082, 3083, which superseded the personal jurisdiction provisions in the ATCA. The PSJVTA amended the definition of "defendant" to

9

specify that it applied only to the PA, the PLO, and their successors. 18 U.S.C. § 2334(e)(5).

The PSJVTA purports to "deem" that Defendants "consent" to personal jurisdiction in ATA cases if they make payments after April 18, 2020, to persons who were "fairly tried" or "ple[d] guilty" and were imprisoned for (or to families of those who died while committing) "any act of terrorism" that killed or injured a U.S. national. *Id.* § 2334(e)(1)(A). The PSJVTA also "deems" "consent" to jurisdiction if, after January 4, 2020, Defendants maintain "any office" or facility "in the United States," or "conduct[] any activity while physically present in the United States," not expressly exempted. *Id.* §§ 2334(e)(1)(B), (e)(3). In determining whether Defendants shall be "deemed" to have "consented" to jurisdiction, the PSJVTA specifically provides that a court may <u>not</u> consider offices or facilities used "exclusively for the purpose of conducting official business of the United Nations," activities "undertaken exclusively for the purpose of conducting" UN business or meetings with U.S. or foreign government officials, and "any personal or official activities" "ancillary" to UN business or government meetings. *Id.* § 2334(e)(3)(A)-(F).

After the PSJVTA's enactment, the Supreme Court granted, vacated, and remanded *Waldman II* for further consideration in light of the PSJVTA. 140 S. Ct. 2714 (2020). (The Court issued an identical order in *Klieman*, a direct-appeal from

the D.C. Circuit.  140 S. Ct. 2713 (2020).)  This Court then remanded to the district court for a determination of the "applicability of the PSJVTA to this case" and "its constitutionality."  2d Cir. No. 15-3135, Dkt 366, at 3.  The Court ruled that Plaintiffs' motion "to recall the mandate, issued on November 28, 2016, will be held in ABEYANCE."  *Id*. at 4 (emphasis in original).

## V.    Three Courts Agree It Is Unconstitutional To Exercise Personal Jurisdiction Over Defendants Under the PSJVTA.

The PSJVTA is now the sole basis asserted by Plaintiffs for personal jurisdiction over Defendants.  Plaintiffs claim Defendants "consented" to jurisdiction under the PSJVTA by (1) making payments to individuals who committed terrorist attacks, or to their families; (2) conducting activities, such as press conferences and social media posts, "while physically present in the United States"; and (3) "continu[ing] to maintain an office" for Palestine's Mission to the United Nations in New York.  *See* Dist. Ct. Dkt 1015, Pls. Opening Mem. on PSJVTA, at 8-19 (cleaned up).

On remand, the district court—like every other court to address the issue—held that the exercise of personal jurisdiction over Defendants under the PSJVTA's deemed-consent provisions would violate the Due Process Clause.  The court held "finding that Defendants have impliedly consented to personal jurisdiction based solely on their conduct in violation of the PSJVTA would violate the due process clause of the constitution."  SPA-11.

11

The court observed that "Congress 'simply took conduct in which the PLO and PA had previously engaged—conduct that the Second and D.C. Circuits held was insufficient to support personal jurisdiction in [*Waldman*, *Livnat*, *Shatsky*, and *Klieman*]—and declared that such conduct shall be deemed to be consent.'" SPA-16 (quoting *Fuld v. PLO*, 578 F. Supp. 3d 577, 587 (S.D.N.Y. 2022)). As the court explained, none of the conduct alleged by Plaintiffs supported the presumption that Defendants knowingly and voluntarily consented to personal jurisdiction in the United States for their alleged involvement in indiscriminate terrorist attacks occurring abroad. SPA-8-11, 16. Accordingly, the court held that exercising jurisdiction on the basis of such conduct "would breach the limits prescribed by the Due Process Clause." SPA-13.

The other two courts to have considered the constitutionality of the "deemed consent" provisions of the PSJVTA both reached the same conclusion. *See Fuld*, 578 F. Supp. 3d 577; *Shatsky v. PLO*, No. 18-cv-12355, 2022 WL 826409 (S.D.N.Y. Mar. 18, 2022). The appeals from the *Fuld* decision are pending before this Court, *see* Nos. 22-76, 22-496, while the appeals from the *Shatsky* decision have been held in abeyance, *see* Nos. 22-791, 22-1138.

## SUMMARY OF ARGUMENT

The PSJVTA does not satisfy the "knowing and voluntary" standard for "consent" jurisdiction, but instead improperly attempts to impose jurisdiction contrary

to constitutional due-process requirements. This Court has already determined that Defendants' alleged activities are constitutionally inadequate to support personal jurisdiction. Allowing Congress to transform those same activities into "consent" to jurisdiction would strip Defendants of these constitutional protections, and undermine the Supreme Court's jurisprudence on personal jurisdiction. This Court should conclude that Plaintiffs have not established valid "consent" to personal jurisdiction under the PSJVTA and reaffirm that exercising personal jurisdiction over Defendants would violate due process.

### 1. *Implied Consent Must Be Knowing and Voluntary.*

Both the Supreme Court and this Court have emphasized that consent to personal jurisdiction must be "knowing and voluntary." *Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S. 665, 685 (2015); *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 640 (2d Cir. 2016). For implied consent, Plaintiffs must demonstrate some "actions of the defendant" that "amount to a legal submission to the jurisdiction of the court." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704-09 (1982) ("*Bauxites*"). Because implied or "constructive" consent "is not a doctrine commonly associated with the surrender of constitutional rights," federal courts "indulge every reasonable presumption against waiver." *College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 681-82 (1999) (Scalia, J.).

13

The Supreme Court distinguishes between inferring a defendant's knowing and voluntary choice to submit to jurisdiction based on its own conduct, and "mere assertions of power" by the forum to impose jurisdiction on nonconsenting defendants. *Bauxites*, 456 U.S. at 705. Imposing jurisdiction on a defendant is not valid "consent" to jurisdiction, unless the defendant's conduct supports the presumption that it knowingly and voluntarily submitted to jurisdiction in the forum. *Id.* at 705-06 (discussing the "*Hammond Packing* presumption"); *see also College Savings Bank*, 527 U.S. at 680-81 (explaining that merely putting the defendant "on notice" the forum "intends to subject it to suits" is "very far from concluding that the [defendant] made an 'altogether voluntary' decision" to consent to personal jurisdiction).

As one barometer for valid consent, courts have recognized a narrow category of "implied consent" statutes under which a party knowingly and voluntarily agrees to personal jurisdiction by accepting a benefit conferred by the forum. Many states, for example, have enacted statutes conditioning the benefit of driving on public roads on consent to personal jurisdiction for suits arising from those acts. By "accept[ing]" the "rights and privileges" of driving on public roads, a non-resident defendant signifies its "agreement" to submit to personal jurisdiction in the forum. *See Hess v. Pawloski*, 274 U.S. 352, 354-57 (1927). The Supreme Court likewise recognizes that "acceptance" of federal funds by a state may signal its implied "agreement" or

consent to submit to jurisdiction in federal court. *College Savings Bank*, 527 U.S. at 686.

This type of conduct indicates knowing and voluntary <u>agreement</u> to personal jurisdiction, as distinguished from the forum's unilateral <u>imposition</u> of jurisdiction, because the defendant's acceptance of a benefit or privilege conditioned on consent signals its implicit agreement to submit to the court's jurisdiction. *See Hess*, 274 U.S. at 356-57 (acceptance of privilege of driving serves as "equivalent" of consent). A reciprocal exchange underpinned the PSJVTA's predecessor, the Anti-Terrorism Clarification Act. The ATCA provided for "deemed consent" jurisdiction over Defendants if they <u>accepted</u> certain <u>benefits</u> offered by the United States. *Infra* at 51-52. This Court held that the ATCA did not supply jurisdiction over Defendants because they had not accepted these government benefits. *Waldman II*, 925 F.3d at 574-75. The PSJVTA, by contrast, does not ground "consent" in Defendants' acceptance of a benefit from the forum, but rather impermissibly seeks to impose jurisdiction without any conduct signaling knowing and voluntary consent.

**2. *Defendants Have Not Consented to Jurisdiction.*** As their long-standing objection to personal jurisdiction in this and similar cases makes clear, Defendants have not agreed—expressly or impliedly—to consent to jurisdiction in the United States. Defendants have not signed a contract expressly agreeing to jurisdiction, or taken any action in the litigation itself evincing their intent to submit to jurisdiction.

Defendants also have not accepted any government benefit or privilege conditioned on consent to jurisdiction.

Unlike the implied consent statutes described above, the PSJVTA does not confer any benefit on Defendants or offer to waive pre-existing laws penalizing or prohibiting their activities in the United States, in exchange for their consent to jurisdiction. Social welfare payments in Palestine to families of prisoners or decedents ("prisoner and martyr payments") occur entirely outside the United States. The courts have already held that such payments do not provide <u>jurisdiction</u> over Defendants because such payments are not connected to the United States, and Plaintiffs' claims do not arise from or relate to such payments. *See Shatsky*, 955 F.3d at 1022-23 (alleged "martyr payments" did not confer specific jurisdiction). Defendants' payments in Palestine do not depend on Congressional authorization, and Defendants thus do not avail themselves of any U.S. government benefit when they make such payments.

The same is also true of Palestine's UN Mission, and Defendants' alleged activities in the United States, such as social media posts in furtherance of the Mission's work. For more than three decades, the Anti-Terrorism Act of 1987 ("1987 ATA") has expressly denied Defendants the "benefit" of engaging in any non-UN related activity in the United States. *See* 22 U.S.C. §§ 5201(b), 5202; *United States v. PLO*, 695 F. Supp. at 1471 (describing 1987 ATA as a "wide gauged

restriction of PLO activity within the United States"). The PSJVTA does not offer to waive any restriction or penalties imposed by the 1987 ATA, nor does it purport to authorize Defendants to engage in any previously unauthorized activity in the United States.

### 3. The Fiction of "Deemed Consent" Cannot Displace the Requirements of the Due Process Clause.

Stripped of the fiction of "consent," the PSJVTA attempts to impose jurisdiction over Defendants based on the same activities this Court and others have already held insufficient to support personal jurisdiction under the Due Process Clause. But deemed consent statutes cannot pass constitutional muster merely by providing advance notice of jurisdictional consequences, as Appellants propose, without undermining fundamental due process protections.

The Supreme Court has already rejected the same "fair warning" argument Appellants make now, *see College Savings Bank*, 527 U.S. at 679-80, and for good reason. This Court likewise recognized in *Brown* and *Chen* that due process serves as a supervening check on legislatively-imposed "consent" to jurisdiction, reiterating its "constitutional concerns" that if mere notice of jurisdictional consequences were enough to satisfy due process, "'*Daimler*'s ruling would be robbed of meaning by a back-door thief.'" *Chen v. Dunkin' Brands*, 954 F.3d 492, 499 (2d Cir. 2020) (quoting *Brown*, 814 F.3d at 640). The PSJVTA demonstrates that these "constitutional concerns" were well-founded. If "fair warning" alone could imply

consent to jurisdiction, there is no end to the types of activities that could give rise to "deemed consent" to jurisdiction—including activities that the courts have already held insufficient to satisfy the Due Process Clause.

**4. *The PSJVTA, As Interpreted by Plaintiffs, Also Violates Separation of Powers.*** Allowing Congress to dictate when the courts must find "consent" to personal jurisdiction, and interpreting the PSJVTA to restore jurisdiction in a closed case, would also violate separation of powers. Determining whether a party has waived its constitutional defenses requires the "application of constitutional principles to the facts as found." *Brewer v. Williams,* 430 U.S. 387, 403 (1977). Personal jurisdiction requires individualized adjudication that is reserved for the judiciary—particularly as the courts have already provided the constitutional "knowing and voluntary" standard for consent. *See Bank Markazi v. Peterson,* 136 S. Ct. 1310, 1323 (2016) ("Congress, no doubt, 'may not usurp a court's power to interpret and apply the law to the [circumstances] before it.'"). The PSJVTA attempts to usurp the judicial function by dictating that certain activities must always be "deemed" to be knowing and voluntary "consent" to personal jurisdiction.

That constitutional problem is exacerbated if the PSJVTA is interpreted to "restore" jurisdiction in this closed case. That interpretation directly violates the Supreme Court's holding in *Plaut v. Spendthrift Farm*, 514 U.S. 211, 227-28 (1995). Under *Plaut,* "Congress' retroactive imposition of jurisdiction to reopen a case after

18

final judgment" would be "an impermissible encroachment by Congress into the sphere of the federal courts and [a violation of] Article III." *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 162 (D.D.C. 2002). Because the PSJVTA itself is silent about reopening final judgments, and to avoid the separation-of-powers problem, this Court should decline to interpret the PSJVTA as restoring jurisdiction in this closed case.

**5.** ***Given the Finality Interests at Stake, This Court Should Decline To Recall Its Six-Year-Old Mandate When Plaintiffs May Pursue Claims in a Separate Action.*** In light of "the profound interests in repose attaching to the mandate of a court of appeals," recall of a mandate is a tool "of last resort, to be held in reserve against grave, unforeseen contingencies." *Calderon v. Thompson*, 523 U.S. 538, 549-50 (1998). There is no "last resort" here—even if the Court determines that the PSJVTA is constitutional, Plaintiffs may pursue their claims in a separate case stayed at the pleadings stage, as this Court has observed. *See Waldman II*, 925 F.3d at 576 n.2. That outcome also respects this Court's recognized interest in the finality of its mandates, which has only grown in the four years since it last declined to recall its mandate in this case. *Id.* at 574-75. Recalling the mandate would be futile in any event, because a judgment entered without personal jurisdiction, like the district court's 2015 judgment in this case, is void. *See, e.g.*, "*R" Best Produce v. DiSapio*, 540 F.3d 115, 122-23 (2d Cir. 2008).

19

***6.  A New Trial Is Required Because Plaintiffs' Purported Experts Had No Specialized Knowledge or Reliable Methodology and Usurped the Jury's Role.*** The district court committed manifest error when it allowed Plaintiffs' three liability experts to testify at trial despite failing to apply any discernable methodology.  *See United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994).  These witnesses instead provided speculative narratives about the attackers' mental states and told the jury which conclusions to draw.  The D.C. Circuit affirmed the exclusion of testimony from one of these same experts based on nearly-identical infirmities.  *See Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 972 (D.C. Cir. 2016).  As these witnesses served as Plaintiffs' only liability witnesses, there is (at the very least) a "distinct possibility" that the verdict was prejudiced by their improper and unfounded testimony.  Even if this Court were to recall the mandate and exercise personal jurisdiction over Defendants, a new trial is necessary.

## ARGUMENT

I.  **Exercising Personal Jurisdiction Over Defendants Would Violate Due Process.**

A.  **Defendants Lack Sufficient Contacts with the United States to Support the Exercise of Personal Jurisdiction.**

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S.

462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). Because a court's "assertion of jurisdiction exposes [a foreign defendant] to the State's coercive power," it is subject to review in federal court for "compatibility" with due process. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011) (holding assertion of personal jurisdiction over foreign corporations violated due process). The personal jurisdiction requirement "represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Bauxites*, 456 U.S. at 702.

"Due process requires that a defendant be haled into court … based on <u>his own affiliation</u> with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Walden*, 571 U.S. at 286 (emphasis added). Accordingly, the Supreme Court has "consistently" rejected the argument that the "foreseeability of causing <u>injury</u>" to residents of the forum is sufficient to establish personal jurisdiction whenever "policy considerations so require." *Burger King*, 471 U.S. at 474. Rather, jurisdiction is "proper" only when some "actions by the defendant himself" create a "substantial connection" with the forum. *Id.* at 475-76; *see also Walden*, 571 U.S. at 289-90 (emphasizing "analytical focus" must remain on <u>the defendant's</u> connection to the forum and holding "mere injury to a forum resident is not a sufficient connection" to satisfy due process).

21

Applying these principles, this Court previously held that subjecting Defendants to personal jurisdiction in the United States for the claims alleged by Plaintiffs in this very case would violate due process, because Defendants lack sufficient contacts with the forum. *See Waldman*, 835 F.3d at 343-44. Defendants are not subject to general jurisdiction in the United States because, as this Court explained, the "overwhelming evidence" shows they are only "'at home' in Palestine, where [they] are headquartered and from where they are directed." *Id.* at 332-34; *see also Daimler*, 571 U.S. at 137-39 (holding general jurisdiction requires contacts with the forum "so 'continuous and systematic' as to render [the defendant] essentially at home in the forum").

This Court further held Defendants are not subject to specific jurisdiction in the United States for the claims at issue here because their "suit-related conduct"— namely, their alleged involvement in terrorist attacks in Israel (which Defendants dispute)—is "not sufficiently connected to the United States." *Waldman*, 835 F.3d at 335-43. The attacks at issue "were not expressly aimed at the United States," but rather "affected United States citizens only because they were victims of indiscriminate violence that occurred abroad." *Id.* at 337; *see also id.* at 326 (noting Plaintiffs failed to present any evidence they "were targeted … because of their United States citizenship"). Moreover, "the connections the defendants do have with the United States … revolve around lobbying activities that are not proscribed by

the ATA and are not connected to the wrongs for which the plaintiffs here seek redress." *Id.* at 342; *see also id.* at 326 (noting "plaintiffs did not allege or submit evidence … that the defendants engaged in conduct in the United States related to the attacks"). Accordingly, "[a] focus on the relationship of the defendants, the forum, and the defendants' suit-related conduct" led this Court to conclude "that there is no specific personal jurisdiction over the defendants for the torts [alleged by Plaintiffs] in this case." *Id.* at 337.

In this and similar cases pending before this Court, Appellants seek to paint this panel's prior decision as an outlier, asserting *Waldman* was "incorrectly decided" and "has received substantial criticism." Pls. Br. 16-17, 48-63, *Fuld v. PLO*, No. 22-76(L) (2d Cir. 2022); *see also* Gov't Br. 16-17, 30-35 (urging this panel to "reconsider" *Waldman*).[2] To the contrary, every other court to consider the issue has reached the same conclusion, holding Defendants lack sufficient contacts with the United States to be subject to either general or specific jurisdiction for the types of claims at issue here. *See Shatsky*, 955 F.3d at 1036-38 (directing dismissal of ATA claims against Defendants for lack of personal jurisdiction); *Klieman*, 923 F.3d

---

[2] In *Fuld*, Plaintiffs urged a different panel to invoke this Court's "mini en banc" process to reconsider and overrule *Waldman*. *See* Pls. Br. 49-51, *Fuld v. PLO*, No. 22-76(L) (2d Cir. 2022). Curiously, Plaintiffs here (represented by the same counsel) do not acknowledge, let alone address, their collateral attack on this panel's prior ruling.

at 1126 (holding that, "absent intentional targeting, the fact that an American died in a terrorist incident abroad" is exactly the type of "'random, fortuitous, or attenuated' contact" that is insufficient to support personal jurisdiction); *Livnat*, 851 F.3d at 56-58 (same). Put simply, the courts have repeatedly held—consistent with *Waldman*—that Defendants are not subject to personal jurisdiction in the United States for claims based on their alleged involvement in indiscriminate third-party attacks in Israel or Palestine.

Notably, this unbroken line of decisions specifically holds the <u>same activities</u> upon which Plaintiffs and the Government now rely to impose personal jurisdiction under the PSJVTA are <u>insufficient</u> to support the exercise of jurisdiction under the Due Process Clause. As noted above, Plaintiffs here allege that Defendants "consented" to jurisdiction by: (1) "continuing" to make "prisoner and martyr payments" in Palestine; (2) conducting activities, such as press conferences and social media posts, "while physically present in the United States"; and (3) "continuing to maintain an office" in New York, the site of Palestine's Mission to the United Nations. *See* Dist. Ct. Dkt 1015, Pls. Opening Mem. on PSJVTA, at 8-19 (cleaned up).

But courts confronted with virtually identical (if not more extensive) allegations have consistently held these same types of activities do <u>not</u> establish a sufficient connection between Defendants, the claims at issue, and the United States

24

to support the exercise of personal jurisdiction. In *Waldman*, for example, this Court rejected Plaintiffs' claims that activities "intended to influence United States policy to favor the defendants' political goals" were sufficient to establish personal jurisdiction. 835 F.3d at 337, 341. Plaintiffs specifically alleged that Defendants maintained a "substantial" diplomatic and commercial presence in the United States, retained a lobby firm, "promoted the Palestinian cause in speeches and media appearances," and engaged in "extensive public relations activities" to "influence United States policy."[3] *Id.* at 323, 326, 333, 337. This Court held that none of those alleged activities created a "substantial connection" between Defendants, the alleged attack, and the United States. *Id.* at 335-37.

The D.C. Circuit reached the same conclusion in a series of ATA cases against Defendants, holding alleged "martyr payments," "speaking engagements," and public advocacy for the Palestinian cause failed to establish the requisite connection between Defendants, the claims at issue, and the United States. *See Shatsky*, 955 F.3d at 1022-23, 1037 (holding alleged "martyr payments" and "public relations

---

[3] When this Court decided *Waldman*, Defendants' presence in the United States was more substantial than it is now. At that time, Defendants maintained an office in Washington, D.C. (in addition to Palestine's UN Mission in New York). As discussed below, Defendants closed their D.C. office in 2018 after the U.S. Government declined to extend the ATA waiver necessary to continue operations. *See Klieman*, 923 F.3d at 1130. Aside from the UN Mission, Defendants do not currently maintain any office or physical location in the United States.

campaign" insufficient to support personal jurisdiction); *Klieman*, 923 F.3d at 1118, 1123-26 (holding alleged "campaign" to "influence" U.S. foreign policy "through the use of U.S. offices, fundraising, lobbying, [and] speaking engagements" insufficient); *Livnat*, 851 F.3d at 56-57 (holding plaintiffs failed to establish requisite link between alleged attack and "lobbying" activities).

Contrary to Appellants' and amici's assertions, these holdings do not place Defendants "beyond the jurisdictional reach" of U.S. courts, or "effectively preclude[]" alleged "foreign sponsor[s] of terrorism acting abroad from being hailed [sic] into U.S. courts."[4]  When a defendant targets American citizens, or engages in conduct in the United States substantially connected to terrorist attacks overseas, U.S. courts can (and do) exercise personal jurisdiction over the defendant.[5]  *See, e.g.*, *Mwani v. bin Laden*, 417 F.3d 1, 11-14 (D.C. Cir. 2005) (holding foreign defendants who "orchestrated the bombing of the American embassy in Nairobi" subject to personal jurisdiction because they "purposefully direct[ed] their terror at the United

---

[4] *See, e.g.*, Amicus Br. of Con. Law Professors 3, 19 (wrongly asserting Congress has been "hamstrung by the courts in its obligation to protect citizens"); Amicus Br. of U.S. Sens. & Reps. 5, 15-16 (wrongly claiming decision below "effectively plac[es] the PLO and PA beyond the reach of Congress and American courts"); Amicus Br. of Fmr. Officials 4 (wrongly stating decision below "takes the civil-liability option off the table vis-à-vis these defendants").

[5] The same is true of the opening "vignette" offered by one amicus, which describes the Iranian hostage crisis.  *See* Amicus Br. of Con. Law Professors 4-6.  Because the hostage-takers targeted the United States, they, too, would have been subject to personal jurisdiction.

26

States"); *Atchley v. AstraZeneca UK Ltd.,* 22 F.4th 204, 209-10, 231-38 (D.C. Cir. 2022) (holding court had specific jurisdiction over foreign companies that provided substantial support to a terrorist group that "injured or killed hundreds of United States service members" during a "years-long campaign to harm Americans and drive the United States' military … out of Iraq"); *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 169-74 (2d Cir. 2013) (holding foreign bank that used U.S. correspondent accounts to transfer funds for Hezbollah was subject to personal jurisdiction for claims arising from rocket attacks in Israel). The Due Process Clause precludes the exercise of personal jurisdiction only when plaintiffs cannot establish the requisite connection between the defendant, the attack allegedly giving rise to plaintiffs' claims, and the forum. *See Klieman*, 923 F.3d at 1126 (distinguishing claims brought by plaintiffs injured in bus attack in Israel from *Mwani*, in which the defendants "indisputably aimed to kill Americans").

In this case, Plaintiffs cannot satisfy the traditional due process requirements for exercising personal jurisdiction over a foreign defendant—as this Court already held in *Waldman*. The sole question before this Court is whether Plaintiffs can rely upon the same activities held constitutionally insufficient in *Waldman* to establish "deemed consent" to personal jurisdiction under the PSJVTA. Over the past year, three federal judges have considered that question. All three, including Judge

27

Daniels below, correctly concluded the constitutional protections afforded to defendants under the Due Process Clause are not so easily evaded.

**B.    Defendants Have Not "Consented" to Personal Jurisdiction in the United States.**

**1.    Consent to Personal Jurisdiction Must Be Knowing and Voluntary.**

"Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Bauxites*, 456 U.S. at 703. A party may expressly consent to the court's jurisdiction, or impliedly consent by "signal[ing]" its agreement "through actions rather than words." *Roell v. Withrow*, 538 U.S. 580, 589-91 (2003). In *Bauxites*, the Supreme Court cataloged a "variety of legal arrangements [that] have been taken to represent express or implied consent to the personal jurisdiction of the court," including submission "by appearance," forum-selection clauses, arbitration agreements, stipulation, "constructive consent" through "the voluntary use of certain state procedures," and failure to assert a jurisdictional defense in a responsive pleading. 456 U.S. at 703-04. Each of these "legal arrangements," the Court explained, reflects some "actions of the defendant" that "amount to a legal submission to the jurisdiction of the court." *Id.* at 704-05.

"[W]hether express or implied," however, the Supreme Court has "emphasiz[ed]" that a party's consent to jurisdiction must be "knowing and voluntary." *Wellness Int'l*, 575 U.S. at 685; *see also Brown*, 814 F.3d at 640

28

(explaining defendant may "submit to jurisdiction" that a court "would otherwise be unable to exercise" through "free and voluntary consent"). An "effective waiver of a constitutional right" generally requires proof of "the 'intentional relinquishment or abandonment of a known right or privilege.'" *College Savings Bank*, 527 U.S. at 682. Because implied or "constructive" consent "is not a doctrine commonly associated with the surrender of constitutional rights," federal courts "indulge every reasonable presumption against waiver."[6] *Id.* at 681-82.

In some cases, determining whether a defendant knowingly and voluntarily consented to personal jurisdiction is straightforward. A party may <u>expressly</u> agree—through a forum-selection clause, for example—to litigate in a particular forum. *See Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315-16 (1964) ("[I]t is settled … that parties to a contract may agree in advance to submit to the jurisdiction of a given court…."); *Burger King*, 471 U.S. at 472 n.14 ("Where such forum-selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their enforcement does not offend due process."); *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 379-80 & n.21 (S.D.N.Y. 2001) (finding

---

[6] Regardless of whether jurisdictional due process protections are properly categorized as "fundamental rights," constitutional rights, or liberty interests (*see* Pls. Br. 18, 59-60), the parties and the Court all agree that the waiver of such protections by consent to jurisdiction must be "knowing and voluntary." *See Wellness Int'l*, 575 U.S. at 685; Pls. Br. 41; Gov't. Br. 19.

voluntary "consent" via a forum-selection clause).  Courts may also infer consent to jurisdiction based on <u>actions in the litigation itself</u> that demonstrate the defendant's intent to submit to jurisdiction.  *See, e.g.*, *Roell*, 538 U.S. at 584 (holding parties who "voluntarily participated in the entire course of proceedings" through trial without objecting to jurisdiction "clearly implied their consent" "by their actions"); *V&A Collection, LLC v. Guzzini Props.*, 46 F.4th 127, 132 (2d Cir. 2022) (party bringing suit in forum impliedly consents to jurisdiction for all claims arising from the same transaction).

These canonical forms of consent are not at issue in this case, however, because Plaintiffs do not claim Defendants expressly consented to jurisdiction,[7] or took any action in the litigation itself evincing their intent to submit to the court's jurisdiction.  To the contrary, as this Court previously noted, from the inception of this case in 2004, Defendants "repeatedly argued" the district court "lacked personal jurisdiction over them in light of their minimal presence" in the United States, and "the lack of any nexus between the facts underlying the plaintiffs' claims and [this

---

[7] One amicus asserts the PSJVTA is an "express consent" statute, but its description of "express" consent (consent "expressed through actions") makes clear it is actually discussing implied consent.  *See* Amicus Br. of Am. Ass'n for Justice at 2; *see also Roell*, 538 U.S. at 589-90 (implied consent is consent "through actions rather than words").  No party to this case has ever argued Defendants expressly consented to personal jurisdiction.

forum]." *Waldman*, 835 F.3d at 322; *see also* SPA-2-3 (cataloging at least six instances in which Defendants challenged personal jurisdiction below).

In the absence of express consent or litigation conduct evincing submission to jurisdiction, determining whether the defendant knowingly and voluntarily consented to personal jurisdiction is more difficult. To establish implied consent, Plaintiffs must demonstrate some "actions of the defendant" that "amount to a legal submission to the jurisdiction of the court." *Bauxites*, 456 U.S. at 704-05. This is "a deeply factbound analysis" that requires the court to determine "whether [defendant's] actions evinced the requisite knowing and voluntary consent." *Wellness Int'l*, 575 U.S. at 685-86.

In making this determination, the Supreme Court expressly distinguishes between inferring a defendant's knowing and voluntary choice to submit to jurisdiction by its own conduct, and "mere assertions of power" by the forum to impose jurisdiction on nonconsenting defendants. *See Bauxites*, 456 U.S. at 705. In *Bauxites*, for example, the Court examined whether the defendant's failure to comply with court-ordered jurisdictional discovery could be treated as constructive waiver of its objection to personal jurisdiction. The Court held that it could, but only because "[t]he preservation of due process was secured by the presumption" that the defendant's specific conduct—its "failure to supply the requested information as to its contacts with [the forum]"—"was but an admission of the want of merit in the

31

asserted defense." *Id.* at 705, 709 (quoting *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 351 (1909)). By refusing to produce the requested materials, the defendant implicitly acknowledged that it did have sufficient contacts with the forum to support the exercise of personal jurisdiction. *Id.* at 706. The defendant's conduct thus served as a constructive waiver of any objection to jurisdiction. *See id.* ("[T]he sanction is nothing more than the invocation of a legal presumption, or what is the same thing, the finding of a constructive waiver.").

To illustrate the "due process limits" that apply to constructive consent, *Bauxites* distinguished an earlier case, *Hovey v. Elliott*, 167 U.S. 409 (1897), in which the Court held "it did violate due process for a court to take similar action as 'punishment' for failure to obey [a court] order" unrelated to the asserted defense. *Bauxites*, 456 U.S. at 705-06 (emphasis added). The defendant's conduct in that case—failure "to pay into the registry of the court a certain sum of money"—did not support the presumption of a "want of merit" in its asserted defense. *Id.* Subjecting the defendant to the court's jurisdiction, the Court explained, therefore constituted an improper penalty, rather than a valid presumption of constructive waiver drawn from the defendant's own conduct. *See id.* at 706 ("Due process is violated only if

the behavior of the defendant will not support the *Hammond Packing* presumption.").[8]

The Supreme Court similarly distinguished between valid, implied consent to jurisdiction and the improper imposition of jurisdiction in *College Savings Bank*. In that case, plaintiffs argued a state agency waived its immunity and "impliedly" consented to jurisdiction in federal court by knowingly and voluntarily engaging in interstate marketing, after a federal statute made clear that such activity would subject it to jurisdiction for Lanham Act claims. 527 U.S. at 671, 676. Writing for the Court, Justice Scalia emphatically rejected this "constructive-waiver" theory, explaining:

> There is a fundamental difference between a State's expressing unequivocally that it waives its immunity and Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived that immunity. In the latter situation, the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suits brought by individuals. That is very far from concluding that *the State* made an "altogether voluntary" decision to waive its immunity.

---

[8] As discussed further below, Judge Daniels expressly relied on *Bauxites*' discussion of the "*Hammond Packing* presumption" to hold the PSJVTA failed to provide valid consent in this case. As Judge Daniels explained, the PSJVTA's "deemed consent" provisions violate due process because engaging in the specified conduct—making payments in Palestine or conducting activities in the United States unrelated to Plaintiffs' claims—does not support an inference that Defendants intended to submit to jurisdiction. *See* SPA-9-11.

*Id.* at 680-81. The constitutional requirement of knowing and voluntary consent would mean nothing, the Court noted, if Congress had "[the] power to exact constructive waivers" of jurisdictional defenses "through the exercise of Article I powers." *Id.* at 683. Accordingly, the Court held that merely providing notice of Congress's intent to subject the defendant to jurisdiction if it "voluntarily" engaged in "federally regulated conduct" was insufficient to establish a constructive waiver. *Id.* at 679-82. In other words, knowledge of the law (congressional intent to impose jurisdiction) alone cannot be the basis for inferring "consent" to jurisdiction. *See id.* at 681. Otherwise, legislative fiat coupled with presumed knowledge of the law always would suffice to establish jurisdiction.

In describing the circumstances in which plaintiffs could demonstrate implied consent to jurisdiction, *College Savings Bank* located valid "consent" in the same place as many other implied consent statutes: the defendant's knowing and voluntary acceptance of a government benefit or privilege conditioned upon consent. Congress, the Court explained, may "condition its grant of [federal] funds to the States" upon their willingness to consent to jurisdiction in a federal forum. 527 U.S. at 686-87. By "acceptance of the funds," the State signals its "agreement" or consent to the condition attached. *Id.* The Court noted, however, that accepting this type of "gift" or "gratuity" conditioned on consent to jurisdiction presents a "fundamentally different" case than the imposition of jurisdiction by legislative fiat. *Id.* In the latter

34

case, "what Congress threatens if the State refuses to agree to its condition is not the denial of a gift or gratuity, but a sanction." *Id.*; *see also AT&T Communs. v. BellSouth Telecom.*, 238 F.3d 636, 646 (5th Cir. 2001) (contrasting "forced waiver" with "[a] state's voluntary waiver of immunity, inferred from the state's acceptance of a Congressional gratuity that it was free to decline without loss").[9]

Courts have used the same barometer to evaluate other implied consent statutes, examining whether the defendant signaled its agreement to personal jurisdiction by accepting a government benefit or privilege conditioned on consent. Many states, for example, have enacted statutes conditioning the "privilege" of driving on public roads on a non-resident's consent to personal jurisdiction in the state for any suits arising from such conduct. Because the state has the antecedent

---

[9] Plaintiffs assert that *College Savings Bank* is inapposite because it addresses state sovereign immunity rather than personal jurisdiction. *See* Pls. Br. 60-63. The decision itself, however, refutes this narrow interpretation. Relying on the "classic description of an effective waiver of a constitutional right," the Court explained that "constructive consent is not a doctrine commonly associated with the surrender of constitutional rights." 527 U.S. at 681-82 (emphasis added). Because "[s]tate sovereign immunity, no less than the right to trial by jury in criminal cases, is constitutionally protected," courts should "indulge every reasonable presumption against waiver." *Id.* at 682. Accordingly, "the principles underlying *College Savings Bank* are not specific to the Eleventh Amendment, but rather apply to constitutional rights broadly." *Fuld*, 578 F. Supp. 3d at 588. State sovereign immunity and lack of personal jurisdiction are also both jurisdictional defenses grounded in the Constitution. Plaintiffs fail to explain why Supreme Court precedent addressing the waiver of a jurisdictional defense is less instructive than their own "consent" cases, which address car searches and blood-alcohol tests. *See* Pls. Br. 62-63.

35

authority "to regulate the use of its highways" and to "exclude" non-residents from such use, the Supreme Court has held the state may also require non-residents to consent to jurisdiction "in advance of the operation of a motor vehicle on its highway." *Hess,* 274 U.S. at 354-57. By "accept[ing]" the "privilege" of driving on public roads, a non-resident defendant implicitly signals its agreement, through its actions, to consent to personal jurisdiction in the forum. *Id.*; *see also Wuchter v. Pizzutti*, 276 U.S. 13, 19 (1928) ("[T]he act of a non resident in using the highways of another state may be properly declared to be an agreement to accept service of summons in a suit growing out of the use of the highway…").

Courts apply the same framework to a host of other implied consent statutes as well. Business registration statutes, for example, condition the privilege of doing business in the state on consent to personal jurisdiction. By registering to do business in the state, a foreign corporation impliedly agrees to submit to personal jurisdiction in the forum.[10] *See, e.g.*, *Brown*, 814 F.3d at 632-33 (tracing the history

---

[10] The Supreme Court recently heard a case addressing the continued vitality of business registration statutes following *Daimler*, which sharply curtailed the exercise of general jurisdiction over foreign corporations on due process grounds. *See Mallory v. Norfolk Southern Ry. Co.*, No. 21-1168 (cert. granted April 25, 2022). In addition to challenging whether the "consent" extracted under such statutes is truly "knowing and voluntary," the Respondents in *Mallory* also challenged whether the ability to do business in a state is a "privilege" the State may deny if the corporation refuses to consent, or an antecedent "right" protected by the Constitution. *See* Resp't Br. 11-13, 25, 34-38.

of such statutes, which "extract" consent to jurisdiction in exchange for the privilege of doing business); *In re Mid-Atl. Toyota*, 525 F. Supp. 1265, 1278 (D. Md. 1981) (foreign corporation "consents" to jurisdiction as "part of a bargain, by which the corporation agrees to accept certain obligations in return for the right to do business in the state").

Several states have also adopted corporate director statutes, which "deem" that non-resident defendants "consent" to jurisdiction by accepting appointment to a corporation's board of directors. *See, e.g.*, *Armstrong v. Pomerance*, 423 A.2d 174, 176 & n.4 (Del. 1980) (analyzing Delaware corporate director statute). By accepting the benefits afforded to directors under state law (e.g., eligibility for interest-free, unsecured loans from the corporation, indemnification rights, and managerial powers), non-resident directors impliedly consent to personal jurisdiction in the state for any claims related to the corporation. *Id.*; *see also Swenson v. Thibaut*, 250 S.E.2d 279, 289-91 (N.C. Ct. App. 1978) (same).[11]

In each of these cases, the defendant's acceptance of a benefit or privilege conditioned by the forum on consent to jurisdiction signals the defendant's implied agreement to submit to jurisdiction in the forum—just as a state's acceptance of a

---

[11] The same is true of the other "narrowly-drawn" statutes cited by Plaintiffs: foreign companies and banks agree to appoint agents for service of process in the United States in exchange for the privilege of access to the U.S. financial system. *See* Pls. Br. 49-51.

conditional "gift" or "gratuity" from the federal government signals its implied waiver of sovereign immunity under *College Savings Bank*. By accepting the benefit provided by the forum, the defendant enters a "bargain with the state" whereby it consents to personal jurisdiction in exchange for permission to engage in conduct the state could otherwise prohibit. *Leonard v. USA Petroleum*, 829 F. Supp. 882, 889 (S.D. Tex. 1993); *see also Mid-Atl. Toyota*, 525 F. Supp. at 1278 (describing implied "consent" as "part of a bargain"). Indeed, the exchange of "reciprocal obligations" is exactly what makes the exercise of personal jurisdiction "fair" to a defendant under the Due Process Clause. *Ford Motor v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1029-30 (2021) (explaining that "allowing jurisdiction in these cases treats Ford fairly" because Ford enjoyed "the benefits and protection" of state law when doing business in the forum).

As Justice Scalia recognized, however, implied consent becomes a disguised form of legislatively-imposed jurisdiction when the forum does not offer any corresponding benefit for the defendant to accept or reject, in exchange for its consent to jurisdiction. *College Savings Bank*, 527 U.S. at 679-86. If the activity purportedly giving rise to "consent" does not require authorization from the forum, the defendant's choice to engage in the activity does not reflect any implied agreement to submit to jurisdiction because the defendant's ability to engage in the activity did not depend on any benefit (or "gratuity") conferred by the forum in the

first instance.  *Id*. at 680-81 (holding Congress's bare "intention" to subject defendant to jurisdiction failed to establish implied consent because "there is little reason to assume actual consent based upon the [defendant's] mere presence in a field subject to congressional regulation").  "Without a received benefit," in other words, "there is no bargain, and without a bargain, there is no due process." *Leonard*, 829 F. Supp. at 889.

This does not mean that reciprocity or an exchange of benefits is necessary to establish knowing and voluntary consent in <u>every</u> case.  As noted above, a defendant may expressly consent to personal jurisdiction via a forum-selection clause, for example, obviating any need to determine whether the defendant consented "through actions rather than words."  Consent to jurisdiction also may result from a defendant's failure to comply with "certain procedural rules" governing the waiver of substantive rights.  *See Bauxites*, 456 U.S. at 705 ("The expression of legal rights is often subject to certain procedural rules: The failure to follow those rules may well result in a curtailment of the rights.").  For example, a defendant who enters an appearance and then fails to object to personal jurisdiction may impliedly submit to

the court's jurisdiction, "whether voluntary or not." *Id.* at 704-05 (discussing waiver under Fed. R. Civ. P. 12(h)).[12]

But Defendants are not aware of a single case—and neither Plaintiffs nor the Government have identified one—implying consent to jurisdiction based on a defendant's choice to engage in non-litigation-related activities in the <u>absence</u> of some benefit or privilege conferred upon the defendant in exchange for its consent. Reciprocity, or an exchange of benefits, thus provides a useful means of distinguishing between knowing and voluntary consent under an implied consent statute, and improper attempts to legislatively impose jurisdiction on a nonconsenting defendant.

### 2. Defendants Have Not Knowingly and Voluntarily Consented to Personal Jurisdiction.

Measured against these standards, the PSJVTA fails to provide valid, "knowing and voluntary" consent to personal jurisdiction in this case. Rather than

---

[12] The same is also true of a defendant who initially challenges jurisdiction, but then willfully withdraws from the litigation and defaults. *See City of NY v. Mickalis Pawn Shop*, 645 F.3d 114, 133-36 (2d Cir. 2011); *see also* Pls. Br. 42, 53, Gov't. Br. 28 (relying on *Mickalis*). These examples of procedural waiver are inapposite, as Plaintiffs cannot (and do not) claim Defendants submitted to jurisdiction by failing to follow any "procedural rule." *Bauxites*, 456 U.S. at 705; *see also* Gov't. Br. 12 (conceding "[p]ersonal jurisdiction has been contested throughout the eighteen years that this action has been pending"). Rather, the question in this case is whether a court can properly infer consent to jurisdiction based on Defendants' substantive, non-litigation-related activities.

identifying conduct that might actually demonstrate implied consent (such as the acceptance of U.S. foreign aid or some other government benefit), "Congress 'simply took conduct in which the PLO and PA had previously engaged—conduct that the Second and D.C. Circuits had held was insufficient to support personal jurisdiction in [*Waldman*, *Livnat*, *Shatsky*, and *Klieman*]—and declared that such conduct shall be deemed to be consent.'" SPA-16 (quoting *Fuld*, 578 F. Supp. 3d at 587). As Judge Daniels recognized, neither form of conduct alleged by Plaintiffs in this case—making social welfare payments in Palestine or maintaining a UN office and conducting related activities in the United States—supports the presumption that Defendants intended "to legally submit to suit in the United States," or reflects any "want of merit" in their asserted jurisdictional defenses. SPA-8-11, 16. Accordingly, the district court correctly rejected the PSJVTA as a basis for personal jurisdiction.

> ### a. Social Welfare Payments Made Outside the United States Do Not Evince Agreement to Personal Jurisdiction in the United States.

The first type of conduct specified by the PSJVTA—payments made in Palestine to those imprisoned or killed in terrorist attacks, or to their families—has "no direct connection to the United States, let alone [to] litigation in a United States court." SPA-10 & n.4 (quoting *Fuld*, 578 F. Supp. 3d at 587). The payments at issue occur entirely outside the United States under Palestinian law, and do not

require authorization from the U.S. government or the involvement of any U.S. entity. Any decision to continue making such payments reflects Defendants' own domestic laws and policy choices, rather than some implicit agreement to knowingly and voluntarily consent to jurisdiction in a forum (the United States) completely unconnected to the payments.

Applying the framework set forth by the Supreme Court in *Bauxites*, the district court properly concluded it would violate due process to imply "consent" to personal jurisdiction from such payments because the payments are "unrelated to the underlying issues" in the case, and do not reflect any "want of merit" in Defendants' asserted jurisdictional defenses. SPA-9-11 (explaining the payments "do[] not support a *Hammond Packing* presumption"). Unlike the discovery sanction affirmed by the Supreme Court in *Bauxites*, inferring consent to personal jurisdiction based on such payments therefore would "strain the idea of consent beyond its breaking point," allowing Congress to unilaterally impose jurisdiction on nonconsenting foreign defendants. SPA-10 n.4 (quoting *Fuld*, 578 F. Supp. 3d at 587).[13]

_____

[13] Plaintiffs misread the decision below, myopically focusing on its discussion of the specific discovery orders at issue in *Bauxites* and *Hammond Packing* to claim the court committed "a rudimentary error of logic: the fallacy of denying the antecedent." *See* Pls. Br. 17-18, 51-53. Consistent with *Bauxites*, the district court invoked the "*Hammond Packing* presumption" to explain why the conduct specified by the PSJVTA cannot serve as a proxy for valid "consent" to personal jurisdiction: the nature of the activity does not support the presumption that Defendants knowingly and voluntarily submitted to jurisdiction in the United States. *See* SPA-

In asserting these payments may constitute "knowing and voluntary" consent to jurisdiction, Appellants and amici repeatedly conflate federal authority to penalize extraterritorial conduct (so-called "prescriptive" or "legislative" jurisdiction) and federal authority to subject nonresident defendants to personal jurisdiction in U.S. courts (so-called "adjudicative" jurisdiction).  Whether Congress could legislate that such payments may subject a party to <u>liability</u>,[14] that prescriptive authority does not answer the separate constitutional question whether Defendants can be forced to <u>adjudicate</u> such claims in U.S. court.  Indeed, as noted above, courts have already held that such payments, standing alone, fail to establish the requisite "connection" between Defendants, Plaintiffs' claims, and the United States to support the exercise

---

9-11.  Courts frequently cite *Hammond Packing* for this broader principle, distinguishing unconstitutional "penalties" from valid waivers or "presumptions." *See, e.g.*, *Collazos v. United States*, 368 F.3d 190, 203-06 (2d Cir. 2004) (distinguishing "punitive" waivers from permissible adverse presumptions, citing *Hammond Packing*); *Volkart Bros., Inc. v. M/V Palm Trader*, 130 F.R.D. 285, 289 (S.D.N.Y. 1990) ("The chief practical distinction between the assertion of personal jurisdiction through a valid 'presumption' as opposed to an unconstitutional 'punishment' is that the former requires that the defendant's behavior in the transaction at issue support the presumption." (citing *Hammond Packing* and *Bauxites*)).

[14] Congress has legislated that continuation of such payments forecloses Defendants from receiving a government benefit: U.S. foreign aid to Palestine.  *See* Taylor Force Act, 22 U.S.C. § 2378c-1.  But like the imposition of civil or criminal liability, Congress's decision to discontinue foreign aid in response to Defendants' conduct cannot answer the separate constitutional question whether Defendants can be subject to personal jurisdiction in the United States.

of personal jurisdiction. *See, e.g.*, *Shatsky*, 955 F.3d at 1022-23, 1037 (holding alleged "martyr payments" did not confer specific jurisdiction).

"The personal jurisdiction requirement—which prevents federal courts from exercising authority over defendants without sufficient contacts with the United States—is an important limitation on the jurisdiction of the federal courts over purely extraterritorial activity that is <u>independent of the extraterritorial reach of a federal statute</u> or the court's subject matter jurisdiction." *Litecubes v. N. Light Prods.*, 523 F.3d 1353, 1363 & n.10 (Fed. Cir. 2008) (emphasis added). Although Congress can "extend[] a cause of action to reach extraterritorial activity," a federal court can only adjudicate such claims "providing [it] has personal jurisdiction over the defendants." *Id.* at 1363. In other words, Congress's "prescriptive jurisdiction," its authority to make federal law applicable to foreign conduct, "is activated only when there is personal jurisdiction, often referred to as 'jurisdiction to adjudicate.'" *Laker Airways v. Sabena*, 731 F.2d 909, 923 (D.C. Cir. 1984). Accordingly, Plaintiffs' repeated insistence that Congress has the "authority" to impose civil liability for extraterritorial attacks does not answer the separate question whether the court has personal jurisdiction over Defendants. *See, e.g.*, *Waldman*, 835 F.3d at 343 (holding federal statute providing for jurisdiction through service of process in ATA cases "does not answer the constitutional question of whether due process is satisfied").

Plaintiffs and the Government also misleadingly suggest the payments are "closely linked" to the United States because they are made "by reason of terrorist acts injuring or killing U.S. nationals." *See, e.g.*, Gov't Br. 17, 23-24. That assertion overlooks this Court's prior holding that the attacks at issue (and *a fortiori* any payments purportedly following from such attacks) did <u>not</u> target the United States, and "affected United States citizens only because they were victims of indiscriminate violence that occurred abroad." *Waldman*, 835 F.3d at 337. Indeed, this Court expressly found that Plaintiffs "did not allege or submit evidence that the plaintiffs were targeted in any of the six attacks at issue because of their United States citizenship." *Id.* at 326.

Contrary to Appellants' assertions, the payments at issue are part of a broader program designed to provide a "social safety net in the face of brutal and oppressive living conditions under Israeli military occupation."[15] As part of the program, the PA provides monthly welfare payments to families of Palestinians imprisoned in Israel for political crimes and security offenses or killed during political violence.[16] Israel broadly defines what constitutes a security offense in the occupied territories,

---

[15] Carnegie Endowment, *supra* note 1.

[16] *Id.*; *see also* Brookings Institution, *Why the discourse about Palestinian payments to prisoners' families is distorted and misleading* (2020), https://www.brookings.edu/blog/order-from-chaos/2020/12/07/why-the-discourse-about-palestinian-payments-to-prisoners-families-is-distorted-and-misleading/.

and Palestinians can be imprisoned for participating in political demonstrations without a permit, waving the Palestinian flag without approval, or posting social media messages critical of Israeli forces and the occupation.[17]  According to the Carnegie Endowment, 70% of Palestinian families have at least one relative detained by Israel.[18]  As of 2017, an estimated 13,000 prisoners and 33,700 families received monthly payments under the program.[19]  Given this context, portraying these payments as rewarding terrorism (*see, e.g.*, Pls. Br. 7, 17; Amicus Br. of Fmr. Officials 3-4, 26) is "wrong and incendiary."[20]

> **b.  Plaintiffs' Allegations Regarding Defendants' U.S. Activities Fail to Demonstrate Knowing and Voluntary Consent to Jurisdiction.**

Plaintiffs' allegations regarding the second type of conduct specified by the PSJVTA—conducting any non-exempt activities while physically present in the United States or maintaining a U.S. office—similarly fail to establish a basis for knowing and voluntary consent to personal jurisdiction.  As noted above, the jurisdictional conduct alleged by Plaintiffs in this case—maintaining Palestine's UN Mission in New York and conducting related activities, such as press conferences

---

[17] Carnegie Endowment, *supra* note 1.

[18] *Id.*

[19] *Id.*

[20] Brookings Institution, *supra* note 16.

46

and social media posts promoting the Palestinian cause—is the same conduct the courts have repeatedly held <u>insufficient</u> to satisfy the Due Process Clause. Such conduct, the district court explained, cannot serve as a proxy for knowing and voluntary consent, given the courts' repeated holdings that the same conduct failed to establish any constitutionally-meaningful connection between Defendants, the claims at issue, and the United States. SPA-16.

Appellants attempt to shoehorn this case into the line of implied consent cases described above, asserting the PSJVTA extracts valid "consent" by conditioning a government benefit (entry into the United States) on Defendants' agreement to submit to personal jurisdiction in ATA cases. *See* Pls. Br. 54, 57-58; Gov't Br. 22-24. Noticeably absent from that discussion, however, is a citation to any provision of the PSJVTA permitting Defendants to enter and operate in the United States, or waiving penalties for doing so, in exchange for their consent to personal jurisdiction.[21]

---

[21] Plaintiffs attempt to latch onto Justice Scalia's discussion of "tag jurisdiction" in *Burnham v. Superior Court*, 495 U.S. 604 (1990), asserting "historical pedigree" supports the sovereign's right to impose "deemed consent" to jurisdiction in exchange for entry into the sovereign's territory. *See* Pls. Br. 57-59. As the district court recognized, however, *Burnham* is inapplicable because "tag jurisdiction" applies only to individuals, not to entities like Defendants. SPA-17. Moreover, Plaintiffs' "territorial exclusion" argument also fails because, as explained below, the PSJVTA does not permit Defendants to operate in the United States. To the contrary, longstanding federal law continues to prohibit Defendants from operating

Since long before passage of the PSJVTA, Congress has blocked Defendants from conducting any activities in the United States. More than three decades ago, Congress enacted the Anti-Terrorism Act of 1987 for the express purpose of denying Defendants the "benefit" of "operating in the United States." *See* 22 U.S.C. § 5201(b). The 1987 ATA prohibits Defendants from operating in the United States by making it unlawful to (1) "receive anything of value except informational material" from the PLO; (2) "expend funds from the PLO"; or (3) "establish or maintain an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by," the PLO. 22 U.S.C. § 5202.

The 1987 Act has been interpreted as a "wide gauged restriction of PLO activity within the United States," *United States v. PLO*, 695 F. Supp. at 1471, that deprives Defendants of the "many benefits which accrue to organizations operating in the United States, including political stability, access to our press and capital infrastructure, and … the patina of legitimacy." *Mendelsohn v. Meese*, 695 F. Supp. 1474, 1484 (S.D.N.Y. 1988) ("The avowed interest asserted by Congress in favor of the ATA is a tactical one—to deny the PLO the benefit of operating in the United States."). Consistent with this prohibition, Defendants do not currently operate or

---

in the United States, except for Defendants' UN-related presence. *See infra* at 49-50.

maintain any physical presence in the United States—as the Government concedes. *See* Gov't Br. 7 (acknowledging Defendants do not operate any non-UN office in the United States).[22]

The sole exception is for activities conducted by Defendants in furtherance of Palestine's role as a Permanent Observer at the United Nations. The UN Headquarters Agreement ("UNHQA") guarantees "invitees" of the UN, including Defendants, basic rights of "entry, access, and residence" in the UN Headquarters District in New York. *United States v. PLO*, 695 F. Supp. at 1465-68. Under the UNHQA, the United States is "obligat[ed] … to refrain from impairing the function of the PLO Observer Mission to the United States," which falls outside U.S. "jurisdiction." *Id.* at 1465-68, 1471. Courts have thus long held that UN-related activities conducted by Defendants cannot serve as the basis for exercising personal jurisdiction. *See Klinghoffer*, 937 F.2d at 51 (holding activities of Palestine's UN

---

[22] One of the amici repeatedly (and inaccurately) asserts that Defendants "continue to operate freely on U.S. soil" and "enjoy[] the benefits of operating in the United States." *See* Amicus Br. of U.S. Sens. & Reps. 3, 5, 18. Such assertions cannot be squared with the 1987 ATA, which has prohibited Defendants from "operating freely on U.S. soil" for more than three decades. Such assertions also are inconsistent with the PSJVTA's predecessor statute, the ATCA, which specifically predicated jurisdiction on an Executive Branch waiver of the 1987 ATA (which did not exist) or on benefits that Defendants declined. *See infra* at 8, 51-52. A waiver obviously would not be necessary unless Defendants were otherwise prohibited from operating in the United States.

Mission cannot "properly be considered as a basis of jurisdiction").[23] The PSJVTA mirrors but does not alter this longstanding interpretation of the UNHQA, providing that "[i]n determining whether a defendant shall be deemed to have consented to personal jurisdiction," "no court may consider" Defendants' UN Mission, their UN-related activities and meetings with government officials, or "any personal or official activities conducted ancillary" thereto.[24]  *See* 18 U.S.C. § 2334(e)(3).

---

[23] The 1987 ATA authorizes the Attorney General to enforce its prohibition on non-UN-related activities by filing suit in district court.  22 U.S.C. § 5203.  The lack of enforcement actions brought against Defendants refutes Plaintiffs' assertions that Defendants engage in non-UN-related activities in the United States.

[24] In the proceedings below, Defendants argued that all of the U.S. activities alleged by Plaintiffs fall under this exemption, and therefore cannot trigger "deemed consent" jurisdiction under the PSJVTA.  SPA-15.  As part of its UN activities, the Palestinian Mission participates in the work of the UN Committee on the Exercise of the Inalienable Rights of the Palestinian People ("CEIRPP").  *See* Report, CEIRPP, UN Doc. A/75/35 (Oct. 13, 2020).  The CEIRPP's purpose is to "mobilize the international community" to provide "the broadest possible international support" for the Palestinian people by "end[ing] … the Israeli occupation," supporting the "two-State solution," "highlighting the illegality of Israeli settlement activities in the West Bank," and "rais[ing] international awareness of the political, human rights and humanitarian developments on the ground."  Programme of Work for 2020, CEIRPP, UN Doc. A/AC.183/2020/1 (Feb. 7, 2020).  In light of the CEIRPP's work, the U.S. activities alleged by Plaintiffs in this case are all plainly either official UN business or "ancillary to" such activities under 18 U.S.C. § 2334(e)(3).  The district court did not reach this issue, given its conclusions that the types of activities alleged by Plaintiffs—even if non-exempt—"do not infer any intention on the part of Defendants to legally submit to suit in the United States." SPA-16.  On appeal, however, this Court may affirm on any grounds supported by the record.  *See Shumway v. UPS*, 118 F.3d 60, 63 (2d Cir. 1997).

The PSJVTA does not waive the prohibitions or penalties imposed by the 1987 ATA, nor does it purport to permit Defendants to conduct any previously-unauthorized activities in the United States. Contrary to Plaintiffs' assertions, the PSJVTA thus fails to offer any "benefit" for Defendants to accept or reject in exchange for their consent to personal jurisdiction in the United States.

The PSJVTA's failure to establish valid, implied consent to jurisdiction is perhaps best illustrated by contrasting the PSJVTA with its predecessor statute, the ATCA. The ATCA provided that Defendants "shall be deemed to have consented to personal jurisdiction" if they accepted either of two government benefits: (1) U.S. foreign aid, or (2) the "benefit" of a formal "waiver or suspension" of the 1987 ATA's prohibitions on Defendants' U.S. activities under the 1987 ATA, which would have allowed them to maintain an embassy in Washington. *See* 18 U.S.C. § 2334(e)(1) (2018) (superseded by PSJVTA).

In defending the constitutionality of the ATCA, the Government specifically argued the statute was "reasonable and consistent with the Fifth Amendment" because "the political branches have long imposed <u>conditions on these benefits</u>." U.S. Brief 12-13, *Klieman v. Palestinian Auth.*, No. 15-7034 (D.C. Cir. Mar. 13, 2019) (emphasis added). The ATCA satisfied due process, in other words, because it grounded "deemed consent" on Defendants' choice to accept or reject either of

two distinct government benefits conditioned upon consent.[25]  This interpretation is consistent with *Hess*, *College Savings Bank*, and the other authorities described above, which similarly hold that acceptance of a government benefit or "gratuity" conditioned on consent may constitute a knowing and voluntary waiver of jurisdictional defenses.  *See Hess*, 274 U.S. at 354-57; *College Savings Bank*, 527 U.S. at 686.  Both this Court and the D.C. Circuit subsequently held the ATCA did not establish personal jurisdiction because Defendants had not accepted either of the benefits specified by the Act.  *See Waldman II*, 925 F.3d at 574-75; *Klieman*, 923 F.3d at 1128-31.

The PSJVTA, by contrast, does not confer any benefit on Defendants in exchange for their purported "consent."  The PSJVTA does not authorize Defendants to engage in activities in the United States prohibited by the ATA, nor does it extend any government benefit (*e.g.*, foreign aid) conditioned upon consent to personal jurisdiction.  Accordingly, "there is no bargain—no social compact" that could evince Defendants' implied agreement to submit to jurisdiction in the United States. *Leonard*, 829 F. Supp. at 889.

---

[25] The Government offers a similar description of the ATCA in this case, acknowledging "deemed consent" was triggered only if Defendants "accept[ed]" either of two "forms of foreign assistance."  *See* Gov't. Br. 7.

The Government takes a different tack, asserting the PSJVTA is "consistent with due process" because the U.S. activities that give rise to "deemed consent" are "closely linked to the ATA claims that may be asserted against [Defendants]." *See* Gov't Br. 2, 17.  That argument, however, runs counter to the plain language of the U.S. activities provision, which does not require any such "link."  Rather, that provision specifically provides Defendants "shall be deemed to have consented to personal jurisdiction" if, *inter alia*, they "conduct[] <u>any activity while physically present</u> in the United States on behalf of the [PLO] or the [PA]" (subject to the exemptions for UN-related activities and meetings with government officials described above).  18 U.S.C. § 2334(e)(1)(B)(iii) (emphasis added).  The provision does not limit "deemed consent" to activities "closely linked" to "civil ATA actions" or "attacks on Americans," but rather sweeps in any non-exempt activity conducted in the United States—no matter how unrelated or tangential to the claims at issue.  Plaintiffs, for example, have asserted Defendants "consented" to jurisdiction by maintaining and "regularly updat[ing]" their UN Mission website and social media accounts, giving interviews to NPR and Voice of America, tweeting a message promoting a film about "surfing in Gaza," and publishing "a link to a statement by U.S. Secretary of State Antony Blinken" on social media.  *See* Dist. Ct. Dkt 1015, Pls. Opening Mem., at 18; Dist Ct. Dkt 1027, Second Supp. Yalowitz Decl., at 2-3.

Obviously, none of those activities is "closely linked" to any "civil ATA action" or terrorist attack.

For that reason, the district court correctly recognized the specified activities cannot serve as a valid proxy for knowing and voluntary consent to jurisdiction in this case because they "do not infer any intention on the part of Defendants to legally submit to suit in the United States." SPA-16. The conduct relied upon by Plaintiffs in this case proves the point, as this Court has already held the same conduct insufficient to support the exercise of jurisdiction under the Due Process Clause. *See Waldman*, 835 F.3d at 323, 326, 335-37; *Shatsky*, 955 F.3d at 1022-23, 1037. As the district court concluded, "Congress 'cannot simply declare anything it wants to be consent.'" SPA-16 (quoting *Fuld*, 578 F. Supp. 3d at 595). Rather, the specified conduct must support an inference that Defendants knowingly and voluntarily consented to suit in the United States. *Id.*

In so holding, the district court expressly "join[ed] two other courts in concluding that an exercise of jurisdiction under either of the PSJVTA's factual predicates is unconstitutional." SPA-15 (citing *Fuld* and in *Shatsky*). Plaintiffs attempt to manufacture a split in authority, repeatedly asserting—without support— that the district court "eschewed" and declined to adopt *Fuld*. *See* Pls. Br. 12, 18, 59. That is a bizarre claim, given the district court's reliance on *Fuld* in both its initial decision and the order denying Plaintiffs' motion for reconsideration. SPA-

10, 15-16.  To date, all three judges to consider the issue have concluded that it would violate due process to "deem" that Defendants "consented" to personal jurisdiction by engaging in the types of activities alleged by Plaintiffs in this case. No court has adopted Appellants' view that Congress can transform constitutionally-inadequate contacts with a forum into "deemed consent" merely by legislative say-so.

> **C.** **Permitting Congress to Impose "Deemed Consent" to Personal Jurisdiction Based on Constitutionally-Inadequate Conduct Would Eviscerate Due Process Protections.**

Although Plaintiffs and the Government concede that consent to personal jurisdiction must be "knowing and voluntary," they pay only lip service to that requirement in their briefs before this Court.  *See* Pls. Br. 41-43; Gov't Br. 18-20. Instead, Plaintiffs and the Government primarily attempt to redefine the applicable standard, asserting a "deemed consent" statute satisfies due process if it provides "fair warning" and "reasonably advances legitimate government interests."  Pls. Br. 4, 17, 40-51; Gov't Br. 18-26.  The cases upon which they rely for that proposition, however, do not address consent, let alone "deemed consent" statutes.  Rather, Plaintiffs and the Government draw their purported standard from cases like *Ford*, *Burger King*, and *International Shoe*—the same cases squarely holding that "[t]he Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful

contacts, ties, or relations." *Burger King*, 471 U.S. at 471-72; *see also* Pls. Br. 17, 41, 43-45; Gov't Br. 18-20.

Plaintiffs' and the Government's reliance on hornbook "minimum contacts" caselaw to establish the applicable standard for consent highlights a deeper inconsistency at the heart of their arguments before this Court. On one hand, Plaintiffs claim this Court's prior jurisdictional analysis in *Waldman* is "not germane here" because the PSJVTA hinges on "consent," a "separate basis for jurisdiction" that "may be upheld even in the absence of minimum contacts between the defendant and the forum." Pls. Br. 1, 4, 6, 39-40; *see also* Gov't Br. 2, 15. But to defend the PSJVTA as creating valid "consent" to jurisdiction, Plaintiffs and the Government turn around and summon the "fair warning" plus "reasonableness" standard from *International Shoe*—a seminal "minimum contacts" case. *See* Pls. Br. 41, 43 (quoting *Int'l Shoe*, *Burger King*, and *Ford*); Gov't Br. 18 (same). Rather than focusing on Defendants' purported "consent" as a "separate" basis for jurisdiction, in other words, Plaintiffs and the Government treat the PSJVTA as if it simply imposes personal jurisdiction on Defendants by legislative fiat—asking whether it is "fair" and "reasonable" for Congress to "assert[]" personal jurisdiction over Defendants in the United States. Gov't Br. 19-20, 26.

That, of course, is the same question resoundingly answered in the negative in *Waldman*, *Livnat*, *Klieman*, and *Shatsky*—all of which held that it would be unfair

and unreasonable to subject Defendants to suit in the United States because they lack any constitutionally-meaningful connection to the forum. Appellants' proffered "fair warning plus reasonableness" standard is also the same test squarely rejected by the Supreme Court in *College Savings Bank*. In that case, plaintiffs urged the Court to find implied waiver so long as the Government "unambiguously" warned defendants that engaging in "specified conduct governed by federal regulation" would subject it to suit, and defendants "voluntarily elect[ed]" to engage in the regulated activity. 527 U.S. at 679.

The Supreme Court emphatically rejected this "constructive-waiver" theory, holding there was a "fundamental difference" between the Government "expressing unequivocally its intention" to subject defendants to suit, and a defendant's knowing and voluntary choice to submit to jurisdiction. *Id.* at 680-81. Putting the defendant "on notice" of <u>Congress's</u> intention to subject the defendant to suit, the Court explained, remains "very far" from demonstrating that <u>the defendant</u> "made an 'altogether voluntary' decision" to submit to jurisdiction. *Id.* at 681. Or as Judge Daniels put it in this case: "Consent is not a legal fiction devoid of content[,] and neither the courts nor Congress may engage in circular reasoning that premises consent on the presumption that defendants know the law and then define the law so that anyone engaging in the defined conduct is deemed to have consented to personal jurisdiction." SPA-16 (cleaned up).

If "fair warning" and a legitimate government interest were all that due process required to subject a defendant to personal jurisdiction, Congress and state legislatures could circumvent modern due-process doctrine simply by enacting statutes declaring that the same activities already held insufficient to confer jurisdiction under the Due Process Clause "shall be deemed consent" to personal jurisdiction. In *Daimler*, for example, the Supreme Court held it would violate due process to allow a California court to subject a foreign car manufacturer and its U.S. subsidiary, which distributed vehicles to California dealerships but were incorporated and maintained their principal places of business elsewhere, to personal jurisdiction in the state. *See* 571 U.S. at 139. Under Plaintiffs' and the Government's novel theory, California could circumvent that holding simply by enacting a statute declaring that any foreign corporation that distributed vehicles to California dealerships "shall be deemed to have consented to personal jurisdiction" in the state.

The same would be true of virtually any decision dismissing federal claims for lack of personal jurisdiction: the legislature could simply repackage the contacts with the forum found insufficient to support the exercise of jurisdiction as grounds for "deemed consent" to jurisdiction. Accepting this interpretation "would effectively mean that there are <u>no</u> due process limitations on the exercise of personal jurisdiction. Congress or a state legislature could provide for jurisdiction over <u>any</u>

defendant for <u>any</u> conduct so long as the conduct post-dated enactment of the law at issue." *Fuld*, 578 F. Supp. 3d at 590. The only limit would be the "reach of the legislative imagination—which is to say, that there are no constitutional limits at all." *Id.* at 591.

Finally, even if this Court were to adopt Plaintiffs' proposed standard, exercising personal jurisdiction over Defendants in this case would "offend 'traditional notions of fair play and substantial justice.'" *Bauxites*, 456 U.S. at 702-03 (quoting *Int'l Shoe Co.*, 326 U.S. at 316); *see also Carnival Cruise Lines v. Shute*, 499 U.S. 585, 595 (1991) (holding that even when a party <u>expressly</u> consents to jurisdiction, the agreement is still "subject to judicial scrutiny for fundamental fairness").

Despite Defendants' long-standing objection to personal jurisdiction, the PSJVTA directs courts to "deem" that Defendants have "consented" to jurisdiction by engaging in the same conduct this Court previously held insufficient to establish the requisite connection between Defendants, Plaintiffs' claims, and the forum. Concluding that Defendants nonetheless "consented" to jurisdiction in the same case in which they successfully challenged the exercise of personal jurisdiction "would let fiction get the better of fact and make a mockery of the Due Process Clause." *Fuld*, 578 F. Supp. 3d at 595; *see also Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 183-84 (5th Cir. 1992) (holding defendant can only impliedly "consent" to

59

jurisdiction "where such jurisdiction is constitutionally permissible"); *WorldCare Ltd. Corp. v. World Ins. Co.*, 767 F. Supp. 2d 341, 361, 363 (D. Conn. 2011) (holding foreign defendant's "paltry" forum contacts failed the "reasonableness test").

## II. THIS COURT SHOULD REJECT APPELLANTS' ATTEMPTS TO AVOID THE REQUIREMENTS OF DUE PROCESS AND BINDING CIRCUIT PRECEDENT.

Because courts consistently hold that exercising personal jurisdiction over Defendants would not be "fair" or "reasonable," Plaintiffs, the Government, and amici present a variety of other reasons to depart from precedent and subject Defendants to jurisdiction. They make expansive (and unsupported) claims about legislative authority and foreign policy couched as "deference" to Congress. Gov't Br. 20-26; Pls. Br. 42-46; Amicus Br. Former Fed. Officials 25-30. But no personal jurisdiction case supports their deference arguments, and certainly no case supports turning a blind eye to due process. Put simply, this Court does not "defer" to Congress when interpreting the Constitution.

### A. Courts Do Not Defer to Congress on Constitutional Issues.

Appellants assert the PSJVTA's "deemed consent" provisions are "reasonable" because Congress has "broad authority" on matters of "foreign affairs" and "national security." Gov't Br. 2, 18, 23-26; Pls. Br. 42-46. This authority, however, does not include the power to impose personal jurisdiction where it is otherwise lacking under the Due Process Clause. The Supreme Court has long held

60

"Congress may not expand the jurisdiction of the federal courts beyond the bounds established by the Constitution." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 491 (1983). Cases involving "foreign affairs" and "national security" are not exceptions to the well-settled rule that "a statute cannot grant personal jurisdiction where the Constitution forbids it." *Gilson v. Republic of Ire.*, 682 F.2d 1022, 1028 (D.C. Cir. 1982). As such, "respect for Congress's policy judgments … can never extend so far as to disavow restraints on federal power that the Constitution carefully constructed." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). The Supreme Court has emphasized that "concerns of national security and foreign relations" neither "warrant abdication of the judicial role" nor "trump the Court's own obligation to secure the protection that the Constitution grants to individuals.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010).

In *Livnat*, for example, plaintiffs urged the court to depart from "ordinary due-process requirements" and exercise personal jurisdiction over Defendants because the ATA reflected "Congress's intent to provide redress in U.S. courts for terrorism abroad." 851 F.3d at 53. The D.C. Circuit rejected that argument, holding "Congress cannot wish away a constitutional provision." *Id.* Similarly, *Waldman* held that compliance with service-of-process provisions for jurisdiction "does not answer the constitutional question of whether due process is satisfied." 835 F.3d at 343. Deference is even less appropriate when, as here, Congress's explicit purpose

61

is to reverse federal decisions addressing constitutional limits on personal jurisdiction. *See Boerne v. Flores*, 521 U.S. 507, 536 (1997) ("When the political branches of the Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including *stare decisis*, and contrary expectations must be disappointed.").

The Government's constant assurances that the PSJVTA's "deemed consent" provisions are narrowly-tailored to apply only to the PA and PLO does not help their cause. *See* Gov't Br. 2, 15, 17, 26, 35. The "judicial powers" are vested in a non-political branch precisely to protect "the rights of one person" from the "tyranny of shifting majorities." *INS v. Chadha*, 462 U.S. 919, 961-62 (1983) (Powell, J., concurring). A statute limiting the due process rights of just two groups should result in more scrutiny, not less. If Congress were permitted to define the scope of constitutional protections for individual groups, "it is difficult to conceive of a principle that would limit congressional power." *Boerne*, 521 U.S. at 529. Without a limiting principle, which the Government fails to describe, there is no reason to assume "deemed consent" provisions will not proliferate. As explained by one scholar, courts "are very likely to apply" Fifth Amendment decisions on PSJVTA-style consent "across all areas of substantive law," and "state legislatures

are also likely to follow suit" with expansive legislation.  Aaron Simowitz, *The Private Law of Terror*, 126 Penn St. L. Rev. 159, 193-94 (2021).

### B.  Neither the War on Terror Nor the Alleged Need for Lawsuits Against Defendants Justifies Ignoring Due Process.

There is similarly no merit to Appellants' claims that permitting "deemed consent" under the PSJVTA is necessary for the war on terror.  The United States does not lack tools for fighting terrorism; indeed, one of the amici lists <u>dozens</u> of anti-terrorism treaties and statutes that are unaffected by the decision below.  *See* Amicus Br. of U.S. Sens. & Reps. at 6-7 & 12-13 (listing more than 30 treaties, statutes, and amendments with extraterritorial effect).  If the PSJVTA were essential to that effort, it would presumably confer jurisdiction for claims against other groups or individuals—but it does not.  As the Government repeatedly concedes, this special legislation targets only the PA and PLO.

The Government itself has acknowledged in this very case that applying traditional due-process protections in civil cases will <u>not</u> interfere with its ability to combat terrorism.  In urging the denial of Plaintiffs' petition for certiorari in this case, the Solicitor General confirmed that "nothing in the court's opinion calls into question the United States' ability to prosecute defendants … in cases involving the application of U.S. criminal laws to conduct affecting U.S. citizens or interests."  CVSG Br. at 18, *Sokolow v. PLO*, No. 16-1071 (U.S. 2018).  In another case, the Government acknowledged the traditional standard will not "interfere with the

government's ability to combat terrorism through criminal prosecutions" because "in a criminal case, personal jurisdiction is based on the physical presence of the defendant in the forum, independent of any minimum-contacts analysis." CVSG Br. 21, *Fed. Ins. Co. v. Saudi Arabia,* No. 08-640 (U.S. 2009). As Congress has recognized, criminal cases more directly advance the Government's anti-terrorism interests than civil cases. 138 Cong. Rec. S17260 (daily ed. Oct. 7, 1992); Antiterrorism Act of 1990: Hearing on S. 2465 Before the S. Comm. on the Judiciary, 101st Cong. 46-47 (1990).

Nor is the PSJVTA necessary to allow terror victims to sue the PA and PLO because Israeli courts already allow such suits by American citizens. The estates of the American victims of the Achille Lauro hijacking (who filed *Klinghoffer*) were awarded over $100 million against the PA and PLO by an Israeli court.[26] Other Israeli cases resulted in large awards against Defendants for attacks during the Second Intifada.[27] As noted above, jurisdiction may also be available in U.S. courts

---

[26] *See Norz'its Litbac v. Palestinian Auth.* (Isr.)*,* CivC 2538/00 (Jerusalem); Shurat Hadin, Press Release (11/19/2018), https://israellawcenter.org/legal_actions/shurat-hadin-wins-precedent-setting-ruling-in-achille-lauro-terror-case/; Jerusalem Post, *Terror victims' families to collect NIS 500 m. from Palestinian Authority* (4/26/2020), https://www.jpost.com/arab-israeli-conflict/court-orders-collection-of-nis-500-m-from-pa-for-second-intifada-625930.

[27] *See Anonymous v. Palestinian Auth.* (Isr.), CivA 2362/19 (Jerusalem, 10/4/2022); *Mentin v. Palestinian Auth.* (Isr.), CivC 3361/09 (Jerusalem 2017). Times of Israel, *High Court: PA liable for terrorism due to money it pays attackers; victims can*

if an attack targeted Americans.

### C. *Waldman* Correctly Held that Jurisdictional Due Process Protects Individual Liberty Interests.

As *Waldman* recognized, this Court's prior decisions "clearly establish the congruence of due process analysis under both the Fourteenth and Fifth Amendments." 835 F.3d at 330. Appellants nonetheless argue that Fourteenth Amendment cases turn on federalism interests irrelevant to the Fifth Amendment, and that a watered-down version of personal jurisdiction protections therefore should apply here. Gov't Br. 31-33; Pls. Br. 45-46. But personal jurisdiction "represents a restriction on judicial power not as a matter of sovereignty, but … as a matter of <u>individual liberty</u>." *Bauxites*, 456 U.S. at 702 & n.10 (emphasis added). Accordingly, the lack of federalism concerns in this case does not diminish Defendants' due process interests.

Every circuit to reach the issue agrees with this Court's holding. The Eleventh Circuit explained that "the operative language of the Fifth and Fourteenth Amendments is materially identical, and it would be incongruous for the same words to generate markedly different doctrinal analyses." *Herederos De Roberto Gomez Cabrera v. Teck Res. Ltd.*, 43 F.4th 1303, 1308 (11th Cir. 2022). The Fifth Circuit

---

*sue* (4/10/2022), https://www.timesofisrael.com/high-court-pa-liable-for-terrorism-due-to-stipends-to-attackers-victims-can-sue/.

agrees: "Both Due Process Clauses use the same language and serve the same purpose, protecting individual liberty by guaranteeing limits on personal jurisdiction. <u>Every court that has considered this point agrees that the standards mirror each other</u>." *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 235 (5th Cir. 2022) (en banc). The Government reiterated this point in opposing *certiorari* in this case, arguing *Waldman* was consistent with other circuits. CVSG Br. at 10, 14-16, *Sokolow*, No. 16-1071 (U.S. 2018).

By contrast, no court has adopted the "holistic approach" to personal jurisdiction urged by Appellants. *See* Gov't Br. 25-26. Appellants rely on *Ford*, but *Ford* merely applied the standard minimum contacts test, holding that plaintiff's claims "must arise out of or relate to the defendant's contacts," such that there is "an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum." 141 S. Ct. at 1024-25 (cleaned up). Appellants selectively quote *Ford's* "reasonable, in the context of our federal system of government" language (Gov't Br. 25; Pls. Br. 43), failing to include the essential language in that sentence—that a defendant's forum "contacts" determine whether jurisdiction is reasonable.

None of Appellants' other cases discusses deference to Congress on due process or personal jurisdiction. For example, *Jesner v. Arab Bank*, 138 S. Ct. 1386, 1403 (2018), afforded deference when deciding whether to extend a judge-made

cause of action into an area with "foreign-policy consequences." Similarly, *ACLU v. Dep. of Defense*, 901 F.3d 125, 134 (2d Cir. 2018), approved deference to an agency's consideration of the national security implications of a FOIA request if the agency's decision is "logical and plausible." The other cases are even farther afield. *See United Student Aid Funds v. Espinosa*, 559 U.S. 260, 272 (2010) (failure to serve a summons did not violate due process when the defendant had "*actual* notice of the filing and contents"); *Snyder v. Massachusetts*, 291 U.S. 97, 117 (1934) (criminal defendant not entitled to attend jury's viewing of crime scene). The Supreme Court has never authorized federal courts to take a "holistic" approach to personal jurisdiction just because Congress wants a statute to have extraterritorial reach.

Some amici argue that *Waldman* is inconsistent with the original public understanding of the Fifth Amendment (*see* Amicus Br. of Former Officials 7-16), as they claimed in the *Fuld* appeal. This issue is waived here, however, because it "was raised by *amici*, not by the appellants themselves." *Bano v. Union Carbide*, 273 F.3d 120, 128 & n.5 (2d Cir. 2001). In any case, "courts and commentators have overwhelmingly concluded," consistent with *Waldman*, "that 'the full protection of the Due Process Clause should be available to foreign citizens summoned to defend themselves in United States courts.'" W. Dodge & S. Dodson, *Personal Jurisdiction and Aliens*, 116 Mich. L. Rev. 1205, 1222 (2018); *see* Defs. Br. 69-78, *Fuld v. PLO*, No. 22-76(L) (2d Cir. 2022) (discussing same).

### III. THE PSJVTA VIOLATES SEPARATION OF POWERS.

In addition to due process, the PSJVTA's deemed consent provisions also violate separation of powers. Congress oversteps its constitutional authority when it attempts to "usurp a court's power to interpret and apply the law to the circumstances before it." *Bank Markazi*, 578 U.S. at 224-28 (cleaned up); *see Boerne*, 521 U.S. at 536 (Congress cannot override the judiciary's responsibility to "say what the law is"); *United States v. Klein,* 80 U.S. 128, 147 (1871) (holding statute requiring courts to treat pardons of Confederate sympathizers as conclusive evidence of disloyalty "passed the limit which separates the legislative from the judicial power"). This Court should also reject Plaintiffs' interpretation of the PSJVTA as creating a new power to "restore jurisdiction" in closed cases. That interpretation directly violates the Supreme Court's holding in *Plaut*, 514 U.S. at 227.

### A. The PSJVTA's "Deemed Consent" Provisions Violate Separation of Powers.

The PSJVTA usurps judicial power by directing courts to <u>always</u> find consent if its factual predicates are met—regardless of whether those activities satisfy the standard for consent under the Due Process Clause. Determining whether a party has waived constitutional rights is a quintessentially judicial question, requiring "application of constitutional principles to the facts as found." *Brewer*, 430 U.S. at

68

403 (cleaned up).  While Congress may legislate standards for liability, it cannot dictate or override constitutional due-process standards.

The Government concedes that the reasonableness of personal jurisdiction must always be assessed under "the circumstances of the particular case."  Gov't Br. 20, 25, 29 (quoting *Waldman*, 835 F.3d at 331).  But the PSJVTA blocks the courts from assessing the reasonableness of exercising personal jurisdiction over Defendants under the circumstances of this particular case.  Instead, the PSJVTA instructs the courts which activities are determinative of consent and forbids courts from deciding if those activities actually signify "knowing and voluntary" consent.  *See* Gov't Br. 2 ("Congress clearly stated what knowing and voluntary activities would be deemed to be consent to personal jurisdiction").

The Government's suggestion that this encroachment is permissible because the PSJVTA targets a narrow set of defendants is no answer:  "A statute may no more lawfully chip away at the authority of the Judicial Branch than it may eliminate it entirely.  'Slight encroachments create new boundaries from which legions of power can seek new territory to capture' …. We cannot compromise the integrity of the system of separated powers and the role of the Judiciary in that system, even with respect to challenges that may seem innocuous at first blush."  *Stern v. Marshall*, 564 U.S. 462, 502-03 (2011).

The PSJVTA also violates the well-established principle that Congress cannot "legislatively supersede" decisions "interpreting and applying the Constitution." *Dickerson v. United States*, 530 U.S. 428, 437 (2000). As noted above, *Waldman*, *Shatsky*, *Livnat*, and *Klieman* uniformly held that subjecting Defendants to personal jurisdiction in the United States based on the same type of conduct alleged in this case would violate the Due Process Clause. Permitting Congress to supersede those constitutional holdings would make the Constitution, "like other acts … alterable when the legislature shall please to alter it," in violation of fundamental principles of separation of powers. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *see, e.g.*, *Boerne*, 521 U.S. at 523-24 (rejecting Congressional effort to overturn Supreme Court precedent by creating a different constitutional standard).

## B. Interpreting the PSJVTA to "Restore" Jurisdiction in Closed Cases, as Plaintiffs Suggest, Would Violate Separation of Powers.

This Court should not accept Plaintiffs' reading of the PSJVTA as creating a hitherto-unknown power to "restore" jurisdiction in this closed case. *See* Pls. Br. 21. Plaintiffs' interpretation violates separation of powers under *Plaut*: "Having achieved finality … a judicial decision becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable *to that very case* was something other than what the courts said it was." 514 U.S. at 227.

70

This Court's decision in *Waldman*, and the subsequent final judgment issued in 2016 (Dist. Ct. Dkt 1003), were the "last word of the judicial department" in this case. As such, Congress "may not retroactively command the federal courts to reopen final judgments," *Bank Markazi*, 578 U.S. at 226 (cleaned up), especially when the judgment originally entered by the trial court is void for lack of jurisdiction, *see infra* at 76-79. This Court has adhered to *Plaut* on multiple occasions. *Schwartz v. Merrill Lynch*, 665 F.3d 444, 454 (2d Cir. 2011) ("a statute that would require an Article III court to set aside a final judgment entered before its enactment would violate … separation of powers"); *Benjamin v. Jacobson*, 172 F.3d 144, 161 (2d Cir. 1999) (same).

Other courts agree that retroactively imposing jurisdiction in closed cases would violate separation of powers under *Plaut*. In *Roeder*, 195 F. Supp. 2d at 152, 162-63, Congress passed a special statute creating jurisdiction over that particular case after the trial court entered a default judgment. When later vacating the judgment and dismissing for lack of jurisdiction, *Roeder* refused to interpret the statute as applying retroactively, explaining that "the post-judgment retroactive imposition of jurisdiction by Congress raises serious separation of powers concerns." *Id*. "Congress' retroactive imposition of jurisdiction to reopen a case after final judgment … was an impermissible encroachment by Congress into the sphere of the federal courts and violated Article III." *Id*. The same analysis applies

71

here.  *See, e.g., TGX Corp. v. Simmons*, 62 F.3d 666, 667 (5th Cir. 1995) ("*Plaut*

turned not on the fact that the judgments Congress chose to set aside through

retroactive legislation were with prejudice, but on the fact that they were final

judgments.").

To avoid the constitutional problems that would arise if Congress sought to

"restore" jurisdiction in closed cases, this Court should reject Plaintiffs'

interpretation of the PSJVTA.  Although the PSJVTA may "apply" to cases pending

as of August 30, 2016 (the day before this Court's decision in *Waldman*), the text of

the statute says nothing about recalling mandates, reopening cases, or restoring

jurisdiction in closed cases.[28]  Accordingly, this Court should interpret the PSJVTA

"to avoid rendering [it] unconstitutional."  *United States v. Davis*, 139 S. Ct. 2319,

2332 n.6 (2019).

---

[28] Insofar as Plaintiffs claim Congress implied or intended that result, this Court should ignore such overtures and apply the plain text of the legislation. *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) ("'an implicit congressional intent to impose ... aiding and abetting liability' could not plausibly be inferred from 'statutory silence'") (quoting *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 185 (1994)); *Peabody Coal v. Dir., Office of Workers' Comp. Programs*, 857 F.3d 310, 314 (6th Cir. 2014) ("Does it make a difference whether the judicial branch creates the separation-of-powers violation itself, as here (by interpreting the statute to have this effect), rather than by having the violation expressly thrust upon it by Congress, as in *Plaut*?  No.  The point of dividing power is to protect individual liberty, not the branches of government themselves.") (Sutton, J., concurring).

## IV. THE COURT SHOULD NOT RECALL ITS SIX-YEAR-OLD MANDATE.

If this Court holds it is unconstitutional to exercise personal jurisdiction over Defendants under the PSJVTA, it need not address Plaintiffs' request to recall the mandate. But if the Court does reach that issue, it should not resort to the extraordinary step of recalling the mandate. There are substantial finality interests in this long-closed case; Plaintiffs have already filed a separate action in which they can pursue their claims. Recall would be futile, in any event, because the district court's judgment was entered without personal jurisdiction and is therefore void.

### A. Finality Interests Overwhelmingly Support Leaving the Mandate Undisturbed

Four years ago, this Court refused to recall the mandate, holding that "[t]his Court's interest in finality also weighs against recalling the mandate." *Waldman II*, 925 F.3d at 574-75. Emphasizing that the mandate "issued two and a half years ago," and that the Supreme Court denied certiorari "more than six months before the plaintiffs filed their motion," this Court explained "it is well-established that retroactive laws generally do not affect valid, final judgments." *Id*. at 575. Now that more than <u>six years</u> have passed since the mandate issued, the interests in finality have become even more compelling.

Recalling a mandate undermines "the profound interests in repose attaching to the mandate of a court of appeals" such that it is a tool "of last resort, to be held

in reserve against grave, unforeseen contingencies." *Calderon*, 523 U.S. at 549-50. "[T]he sanctity of final judgments in our federal judicial system" compels "parsimony in the exercise of our power to recall a mandate." *Sargent v. Columbia Forest Prods*, 75 F.3d 86, 89 (2d Cir. 1996). This Court should deny Plaintiffs' latest request to recall the mandate to protect the same finality interests it relied upon before.

Nor will Plaintiffs be prejudiced. In *Waldman II*, this Court noted that Plaintiffs could still pursue their claims and raise any new "developments" regarding personal jurisdiction in a separate action. 925 F.3d at 576 n.2 (referring to *Sokolow v. PLO*, No. 18-cv-12213 (S.D.N.Y.)). Plaintiffs' separate case has remained stayed at the pleadings stage, pending the outcome of this appeal. Plaintiffs can proceed with their claims there on the same footing as they would in this case: As explained below, even if the mandate is recalled, the 2015 jury verdict cannot stand because it was entered without personal jurisdiction.

The D.C. Circuit has made a similar determination. In *Shatsky v. PLO*, the D.C. Circuit rejected the newly-enacted PSJVTA as a basis to retain jurisdiction in a case on direct appeal. 955 F.3d 1016. It reasoned that plaintiffs could proceed in a new case "if new facts establish personal jurisdiction before the statute of limitations runs." *Id.* at 1038.

The cases upon which Plaintiffs rely are easily distinguished. In *Gondeck v. Pan Am. World Airways*, 382 U.S. 25, 27 (1965) (per curiam), the Supreme Court recalled its mandate to grant a widow relief after the lower courts reached conflicting results. The Fifth Circuit rejected a widow's claim based on a car accident, and then certiorari was denied. *Id*. The Fourth Circuit came to different result on the same accident, and the Supreme Court recalled its mandate to grant relief. *Id*.

The facts here are nothing like *Gondeck*, which courts have explained represents "the interest in treating victims of the same tort consistently." *In re Terrorist Attacks on Sept. 11, 2001*, 741 F.3d 353, 357 (2d Cir. 2013). "In contrast to *Gondeck*, this case does not involve two similarly-situated plaintiffs who received disparate outcomes based on contrary interpretations of the same controlling legal standard." *Afoa v. China Airlines*, 396 F. Supp. 3d 984, 991 (W.D. Wash. 2019). Nor is the timing in this case similar to *ACLU v. Dep. of Defense*, 543 F.3d 59 (2d Cir. 2008). *See* Pls. Br. 26-27. There, this Court recalled its mandate *less than two months after it issued* based on new legislation, before a petition for certiorari had even been filed. *See* Dkt, 2d Cir. No. 06-3140.

Plaintiffs also try to fit this case into the pattern of *Sargent*, 75 F.3d at 89, in which the governing state employment law changed after the court of appeals' mandate but before the petition for certiorari. The plaintiff moved to recall the mandate mere *days* after certiorari was denied. The facts that impacted *Sargent* are

75

not applicable here.  The time frame here is <u>years</u> not <u>days</u>.  And the "new law" (the PSJVTA) was enacted almost two years after certiorari was denied.  *C.f. United States v. Tapia*, 816 F. App'x 619, 620 (2d Cir. 2020) (recalling mandate when motion was made less than three months after mandate issued); *Carrington v. United States*, 503 F.3d 888, 892-93 (9th Cir. 2007) (contrasting "case that is still subject to the filing of a petition for a writ of certiorari" with "[t]he recognition that petitioners seek [to] recall … mandates … which have been final for years").

The equities also support leaving the mandate undisturbed.  As explained below, it would be profoundly unfair (and even unconstitutional) for the Court to revive the void district court judgment and permit Plaintiffs to enforce that judgment against Defendants.  *See, e.g., Roman Cath. Archdiocese v. Feliciano*, 140 S. Ct. 696, 700 (2020).  This Court should not effect such unfairness given that Plaintiffs have a viable alternative case (*Sokolow II*) for prosecuting their ATA claims.

## B.  Recalling the Mandate Would Be Futile Because the District Court's Judgment Is Void.

The district court's original judgment is void because it was made without personal jurisdiction—so a new trial would be necessary even if the mandate were recalled.  As explained in *Burnham*, 495 U.S. at 608-09, the limited nature of the judicial power under the Constitution means that "the judgment of a court lacking jurisdiction is void."  Both the "proceedings" and "judgment" made without personal jurisdiction are "not simply erroneous, but absolutely void."  *Roman Cath.*

76

*Archdiocese*, 140 S. Ct. at 700 (cleaned up). Stated differently, "personal jurisdiction is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (cleaned up).

Because the district court lacked personal jurisdiction when it held a jury trial and entered judgment in 2015, those proceedings are void and cannot be reinstated even if this Court recalls its mandate. *DiSapio*, 540 F.3d at 122-23 ("a judgment is void … if the court that rendered it lacked jurisdiction [over] the parties"). Prior decisions made without jurisdiction remain "absolutely void" even if a court later acquires jurisdiction <u>in the same case</u>. *Roman Cath. Archdiocese,* 140 S. Ct. at 700. These principles are well-understood and widely applied. *See, e.g., South Carolina v. Moore,* 447 F.2d 1067, 1073 (4th Cir. 1971) (decisions were void "despite subsequent determination that the removal petition was ineffective"); *McCulley v. Brooks & Co. Gen. Constr.*, 816 S.E.2d 270, 273-74 & n.4 (Va. 2018) (collecting cases) ("Just as medicine may cure a sick man of a fatal disease but not revive him after his burial, a litigant can 'cure' the absence of personal jurisdiction by making a general appearance prior to final judgment but cannot resurrect a void judgment thereafter."); *G.L. v. D.L.*, 406 P.3d 367 (Haw. App. 2017) (void judgment not "resurrected or reinstated" by post-judgment waiver of personal jurisdiction).

By the same token, "[e]nforcement of a judgment of a court that lacked personal jurisdiction would violate due process of law." 18 Moore's Fed. Pract. § 130.06 (2022); *H & D Tire & Auto. Hardware v. Pitney Bowes*, 227 F.3d 326, 328 (5th Cir. 2000) (If "the court lacked jurisdiction both at the time of removal and judgment, the judgment cannot stand."). This Court has thus refused to enforce judgments entered without personal jurisdiction. *See Sartor v. Toussaint*, 70 F. App'x 11, 13 (2d Cir. 2002) (when a judgment is void, "the Court has no discretion and is compelled to grant [relief from judgment] for the reason that a void judgment cannot be enforced").

Plaintiffs' cases about "salvaging" jurisdiction do not alter these well-established principles, as they involve curing diversity jurisdiction on direct appeal rather than creating personal jurisdiction after final judgment. For example, *Caterpillar v. Lewis*, 519 U.S. 61, 64, 73, 75-77 (1996), held that diversity might be salvaged in some circumstances "at the time judgment is entered"—but warned that "if, at the end of the day and case, a *jurisdictional* defect remains uncured, the judgment must be vacated." Similarly, *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 837 (1989), dismissed "a dispensable nondiverse party" on direct appeal to retain jurisdiction, but emphasized "that such authority should be exercised sparingly." Moreover, these cases do not relate to the cure of a truly "*jurisdictional* defect, but to cure of a *statutory* defect," which in *Caterpillar* was the "failure to

78

comply with the [complete diversity] requirement of the removal statute." *Grupo Dataflux v. Atlas Global Group*, 541 U.S. 567, 574 (2004).[29]

Finally, Plaintiffs argue recalling the mandate would be consistent with the Supreme Court's GVR. Pls. Br. 33-37. But a GVR does not decide or suggest how to resolve the merits of any issue. All circuits agree that a GVR "does not make a decision on the merits of the case nor dictate a particular outcome." *Cole v. Carson*, 935 F.3d 444, 450 n.21 (5th Cir. 2019) (collecting cases). Rather, it requires only "further consideration" of the appellate *status quo ante* in light of subsequent developments. *Amara v. CIGNA Corp.*, 775 F.3d 510, 531 (2d Cir. 2014). Here, the Supreme Court explicitly remanded the case "for further consideration in light of the [PSJVTA]." *Sokolow*, 140 S. Ct. 2714 (2020). This was not a merits decision.

## V. IMPROPER EXPERT TESTIMONY NECESSITATES A NEW TRIAL.

Trial courts must serve a gatekeeping function to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993). Consistent with that responsibility, Rule of Evidence 702 "directs the district court to 'focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or

---

[29] Plaintiffs other cases are equally inapposite. For example, *Mullaney v. Anderson*, 342 U.S. 415, 416-17 (1952), allowed joinder of non-resident union members because "earlier joinder [would not] have in any way affected the course of the litigation" and with "the silent concurrence of the defendant."

the district court's belief as to the correctness of those conclusions.'" *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 662 (2d Cir. 2016) (citation omitted).

Plaintiffs' purported experts were Nick Kaufman, a former prosecutor and judge in the Israeli Defense Forces ("IDF"), Alon Eviatar, a former IDF intelligence officer, and Israel Shrenzel, a former Israeli intelligence and security employee. JA-3883-86, 4139-41, 4933-34. Over Defendants' objections (JA-1427-58), these witnesses reviewed case files and ran online searches, then surmised what happened and who was responsible without applying any specialized methodology or offering an approach different from a layperson. The district court's manifest error in admitting this testimony was compounded when those witnesses constructed speculative narratives and told the jury which conclusions to draw. A new trial is required because there is a "distinct possibility" that "the jury would not have reached the verdict that it did" without the improper testimony. *Nimely v. NYC*, 414 F.3d 381, 397, 400 (2d Cir. 2005).

### A. The District Court Allowed Plaintiffs' Experts to Weigh the Evidence Rather Than Apply Any Particular Methodology.

Plaintiffs' three former IDF employees reviewed "case files" from "military courts in the West bank" provided by Plaintiffs' attorneys. JA-3886 (Kaufman); JA-4181 (Eviatar); JA-5195-96 (Shrenzel). Then each witness applied internet searches and their law-enforcement "experience" to speculate "what actually happened, who was involved, and what was the links of the perpetrators to the PA." *Id*. Each

witness vaguely claimed their "great many years of experience as an expert" enabled them to determine whether an attack was directed by Defendants.  JA-4181.

The D.C. Circuit affirmed the exclusion of an expert opinion by one of the same witnesses (Eviatar) for the very same infirmities.  *Gilmore*, 843 F.3d at 972-73.  In *Gilmore*, a look-alike case, the court of appeals agreed Eviatar failed to offer any particular methodology in support of his opinion or explain "how [his] approach differed from that of a layperson."  *Id.* at 973.

Just like in this case, Eviatar in *Gilmore* did not "explain how his 'cumulative experience and knowledge' as an IDF intelligence officer, as opposed to commonsense and general deductive principles that any non-expert finder of fact would rely on, lead him to the conclusion that [a particular individual] was the likely murderer."  *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 53 F. Supp. 3d 191, 211-15 (D.D.C. 2014).  As in this case, Eviatar's opinion "consist[ed] entirely of generalized and conclusory assertions that lack any basis in his specialized knowledge."  *Id.* at 213.  His opinion was "not based on any reliable principles [or] methodology reliably applied to the facts of the case."  *Id.* at 213-14 (cleaned up).  "Instead, he merely weigh[ed] the evidence in precisely the same way as would a trier of fact."  *Id.*

Over Defendants' objections (JA-1427-58, JA-3287-88, JA-3299), all three of Plaintiffs' experts in this case took a nearly-identical approach to that rejected by the

D.C. Circuit.  *See Gilmore*, 843 F.3d at 973;*compare Gilmore*, 53 F. Supp. 3d at 212

(rejecting Eviatar's reliance on "'cumulative experience and knowledge' as an IDF

intelligence officer" as the basis for his conclusions) *with* JA-4181 (Eviatar

"formulated all of that information together with my years of – my great many years

of experience as an expert.  I formulated that into one solid picture of evidence").

These witnesses never provided the required "indicia of reliability" for their opinions

or any demonstration that their "expertise permits the opinion(s) rendered."

*Carrizosa v. Chiquita Brands Int'l*, 47 F.4th 1278, 1322 (11th Cir. 2022) (requiring

both showings for experience-based opinions).

Nor did these witnesses distinguish their approach from that of a layperson.

Courts reserve expert testimony for subject matters "beyond the ken of the average

juror"—issues that the average juror "is not capable of understanding on his or her

own."  *United States v. Mejia*, 545 F.3d 179, 191, 194 (2d Cir. 2008); *Amuso*, 21

F.3d at 1263 ("manifest error [to admit] expert testimony where … the subject matter

of the expert's testimony is not beyond the ken of the average juror"); *United States

v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) ("expert testimony should be excluded

if the witness is not actually applying expert methodology").  Though the court

below initially agreed that such testimony was improper,[30] it stopped enforcing this

---

[30] *See also* JA-3283-84; JA-3286.

rule during Plaintiffs' first expert witness. *See* JA-3930-31. Thereafter, it stopped enforcing this limitation entirely, as shown below.

### B. Plaintiffs' Experts Constructed Inflammatory, Speculative Narratives and Then Told the Jury What to Decide.

The district court committed manifest error by permitting Plaintiffs' experts to give inflammatory and speculative testimony, to introduce and summarize fact evidence, and "merely [tell] the jury what result to reach." *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992). As "shortcuts to proving guilt," Plaintiffs relied on these purported experts, "whose expertise happens to be the defendant," to impermissibly chronicle and summarize facts. *Mejia*, 545 F.3d at 190-91 (cleaned up). One expert brazenly admitted that he was telling a "story" that "contributes to our case." JA 5288-90 (emphasis added). The district court initially recognized the impropriety of Plaintiffs' approach and instructed that the witness is "not here to tell us the story." JA-3930-31. But while it "properly established initial limits," when Plaintiffs' experts "strayed beyond those limits, and when defense counsel objected, the district court did not enforce them and thus failed to fulfill its gatekeeping function." *Dukagjini*, 326 F.3d at 55.

First, Plaintiffs' experts were improperly afforded great liberty to spin theories about a wide range of critical issues, including speculating about the thoughts of the attackers and Defendants' purported Soviet-style mind-control of the Palestinian people. *See Nimely*, 414 F.3d at 399 (rejecting expert's conclusions as "the essence

of unverifiable subjectivity, amounting to the sort of *ipse dixit* connection between methodology and conclusion" prohibited by Rule 702).  For example:

- Shrenzel conjectured, over objection, about one attacker's thoughts:  "for him it was clear, this is what my superiors expect from me .... They want me to go out and ... shoot indiscriminately in the streets of Jerusalem."  JA-5690-92.

- Kaufman spun a tale that a PA employee and another man "got [the attacker] ready for the attack.  They did that by taking him to pray.  Why, may you ask, did they take him to pray?  Well, he knew he was going to die, so he was preparing himself for death.  They bought him food maybe for his last supper, clothes and shoes."  JA-3926-29 (includes objection).  Needless to say, Kaufman was neither present nor clairvoyant.

- Conjuring broad accusations from nowhere, and over objection, Shrenzel testified that Defendants used techniques from "the Soviet Union" to "control [Palestinians'] minds and thoughts and lead them in a specific way that is desired by the central leadership of the PLO/PA."  JA-5329.  He claimed that Defendants created an "atmosphere" that transformed all PA employees into would-be terrorists:  "This is the crucial issue.  There was an atmosphere, either those were employees of the PA, either they read it, either they were exposed to announcement by the commanders."  JA 5690-92 (includes objection).

Experts are not permitted to "speculate as to the motivations and intentions of certain parties"—those questions are left to the jury.  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013).  As these examples illustrate, Plaintiffs' experts spent little time "translat[ing] esoteric terminology," "explicat[ing] an organization's hierarchical structure," or "describing the inner workings of a closed community," but instead became "chronicler[s] of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving

84

guilt." *Mejia*, 545 F.3d at 190. The speculation about Defendants' purported indoctrination of the Palestinian people and the internal thoughts of individuals was severely prejudicial. *United States v. Zhong*, 26 F.4th 536, 557-58 (2d Cir. 2022) (vacating conviction where expert improperly discussed China's "reeducation through labor camps").

Second, Plaintiffs' experts improperly offered summary and ultimate-issue testimony, which this Court has repeatedly held creates prejudice warranting a new trial. *See Mejia*, 545 F.3d at 190-94. Such testimony is not helpful in establishing facts which must be "proven by competent evidence," and "to substitute expert testimony for factual evidence of murder" constitutes an impermissible "shortcut around" Plaintiffs' evidentiary obligation. *Id.* at 195-96.

Plaintiffs deputized their experts for that very purpose. For example, Plaintiffs' experts provided the only testimony that the PA's social welfare programs were, in part, responsible for the attacks. The programs support families of Palestinian security prisoners, were created by the PA (with input from the United States) for the purpose of rehabilitating and reintegrating offenders, and have been "very successful." JA-7184-90; JA-7539-44; JA-7360 (Objections: JA-1435; JA4355, JA-4284-85, JA4373-74). Nevertheless, Eviatar, who is not an economist, offered unsupported testimony that the payments constitute "an economic motivation for the perpetration of acts of terror" (JA-4351), "are not social welfare

payments" (JA-4281) and are "a positive incentive that multiplies [terrorists'] motivation (JA-4374)."[31] Plaintiffs' counsel characterized it as a "professional opinion" (JA-4385), but Eviatar had no qualifications or support for his opinions.

Plaintiffs' counsel argued in closing that this testimony proved the PA's social welfare programs caused the attacks: "[I]f you set up a program in which you say if you commit a terrorist act we will pay your family, that is providing material support, and you can't do that." JA-8107-10; *Dukagjini*, 326 F.3d at 54 (party may not use expert testimony to "provide [itself] with an additional summation by having the expert interpret the evidence"). Counsel added, over objection, "[a]nytime that there's martyr payments, you can check yes [as to material support]. You don't have to find that those payments preceded the attack." JA-8110.

Finally, Plaintiffs' experts improperly instructed the jury how to interpret evidence and what conclusions to draw. *Nimely*, 414 F.3d at 398. For example:

- Eviatar broadly assured the jury that PA security forces supported terrorism: "My well-founded assessment is that many hundreds from among the Palestinian security apparatuses were involved in terrorist activities." JA-4597. Eviatar repeatedly returned to that theme, claiming that Defendants were in "cooperation and coordination in the perpetration of joint acts of terror" with Hamas. JA-4619; JA-4597-98; *see* JA-4176-77 (court's reasoning for allowing such testimony).

- Eviatar contended the PA incited Palestinians, over objection: "all of the different sectors of the Palestinian leadership … want to convey to the public by messages, by statements, by hinting, by explicit calls, all of these fall under

---

[31] Eviatar also falsely represented Defendants' position: "My opinion is the same as that of the Palestinian Authority: These are not social welfare benefits." JA-4353.

the category of incitement, the meaning of which is clear anti-Israeli statements from an explicit call for armed struggle." JA-4154-55.

- Although Shrenzel admitted that Palestinian media does not instruct Palestinians to "please go out and kill all Jews or all the Israeli citizens," he conjectured that "it is the explicit, but no less than that, the implicit messages" to kill Israelis, and that this was a "contributing factor" that caused the attacks in this case. JA-5690-92 (includes objection). Shrenzel argued that the PA "create[ed] the proper atmosphere" that caused the June 19, 2002, bomber to "go out and detonate himself." JA-5690-92; *see also* JA-5326-27 (includes objection).

- Eviatar also repeated the conclusions of an Israeli report (serving as a conduit for inadmissible hearsay (*see* JA-4313)) entitled, "Arafat's and the PA's Involvement in Terrorism ... that determines that Arafat and the Palestinian Authority are involved in terrorism." JA-4425-26 (includes objection).

- Shrenzel instructed the jury, over objection, that a PA intelligence official had advance knowledge of an attack: "This very document cannot provide us with a conclusive final proof of his prior knowledge of the attack. But ... I think it's more likely than not that he had prior knowledge and involvement in that attack. That's my professional assessment." JA 5716.

As explained in *Gilmore*, 53 F. Supp. 3d at 213, such expert testimony is improper because "Eviatar has not applied any specialized knowledge to the hearsay materials on which he relies" and acts as a layperson because "his analysis consists entirely of deductions and observations that flow directly from the content of the hearsay statements." *See also United States v. Escobar*, 462 F. App'x 58, 62 (2d Cir. 2012) (error to admit expert testimony that "went far beyond interpreting jargon or coded messages, describing membership rules, or explaining organizational hierarchy") (cleaned up).

The district court committed manifest error by permitting Plaintiffs' experts to present lay opinions on Defendants' liability as expert testimony based on nothing more than their personal views and speculation. A new trial should be granted where, as here, Plaintiffs "emphasized in arguments to the jury" their experts' improper testimony, *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000), resulting in the "distinct possibility" that without it, "the jury would not have reached the verdict that it did." *Nimely*, 414 F.3d at 400.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's conclusion that exercising personal jurisdiction would be unconstitutional, and decline to recall the mandate.

Dated: January 27, 2023         Respectfully submitted,

SQUIRE PATTON BOGGS (US) LLP

*/s/ Gassan A. Baloul*
Gassan A. Baloul
Mitchell R. Berger
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

*Counsel for Defendants-Appellees*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel certifies that this document complies as follows:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's Order (Dkt. 505) because it contains 20,951 words, excluding the parts exempted by Rule 32(f).

2.     This document complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-Point font.

Dated: January 27, 2023                    */s/ Gassan A. Baloul*
                                           Gassan A. Baloul

                                           *Counsel for Defendants-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2023, the foregoing document was filed

with the Clerk of the Court and served via CM/ECF upon all counsel of record.


Dated: January 27, 2023                     */s/ Gassan A. Baloul*
                                            *Counsel for Defendants-Appellees*