**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

**Docket Number(s):** 15-3135(L), 15-3151(XAP), 22-1060(C) _____ Caption [use short title] _____

**Motion for:** Remand to district court with instructions to reinstate judgment on the verdict.

Set forth below precise, complete statement of relief sought:

Vacate this court's judgment, remand to the district court with instructions to reinstate its judgment on the jury verdict, and award costs to plaintiffs.

Waldman v. Palestine Liberation Organization

**MOVING PARTY:** Waldman et al.   **OPPOSING PARTY:** Palestine Liberation Org. et al.

[✓] Plaintiff   [ ] Defendant

[✓] Appellant/Petitioner   [ ] Appellee/Respondent

**MOVING ATTORNEY:** Kent. A. Yalowitz   **OPPOSING ATTORNEY:** Gassan A. Baloul

[name of attorney, with firm, address, phone number and e-mail]

Arnold & Porter

250 West 55th Street

New York, New York 10022

Squire Patton Boggs

2550 M Street NW

Washington, DC 20037

Court- Judge/ Agency appealed from: SDNY - Hon. George B. Daniels

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
[✓] Yes   [ ] No (explain): _____

Opposing counsel's position on motion:
[ ] Unopposed [✓] Opposed [✓] Don't Know

Does opposing counsel intend to file a response:
[✓] Yes   [ ] No   [✓] Don't Know

The United States has not determined whether it will file a response.
The PLO opposes and will file a response.

Is oral argument on motion requested?   [✓] Yes   [ ] No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   [✓] Yes   [ ] No   If yes, enter date: May 3, 2023

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below?   [ ] Yes   [ ] No

Has this relief been previously sought in this court?   [ ] Yes   [ ] No

Requested return date and explanation of emergency: _____

**Signature of Moving Attorney:**

/s/ Kent A. Yalowitz   **Date:** Aug. 11, 2025   Service by: [✓] CM/ECF   [ ] Other [Attach proof of service]

Form T-1080 (rev.12-13)

# 15-3135(L)

## 15-3151(XAP), 22-1060(C)

**UNITED STATES COURT OF APPEALS**
*for the*
**SECOND CIRCUIT**

---

**MARK I. SOKOLOW, *ET AL.*,**

*Plaintiffs-Appellants,*

**UNITED STATES OF AMERICA,**

*Intervenor-Appellant,*

v.

**PALESTINE LIBERATION ORGANIZATION, *ET AL.*,**

*Defendants-Appellees.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK IN 2004 CIV. 397
HONORABLE GEORGE B. DANIELS

## MOTION TO REMAND
## WITH INSTRUCTIONS TO REINSTATE JUDGMENT

## INTRODUCTION

This case is old enough to go to law school. It has been the subject of a lengthy jury trial, three published opinions by this Court, two statutes, and a Supreme Court opinion. The Court should now end this saga. Plaintiffs respectfully ask this Court to vacate its judgment that the district court lacks personal jurisdiction over the defendants, to remand for reinstatement of the judgment consistent with the jury verdict, and to award plaintiffs their costs.

This motion arises out of a submission-to-jurisdiction statute, which Congress enacted in response to this Court's decision that the district court lacked personal jurisdiction over defendants. The Court initially determined that defendants had altered their conduct to avoid the effect of that statute. It also observed that the statute did not provide expressly that the case could or should be reopened.

In response, Congress amended the statute, expanding the jurisdictionally relevant conduct, and pointedly making the statute retroactive to August 30, 2016—the day before this Court entered judgment in this case. The Supreme Court entered a "GVR" order directing further consideration in light of the amended statute; the district court found (on remand from this Court) that defendants *had* engaged in conduct meeting the factual predicate of the statute; and the case again returned to this Court. This Court then held the amended statute unconstitutional, but the Supreme Court has reversed on that point.

This Court should now vacate its 2016 judgment and remand to the district court for reinstatement of judgment on the jury verdict. It should do so for two independent reasons. *First*, the Supreme Court's decision to reverse—rather than vacate—reflects its conclusion that there is personal jurisdiction over defendants in this case and that this Court's decision to the contrary was "absolutely wrong." *See* The Supreme Court's Style Guide § 10.5 (Jack Metzler ed., 2016) (hereinafter *Style Guide*). This is so even if this Court views the Supreme Court as having reversed only this Court's order denying the motion to recall the mandate: With that order reversed, this Court must apply the law as it now exists.

2

*Second*, if this Court believes it still has an obligation to decide for itself whether to reopen the case under its own authority, the answer is unequivocal—it can and it should. "Once a district court has proceeded to final judgment, considerations of finality, efficiency, and economy become overwhelming, and federal courts must salvage jurisdiction where possible." *United Republic Ins. Co. v. Chase Manhattan Bank*, 315 F.3d 168, 170 (2d Cir. 2003) (recalling mandate) (cleaned up).

Forcing plaintiffs to start over and go through a re-trial on the same claims against the same defendants would needlessly consume judicial resources, inflict unnecessary pain, and serve no valid purpose. It would also disregard the views of coordinate branches of government that the claims in this case should be resolved on the merits without protracted further litigation.

Finally, the issues remaining on appeal need not long detain the Court. Plaintiffs have abandoned their cross-appeal, and defendants' alternative grounds for vacatur are makeweights.

## BACKGROUND

After a seven-week trial with testimony from 50 witnesses, the jury rendered a verdict in favor of plaintiffs. App'x 1-21.[1] Overwhelming evidence showed that defendants provided material support and resources to terrorists and foreign terrorist organizations who committed the six attacks at issue in this case, and that defendants' employees and agents, acting within the scope of their employment, committed or supported those attacks. *See id.* at 34-51. The district court entered judgment in plaintiffs' favor on October 1, 2015. *Id.* at 97-103.

---

[1] Attached to this motion.

On appeal, this Court held that the district court lacked personal jurisdiction over defendants. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 344 (2d Cir. 2016) (*Waldman I*). The Court vacated the district court's judgment and remanded with instructions to dismiss the case. *Id.* This Court entered its judgment August 31, 2016, App'x 104-06, and issued its mandate November 28, 2016, *id.* at 107. On remand, the district court vacated its judgment and dismissed the case. *Id.* at 110.

The Supreme Court denied plaintiffs' certiorari petition on April 2, 2018. 138 S. Ct. 1438 (2018). A few weeks later, members of Congress introduced the Anti-Terrorism Clarification Act of 2018 (ATCA). 164 Cong. Rec. S2926 (May 24, 2018). The ATCA became law on October 3, 2018. 132 Stat. 3183.

Five days later, on October 8, 2018, plaintiffs filed a motion in this Court to recall its mandate in light of the ATCA. Soon after (and before the limitations period expired), plaintiffs filed a second complaint—alleging the same claims, in case this Court did not recall its mandate. That case has been stayed pending resolution of the motion to recall the mandate.

This Court denied the motion to recall the mandate. App'x 111-22 (*Waldman v. Palestine Liberation Org.*, 925 F.3d 570, 574-75 (2d Cir. 2019) (*Waldman II*)). Plaintiffs petitioned for certiorari. While the petition was pending, Congress enacted the Promoting Security and Justice for Victims of Terrorism Act of 2019 (PSJVTA). The Supreme Court vacated this Court's judgment and remanded for further consideration in light of the PSJVTA. App'x 123 (140 S. Ct. 2714 (2020)).

This Court remanded to the district court to determine the PSJVTA's applicability to this case and, if applicable, its constitutionality. App'x 124-27.

4

On remand, the United States intervened to defend the PSJVTA's constitutionality. *See* 28 U.S.C. § 2403. The district court found by a preponderance of the evidence that defendants engaged in conduct triggering jurisdiction under the PSJVTA, but it held the law unconstitutional. *Sokolow v. Palestine Liberation Org.*, 590 F. Supp. 3d 589, 594-97 (S.D.N.Y. 2022).

This Court then directed the parties "to brief all issues without incorporation by reference to prior briefs." App'x 128. Defendants' brief challenged neither the district court's findings of fact nor its conclusion that their conduct met the statutory predicate for jurisdiction under the PSJVTA. Rather, their brief contended that the PSJVTA is unconstitutional. Defendants also contended (1) the Court should *not* apply the PSJVTA in this case because the district court's original judgment was "void," App'x 221-24; and (2) even if the Court were to apply the PSJVTA in this case, expert testimony erroneously admitted at trial would necessitate a retrial, *id.* at 224-33. Plaintiffs addressed these arguments on reply. *See id.* at 254-60, 289-310.

In *Fuld v. Palestine Liberation Organization*, No. 22-76, decided together with this case, this Court concluded that the PSJVTA was inconsistent with the Due Process Clause of the Fifth Amendment. Based on *Fuld*, the Court held that no basis existed to recall the November 2016 mandate in this case and so denied plaintiffs' motion to recall the mandate. App'x 312-31.

The Supreme Court reversed. 145 S. Ct. 2090 (2025).

5

## ARGUMENT

**I.  THE COURT SHOULD VACATE ITS 2016 JUDGMENT AND APPLY THE PSJVTA IN THIS CASE**

The Court should vacate its 2016 judgment and apply the PSJVTA in this case—either because the Supreme Court has already reopened the case, or (if not) because that is the only just, equitable, and efficient course of action.

It is axiomatic that "an appellate court must apply the law in effect at the time it renders its decision," *Henderson v. United States*, 568 U.S. 266, 271 (2013) (cleaned up), including "intervening statutes conferring or ousting jurisdiction," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994). Thus, in *United States v. Alabama*, 362 U.S. 602, 604 (1960), the Supreme Court held that it had subject-matter jurisdiction based on a newly enacted statute, even though the district court had lacked jurisdiction, explaining that "the case must be decided on the basis of law now controlling." Similarly, in *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 178 (2d Cir. 1967), this Court applied a newly enacted statute on remand from the Supreme Court, explaining that "the mandate has been affected by a subsequently enacted federal statute."

Thus, the PSJVTA applies upon the reopening of this case, and Defendants' post-enactment conduct cured any prior lack of personal jurisdiction. *See Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción*, 832 F.3d 92, 100 (2d Cir. 2016) (defendant's conduct during appellate proceedings amounted to a "legal submission" to personal jurisdiction) (citation omitted); *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1029 (D.C. Cir. 2020) (objections to lack of personal jurisdiction "can be forfeited at any stage

6

of a proceeding" (cleaned up)).

### A. The Supreme Court's Reversal Reopened the Case

"When a judgment has been rendered and later set aside or vacated, the matter stands precisely as if there had been no judgment." 47 Am. Jur. 2d Judgments § 676. In particular, "the case remains open," and "the court must apply the law as it stands" at the time it makes a new decision, taking account of intervening legal developments. *Ditto v. McCurdy*, 510 F.3d 1070, 1077 (9th Cir. 2007); *see Banco Nacional de Cuba*, 383 U.S. at 173 ("a case must be decided according to the law as it exists at the time of final judgment"); *United States v. Lentz*, 383 F.3d 191, 223 (4th Cir. 2004) (Michael, J., concurring) ("reversal of the judgment of acquittal means that the case … remains open").

Thus, when the Supreme Court overturns a judgment of this Court, this Court on remand follows the law as announced by the Supreme Court without considering the discretionary factors that would otherwise apply if this Court were reopening the case on its own authority. *See, e.g.*, *United States v. Aiello*, 118 F.4th 291 (2d Cir. 2024); *United States v. Percoco*, 80 F.4th 393 (2d Cir. 2023); *In Re: Vitamin C Antitrust Litig.*, 8 F.4th 136 (2d Cir. 2021). This is true even if this Court's mandate issued before the Supreme Court's decision. Indeed, given the time required to obtain Supreme Court review and a merits decision, this Court's mandate almost always issues before the Supreme Court rules. *See* Fed. R. App. P. 41(b) (requiring court of appeals to issue its mandate promptly in absence of a stay). Yet on remand, this Court does not engage in a discretionary balancing of factors to decide whether to recall its mandate; it just does so.

The decretal language used by the Supreme Court in this case supports the conclusion that the case has already been reopened. The Supreme Court stated that "the judgments of the above court [in *Fuld* and *Waldman*] are reversed with costs, and the cases are remanded to the United States Court of Appeals for the Second Circuit for further proceedings consistent with the opinion of this Court." App'x 333.

The Supreme Court's choice of the word "reversed," rather than "vacated," reflected a considered decision, and this Court must give it effect. As the Supreme Court Style Guide explains:

> In virtually every Term, the question arises whether the Court should vacate, as opposed to reverse, particular lower court judgments. The rule of thumb applied by the Office of the Clerk of the Court is easy to state, but may be difficult to apply in particular instances: *This Court should reverse if it deems the judgment below to be absolutely wrong, but vacate if the judgment is less than absolutely wrong.*

*Style Guide* § 10.5 (emphasis added). "Reversed" thus means something different from "vacated," which would have indicated that the Court left open the possibility that the judgment or order under review was correct. *See Esteras v. United States*, 145 S. Ct. 2031, 2045 (2025) (proper appellate resolution of non-harmless sentencing error is for court of appeals to "vacate the court's order and remand for the court to apply the correct standard"); *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (vacating and remanding where preliminary injunction was granted under incorrect legal standard); *Mickens v. Taylor*, 535 U.S. 162, 170 n.3 (2002) (proper disposition "was *not* to reverse but to vacate and remand for the trial court to conduct the inquiry it had omitted"); Aaron-Andrew P. Bruhl, *The Remand Power and the*

8

*Supreme Court's Role*, 96 Notre Dame L. Rev. 171, 207 (2020) ("one of the central uses of vacatur is to wipe the slate clean of a judgment that, on remand, may yet be shown to be correct").

At an earlier stage of the case, the Supreme Court vacated and remanded "for further consideration in light of the [PSJVTA]." 140 S. Ct. 2714. This Court understood that prior mandate as leaving open the possibility that its own order (and judgment) might ultimately stand. But that possibility no longer remains in light of the Supreme Court's reversal.

The reopened status of this case is underscored by the Supreme Court's use of the word "judgment." App'x 333. The *judgment* is "the document that states the dispositive action taken by the court of appeals." *United States v. Reyes*, 49 F.3d 63, 65 (2d Cir. 1995); *see* Fed. R. App. P. 36(a). Indeed, the Supreme Court "does not review lower courts' opinions, but their *judgments*." *Jennings v. Stephens*, 574 U.S. 271, 277 (2015). This Court has issued one judgment in this case, in 2016, App'x 104-06, and two post-judgment orders declining to reopen the case, *id.* at 111-22, 312-31. The Supreme Court has now reversed this Court's 2016 judgment—*i.e.*, its holding that "[t]he district court could not constitutionally exercise…personal jurisdiction over the defendants in this case." *Waldman I*, 835 F.3d at 344.

## B.      Even if Not Automatic, Recall of the Mandate Is Required

The result would be the same if this Court determines that it must consider the discretionary factors that govern reopening its own cases. This Court has recognized "the imperative to salvage jurisdiction where possible," *Universal Reinsurance Co.*

*v. St. Paul Fire & Marine Ins. Co.*, 312 F.3d 82, 89 (2d Cir. 2002), and has recalled its mandate in order to implement that duty, *United Republic*, 315 F.3d at 169.

This Court "ha[s] the power to reopen a case at any time," which it exercises when: (1) there has been a "supervening change in governing law that calls into serious question the correctness of the court's judgment," (2) the movant preserved the issue in the original appeal, (3) there was "not a substantial lapse of time" before the motion to recall the mandate, and (4) the equities "strongly favor" relief. *Sargent v. Columbia Forest Prods., Inc.*, 75 F.3d 86, 89-90 (2d Cir. 1996) (cleaned up). Here, each *Sargent* factor strongly supports recalling the mandate.

**1.** There have been "supervening change[s] in governing law that call[] into serious question the correctness of the court's judgment." *Id.* at 90.

**a.** Begin with the PSJVTA. As the Ninth Circuit has explained, "an abrupt change in the law shortly after the panel's opinion justifies a recall of the mandate," as it would be "patently unfair" to deprive a litigant of the benefit of new legislation—a principle that applies with particular force where "Congress act[s] specifically to overrule [the court's] decision." *Bryant v. Ford Motor Co.*, 886 F.2d 1526, 1530 (9th Cir. 1989).

Thus, this Court recalled its mandate in light of *pending* legislation in *ACLU v. Department of Defense*, 543 F.3d 59 (2d Cir. 2008). There, the federal government moved to recall the mandate after this Court held that photographs depicting mistreatment of detainees in Iraq and Afghanistan must be released under the Freedom of Information Act. *See* Mot. to Recall Mandate, *ACLU v. Dep't of Def.*, No. 06-3140 (May 28, 2009), https://bit.ly/40ZlGSf ("DOD Mot. to Recall Mandate"). The

10

government emphasized that "Congress is considering legislation (already passed by the Senate) that would exempt certain photographs—including those at issue in this case—from disclosure." *Id.* at 1. "[T]he imminent possibility of a significant change in the law," the government explained, "strongly reinforces the grounds for recall of the mandate." *Id.* at 12. This Court granted the motion. Order, *ACLU v. Dep't of Def.*, No. 06-3140 (June 10, 2009).[2]

Recall of the mandate here follows *a fortiori* from *ACLU*. In *ACLU*, the legislation had passed only one chamber of Congress at the time the Court recalled its mandate. Here, the statute has been enacted by Congress and signed by the President.

The PSJVTA does not merely create a new rule. It reflects the views of Congress and the President that national security and foreign policy are best served by providing relief to plaintiffs in this case. As the Supreme Court observed, "a key premise of the PSJVTA was Congress's desire to facilitate the adjudication of ATA claims like the plaintiffs', which it views as vital to furthering the safety of Americans abroad, facilitating compensation for injuries or death, and deterring international terrorism." 145 S. Ct. at 2107 (cleaned up). The PSJVTA expresses this desire in numerous respects. Most tellingly, it applies to any case "pending on or after August 30, 2016," which is the day before this Court issued judgment in this case. PSJVTA § 903(d)(2), 133 Stat. 3085. It also identifies its purpose as "provid[ing] relief for victims of terrorism." *Id.* § 903(d)(1)(A). And it expresses the "sense of Congress" that victims whose cases were dismissed for lack of personal

---

[2] *See* ECF No. 356, No. 04 Civ. 4151 (AKH) (S.D.N.Y. June 15, 2009).

11

jurisdiction—*i.e.*, plaintiffs in this case—should *not* be subjected to "unnecessary or protracted litigation." *Id.* § 903(b)(4), 133 Stat. 3083.

A statute implementing a practical resolution to "a specific controversy" is "due great respect," because of the deference owed to "Congress's prerogative to balance opposing interests and its institutional competence to do." *Salazar v. Buono*, 559 U.S. 700, 717 (2010) (plurality opinion) (cleaned up). In *Salazar*, the district court ordered the federal government to remove a large cross that had been erected on federal land in the Mojave Desert by veterans of World War I as a memorial to fallen soldiers. Congress then enacted a statute designed to resolve the suit by directing a "land exchange," so that the cross would be on private rather than public land. *Id.* at 727. The court of appeals deemed this statute "an evasion" of the injunction. *Id.* at 717. Reversing, the Supreme Court explained that "[r]espect for a coordinate branch of Government" required the lower courts to reassess the injunction "in light of the policy … that Congress had embraced." *Id.* at 721. So, too, in *ACLU*. There, the government successfully argued that recall of the mandate was appropriate because release of the photographs would harm national security and the potential statute was designed "to address the precise issue in this case." DOD Mot. to Recall Mandate at 6.

**b.** The Supreme Court's reasoning also "calls into serious question" the correctness of this Court's judgment. *Sargent*, 75 F.3d at 90. The Supreme Court did not merely uphold the PSJVTA's constitutionality; it held that *Waldman I* "applied the wrong constitutional test." 145 S. Ct. at 2109. Defendants argued in *Fuld* that "deference to the political branches" was "unwarranted … because Congress's

explicit purpose was to reverse federal decisions holding that the same activities that trigger jurisdiction under the PSJVTA were insufficient to support the exercise of jurisdiction under the Due Process Clause." *Id.* at 2108-09 (cleaned up). The Supreme Court rejected that argument on the ground that those "federal decisions" (including *Waldman I*) were "wrong." *Id.*

The Supreme Court's decision calls this Court's judgment into serious question in other respects, too. This Court held that "the minimum contacts and fairness analysis is the same under the Fifth Amendment and the Fourteenth Amendment in civil cases," *Waldman I*, 835 F.3d at 331, but the Supreme Court held that "the Due Process Clause of the Fifth Amendment does not incorporate the Fourteenth Amendment minimum contacts standard," 145 S. Ct. at 2109.

This Court rejected the contention that "meeting the statutory requirement for service of process" under the ATA "suffices to establish personal jurisdiction," *Waldman I*, 835 F.3d at 343, but the Supreme Court weighed in against that reasoning: "When Congress has undertaken to enact a nationwide service statute applicable to a certain class of disputes," as Congress did in the ATA, "that statute should be afforded substantial weight as a legislative articulation of federal social policy," 145 S. Ct. at 2107 (quoting 4 Wright, Federal Practice and Procedure § 1068.1, at 733). The Supreme Court further deemed it "permissible for the Federal Government to craft a narrow jurisdictional provision that ensures, as part of a broader foreign policy agenda, that Americans injured or killed by acts of terror have an adequate forum in which to vindicate their right to ATA compensation." *Id*. In words applicable to the ATA, the Supreme Court also reasoned that "the Executive and Congress have

13

spoken with one voice," and "their coordinate action is 'supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'" *Id.* (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

This Court held that the "citizenship of the plaintiffs is an insufficient basis for specific jurisdiction over the defendants," *Waldman I*, 835 F.3d at 337, but the Supreme Court upheld the PSJVTA as reasonable because the federal government has "a strong interest in permitting American victims of international terror to pursue justice in domestic courts," 145 S. Ct. at 2107, and "an exceedingly compelling interest, as part of its comprehensive efforts to deter international terrorism, in providing a forum for American victims to hold the perpetrators of such acts accountable," *id.* at 2109. The Supreme Court also explained that the federal government has an "interest in holding accountable those who perpetrate an 'act of violence against' U.S. nationals—who, even when physically outside our borders, remain 'under the particular protection' of American law." *Id.* at 2104 (quoting *Gamble v. United States*, 587 U.S. 678, 687 (2019)).

This Court held that "direct, knowing provision of material support to designated [foreign terrorist organizations]" was "not sufficiently connected to the United States to provide specific personal jurisdiction in the United States," *Waldman I*, 835 F.3d at 337, 339 n.13, but the Supreme Court reasoned that payments to terrorists *are* a legitimate predicate to personal jurisdiction in an ATA case because "the United States has determined" that such payments "promote acts of terror that may

14

injure or kill Americans," 145 S. Ct. at 2107—conduct that "in and of itself bears a meaningful relationship to the United States," *id.* at 2109.

Finally, this Court held that defendants' U.S. conduct—"establishing a continuous presence in the United States and pressuring United States government policy"—did not support personal jurisdiction, *Waldman I*, 835 F.3d at 341, but the Supreme Court determined that *any* U.S. conduct by defendants "directly implicates issues of sensitive and ongoing concern in respondents' relationships with the United States," 145 S. Ct. at 2108.

In sum, this case involves *several* "supervening change[s] in governing law that call[] into serious question the correctness of the court's judgment." *Sargent*, 75 F.3d at 90 (quotation marks omitted).

**2.** Plaintiffs preserved the argument they now ask the Court to adopt, arguing in the original appeal that defendants were subject to personal jurisdiction. Plaintiffs-Appellees' Br. 40-44 [ECF No. 96].

**3.** This motion does not involve the sort of "substantial lapse of time" that counsels against recalling the mandate. *See Sargent*, 75 F.3d at 90. In *Thai-Lao Lignite (Thailand) Co. v. Lao People's Democratic Republic*, 864 F.3d 172, 189 (2d Cir. 2017), this Court affirmed the reopening of a case on a motion made 19 months after final judgment, explaining: "Had *ten* years elapsed … the judicial interests in finality of judgments *might* well outweigh" other factors. *Id.* (emphasis added).[3]

---

[3] Although that case addressed a Rule 60(b) motion rather than a motion to recall the mandate, the two are "analogous." *Sargent*, 75 F.3d at 89; *see Tal v. Miller*, No. 97 Civ. 2275 (JGK), 1999 WL 38254, at *2 (S.D.N.Y. Jan. 27, 1999) (applying *Sargent* factors to Rule 60(b) motion).

15

Here, plaintiffs filed their motion six months after the Supreme Court denied their certiorari petition. It is the "decision by [the Supreme] Court denying discretionary review [that] usually signals the end of litigation." *Bell v. Thompson*, 545 U.S. 794, 806 (2005). But even if the Court were to disregard plaintiffs' filing of a petition for certiorari, the 23 months that elapsed between the issuance of the mandate and the filing of the motion is well within the period in which this Court has recalled its mandate. *E.g.*, *Wingate v. Gives*, 725 F. App'x 32, 35 (2d Cir. 2018) (five years); *Davis v. United States*, 643 Fed. App'x 19, 21-22 (2d Cir. 2016) (four years); *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 72 n.3 (2d Cir. 2019) (21 months).[4]

Moreover, the interest in finality stems from repose, and defendants have never enjoyed any expectation of repose. To begin, "it is perilous to develop any sense of repose around a disposition based on a procedural shortcoming rather than the merits." 16 Wright, *Fed. Prac. & Proc.* § 3938 (3d ed.). Moreover, as this Court has explained, "finality interests [do] not stand in the way of" recalling a mandate where "the party seeking to enforce the [judgment] knew proceedings to set [it] aside … were ongoing." *Thai-Lao Lignite (Thailand) Co.*, 864 F.3d at 189. Here, defendants have been fully aware of plaintiffs' efforts to overturn defendants' procedural victory—they have participated in every step of the litigation, and their lobbyists even opposed the ATCA while it moved through Congress.[5]

---

[4] No. 13-3992 (2d Cir.), ECF Nos. 374, 376, 386.

[5] Squire Patton Boggs (US) LLP, FARA Supp. Statement (Dec. 31, 2018), Att. D, https://bit.ly/45G6zzM.

16

**4.** The equities overwhelmingly favor reinstatement of the judgment. As an initial matter, where (as here) "a district court has proceeded to final judgment, considerations of finality, efficiency, and economy become overwhelming, and federal courts *must* salvage jurisdiction where possible." *United Republic*, 315 F.3d at 170 (cleaned up) (emphasis added). The 2015 trial involved a tremendous expenditure of public and private resources. Both judge and jury sat through a seven-week trial, carefully parsing a mountain of testimony and documents to arrive at a verdict and judgment. Fifty witnesses—including 30 terror victims, most of whom struggle with life-long trauma from the attacks—testified at the trial. JA-6343-7053; JA-5743-6002. A terror victim who is forced to undergo "the wrenching process of testifying again" would suffer "serious prejudice," due to the "enormous emotional cost to Plaintiffs should they be forced to undergo the excruciating process of testifying about their loss all over again." *Gilmore v. Palestinian Interim Self-Governing Auth.*, 675 F. Supp. 2d 104, 111 (D.D.C. 2009) (cleaned up), *aff'd*, 843 F.3d 958 (D.C. Cir. 2016). As a group of terror victims explained in an *amicus* brief, "subjecting terror victims to a retrial in this case, after having already testified as to their attacks and aftermath, would be highly detrimental to their psychological well-being." Amicus Br. 3 [ECF 487]. The Supreme Court, too, recognizes that "conducting retrials years later inflicts substantial pain on crime victims who must testify again and endure new trials." *Edwards v. Vannoy*, 141 S. Ct. 1547, 1554-55 (2021); *accord Morris v. Slappy*, 461 U.S. 1, 14-15 (1983); *United States v. Hasting*, 461 U.S. 499, 507 (1983). Some plaintiffs have died since the trial, and others would be unable to travel to New York due to age and illness, further prejudicing them and undermining

17

plaintiffs' ability to present their case: "the availability of a trial transcript is no substitute for a public presence at the trial itself." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 597 n.22 (1980) (Brennan, J., concurring).

A retrial would allow defendants to treat the first trial as a dry run, take advantage of the fading of memories and loss of witnesses due to the passage of time, and then drag this case out for many more years of appeals—the polar opposite of finality, and contrary to the expression of federal policy in the PSJVTA. Restoring plaintiffs' jury verdict will end this litigation, providing *actual* finality for the parties and justice for terror victims.

Additionally, the protection of "fundamental international norms is an important jurisdiction-related interest." *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1674 (2013) (Breyer, J., concurring) (citing Pierre N. Leval, *The Long Arm of International Law: Giving Victims of Human Rights Abuses Their Day in Court*, Foreign Affairs (2013)). The terror campaign orchestrated by defendants violated such norms. At trial, *defendants' own expert*, a respected human rights lawyer, characterized the terror attacks at issue here as "crimes against humanity, absolutely." JA-7530. Atrocities like those at issue in this case are universally condemned by nearly every nation. *See* International Convention for the Suppression of the Financing of Terrorism, 39 I.L.M. 268 (joined by 189 nations, *see* https://bit.ly/ICSFT_ Parties); International Convention for the Suppression of Terrorist Bombings, 2149 U.N.T.S. 256 (joined by 170 nations, *see* https://bit.ly/ICSTB_Parties). Yet defendants did not merely tolerate these attacks; they incited them through official channels, organized and executed them though their senior officers, participated in them

18

through employees, and rewarded them with systematic pay and promotions to convicted perpetrators.

Finally, defendants twice argued to the Supreme Court that "finality" is an independent ground for upholding the judgment of this Court. *See* BIO at 12-14 (No. 19-764); BIO at 28 (No. 24-20). But the Supreme Court rejected that argument each time, deeming defendants' finality objections insufficient to preclude application of governing legal principles. This Court should follow the Supreme Court's approach.

\* \* \* \* \*

As this Court has said, the terror attacks that "victimized these plaintiffs" and gave rise to this suit "were unquestionably horrific," and plaintiffs' claims are "morally compelling." *Waldman I*, 835 F.3d at 344; *see Waldman III*, 82 F.4th at 73-74; *Fuld*, 82 F.4th at 105. The Supreme Court has now clarified the applicable law, holding that due process permits the exercise of jurisdiction here. If this Court views application of the PSJVTA to this case as discretionary, it should exercise that discretion in favor of plaintiffs.

## II. THIS COURT SHOULD REMAND WITH INSTRUCTIONS TO REINSTATE THE JUDGMENT CONSISTENT WITH THE JURY VERDICT

This Court did not reach the remaining issues raised by the parties on appeal from the district court's final judgment: defendants' objections to the use of expert testimony at trial and plaintiffs' cross-appeal. *See Waldman I*, 835 F.3d at 322. These issues need not long detain the Court. Plaintiffs have dropped their cross-appeal. And defendants' "void judgment" theory and expert objections are makeweights. Defendants failed even to mention the expert-testimony issue, and touched on the

19

void-judgment issue only briefly, during oral argument. The Court should resolve those two issues by summary order based on the briefs filed in 2023. See App'x 3, 175-87, 207-14, 243-64.

## **CONCLUSION**

This Court should VACATE its 2016 judgment, REMAND to the district court with instructions to reinstate judgment on the jury verdict, and AWARD plaintiffs their costs.

Dated: August 11, 2025
New York, New York

Respectfully submitted,

Allon Kedem
John P. Elwood
Dirk C. Phillips
Stephen K. Wirth
Daniel Yablon
Arnold & Porter
  Kaye Scholer LLP
601 Massachusetts Ave, NW
Washington, DC 20001
(202) 942-6234

Brian Williams
Arnold & Porter
  Kaye Scholer LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
(303) 833-2322

Kent A. Yalowitz
  *Kent.Yalowitz@arnoldporter.com*
Nicole L. Masiello
Arnold & Porter
  Kaye Scholer LLP
250 West 55th Street
New York, NY 10019
(212) 836-8344

*Counsel for Plaintiffs-Appellants*

20

## CERTIFICATE OF COMPLIANCE WITH FRAP 27

I hereby certify that the foregoing motion contains 5,144 words (including footnotes and excluding caption and signature block), according to the Word Count feature in Microsoft Word.

Kent A. Yalowitz

# APPENDIX OF EXHIBITS

**Exhibit** **Page**

Jury Veridict Form (Feb. 23, 2015) ................................................................. 1

Plaintiffs' Opposition to Defendants' Motion
   to Dismiss for Judgment as a Matter of Law or
   for a New Trial (May 21, 2015) ................................................................ 22

District Court Judgment (Oct. 1, 2015) ......................................................... 97

Second Circuit Judgment (Aug. 31, 2016) .................................................. 104

Second Circuit Mandate (Nov. 28, 2016) ................................................... 107

District Court Order vacating Judgment (Dec. 1, 2016) .............................. 110

Second Circuit Order denying Motion
   to Recall Mandate (June 3, 2019) .......................................................... 111

Supreme Court Judgment (Apr. 27, 2020) .................................................. 123

Second Circuit Order remanding to District Court
   for limited purpose (Sept. 8, 2020) ........................................................ 124

Second Circuit Order lifting appeal from abeyance
   (July 20, 2022) ....................................................................................... 128

Defendants-Appellees' Merits Brief (Jan. 27, 2023) .................................. 131

Reply Brief for Plaintiffs-Appellants (March 13, 2023) ............................. 236

Secone Circuit Order denying Motion
   to Recall Mandate (Sept. 8, 2023) ......................................................... 312

Supreme Court Judgment (June 20, 2025) .................................................. 332

**A-1**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ELISE GOULD, RONALD GOULD, SHAYNA :
GOULD, JESSICA RINE, HENNA NOVACK :
WALDMAN, MORRIS WALDMAN, SHMUEL :
WALDMAN, :
  :
                   Plaintiffs, :
  :
   v. :
  :
THE PALESTINE LIBERATION :
ORGANIZATION (PLO) and THE PALESTINIAN :
AUTHORITY (PA), :
  :
                 Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**Jury Verdict Form**

04 Civ. 00397 (GBD)

## LIABILITY

**I.   JANUARY 22, 2002 – JAFFA ROAD SHOOTING**

**1.**  Did Plaintiffs prove by a preponderance of the evidence that **Defendant PLO** is liable for the **January 22, 2002** attack because the **PLO** knowingly provided material support or resources that were used in preparation for or in carrying out this attack?

      ✓ **YES**                     ____**NO**

**2.**  Did Plaintiffs prove by a preponderance of the evidence that **Defendant PA** is liable for the **January 22, 2002** attack because the **PA** knowingly provided material support or resources that were used in preparation for or in carrying out this attack?

      ✓ **YES**                     ____**NO**

**3.**  Did Plaintiffs prove by a preponderance of the evidence that **Defendant PA** is liable for the **January 22, 2002** attack because an employee of the **PA**, acting within the scope of his employment and in furtherance of the activities of the **PA**, either carried out, or knowingly provided material support or resources that were used in preparation for or in carrying out, this attack?

      ✓ **YES**                     ____**NO**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                  :

ELANA SOKOLOW, JAMIE SOKOLOW,    :
LAUREN SOKOLOW, MARK SOKOLOW,  :
RENA SOKOLOW,               :     **Jury Verdict Form**
                  :
        Plaintiffs,     :     04 Civ. 00397 (GBD)
   v.                 :
                  :
THE PALESTINE LIBERATION    :
ORGANIZATION (PLO) and THE    :
PALESTINIAN AUTHORITY (PA),   :
                  :
        Defendants.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## LIABILITY

**II.   JANUARY 27, 2002 – JAFFA ROAD BOMBING**

    1.  Did Plaintiffs prove by a preponderance of the evidence that **Defendant PLO** is liable for the **January 27, 2002** attack because the **PLO** knowingly provided material support or resources that were used in preparation for or in carrying out this attack?

        ✓ YES              ____NO

    2.  Did Plaintiffs prove by a preponderance of the evidence that **Defendant PA** is liable for the **January 27, 2002** attack because the **PA** knowingly provided material support or resources that were used in preparation for or in carrying out this attack?

        ✓ YES              ____NO

    3.  Did Plaintiffs prove by a preponderance of the evidence that **Defendant PA** is liable for the **January 27, 2002** attack because an employee of the **PA**, acting within the scope of his employment and in furtherance of the activities of the **PA**, either carried out, or knowingly provided material support or resources that were used in preparation for or in carrying out, this attack?

        ✓ YES              ____NO

**A-2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ALAN BAUER, BINYAMIN BAUER, DANIEL
BAUER, YEHONATHON BAUER, YEHUDA
BAUER,

**Jury Verdict Form**

Plaintiffs,

04 Civ. 00397 (GBD)

v.

THE PALESTINE LIBERATION
ORGANIZATION (PLO) and THE
PALESTINIAN AUTHORITY (PA),

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## LIABILITY

**III.    MARCH 21, 2002 – KING GEORGE STREET BOMBING**

1.  Did Plaintiffs prove by a preponderance of the evidence that **Defendant PLO** is liable for the **March 21, 2002** attack because the **PLO** knowingly provided material support or resources that were used in preparation for or in carrying out this attack?

    ✔ **YES**                    ____ **NO**

2.  Did Plaintiffs prove by a preponderance of the evidence that **Defendant PA** is liable for the **March 21, 2002** attack because the **PA** knowingly provided material support or resources that were used in preparation for or in carrying out this attack?

    ✔ **YES**                    ____ **NO**

3.  Did Plaintiffs prove by a preponderance of the evidence that **Defendant PA** is liable for the **March 21, 2002** attack because an employee of the **PA**, acting within the scope of his employment and in furtherance of the activities of the **PA**, either carried out, or knowingly provided material support or resources that were used in preparation for or in carrying out, this attack?

    ✔ **YES**                    ____ **NO**

3

**A-3**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                       :

LEONARD MANDELKORN,            :

                 Plaintiff,    :     **Jury Verdict Form**

    v.                    :

                       :     04 Civ. 00397 (GBD)

THE PALESTINE LIBERATION     :
ORGANIZATION (PLO) and THE    :
PALESTINIAN AUTHORITY (PA),    :

                       :

            Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## LIABILITY

### IV.    JUNE 19, 2002 – FRENCH HILL BOMBING

1. Did Plaintiffs prove by a preponderance of the evidence that **Defendant PLO** is liable for the **June 19, 2002** attack because the **PLO** knowingly provided material support or resources that were used in preparation for or in carrying out this attack?

            ✓ **YES**               ____ **NO**

2. Did Plaintiffs prove by a preponderance of the evidence that **Defendant PA** is liable for the **June 19, 2002** attack because the **PA** knowingly provided material support or resources that were used in preparation for or in carrying out this attack?

            ✓ **YES**               ____ **NO**

3. Did Plaintiffs prove by a preponderance of the evidence that **Defendant PLO** is liable for the **June 19, 2002** attack because the **PLO** knowingly provided to the al-Aqsa Martyrs' Brigade, after its designation as a Foreign Terrorist Organization, material support or resources that were used in preparation for or in carrying out this attack?

            ✓ **YES**               ____ **NO**

4. Did Plaintiffs prove by a preponderance of the evidence that **Defendant PA** is liable for the **June 19, 2002** attack because the **PA** knowingly provided to the al-Aqsa Martyrs' Brigade, after its designation as a Foreign Terrorist Organization, material support or resources that were used in preparation for or in carrying out this attack?

            ✓ **YES**               ____ **NO**

**A-4**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

KATHERINE BAKER, ESTATE OF BENJAMIN  :
BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD :
BLUTSTEIN, ESTATE OF DIANE CARTER,     :       **<u>Jury Verdict Form</u>**
LARRY CARTER, SHAUN CHOFFEL, ROBERT  :
L. COULTER JR., DIANE COULTER MILLER,  :       04 Civ. 00397 (GBD)
ROBERT L. COULTER SR., ESTATE OF JANIS :
RUTH COULTER, ESTATE OF DAVID GRITZ,  :
NEVENKA GRITZ (on behalf of herself and as :
successor to NORMAN GRITZ),          :
                                :
                 Plaintiffs,    :
    v.                            :
                                :

THE PALESTINE LIBERATION          :
ORGANIZATION (PLO) and THE PALESTINIAN :
AUTHORITY (PA),                 :
                                :
                Defendants.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>LIABILITY</u>

**V.    JULY 31, 2002 – HEBREW UNIVERSITY BOMBING**

    **1.**  Did Plaintiffs prove by a preponderance of the evidence that **Defendant PLO** is liable for the **July 31, 2002** attack because the **PLO** knowingly provided material support or resources that were used in preparation for or in carrying out this attack?

             ✓**YES**                    ____**NO**

    **2.**  Did Plaintiffs prove by a preponderance of the evidence that **Defendant PA** is liable for the **July 31, 2002** attack because the **PA** knowingly provided material support or resources that were used in preparation for or in carrying out this attack?

             ✓**YES**                    ____**NO**

    **3.**  Did Plaintiffs prove by a preponderance of the evidence that **Defendant PA** is liable for the **July 31, 2002** attack because an employee of the **PA**, acting within the scope of his employment and in furtherance of the activities of the **PA**, either carried out, or knowingly provided material support or resources that were used in preparation for or in carrying out, this attack?

             ✓**YES**                    ____**NO**

5

**A-5**

**A-6**

4. Did Plaintiffs prove by a preponderance of the evidence that **Defendant PLO** is liable for the **July 31, 2002** attack because the **PLO** knowingly provided to Hamas, after its designation as a Foreign Terrorist Organization, material support or resources that were used in preparation for or in carrying out this attack?

      ✓ YES             ____NO

5. Did Plaintiffs prove by a preponderance of the evidence that **Defendant PA** is liable for the **July 31, 2002** attack because the **PA** knowingly provided to Hamas, after its designation as a Foreign Terrorist Organization, material support or resources that were used in preparation for or in carrying out this attack?

      ✓ YES             ____NO

6. Did Plaintiffs prove by a preponderance of the evidence that **Defendant PLO** is liable for the **July 31, 2002** attack because the **PLO** harbored or concealed a person who the **PLO** knew, or had reasonable grounds to believe, committed or was about to commit this attack?

      ✓ YES             ____NO

7. Did Plaintiffs prove by a preponderance of the evidence that **Defendant PA** is liable for the **July 31, 2002** attack because the **PA** harbored or concealed a person who the **PA** knew, or had reasonable grounds to believe, committed or was about to commit this attack?

      ✓ YES             ____NO

6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                    :

CHANA GOLDBERG, ELIEZER GOLDBERG,   :
ESTHER GOLDBERG, KAREN GOLDBERG,   :
SHOSHANA GOLDBERG, TZVI GOLDBERG,   :   **Jury Verdict Form**
YAAKOV GOLDBERG, YITZHAK GOLDBERG, :
                    :   04 Civ. 00397 (GBD)
           Plaintiffs,     :

    v.                 :

                    :
THE PALESTINE LIBERATION      :
ORGANIZATION (PLO) and THE PALESTINIAN :
AUTHORITY (PA),          :

                   :
          Defendants.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## LIABILITY

**VI.**    **JANUARY 29, 2004 – BUS NO. 19 BOMBING**

    **1.**   Did Plaintiffs prove by a preponderance of the evidence that **Defendant PLO** is liable for the **January 29, 2004** attack because the **PLO** knowingly provided material support or resources that were used in preparation for or in carrying out this attack?

               ✓ **YES**                   ____**NO**

    **2.**   Did Plaintiffs prove by a preponderance of the evidence that **Defendant PA** is liable for the **January 29, 2004** attack because the **PA** knowingly provided material support or resources that were used in preparation for or in carrying out this attack?

               ✓ **YES**                   ____**NO**

    **3.**   Did Plaintiffs prove by a preponderance of the evidence that **Defendant PA** is liable for the **January 29, 2004** attack because an employee of the **PA**, acting within the scope of his employment and in furtherance of the activities of the **PA**, either carried out, or knowingly provided material support or resources that were used in preparation for or in carrying out, this attack?

               ✓ **YES**                   ____**NO**

7

**A-7**

A-8

4. Did Plaintiffs prove by a preponderance of the evidence that **Defendant PLO** is liable for the **January 29, 2004 attack** because the **PLO** knowingly provided to the al-Aqsa Martyrs' Brigade, after its designation as a Foreign Terrorist Organization, material support or resources that were used in preparation for or in carrying out this attack?

✓ YES                    ____NO

5. Did Plaintiffs prove by a preponderance of the evidence that **Defendant PA** is liable for the **January 29, 2004 attack** because the **PA** knowingly provided to the al-Aqsa Martyrs' Brigade, after its designation as a Foreign Terrorist Organization, material support or resources that were used in preparation for or in carrying out this attack?

✓ YES                    ____NO

A-8

IF YOU ANSWERED "YES" IN RESPONSE TO AT LEAST ONE PREVIOUS QUESTION, PLEASE PROCEED TO ANSWER THE RELATED DAMAGES QUESTIONS BEGINNING ON PAGE 10.  IF YOU ANSWERED "NO" IN RESPONSE TO EVERY PREVIOUS QUESTION, YOU SHOULD PROCEED NO FURTHER.

9

**A-9**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| ELISE GOULD, RONALD GOULD, SHAYNA GOULD, JESSICA RINE, HENNA NOVACK WALDMAN, MORRIS WALDMAN, SHMUEL WALDMAN, | **<u>Jury Verdict Form</u>** |
| Plaintiffs, | 04 Civ. 00397 (GBD) |
| v. | |
| THE PALESTINE LIBERATION ORGANIZATION (PLO) and THE PALESTINIAN AUTHORITY (PA), | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>DAMAGES</u>

**I.   JANUARY 22, 2002 – JAFFA ROAD SHOOTING**

1.  What amount of damages, if any, do you award as compensation for Plaintiff **Elise Gould's** injuries that you determine were caused by the **January 22, 2002** terrorist attack?

    $ 3,000,000.00

2.  What amount of damages, if any, do you award as compensation for Plaintiff **Ronald Gould's** injuries that you determine were caused by the **January 22, 2002** terrorist attack?

    $ 3,000,000.00

3.  What amount of damages, if any, do you award as compensation for Plaintiff **Shayna Gould's** injuries that you determine were caused by the **January 22, 2002** terrorist attack?

    $ 20,000,000.00

4.  What amount of damages, if any, do you award as compensation for Plaintiff **Jessica Rine's** injuries that you determine were caused by the **January 22, 2002** terrorist attack?

    $ 3,000,000.00

**A-10**

5. What amount of damages, if any, do you award as compensation for Plaintiff **Henna Novack Waldman's** injuries that you determine were caused by the **January 22, 2002** terrorist attack?

$2,500,000.00

6. What amount of damages, if any, do you award as compensation for Plaintiff **Morris Waldman's** injuries that you determine were caused by the **January 22, 2002** terrorist attack?

$1,500,000.00

7. What amount of damages, if any, do you award as compensation for Plaintiff **Shmuel Waldman's** injuries that you determine were caused by the **January 22, 2002** terrorist attack?

$7,500,000.00

**A-11**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :

ELANA SOKOLOW, JAMIE SOKOLOW,      :
LAUREN SOKOLOW, MARK SOKOLOW,    :
RENA SOKOLOW,                       :     **Jury Verdict Form**
                                      :

               Plaintiffs,     :     04 Civ. 00397 (GBD)
    v.                          :
                                        :
THE PALESTINE LIBERATION         :
ORGANIZATION (PLO) and THE       :
PALESTINIAN AUTHORITY (PA),      :
                                        :
             Defendants.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DAMAGES

**II.    JANUARY 27, 2002 – JAFFA ROAD BOMBING**

1.  What amount of damages, if any, do you award as compensation for Plaintiff **Elana Sokolow's** injuries that you determine were caused by the **January 27, 2002** terrorist attack?

$ 2,500,000.00

2.  What amount of damages, if any, do you award as compensation for Plaintiff **Jamie Sokolow's** injuries that you determine were caused by the **January 27, 2002** terrorist attack?

$ 6,500,000.00

3.  What amount of damages, if any, do you award as compensation for Plaintiff **Lauren Sokolow's** injuries that you determine were caused by the **January 27, 2002** terrorist attack?

$ 5,000,000.00

4.  What amount of damages, if any, do you award as compensation for Plaintiff **Mark Sokolow's** injuries that you determine were caused by the **January 27, 2002** terrorist attack?

$ 5,000,000.00

12

**A-12**

A-13

5. What amount of damages, if any, do you award as compensation for Plaintiff **Rena Sokolow's** injuries that you determine were caused by the **January 27, 2002** terrorist attack?

$ 7,500,000.00

13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ALAN BAUER, BINYAMIN BAUER, DANIEL
BAUER, YEHONATHON BAUER, YEHUDA
BAUER,

              Plaintiffs,

    v.

THE PALESTINE LIBERATION
ORGANIZATION (PLO) and THE
PALESTINIAN AUTHORITY (PA),

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**Jury Verdict Form**

04 Civ. 00397 (GBD)

## DAMAGES

### III.   MARCH 21, 2002 – KING GEORGE STREET BOMBING

1. What amount of damages, if any, do you award as compensation for Plaintiff **Alan Bauer's** injuries that you determine were caused by the **March 21, 2002** terrorist attack?

    $ 7,000,000.00

2. What amount of damages, if any, do you award as compensation for Plaintiff **Binyamin Bauer's** injuries that you determine were caused by the **March 21, 2002** terrorist attack?

    $ 1,000,000.00

3. What amount of damages, if any, do you award as compensation for Plaintiff **Daniel Bauer's** injuries that you determine were caused by the **March 21, 2002** terrorist attack?

    $ 1,000,000.00

4. What amount of damages, if any, do you award as compensation for Plaintiff **Yehonathon Bauer's** injuries that you determine were caused by the **March 21, 2002** terrorist attack?

    $ 25,000,000.00

14

**A-14**

A-15

5. What amount of damages, if any, do you award as compensation for Plaintiff **Yehuda Bauer's** injuries that you determine were caused by the **March 21, 2002** terrorist attack?

$ 1,000,000.00

**A-15**

A-16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                  :

LEONARD MANDELKORN,           :

                    :

            Plaintiff,     :   **Jury Verdict Form**

   v.               :

                    :   04 Civ. 00397 (GBD)

THE PALESTINE LIBERATION   :
ORGANIZATION (PLO) and THE   :
PALESTINIAN AUTHORITY (PA),  :

                    :

         Defendants.   :

                    :

                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DAMAGES

**IV.   JUNE 19, 2002 – FRENCH HILL BOMBING**

1.   What amount of damages, if any, do you award as compensation for Plaintiff **Leonard Mandelkorn's** injuries that you determine were caused by the **June 19, 2002** terrorist attack?

$ 10,000,000.00

16

**A-16**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                         :

KATHERINE BAKER, ESTATE OF BENJAMIN : 
BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD : 
BLUTSTEIN, ESTATE OF DIANE CARTER, LARRY : 
CARTER, SHAUN CHOFFEL, ROBERT L. : 
COULTER JR., DIANE COULTER MILLER, : 
ROBERT L. COULTER SR., ESTATE OF JANIS : 
RUTH COULTER, ESTATE OF DAVID GRITZ, : 
NEVENKA GRITZ (on behalf of herself and as : 
successor to NORMAN GRITZ), :

                Plaintiffs, :

   v. :

THE PALESTINE LIBERATION ORGANIZATION : 
(PLO) and THE PALESTINIAN AUTHORITY (PA), :

              Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**Jury Verdict Form**

04 Civ. 00397 (GBD)

## DAMAGES

**V.**   **JULY 31, 2002 – HEBREW UNIVERSITY BOMBING**

1. What amount of damages, if any, do you award as compensation for Plaintiff **Katherine Baker's** injuries that you determine were caused by the **July 31, 2002** terrorist attack?

$ 6,000,000.00

2. What amount of damages, if any, do you award as compensation for Plaintiff **Benjamin Blutstein's** injuries that you determine were caused by the **July 31, 2002** terrorist attack?

$ 2,500,000.00

3. What amount of damages, if any, do you award as compensation for Plaintiff **Rebekah Blutstein's** injuries that you determine were caused by the **July 31, 2002** terrorist attack?

$ 4,000,000.00

17

**A-17**

4. What amount of damages, if any, do you award as compensation for Plaintiff **Richard Blutstein's** injuries that you determine were caused by the **July 31, 2002** terrorist attack?

$ _6,000,000.00_

5. What amount of damages, if any, do you award as compensation for Plaintiff **Diane Carter's** injuries that you determine were caused by the **July 31, 2002** terrorist attack?

$ _1,000,000.00_

6. What amount of damages, if any, do you award as compensation for Plaintiff **Larry Carter's** injuries that you determine were caused by the **July 31, 2002** terrorist attack?

$ _6,500,000.00_

7. What amount of damages, if any, do you award as compensation for Plaintiff **Shaun Choffel's** injuries that you determine were caused by the **July 31, 2002** terrorist attack?

$ _1,500,000.00_

8. What amount of damages, if any, do you award as compensation for Plaintiff **Robert L. Coulter Jr.'s** injuries that you determine were caused by the **July 31, 2002** terrorist attack?

$ _3,000,000.00_

9. What amount of damages, if any, do you award as compensation for Plaintiff **Diane Coulter Miller's** injuries that you determine were caused by the **July 31, 2002** terrorist attack?

$ _3,000,000.00_

10. What amount of damages, if any, do you award as compensation for Plaintiff **Robert L. Coulter Sr.'s** injuries that you determine were caused by the **July 31, 2002** terrorist attack?

$ _7,500,000.00_

18

**A-18**

A-19

11. What amount of damages, if any, do you award as compensation for Plaintiff **Janis Ruth Coulter's** injuries that you determine were caused by the **July 31, 2002** terrorist attack?

$ 2,500,000.00

12. What amount of damages, if any, do you award as compensation for Plaintiff **David Gritz's** injuries that you determine were caused by the **July 31, 2002** terrorist attack?

$ 2,500,000.00

13. What amount of damages, if any, do you award as compensation for Plaintiff **Nevenka Gritz's** injuries that you determine were caused by the **July 31, 2002** terrorist attack?

$ 10,000,000.00

14. What amount of damages, if any, do you award to Plaintiff **Nevenka Gritz as successor to Norman Gritz** as compensation for Plaintiff **Norman Gritz's** injuries that you determine were caused by the **July 31, 2002** terrorist attack?

$ 2,500,000.00

19

**A-19**

A-20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

CHANA GOLDBERG, ELIEZER GOLDBERG,  :
ESTHER GOLDBERG, KAREN GOLDBERG,  :
SHOSHANA GOLDBERG, TZVI GOLDBERG,  :   **Jury Verdict Form**
YAAKOV GOLDBERG, YITZHAK GOLDBERG, :
                            :   04 Civ. 00397 (GBD)
                            :

              Plaintiffs,   :
    v.                         :
                            :
THE PALESTINE LIBERATION         :
ORGANIZATION (PLO) and THE PALESTINIAN :
AUTHORITY (PA),               :
                            :
             Defendants.  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DAMAGES

**VI.**   **JANUARY 29, 2004 – BUS NO. 19 BOMBING**

1. What amount of damages, if any, do you award as compensation for Plaintiff **Chana Goldberg's** injuries that you determine were caused by the **January 29, 2004** terrorist attack?

   $ 8,000,000.00

2. What amount of damages, if any, do you award as compensation for Plaintiff **Eliezer Goldberg's** injuries that you determine were caused by the **January 29, 2004** terrorist attack?

   $ 4,000,000.00

3. What amount of damages, if any, do you award as compensation for Plaintiff **Esther Goldberg's** injuries that you determine were caused by the **January 29, 2004** terrorist attack?

   $ 8,000,000.00

4. What amount of damages, if any, do you award as compensation for Plaintiff **Karen Goldberg's** injuries that you determine were caused by the **January 29, 2004** terrorist attack?

   $ 13,000,000.00

20

**A-21**

5. What amount of damages, if any, do you award as compensation for Plaintiff **Shoshana Goldberg's** injuries that you determine were caused by the **January 29, 2004** terrorist attack?

$ 4,000,000.00

6. What amount of damages, if any, do you award as compensation for Plaintiff **Tzvi Goldberg's** injuries that you determine were caused by the **January 29, 2004** terrorist attack?

$ 2,000,000.00

7. What amount of damages, if any, do you award as compensation for Plaintiff **Yaakov Goldberg's** injuries that you determine were caused by the **January 29, 2004** terrorist attack?

$ 1,000,000.00

8. What amount of damages, if any, do you award as compensation for Plaintiff **Yitzhak Goldberg's** injuries that you determine were caused by the **January 29, 2004** terrorist attack?

$ 6,000,000.00

**A-21**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**A-22**

---

MARK I. SOKOLOW, *et al.*,

                           Plaintiffs,

        vs.

THE PALESTINE LIBERATION
ORGANIZATION, *et al.*,

                          Defendants.

No. 04 Civ. 00397 (GBD) (RLE)

---

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL

Arnold & Porter LLP
399 Park Avenue
New York, NY  10022-4690
(212) 715-1113 [tel]
(212) 715-1399 [fax]

*Counsel for Plaintiffs*

May 21, 2015

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

I.     LEGAL STANDARD.................................................................................... 1

II.    THE JURY'S VERDICT WAS SUPPORTED BY OVERWHELMING EVIDENCE .... 1

     A.    Common Evidence Supported the Jury's Findings on Scope of Employment and Material Support.................................................................. 2

          1.    Scope of Employment............................................................. 2

          2.    Material Support .................................................................... 4

     B.    Each of the Attacks Was Supported by Ample Specific Evidence......................... 6

          1.    January 22, 2002 Jaffa Street Shooting................................... 6

          2.    January 27, 2002 Wafa Idris Bombing .................................. 8

          3.    March 21, 2002 King George Street Bombing ...................... 10

          4.    June 19, 2002 French Hill Bombing...................................... 12

          5.    July 31, 2002 Hebrew University Bombing ............................ 13

          6.    January 29, 2004 Bus No. 19 Bombing ................................. 15

     C.    Proximate Cause and Knowledge ........................................................ 16

     D.    Defendants Did Not Present Countervailing Evidence........................................ 17

III.   PLAINTIFFS' LIABILITY EXPERTS OFFERED PROPER TESTIMONY ................. 18

     A.    Expert Testimony Is Appropriate and Customary In Terrorism Cases................. 19

     B.    Alon Eviatar and Israel Shrenzel Were Appropriately Qualified as Experts........ 20

          1.    Alon Eviatar.......................................................................... 20

          2.    Israel Shrenzel....................................................................... 21

     C.    Plaintiffs' Experts Did Not Offer Lay Opinions On Ultimate Issues ................... 22

     D.    Shrenzel and Evitar Did Not Offer Improper State of Mind Testimony .............. 24

     E.    Plaintiffs' Experts Properly Opined On Defendants' Policies............................. 24

     F.    The *Gilmore* Court's Opinion About Eviatar Is Inapposite................................ 25

**A-23**

IV.     DEFENDANTS' RULE 403 ARGUMENTS ARE FRIVOLOUS ................................ 26

      A.     Rule 403 Did Not Require Plaintiffs to Sanitize Their Case .............................. 26

      B.     Admission of the PA Police Magazines Was Proper ........................................... 27

      C.     Admission of Indictments and Custodial Statements in this Case Was Proper .... 30

      D.     Defendants Were Not Limited In Presentation of Their Defense At Trial .......... 31

      E.     Exclusion of Defendants' Proposed Trial Exhibits 29 and 70 Was Proper ......... 34

V.     THE COURT'S DECISION NOT TO SEVER WAS A PROPER EXERCISE OF DISCRETION .................................................................................................................. 35

      A.     Demonstrative Aids And Organizational Tools Prevented Jury Confusion ......... 35

      B.     Any Spillover Prejudice Was Cured by Instructions ........................................... 36

VI.     THE COURT'S JURY INSTRUCTIONS WERE SOUND ...................................... 37

      A.     The Court Correctly Included An Instruction On *Respondeat Superior* ............. 37

      B.     The Court's Agency and *Respondeat Superior* Instructions Were Sound ........... 39

VII.     PLAINTIFFS' SUMMATION WAS APPROPRIATE ................................................. 41

VIII.     THE JURY'S DAMAGES VERDICT DOES NOT SHOCK THE CONSCIENCE ....... 43

      A.     The Court Correctly Permitted Counsel to Recommend Specific Damages ........ 43

      B.     The Jury Verdict Does Not Shock the Conscience .............................................. 44

IX.     THE COURT SHOULD DENY THE "RENEWED" MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION ............................................................... 47

      A.     Defendants Waived Their Jurisdictional Arguments .......................................... 47

      B.     Alternate Grounds Establish Personal Jurisdiction .............................................. 50

           1.     The Fifth Amendment Applies and Is Less Restrictive than the Fourteenth Amendment ................................................................................. 51

           2.     The Court Has Specific Jurisdiction Even Under Fourteenth Amendment Case Law ........................................................................... 53

CONCLUSION ................................................................................................................. 59

ii

A-24

## TABLE OF AUTHORITIES

**Page(s)**

<u>C<small>ASES</small></u>**:**

*Abecassis v. Wyatt*,
  785 F. Supp. 2d 614 (S.D. Tex. 2011) ...................................................................37

*Almonte v. N.Y. City Hous. Auth.*,
  No. 89 Civ. 7677 (SWK),
  1990 WL 113125 (S.D.N.Y. July 30, 1990) ..........................................................38

*Anderson v. Branen*,
  17 F.3d 552 (2d Cir. 1994) ...................................................................................39

*Apollo Fuel Oil v. United States*,
  195 F.3d 74 (1999) ................................................................................................16

*AT&T Co. v. Winback & Conserve Program*,
  42 F.3d 1421 (3d Cir. 1994) ...........................................................................38, 39

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
  305 F.3d 120 (2d Cir. 2002) .................................................................................58

*Boim v. Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008) .................................................................5, 6, 13, 42

*Boim v. Quranic Literacy Inst.*,
  No. 00 C 2905, 2005 WL 433463 (N.D. Ill. Feb. 18, 2005),
  *aff'd in relevant part, rev'd on other grounds sub nom.*
  *Boim v. Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008) ...............................................................................44

*Boim v. Quranic Literary Fund*,
  291 F.3d 1000 (7th Cir. 2002) ..............................................................................45

*CA, Inc. v. Stonebranch, Inc.*,
  No. 12 Civ. 5988(SFL)(ARL),
  2014 WL 917269 (E.D.N.Y. Jan. 27, 2014),
  *adopted in relevant part*,
  2014 WL 931223 (E.D.N.Y. Mar. 7, 2014) ..........................................................48

*Calderon-Cardona v. Democratic Peoples Republic of Korea*,
  723 F. Supp. 2d 441 (D.P.R. 2010) .......................................................................47

*Campuzano v. Islamic Republic of Iran*,
  281 F. Supp. 2d 258 (D.D.C. 2003) ................................................................45, 46

*Chew v. Dietrich*,
143 F.3d 24 (2d Cir. 1998)..................................................................51, 52, 53, 58

*Chloe v. Queen Bee of Beverly Hills, LLC*,
616 F.3d 158 (2d Cir. 2010)......................................................................53, 54, 58

*Compton v. Luckenbach Overseas Corp.*,
425 F.2d 1130 (2d Cir.1970)........................................................................................1

*Cross v. N.Y. City Transit Auth.*,
417 F.3d 241 (2d Cir. 2005)........................................................................................1

*CV Holdings, LLC v. Bernard Techs., Inc.*,
14 A.D.3d 854 (3d Dept 2005) ................................................................................48

*Daimler AG v. Bauman*,
134 S. Ct. 746 (2014)..........................................................................................49, 50

*DiSorbo v. Hoy*,
343 F.3d 172 (2d Cir. 2003)......................................................................................45

*Doe v. Guthrie Clinic, Ltd.*,
22 N.Y.3d 480 (2014) ................................................................................................12

*Duch v. Jakubek*,
588 F.3d 757 (2d Cir. 2009).......................................................................................41

*Estate of Klieman v. PA*,
2015 WL 967624 (D.D.C. Mar. 3, 2015),
*appeal filed*, No. 15-1034 (D.C. Cir. Apr. 8, 2015).....................................55, 57, 58

*Estate of Parsons v. PA*,
651 F.3d 118 (D.C. Cir. 2011) ............................................................................38, 39

*Estate of Ungar v. PA*,
325 F. Supp. 2d 15 (D.R.I. 2004),
*aff'd*, 402 F.3d 274 (1st Cir. 2005) .....................................................................46, 47

*Garnett v. Undercover Officer C0039*,
No. 1:13 Civ. 7083 (GHW),
2015 WL 1539044 (S.D.N.Y. Apr. 6, 2015).............................................................39

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 523 (E.D.N.Y. 2012) ......................................................................19

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 542 (E.D.N.Y. 2012) ......................................................................37

*Gilmore v. Palestinian Auth.*,
8 F. Supp. 3d 9, 16 (D.D.C. 2014) ..................................................................50

*Gilmore v. Palestinian Interim Self-Government Auth.*,
No. 1-853,
2014 U.S. Dist. LEXIS 102093 (D.D.C. July 28, 2014) .................................25, 26

*Goodyear Dunlop Tires Operations, SA v. Brown*,
131 S. Ct. 2846 (2011) ...............................................................................49, 50

*Gordon v. N.Y. City Bd. of Educ.*,
232 F. 3d 111 (2d Cir. 2000) ..............................................................................40

*Gucci Am., Inc. v. Li*,
768 F.3d 122 (2d Cir. 2014) ...........................................................................49, 50

*Gulf Oil Corp. v. Gilbert*,
330 U.S. 501 (1947) .............................................................................................52

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004) .............................................................................................52

*Handley v. Ind.& Mich. Elec. Co.*,
732 F.2d 1265 (6th Cir. 1984) ............................................................................51

*Haskell v. Kaman Corp.*,
743 F.2d 113 (2d Cir. 1984) ................................................................................36

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984) .............................................................................................53

*Higgens v. Islamic Republic of Iran*,
No. 99 Civ. 00377,
2000 WL 33674311 (D.D.C. Sept. 21, 2000) ....................................................45

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)..................................................................................................52

*Holland v. Islamic Republic of Iran*,
496 F. Supp. 2d 1 (D.D.C. 2005) ........................................................................45

*Holzsager v. Valley Hosp.*,
646 F.2d 792 (2d Cir. 1981)............................................................................49, 50

*In re Air Crash Near Nantucket Island*,
462 F. Supp. 2d 360 (E.D.N.Y. 2006) ................................................................46

**A-27**

*In re Boesky Sec. Litig.*,
  36 F.3d 255 (2d Cir. 1995)........................................................................12

*In re Grand Jury Subpoena*,
  707 F.2d 663 (2d Cir. 1983)......................................................................56

*In re Magnetic Audiotape Antitrust Litig.*,
  334 F.3d 204 (2d Cir. 2003)......................................................................56

*In re Parmalat Sec. Litig.*,
  474 F. Supp. 2d 547 (S.D.N.Y. 2007).......................................................38

*In re Roman Catholic Diocese of Albany, N.Y., Inc.*,
  745 F.3d 30 (2d Cir. 2014)........................................................................49

*Ira S. Bushey & Sons v. United States*,
  398 F.2d 167 (2d Cir. 1968).................................................................38, 41

*Ismail v. Cohen*,
  899 F.2d 183 (2d Cir. 1990)......................................................................45

*J. McIntyre Mach., Ltd. v. Nicastro*,
  131 S. Ct. 2780 (2011)..............................................................................54

*Jenco v. Islamic Republic of Iran*,
  154 F. Supp. 2d 27 (D.D.C. 2001).............................................................47

*Kennedy v. Mendoza-Martinez*,
  372 U.S. 144 (1963)..................................................................................57

*Kerman v. City of New York*,
  No. 96 Civ. 7865 (LMM),
  1997 WL 666261 (S.D.N.Y. Oct. 24, 1997)..............................................36

*Kirsch v. Fleet Street, Ltd.*,
  148 F.3d 149 (2d Cir. 1998)......................................................................44

*Knox v. PLO*,
  442 F. Supp. 2d 62 (S.D.N.Y. 2006).............................................37, 45, 46

*Kwon v. Yun*,
  606 F. Supp. 2d 344 (S.D.N.Y. 2009).......................................................38

*Leibovitch v. Syrian Arab Republic*,
  No 08-C-1939, 2011 WL 444762 (N.D. Ill. Feb. 1, 2011),
  *rev'd on other grounds sub nom. Liebovitch v. Islamic Republic of Iran*,
  697 F.3d 561 (7th Cir. 2012) ....................................................................19

vi

**A-28**

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013)................................................................56

*Lightfoot v. Union Carbide Corp.*,
   110 F.3d 898 (2d Cir. 1997)................................................................43

*Linde v. Arab Bank PLC*,
   706 F.3d 92 (2d Cir. 2013)..................................................................53

*Linde v. Arab Bank PLC*,
   04 Civ. 2799 (BMC),
   2015 U.S. Dist. LEXIS 45903 (E.D.N.Y. Apr. 8, 2015) ...............37, 39, 42

*Linde v. Arab Bank, PLC*,
   922 F. Supp. 2d 316 (E.D.N.Y. 2013) ................................................19

*Linde v. Arab Bank*,
   920 F. Supp. 2d 282 (E.D.N.Y. 2011) ................................................31

*Livnat v. PA.*,
   13-CV-00498 (E.D. Va. June 5, 2013) ................................................50

*Livnat v. PA*,
   No. Civ. 14-668 (CKK),
   2015 WL 558710 (D.D.C. Feb. 11, 2015),
   *appeal filed*, No. 15-7024 (D.C. Cir. Mar. 18, 2015) ..............................57

*Lore v. City of Syracuse*,
   670 F.3d 127 (2d Cir. 2012)................................................................44

*Marcic v. Reinauer Transp. Cos.*,
   397 F.3d 120 (2d Cir. 2005)................................................................41

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)...........................................................................52

*Max Daetwyler Corp. v. R. Meyer*,
   762 F.2d 290 (3d Cir. 1985)................................................................51

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos*,
   553 F.2d 842 (2d Cir. 1977)................................................................48

*Mileski v. Long Island R.R.*,
   499 F.2d 1169 (2d Cir. 1974)..............................................................44

*Mohamad v. Rajoub*,
   No. 11-18,
   2011 WL 3664462 (Aug. 19, 2001)......................................................49

vii

**A-29**

*Monaghan v. SZS 33 Assocs., L.P.*,
 827 F. Supp. 233 (S.D.N.Y. 1993)..................................................................35

*Moorhouse v. Boeing Co.*,
 501 F. Supp. 390 (E.D. Pa. 1990) ...................................................................36

*Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*,
 476 F. Supp. 2d 414 (S.D.N.Y. 2007)............................................................40

*Mullen v. Princess Anne Volunteer Fire Co.*,
 853 F.2d 1130 (4th Cir. 1988) ..................................................................27, 29

*Neirbo Co. v. Bethlehem Shipbuilding Corp.*,
 308 U.S. 165 (1939)..........................................................................................49

*Nimely v. City of N.Y.*,
 414 F.3d 381 (2d Cir. 2005)..............................................................................22

*Owen v. Thermatool Corp.*,
 155 F. 3d 137 (2d Cir. 1998).............................................................................39

*Patterson v. Balsamico*,
 440 F.3d 104 (2d Cir. 2006)..............................................................................41

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
 290 F. Supp. 2d 54 (D.D.C. 2003)...................................................................53

*Reilly v. Natwest Mkts. Grp.*,
 181 F. 3d 253 (2d Cir. 1999).............................................................................41

*Republic of Panama v. BCCI Holdings (Luxembourg) SA*,
 119 F.3d 935 (11th Cir.1997) ...........................................................................51

*Richardson Greenshields Secs., Inc. v. Metz*,
 566 F. Supp. 131 (S.D.N.Y. 1983)...................................................................48

*Riviello v. Waldron*,
 47 N.Y.2d 297 (1979) .........................................................................................2

*Robinson v. Runyon*,
 149 F.3d 507 (6th Cir. 1998) ............................................................................29

*Rodriguez v. Senor Frog's de la Isla*,
 642 F.3d 28 (1st Cir. 2011)...............................................................................43

*Rothstein v. UBS AG*,
 708 F.3d 82 (2d Cir. 2013)..........................................................................16, 17

*Schermerhorn v. Local 100*,
  91 F. 3d 316 (2d Cir. 1996)......................................................39, 41

*SEC v. LovesLines Overseas Mgmt., Ltd.*,
  No. 04 Misc. 302 (RWR) (AK),
  2007 WL 581909 (D.D.C. Feb. 21, 2007) ..............................................51

*SEC v. Straub*,
  921 F. Supp. 2d 244 (S.D.N.Y. 2013)..................................................58

*SEC v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013)..................................................22

*SEC v. Unifund SAL*,
  910 F.2d 1028 (2d Cir. 1990)......................................................52, 56

*Shrader v. CSX Transp., Inc.*,
  70 F.3d 255 (2d Cir. 1995)..........................................................47

*Stanford v. Kuwait Airways Corp.*,
  89 F.3d 117 (2d Cir. 1996)..........................................................16

*Strauss v. Microsoft Corp.*,
  No. 91 Civ. 5928(SWK),
  1995 WL 326492 (S.D.N.Y. June 1, 1995) ............................................29

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001)..........................................................38

*Sutherland v. Islamic Republic of Iran*,
  151 F. Supp. 2d 27 (D.D.C. 2001) ..................................................47

*Taber v. Maine*,
  67 F.3d 1029 (2d Cir. 1995)..........................................................41

*United States v. Al Kassar*,
  660 F.3d 108 (2d Cir. 2011)......................................................53, 56

*United States v. Chavez*,
  229 F.3d 946 (10th Cir. 2000) ......................................................25

*United States v. Cross*,
  308 F.3d 308 (3d Cir. 2002)..........................................................26

*United States v. DeMuro*,
  677 F.3d 550 (3d Cir. 2012)..........................................................26

**A-31**

*United States v. Figueroa*,
    618 F.2d 934 (2d Cir. 1980) .......................................................26, 27

*United States v. Gartmon*,
    146 F.3d 1015 (D.C. Cir. 1998) ...........................................................26

*United States v. Kassir*,
    No. S2 04 Cr. 356(JFK),
    2009 WL 910767 (S.D.N.Y. Apr. 2, 2009) ...............................20, 21, 22

*United States v. Koppers Co.*,
    652 F.2d 290 (2d Cir. 1981) ..........................................................39, 40

*United States v. Paracha*,
    No. 03 Cr. 1197(SHS),
    2006 WL 12768 (S.D.N.Y. Jan. 3, 2006) ..........................................21, 22

*United States v. Roldan-Zapata*,
    916 F.2d 795 (2d. Cir. 1990) ...............................................................9

*United States v. Toner*,
    728 F.2d 115 (2d Cir. 1984) ...............................................................31

*United States v. Twentieth Century Fox Film Corp.*,
    882 F.2d 656 (2d Cir. 1989) ...............................................................16

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003) ...........................................................53, 56

*United States v. Zichettello*,
    208 F.3d 72 (2d. Cir. 2000) ..................................................................9

*Wachsman v. Islamic Republic of Iran*,
    603 F. Supp. 2d 148 (D.D.C. 2009) .....................................................19

*Weiming Chen v. Ying-Jeou Ma*,
    595 F. App'x 79 (2d Cir. 2015) ...........................................................47

*Wilson v. City of Aliceville*,
    779 F.2d 631 (11th Cir. 1986) ............................................................29

*World-Wide Volkswagen v. Woodson*,
    444 U.S. 286 (1980) ...........................................................................51

**STATUTES:**

18 U.S.C. § 2331(1)(B) ............................................................................54

18 U.S.C. § 2331(3) .................................................................................37

x

**A-32**

28 U.S.C. § 2339B ..................................................................................13, 14

Fed. R. Civ. P. 12 ......................................................................................48, 50

Fed. R. Civ. P. 42(b) .......................................................................................35

Fed. R. Civ. P. 50 ...............................................................................................1

Fed. R. Civ. P. 59 ...............................................................................................1

Fed. R. Evid. 403 ...............................................................26, 27, 29, 34

Fed. R. Evid. 704(a) .......................................................................................22

Fed. R. Evid. 804(b)(1) ...................................................................................14

**OTHER AUTHORITIES:**

N.Y. Pattern Jury Instr., Civil, 2:235 ..........................................30, 40, 41

N.Y. Pattern Jury Instr., Civil, 2:236 ...........................................................40

N.Y. Pattern Jury Instr., Civil, 2:277A .........................................................44

*Restatement (Third) of Agency* § 7.07 (2006) ...........................................38

Leonard B. Sand, 4-72 *Modern Fed. Jury Instr.*, Civil P. 72.01 ..................40

Charles A.Wright & Arthur R. Miller, *et al.*,
   *Personal Jurisdiction in Federal Question Cases*,
   4 Fed. Practice & Procedure Civil § 1068.1 (3d ed.)..........................51, 52

**A-33**

## I.  LEGAL STANDARD

In reviewing a Rule 50 motion, a court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Cross v. N.Y. City Transit Auth.,* 417 F.3d 241, 247 (2d Cir. 2005) (citations omitted).  The burden on the moving party is "particularly heavy where the jury has deliberated in the case and actually returned its verdict . . . ." *Id.* at 248.  On a Rule 59 motion, the court "may not disturb the jury's verdict unless there was no substantial evidence to support it." *Compton v. Luckenbach Overseas Corp.,* 425 F.2d 1130, 1133 (2d Cir.1970).  "The judge's duty is essentially to see that there is no miscarriage of justice." *Id.*

## II.  THE JURY'S VERDICT WAS SUPPORTED BY OVERWHELMING EVIDENCE

The jury's verdict was supported by overwhelming evidence that defendants provided material support and resources to the terrorists and terror groups who committed the six attacks at issue in this case, and that PA employees committed or supported five of those six within the scope of their employment.  The core evidence before the jury included:  (1) financial records showing payments from the PA to actual terrorists; (2) convictions of PA security officers for terrorism and high-level PLO and PA officials for orchestrating the terror campaign; (3) official reports from the U.S. and Israeli Governments confirming the link between defendants and the terrorists; (4) personnel records showing pay and promotion of convicted terrorists; (5) PA intelligence records showing knowledge and approval of the conduct of convicted terrorists; (6) PA publications encouraging terrorism; and (7) evidence of a wide-spread policy supporting and approving terror by employees and non-employees, including a law institutionalizing payments to terrorists, hundreds of employees and non-employees in jail for terror crimes and on the payroll as a result of "their fight for their country," and payments to the families of suicide terrorists.

**A-34**

**A.      Common Evidence Supported the Jury's Findings on Scope of Employment and Material Support**

**1.      Scope of Employment**

The jury's findings on *respondeat superior* liability were supported by overwhelming evidence applicable to all five attacks that went to the jury on this theory.

First, the jury heard extensive testimony about the connection between the time, place and occasion for the terrorist attacks. *See Riviello v. Waldron*, 47 N.Y.2d 297, 304 (1979). Plaintiffs' experts testified about the four-year period of violence known as the Al-Aqsa Intifada during which all of the attacks occurred. Tr. 414-514 (Eviatar) (explaining duration and nature of Al-Aqsa Intifada).[1] They also heard about the role of defendants' leader, Yasser Arafat, throughout that period. Tr. 457, 770-71 (Eviatar) (explaining significance of Arafat's dress and appearances in public with weapons). According to plaintiffs' expert, Israel Shrenzel, Arafat set the tone during the intifada, and his employees followed suit:

> The motivation [was] what Arafat preached, what Arafat decided, what Arafat condoned, what orders and what atmosphere was created by the PA, an atmosphere of an all-out attack against Israel . . . . Palestinian operatives ask themselves, what is expected from me? . . . What Arafat wants for me? What Fatah wants for me? What should I perform as a member of the security apparatuses? [T]he answer was: You should participate—his understanding was: I should take active role in the attacks against Israel.

*Id.* at 1562. The jury was entitled to consider Arafat's role as a public figure and the leader of the PA's security forces in assessing the scope of employment of the terrorists convicted here.

The record on the other *Riviello* factors was even more extensive. 47 N.Y.2d at 304 (factors include whether the act was one commonly done by such an employee, and whether specific act was one that the employer could reasonably have anticipated). The jury heard about a PA

---

[1] This brief cites the trial transcript (Jan. 13, 2015 – Feb. 23, 2015) as "Tr. __" and plaintiffs' trial exhibits as "Ex. __."

2

**A-35**

law that actually institutionalizes payments to terrorists. Ex. 512. Under that law, "[a]nyone who is kept in prisons of the occupation for offenses of participating in the struggle against the occupation" gets a PA salary. *Id.* That includes PA employees who were tasked with maintaining security but instead plotted to kill innocent people. *See* Ex. 1143 (2013 amendment to prisoner's law mandating that defendants "shall continue to pay the salary of an imprisoned employee"); Tr. 745 ("[M]any hundreds from among the Palestinian security apparatuses were involved in terrorist activities during the Intifada."). Even those who were *not* PA employees at the time they committed the attack were embraced by the PA for their crimes. *E.g.*, Exs. 66 (Abdullah), 85 (Ghanem); Ex. 17 ([Idris] was martyred during a heroic martyrdom operation against the Zionists in the occupied city of Jerusalem."). The evidence of how common it was for defendants' employees to be involved in acts of terror was corroborated by the U.S. government in an official report assessing the PLO: "[A]vailable evidence indicates that . . . members of other security forces, were frequently involved in acts of violence against Israelis." Ex. 496.

Defendants argue that "lockstep promotions . . ., payments to a prisoner . . . and references to security and moral status" are "flimsy pieces of evidence." Defs. Mem. at 48-49. Assessing the effect of those policies was the jury's task. Defendants' own witness, Michael Sfard, admitted to the jury that it would not be difficult for defendants to identify and remove from the payroll those prisoners who had been convicted of terror. Tr. 3237. The jury was entitled to credit the expert testimony and documents in the context of convicted terrorists. Such policies speak volumes about the PA's attitude toward terror, and the jury was entitled to conclude that these policies were a substantial contributing factor motivating terrorists/employees, who could easily have understood that their crimes would generate financial reward and public honor.

3

**A-36**

Finally, the jury saw actual magazines published by the PA and directed at defendants' security forces. In these official "political guidance" publications, the PA encouraged its employees to "liquidat[e]," and "exterminat[e]" Jewish civilians. Tr. 1569-70; *see, e.g.*, Exs. 198 ("They are becoming martyrs as a sacrifice for the Palestinian dream, and in compliance with the call of Al Aqsa. . . ."); 965 ("[W]e cannot but bow reverentially and respectfully to our heroic martyrs who have watered the soil of our beloved nation . . . to prove to the whole world that our Palestinian land is our right, and that blood is a small price to pay on the path to liberating and defending it."). A U.S. Government report corroborated the incendiary atmosphere created by the defendants. *See* Ex. 496 ("[S]ome senior PLO and PA leaders did little to prevent—and in some cases encouraged—acts of violence and an atmosphere of incitement to violence . . . ."). Based on these magazines alone, the jury could have concluded that the PA reasonably anticipated that its security forces—the recipients of these magazines—would carry out terror attacks.

### 2. Material Support

The record contained substantial evidence that defendants provided material support and resources to Fatah's military wing, the Al-Aqsa Martyrs Brigades ("AAMB"). The jury learned about AAMB from the PLO's own website: "Al-Aqsa Martyrs Brigades: This is the military wing of the Fatah movement. . . . It carried out a number of quality military operations and offered many martyrs." Ex. 1052. According to a U.S. Government report, "[m]embers of AAMB are drawn largely from grass roots Fatah Tanzim." Ex. 496. Defendants' own documents confirmed the overlap. *See, e.g.*, Exs. 130, 131, 136, 140, 142, 143, 146, 153, 157, 159.

The evidence showed that the PA funded Fatah, AAMB, and defendants' employees, who were members of these organizations. For example, the jury saw documents showing actual payments from the PLO and the PA to Fatah terrorists and approval of terrorism as "quality operations." Exs. 831, 962, 963; *see* Tr. 641 (Eviatar testimony regarding Raed al-Karmi, listed in

4

**A-37**

Ex. 962); *id*. at 644-647 (comparing names on Ex. 963 with descriptions in Ex. 831). The jury saw pages and pages of financial records showing payments from the PA to Fatah. Exs. 20, 173, 958; *see* Tr. 478-480. They saw and heard evidence that such payments continued throughout the intifada. Ex. 631 at 1 (Israel Defense Forces ("IDF") report indicating that "large sums of money are transferred on a monthly basis in order to finance terrorist infrastructures"). They saw evidence that Arafat worked through "'intermediaries,'" such as Marwan Barghouti and Fuad Shubaki, to distribute money for terror operations. Ex. 631 at 2. Barghouti's and Shubaki's convictions for orchestrating the terror campaign were in the record. Exs. 451, 889.

Corroborating the evidence of defendants' material support of terror was a report issued by the United States government in June 2002: "Documents . . . show direct payments from the PA to Fatah party activists, some of whom were also affiliated with the Al-Aqsa Martyrs Brigade, who had been involved in violence. The *payments were likely made with the knowledge that the intended recipients had been involved in violence and terrorism*." Ex. 496 (emphasis added). On the basis of this evidence, it was more than reasonable for the jury to conclude that the PA provided material support to AAMB throughout the relevant time period.

The jury was also entitled to find that defendants provided material support by rewarding convicted terrorists monetarily, even if those rewards came after the fact.[2] A well-publicized and consistently applied policy of compensating terrorists could certainly be a substantial contributing factor to terrorism. Tr. 1560 (Shrenzel) ("The money was a factor. It was a contributing factor to their motivation . . . ."). "[O]ne who donates money to Hamas in order to fund such payments thus could be thought to be promoting terrorism. Yet, the same could be said of a do-

---

[2] Defendants argue that this Court ruled that such payments could not be presented as material support. Defs. Mem. at 16, 30. However, the Court's summary judgment ruling about post-attack payments was limited to whether those payments were evidence of defendants' liability on a theory of ratification, *not* whether they were material support of terrorism. DE 646 at 11 n.11.

**A-38**

nor who instead makes payments directly to the family members of terrorists rather than giving the money to Hamas." *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 711 (7th Cir. 2008) (Rovner, J., concurring in part).

The jury was also entitled to find that the PA and PLO were agents for each other in providing material support. The jury heard evidence of multiple governmental bodies, including those with direct significance here, that simply switched between being under the PA and being under the PLO. Tr. 3133 (Prisoner Ministry); Tr. 3132 (Martyrs Foundation). According to defendants' own witness, Hanan Ashrawi, the decision to move the ministries back and forth was a "presidential decision." Tr. 3133. In addition, the jury saw document after document on joint PA/PLO letterhead. Exs. 14, 25, 36B, 48, 88, 89, 104, 105, 106, 108, 113, 116, 123, 127. They heard extensive testimony that Arafat had ultimate decision-making authority for all these bodies and ultimate control over the entities' finances. *See* Dep. of Hussein al-Sheikh at 140-42 ("Fatah and PLO are the same because the Fatah and the PLO budget are with Arafat."); Dep. of Salam Fayyad at 76 ("[A]fter the PA came into being, the PLO . . . ceased to have its own independent sources of funding largely. . . . [F]unding for its own operations did come from the PA.").

**B.     Each of the Attacks Was Supported by Ample Specific Evidence**

In addition to the common evidence, the jury had ample specific evidence on each attack to support their findings on both material support and *respondeat superior* liability.

**1.     January 22, 2002 Jaffa Street Shooting**

The record on defendants' liability for the January 22 shooting was overwhelming. It established that: (1) six of the eight perpetrators were PA employees at the time they planned and carried out the attack; (2) defendants approved of their employees' actions and manifested that approval through their own words and policies; and (3) AAMB was responsible for the shooting.

6

**A-39**

Defendants suggest that the only evidence of *respondeat superior* liability for the January 22, 2002 attack was that the "shooter happened to be employed by the PA's Maritime Police." Defs. Mem. at 43. But in fact, the shooter *and five others* were PA employees at the time they planned and carried out the attack. *See* Exs. 36C (Ahmed Barghouti); 3 (Nasser Aweis), 360 (Abdel Hai); 36B (Majed al-Masri); 109 (Mohamed Mousleh). All five were convicted for their roles. Exs. 357-58 (Barghouti); 362 (Aweis); 360-61 (Abdel Hai); 384 (al-Masri); 418-20 (Mousleh). That is not a coincidence, as defendants' partial review of the evidence suggests; but a pattern evincing the scope of employment for PA's security officers during the Intifada.

In further support of *respondeat superior* liability, the jury also heard evidence of defendants' approval of their employees' conduct following the attack. Defendants did not condemn a single one of these terrorists. Instead, they were all kept on the payroll; the security employees were even promoted. Ex. 36C (Barghouti); 112 (Aweis); Ex. 36B (al-Masri).[3] This is true even of Majed al-Masri, a PA civil police officer, who had received a "final warning" from his superiors in 2001 that, going forward, he would be subject to "dismissal *should he violate instructions*" and required "all competent authorities" to execute the order. Ex. 127. Apparently, al-Masri's involvement in a terrorist attack against civilians in Israel did not "violate instructions," because he is still on the PA's payroll today. Ramadan (the suicide shooter) received a posthumous promotion. Exs. 89, 123. His family receives a salary from the PA to this day. Ex. 60 at 3; Ex. 62 at 3.

Finally, defendants' own words were consistent with defendants' expressed policy of supporting the use of terrorism to achieve political goals. According to the PLO's Martyr Insti-

---

[3]  Employment records for Ibrahim Abdel Hai were not produced, but the record supports the conclusion that he too was paid and promoted following the January 22 shooting, consistent with PA law and policy. Ex. 512; DE 632-1 (stipulation).

**A-40**

tute, Ramadan was "martyred while performing his national duty." Ex. 60 at 2. According to the PA's General Intelligence Service, he was "good in terms of security and morals." Ex. 153. Similarly, after Nasser Aweis—a PA officer and the leader of the January 22 plot—was convicted of 14 counts of murder, the Ministry of Prisoner embraced Aweis' imprisonment as being "a result of his fight for his country." Ex. 76; *see* Ex. 96 (same in al-Masri's prisoner file). Nasser Aweis, too, was deemed "good in terms of security and morals" by the GIS. Ex. 140; *see* Ex. 142 (same in Barghouti's GIS file); Ex. 159 (same in Mousleh's GIS file). All this evidence supported the jury's finding that PA employees committed the January 22 attack within the scope of their employment.

The record of defendants' material support for the January 22 shooting was also overwhelming. First, every one of the perpetrators convicted of carrying out the shooting—even those who were not defendants' employees at the time—was on the PA's payroll following the attack and remains on the PA's payroll today. Exs. 1120, 1121. Those payments constitute material support. *See supra* Part II.A.2. Moreover, the jury heard and saw evidence that AAMB took credit and was responsible for the January 22 shooting. Tr. 1469-70 (Shrenzel); Ex. 153 (GIS document confirming same). The jury saw the shooter's "martyr video"—filmed shortly before his suicide mission—in which the shooter read his final will in front of an AAMB banner, wearing an AAMB headband. Ex. 196, Clip 6. Given the extensive evidence of defendants' material support to AAMB, *see supra* Part II.A.2, the jury was entitled to find the PA and PLO liable for knowingly provided material support and resources for the attack.

### 2. January 27, 2002 Wafa Idris Bombing

The jury's verdict on the January 27, 2002 bombing was supported by evidence showing that: (1) defendants attempted to cover up their role in the attack; (2) the perpetrators planned

8

**A-41**

and obtained materials for the attack from an office at the Muqataa; and (3) the AAMB claimed responsibility for the bombing.

First, plaintiffs introduced a "letter and handwritten notes created by [PA] employees" showing that the PA attempted to cover up the January 27 bombing. Ex. 233 (the "Tirawi Letter"); Tr. 1300 (parties' stipulation on Ex. 233). A cover-up is evidence of a consciousness of guilt. *See*, *e.g.*, *United States v. Zichettello*, 208 F.3d 72, 105 (2d. Cir. 2000) (efforts "to conceal the scheme" are evidence of a "consciousness of guilt"); *United States v. Roldan-Zapata*, 916 F.2d 795, 803-04 (2d. Cir. 1990) (same). The Tirawi Letter states that the commander of the General Intelligence Service, Tawfik Tirawi, called Wafa Idris's family "before anyone claimed responsibility for the attack," to request that "that the family would not announce that Wafa was the one who carried out the attack[.]" Ex. 233. Shrenzel opined that the letter reflected not only a cover-up, but also Tirawi's direct involvement based on Tirawi's other terror activities. Tr. 1594. His opinion was also supported by a handwritten note on the letter, by a PA official, stating that the letter itself shows that the PA's "General Intelligence [was] involved in the issue of Wafa Idris." Ex. 233. The jury even heard from defense witness Amnah Reehan, the letter's author herself, that the information was "important" and distributed to very senior PA security officers. Tr. 3547, 3549-50. Based on this evidence alone, it was reasonable for the jury to conclude that defendants' employees were involved in the planning and perpetration of the attack.

Plaintiffs' evidence on this attack extended beyond the Tirawi letter. The jury also saw evidence of *why* the PA would want to cover up the January 27 bombing after it occurred: the perpetrators planned and obtained a bomb for the attack from a man who held an office at the Muqataa, defendants' headquarters in the West Bank:

> I called [redacted] and told him that Wafa was prepared to carry out an attack and [redacted] asked for us to come to his office in

9

**A-42**

the Mukataa on Friday, January 25, 2002. And we came to the office, Wafa and I . . . . On Saturday, January 26, 2002, . . . at 4:00 p.m. Wafa called me . . . and asked me to come to take her, and I came and took her in my vehicle and she traveled to [redacted]'s office in the Mukataa . . . . [Redacted] asked me to bring a bag behind the door of his office . . . . I took the bag in my hand. [Redacted] told me to be careful when I bring the bag, and not to open it and to put it next to Wafa on the floor. [Redacted] told Wafa to pick up the bag and see what it weighed, and she said that it was not very heavy. Wafa asked how to activate the explosive device, and [redacted] said that he would explain it to her on the following day. We went out, Wafa and I, from the Mukataa and I went home. Ex. 467, sheets 2 and 3.

Based on this evidence, the jury reasonably concluded that Noor and Idris planned the attack alongside defendants' employee, and that that employee supplied the bomb for the attack. This evidence—in conjunction with the evidence that the head of the PA's GIS sought to cover up the attack after it occurred—amply supports the jury's verdict that a PA employee knowingly provided material support for the attack or committed it within the scope of his employment.

Finally, the jury heard evidence that the AAMB was responsible for the January 27 bombing. Tr. 1469-70. Similarly, the jury heard evidence that the PA put Munzar Noor on the payroll after he was arrested for his involvement in the attack. Ex. 26. Wafa Idris' family also receives a salary from the PA to this day. Ex. 17. Together with plaintiffs' extensive evidence of defendants' material support to AAMB, *see supra* Part II.A.2, this evidence supported the jury's finding of liability for knowingly provided material support and resources for the attack.

### 3. March 21, 2002 King George Street Bombing

Defendants try to suggest that the record on the March 21, 2002 attack is thin by simply ignoring plaintiffs' evidence. In reality, the jury's verdict on the March 21 bombing was based on substantial evidence, showing that: (1) the head of the plot was a senior officer in the PA's GIS who remains on the PA payroll to this day; (2) senior PA leadership, including Arafat him-

10

**A-43**

self, were involved in the arrest, interrogation and release of the suicide bomber from jail mere weeks before the attack; and (3) the AAMB was responsible for the bombing.

Plaintiffs' evidence on *respondeat superior* liability focused on the plot—orchestrated by senior employees of the PA's GIS—to release Mohamed Hashaika from PA prison mere weeks before the attack. *See* Ex. 1060; Tr. 1173-74. On February 10, 2002, the PA arrested and interrogated Mohamed Hashaika upon learning that he had wanted to perpetrate a suicide attack in Israel. Ex. 1060. Tawfiq Tirawi, head of the GIS, informed Arafat personally of the arrest by letter. *Id.* One month later, Hashaika was out of prison, with a bomb strapped to his chest that he detonated right behind Alan and Yehonathon Bauer. The evidence showed that Abdel Karim Aweis—a senior intelligence officer working under Tirawi at the GIS—was the one who orchestrated Hashaika's release in early March 2002. Ex. 356, Count 39 ("In early March 2002, Muhammed Hashaika was remanded in the 'Mukata'ah' complex . . . Following the request of [Aweis], who is [in] the general intelligence of the [PA], Muhammed Hashaika was released from the said remand.").

Defendants suggest that evidence of Hashaika's release "without further detail" is insufficient to support a verdict. Defs. Mem. at 46. That ignores Abdel Karim Aweis' conviction (Ex. 356), as well as expert testimony on Hashaika's release (Tr. 1580-81, 1586-87) and the PA's "revolving door" policy (Tr. 762). There was also a thundering silence from the defendants. Defendants asked the jury to believe that Hashaika escaped, but they did not submit a shred of evidence to controvert the evidence that Aweis released Hashaika. No evidence of a search for Hashaika. No reports, no bulletins, no wanted posters. No witnesses with firsthand knowledge of Hashaika's "escape." It was eminently reasonable, therefore, for the jury to conclude that Aweis released a known terrorist from prison within the scope of his employment.

11

**A-44**

The jury heard additional evidence showing that Abdel Karim Aweis acted within the scope of his employment. After Aweis was convicted of 5 counts of murder and over 100 counts of attempted murder, defendants promoted him. Ex. 58. They also kept him on the payroll. Exs. 58, 128. Defendants admit that Aweis was involved in the March 21 attack, but they say he was acting for "personal motives." Defs. Mem. at 46. Even if that were true, it is of no consequence in light of the substantial evidence that Aweis planned the attack within the scope of his employment, and that defendants approved of his conduct. *In re Boesky Sec. Litig.*, 36 F.3d 255, 265 (2d Cir. 1995) (employees' personal motives foreclose employers' liability for intentional and criminal acts only if those acts were "solely" to benefit the employee.); *see Doe v. Guthrie Clinic, Ltd.*, 22 N.Y.3d 480, 484 (2014) (same).

Finally, the record was undisputed that the AAMB was responsible for the March 21 suicide bombing. Tr. 1470. Yet, after the attack, the PA put every perpetrator convicted of planning and carrying out the March 21 bombing on the payroll. Exs. 1120, 1121. These payments constitute material support. The jury also saw video of Kahira Sa'adi, one of the women responsible for driving Hashaika to the attack site, who testified that she received training prior to the attack. Ex. 372. Together with plaintiffs' extensive evidence of defendants' material support to AAMB, *see supra* Part II.A.2, this evidence supported the jury's finding of liability for knowingly provided material support and resources for the attack.

### 4.    June 19, 2002 French Hill Bombing

The evidence in the record proved that the June 19, 2002 French Hill bombing was an AAMB attack and occurred *after* the group was designated as a foreign terrorist organization. Ex. 537 (U.S. designation of AAMB as foreign terrorist organization in March 2002). The PA's own General Intelligence Service indicated as much, stating that Sa'id Awada—the suicide bomber in the June 19 bombing—was "a member of Fatah and the al-Aqsa [Martyrs'] Brigades"

12

and that he died "in Jerusalem during an operation of the al-Aqsa [Martyrs'] Brigades." Ex. 139; *see* Tr. 1382 (Q. And are you satisfied that the [June 19] attack was an Al Aqsa attack? A. Absolutely.).[4] After Awada killed 7 civilians in a suicide bombing, defendants began monthly payments to his family. Ex. 19.

The evidence also proved that defendants provided AAMB with material support in the form of funding in June 2002. Shrenzel testified that "Arafat himself provided financial aid to AAMB squads just a few days after the attack that we are discussing, namely, a few days after June 19." Tr. 1381. Defendants did not dispute this evidence.[5] The jury was entitled to find defendants liable for the June 19 bombing based on this testimony, in conjunction with plaintiffs' extensive evidence of defendants' general material support to AAMB, *see supra* Part II.A.2.

### 5. July 31, 2002 Hebrew University Bombing

The record also supports the jury's verdict on the July 31, 2002 attack. The evidence showed that: (1) a senior employee of the PA, who is still on the payroll today, provided material support, in the form of personnel, to Hamas by releasing the bomb maker from prison before he went on a killing spree; (2) the same senior PA employee harbored the bomb maker after the release; and (3) Hamas took credit for the attack.

Amazingly, defendants ask this Court to throw out the jury's verdict on the Hebrew University bombing without even acknowledging the core evidence of defendants' liability—that PA officials released Abdullah Barghouti, a notorious Hamas bomb-maker, from prison, in violation

---

[4] Defendants call into question the basic facts of the June 19 bombing based on a typo in the martyr file of the suicide bomber in the attack, Said Awda. Defs. Mem. at 46. The jury heard testimony about this typographical error (Tr. 1382) and was entitled to credit it.

[5] It is not necessary to prove that the funds were actually used to carry out a predicate act. Even a small amount of funding to a large and disbursed organization like Hamas can be a substantial contributing factor causing a terrorist attack, under traditional principles of tort law. *See Boim*, 549 F.3d at 695-99 (explaining why small dollar knowing donations to terror organizations can result in liability for provision of material support).

of 28 U.S.C. § 2339B. *See* Tr. 807-09 (testimony of Mosab Yousef). [6] Mosab Yousef testified that senior PA officials, including Jibril Rajoub and Marwan Barghouti, made a deal with Hamas that the PA would arrest Abdullah Barghouti but release him shortly thereafter. Tr. 807-09. Ahmed Barghouti pled guilty in part to personally "transfer[ing] . . . Abdullah Barghouti from the prison of the Preventative Security of the Palestinian Authority in Bitunia to an apartment, which [he] had rented downtown." Ex. 357, Count 51. Abdullah Barghouti himself stated that he was released from prison. Ex. 427. On top of this evidence, the jury heard testimony from plaintiffs' expert, Alon Eviatar, about the PA's "revolving door" policy, which was a way to placate Israel and the United States but keep terrorists on the street Tr. 762-66. Defendants attempted to convince the jury that Abdullah Barghouti had "escaped" from PA prison. Tr. 2884. But without any reliable evidence of an escape—no written reports, no bulletins, no wanted posters, no witnesses with firsthand knowledge—the jury rejected defendants' hearsay testimony of the alleged "escape." Based on the credible evidence in the record, the jury was entitled to conclude that senior PA officials made a deal to release, and in fact released, Barghouti from prison.

Upon his release from the PA's prison, Abdullah Barghouti once again began working for Hamas. The PA's own intelligence files say that "Abdullah received approximately $117,000, which he was supposed to use for financing the military wing of the Hamas movement." Ex. 164 at 02:010034; Ex. 452, Count 2. Abdullah Barghouti's conviction and interrogation records also show that, following his release, he manufactured a string of bombs at the behest of, and for use by, Hamas. Exs. 452, 427 at P7: 130; Tr. 823-24. The PA's own intelligence files say that Abdullah Barghouti "is responsible for manufacturing explosives for the Izz al-Din [al-Qassam]

---

[6] Defendants only mention of plaintiffs' evidence regarding Abdullah Barghouti's release is in a footnote, in which they state that the evidence was admitted in error. Defs. Mem. at 48 n.14. Mosab Yousef's testimony—which was given at a deposition that plaintiffs took *in this case*— was properly admitted under Rule 804(b)(1).

14

**A-47**

Brigades" of Hamas. Ex. 164 at 01:010038. One of those explosives was the bomb used in the Hebrew University attack, for which Hamas claimed credit. Tr. 991.

Following this series of events, the PA retained Ahmed Barghouti as an employee, and put Abdullah Barghouti and other Hamas perpetrators of the bombing on their payroll. Exs. 1120, 1121. These payments constitute material support and are evidence of the scope of PA employment of Ahmed Barghouti. The PA's own documents indicate that certain of these terrorists are "good in terms of security and morals." Exs. 73, 164 (Abdullah Barghouti); Exs. 36C, 113, 142 (Ahmed Barghotui). Ahmed Barghouti was even promoted. Ex. 36C.

Based on this compelling record, the jury reasonably concluded that defendants provided material support to Hamas, and that Ahmed Barghouti did so in the scope of his employment.

### 6. January 29, 2004 Bus No. 19 Bombing

Finally, the jury was entitled to conclude that defendants were also liable for the January 29, 2004 bus bombing that killed Scott Goldberg and grievously injured his eight surviving family members. Defendants suggest that other than the fact that AAMB claimed credit for the January 29, 2004 bombing, "[n]o other evidence ties either the PA or the PLO to the January 29 attack." Defs. Mem. at 48. But the evidence showed that the suicide bomber *and three others* of the perpetrators were PA employees at the time they planned and carried out the attack. *See* Exs. 7 (Ahmed Salah); 10 (Hilmi Hamash), 116 (Abdel Maqdad). All three were convicted for their roles. Exs. 260, 261 (Salah); 313 (Hamash); 275, 295 (Maqdad). All three remain on the PA payroll to this day; all have been promoted since they were convicted; and all three, according to the PA, are unremarkable in terms of security and morals. Exs. 48, 131 (Salah), 114, 130 (Hamash); 116, 129 (Maqdad). Again, this is not a coincidence; it is a pattern that the jury was entitled to recognize and use to evaluate the scope of employment in the PA's security apparatus.

15

Defendants claim that the suicide bomber, Ali Ja'ara, had been fired prior to boarding the bus on January 29, 2004. But according to defendants' own records, Ja'ara "worked as a First Sergeant in the police until he was martyred." Ex. 22. His personnel files show that he was even promoted posthumously in April 2004, just 2 months after killing 11 people. Ex. 8.

Finally, the jury heard undisputed evidence that the Bus No. 19 bombing was an AAMB attack. Ex. 132 (Ja'ara GIS file stating that a "group belonging to the al-Aqsa Martyrs' Brigades claimed responsibility for the operation"); Tr. 1469-70 (Shrenzel). Together with other evidence of defendants' material support to AAMB, *see supra* Part II.A.2, this evidence supported the jury's finding of liability for knowingly provided material support and resources for the attack.

### C. Proximate Cause and Knowledge

The foregoing evidence provided the jury with an ample basis to conclude that defendants' conduct was both knowing and a proximate cause of plaintiffs' injuries.

Intent (even criminal intent) is imputed to an employer when employees or agents with such intent act "within the scope of their authority." *See United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 660 (2d Cir. 1989); *Apollo Fuel Oil v. United States*, 195 F.3d 74, 76 (1999) (a corporation can be guilty of "knowing" or "willful" violations of regulatory statutes through the doctrine of *respondeat superior*."). Similarly, the jury had ample evidence of knowledge of senior officials (summarized above), including criminal convictions, government reports, intelligence files, prisoner files, martyr files, and captured documents.

Proximate cause is generally a question of fact for the jury. *See Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 125-27 (2d Cir. 1996) (reversing judgment as a matter of law in a terror case, where "district court impermissibly substituted its judgment for that of the jury" on proximate cause). There can be no doubt that the terrorists injured the plaintiffs here. Thus, with vicarious liability, causation was proven. Even without vicarious liability, the Second Circuit's

16

**A-49**

analysis in *Rothstein v. UBS AG* supports the jury's finding that defendants proximately caused plaintiffs' injuries on these facts. 708 F.3d 82 (2d Cir. 2013). In *Rothstein*, the complaint "[did] not allege that UBS was a participant in the terrorist attacks that injured plaintiffs." *Id.* at 82, 97. Here, in contrast, the evidence showed that defendants *were* participants in the attacks. *See supra* Part II.A.2. The *Rothstein* complaint did "not allege that UBS provided money to" terrorist organizations. *Id.* Here, in contrast, the evidence reviewed above showed that defendants *did* provide money, weapons, personnel, and services to terrorists and terror organizations.

### D. Defendants Did Not Present Countervailing Evidence

Defendants did not present credible evidence to refute the record established by plaintiffs. During opening statements, defendants forecasted their theory of the case: "Crazy, wrong, contemptible, but not my clients." Tr. 83-84; *see* Defs. Mem. at 42-43. With respect to both material support and *respondeat superior* liability, defendants tried to convince the jury that there was no connection between themselves and the six terror attacks at issue in the case.

The jury rejected defendants' theory because it could not be squared with the evidence. It did not make sense to say that defendants found their employees' actions reprehensible when they kept terrorists on the payroll, promoted them, and characterized their imprisonments as being "a result of [their] fight for [their] country." It did not make sense to say that the PA had no control over its employees when their records reflect uninterrupted monthly payments, they published monthly political guidance magazines inciting terror, and Arafat admitted to having "total control," Ex. 239 clip 2. It did not make sense to say that terrorists escaped from PA prison (versus having been released intentionally by those with access) when there was not a single document or percipient witness to show that a search was conducted for such dangerous fugitives.

What affirmative evidence did defendants offer? Four photographs of Yasser Arafat (Defs. Tr. Exs. ("DTE") 71-74), a map (DTE 75), and a pair of letters exchanged between Israel

17

**A-50**

and the PLO in 1993 (DTE 17). They also brought six witnesses, none of whom had any personal knowledge about the attacks or any of the perpetrators. They did not call a single supervisor of the PA employees who were convicted of perpetrating the attacks in this case. They did not call any of the perpetrators' co-workers. They did not call any percipient witnesses to the various alleged "escapes" of terrorist operatives from PA prison. They even blocked depositions of the perpetrators themselves. DE 229; DE 290. With a complete dearth of evidence to support defendants' theory that "it wasn't us," the jury was more than entitled to reject it.

Defendants' real problem is that they tried the case as a reasonable doubt case, *see* Tr. 3727-3728) ("[t]here is no conclusive evidence that the senior leaderships of the PA or PLO were involved in planning or approving specific acts of violence."); Tr. 3738 (arguing that a document relating to the Wafa Idris attack "cannot provide us with a conclusive final proof of his final knowledge of the attack."), and they relied on witnesses to say only that they did not support terror. *See, e.g.,* Tr. 2899 (Faraj), 3126 (Ashrawi). Defendants failed to bring any witnesses who served in the police forces with the convicted terrorists, they did not offer evidence that defendants issued reports rebuking the PA employees, or that defendants investigated the PA employees who committed terrorist attacks; they did not bring supervisors to condemn the actions of their underlings. Indeed, they did not bring anyone with any personal knowledge of the events in question. The jury found defendants liable based on the plaintiffs' evidence and defendants' lack of evidence.

## III. PLAINTIFFS' LIABILITY EXPERTS OFFERED PROPER TESTIMONY

The Court was well within its discretion in allowing expert testimony from Alon Eviatar and Israel Shrenzel.

18

A-51

### A. Expert Testimony Is Appropriate and Customary In Terrorism Cases

In terrorism cases, expert testimony is particularly useful to explain the workings of terror organizations, which are often murky and difficult for jurors to understand. As Judge Weinstein explained: "[E]ach proffered witness's testimony must be approached applying a strong policy in favor of full admissibility required for the jury to understand the complex details of this case. Those particulars are remote from the normal life experience upon which jurors rely when deciding cases. Admissibility of expert reports and testimony is therefore strongly favored." *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 530-31 (E.D.N.Y. 2012).

Courts in this Circuit and elsewhere have routinely qualified former intelligence officers like Eviatar and Shrenzel as experts in terrorism cases. In *Gill*, for example, Judge Weinstein qualified several terrorism experts, many of whom had worked for Israeli security and intelligence agencies. 893 F. Supp. 2d at 531–34. Similarly, in *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 329–31 (E.D.N.Y. 2013), Judge Gershon found that three former Israeli security officials were qualified, including one from the Palestinian Affairs Department of the Israel Ministry of Defense's Coordinator of Governmental Activities in the Palestinian Territories ("COGAT") (like Eviatar), and one who worked for the Israeli Security Agency ("ISA") (like Shrenzel). In *Leibovitch v. Syrian Arab Republic*, No 08-C-1939, 2011 WL 444762, at *3–4 (N.D. Ill. Feb. 1, 2011), *rev'd on other grounds sub nom. Liebovitch v. Islamic Republic of Iran*, 697 F.3d 561 (7th Cir. 2012), the court relied on an expert who served for three decades as an IDF intelligence officer studying Iran's support for terrorism in Israel. And in *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 153 n.1 (D.D.C. 2009), the court relied on an official from the IDF's Military Intelligence Branch as an expert on Islamic terrorism.

19

**A-52**

**B.     Alon Eviatar and Israel Shrenzel Were Appropriately Qualified as Experts**

**1.     Alon Eviatar**

Alon Eviatar is a Lieutenant Colonel who spent 27 years with the IDF.  Tr. 363.  He served as an intelligence officer for twelve years. Tr. 364-65.  He served for fifteen years in COGAT, the "unit [that] is charged on behalf of the government of Israel and the Israel Defense Forces with the entire system of coordination and liaising with the Palestinian Authority, with international organizations, and all of the other official organizations that operate in the areas of the Palestinian Authority."  Tr. 366.  During his service, Eviatar "traveled throughout the West Bank on a daily basis," Tr. 367, "regularly investigated . . . all the relevant materials from the Palestinian media . . . maintained very close ties with hundreds of Palestinians . . . met . . . with thousands of Palestinians from all the various . . . parts of society, official and unofficial, in all possible roles and functions, from the various movements . . . [and] maintained professional ties with research institutes [and] academic institutes which have interests in the Palestinian arena."  Tr. 367-68.  He is fluent in Arabic.  Tr. 364.

Eviatar analyzed the information about which he testified by cross referencing it with other sources.  He never based his findings "on a single source."  Tr. 408.  Instead, he "check[ed] additional material to make sure that it corresponds with other material.  [He] examine[d] the identity of the people whose names appear in the documents, and [he] also coordinate[d] that with all of the knowhow that [he has] accumulated over the course of the years."  *Id*.  Eviatar's methodologies in analyzing documents and information in preparation for his testimony was "identical to all of the professional tools and instruments that [he] made use of and that [he] worked with during the course of [his] years in the military."  *Id*.  This was an appropriate methodology for a terrorism expert.  Other members of this Court have approved experts whose methodology was similar—"gathering multiple sources of information, including original and

20

**A-53**

secondary sources, cross-checking and juxtaposing new information against existing information and evaluating new information." *United States v. Kassir*, No. S2 04 Cr. 356(JFK), 2009 WL 910767, at *6 (S.D.N.Y. Apr. 2, 2009); *accord United States v. Paracha*, No. 03 Cr. 1197(SHS), 2006 WL 12768, at *22-23 (S.D.N.Y. Jan. 3, 2006) (approving the expert opinion where the expert "relied on multiple sources of information that he gathered and vetted through his process of cross-referencing and peer review, and explained that he has been gathering information relevant to [the subject of his testimony] for several years.").

Accordingly, the Court properly qualified Eviatar as an expert. Tr. 409.

### 2.      Israel Shrenzel

Israel Shrenzel spent 17 years with the ISA, "a government body charged with frustration or prevention of terrorism and espionage." Tr. 1016-17. During his last ten years at the ISA, Shrenzel was the "head of the department that dealt with the analysis of Palestinian affairs, especially the policies of the PLO, the PA and the various other Palestinian organizations." Tr. 1017. His department "tried to understand the ideas, the ideologies, the motivation and the declaration and of course the deeds of the PA as a whole and of the various organizations within the PA and even those that were not part of the PA, such as Hamas and PIJ . . . ." Tr. 1017 -18. He also "analyz[ed] the positions of various important individuals in the PA area." *Id.* at 1018. As part of his work, Shrenzel interacted with anti-terror personnel around the world, including in the United States. Tr. 1018. Shrenzel is fluent in Arabic. Tr. 1070; 1073-74.

In order to prepare his opinions and testimony, Shrenzel and his team gathered information regarding the five attacks that were the subject of his testimony, including the indictments, verdicts and sentencing documents pertaining to the individuals convicted of those attacks, as well as United States and Israeli government reports, newspapers, publicly available videos and clips, and files supplied by the defendants. Tr. 1019; 1074. He and his team ana-

21

**A-54**

lyzed the documents "to understand what actually happened, who was involved, and what was the links of the perpetrators to the PA, to the defendants, and what was, let's say, the attitude of the defendants toward that attack and towards its perpetrators." Tr. 1074-75. Shrenzel's methodology was very similar to the methodology he used at the ISA. Tr. 1019; 1069 -1070, 1075. Just as with Eviatar, other judges in this District have approved similar experts, with similar methodologies. *Kassir*, 2009 WL 910767, at *6; *Paracha*, 2006 WL 12768, at *22-23.

Accordingly, the Court properly qualified Shrenzel as an expert. Tr. 1076.

### C. Plaintiffs' Experts Did Not Offer Lay Opinions On Ultimate Issues

Defendants claim that Eviatar and Shrenzel offered "lay opinions" on "ultimate issues." Defs. Mem. at 12-13. That is wrong. Eviatar and Shrenzel's opinions were well within the bounds of their expertise. Nor did they opine on whether defendants were ultimately liable for any of the attacks.

Defendants cite two cases in support of their argument. In both cases, the court either excluded expert testimony or found expert testimony improper where the experts offered opinions on crucial issues *about which they had no expertise*. *Nimely v. City of N.Y.*, 414 F.3d 381, 398 (2d Cir. 2005) (expert testimony that police officers, who were also fact witnesses, were "telling the truth"); *SEC v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (expert testimony that securities disclosure documents provided all "economically material" information).

Here, in contrast to the experts in *Nimely* and *Tourre*, Eviatar and Shrenzel gave opinions within the areas of their expertise. Defendants do not even set forth which statements they believe fall outside Eviatar and Shrenzel's expertise. Instead, defendants simply offer a string of citations that they claim represent instances where Shrenzel and Eviatar opined on "ultimate issues." Defs. Mem. at 12. This is not enough to claim error. *See* Fed. R. Evid. 704(a) ("[a]n opinion is not objectionable just because it embraces an ultimate issue"). Moreover, and contra-

22

**A-55**

ry to defendants' assertion, the cited portions of the transcript do *not* actually represent testimony on the ultimate issue of whether "the PA and PLO were ultimately responsible for the attacks committed by Fatah, Hamas, and the AAMB regardless of the facts of a specific attack."  Defs. Mem. at 13.  In none of the cited portions of the transcript did Eviatar or Shrenzel opine that the PA and/or the PLO were ultimately responsible for any of the six attacks at issue.[7]

Defendants also claim that Shrenzel improperly opined about Tawfiq Tirawi's role in the Wafa Idris bombing and improperly stated that an official of the PA considered Sa'id Ramadan's attack against civilians a performance of national duty.  *See* Defs. Mem. at 13-14.  These complaints also have no merit.  Defendants opened the door to Shrenzel's opinions about Tirawi's role in the attack by asking questions during cross examination implying that Tirawi was actually innocent.  *See* Tr. 1514-15.  Plaintiffs were entitled to meet this line of questioning on redirect.[8] As for Shrenzel's statements about Ramadan, his testimony was straight from defendants' martyr file, which was already before the jury.  *Compare* Tr. 1101 (Shrenzel) *with* Ex. 60 (Ramadan martyr file).

---

[7]  *See* Tr. at 728-31 (operatives in Fatah and AAMB viewed Marwan Barghouti as the link between them and Arafat); Tr. 737 (defendants' GIS files indicated that there are "common interests" between Marwan Barghouti and the GIS); Tr. 745-46 (hundreds of Palestinian security employees were involved in terrorist activities during Intifada); Tr. 767 (there was cooperation and coordination between defendants and Hamas in the perpetration of joint acts of terror); Tr. 839-42 (Ibrahim Hamad received money from the PA pursuant to PA law after he was convicted for role in Hebrew University attack and others); Tr. 1162-64 (testimony about the relationship between the individuals convicted for the January 22, 2002 attack and the PA); Tr. 1205-06 (same for March 21, 2002 attack, as well as testimony that PA did not take steps to prevent the attack in light of the upcoming designation of the AAMB as an FTO); Tr. 1379-81 (Arafat provided financial aid to AAMB squads just a few days after the June 19, 2002 attack); Tr. 1428 (AAMB took responsibility for and perpetrated the January 29, 2004 attack).

[8]  Defendants later argue that Shrenzel improperly testified that Tirawi supplied explosives to Hashaika "even though this testimony derived from a custodial statement placing the blame on another person. . . ."  *See* Defs. Mem. at 15.  This was in response to defendants' implications during cross that Tirawi was innocent.  Tr. 1596-99 (Court's reasoning explaining why Tirawi testimony was admissible).  In any event, defendants could have used the custodial statement to cross examine Shrenzel, but they chose not to do so.

23

**D.** **Shrenzel and Evitar Did Not Offer Improper State of Mind Testimony**

Defendants next argue that Shrenzel and Eviatar offered improper state of mind testimony. Defs. Mem. at 14. This too is incorrect.

Shrenzel's testimony about the motivations of people such as Sa'id Ramadan was in direct response to defendants' questions about the motives of the perpetrators. Defendants asked Shrenzel multiple questions implying that the perpetrators could not have been motivated by post-attack payments by the PA. *See* Tr. 1561. It was entirely proper for Shrenzel to respond by giving his opinion on what *did* motivate the perpetrators during his redirect examination.[9]

Eviatar's testimony about Marwan Barghouti was also proper. He testified that Marwan Barghouti was "very close to Arafat," Tr. 725, and "was the leader of Fatah in the West Bank and commander of the Tanzim and Al Aqsa Martys Brigades," Tr. 729-30. One obvious evidential basis for this testimony was Barghouti's conviction. *See* Ex. 451. Moreover, this testimony came directly from Eviatar's expertise—surely an intelligence agent who spent his professional career studying the PA would know the relationship between Arafat and his direct subordinate.

**E.** **Plaintiffs' Experts Properly Opined On Defendants' Policies**

Defendants also complain about Eviatar's and Shrenzel's testimony concerning defendants' policies of paying convicted terrorists and releasing known terrorists from jail. Defs. Mem. at 15-16. But these policies were squarely within both Eviatar and Shrenzel's areas of expertise. Among other things, Eviatar spent fifteen years in COGAT, which is charged with "the entire system of coordination and liaising with the Palestinian Authority," Tr. 366, and Shrenzel spent

---

[9] Shrenzel's testimony about the contents of the police magazines during his redirect examination, including that the magazines referred to Jews as "descendants of monkeys and pigs," was similarly appropriate testimony to rebut defendants' implications during cross examination that the magazines were innocuous. Tr. 1564-67. Since defendants opened the door, their complaints about this testimony are also without merit.

ten years as the "head of the department [within the Israeli Security Agency] that dealt with the analysis of Palestinian affairs, especially the policies of the PLO, the PA and the various other Palestinian organizations." Tr. 1017.

Moreover, *defendants* opened the door to testimony about the purpose of such payments by raising it in their opening statement. During opening statements, defendants' counsel argued that payments to convicted terrorists and the families of martyrs were a form of social welfare: "These payments are routine in my client's society. My client is essentially a social welfare state." Tr. 86. "It is widely recognized that a party who raises a subject in an opening statement 'opens the door' to admission of evidence on that same subject by the opposing party." *See United States v. Chavez*, 229 F.3d 946, 952 (10th Cir. 2000) (collecting cases). Defendants cannot now claim that Eviatar and Shrenzel's opinions rebutting this trial theme were improper. [10]

### F.   The *Gilmore* Court's Opinion About Eviatar Is Inapposite

Defendants claim that Eviatar's testimony was improper because another court, in another case decided that Eviatar could not testify as an expert on a subject that was different than the subjects about which Eviatar testified here. *See* Defs. Mem. at 18-19. In *Gilmore v. Palestinian Interim Self-Government Auth*., No. 1-853, 2014 U.S. Dist. LEXIS 102093 (D.D.C. July 28, 2014), the plaintiffs sought to offer Eviatar to opine that a particular individual perpetrated an attack. The court had excluded all other evidence of the individual's role in the attack, and as such, Eviatar's testimony would have been based *exclusively* on information the court had ruled was inadmissible, and it would have been the *only* evidence linking that individual to the attack.

---

[10]  Like his testimony on defendants' policies, Eviatar's testimony that Israeli government reports were reliable was also proper and within the scope of his expertise. *See* Defs. Mot. at 23 (challenging admission of IDF reports). Eviatar's experience in the IDF and COGAT provided him with the experience to judge the accuracy and reliability of those reports. Moreover, he testified that he always cross checked information to ensure its accuracy. *See supra* Part III.B.1. Defendants cannot plausibly complain that his methodology in assessing those reports was unreliable.

**A-58**

*See Gilmore*, 2014 U.S. Dist. LEXIS 102093, at *51-53. The court found that, although Eviatar detailed his methodology in his report, his methodology was not applied in the context of the hearsay documents. *Id*. at *50-51. The court concluded that, although an expert can rely on inadmissible evidence in forming his or her opinion, Eviatar's testimony that a particular individual perpetrated the *Gilmore* attack would be "simply repeating hearsay evidence without applying any expertise . . . ." *Id*. at *56.

Here, by contrast, Eviatar's opinions were based on admissible evidence, and Eviatar detailed both his methodology, as well how he applied that methodology to form his opinions, to the Court and the jury. *See* Tr. 363-403. Moreover, rather than assessing who had actually committed a specific attack, Eviatar's opinions in this case were limited to background information about the PLO, the PA, Fatah, AAMB, and Hamas; the policies and practices of the PA and the PLO as they relate to the support of terrorism; the relationship between the defendants and AAMB; and the relationship between the defendants and Hamas. Each of these areas is well within Eviatar's areas of expertise, all were topics on which he was more than qualified to give opinions, and none were excluded in *Gilmore*.

## IV. DEFENDANTS' RULE 403 ARGUMENTS ARE FRIVOLOUS

### A. Rule 403 Did Not Require Plaintiffs to Sanitize Their Case

Defendants complain that the Court improperly allowed plaintiffs to introduce inflammatory and prejudicial evidence, and "limited the PA's and PLO's ability to respond." Defs. Mem. at 17-18, 19-24. "Rule 403 does not provide a shield for defendants who engage in outrageous acts . . . . It does not generally require the [proponent] to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone." *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998); *see United States v. DeMuro*, 677 F.3d 550, 559 (3d Cir. 2012) (same); *United States v. Cross*, 308 F.3d 308, 325 (3d Cir. 2002) (same). Evidence is unduly prejudicial only

26

**A-59**

"when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).

The fact that testimony and documents concerning post-attack payments, the PA's "revolving door" policy, and the police magazines were harmful to defendants was no reason to exclude it. To the contrary, "the Federal Rules favor placing even the nastier side of human nature before the jury if to do so would aid its search for truth." *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1135 (4th Cir. 1988). Moreover, as set forth above, defendants opened the door to much of this testimony by arguing in opening statements that the post-attack payments were a form of social welfare, and by cross-examining Shrenzel about the motivations of the perpetrators in carrying out terror attacks. Tr. 86 (opening); 1560-62 (Shrenzel).

Moreover, defendants' suggestion that the Court "created an unfair playing field" (Defs. Mot. at 21) is baseless. The Court applied Rule 403 evenly throughout the trial, excluding evidence proffered by *both* sides. *E.g.*, Tr. 994-97 (excluding many probative police magazines offered by plaintiffs); Tr. (1/6/15) at 63-69 (excluding photographs offered by plaintiffs); Tr. 632-33 (excluding videos offered by plaintiffs, such as BBC video of Arafat leading a chant to "give us weapons Abu Amar"); Tr. 3248-49 (excluding testimony of defense witness Issa about the total numbers of Palestinians arrested since 1967). Just as the Court excluded much of plaintiffs' evidence that it deemed was more prejudicial than probative, the Court reasonably exercised its discretion to exclude defendants' repeated and improper attempt to inject evidence of an overtly political nature.

## B. Admission of the PA Police Magazines Was Proper

Defendants complain that the police magazines had only "tenuous connections to the PA and PLO." Defs. Mem. at 19. Nothing could be further from the truth. Plaintiffs offered exten-

27

sive testimony that these magazines were published by an official PA/PLO propaganda bureau and distributed to the PA's security forces during the relevant time period. Tr. 1206-1216; 1269-1274 (Shrenzel). Defendants did not offer any evidence in response.[11]

Moreover, the magazines were highly probative, containing powerful evidence of three important facts. *First*, they showed that PA security personnel could have reasonably believed that orchestrating or participating in terror attacks was furthering their employer's interests and political goals, as articulated in these magazines. *Second*, they were evidence that it was reasonably foreseeable to the PA that its security personnel would commit violent and dangerous criminal acts against Israeli civilians. *Third*, the magazines reflect an apparent intent to influence U.S. Government policy. *See, e.g.*, Ex. 200 ( "[T]he Palestinian people reject the yellow policy of the U.S. and its leader Bush, and our people shall continue the popular struggle . . . until achievement of the sought-after and historical goal . . . which we have taken on . . . through waterfalls of blood that Palestinian people have offered up on a daily basis . . ."); *id.* ("[A]ll efforts by Palestinian forces should be turned towards inflaming the popular Intifada until the image of the infamous child who challenges Israeli tanks with stones appears, for this image evokes Arab and Muslim sympathy, and [of] the free world, and moves it . . . to needed additional U.S. and European pressure on Israel . . ."); Ex. 175 ("The European nations and the U.S., who have strategic interests in the region, are called upon to see the necessity of urgent and immediate action to stop Israeli practices against the Palestinian people. Without this, their vital interests shall be directly jeopardized.").

---

[11] Defendants submitted a declaration to argue that some of the magazines were not "official statements of the Palestinian Authority or its security forces." *See* DE 759 at 2, Ex. 1 at ¶ 9. They offered no such evidence at trial.

**A-61**

The Court correctly concluded that the magazines were probative. *E.g.*, Tr. (1/12/2015) at 158 ("[T]here is some relevance about heightened rhetoric . . . by the PLO or the PA that they claim is urging people to commit violence."). This ruling is amply supported by case law. Courts have repeatedly held that a defendant's own words are not unduly prejudicial under Rule 403. *E.g.*, *Mullen*, 853 F.2d at 1132-35; *Robinson v. Runyon*, 149 F.3d 507, 514-15 (6th Cir. 1998); *Wilson v. City of Aliceville*, 779 F.2d 631, 635-36 (11th Cir. 1986); *Strauss v. Microsoft Corp.*, No. 91 Civ. 5928(SWK), 1995 WL 326492, at *4-*5 (S.D.N.Y. June 1, 1995).

Moreover, in response to defendants' Rule 403 objections, the Court admitted only *eight* of the twenty exhibits that plaintiffs had offered. *E.g.*, Tr. 994, 1232-33. Defendants even used certain of the admitted magazines to advance their *own* theory of the case during cross-examination. Tr. 1563-67. They cannot now claim that the magazines were not relevant.

Defendants also claim that it was error for the Court to admit a Fatah circular (Ex. 185) and a supposedly "highly prejudicial" photograph of Arafat and Sheikh Ahmad Yassin, the then-leader of Hamas (Ex. 1128). *See* Defs. Mem. at 19. With respect to the photograph, defendants never articulated, nor pressed, an objection to this exhibit. *See* DE 758 (raising objections to only 4 of 45 exhibits identified for use with Eviatar on 1/20/15); Tr. 768-69 (admission of Ex. 1128). With respect to the Fatah circular, the Court engaged in a careful Rule 403 analysis and found that the exhibit was more probative than prejudicial. *E.g.*, Tr. 994-95. Moreover, the circular set forth the official positions and policies of Fatah, which was dominated and controlled by Arafat. Tr. 443-44 (Eviatar). The jury was entitled to conclude that this circular represented statements approved by individuals (including Arafat) who dominated and controlled the PA. Tr. 1472-74 (Shrenzel). Admission of these exhibits was correct.

**A-62**

### C.     Admission of Indictments and Custodial Statements in this Case Was Proper

Defendants complain that the Court admitted indictments and custodial statements of the convicted perpetrators in this case, without requiring plaintiffs to redact information about unrelated crimes. Defs. Mem. at 20. This argument should be rejected out of hand. Plaintiffs presented evidence at trial that defendants, pursuant to official policy, pay convicted terrorists *on account of their crimes*. *See, e.g.*, Exs. 512, 1120. Defendants make prisoner payments—even to this day—to terrorists who are sitting in jail (and to those who have been released). *Id.* Defendants also make continuing payments to the families of suicide terrorists. *See, e.g.*, Exs. 17 (Idris), 19 (Awada), 22 (Ja'ara), 23 (Hashaika), 60 (Ramadan). Evidence of these individuals' involvement in terrorism—especially where it was ongoing and extensive, as demonstrated by unredacted indictments and custodial statements—is highly relevant to defendants' policies and practices as they relate to support for terrorism. As for those perpetrators who are also PA employees, the evidence was also highly probative of the employer-employee relationship as spelled out in actual practice—a relevant inquiry for *respondeat superior* liability. N.Y. Pattern Jury Instr., Civil 2:235. The Court was correct in its ruling: "I do not find . . . it is somehow unduly prejudicial if there is evidence that a reasonable jury could conclude that the people that the defendants were dealing with and compensating were known to be involved in the acts of violence." Tr. (1/6/15) at 57.

Moreover, there was no prejudice resulting from the indictments and custodial statements at issue here because the same information was contained in defendants' own GIS files. Abdullah Barghouti's indictment (*see* Defs. Mem. at 20-21) is one example. At trial, plaintiffs offered the deposition testimony of Mosab Yousef, the son of a Hamas leader, who recounted that senior PA officials entered into a deal with Hamas to "arrest" Abdullah Barghouti but release him

30

**A-63**

shortly thereafter. Tr. 807-09.[12] Barghouti himself stated that he was released from prison. Ex. 427, Sheet 12. Following his release, Barghouti went on a killing spree, manufacturing a string of bombs at the behest of, and for use by, Hamas, including the Hebrew University bomb. Exs. 452, 427. The PA's own intelligence files reflect the same facts, stating that Barghouti "is responsible for manufacturing explosives for the Izz al-Din [al-Qassam] Brigades." Ex. 164. Admission of Barghouti's and the other perpetrators' indictments and custodial statement did not unfairly prejudice defendants—defendants' own conduct, corroborated by their own GIS files, confirmed liability.

**D.      Defendants Were Not Limited In Presentation of Their Defense At Trial**

Defendants claim they were entitled to make a political argument to the jury, which "needed to understand the Palestinian perspective on the Israeli occupation to understand the PA's actions. Defs. Mem. at 22. They claim that "where the line is for encouraging resistance against a devastating occupation [is a] serious question[] for the PA and PLO." *Id.* at 23-24.

As the Court correctly ruled throughout the trial, those arguments were wholly inadmissible. *See United States v. Toner*, 728 F.2d 115, 123 (2d Cir. 1984) ("This was not a trial as to who was, or is, right or wrong in the dispute in Northern Ireland."); *Linde v. Arab Bank*, 920 F. Supp. 2d 282 (E.D.N.Y. 2011). And yet, the Court indulged defendants to a remarkable degree.

The real problem for defendants was *not* that the Court did not allow them to attempt to contextualize their conduct. In fact, the evidence that defendants complain was excluded (Def. Mem. at 21-24) was put into evidence through the defense witnesses and during the cross-examinations of Eviatar and Shrenzel. Thus, the problem for defendants was that the jury simply

---

[12]   These officials made the deal despite the fact that, prior to his arrest, Abdullah Barghouti was involved in several devastating terrorist attacks. Ex. 452, Counts 12-28. Indeed, the evidence includes an admission by defendants that the "PA was notified by Israel and/or the United States between September 1, 2000 and July 31, 2002 to detain or arrest Abdullah Barghouti." Tr. 774.

did not credit defendants' "context." For example, defendants claim that they were unable to show that "the PA lost control over the average Palestinian during the time of the attacks because of the failure to have a Palestinian state and the actions of Israel." Defs. Mem. at 21-22. However—and despite defendants' concession that this type of evidence should be excluded (*see* DE 524 at 1-2)—the record is replete with such references.[13]

Defendants also complain that they were unable to offer evidence that the payments made to terrorists and their families "actually reduce terrorism." Defs. Mem. at 22-23. Again, the record shows that defendants repeatedly put such evidence before the jury. *E.g.*, Tr. 2889-95, 3065, 3078 (Faraj) (purpose of prisoner and martyr benefits "was to rehabilitate them and . . . contribute and change them and change the culture, and also to engage them in an active manner"); 3249 (Issa) (same). It was within the Court's discretion to preclude further testimony as cumulative:

---

[13] *E.g.*, Tr. at 858 (referencing IDF soldiers in "the occupied Palestinian territory in the West Bank"); 944 (IDF "incursions" into West Bank); 972-76 (lack of Palestinian control); 977-90, 1484-85 (mistreatment and "assassinations" of Palestinians by Israel; degradation of the PA's control over security); 1493-96 (homes were demolished), 1564-67 (PA magazine: Israel has "airplanes, tanks, rockets and all the lethal and internationally prohibited weapons"); 2854-63 (Faraj) (Palestinian government buildings and prisons destroyed); 3090-91 (Ashrawi) (Palestinians were "expelled or . . . in refugee camps . . . [U]nder occupation we weren't allowed to belong to PLO institutions."), 3117-22 (Ashrawi) (Palestinian government buildings, prisons, and other infrastructure destroyed); 3248-49 (Issa) ("[T]he reason for establishing a special ministry for the security prisoners is actually a political reason. These are so many. Since Israeli occupied, since 1967 until recently, more than 850,000—[objection sustained]."), 3276-77 (Shehadeh) (Palestinian government buildings and prisons destroyed), 3298 (Al Sheikh) (same).

Defendants also argue that the Court's exclusion of Glenn Robinson was unduly prejudicial. This is dishonest at best. Defendants did not call Robinson to testify on the many topics that would have been permissible because he would have said things that defendants did not want the jury to hear. For example, Robinson published a study concluding that "Arafat retained virtually exclusive control over the Palestinian security forces until his death in November 2004," and "[t]he *al-Aqsa Martyrs Brigades* are an armed faction affiliated with Fatah." Proposed Ex. 521 at 37-38; *see* Robinson Dep. 49. In another article, Robinson stated that Arafat "epitomized one man rule" and "maintained a firm grip on the security forces until his dying day." Proposed Ex. 520. Defendants did not call Robinson because he would have hurt their case.

> THE COURT:  Don't we already have that testimony?
>
> MR. ROCHON:  We have some of it.
>
> THE COURT:  We have all of it.  Nothing that you said is not be-
> fore this jury.

Tr. 3251-52.

Contrary to defendants' assertion that the "unfairness from this Court's rulings extended even to background about the PA's formation" (*see* Defs. Mem. at 22), defendants also filled the record with testimony about the supposed renunciation of terror in 1993, as well as the Oslo Accords in 1995.  *E.g.*, Tr. 937-39 (Eviatar cross); 2831, 2855-58, 3104-14, 3283-89, 3292-95 (defense case).  The Court, as well as the parties, were well aware of this:

> THE COURT:  Quite frankly, I don't think this jury needs a whole
> lot more testimony about the Oslo Accords for what it's worth.
>
> MR. ROCHON:  I was going for zero.  If I had my way, we'd be
> done by now.

Tr. 3155.  Later in the trial, counsel for defendants even joked about how much testimony the jury had about the Oslo Accords:  "The other areas have been well covered.  Would you like more on Oslo?"  Tr. 3308.

As for testimony concerning the PA's "physical ability to arrest people" (Defs. Mem. at 22-23), the problem was one of competent evidence from personal knowledge:  "If you have someone who investigated these individuals in the police department who will come in here and say, I was looking for this guy, I could not find this guy because I was tripping over tanks, then you bring that person in here and you let that person say that."  Tr. 3263; 3265-66.  Defendants tried to slip in hearsay testimony on this topic through Faraj, but the Court properly prevented Faraj from saying more.  Tr. 3380 ("He has no firsthand knowledge of how this guy walked out

33

**A-66**

of prison or escaped. Ran, walked, crawled, however he got out of prison."). If defendants had non-hearsay evidence about the PA's ability to arrest, the Court would have allowed it:

> I am letting you put in any person that was at the prison when they were released, any person that was there the day before, any person that can give me some facts [to] back up your theory of these people must have escaped. . . . [Y]ou have no witness who is willing to come into this courthouse who is an employee of the defendant who will say they escaped on Tuesday because the building was bombed. . . . You have brought nobody in this case at all during this trial to say how any individual who was locked up by the PA or the PLO got out of jail. Not a single fact.

Tr. 3393. Defendants' counsel responded: "If you let me put in hearsay evidence, I would have had it." *Id.* at 3394.

### E. Exclusion of Defendants' Proposed Trial Exhibits 29 and 70 Was Proper

In an attempt to put the State of Israel on trial, defendants offered two irrelevant documents. Proposed DTE 29 (report by anti-Israel U.N. committee criticizing policies of Israel); Proposed DTE 70 (State Department "country report" on human rights practices of Israel). They now complain that these exhibits were improperly excluded. Defs. Mem. at 23. However, the Court correctly applied Rule 403 to that evidence, finding that the reports had no probative value and were unduly prejudicial. Tr. 924-26 (the Court: "It is unduly prejudicial. You are doing exactly what I said you cannot do. You cannot simply say, oh, the Israelis are bad guys because they bulldozed my house, and therefore that has some relevance to the jury's determination of whether the PA or the PLO was complicit in terrorism."). The exhibits are also hearsay.

Defendants argue that these evidentiary rulings hampered their ability to challenge certain findings in IDF reports. Defs. Mem. at 23. Not so. Defendants used their opening (Tr. 90), their cross-examination of Eviatar (Tr. 858-59; 985-90), and their closing (Tr. 3705-07) to argue that the IDF reports were biased. Moreover, challenging the IDF reports would not have changed the outcome, as the IDF reports were corroborated by other evidence in the case, such as

34

**A-67**

raw captured documents (Exs. 962, 963), expert testimony (Tr. 643-44; 660-61; 805-07), deposition testimony (Tr. 2079-82 (Al-Sheikh)), and reports by the U.S. State Department (Exs. 496, 634, 635, 1142). The jury was entitled to credit that evidence.

## V. THE COURT'S DECISION NOT TO SEVER WAS A PROPER EXERCISE OF DISCRETION

Defendants argue that the decision not to sever this case was reversible error. That decision was an entirely proper exercise of the Court's discretion. Severance is "reserved for truly extraordinary situations of *undue* prejudice." *Monaghan v. SZS 33 Assocs., L.P.*, 827 F. Supp. 233, 246 (S.D.N.Y. 1993) (emphasis in original). The primary interest under Rule 42(b), which governs severance, is efficiency. *See* DE 571 at 1-2. Efficiency is paramount, particularly where, as here, different incidents are unified by a defendant's common plan and practice. *See* DE 571 at 7-8 (citing cases). Indeed, at trial, plaintiffs presented hours of testimony and countless exhibits that served as evidence for all six of the attacks in the case. *See supra* Part II.A.

Given the extent of overlap in the issues and evidence, it was well within the Court's discretion to try all six attacks together. Indeed, these considerations supported the Court's decision not to sever: "[A] significant amount of evidence might even otherwise be admissible, even if other plaintiffs were not in the same case. And I see no undue prejudice to the defendant in efficiently trying all of these related issues." Tr. (11/20/14) at 3-4; *see* Tr. (9/16/14) at 5-6 ("[O]bviously, if it's appropriate to sever, I will sever. But, obviously, that's not going to save us time. It is going to add time to separate trials.").

### A. Demonstrative Aids And Organizational Tools Prevented Jury Confusion

Defendants argue that a single trial was prejudicial and confusing to the jury. They are wrong. There is no indication that the jury had any difficulty differentiating between attacks and perpetrators. In opposing defendants' original motion to sever, plaintiffs pointed out that a well

**A-68**

organized trial would overcome the risk of confusion.  DE 571 at 6.  At trial, plaintiffs provided the jury with summary exhibits and demonstrative aids.  Exs. 1120, 1121 (summary charts of defendants' pay and promotions of employee and non-employee terrorists); 1193 (chart summarizing date, location, and victims of each attack, passed out to jurors as index cards throughout trial).  Plaintiffs also prepared "attack binders" for the jury, organized by perpetrator, with an index and tabs containing a photograph of each perpetrator and his or her relevant documents, such as the conviction, intelligence and payroll records.  Plaintiffs also created "attack charts" for several attacks, which depicted photographs of those responsible for each attack.  *See* Ex. A hereto.

The jury's notes during deliberations indicated that these aids worked as intended.  On the first day of deliberations, the jury asked for the binders of exhibits, as well as the "attack charts."  Tr. 3913-14.  In the end, it was defendants who objected to putting the aids before the jury because those demonstratives had not been formally moved in evidence.  Tr. 3919.  Their strategy may have been to *hope for* a "dizzying array" of evidence before the jury, but the evidence was actually well organized and accessible to the jury.

### B.      Any Spillover Prejudice Was Cured by Instructions

Potential spillover prejudice is "normally dealt with through an appropriate charge and curative instructions."  *See, e.g.*, *Kerman v. City of New York*, No. 96 Civ. 7865 (LMM), 1997 WL 666261, at *5 (S.D.N.Y. Oct. 24, 1997); *see also* cases cited in DE 571 at 10-11.[14]  That is exactly what happened here.  The Court instructed the jury that "[p]roof of liability relating to one terrorist attack would not automatically constitute proof of liability relating to any other at-

---

[14]  In support of their argument that "jury instructions could not remedy [the] prejudice," defendants cite two cases that have nothing to do with Rule 42(b).  *See* Defs. Mem. 27.  In both cases, the issue was whether non-party witnesses could testify about other bad acts of the defendants, and not whether to sever.  *Haskell v. Kaman Corp.*, 743 F.2d 113, 121 (2d Cir. 1984); *Moorhouse v. Boeing Co.*, 501 F. Supp. 390, 393-94 (E.D. Pa. 1990).  In both cases, there was only one plaintiff and only one incident.

tack.  You must consider each of the six attacks separately."  Tr. 3887.  The Court made that crystal clear in its verdict sheet, with specific, individualized questions for each attack.  DE 825.

The Court's denial of the motion to sever was a proper exercise of discretion in a case where the witnesses and documents overlapped, allegations were made against two defendants for each incident, and the jury instructions addressed any potential spillover prejudice.

## VI.     THE COURT'S JURY INSTRUCTIONS WERE SOUND

### A.     The Court Correctly Included An Instruction On *Respondeat Superior*

Defendants claim that *respondeat superior* does not apply in ATA cases.  Defs. Mem., Part III.A.  They are wrong.  *See Linde v. Arab Bank*, 04 Civ. 2799 (BMC), 2015  U.S. Dist. LEXIS 45903, at *152 (E.D.N.Y. Apr. 8, 2015) ("Judge Gershon rejected defendant's effort to impose a standard higher than traditional *respondeat superior*.  She was correct to do so."); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 558 (E.D.N.Y. 2012) ("*Gill II*") ("Plaintiff is correct in contending that the ATA provides for corporate liability on a theory of *respondeat superior*."); *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 650 (S.D. Tex. 2011) (plaintiffs' "allegations [were] sufficient to survive a motion to dismiss on the *respondeat superior* claim" under the ATA).

Congress imposed liability on *any* "entity" violating the ATA.  18 U.S.C. § 2331(3) (defining "person" as "an individual or entity capable of holding a legal or beneficial interest in property").  An entity can only act through its agents or employees.  Moreover, "when enacting the ATA's civil remedy provision, [Congress] 'intended to incorporate general principles of tort law . . . into the [civil] cause of action under the ATA.'"  *Gill II*, 893 F. Supp. 2d at 558.  The ATA's "legislative history, in combination with the language of the statute itself, evidences an intent to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law."  *Knox v. PLO*, 442 F. Supp. 2d 62, 77 (S.D.N.Y. 2006).

A-70

Under traditional tort principles, a defendant is liable for the acts of its employees "engaging in a course of conduct subject to the employer's control." *Restatement (Third) of Agency* § 7.07 (2006). In the leading case of *Ira S. Bushey & Sons v. United States*, 398 F.2d 167, 170 (2d Cir. 1968) (Friendly, J.), the court explained that *respondeat superior* applies where the employee's tortious "conduct was not so 'unforeseeable' as to make it unfair to charge the [defendant] with responsibility." Indeed, "for purposes of *respondeat superior* liability, even an employee who commits an intentional tort may be found to have acted within the scope of his employment." *Kwon v. Yun*, 606 F. Supp. 2d 344, 363 (S.D.N.Y. 2009); *Almonte v. N.Y. City Hous. Auth.*, No. 89 Civ. 7677 (SWK), 1990 WL 113125, at *3 (S.D.N.Y. July 30, 1990) (jury could hold Housing Authority liable for beating administered by its police officers because such conduct was foreseeable). As Judge Brown explained in *Estate of Parsons v. Palestinian Authority*, "*[r]espondeat superior* liability is an elementary principle of tort law and must therefore inform our interpretation of the federal torts created in the Anti-Terrorism Act. Thus, the Palestinian Authority is liable for the acts its employees committed within the scope of their employment." 651 F.3d 118, 148 (D.C. Cir. 2011) (concurring opinion).

Defendants suggest that a rejection of aiding and abetting liability requires a rejection of *respondeat superior* liability. Defs. Mem. at 38-40. That is incorrect. The unavailability of aiding and abetting liability is irrelevant to the "quite separate matter of whether a principal may be held liable for the . . . violation of its agent on the basis of the principal's status" as employer. *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 552 (S.D.N.Y. 2007) (following *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100-01 (2d Cir. 2001)); *see AT&T Co. v. Winback & Conserve Program*, 42 F.3d 1421, 1430-31 (3d Cir. 1994) (under agency theories like *respondeat superior*, the "principal is held liable not because it committed some wrongdoing

38

**A-71**

outside the purview of the statute which assisted the wrongdoing prohibited by the statute, but because its status merits responsibility for the tortious actions of its agent.").

Defendants' argument that *respondeat superior* liability should not be permitted because of the ATA's treble damages provision is equally unsupported. Defs. Mem. at 40-41. As Judge Cogan held in *Linde v. Arab Bank*, a treble damages provision alone is not sufficient to overcome the presumptive application of general *respondeat superior* principles in an ATA case. 2015 U.S. Dist. LEXIS 45903, at *153 (E.D.N.Y. Apr. 8, 2015) (citing *Estate of Parsons v. PA*, 651 F.3d 118, 148 (D.C. Cir. 2011) (Brown, C.J., concurring)). Defendants do not point to a single case holding that the treble damages provision of the ATA precludes *respondeat superior* liability.

**B.     The Court's Agency and *Respondeat Superior* Instructions Were Sound**

A jury instruction need only "sufficiently cover[] the essential issues." *See Owen v. Thermatool Corp.*, 155 F. 3d 137, 139 (2d Cir. 1998). And, "a jury instruction will be deemed adequate if 'the charge, taken as a whole, is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it.'" *Garnett v. Undercover Officer C0039*, No. 1:13 Civ. 7083 (GHW), 2015 WL 1539044, at *14 (S.D.N.Y. Apr. 6, 2015) (quoting *Schermerhorn v. Local 100*, 91 F. 3d 316, 322 (2d Cir. 1996)). A new trial is not warranted unless "[a] jury instruction . . . misleads the jury as to the correct legal standard or does not adequately inform the jury on the law[,]" and, defendants can "show that in viewing the charge given as a whole, they were prejudiced by the error." *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994).

Defendants cannot possibly meet their heavy burden here. This Court used tried and true models for its instructions. The Court's instruction that "[i]n order to prove that a defendant is liable for a particular claim under the ATA, plaintiffs must demonstrate the involvement of a senior official or other person having duties of such responsibility that his or her conduct may

39

**A-72**

fairly be considered to represent the PLO or PA" came directly from the Second Circuit's decision in *United States v. Koppers Co.*, 652 F.2d 290, 298 (2d Cir. 1981). The Court's agency instruction came from Judge Sand's *Modern Federal Jury Instructions*, which was modeled after a charge given by Judge Weinfeld. *See* Tr. 3897; 4-72 *Modern Fed. Jury Instr.*, Civil P 72.01. Similarly, the Court's *respondeat superior* instructions followed the New York pattern jury instructions almost word for word. *Compare* Tr. 3899-900, *with* N.Y. Pattern Jury Instr., Civil 2:235-2:236. A more demanding standard would have been dangerous at best. *Cf. Gordon v. N.Y. City Bd. of Educ.*, 232 F. 3d 111, 116 (2d Cir. 2000) (in a retaliation case, court's charge that the *agents*, as opposed to the entity, must have known about the prior discrimination claim to find retaliation warranted a new trial because "[n]either this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff had engaged in protected activity").

Defendants contend that the agency instruction was inadequate on the theory that it did not explicitly say that a defendant must have the "power to control" the agent for an agency relationship to exist. Defs. Mem. at 33. But this element was fairly encompassed in the portion of the charge requiring the jury to find "that the agent had authority to act in the manner in which he or she is alleged to have acted." Tr. 3897. "The essence of control in an agency sense is in the necessity of the *consent of the principal* on a given matter." *Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 2d 414, 422-23 (S.D.N.Y. 2007) (emphasis added). Defendants cite no case from this Circuit or elsewhere finding Judge Sand's pattern instruction inadequate.

Finally, defendants' assertion that the *placement* of the agency instruction in the jury charge rendered the charge insufficient is frivolous. *See* Defs. Mem. at 31-33. The Court included its agency instruction just before the instructions on authority and *respondeat superior*.

**A-73**

The instruction was not "buried" in the midst of unrelated instructions. In any event, jury instructions must be considered *as a whole*. *Schermerhorn*, 91 F.3d at 322.

## VII. PLAINTIFFS' SUMMATION WAS APPROPRIATE

Defendants' complaints about summation are meritless. Attorneys have "'wide latitude in formulating their arguments'" to the jury, and "'[r]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal.'" *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006) (citing *Reilly v. Natwest Mkts. Grp.*, 181 F. 3d 253, 271 (2d Cir. 1999)). "A party seeking a new trial on the basis of opposing counsel's improper statements to the jury faces a heavy burden . . . ." *Marcic v. Reinauer Transp. Cos.*, 397 F. 3d 120, 124 (2d Cir. 2005).

Defendants assert that plaintiffs misstated the law and facts on *respondeat superior*. Defs. Mem. at 29. They contend that only a "sufficiently high level" official can bind a defendant, relying on *Duch v. Jakubek*, 588 F.3d 757, 763 (2d Cir. 2009). But *Duch* was a hostile work environment case. A low-level employee is never acting within the scope of employment by engaging in sexual harassment, and the only viable claim when a low-level employee creates a hostile environment is a failure to supervise claim. *Id.* In contrast, in a case involving other kinds of misconduct, the jury is entitled to consider a variety of factors to determine whether the employee causing harm was acting within the scope of employment—just as this Court instructed. *See* Tr. 3900 (tracking N.Y. Pattern Jury Instr., Civil 2:235).

Contrary to defendants' position, employers are responsible for the acts of *all* employees—even drunken sailors—when those acts "arise 'out of and in the course of'" employment. *Ira S. Bushey & Sons v. United States*, 398 F.2d 167, 171-72 (2d Cir. 1968). The rule of *respondeat superior* in the Second Circuit is that "'the employer should be liable for those faults that may be fairly regarded as risks of his business, whether they are committed in furthering it or not.'" *Taber v. Maine*, 67 F.3d 1029, 1037 (2d Cir. 1995). As plaintiffs' counsel put it to the

41

**A-74**

jury, a customer service representative who is on the job and solves a problem for a customer can fairly be considered to represent the entity. Tr. 3781-82. That is because such a representative is acting within the scope of employment. Defendants also complain that there was no record support for the statement in plaintiffs' closing that "hundreds of low-level employees" had murdered civilians, but Eviatar testified precisely that "many hundreds from among the Palestinian security apparatuses were involved in terrorist activities during the Intifada." Tr. 745.

Defendants also assert that plaintiffs misstated the law on material support. They contend (without citation) that their well-publicized and consistently applied policy of keeping convicted terrorists on the payroll (or adding them to the payroll upon arrest) did not constitute material support as a matter of law. Defs. Mem. at 30. Surely the jury was entitled to conclude that the knowing employment and payment for many years to convicted terrorists was the provision of material support of terror. *See supra* Part II.A.2. This is the basic theory of every ATA claim against every financial institution that finances terror, including several criminal cases to which very large financial institutions have pled guilty and paid record-breaking fines. *See, e.g.*, *Linde v. Arab Bank*, 04 Civ. 2799 (BMC), 2015 U.S. Dist. LEXIS 45903 (E.D.N.Y. Apr. 8, 2015). A ruling that terror financing is *only* material support if paid in advance would jeopardize such prosecutions and make no sense—people are paid all the time after they provide a service, and the jury was entitled to conclude that the promise of the payment was a substantial contributing factor here. Tr. 1560; *Boim*, 549 F.3d at 711.

Defendants contend that certain statements concerning Fatah and AAMB—particularly the statement that "Fatah and the PLO are the same because the Fatah and the PLO budget are with Arafat," Tr. 3796—were improper "alter ego arguments." But that was a direct quotation from the deposition of Hussein al Sheikh, one of Arafat's top deputies and a senior PA Minister.

42

Al-Sheikh Dep. 140.  Moreover, the jury was fully entitled to conclude that Fatah was acting as an agent for the PLO, based on Al-Sheikh's testimony and other evidence in the record.  *See, e.g.*, Tr. 443-44 (Eviatar).

Finally, the Court cured any possible prejudice by instructing the jury that their verdict must "be guided by [the Court's] complete instructions on the law and not the lawyers' view of what the law is and how you should apply it.  If any attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions you must follow."  Tr. 3871-72.  The Court gave the further instruction that "[i]n determining the facts, you must rely upon your own recollection of the evidence.  What the lawyers have said in their opening statements, in their closing arguments, in their objections or in their questions is not evidence."  Tr. 3872.

## VIII.  THE JURY'S DAMAGES VERDICT DOES NOT SHOCK THE CONSCIENCE

### A.  The Court Correctly Permitted Counsel to Recommend Specific Damages

Defendants complain that counsel suggested specific dollar amounts for non-economic damages during summations.  As defendants concede, the Second Circuit has refused to adopt a rule prohibiting counsel from doing so.  *See* Defs. Mem. at 34.  Instead, the Second Circuit "favor[s] a more flexible approach," with the decision "best left to the discretion of the trial judge." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 912 (2d Cir. 1997).

Although defendants cite a decision by the First Circuit prohibiting such suggestions, the First Circuit conceded that "our outright ban is clearly out of step with prevailing federal practice.  The Second, Fourth, Sixth, Seventh, Eighth and Tenth circuits leave it to district judges to decide whether and how lawyers may discuss pain and suffering damages with juries." *Rodriguez v. Senor Frog's de la Isla*, 642 F.3d 28 n.3 (1st Cir. 2011).  Moreover, this Court correctly instructed the jury to guard against any potential prejudice, with an instruction straight from the

43

**A-76**

New York Pattern Jury Instructions permitting suggested awards. Tr. 3904; N.Y. Pattern Jury Instr.–Civil 2:277A.

Defendants cry foul because the jury made their determination of damages "[w]ithout the benefit of any counter-figures from other sources." Defs. Mem. at 35 (citing *Mileski v. Long Island R.R.*, 499 F.2d 1169, 1172 (2d Cir. 1974)). But the lack of counter-figures was solely a result of defendants' trial strategy. The Court ensured that defendants knew the amounts plaintiffs would be seeking before plaintiffs recommended the amounts to the jury (Tr. 3659-61), and there was nothing to stop defendants from proposing counter amounts. Tr. 3664 ("I thought it was appropriate and fair, but not necessary, to require him to tell you so you have a full opportunity if you think you want to give the jury guidance with regard to whether or not certain things were caused by the acts, certain injuries weren't caused by them. . . ."). Defendants decided against putting on a damages case at trial; they cannot now complain that the trial was unfair because they chose not to provide the jury with counter-figures.

## B. The Jury Verdict Does Not Shock the Conscience

"Where there is no particular discernible error, [the Second Circuit has] generally held that a jury's damage award may not be set aside as excessive unless 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998)); *Boim v. Quranic Literacy Inst.*, No. 00 C 2905, 2005 WL 433463, at *5 (N.D. Ill. Feb. 18, 2005), *aff'd in relevant part, rev'd on other grounds sub nom. Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) (denying remittitur for jury award of $52 million in terror case because Court could not say award was "'monstrously excessive'" or "surprising, given the nature of the case, and given that the defendants offered no alternative to the plaintiffs' pleas and figures."). In determining whether an award is excessive, courts look to awards in

44

A-77

comparable cases. *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003). A verdict stands if it falls "within [a] reasonable range" established by similar cases. *Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir. 1990). Here, the jury's damage awards were well within the range awarded in other terror cases:

- $17 million to a terror victim who endured a brain injury, a destroyed sinus cavity and left ear drum, permanently impaired vision, and loss of the ability to taste and smell. *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 263 (D.D.C. 2003).

- $15 million per parent for pain and suffering of losing a child in a terror attack. *Boim v. Quranic Literary Fund*, 291 F.3d 1000 (7th Cir. 2002) (affirming jury award of $52 million, including $22 million in economic damages).

- $12 million for child's pain and suffering due to loss of father to terror attack. *Holland v. Islamic Republic of Iran*, 496 F. Supp. 2d 1, 34-35 (D.D.C. 2005) ("exceptional and attentive father" whose children had "behavioral problems caused—in part—by the lack of a father figure").

- $12 million to wife of hostage victim killed. *Higgens v. Islamic Republic of Iran*, No. 99 Civ. 00377, 2000 WL 33674311 (D.D.C. Sept. 21, 2000).

- $12 million to terror victim hospitalized for one month due to chest injury (shrapnel perforated lung), requiring surgery to remove screws lodged in his spleen and chest, as well as a bolt in his foot. *Campuzano*, 281 F. Supp. 2d at 264-67.

- $12 million to terror victim who required surgery to remove nuts and bolts in both ankles, a spike in his left leg, and glass in his eye, and suffers from a permanent limp, nerve damage, hypersensitivity to light, a risk of glaucoma, and PTSD. *Campuzano*, 281 F. Supp. 2d at 266.

- $10 million to wife of deceased terror victim whose "financial stability and plans for the future were destroyed," and $5 million to children and parents. *Knox v. PLO*, 442 F. Supp. 2d 62, 79 (S.D.N.Y. 2006).

- $10 million to terror victim with a perforated eardrum, shrapnel injuries that caused nerve damage to the upper lip,

45

**A-78**

debilitating headaches and an 8-day hospital stay. *Campuzano*, 281 F. Supp. 2d at 265.

- $7 million to terror victim who was taken to hospital but not admitted because she did not have physical injuries other than ringing in ears (which became permanent), and who later received psychiatric treatment for emotional injuries. *Campuzano*, 281 F. Supp. 2d at 265

- $6 million to wife of bombing victim who must act as nurse to husband as a result of his injuries. *Campuzano*, 281 F. Supp. 2d at, 267-68 (D.D.C. 2003).

- $2.5 million for pain and suffering of a sibling killed in a terrorist attack. *E.g., Estates of Ungar v. PA*, 325 F. Supp. 2d 15, 67 (D.R.I. 2004), *aff'd*, 402 F.3d 274 (1st Cir. 2005); *Knox v. PLO*, 442 F. Supp. 2d 62 (S.D.N.Y. 2006).

Defendants attempt to counter these awards with cases that did not involve terror and, significantly, did not permit recovery for a family member's pain and suffering. *See* Defs. Mem. at 35-36 (citing cases); *id*. at Ex. A (citing, *e.g.*, *In re Air Crash Near Nantucket Island*, 462 F. Supp. 2d 360, 368-69 (E.D.N.Y. 2006) (Death on the High Seas Act)). These cases are irrelevant. The jury had significant evidence that terror cases are different from ordinary tort cases. *See, e.g.*, Tr. 2175 (R. Sokolow); 2195 (A. Bauer); 2431-32 (S. Gould); 2342-43 (S. Waldman); 2321 (M. Waldman); 2272, 2279 (L. Mandelkorn); 2388 (R. Gould); 2627 (D. Miller); 2721 (R. Blutstein); 2532 (S. Goldberg). The amounts awarded by the jury are reasonably within the range of terror cases.

Defendants also claim that family members of those who were wounded or killed should not be permitted to recover damages for emotional distress if they were not present at the scene of the attack. But no court has ever imposed a "physical presence" requirement under the ATA. To the contrary, courts have awarded significant damages to plaintiffs who endured the trauma and emotional impact of having a relative killed or injured in a terrorist attack without being present. *See, e.g.*, *Knox v. PLO*, 442 F. Supp. 2d 62, 79 (S.D.N.Y. 2006); *Estates of Ungar v. PA*,

46

**A-79**

325 F. Supp. 2d 15, 67 (D.R.I. 2004) ($85 million to family members who were not present); *see generally Calderon-Cardona v. Democratic Peoples Republic of Korea*, 723 F. Supp. 2d 441, 461 (D.P.R. 2010) (collecting cases). As this Court already ruled on summary judgment, a physical presence requirement makes no sense where, as here, persons not at the scene were intended victims of the tortious conduct. *See, e.g.*, *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001).

## IX. THE COURT SHOULD DENY THE "RENEWED" MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

The standard on a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). A "motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Weiming Chen v. Ying-Jeou Ma*, 595 F. App'x 79, 80 (2d Cir. 2015). Defendants' motion fails this test—it contains no "controlling decisions or data" that were not included in their many previous personal jurisdiction challenges—and so should be summarily denied.

### A. Defendants Waived Their Jurisdictional Arguments

If the Court is to entertain the jurisdictional issue at all, it should make express findings of fact on defendants' consent and waiver. Defendants gave express written consent "to allow the case to proceed before this Court." DE 476-#3. They did so having made a strategic decision to avoid a decision on plaintiffs' cross-motion to change venue. Defendants moved to dismiss the action for lack of proper venue, arguing that the improper venue also defeated personal jurisdiction. DE 94. Plaintiffs opposed that motion and cross-moved to transfer the case to the Eastern District of New York. DE 96. Then, defendants voluntarily consented to have the case

47

**A-80**

continue in this Court. *See* DE 476-#3. Their consent to this forum as the venue for this case necessarily included consent to personal jurisdiction. *See Richardson Greenshields Secs., Inc. v. Metz*, 566 F. Supp. 131, 133 (S.D.N.Y. 1983) ("A waiver of objection to venue would be meaningless . . . if it did not also contemplate a concomitant waiver of objection to personal jurisdiction.") (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos*, 553 F.2d 842, 844 (2d Cir. 1977)); *CA, Inc. v. Stonebranch, Inc.*, No. 12 Civ. 5988(SFL)(ARL), 2014 WL 917269, at *6 (E.D.N.Y. Jan. 27, 2014), *adopted in relevant part* 2014 WL 931223 (E.D.N.Y. Mar. 7, 2014) (federal courts consistently hold that an agreement to submit to venue necessarily serves as consent to personal jurisdiction) (collecting cases).[15] Defendants got the benefit of their bargain—a trial in Manhattan instead of Brooklyn—in consideration for their commitment to be bound by a trial in this Court. They made the waiver for their own strategic reasons and must be held to it.

Separately, defendants are also barred from now asserting a personal jurisdiction defense because they failed to include that defense in their Rule 12(c) motion for judgment on the pleadings, filed in January 2012. DE 187. Rule 12(g) provides in relevant part that "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). And Rule 12(h) provides that a party waives any defense based on personal jurisdiction that is omitted from a Rule 12(c) motion. Fed. R. Civ. P. 12(h).

---

[15] *Accord CV Holdings, LLC v. Bernard Techs., Inc.*, 14 A.D.3d 854, 855 (3d Dept 2005) ("Although defendant now contends that this clause cannot be deemed a consent to personal jurisdiction because it uses the word 'venue' instead of 'jurisdiction,' we agree with plaintiff that to interpret the provision as defendant urges would render it meaningless inasmuch as a court that lacks jurisdiction cannot, at the same time, be the proper venue for an action."). While this question usually arises in the context of pre-litigation contracts, a stipulation during litigation is merely a form of contract. The fact that the stipulation here was drafted and executed by experienced litigation counsel means the cases regarding pre-litigation contracts apply here *a fortiori*.

To be sure, "a defendant does not waive a personal jurisdiction argument . . . if the 'argument that the court lacked jurisdiction over [the] defendant would have been directly contrary to controlling precedent in this Circuit.'" *Gucci Am., Inc. v. Li*, 768 F.3d 122, 135-36 (2d Cir. 2014). However, previously unavailable defenses must be raised "as soon as their cognizability is made apparent." *Holzsager v. Valley Hosp.*, 646 F.2d 792, 796 (2d Cir. 1981). Even a new defense is subject to waiver "by failure to assert it seasonably, by formal submission in a cause, or by submission [to the court's jurisdiction] through conduct." *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939).

The "at home" defense to general jurisdiction *was* available and "apparent" to these defendants in 2012, because the previous year the Supreme Court decided *Goodyear Dunlop Tires Operations, SA v. Brown*, 131 S. Ct. 2846 (2011). *Goodyear* was the "pathmarking opinion" that established the "at home" test. *Id.* at 2851. As the Supreme Court stated in *Daimler AG v. Bauman*, "the Court made plain in *Goodyear* and repeats here [that] general jurisdiction requires affiliations 'so "continuous and systematic" as to render [the foreign corporation] essentially at home in the forum State.'" 134 S. Ct. 746, 758 n.11, 760 n.16 (2014)(quoting *Goodyear*). The Second Circuit too has confirmed that the "essentially at home" standard was set forth in *Goodyear* and merely clarified in *Daimler*. *In re Roman Catholic Diocese of Albany, N.Y., Inc.*, 745 F.3d 30, 37-38 (2d Cir. 2014).

Defendants well understood that they had a basis to argue against general jurisdiction under *Goodyear*. They not only cited *Goodyear* to the Supreme Court in 2011,[16] they moved to dismiss another case for lack of personal jurisdiction prior to *Daimler*, arguing that they were not

---

[16] Resp'ts Brief, *Mohamad v. Rajoub*, No. 11-18, 2011 WL 3664462, at *17 (Aug. 19, 2001).

49

**A-82**

"at home" in the United States. *See* Mem. in Supp. of Mot. to Dismiss (DE 6) at 19-20, *Livnat v. PA.*, 13-CV-00498 (E.D. Va. June 5, 2013).

The Second Circuit's decision in *Gucci* strongly supports a finding of waiver here. In *Gucci* there was no waiver because the non-party bank was not a defendant and did not make a Rule 12 motion. As the Circuit explained: "the waiver provisions of that rule are inapplicable because the Bank is not a 'party' that could fail to assert its personal jurisdiction defense in an answer or a motion to dismiss." *Gucci*, 768 F.3d at 136 n.14. Moreover, the issue in *Gucci* was purely one of a bank "branch office" rule unique to New York law. *Id.* at 136. In this case, this Court's general jurisdiction ruling was unequivocally not based on the mere presence of a branch office. *See* DE 478, Tr. (4/11/14) at 63-64 ("I haven't ruled that a local office is sufficient."). And, unlike the bank in *Gucci*, it is simply an empirical fact that *Goodyear*'s "at home" defense had been "made apparent" (*Holzsager*, 646 F.2d at 796) to these defendants no later than mid-2011, as evidenced by their citation of the *Goodyear* standard to the Supreme Court in August 2011. "Defendants [the PA and PLO] themselves, represented by the same counsel . . . twice invoked *Goodyear*'s "at home" standard before *Daimler* was decided." *Gilmore v. Palestinian Auth.*, 8 F. Supp. 3d 9, 16 (D.D.C. 2014).

## B. Alternate Grounds Establish Personal Jurisdiction

The Court was absolutely correct on general jurisdiction because defendants' stateless status is indeed "exceptional." *See Daimler*, 134 S. Ct. at 761 n.19. Other cases purporting to apply *Daimler* failed to recognize that the PA and PLO are stateless entities, which brings this case within the "exceptional" circumstances foreshadowed in *Daimler*. There is absolutely no need for the Court to revisit *Daimler*. However, the Court should also not accept defendants' false dichotomy of "general jurisdiction or no jurisdiction." Merely stating defendants' position on specific jurisdiction shows its absurdity: they contend that a person can kill American citi-

50

**A-83**

zens for the purpose of affecting the conduct of the U.S. Government and yet remain outside the reach of the United States courts. That cannot be the law.

### 1. The Fifth Amendment Applies and Is Less Restrictive than the Fourteenth Amendment

This case is controlled by the Fifth Amendment, which governs cases arising under federal law.[17] The Sixth Circuit has held that due process under the Fourteenth Amendment operates differently than due process under the Fifth Amendment because only the Fourteenth Amendment "'ensure[s] that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.'"[18] Similarly, the Third Circuit has held: "Those strictures of fourteenth amendment due process analysis which attempt to prevent encroachment by one state upon the sovereignty of another do not apply with equal force to the adjudication of a federal claim in a federal court."[19] Professors Wright & Miller expounded on the unique importance of federal concerns:

> Presumably, when Congress has undertaken to enact a nationwide service statute applicable to a certain class of disputes, that statute should be afforded substantial weight as a legislative articulation of federal social policy. . . . [D]ue process will not prevent jurisdiction in an otherwise appropriate forum when the federal interest in furthering objectives or policies rises to a constitutional level, or implicates other especially weighty or uniquely federal concerns. . . . The Fourteenth Amendment function of protecting the several states' status as coequal sovereigns seemingly ought to

---

[17] *See, e.g.*, *Chew v. Dietrich*, 143 F.3d 24, 27-28 & n.4 (2d Cir. 1998) (applying Fifth Amendment in case under Jones Act).

[18] *Handley v. Ind.& Mich. Elec. Co.*, 732 F.2d 1265, 1271 (6th Cir. 1984) (quoting *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 291-92 (1980)).

[19] *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 294 (3d Cir. 1985). Other courts have read the Fifth Amendment as requiring the same analysis as the Fourteenth, though in "in a less demanding" fashion. *Republic of Panama v. BCCI Holdings (Luxembourg) SA*, 119 F.3d 935, 942 (11th Cir.1997); *see generally SEC v. LovesLines Overseas Mgmt., Ltd.*, No. 04 Misc. 302 (RWR) (AK), 2007 WL 581909, at *2 (D.D.C. Feb. 21, 2007) (collecting cases).

51

be of no relevance to the parallel analysis under the Due Process Clause of the Fifth Amendment.[20]

Thus, although the Second Circuit has said (in a case that did not have national security implications) that the Fifth and Fourteenth Amendment analyses are "basically the same," *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998), it has applied the minimum contacts test under the Fifth Amendment to *permit* jurisdiction over defendants engaged in commercial activities entirely overseas. *E.g., SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990).

Moreover, due process is a flexible concept, requiring a balancing of the private interests, the value of alternate procedures, and the Government's interests at stake in any given context. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (plurality opinion) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). The PLO and the PA assert a private interest in avoiding litigation in the United States—an interest that is not a particularly strong one in comparison to deprivation of life or liberty often confronted by the courts.[21] As for the value of alternative procedures, accepting defendants' position that they should not be subject to an ATA suit anywhere would mean that there would be no recourse for these American victims. Finally, the Governmental interests are at their apex in this context. Indeed, "the Government's interest in combating terrorism is an urgent objective of the highest order . . . .". *Holder v. Humanitarian Law Project*, 561 U.S. 1, 4 (2010). In combating terror, the Federal Government has the power— consistent with the Due Process Clause—to use drone strikes for targeted killings, to capture suspects and bring them to the United States to face criminal justice, to bar those who support

---

[20] Wright & Miller, *Personal Jurisdiction in Federal Question Cases*, 4 Fed. Practice & Procedure, Civ. § 1068.1 (3d ed.).

[21] *Cf. Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) (in a forum non convenience analysis, private interests of a litigant "are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive").

**A-85**

terror from doing business with U.S. persons, to freeze assets, and to impose embargoes. The ATA is one more weapon in the arsenal of fighting terror, and a relatively tame one at that, enabling victims to hold sponsors of terror legally accountable under U.S. law. "Congress conceived of the ATA, at least in part, as a mechanism for protecting the public's interest through private enforcement." *Linde v. Arab Bank PLC*, 706 F.3d 92,112 (2d Cir. 2013).

It would be a bizarre result if the Due Process Clause permitted targeted killings, renditions, and *ex parte* asset freezes but forbade Congress from allowing jurisdiction in civil actions seeking redress for the same conduct. As one court has observed, "if federal courts may constitutionally exercise criminal jurisdiction over [foreign terrorists], the Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil *in personam* jurisdiction over those same individuals for the same acts." *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 59 (D.D.C. 2003). In the terrorism context, the Second Circuit has been especially protective of federal power to exercise jurisdiction over persons acting abroad to harm the interest of the United States or its citizens. *United States v. Yousef*, 327 F.3d 56, 112 (2d Cir. 2003); *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011).

### 2. The Court Has Specific Jurisdiction Even Under Fourteenth Amendment Case Law

Even under the Fourteenth Amendment, specific jurisdiction may be exercised where a claim "arises out of *or relates to* defendants' contacts" with the forum (here, the United States). *Chew*, 143 F.3d at 28 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)) (emphasis added); *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 167 (2d Cir. 2010) (district court "too narrowly construes the nexus requirement, which merely requires the cause of action to 'relate to' defendant's minimum contacts with the forum").

53

**A-86**

"The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct." *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2789 (2011). The Second Circuit has identified several ways of meeting the minimum contacts requirement for specific jurisdiction, including (a) contact with the forum that is part of an overall "plan" directed at least in part to the jurisdiction, (b) in-state effects of completely extraterritorial activity, and (c) sufficient related activity within the jurisdiction.

a. **A Plan Directed at the United States.** To give rise to specific jurisdiction, the offending conduct may be "a part of a larger business plan purposefully directed at [the relevant jurisdiction]." *Chloe*, 616 F.3d at 167. In *Chloe*, the court had specific jurisdiction over a seller of counterfeit goods because a single sale was part of a larger "plan" directed at customers in New York. *Id.* at 166-67.

Here, defendants' overall "plan" was directed in material part at the United States. By definition, terrorism is violent or dangerous criminal conduct that appears intended to "influence the policy" or "affect the conduct" of a government. 18 U.S.C. § 2331(1)(B). Defendants' political goal was to obtain territorial concessions from Israel, and the evidence at trial supported the conclusion that one goal of the terror campaign was influencing U.S. policy and affecting the conduct of the U.S. Government in favor of achieving those territorial objectives. This evidence revealed a two-pronged approach: (a) carrying out a massive terror campaign in Israel in which many Americans and others were killed and injured, in order to influence the conduct and policies of the governments of the United States and Israel; and (b) advancing the argument in the United States and elsewhere that the terror campaign would stop when defendants achieved their

54

**A-87**

political goals. To begin, defendants repeatedly and openly stated their intention to use their terror campaign to influence U.S. policy. *See, e.g.*, Ex. 175; 200 ("The European nations and the U.S., who have strategic interests in the region, are called upon to see the necessity of urgent and immediate action to stop Israeli practices against the Palestinian people. Without this, their vital interests shall be directly jeopardized.").

At the same time as their terror campaign, defendants' representatives met with senior U.S. officials on "scores" of occasions to discuss U.S. policy toward the PA and the PLO. Tr. 3115-16; 3133-34 (Ashrawi). Exactly as planned by defendants, the topic of discussion was "stopping terrorism." *Id.* Defendants' substantive "anti-terror" message in the U.S. reflected a tight link to the goals of the terror campaign: the "violence" would end only after Israel withdrew from "occupation" of territory that defendants wished to control. *See* DE 476 (summarized in Proposed Ex. 1119). If organized criminals damaged a restaurant in New Jersey and then peacefully came to Manhattan to encourage the owners to pay protection money to "end the violence in Jersey," no one would think twice if a civil or criminal case were brought against the racketeers in this District.[22]

Not only did defendants *intend* to affect U.S. Government policy, they *actually* affected it, though the impact of defendants' conduct on the United States sometimes differed from that they sought to achieve. The State Department concluded that "members of other [PA] security forces, were frequently involved in acts of violence against Israelis." Ex. 496. In March 2002, the Secretary of State designated AAMB—whose members were drawn mainly from PA security

---

[22] In *Klieman. v. PA,* the District Court concluded that an allegation that the PA and PLO would use violence to attempt to influence the U.S. government lacked plausibility because it was unsupported by specific factual allegations. 04 Civ. 1173 (PLF), 2015 WL 967624, at *8 (D.D.C. Mar. 3, 2015), *appeal filed*, No. 15-1034 (D.C. Cir. Apr. 8, 2015). Here, in contrast, this Court is not dealing with *allegations*, but with *evidence* that this was *exactly* the defendants' stated intent.

forces—as a foreign terrorist organization, stating that "the Al Aqsa Martyrs Brigades . . . has committed or poses a serious risk of committing acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States."  Ex. 537.  And in June 2002, the President called on the Palestinian people to elect new leadership "not compromised by terror."  President Bush's Remarks on Middle East (June 24, 2002), Excluded Ex. 1278.

      **b.**      **Effects on the United States and its Citizens.**  "The effects test is a theory of personal jurisdiction typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013).  The Second Circuit has repeatedly upheld the exercise of jurisdiction where defendants acted abroad but "expressly aimed" their conduct at U.S. interests.  The court has upheld specific jurisdiction against Fifth Amendment challenges where the defendant engaged in insider trading abroad,[23] attended a price-fixing meeting in a foreign country,[24] assisted from abroad in the evasion of U.S. tax laws,[25] placed a bomb on a non-U.S. airliner traveling between non-U.S. cities,[26] and even conspired to sell arms abroad "with the understanding that they would be used to kill Americans and destroy U.S. property" abroad.  *Al Kassar*, 660 F.3d at 118.

      The United States has a strong interest in asserting jurisdiction over those who kill and injure U.S. citizens or engage in terror in order to influence U.S. Government policy or affect U.S. Government interests.  The attacks in this case were carried out by AAMB and Hamas.  The

---

[23] *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990).

[24] *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d Cir. 2003).

[25] *In re Grand Jury Subpoena*, 707 F.2d 663 (2d Cir. 1983).

[26] *United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003).

Executive Branch designated these entities as foreign terrorist organizations, because each "has committed or poses a serious risk of committing acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States." *See* Ex. 537; Tr. 3894 (jury instruction that Hamas was designated in 1997).

Congress has protected the security of the United States by passing extraterritorial legislation imposing criminal and civil legal consequences for engaging in terror or supporting terror. As discussed above, to hold that those who perpetrate such crimes are immune from jurisdiction in the United States unless their violent actions physically occur on U.S. soil would be a perversion of the Constitution, for a core mission of the Federal Government is to protect its citizens from foreign terrorism. "[W]hile the Constitution protects against invasions of individual rights, it is not a suicide pact. . . . Congress has broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs. Latitude in this area is necessary to ensure effectuation of this indispensable function of government." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963).

Defendants rely on *Livnat* and *Klieman* to challenge jurisdiction.[27] We disagree with the reasoning of those cases to the extent, if any, that they are not based on a mere failure of proof by those plaintiffs, or of the insufficiency of the allegations made by those plaintiffs, and purport to hold as a matter of law that a terror organization which carries out a violent attack on a U.S. citizen conducted as part of a terror campaign designed to influence the policies of the U.S. government is exempt from the jurisdiction of the U.S. courts. Indeed, the *Livnat* court suggested that a jurisdictional nexus must be "with the forum itself rather than with its citizens." *Livnat*, 2015 WL 558710, at *12. That is exactly what happened and was shown in this case: defend-

---

[27] *Livnat v. PA*, No. Civ. 14-668 (CKK), 2015 WL 558710, at *9 (D.D.C. Feb. 11, 2015) *appeal filed*, No. 15-7024 (D.C. Cir. Mar. 18, 2015); *Klieman*, 2015 WL 967624, at *6.

57

**A-90**

ants' terror activities were not mindless nor were they aimed at the plaintiffs and decedents individually; on the contrary, the terror campaign was aimed at the United States Government itself. *See, e.g.*, Exs. 175, 200.

        **c.**        **Activity in the United States.**  This Court found in 2011 that defendants were continuously and systematically present in the United States.  DE 87 at 14-15.  (The Court also found, like every other court to have considered the issue, that the defendants' D.C. office and employees "simultaneously served as an office for the PLO and the PA," and that the activities of the D.C. office were "attributable to both the PLO and the PA."  DE 87 at 8-9.)   The exercise of specific jurisdiction is particularly appropriate where, as here, the defendant is *also* systematically and continuously present in the United States.  *See, e.g.*, *Chew*, 143 F.3d at 28; *SEC v. Straub*, 921 F. Supp. 2d 244, 253-54 & n.6 (S.D.N.Y. 2013); *see Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002) ("[W]hile these [New York] contacts may not have directly given rise to the plaintiff's cause of action, they certainly 'relate to' it."); *Chloe*, 616 F.3d at 167.[28]  Here, as in *Bank Brussels*, the U.S. activities furthered defendants' political goal of gaining territory—the same political goal of their terror campaign.

*    *    *

     The Court obviously has jurisdiction over these defendants.  They affirmatively consented to proceeding in this district; they waived their objections to jurisdiction; and it cannot be the law that a defendant can kill Americans for the purpose of affecting U.S. government policy and avoid being held accountable in a court of the United States.

---

[28]  The District Court in *Klieman* said that "[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit."  2015 WL 967624, at *7.  That is certainly not the law of the Second Circuit.  *See Chew*, 143 F.3d at 28 (rejecting causation test); *Chloe*, 616 F.3d at 167 (district court "too narrowly construes the nexus requirement, which merely requires the cause of action to 'relate to' defendant's minimum contacts with the forum").

58

**A-91**

## CONCLUSION

The Court and the jury devoted enormous time, energy and resources to the just resolution of this case. Defendants' lengthy motion for a new trial demonstrates only one thing: the Court gave them a fair trial. The Court should deny the motion and enter final judgment.

Dated:   New York, New York
        May 21, 2015

ARNOLD & PORTER LLP

By:_____

Kent A. Yalowitz
    kent.yalowitz@aporter.com
Lucy S. McMillan
    Lucy.McMillan@aporter.com
Carmela T. Romeo
    carmela.romeo@aporter.com
Tal R. Machnes
    tal.machnes@aporter.com

399 Park Avenue
New York, New York  10022
(212) 715-1000

59

**A-92**

A-93

# EXHIBIT  A

**A-93**

# Jan. 22, 2002 Jaffa Road Shooting

**Nasser Aweis**     **Ahmed Barghouti**

Commanders

**Ibrahim Abdel Hai**

Recruiter

**Mohamed Mousleh**     **Majed al-Masri**

Prep Team

**Fares Ghanem**     **Mohamed Abdullah**

Transport



**Sa'id Ramadan**

Shooter

Case 15-3135, Document 631, 08/11/2025, 3646212, Page118 of 357

# March 21, 2002 King George Street Bombing



**Nasser Shawish**



**Abdel Karim Aweis**

Commanders



**Tawfiq Tirawi**

Provided Weapons, Freedom to Operate



**Kahira Sa'adi**     **Sana'a Shehadeh**

Transport



**Mohamed Hashaika**

Suicide Bomber

Case 15-3135, Document 631, 08/11/2025, 3646212, Page119 of 357

A-95

# Jan. 29, 2004 Bus No. 19 Bombing

**Ahmed Salah**

Commander

**Ali Abu Haliel**

**Abdul Rahman Maqdad**

Bomb Makers

**Ahmed Sa'ad**

**Hilmi Hamash**

Prep and Recruiter

**Mohamed Ma'ali**

Transport



**Ali Ja'ara**

Suicide Bomber

Case 15-3135, Document 631, 08/11/2025, 3646212, Page120 of 357

A-96



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

MARK I. SOKOLOW, et al.,

              Plaintiffs,

        -against-

THE PALESTINE LIBERATION
ORGANIZATION and THE PALESTINIAN
AUTHORITY,

              Defendants.

-----------------------------------------------------------X

04 **CIVIL** 00397 (GBD)

**JUDGMENT**

A Jury Trial before the Honorable George B. Daniels, United States District Judge, began

on January 14, 2015, and at the conclusion of the trial, on February 23, 2015, the jury rendered a

verdict in favor of each Plaintiff and against both Defendants the Palestine Liberation Organization

and the Palestinian Authority resulting in the following judgment:

I. JANUARY 22, 2002 - JAFFA ROAD SHOOTING:

    1.     A jury verdict in favor of Plaintiff Elise Gould in the amount of $3,000,000.00,

which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. §

2333(a), for a total award of **$9 million**;

    2.     A jury verdict in favor of Plaintiff Ronald Gould in the amount of $3,000,000.00,

which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. §

2333(a), for a total award of **$9 million**;

    3.     A jury verdict in favor of Plaintiff Shayna Gould in the amount of $20,000,000.00,

which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. §

2333(a), for a total award of **$60 million**;

1

**A-97**

4.     A jury verdict in favor of Plaintiff Jessica Rine in the amount of $3,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$9 million**;

5.     A jury verdict in favor of Plaintiff Henna Novack Waldman in the amount of $2,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$7.5 million**;

6.     A jury verdict in favor of Plaintiff Morris Waldman in the amount of $2,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$7.5 million**;

7.     A jury verdict in favor of Plaintiff Shmuel Waldman in the amount of $7,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$22.5 million**;

II. JANUARY 27, 2002 - JAFFA ROAD BOMBING:

1.     A jury verdict in favor of Plaintiff Elana Sokolow in the amount of $2,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$7.5 million**;

2.     A jury verdict in favor of Plaintiff Jamie Sokolow in the amount of $6,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$19.5 million**;

3.     A jury verdict in favor of Plaintiff Lauren Sokolow in the amount of $5,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$15 million**;

2

**A-98**

4.    A jury verdict in favor of Plaintiff Mark Sokolow in the amount of $5,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$15 million**;

5.    A jury verdict in favor of Plaintiff Rena Sokolow in the amount of $7,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$22.5 million**;

III.  MARCH 21, 2002 - KING GEORGE STREET BOMBING:

1.    A jury verdict in favor of Plaintiff Alan Bauer in the amount of $7,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$21 million**;

2.    A jury verdict in favor of Plaintiff Binyamin Bauer in the amount of $1,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$3 million**;

3.    A jury verdict in favor of Plaintiff Daniel Baur in the amount of $1,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$3 million**;

4.    A jury verdict in favor of Plaintiff Yehonathon Bauer in the amount of $25,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$75 million**;

5.    A jury verdict in favor of Plaintiff Yehuda Bauer in the amount of $1,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$3 million**;

3

**A-99**

IV.   JUNE 19, 2002 - FRENCH HILL BOMBING:

1.    A jury verdict in favor of Plaintiff Leonard Mandelkorn in the amount of $10,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$30 million**;

V.   July 31, 2002 - HEBREW UNIVERSITY BOMBING:

1.    A jury verdict in favor of Plaintiff Katherine Baker in the amount of $6,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$18 million**;

2.    A jury verdict in favor of Plaintiff Benjamin Blutstein in the amount of $2,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$7.5 million**;

3.    A jury verdict in favor of Plaintiff Rebekah Blutstein in the amount of $4,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$12 million**;

4.    A jury verdict in favor of Plaintiff Richard Blutstein in the amount of $6,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$18 million**;

5.    A jury verdict in favor of Plaintiff Diane Carter in the amount of $1,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$3 million**;

6.    A jury verdict in favor of Plaintiff Larry Carter in the amount of $6,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$19.5 million**;

4

**A-100**

7.  A jury verdict in favor of Plaintiff Shaun Choffel in the amount of $1,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$4.5 million**;

8.  A jury verdict in favor of Plaintiff Robert L. Coulter Jr. in the amount of $3,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$9 million**;

9.  A jury verdict in favor of Plaintiff Diane Coulter Miller in the amount of $3,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$9 million**;

10. A jury verdict in favor of Plaintiff Robert L. Coulter Sr. in the amount of $7,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$22.5 million**;

11. A jury verdict in favor of Plaintiff Janis Ruth Coulter in the amount of $2,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$7.5 million**;

12. A jury verdict in favor of Plaintiff David Gritz in the amount of $2,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$7.5 million**;

13. A jury verdict in favor of Plaintiff Nevenka Gritz in the amount of $10,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$30 million**;

5

**A-101**

14. A jury verdict in favor of Plaintiff Nevenka Gritz, as successor to Norman Gritz, in the amount of $2,500,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$7.5 million**;

VI. JANUARY 29, 2004 - BUS NO. 19 BOMBING:

1. A jury verdict in favor of Plaintiff Chana Goldberg in the amount of $8,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$24 million**;

2. A jury verdict in favor of Plaintiff Eliezer Goldberg in the amount of $4,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$12 million**;

3. A jury verdict in favor of Plaintiff Esther Goldberg in the amount of $8,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$24 million**;

4. A jury verdict in favor of Plaintiff Karen Goldberg in the amount of $13,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$39 million**;

5. A jury verdict in favor of Plaintiff Shoshana Goldberg in the amount of $4,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$12 million**;

6. A jury verdict in favor of Plaintiff Tzvi Goldberg in the amount of $2,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$6 million**;

**A-102**

7. A jury verdict in favor of Plaintiff Yaakov Goldberg in the amount of $2,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$6 million**;

8. A jury verdict in favor of Plaintiff Yitzhak Goldberg in the amount of $6,000,000.00, which is trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$18 million**.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED:** That Plaintiffs have a judgment as against Defendants the Palestine Liberation Organization and the Palestinian Authority jointly and severally in the amounts specified above for a total jury verdict of $218.5 million, trebled automatically pursuant to the Antiterrorism Act, 18 U.S.C. § 2333(a), for a total award of **$655.5 million**.

**DATED:** New York, New York
October 1, 2015

**So Ordered:**

George B. Daniels
U.S.D.J.

7

**A-103**

**UNITED STATES COURT OF APPEALS
FOR THE
SECOND CIRCUIT**

_____

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 31st day of August, two thousand and sixteen.

Before:        Pierre N. Leval,
                  Christopher F. Droney,
                        _Circuit Judges_,
                  John G. Koeltl,
                        _District Judge.*_

_____

Eva Waldman, Revital Bauer, individually and as natural guardian of plaintiffs Yehonathon Bauer, Binyamin Bauer, Daniel Bauer and Yehuda Bauer, Shaul Mandelkorn, Nurit Mandelkorn, Oz Joseph Guetta, minor, by his next friend and guardian Varda Guetta, Varda Guetta, individually and as natural guardian of plaintiff Oz Joseph Guetta, Norman Gritz, individually and as personal representative of the Estate of David Gritz, Mark I. Sokolow, individually and as a natural guardian of Plaintiff Jamie A. Sokolow, Rena M. Sokolow, individually and as a natural guardian of plaintiff Jaime A. Sokolow, Jamie A. Sokolow, minor, by her next friends and guardian Mark I. Sokolow and Rena M. Sokolow, Lauren M. Sokolow, Elana R. Sokolow, Shayna Eileen Gould, Ronald Allan Gould, Elise Janet Gould, Jessica Rine, Shmuel Waldman, Henna Novack Waldman, Morris Waldman, Alan J. Bauer, individually and as natural guardian of plaintiffs Yehonathon Bauer, Binyamin Bauer, Daniel Bauer and Yehuda Bauer, Yehonathon Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Binyamin Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Daniel Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Yehuda Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Rabbi Leonard Mandelkorn, Katherine Baker, individually and as personal representative of the Estate of Benjamin Blutstein, Rebekah Blutstein, Richard Blutstein, individually and as personal representative of the Estate of Benjamin Blutstein, Larry Carter, individually and as personal representative of the Estate of Diane ("Dina") Carter, Shaun Coffel, Dianne Coulter Miller, Robert L Coulter, Jr., Robert L. Coulter, Sr., individually and as personal representative of the Estate of Janis Ruth Coulter, Chana Bracha Goldberg, minor, by

**JUDGMENT**

Docket Nos. 15-3135(L)
                15-3151(XAP)

**A-104**

her next friend and guardian Karen Goldberg, Eliezer Simcha Goldberg, minor, by her next friend and guardian Karen Goldberg, Esther Zahava Goldberg, minor, by her next friend and guardian Karen Goldberg, Karen Goldberg, individually, as personal representative of the Estate of Stuart Scott Goldberg/natural guardian of plaintiffs Chana Bracha Goldberg, Esther Zahava Goldberg, Yitzhak Shalom Goldberg, Shoshana Malka Goldberg, Eliezer Simcha Goldberg, Yaakov Moshe Goldberg,Tzvi Yehoshua Goldberg, Shoshana Malka Goldberg, minor, by her next friend and guardian Karen Goldberg, Tzvi Yehoshua Goldberg, minor, by her next friend and guardian Karen Goldberg, Yaakov Moshe Goldberg, minor, by her next friend and guardian Karen Goldberg, Yitzhak Shalom Goldberg, minor, by her next friend and guardian Karen Goldberg, Nevenka Gritz, sole heir of Norman Gritz, deceased,

Plaintiffs - Appellees - Cross - Appellants,

v.

Palestine Liberation Organization, Palestinian Authority, AKA Palestinian Interim Self-Government Authority and or Palestinian Council and or Palestinian National Authority,

Defendants - Appellants - Cross - Appellees,

Yasser Arafat, Marwin Bin Khatib Barghouti, Ahmed Taleb Mustapha Barghouti, AKA Al-Faransi, Nasser Mahmoud Ahmed Aweis, Majid Al-Masri, AKA Abu Mojahed, Mahmoud Al-Titi, Mohammed Abdel Rahman Salam Masalah, AKA Abu Satkhah, Faras Sadak Mohammed Ghanem, AKA Hitawi, Mohammed Sami Ibrahim Abdullah, Esatate of Said Ramadan, deceased, Abdel Karim Ratab Yunis Aweis, Nasser Jamal Mousa Shawish, Toufik Tirawi, Hussein Al-Shaykh, Sana'a Muhammed Shehadeh, Kaira Said Ali Sadi, Estate of Mohammed Hashaika, deceased, Munzar Mahmoud Khalil Noor, Estate of Wafa Idris, deceased, Estate of Mazan Faritach, deceased, Estate of Muhanad Abu Halawa, deceased, John Does, 1-99, Hassan Abdel Rahman,

Defendants.

_____

The appeals in the above captioned case from a judgment of the United States District Court for the Southern District of New York were argued on the district court's record and the parties' briefs. Upon consideration thereof,

**A-105**

A-106

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the district court's judgment is VACATED and the case is REMANDED to the district court with instructions to DISMISS the case for want of jurisdiction.

> For The Court:
>
> Catherine O'Hagan Wolfe,
> Clerk of Court

_____
* The Honorable John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

**A-106**

# MANDATE

## UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

_____

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 31st day of August, two thousand and sixteen.

Before:          Pierre N. Leval,
                   Christopher F. Droney,
                          *Circuit Judges*,
                 John G. Koeltl,
                          *District Judge.*\*

_____

| | |
|---|---|
| Eva Waldman, Revital Bauer, individually and as natural guardian of plaintiffs Yehonathon Bauer, Binyamin Bauer, Daniel Bauer and Yehuda Bauer, Shaul Mandelkorn, Nurit Mandelkorn, Oz Joseph Guetta, minor, by his next friend and guardian Varda Guetta, Varda Guetta, individually and as natural guardian of plaintiff Oz Joseph Guetta, Norman Gritz, individually and as personal representative of the Estate of David Gritz, Mark I. Sokolow, individually and as a natural guardian of Plaintiff Jamie A. Sokolow, Rena M. Sokolow, individually and as a natural guardian of plaintiff Jaime A. Sokolow, Jamie A. Sokolow, minor, by her next friends and guardian Mark I. Sokolow and Rena M. Sokolow, Lauren M. Sokolow, Elana R. Sokolow, Shayna Eileen Gould, Ronald Allan Gould, Elise Janet Gould, Jessica Rine, Shmuel Waldman, Henna Novack Waldman, Morris Waldman, Alan J. Bauer, individually and as natural guardian of plaintiffs Yehonathon Bauer, Binyamin Bauer, Daniel Bauer and Yehuda Bauer, Yehonathon Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Binyamin Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Daniel Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Yehuda Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Rabbi Leonard Mandelkorn, Katherine Baker, individually and as personal representative of the Estate of Benjamin Blutstein, Rebekah Blutstein, Richard Blutstein, individually and as personal representative of the Estate of Benjamin Blutstein, Larry Carter, individually and as personal representative of the Estate of Diane ("Dina") Carter, Shaun Coffel, Dianne Coulter Miller, Robert L Coulter, Jr., Robert L. Coulter, Sr., individually and as personal representative of the Estate of Janis Ruth Coulter, Chana Bracha Goldberg, minor, by | **JUDGMENT**<br><br>Docket Nos. 15-3135(L)<br>             15-3151(XAP) |

MANDATE ISSUED ON 11/28/2016

A-107

her next friend and guardian Karen Goldberg, Eliezer Simcha Goldberg, minor, by her next friend and guardian Karen Goldberg, Esther Zahava Goldberg, minor, by her next friend and guardian Karen Goldberg, Karen Goldberg, individually, as personal representative of the Estate of Stuart Scott Goldberg/natural guardian of plaintiffs Chana Bracha Goldberg, Esther Zahava Goldberg, Yitzhak Shalom Goldberg, Shoshana Malka Goldberg, Eliezer Simcha Goldberg, Yaakov Moshe Goldberg,Tzvi Yehoshua Goldberg, Shoshana Malka Goldberg, minor, by her next friend and guardian Karen Goldberg, Tzvi Yehoshua Goldberg, minor, by her next friend and guardian Karen Goldberg, Yaakov Moshe Goldberg, minor, by her next friend and guardian Karen Goldberg, Yitzhak Shalom Goldberg, minor, by her next friend and guardian Karen Goldberg, Nevenka Gritz, sole heir of Norman Gritz, deceased,

Plaintiffs - Appellees - Cross - Appellants,

v.

Palestine Liberation Organization, Palestinian Authority, AKA Palestinian Interim Self-Government Authority and or Palestinian Council and or Palestinian National Authority,

Defendants - Appellants - Cross - Appellees,

Yasser Arafat, Marwin Bin Khatib Barghouti, Ahmed Taleb Mustapha Barghouti, AKA Al-Faransi, Nasser Mahmoud Ahmed Aweis, Majid Al-Masri, AKA Abu Mojahed, Mahmoud Al-Titi, Mohammed Abdel Rahman Salam Masalah, AKA Abu Satkhah, Faras Sadak Mohammed Ghanem, AKA Hitawi, Mohammed Sami Ibrahim Abdullah, Esatate of Said Ramadan, deceased, Abdel Karim Ratab Yunis Aweis, Nasser Jamal Mousa Shawish, Toufik Tirawi, Hussein Al-Shaykh, Sana'a Muhammed Shehadeh, Kaira Said Ali Sadi, Estate of Mohammed Hashaika, deceased, Munzar Mahmoud Khalil Noor, Estate of Wafa Idris, deceased, Estate of Mazan Faritach, deceased, Estate of Muhanad Abu Halawa, deceased, John Does, 1-99, Hassan Abdel Rahman,

Defendants.

_____

The appeals in the above captioned case from a judgment of the United States District Court for the Southern District of New York were argued on the district court's record and the parties' briefs. Upon consideration thereof,

**A-108**

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the district court's judgment is VACATED and the case is REMANDED to the district court with instructions to DISMISS the case for want of jurisdiction.

For The Court:

Catherine O'Hagan Wolfe,
Clerk of Court

———————————————

* The Honorable John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

A-109

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARK I. SOKOLOW, et al.,

                    Plaintiffs,

    v.

PALESTINIAN LIBERATION ORGANIZATION,
et al.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER

04-cv-397 (GBD)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: DEC 02 2016

GEORGE B. DANIELS, District Judge:

By order and mandate of the Second Circuit Court of Appeals, the District Court judgment is

VACATED and the case is hereby ordered DISMISSED for want of jurisdiction.

Dated: December 1, 2016
      New York, New York

                    SO ORDERED.

                    _____
                    GEORGE B. DANIELS
                    UNITED STATES DISTRICT JUDGE

**A-110**

15-3135(L)
Sokolow v. Palestine Liberation Organization

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT
_____

August Term, 2015

Case Argued: April 12, 2016                    Case Decided: August 31, 2016
Motion Filed: October 8, 2018                  Motion Decided: June 3, 2019

Docket Nos. 15-3135-cv (Lead); 15-3151-cv (XAP)
_____

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR, BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA, NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW, JAMIE A. SOKOLOW, MINOR, BY HER NEXT FRIENDS AND GUARDIAN MARK I. SOKOLOW AND RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD MANDELKORN, KATHERINE BAKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN,

1

**A-111**

RICHARD BLUTSTEIN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, LARRY CARTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR., INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JANIS RUTH COULTER, CHANA BRACHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STUART SCOTT GOLDBERG/NATURAL GUARDIAN OF PLAINTIFFS CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG, TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, NEVENKA GRITZ, SOLE HEIR OF NORMAN GRITZ, DECEASED,

*Plaintiffs – Appellees - Cross-Appellants,*

—v.—

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY AND OR PALESTINIAN COUNCIL AND OR PALESTINIAN NATIONAL AUTHORITY,

*Defendants - Appellants - Cross-Appellees,*

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESTATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH,

2

**A-112**

TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, DECEASED, ESTATE OF MUHANAD ABU HALAWA, DECEASED, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,

*Defendants.*

_____

Before: LEVAL AND DRONEY, <u>Circuit Judges</u>, AND KOELTL, <u>District Judge</u>.[*]

On October 8, 2018, shortly after Congress enacted the Anti-Terrorism Clarification Act ("ATCA"), the plaintiffs-appellees-cross-appellants ("plaintiffs") moved this Court to recall the mandate issued after this Court's decision holding that the federal courts lacked personal jurisdiction over the Palestine Liberation Organization and the Palestinian Authority – the defendants-appellants-cross-appellees ("defendants") – with respect to the plaintiffs' claims. The plaintiffs contend that the newly enacted ATCA provides federal courts with jurisdiction over the defendants in this case and thus the mandate should be recalled. The extraordinary remedy of recalling a mandate is not warranted in this case, and the plaintiffs' motion is accordingly **DENIED**.

---

[*] Judge John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

_____

KENT A. YALOWITZ AND DAVID C. RUSSELL (Baruch Weiss, Dirk C. Phillips, John Robinson, Avishai D. Don, on the brief), Arnold & Porter Kaye Scholer LLP, for Plaintiffs-Appellees-Cross-Appellants.

GASSAN A. BALOUL (Mitchell R. Berger, Alexandra E. Chopin, Aaron W. Knights, on the brief), Squire Patton Boggs (US) LLP, for Defendants-Appellants-Cross-Appellees.

_____

PER CURIAM:

In this case, eleven American families sued the defendants, the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA"), under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), for various terror attacks in Israel that killed or wounded the plaintiffs or their family members. After a seven-week trial, the jury awarded the plaintiffs damages which, after trebling, amounted to $655.5 million. On appeal, this Court held that the federal courts lacked personal jurisdiction over the defendants with respect to the plaintiffs' claims. This Court vacated the judgment of the district court and remanded the case with instructions to dismiss the action. The mandate issued on November 28, 2016, and the Supreme Court denied the plaintiffs' petition for a writ of certiorari on April 2, 2018. The plaintiffs have now moved to recall the mandate based on the recently enacted Anti-Terrorism Clarification Act ("ATCA").

4

**A-114**

The ATCA became law on October 3, 2018. Pub. L. No. 115-253, 132 Stat 3183 (2018). Section 4 of the ATCA, which added a subsection (e) to 18 U.S.C. § 2334, specifies activities by which certain parties shall be deemed to have consented to personal jurisdiction. The provision states that "regardless of the date of the occurrence of the act of international terrorism upon which [a] civil action [brought under 18 U.S.C. § 2333] was filed," a defendant shall be deemed to have consented to personal jurisdiction in such action if the defendant either (a) accepts any of three specified forms of assistance after the date that is 120 days after Section 4 of the ATCA was enacted or (b) is "benefiting from a waiver or suspension of section 1003 of the [ATA]" and, after the date that is 120 days after Section 4 of the ATCA was enacted, establishes or continues to maintain "any office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States."[1] 18 U.S.C. § 2334(e)(1).

---

[1] Section 1003 of the ATA provides that:

> It shall be unlawful, if the purpose be to further the interests of the Palestine Liberation Organization or any of its constituent groups, any successor to any of those, or any agents thereof . . .
>
> (1) to receive anything of value except informational material from the PLO or any of its constituent groups, any successor thereto, or any agents thereof;
>
> (2) to expend funds from the PLO or any of its constituent groups, any successor thereto, or any agents thereof; or
>
> (3) notwithstanding any provision of law to the contrary, to establish or maintain an office, headquarters, premises, or other facilities or establishments within the

5

**A-115**

On October 8, 2018, the plaintiffs filed the present motion to recall the mandate issued in this case. They argue that Section 4 of the ATCA provides the federal courts with jurisdiction over the defendants with respect to the plaintiffs' claims. The defendants counter that the plaintiffs have failed to show circumstances that warrant the extraordinary remedy of recalling the mandate and that, in any event, Section 4 of the ATCA does not apply retroactively to closed cases.

## I.

The federal courts of appeals "possess an inherent power to recall [a] mandate, subject to review for abuse of discretion." Taylor v. United States, 822 F.3d 84, 90 (2d Cir. 2016) (quotation marks omitted, alteration in original). Recalling a mandate is an extraordinary remedy to be used "sparing[ly]."

---

jurisdiction of the United States at the behest or direction of, or with funds provided by the Palestine Liberation Organization or any of its constituent groups, any successor to any of those, or any agents thereof.

22 U.S.C. § 5202. The President of the United States may waive this provision

if the President determines and certifies in writing to the Speaker of the House of Representatives, the President pro tempore of the Senate, and the appropriate congressional committees that the Palestinians have not, after the date of enactment of this Act [either (1) taken certain steps at the U.N. or (2) taken certain actions vis-à-vis the International Criminal Court].

Klieman v. Palestinian Auth., --- F.3d ----, 2019 WL 2093018, at *12 (D.C. Cir. May 14, 2019) (alteration and emphasis in Klieman) (quoting Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat 2242, 2780 (2015)).

**A-116**

Calderon v. Thompson, 523 U.S. 538, 550 (1998); Taylor, 822 F.3d at 90. Courts are reluctant to recall a mandate because of "the need to preserve finality in judicial proceedings." Sargent v. Columbia Forest Prod., Inc., 75 F.3d 86, 89 (2d Cir. 1996). Although the passage of a new law might warrant recalling a mandate in some circumstances, this is not such a case.

## II.

## A.

The plaintiffs have not shown that either factual predicate of Section 4 of the ATCA has been satisfied. As to the first factual predicate, acceptance of a qualifying form of United States assistance, the plaintiffs state only that the defendants have accepted qualifying assistance in the past; they do not contend that the defendants currently do so. Meanwhile, in Klieman v. Palestinian Authority, which was decided on May 14, 2019, the Court of Appeals for the District of Columbia Circuit accepted the representation the Department of Justice made in an amicus curiae brief that neither the PLO nor the PA accept United States assistance. --- F.3d ----, 2019 WL 2093018, at *10 (D.C. Cir. May 14, 2019). The papers the plaintiffs filed in connection with this motion do not

provide any reason to doubt the Department of Justice's representation or the Klieman court's adoption of that representation.

The plaintiffs also fail to show that, in accordance with Section 4's second factual predicate, the defendants benefit from a waiver or suspension of Section 1003 of the ATA and have established or continued to maintain an office or other facility "within the jurisdiction of the United States." Both conditions are necessary under Section 4's second factual predicate. Klieman, 2019 WL 2093018 at *10.

As to the first condition, the plaintiffs have not established that the defendants benefit from an express waiver or suspension under Section 1003 of the ATA. The plaintiffs contend that an express waiver is not required by Section 4 of the ATCA, and that the President impliedly suspended Section 1003 of the ATA with respect to the defendants by permitting the defendants to engage in conduct allowed only if Section 1003 were suspended. But the Klieman court persuasively rejected a similar argument, reasoning that allowing implied waivers to qualify under Section 4 of the ATCA would "neglect the actual language of the legal authorization to issue waivers under [ATA] § 1003, . . . which creates legal consequences when the President 'certifies in writing' that a

8

**A-118**

waiver is to be issued." 2019 WL 2093018 at *12. The plaintiffs in this case have not put forth anything that could qualify as, or substitute for, an express waiver or suspension under Section 1003 of the ATA.

Moreover, the plaintiffs in this case have not shown that the defendants have established or continued to maintain an office or other facility within the jurisdiction of the United States. Although the PLO maintains its United Nations Observer Mission in New York, the prohibitions of Section 1003 of the ATA do not apply to that office. Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro, 937 F.2d 44, 46 (2d Cir. 1991); see United States v. Palestine Liberation Org., 695 F. Supp. 1456, 1465 (S.D.N.Y. 1988) (finding the ATA inapplicable to the PLO Observer Mission). The Observer Mission is not considered to be within the jurisdiction of the United States. See Klinghoffer, 937 F.2d at 51 ("[T]he PLO's participation in the UN is dependent on the legal fiction that the UN Headquarters is not really United States territory at all, but is rather neutral ground over which the United States has ceded control.").

The plaintiffs point out that, according to Klinghoffer, "activities not conducted in furtherance of the PLO's observer status may properly be considered as a basis of jurisdiction." Id. at 51. But this statement was made in

9

**A-119**

reference to determining whether such activities conferred personal jurisdiction

over the PLO under § 301 of the New York Civil Practice Laws and Rules.

Nothing in <u>Klinghoffer</u> suggests that the PLO's engaging in activities unrelated

to its observer status transforms the PLO's Observer Mission into an office or

other facility for the PLO "within the jurisdiction of the United States."

In sum, the plaintiffs have provided no basis to conclude that a factual

predicate of Section 4 of the ATCA has been met in this case.

**B.**

This Court's interest in finality also weighs against recalling the mandate.

When its factual predicates are met, Section 4 provides jurisdiction over a

defendant "regardless of the date of the occurrence of the act of international

terrorism upon which [the relevant] civil action was filed," 18 U.S.C. § 2334(e)(1),

providing that the defendant subsequently commits certain acts. But irrespective

of whether this language suggests that Section 4 applies retroactively to pending

cases, such as the appeal in <u>Klieman</u>, it does not suggest that courts should

reopen cases that are no longer pending. Legislation applies prospectively unless

Congress explicitly provides for retroactive application. <u>Vartelas v. Holder</u>, 566

U.S. 257, 265–66 (2012); <u>see</u> <u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244, 272–73

10

**A-120**

(1994). And it is well-established that retroactive laws generally do not affect valid, final judgments. See Bank Markazi v. Peterson, 136 S. Ct. 1310, 1323 (2016) ("Congress . . . may not 'retroactively comman[d] the federal courts to reopen final judgments.'" (quoting Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 219 (1995) (alteration in original))). The mandate in this case was issued two and a half years ago, and the Supreme Court denied the plaintiffs' petition for a writ of certiorari more than six months before the plaintiffs filed their motion to recall the mandate. The ATCA does not provide explicitly or implicitly that closed cases can be reopened. Recalling the mandate now would offend "the need to preserve finality in judicial proceedings." Taylor, 822 F.3d at 90 (quotation marks omitted).[2]

## CONCLUSION

This case does not warrant invoking the extraordinary remedy of recalling a mandate issued two and a half years ago. The Court has considered all the arguments of the parties. To the extent not specifically addressed, they are either

---

[2] The plaintiffs in this case have filed a new complaint in the Southern District of New York. Sokolow v. Palestine Liberation Organization, No. 18cv12213 (S.D.N.Y.). To the extent that there are any developments in the activities of the PA or the PLO that may subject them to personal jurisdiction under the ATCA, they can be raised in that case.

**A-121**

moot or without merit. For the reasons explained above, the plaintiffs' motion to

recall the mandate is **DENIED**.

**A-122**

# Supreme Court of the United States

### No. 19-764

### MARK I. SOKOLOW, ET AL.,

Petitioners

### v.

### PALESTINE LIBERATION ORGANIZATION, ET AL.

**ON PETITION FOR WRIT OF CERTIORARI** to the United States Court of Appeals for the Second Circuit.

**THIS CAUSE** having been submitted on the petition for writ of certiorari and the response thereto.

**ON CONSIDERATION WHEREOF**, it is ordered and adjudged by this Court that the petition for writ of certiorari is granted. The judgment of the above court in this cause is vacated with costs, and the case is remanded to the United States Court of Appeals for the Second Circuit for further consideration in light of the Promoting Security and Justice for Victims of Terrorism Act of 2019, Pub. L. No. 116-94, div. J, tit. IX, §903, 133 Stat. 3082.

**IT IS FURTHER ORDERED** that the petitioners Mark I. Sokolow, et al., recover from the Palestine Liberation Organization, et al., Three Hundred Dollars ($300.00) for costs herein expended.

April 27, 2020

**Clerk's costs:** $300.00

A True copy SCOTT S. HARRIS

Clerk of the Supreme Court of the United States

**A-123**

MANDATE

**UNITED STATES COURT OF APPEALS**
**FOR THE**
**SECOND CIRCUIT**

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 8th day of September, two thousand twenty.

---

**ORDER**

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR, BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA, NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW, JAMIE A. SOKOLOW, MINOR, BY HER NEXT FRIENDS AND GUARDIAN MARK I. SOKOLOW AND RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND

Docket Nos.
15-3135-cv (Lead);
15-3151-cv (XAP)

**A-124**

AND GUARDIANS DR. ALAN J. BAUER AND
REVITAL BAUER, RABBI LEONARD MANDELKORN,
KATHERINE BAKER, INDIVIDUALLY AND AS
PERSONAL REPRESENTATIVE OF THE ESTATE OF
BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN,
RICHARD BLUTSTEIN, INDIVIDUALLY AND AS
PERSONAL REPRESENTATIVE OF THE ESTATE OF
BENJAMIN BLUTSTEIN, LARRY CARTER,
INDIVIDUALLY AND AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF DIANE
("DINA") CARTER, SHAUN COFFEL, DIANNE
COULTER MILLER, ROBERT L COULTER, JR.,
ROBERT L. COULTER, SR., INDIVIDUALLY AND
AS PERSONAL REPRESENTATIVE OF THE ESTATE
OF JANIS RUTH COULTER, CHANA BRACHA
GOLDBERG, MINOR, BY HER NEXT FRIEND AND
GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA
GOLDBERG, MINOR, BY HER NEXT FRIEND AND
GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA
GOLDBERG, MINOR, BY HER NEXT FRIEND AND
GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG,
INDIVIDUALLY, AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF STUART SCOTT
GOLDBERG/NATURAL GUARDIAN OF PLAINTIFFS
CHANA BRACHA GOLDBERG, ESTHER ZAHAVA
GOLDBERG, YITZHAK SHALOM GOLDBERG,
SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA
GOLDBERG, YAAKOV MOSHE GOLDBERG, TZVI
YEHOSHUA GOLDBERG, SHOSHANA MALKA
GOLDBERG, MINOR, BY HER NEXT FRIEND AND
GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA
GOLDBERG, MINOR, BY HER NEXT FRIEND AND
GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE
GOLDBERG, MINOR, BY HER NEXT FRIEND AND
GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM
GOLDBERG, MINOR, BY HER NEXT FRIEND AND
GUARDIAN KAREN GOLDBERG, NEVENKA GRITZ,
SOLE HEIR OF NORMAN GRITZ, DECEASED,

Plaintiffs – Appellees - Cross-Appellants,

v.

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN
AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT
AUTHORITY AND OR PALESTINIAN COUNCIL AND OR
PALESTINIAN NATIONAL AUTHORITY,

**A-125**

*Defendants - Appellants - Cross-Appellees*,

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESTATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, DECEASED, ESTATE OF MUHANAD ABU HALAWA, DECEASED, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,

*Defendants*.

Before: LEVAL, Circuit Judge, AND KOELTL, District Judge.[*][†]

On remand from the United States Supreme Court.

Whereas on April 27, 2020, the Supreme Court of the United States granted a petition for certiorari and vacated this Court's ORDER, dated June 3, 2019, that declined to recall this Court's mandate issued on November 28, 2016; and the Supreme Court remanded the case to this Court for further consideration in light of the Promoting Security and Justice for Victims of Terrorism Act of 2019, Pub. L. No. 116-94, div. J, tit. IX, § 903, 133 State. 3082 (the "PSJVTA"),

Now, therefore, this Court REMANDS this case to the district court for the limited purposes of determining the applicability of the PSJVTA to this case, and, if the PSJVTA is determined to apply, any issues regarding its application to this case including its constitutionality.

---

[*] Judge John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

[†] Judge Christopher Droney, who was originally a member of this panel, retired from the Court effective January 1, 2020, before the determination of this matter. The remaining two members of the panel, who are in agreement, have determined this matter. See 28 U.S.C. § 46(d); 2d Cir. IOP E(b); United States v. Desimone, 140 F.3d 457, 458-59 (2d Cir. 1998).

**A-126**

After the district court has concluded its consideration, the case will be returned to this Court for further proceedings. See United States v. Jacobson, 15 F.3d 19, 22 (2d Cir. 1994). The plaintiffs-appellees-cross-appellants' motion, filed on October 8, 2018, to recall the mandate, issued on November 28, 2016, will be held in ABEYANCE.

The Clerk should issue the mandate forthwith.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

**A-127**

# UNITED STATES COURT OF APPEALS
# FOR THE
# SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 29th day of July, two thousand twenty-two.

Before:       Pierre N. Leval,
                    *Circuit Judge.*

_____

Eva Waldman, Revital Bauer, individually and as natural guardian of plaintiffs Yehonathon Bauer, Binyamin Bauer, Daniel Bauer and Yehuda Bauer, Shaul Mandelkorn, Nurit Mandelkorn, Oz Joseph Guetta, minor, by his next friend and guardian Varda Guetta, Varda Guetta, individually and as natural guardian of plaintiff Oz Joseph Guetta, Norman Gritz, individually and as personal representative of the Estate of David Gritz, Mark I. Sokolow, individually and as a natural guardian of Plaintiff Jamie A. Sokolow, Rena M. Sokolow, individually and as a natural guardian of plaintiff Jaime A. Sokolow, Jamie A. Sokolow, minor, by her next friends and guardian Mark I. Sokolow and Rena M. Sokolow, Lauren M. Sokolow, Elana R. Sokolow, Shayna Eileen Gould, Ronald Allan Gould, Elise Janet Gould, Jessica Rine, Shmuel Waldman, Henna Novack Waldman, Morris Waldman, Alan J. Bauer, individually and as natural guardian of plaintiffs Yehonathon Bauer, Binyamin Bauer, Daniel Bauer and Yehuda Bauer, Yehonathon Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Binyamin Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Daniel Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Yehuda Bauer, minor, by his next friend and guardians Dr. Alan J. Bauer and Revital Bauer, Rabbi Leonard Mandelkorn, Katherine Baker, individually and as personal representative of the Estate of Benjamin Blutstein, Rebekah Blutstein, Richard Blutstein, individually and as personal representative of the Estate of Benjamin Blutstein, Larry Carter, individually and as personal representative of the Estate of Diane ("Dina") Carter, Shaun Coffel, Dianne Coulter Miller, Robert L Coulter, Jr., Robert L. Coulter, Sr., individually and as personal representative of the Estate of Janis Ruth Coulter, Chana Bracha Goldberg, minor, by her next friend and guardian

**ORDER**

Docket Nos. 15-3135(L),
15-3151(XAP),
22-1060(CON),

**A-128**

Karen Goldberg, Eliezer Simcha Goldberg, minor, by her next friend and guardian Karen Goldberg, Esther Zahava Goldberg, minor, by her next friend and guardian Karen Goldberg, Karen Goldberg, individually, as personal representative of the Estate of Stuart Scott Goldberg/natural guardian of plaintiffs Chana Bracha Goldberg, Esther Zahava Goldberg, Yitzhak Shalom Goldberg, Shoshana Malka Goldberg, Eliezer Simcha Goldberg, Yaakov Moshe Goldberg,Tzvi Yehoshua Goldberg, Shoshana Malka Goldberg, minor, by her next friend and guardian Karen Goldberg, Tzvi Yehoshua Goldberg, minor, by her next friend and guardian Karen Goldberg, Yaakov Moshe Goldberg, minor, by her next friend and guardian Karen Goldberg, Yitzhak Shalom Goldberg, minor, by her next friend and guardian Karen Goldberg, Nevenka Gritz, sole heir of Norman Gritz, deceased

        Plaintiffs - Appellants,


United States of America
        Intervenor - Appellant,

v.

Palestine Liberation Organization, Palestinian Authority, AKA Palestinian Interim Self-Government Authority and or Palestinian Council and or Palestinian National Authority,

        Defendants - Appellees.

Yasser Arafat, Marwin Bin Khatib Barghouti, Ahmed Taleb Mustapha Barghouti, AKA Al-Faransi, Nasser Mahmoud Ahmed Aweis, Majid Al-Masri, AKA Abu Mojahed, Mahmoud Al-Titi, Mohammed Abdel Rahman Salam Masalah, AKA Abu Satkhah, Faras Sadak Mohammed Ghanem, AKA Hitawi, Mohammed Sami Ibrahim Abdullah, Esatate of Said Ramadan, deceased, Abdel Karim Ratab Yunis Aweis, Nasser Jamal Mousa Shawish, Toufik Tirawi, Hussein Al-Shaykh, Sana'a Muhammed Shehadeh, Kaira Said Ali Sadi, Estate of Mohammed Hashaika, deceased, Munzar Mahmoud Khalil Noor, Estate of Wafa Idris, deceased, Estate of Mazan Faritach, deceased, Estate of Muhanad Abu Halawa, deceased, John Does, 1-99, Hassan Abdel Rahman,

        Defendants.

_____

**A-129**

Defendants move to lift this appeal from abeyance. Plaintiffs oppose the motion and request that the Court continue to hold the appeal in abeyance pending the Court's decision in *Fuld v. Palestine Liberation Organization*, 22-76(L). Plaintiffs have also filed a cross-motion to realign the parties and to require the parties to brief all issues without incorporation by reference to prior briefs. Defendants oppose the cross-motion.

IT IS HEREBY ORDERED that the motions are GRANTED. The appeal is hereby lifted from abeyance. Plaintiffs and the Government shall file the opening briefs, Defendants shall respond, and the Plaintiffs and Government may file reply briefs. The caption shall be amended to conform with the caption listed above.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

**A-130**

# 15-3135(L)
## 15-3151 (XAP); 22-1060 (CON)

# United States Court of Appeals
### FOR THE
## Second Circuit

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR, BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA, NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW, JAMIE A. SOKOLOW, MINOR, BY HER

*(Caption Continued on Inside Cover)*

On Appeal from the United States District Court for the
Southern District of New York, Case No. 2004 Civ. 0397

**BRIEF OF DEFENDANTS-APPELLEES**

**A-131**

NEXT FRIENDS AND GUARDIAN MARK I. SOKOLOW AND RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD MANDELKORN, KATHERINE BAKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, LARRY CARTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR., INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JANIS RUTH COULTER, CHANA BRACHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STUART SCOTT GOLDBERG/NATURAL GUARDIAN OF PLAINTIFFS CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG, TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM

**A-132**

GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, NEVENKA GRITZ, SOLE HEIR OF NORMAN GRITZ, DECEASED,

*PLAINTIFFS - APPELLANTS,*

UNITED STATES OF AMERICA,

*INTERVENOR - APPELLANT,*

v.

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY AND OR PALESTINIAN COUNCIL AND OR PALESTINIAN NATIONAL AUTHORITY,

*DEFENDANTS - APPELLEES,*

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESATATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, DECEASED, ESTATE OF MUHANAD ABU HALAWA, DECEASED, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,

*DEFENDANTS.*

Gassan A. Baloul
Mitchell R. Berger
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
*Counsel for Defendants-Appellees*

**A-133**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF THE ISSUES ...................................................................... 3

STATEMENT OF THE CASE .......................................................................... 4

I.    The Defendants Are Headquartered in Palestine and Cannot Operate in the United States. ............................................................................................ 4

II.    Over Six Years Ago, This Court Held that the Exercise of Personal Jurisdiction Over Defendants Violates Due Process. ...................................... 6

III.    Congress Passed the ATCA After This Court's Decision in *Waldman*. .......... 8

IV.    Congress Passed the PSJVTA After the Decision in *Waldman II*. ................. 9

V.    Three Courts Agree It Is Unconstitutional To Exercise Personal Jurisdiction Over Defendants Under the PSJVTA. ......................................................... 11

SUMMARY OF ARGUMENT ...................................................................... 12

ARGUMENT ............................................................................................. 20

I.    Exercising Personal Jurisdiction Over Defendants Would Violate Due Process. .................................................................................................. 20

    A.    Defendants Lack Sufficient Contacts with the United States to Support the Exercise of Personal Jurisdiction. ............................................... 20

    B.    Defendants Have Not "Consented" to Personal Jurisdiction in the United States. ............................................................................... 28

        1.    Consent to Personal Jurisdiction Must Be Knowing and Voluntary. ........................................................................ 28

        2.    Defendants Have Not Knowingly and Voluntarily Consented to Personal Jurisdiction. ................................................... 40

    C.    Permitting Congress to Impose "Deemed Consent" to Personal Jurisdiction Based on Constitutionally-Inadequate Conduct Would Eviscerate Due Process Protections. ............................................. 55

II.    This Court Should Reject Appellants' Attempts to Avoid the Requirements of Due Process and Binding Circuit Precedent. ............................................. 60

    A.    Courts Do Not Defer to Congress on Constitutional Issues. ................. 60

B.     Neither the War on Terror Nor the Alleged Need for Lawsuits Against Defendants Justifies Ignoring Due Process. ................................63

C.     *Waldman* Correctly Held that Jurisdictional Due Process Protects Individual Liberty Interests. ................................................................65

III.     The PSJVTA Violates Separation of Powers. ....................................68

A.     The PSJVTA's "Deemed Consent" Provisions Violate Separation of Powers. ............................................................................................68

B.     Interpreting the PSJVTA to "Restore" Jurisdiction in Closed Cases, as Plaintiffs Suggest, Would Violate Separation of Powers. ......................70

IV.     The Court Should Not Recall Its Six-Year-Old Mandate. .............................73

A.     Finality Interests Overwhelmingly Support Leaving the Mandate Undisturbed ..........................................................................................73

B.     Recalling the Mandate Would Be Futile Because the District Court's Judgment Is Void. ................................................................................76

V.     Improper Expert testimony necessitates a new trial.......................................79

A.     The District Court Allowed Plaintiffs' Experts to Weigh the Evidence Rather Than Apply Any Particular Methodology......................80

B.     Plaintiffs' Experts Constructed Inflammatory, Speculative Narratives and Then Told the Jury What to Decide. ................................83

CONCLUSION .................................................................................................88

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

A-135

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Dep. of Defense*,
543 F.3d 59 (2d Cir. 2008) ....................................................................75

*ACLU v. Dep. of Defense*,
901 F.3d 125 (2d Cir. 2018) ..................................................................67

*Afoa v. China Airlines*,
396 F. Supp. 3d 984 (W.D. Wash. 2019) ..............................................75

*Amara v. CIGNA Corp.*,
775 F.3d 510 (2d Cir. 2014) ..................................................................79

*Armstrong v. Pomerance*,
423 A.2d 174 (Del. 1980) ......................................................................37

*AT&T Communs. v. BellSouth Telecom.*,
238 F.3d 636 (5th Cir. 2001) ................................................................35

*Atchley v. AstraZeneca UK Ltd.*,
22 F.4th 204 (D.C. Cir. 2022).................................................................27

*Bank Markazi v. Peterson*,
136 S. Ct. 1310 (2016)...............................................................18, 68, 71

*Bano v. Union Carbide*,
273 F.3d 120 (2d Cir. 2001) ..................................................................67

*Benjamin v. Jacobson*,
172 F.3d 144 (2d Cir. 1999) ..................................................................71

*Boerne v. Flores*,
521 U.S. 507 (1997)...................................................................62, 68, 70

*Brewer v. Williams*,
430 U.S. 387 (1977)............................................................................18, 68

iii

*Brown v. Lockheed Martin Corp.*,
  814 F.3d 619 (2d Cir. 2016) ............................................................13, 17, 28, 36

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)..................................................................................*passim*

*Burnham v. Superior Court*,
  495 U.S. 604 (1990)..........................................................................................47, 76

*Calderon v. Thompson*,
  523 U.S. 538 (1998)..........................................................................................19, 73

*Carnival Cruise Lines v. Shute*,
  499 U.S. 585 (1991).................................................................................................59

*Carrington v. United States*,
  503 F.3d 888 (9th Cir. 2007) ...............................................................................76

*Carrizosa v. Chiquita Brands Int'l*,
  47 F.4th 1278 (11th Cir. 2022) ...........................................................................82

*Caterpillar v. Lewis*,
  519 U.S. 61 (1996)..................................................................................................78

*Chen v. Dunkin' Brands*,
  954 F.3d 492 (2d Cir. 2020) ...............................................................................17

*City of NY v. Mickalis Pawn Shop*,
  645 F.3d 114 (2d Cir. 2011) ...............................................................................40

*Cole v. Carson*,
  935 F.3d 444 (5th Cir. 2019) ...............................................................................79

*Collazos v. United States*,
  368 F.3d 190 (2d Cir. 2004) ...............................................................................43

*College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense
  Bd.*,
  527 U.S. 666 (1999).................................................................................*passim*

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014)..................................................................7, 22, 36, 58

iv

*Daubert v. Merrell Dow Pharm.*,
   509 U.S. 579 (1993)......................................................................79

*Dickerson v. United States*,
   530 U.S. 428 (2000)......................................................................70

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
   46 F.4th 226 (5th Cir. 2022) .......................................................66

*Ford Motor v. Mont. Eighth Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021)....................................................38, 55, 66

*Fuld v. PLO*,
   578 F. Supp. 3d 577 (S.D.N.Y. 2022) ...................................*passim*

*G.L. v. D.L.*,
   406 P.3d 367 (Haw. App. 2017) ...................................................77

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
   53 F. Supp. 3d 191 (D.D.C. 2014)....................................81, 82, 88

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
   843 F.3d 958 (D.C. Cir. 2016)..........................................20, 81, 82

*Gilson v. Republic of Ire.*,
   682 F.2d 1022 (D.C. Cir. 1982).....................................................61

*Gondeck v. Pan Am. World Airways*,
   382 U.S. 25 (1965)................................................................. 74-75

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011)......................................................................21

*Grupo Dataflux v. Atlas Global Group*,
   541 U.S. 567 (2004)......................................................................79

*H & D Tire & Auto. Hardware v. Pitney Bowes*,
   227 F.3d 326 (5th Cir. 2000) .................................................. 77-78

*Hammond Packing Co. v. Arkansas*,
   212 U.S. 322 (1909)....................................................14, 32-33, 42-43

v

**A-138**

*Herederos De Roberto Gomez Cabrera v. Teck Res. Ltd.*,
   43 F.4th 1303 (11th Cir. 2022) ....................................................................65

*Hess v. Pawloski*,
   274 U.S. 352 (1927)...................................................................14, 15, 36, 52

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)............................................................................................61

*Hovey v. Elliott*,
   167 U.S. 409 (1897).......................................................................................32

*Hygh v. Jacobs*,
   961 F.2d 359 (2d Cir. 1992) ........................................................................83

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
   456 U.S. 694 (1982)...............................................................................*passim*

*INS v. Chadha*,
   462 U.S. 919 (1983).......................................................................................62

*Jesner v. Arab Bank*,
   138 S. Ct. 1386 (2018)...................................................................................66

*Estate of Klieman v. Palestinian Auth.*,
   140 S. Ct. 2713 (2020)...................................................................................11

*Estate of Klieman v. Palestinian Auth.*,
   923 F.3d 1115 (D.C. Cir. 2019)............................................................*passim*

*Klinghoffer v. S.N.C. Achille Lauro*,
   937 F.2d 44 (2d Cir. 1991) .................................................................4, 49, 64

*Laker Airways v. Sabena*,
   731 F.2d 909 (D.C. Cir. 1984)......................................................................44

*Leonard v. USA Petroleum*,
   829 F. Supp. 882 (S.D. Tex. 1993).....................................................38, 39, 52

*Licci v. Lebanese Canadian Bank*,
   732 F.3d 161 (2d Cir. 2013) .........................................................................27

*Litecubes v. N. Light Prods.*,
   523 F.3d 1353 (Fed. Cir. 2008) ...............................................................44

*Livnat v. Palestinian Auth.*,
   139 S. Ct. 373 (2018)...............................................................................8

*Livnat v. Palestinian Auth.*,
   851 F.3d 45 (D.C. Cir. 2017).............................................................*passim*

*Mallory v. Norfolk Southern Ry. Co.*,
   No. 21-1168 (cert. granted April 25, 2022)......................................36

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) .................................................................70

*Marvel Characters, Inc. v. Kirby*,
   726 F.3d 119 (2d Cir. 2013) ....................................................................84

*McCulley v. Brooks & Co. Gen. Constr.*,
   816 S.E.2d 270 (Va. 2018) ......................................................................77

*Mendelsohn v. Meese*,
   695 F. Supp. 1474 (S.D.N.Y. 1988) ........................................................48

*In re Mid-Atl. Toyota*,
   525 F. Supp. 1265 (D. Md. 1981)......................................................37, 38

*Mullaney v. Anderson*,
   342 U.S. 415 (1952)................................................................................79

*Mwani v. bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005).....................................................................26

*Nat'l Equip. Rental, Ltd. v. Szukhent*,
   375 U.S. 311 (1964)................................................................................29

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012)................................................................................61

*Newman-Green, Inc. v. Alfonzo-Larrain*,
   490 U.S. 826 (1989).................................................................................78

vii

A-140

*Nimely v. NYC*,
  414 F.3d 381 (2d Cir. 2005) ........................................................*passim*

*Peabody Coal v. Dir., Office of Workers' Comp. Programs*,
  857 F.3d 310 (6th Cir. 2014) ...............................................................72

*In re Pfizer Inc. Sec. Litig.*,
  819 F.3d 642 (2d Cir. 2016) .................................................................80

*Plaut v. Spendthrift Farm*,
  514 U.S. 211 (1995).................................................... 18, 68, 70-72

*"R" Best Produce v. DiSapio*,
  540 F.3d 115 (2d Cir. 2008) ...........................................................19, 77

*Roeder v. Islamic Republic of Iran*,
  195 F. Supp. 2d 140 (D.D.C. 2002)................................................19, 71

*Roell v. Withrow*,
  538 U.S. 580 (2003)...........................................................................28, 30

*Roman Cath. Archdiocese v. Feliciano*,
  140 S. Ct. 696 (2020)........................................................................76, 77

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013) ..................................................................72

*Ruhrgas AG v. Marathon Oil Co.*,
  526 U.S. 574 (1999).............................................................................77

*Sargent v. Columbia Forest Prods*,
  75 F.3d 86 (2d Cir. 1996) ...............................................................74, 75

*Sartor v. Toussaint*,
  70 F. App'x 11 (2d Cir. 2002) .............................................................78

*Schwartz v. Merrill Lynch*,
  665 F.3d 444 (2d Cir. 2011) ...............................................................71

*Shatsky v. PLO*,
  955 F.3d 1016 (D.C. Cir. 2020)....................................................*passim*

**A-141**

*Shatsky v. PLO*,
No. 18-cv-12355, 2022 WL 826409 (S.D.N.Y. Mar. 18, 2022) ........................12

*Shumway v. UPS*,
118 F.3d 60 (2d Cir. 1997) ..............................................................................50

*Siemer v. Learjet Acquisition Corp.*,
966 F.2d 179 (5th Cir. 1992) ...........................................................................59

*Snyder v. Massachusetts*,
291 U.S. 97 (1934)............................................................................................67

*Sokolow v. PLO*,
138 S. Ct. 1438 (2018)........................................................................................8

*Sokolow v. PLO*,
140 S. Ct. 2714 (2020)............................................................................10, 79

*South Carolina v. Moore*,
447 F.2d 1067 (4th Cir. 1971) .........................................................................77

*Stern v. Marshall*,
564 U.S. 462 (2011)..........................................................................................69

*Sun Forest Corp. v. Shvili*,
152 F. Supp. 2d 367 (S.D.N.Y. 2001) .............................................................29

*Swenson v. Thibaut*,
250 S.E.2d 279 (N.C. Ct. App. 1978)..............................................................37

*In re Terrorist Attacks on Sept. 11, 2001*,
741 F.3d 353 (2d Cir. 2013) ............................................................................75

*TGX Corp. v. Simmons*,
62 F.3d 666 (5th Cir. 1995) .............................................................................72

*United States v. Amuso*,
21 F.3d 1251 (2d Cir. 1994) ......................................................................20, 82

*United States v. Davis*,
139 S. Ct. 2319 (2019)......................................................................................72

ix

*United States v. Dukagjini*,
326 F.3d 45 (2d Cir. 2003) .................................................................82, 83, 86

*United States v. Escobar*,
462 F. App'x 58 (2d Cir. 2012) ...................................................................88

*United States v. Klein*,
80 U.S. 128 (1871).......................................................................................68

*United States v. Mejia*,
545 F.3d 179 (2d Cir. 2008) .................................................................82, 83, 85

*United States v. PLO*,
695 F. Supp. 1456 (S.D.N.Y. 1988) ...................................................5, 16, 48, 49

*United States v. Tapia*,
816 F. App'x 619 (2d Cir. 2020) ............................................................. 75-76

*United States v. Zhong*,
26 F.4th 536 (2d Cir. 2022) ........................................................................85

*United Student Aid Funds v. Espinosa*,
559 U.S. 260 (2010).....................................................................................67

*V&A Collection, LLC v. Guzzini Props.*,
46 F.4th 127 (2d Cir. 2022) ........................................................................30

*Verlinden B.V. v. Cent. Bank of Nigeria*,
461 U.S. 480 (1983).....................................................................................61

*Volkart Bros., Inc. v. M/V Palm Trader*,
130 F.R.D. 285 (S.D.N.Y. 1990) .................................................................43

*Walden v. Fiore*,
571 U.S. 277 (2014)...................................................................................7, 21

*Waldman v. PLO*,
835 F.3d 317 (2d Cir. 2016) ................................................................*passim*

*Waldman v. PLO*,
925 F.3d 570 (2d Cir. 2019) ................................................................*passim*

x

*Wellness Int'l Network, Ltd. v. Sharif,*
    575 U.S. 665 (2015)...............................................................13, 28, 29, 31

*WorldCare Ltd. Corp. v. World Ins. Co.,*
    767 F. Supp. 2d 341 (D. Conn. 2011)...............................................................60

*Wray v. Johnson,*
    202 F.3d 515 (2d Cir. 2000) ...............................................................88

*Wuchter v. Pizzutti,*
    276 U.S. 13 (1928)...............................................................36

**Statutes**

18 U.S.C. § 2333(a) ...............................................................*passim*

18 U.S.C. § 2334(e) ...............................................................10, 50, 51, 53

22 U.S.C. § 5201(b) ...............................................................5, 16, 48

22 U.S.C. § 5202 ...............................................................5, 16, 48

22 U.S.C. § 5203 ...............................................................50

Anti-Terrorism Clarification Act, Pub. L. No. 115-253, 132 Stat. 3183
    (2018)...............................................................*passim*

Promoting Security and Justice for Victims of Terrorism Act, Pub. L.
    No. 116-94, div. J, tit. IX, § 903(b)(5), 133 Stat. 3082, 3083 ...............*passim*

Taylor Force Act, 22 U.S.C. § 2378c-1 ...............................................................43

**Other Authorities**

18 Moore's Fed. Pract. § 130.06 (2022) ...............................................................77

138 Cong. Rec. S17260 (daily ed. Oct. 7, 1992) ...............................................................74

Antiterrorism Act of 1990: Hearing on S. 2465 Before the S. Comm.
    on the Judiciary, 101st Cong. 46-47 (1990) ...............................................................74

Aaron Simowitz, *The Private Law of Terror*, 126 Penn St. L. Rev. 159
    (2021)...............................................................63

xi

**A-144**

Antiterrorism Act of 1990: Hearing on S. 2465 Before the S. Comm.
on the Judiciary, 101st Cong. 46-47 (1990) .........................................................64

Brookings Institution, *Why the discourse about Palestinian payments
to prisoners' families is distorted and misleading* (2020),
https://www.brookings.edu/blog/order-from-
chaos/2020/12/07/why-the-discourse-about-palestinian-payments-
to-prisoners-families-is-distorted-and-misleading/ ......................................45, 46

Carnegie Endowment for Int'l Peace, *Palestinian Prisoner Payments*
(2021), https://carnegieendowment.org/specialprojects/
breakingtheisraelpalestinestatusquo/payments ........................................5, 45, 46

W. Dodge & S. Dodson, *Personal Jurisdiction and Aliens*,
116 Mich. L. Rev. 1205 (2018) .............................................................................67

Jerusalem Post, *Terror victims' families to collect NIS 500 m. from
Palestinian Authority* (4/26/2020), https://www.jpost.com/arab-
israeli-conflict/court-orders-collection-of-nis-500-m-from-pa-for-
second-intifada-625930 .........................................................................................64

Programme of Work, UN Committee on the Exercise of the
Inalienable Rights of the Palestinian People, UN Doc.
A/AC.183/2020/1 (Feb. 7, 2020) ...........................................................................50

Report, UN Committee on the Exercise of the Inalienable Rights of
the Palestinian People, UN Doc. A/75/35 (Oct. 13, 2020) ...................................50

Shurat Hadin, Press Release (11/19/2018),
https://israellawcenter.org/legal_actions/shurat-hadin-wins-
precedent-setting-ruling-in-achille-lauro-terror-case/ ........................................64

Times of Israel, *High Court: PA liable for terrorism due to money it
pays attackers; victims can sue* (4/10/2022),
https://www.timesofisrael.com/high-court-pa-liable-for-terrorism-
due-to-stipends-to-attackers-victims-can-sue/ ....................................................64

xii

## PRELIMINARY STATEMENT

The PSJVTA is the latest legislative attempt to undo an unbroken line of cases—including this Court's prior decision in this very case—holding that Defendants are not subject to personal jurisdiction in the United States for their alleged involvement in terrorist attacks in Israel and Palestine. Time and again, courts have held that exercising personal jurisdiction over Defendants would violate due process because the attacks did not target Americans, and Defendants and their actions lack any constitutionally-sufficient connection to the United States. Because jurisdictional due process protections are rooted in the Constitution, these decisions cannot be undone by legislation.

In enacting the PSJVTA, Congress attempted an end-run around this Court's settled constitutional analysis through the long-discarded fiction of "deemed consent." The PSJVTA purports to impose personal jurisdiction where it is otherwise lacking by declaring that Defendants always shall be "deemed" to "consent" to personal jurisdiction when they engage in the same conduct the courts have previously held <u>insufficient</u> to support jurisdiction under the Due Process Clause. The PSJVTA accordingly seeks to elide the constitutional boundaries of due process established by this Court, the D.C. Circuit in look-alike cases, and the Supreme Court.

1

**A-146**

The district court saw through this ruse, holding—like every other federal court to consider the issue—that the fiction of "deemed consent" cannot paper over the lack of any constitutionally-meaningful connection between Defendants, the forum, and the conduct that gave rise to Plaintiffs' claims. Defendants have taken no actions that could be understood as "knowing and voluntary" submission to jurisdiction under the Due Process Clause. The PA and PLO did not sign a contract agreeing to jurisdiction, accept any funding or other benefit from Congress in exchange for submission to personal jurisdiction, or otherwise voluntarily agree to litigate Plaintiffs' claims in this forum. Rather, the PA and PLO have challenged personal jurisdiction at every stage, and this Court has already held they lack the forum-contacts necessary to confer jurisdiction. Because Defendants have not taken any actions demonstrating knowing and voluntary consent to personal jurisdiction in the United States, the district court properly concluded it would be unconstitutional to exercise jurisdiction over them.

Allowing Congress to impose "consent" on Defendants in these circumstances would swallow the traditional due process test. If due process required nothing more than "fair warning" of legislatively-imposed jurisdictional consequences, then nothing would stop Congress from decreeing that a foreign defendant shall be "deemed" to have "consented" to personal jurisdiction by engaging in <u>any</u> activity <u>anywhere</u> in the world. That the conduct "reasonably advances legitimate

2

**A-147**

government interests," as Appellants propose, is hardly a limiting factor. Personal jurisdiction could be legislatively imposed even in the absence of "minimum contacts" or "knowing and voluntary" consent, despite this Court's prior ruling rejecting the same conduct as a constitutionally-insufficient basis for jurisdiction. These are not merely theoretical concerns. That is precisely what the PSJVTA purports to do here.

More troubling still, Congress passed the PSJVTA more than three years <u>after</u> the issuance of this Court's mandate, which directed the district court to dismiss Plaintiffs' claims for lack of personal jurisdiction. Congress violates separation of powers and improperly usurps the judicial role when it attempts to reopen final judgments or dictate jurisdictional outcomes without regard to constitutional standards to be applied by the courts. Accordingly, given the institutional and finality interests at stake, this Court should decline to recall the mandate.

## STATEMENT OF THE ISSUES

1.      Whether Congress violates the Constitution when it imposes "consent" to personal jurisdiction on Defendants based on conduct previously held insufficient to satisfy due process, without requiring a substantial connection between Defendants, Plaintiffs' claims, and the forum (the United States), and without Defendants' knowing and voluntary submission to the jurisdiction of U.S. courts.

3

**A-148**

2. Whether the Court should interpret the PSJVTA to restore jurisdiction in a closed case after final judgment and to dictate when courts must find "consent" to personal jurisdiction in violation of separation of powers under Article III.

3. Whether the Court should disrupt finality, recall its six-year-old mandate in a closed case, and resurrect a void judgment entered without jurisdiction when Plaintiffs have preserved their claims against Defendants in a separate action.

4. Whether a new trial would be required in any event because Plaintiffs' experts gave testimony without any reliable methodology and usurped the jury's role.

## STATEMENT OF THE CASE

**I.      The Defendants Are Headquartered in Palestine and Cannot Operate in the United States.**

The Palestinian Authority ("PA") is the domestic government of parts of the West Bank and the Gaza Strip (collectively, "Palestine"). The Palestine Liberation Organization ("PLO") is the overseas diplomatic representative of the Palestinian people. *See Waldman v. PLO*, 835 F.3d 317, 322-23 (2d Cir. 2016), *cert. denied sub nom. Sokolow v. PLO*, 138 S. Ct. 1438 (2018). The PA is headquartered in the West Bank. *Id.* Since its founding in 1964, the PLO has been headquartered in Ramallah, the Gaza Strip, and Amman, Jordan. *Id.* at 323.

The United States does not recognize the PA or PLO as a sovereign government. *Id.*; *see also Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 47-48

4

**A-149**

(2d Cir. 1991) (holding PLO not a "state" under Foreign Sovereign Immunities Act). But the PA is the "governing authority in Palestine." *Waldman*, 835 F.3d at 323. The PA "funds conventional government services," including "public safety and the judicial system; health care; public schools and education; foreign affairs; economic development initiatives … the payment of more than 155,000 government employee salaries and related pension funds; transportation; and, communications[.]" *Id.* The PA also administers a social welfare program for Palestinians designed to provide a "social safety net in the face of brutal and oppressive living conditions under Israeli military occupation."[1] *See infra* at 45-46.

The PA and PLO have long been forbidden from operating in the United States. *See* 22 U.S.C. §§ 5201(b), 5202; *United States v. PLO*, 695 F. Supp. 1456, 1465-68, 1471 (S.D.N.Y. 1988); *infra* at 48-49. The UN Headquarters Agreement and UN guidance implementing it affords the sole exception, by which Palestine is an "invitee" of the UN, permitted to conduct activities in the United States in furtherance of Palestine's role as a Permanent Observer at the United Nations. *Id.* The PLO's diplomatic mission in Washington, D.C. closed in October 2018. *Estate*

---

[1] Carnegie Endowment for Int'l Peace, *Palestinian Prisoner Payments* (2021), https://carnegieendowment.org/specialprojects/breakingtheisraelpalestinestatusquo/payments.

*of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1130 (D.C. Cir. 2019). Palestine's UN Mission in New York remains open. *Id.*

## II. Over Six Years Ago, This Court Held that the Exercise of Personal Jurisdiction Over Defendants Violates Due Process.

This Court has already held that exercising personal jurisdiction over Defendants based on the same alleged conduct at issue now—UN-related activities in the United States, and domestic payment programs in Palestine—is unconstitutional. Plaintiffs alleged violations of the Anti-Terrorism Act ("ATA") for attacks committed in Israel by nonparties allegedly assisted by Defendants. *Waldman*, 835 F.3d at 324. Although a jury found for Plaintiffs in a seven-week trial in 2015, Plaintiffs failed to prove the attackers targeted Americans. *Id.* at 322, 337-38. Plaintiffs themselves conceded the "killing was indeed random." *Id.*

At trial, Plaintiffs' liability case was presented entirely through the expert testimony of three former Israeli intelligence and military officials. Over Defendants' objections (JA-1427-58), the trial court allowed those purported experts to speculate about the intent, state of mind, and motivations of the attackers. *See* JA-5690-92, JA-3926. None of the experts could identify a methodology—they instead simply summarized the evidence and then opined that Defendants were responsible for the attacks. *See* JA-5716, JA-4597-98. The jury found Defendants liable for six attacks and awarded $218.5 million, which was automatically trebled under 18 U.S.C. § 2333(a), to $655.5 million. *Waldman*, 835 F.3d at 327.

6

**A-151**

This Court held the exercise of personal jurisdiction over Defendants violated the Fifth Amendment Due Process Clause, vacated the judgment, and directed dismissal of Plaintiffs' claims. *Id.* at 330, 332-344. It held that Defendants were "persons" under the Fifth Amendment entitled to due process. *Id.* Defendants were not subject to general jurisdiction under *Daimler AG v. Bauman*, 571 U.S. 117, 127-28 (2014), because they were not "essentially at home" in the United States. *Id.* Nor was there specific jurisdiction under *Walden v. Fiore*, 571 U.S. 277, 284 (2014), because there was no evidence Defendants took actions in the United States related to the attacks, and the attacks "were not expressly aimed at the United States." *Waldman*, 835 F.3d at 337. The fact that Americans were injured was "'random [and] fortuitous.'" *Id.* at 344.

Soon afterward, the D.C. Circuit reached the same constitutional conclusion, holding that plaintiffs in three look-alike cases "failed to carry their burden of demonstrating that personal jurisdiction over the Palestinian Authority in this case would meet the requirements of the Fifth Amendment's Due Process Clause." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 58 (D.C. Cir. 2017); *see also Klieman*, 923 F.3d at 1127 (same); *Shatsky v. PLO*, 955 F.3d 1016, 1037-38 (D.C. Cir. 2020) (same).

This Court's mandate issued on November 28, 2016 (2d Cir. No. 15-3135, Dkt 248), and the case was dismissed on December 2, 2016 (Order, Dist. Ct. Dkt

7

**A-152**

1003). Plaintiffs sought *certiorari*, and the Solicitor General recommended the Supreme Court deny Plaintiffs' petition because *Waldman* did not "implicate any conflict among the courts of appeals, or otherwise warrant [the Supreme] Court's intervention." Br. of U.S. as Amicus Curiae ("CVSG Br.") at 7, *Sokolow v. PLO*, No. 16-1071 (Feb. 22, 2018). The Supreme Court denied *certiorari* in this case, *Sokolow v. PLO*, 138 S. Ct. 1438 (2018), and in a parallel case from the D.C. Circuit, *Livnat v. Palestinian Auth.*, 139 S. Ct. 373 (2018).

**III.   Congress Passed the ATCA After This Court's Decision in *Waldman*.**

In response to *Waldman*, Congress passed the Anti-Terrorism Clarification Act ("ATCA"), Pub. L. No. 115-253, 132 Stat. 3183 (2018). The ATCA provided that defendants shall be "deemed" to have "consented" to personal jurisdiction in civil ATA cases if they either: (1) accept certain U.S. foreign assistance, or (2) maintain a U.S. office pursuant to an Executive Branch waiver. *See infra* at 51-52. Following the ATCA's passage, Plaintiffs moved to recall this Court's mandate, arguing that the ATCA created personal jurisdiction over Respondents. *Waldman v. PLO*, 925 F.3d 570, 573-74 (2d Cir. 2019) ("*Waldman II*"), *vacated on other grounds*, 140 S. Ct. 2714 (2020).

In *Waldman II*, this Court denied Plaintiffs' motion to recall its mandate. The Court held neither of the factual predicates for jurisdiction under the ATCA had been satisfied:  Defendants were not accepting U.S. foreign assistance or maintaining a

8

**A-153**

U.S. office pursuant to an Executive waiver. *Id.* at 573-74. Defendants therefore had not "consented" to personal jurisdiction under the ATCA. *Id.* The D.C. Circuit agreed. *See Klieman*, 923 F.3d at 1128.

This Court further held that the "[c]ourt's interest in finality ... weighs against recalling the mandate." *Waldman II*, 925 F.3d at 575. The Court explained that recalling the mandate more than two years after it directed the dismissal of Plaintiffs' claims for lack of jurisdiction "would offend the need to preserve finality in judicial proceedings." *Id.* (internal quotations omitted). Noting that Plaintiffs had filed a case to take advantage of supposedly new jurisdictional facts, the court determined that "[t]o the extent that there are any developments in the activities of the PA or the PLO that may subject them to personal jurisdiction under the ATCA, they can be raised in that case." *Id.* at 576 n.2. Plainitffs petitioned for certiorari from this Court's refusal to recall the mandate.

## IV.  Congress Passed the PSJVTA After the Decision in *Waldman II*.

In response to *Waldman II* and while Plaintiffs' petition for certiorari was pending, Congress intervened again by passing the Promoting Security and Justice for Victims of Terrorism Act ("PSJVTA"), Pub. L. No. 116-94, div. J, tit. IX, § 903(b)(5), 133 Stat. 3082, 3083, which superseded the personal jurisdiction provisions in the ATCA. The PSJVTA amended the definition of "defendant" to

9

**A-154**

specify that it applied only to the PA, the PLO, and their successors. 18 U.S.C. § 2334(e)(5).

The PSJVTA purports to "deem" that Defendants "consent" to personal jurisdiction in ATA cases if they make payments after April 18, 2020, to persons who were "fairly tried" or "ple[d] guilty" and were imprisoned for (or to families of those who died while committing) "any act of terrorism" that killed or injured a U.S. national. *Id.* § 2334(e)(1)(A). The PSJVTA also "deems" "consent" to jurisdiction if, after January 4, 2020, Defendants maintain "any office" or facility "in the United States," or "conduct[] any activity while physically present in the United States," not expressly exempted. *Id.* §§ 2334(e)(1)(B), (e)(3). In determining whether Defendants shall be "deemed" to have "consented" to jurisdiction, the PSJVTA specifically provides that a court may <u>not</u> consider offices or facilities used "exclusively for the purpose of conducting official business of the United Nations," activities "undertaken exclusively for the purpose of conducting" UN business or meetings with U.S. or foreign government officials, and "any personal or official activities" "ancillary" to UN business or government meetings. *Id.* § 2334(e)(3)(A)-(F).

After the PSJVTA's enactment, the Supreme Court granted, vacated, and remanded *Waldman II* for further consideration in light of the PSJVTA. 140 S. Ct. 2714 (2020). (The Court issued an identical order in *Klieman*, a direct-appeal from

10

**A-155**

the D.C. Circuit. 140 S. Ct. 2713 (2020).) This Court then remanded to the district court for a determination of the "applicability of the PSJVTA to this case" and "its constitutionality." 2d Cir. No. 15-3135, Dkt 366, at 3. The Court ruled that Plaintiffs' motion "to recall the mandate, issued on November 28, 2016, will be held in ABEYANCE." *Id*. at 4 (emphasis in original).

**V.     Three Courts Agree It Is Unconstitutional To Exercise Personal Jurisdiction Over Defendants Under the PSJVTA.**

The PSJVTA is now the sole basis asserted by Plaintiffs for personal jurisdiction over Defendants. Plaintiffs claim Defendants "consented" to jurisdiction under the PSJVTA by (1) making payments to individuals who committed terrorist attacks, or to their families; (2) conducting activities, such as press conferences and social media posts, "while physically present in the United States"; and (3) "continu[ing] to maintain an office" for Palestine's Mission to the United Nations in New York. *See* Dist. Ct. Dkt 1015, Pls. Opening Mem. on PSJVTA, at 8-19 (cleaned up).

On remand, the district court—like every other court to address the issue— held that the exercise of personal jurisdiction over Defendants under the PSJVTA's deemed-consent provisions would violate the Due Process Clause. The court held "finding that Defendants have impliedly consented to personal jurisdiction based solely on their conduct in violation of the PSJVTA would violate the due process clause of the constitution." SPA-11.

11

**A-156**

The court observed that "Congress 'simply took conduct in which the PLO and PA had previously engaged—conduct that the Second and D.C. Circuits held was insufficient to support personal jurisdiction in [*Waldman*, *Livnat*, *Shatsky*, and *Klieman*]—and declared that such conduct shall be deemed to be consent.'" SPA-16 (quoting *Fuld v. PLO*, 578 F. Supp. 3d 577, 587 (S.D.N.Y. 2022)). As the court explained, none of the conduct alleged by Plaintiffs supported the presumption that Defendants knowingly and voluntarily consented to personal jurisdiction in the United States for their alleged involvement in indiscriminate terrorist attacks occurring abroad. SPA-8-11, 16. Accordingly, the court held that exercising jurisdiction on the basis of such conduct "would breach the limits prescribed by the Due Process Clause." SPA-13.

The other two courts to have considered the constitutionality of the "deemed consent" provisions of the PSJVTA both reached the same conclusion. *See Fuld*, 578 F. Supp. 3d 577; *Shatsky v. PLO*, No. 18-cv-12355, 2022 WL 826409 (S.D.N.Y. Mar. 18, 2022). The appeals from the *Fuld* decision are pending before this Court, *see* Nos. 22-76, 22-496, while the appeals from the *Shatsky* decision have been held in abeyance, *see* Nos. 22-791, 22-1138.

## SUMMARY OF ARGUMENT

The PSJVTA does not satisfy the "knowing and voluntary" standard for "consent" jurisdiction, but instead improperly attempts to impose jurisdiction contrary

12

**A-157**

to constitutional due-process requirements. This Court has already determined that Defendants' alleged activities are constitutionally inadequate to support personal jurisdiction. Allowing Congress to transform those same activities into "consent" to jurisdiction would strip Defendants of these constitutional protections, and undermine the Supreme Court's jurisprudence on personal jurisdiction. This Court should conclude that Plaintiffs have not established valid "consent" to personal jurisdiction under the PSJVTA and reaffirm that exercising personal jurisdiction over Defendants would violate due process.

***1. Implied Consent Must Be Knowing and Voluntary.*** Both the Supreme Court and this Court have emphasized that consent to personal jurisdiction must be "knowing and voluntary." *Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S. 665, 685 (2015); *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 640 (2d Cir. 2016). For implied consent, Plaintiffs must demonstrate some "actions of the defendant" that "amount to a legal submission to the jurisdiction of the court." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704-09 (1982) ("*Bauxites*"). Because implied or "constructive" consent "is not a doctrine commonly associated with the surrender of constitutional rights," federal courts "indulge every reasonable presumption against waiver." *College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 681-82 (1999) (Scalia, J.).

13

**A-158**

The Supreme Court distinguishes between inferring a defendant's knowing and voluntary choice to submit to jurisdiction based on its own conduct, and "mere assertions of power" by the forum to impose jurisdiction on nonconsenting defendants. *Bauxites*, 456 U.S. at 705. Imposing jurisdiction on a defendant is not valid "consent" to jurisdiction, unless the defendant's conduct supports the presumption that it knowingly and voluntarily submitted to jurisdiction in the forum. *Id.* at 705-06 (discussing the "*Hammond Packing* presumption"); *see also College Savings Bank*, 527 U.S. at 680-81 (explaining that merely putting the defendant "on notice" the forum "intends to subject it to suits" is "very far from concluding that the [defendant] made an 'altogether voluntary' decision" to consent to personal jurisdiction).

As one barometer for valid consent, courts have recognized a narrow category of "implied consent" statutes under which a party knowingly and voluntarily agrees to personal jurisdiction by accepting a benefit conferred by the forum. Many states, for example, have enacted statutes conditioning the benefit of driving on public roads on consent to personal jurisdiction for suits arising from those acts. By "accept[ing]" the "rights and privileges" of driving on public roads, a non-resident defendant signifies its "agreement" to submit to personal jurisdiction in the forum. *See Hess v. Pawloski*, 274 U.S. 352, 354-57 (1927). The Supreme Court likewise recognizes that "acceptance" of federal funds by a state may signal its implied "agreement" or

14

**A-159**

consent to submit to jurisdiction in federal court. *College Savings Bank*, 527 U.S. at 686.

This type of conduct indicates knowing and voluntary <u>agreement</u> to personal jurisdiction, as distinguished from the forum's unilateral <u>imposition</u> of jurisdiction, because the defendant's acceptance of a benefit or privilege conditioned on consent signals its implicit agreement to submit to the court's jurisdiction. *See Hess*, 274 U.S. at 356-57 (acceptance of privilege of driving serves as "equivalent" of consent). A reciprocal exchange underpinned the PSJVTA's predecessor, the Anti-Terrorism Clarification Act. The ATCA provided for "deemed consent" jurisdiction over Defendants if they <u>accepted</u> certain <u>benefits</u> offered by the United States. *Infra* at 51-52. This Court held that the ATCA did not supply jurisdiction over Defendants because they had not accepted these government benefits. *Waldman II*, 925 F.3d at 574-75. The PSJVTA, by contrast, does not ground "consent" in Defendants' acceptance of a benefit from the forum, but rather impermissibly seeks to impose jurisdiction without any conduct signaling knowing and voluntary consent.

**2. Defendants Have Not Consented to Jurisdiction.** As their long-standing objection to personal jurisdiction in this and similar cases makes clear, Defendants have not agreed—expressly or impliedly—to consent to jurisdiction in the United States. Defendants have not signed a contract expressly agreeing to jurisdiction, or taken any action in the litigation itself evincing their intent to submit to jurisdiction.

15

**A-160**

Defendants also have not accepted any government benefit or privilege conditioned on consent to jurisdiction.

Unlike the implied consent statutes described above, the PSJVTA does not confer any benefit on Defendants or offer to waive pre-existing laws penalizing or prohibiting their activities in the United States, in exchange for their consent to jurisdiction. Social welfare payments in Palestine to families of prisoners or decedents ("prisoner and martyr payments") occur entirely outside the United States. The courts have already held that such payments do not provide jurisdiction over Defendants because such payments are not connected to the United States, and Plaintiffs' claims do not arise from or relate to such payments. *See Shatsky*, 955 F.3d at 1022-23 (alleged "martyr payments" did not confer specific jurisdiction). Defendants' payments in Palestine do not depend on Congressional authorization, and Defendants thus do not avail themselves of any U.S. government benefit when they make such payments.

The same is also true of Palestine's UN Mission, and Defendants' alleged activities in the United States, such as social media posts in furtherance of the Mission's work. For more than three decades, the Anti-Terrorism Act of 1987 ("1987 ATA") has expressly denied Defendants the "benefit" of engaging in any non-UN related activity in the United States. *See* 22 U.S.C. §§ 5201(b), 5202; *United States v. PLO*, 695 F. Supp. at 1471 (describing 1987 ATA as a "wide gauged

16

**A-161**

restriction of PLO activity within the United States"). The PSJVTA does not offer to waive any restriction or penalties imposed by the 1987 ATA, nor does it purport to authorize Defendants to engage in any previously unauthorized activity in the United States.

3. *The Fiction of "Deemed Consent" Cannot Displace the Requirements of the Due Process Clause.* Stripped of the fiction of "consent," the PSJVTA attempts to impose jurisdiction over Defendants based on the same activities this Court and others have already held insufficient to support personal jurisdiction under the Due Process Clause. But deemed consent statutes cannot pass constitutional muster merely by providing advance notice of jurisdictional consequences, as Appellants propose, without undermining fundamental due process protections.

The Supreme Court has already rejected the same "fair warning" argument Appellants make now, *see College Savings Bank*, 527 U.S. at 679-80, and for good reason. This Court likewise recognized in *Brown* and *Chen* that due process serves as a supervening check on legislatively-imposed "consent" to jurisdiction, reiterating its "constitutional concerns" that if mere notice of jurisdictional consequences were enough to satisfy due process, "'*Daimler*'s ruling would be robbed of meaning by a back-door thief.'" *Chen v. Dunkin' Brands*, 954 F.3d 492, 499 (2d Cir. 2020) (quoting *Brown*, 814 F.3d at 640). The PSJVTA demonstrates that these "constitutional concerns" were well-founded. If "fair warning" alone could imply

17

**A-162**

consent to jurisdiction, there is no end to the types of activities that could give rise to "deemed consent" to jurisdiction—including activities that the courts have already held insufficient to satisfy the Due Process Clause.

4. *The PSJVTA, As Interpreted by Plaintiffs, Also Violates Separation of Powers.* Allowing Congress to dictate when the courts must find "consent" to personal jurisdiction, and interpreting the PSJVTA to restore jurisdiction in a closed case, would also violate separation of powers. Determining whether a party has waived its constitutional defenses requires the "application of constitutional principles to the facts as found." *Brewer v. Williams,* 430 U.S. 387, 403 (1977). Personal jurisdiction requires individualized adjudication that is reserved for the judiciary—particularly as the courts have already provided the constitutional "knowing and voluntary" standard for consent. *See Bank Markazi v. Peterson,* 136 S. Ct. 1310, 1323 (2016) ("Congress, no doubt, 'may not usurp a court's power to interpret and apply the law to the [circumstances] before it.'"). The PSJVTA attempts to usurp the judicial function by dictating that certain activities must always be "deemed" to be knowing and voluntary "consent" to personal jurisdiction.

That constitutional problem is exacerbated if the PSJVTA is interpreted to "restore" jurisdiction in this closed case. That interpretation directly violates the Supreme Court's holding in *Plaut v. Spendthrift Farm*, 514 U.S. 211, 227-28 (1995). Under *Plaut,* "Congress' retroactive imposition of jurisdiction to reopen a case after

18

**A-163**

final judgment" would be "an impermissible encroachment by Congress into the sphere of the federal courts and [a violation of] Article III." *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 162 (D.D.C. 2002). Because the PSJVTA itself is silent about reopening final judgments, and to avoid the separation-of-powers problem, this Court should decline to interpret the PSJVTA as restoring jurisdiction in this closed case.

**5. Given the Finality Interests at Stake, This Court Should Decline To Recall Its Six-Year-Old Mandate When Plaintiffs May Pursue Claims in a Separate Action.** In light of "the profound interests in repose attaching to the mandate of a court of appeals," recall of a mandate is a tool "of last resort, to be held in reserve against grave, unforeseen contingencies." *Calderon v. Thompson*, 523 U.S. 538, 549-50 (1998). There is no "last resort" here—even if the Court determines that the PSJVTA is constitutional, Plaintiffs may pursue their claims in a separate case stayed at the pleadings stage, as this Court has observed. *See Waldman II*, 925 F.3d at 576 n.2. That outcome also respects this Court's recognized interest in the finality of its mandates, which has only grown in the four years since it last declined to recall its mandate in this case. *Id.* at 574-75. Recalling the mandate would be futile in any event, because a judgment entered without personal jurisdiction, like the district court's 2015 judgment in this case, is void. *See, e.g.*, *"R" Best Produce v. DiSapio*, 540 F.3d 115, 122-23 (2d Cir. 2008).

19

A-164

***6. A New Trial Is Required Because Plaintiffs' Purported Experts Had No Specialized Knowledge or Reliable Methodology and Usurped the Jury's Role.*** The district court committed manifest error when it allowed Plaintiffs' three liability experts to testify at trial despite failing to apply any discernable methodology. *See United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994). These witnesses instead provided speculative narratives about the attackers' mental states and told the jury which conclusions to draw. The D.C. Circuit affirmed the exclusion of testimony from one of these same experts based on nearly-identical infirmities. *See Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 972 (D.C. Cir. 2016). As these witnesses served as Plaintiffs' only liability witnesses, there is (at the very least) a "distinct possibility" that the verdict was prejudiced by their improper and unfounded testimony. Even if this Court were to recall the mandate and exercise personal jurisdiction over Defendants, a new trial is necessary.

## ARGUMENT

## I. Exercising Personal Jurisdiction Over Defendants Would Violate Due Process.

### A. Defendants Lack Sufficient Contacts with the United States to Support the Exercise of Personal Jurisdiction.

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S.

20

**A-165**

462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). Because a court's "assertion of jurisdiction exposes [a foreign defendant] to the State's coercive power," it is subject to review in federal court for "compatibility" with due process. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011) (holding assertion of personal jurisdiction over foreign corporations violated due process). The personal jurisdiction requirement "represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Bauxites*, 456 U.S. at 702.

"Due process requires that a defendant be haled into court … based on <u>his own affiliation</u> with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Walden*, 571 U.S. at 286 (emphasis added). Accordingly, the Supreme Court has "consistently" rejected the argument that the "foreseeability of causing <u>injury</u>" to residents of the forum is sufficient to establish personal jurisdiction whenever "policy considerations so require." *Burger King*, 471 U.S. at 474. Rather, jurisdiction is "proper" only when some "actions by the defendant himself" create a "substantial connection" with the forum. *Id.* at 475-76; *see also Walden*, 571 U.S. at 289-90 (emphasizing "analytical focus" must remain on <u>the defendant's</u> connection to the forum and holding "mere injury to a forum resident is not a sufficient connection" to satisfy due process).

21

Applying these principles, this Court previously held that subjecting Defendants to personal jurisdiction in the United States for the claims alleged by Plaintiffs in this very case would violate due process, because Defendants lack sufficient contacts with the forum. *See Waldman*, 835 F.3d at 343-44. Defendants are not subject to general jurisdiction in the United States because, as this Court explained, the "overwhelming evidence" shows they are only "'at home' in Palestine, where [they] are headquartered and from where they are directed." *Id.* at 332-34; *see also Daimler*, 571 U.S. at 137-39 (holding general jurisdiction requires contacts with the forum "so 'continuous and systematic' as to render [the defendant] essentially at home in the forum").

This Court further held Defendants are not subject to specific jurisdiction in the United States for the claims at issue here because their "suit-related conduct"—namely, their alleged involvement in terrorist attacks in Israel (which Defendants dispute)—is "not sufficiently connected to the United States." *Waldman*, 835 F.3d at 335-43. The attacks at issue "were not expressly aimed at the United States," but rather "affected United States citizens only because they were victims of indiscriminate violence that occurred abroad." *Id.* at 337; *see also id.* at 326 (noting Plaintiffs failed to present any evidence they "were targeted … because of their United States citizenship"). Moreover, "the connections the defendants do have with the United States … revolve around lobbying activities that are not proscribed by

22

**A-167**

the ATA and are not connected to the wrongs for which the plaintiffs here seek redress." *Id.* at 342; *see also id.* at 326 (noting "plaintiffs did not allege or submit evidence … that the defendants engaged in conduct in the United States related to the attacks"). Accordingly, "[a] focus on the relationship of the defendants, the forum, and the defendants' suit-related conduct" led this Court to conclude "that there is no specific personal jurisdiction over the defendants for the torts [alleged by Plaintiffs] in this case." *Id.* at 337.

In this and similar cases pending before this Court, Appellants seek to paint this panel's prior decision as an outlier, asserting *Waldman* was "incorrectly decided" and "has received substantial criticism." Pls. Br. 16-17, 48-63, *Fuld v. PLO*, No. 22-76(L) (2d Cir. 2022); *see also* Gov't Br. 16-17, 30-35 (urging this panel to "reconsider" *Waldman*).[2] To the contrary, every other court to consider the issue has reached the same conclusion, holding Defendants lack sufficient contacts with the United States to be subject to either general or specific jurisdiction for the types of claims at issue here. *See Shatsky*, 955 F.3d at 1036-38 (directing dismissal of ATA claims against Defendants for lack of personal jurisdiction); *Klieman*, 923 F.3d

---

[2] In *Fuld*, Plaintiffs urged a different panel to invoke this Court's "mini en banc" process to reconsider and overrule *Waldman*. *See* Pls. Br. 49-51, *Fuld v. PLO*, No. 22-76(L) (2d Cir. 2022). Curiously, Plaintiffs here (represented by the same counsel) do not acknowledge, let alone address, their collateral attack on this panel's prior ruling.

23

**A-168**

at 1126 (holding that, "absent intentional targeting, the fact that an American died in a terrorist incident abroad" is exactly the type of "'random, fortuitous, or attenuated' contact" that is insufficient to support personal jurisdiction); *Livnat*, 851 F.3d at 56-58 (same). Put simply, the courts have repeatedly held—consistent with *Waldman*—that Defendants are not subject to personal jurisdiction in the United States for claims based on their alleged involvement in indiscriminate third-party attacks in Israel or Palestine.

Notably, this unbroken line of decisions specifically holds the <u>same activities</u> upon which Plaintiffs and the Government now rely to impose personal jurisdiction under the PSJVTA are <u>insufficient</u> to support the exercise of jurisdiction under the Due Process Clause. As noted above, Plaintiffs here allege that Defendants "consented" to jurisdiction by: (1) "continuing" to make "prisoner and martyr payments" in Palestine; (2) conducting activities, such as press conferences and social media posts, "while physically present in the United States"; and (3) "continuing to maintain an office" in New York, the site of Palestine's Mission to the United Nations. *See* Dist. Ct. Dkt 1015, Pls. Opening Mem. on PSJVTA, at 8-19 (cleaned up).

But courts confronted with virtually identical (if not more extensive) allegations have consistently held these same types of activities do <u>not</u> establish a sufficient connection between Defendants, the claims at issue, and the United States

24

**A-169**

to support the exercise of personal jurisdiction. In *Waldman*, for example, this Court rejected Plaintiffs' claims that activities "intended to influence United States policy to favor the defendants' political goals" were sufficient to establish personal jurisdiction. 835 F.3d at 337, 341. Plaintiffs specifically alleged that Defendants maintained a "substantial" diplomatic and commercial presence in the United States, retained a lobby firm, "promoted the Palestinian cause in speeches and media appearances," and engaged in "extensive public relations activities" to "influence United States policy."[3] *Id.* at 323, 326, 333, 337. This Court held that none of those alleged activities created a "substantial connection" between Defendants, the alleged attack, and the United States. *Id.* at 335-37.

The D.C. Circuit reached the same conclusion in a series of ATA cases against Defendants, holding alleged "martyr payments," "speaking engagements," and public advocacy for the Palestinian cause failed to establish the requisite connection between Defendants, the claims at issue, and the United States. *See Shatsky*, 955 F.3d at 1022-23, 1037 (holding alleged "martyr payments" and "public relations

---

[3] When this Court decided *Waldman*, Defendants' presence in the United States was more substantial than it is now. At that time, Defendants maintained an office in Washington, D.C. (in addition to Palestine's UN Mission in New York). As discussed below, Defendants closed their D.C. office in 2018 after the U.S. Government declined to extend the ATA waiver necessary to continue operations. *See Klieman*, 923 F.3d at 1130. Aside from the UN Mission, Defendants do not currently maintain any office or physical location in the United States.

25

**A-170**

campaign" insufficient to support personal jurisdiction); *Klieman*, 923 F.3d at 1118, 1123-26 (holding alleged "campaign" to "influence" U.S. foreign policy "through the use of U.S. offices, fundraising, lobbying, [and] speaking engagements" insufficient); *Livnat*, 851 F.3d at 56-57 (holding plaintiffs failed to establish requisite link between alleged attack and "lobbying" activities).

Contrary to Appellants' and amici's assertions, these holdings do not place Defendants "beyond the jurisdictional reach" of U.S. courts, or "effectively preclude[]" alleged "foreign sponsor[s] of terrorism acting abroad from being hailed [sic] into U.S. courts."[4] When a defendant targets American citizens, or engages in conduct in the United States substantially connected to terrorist attacks overseas, U.S. courts can (and do) exercise personal jurisdiction over the defendant.[5] *See, e.g.*, *Mwani v. bin Laden*, 417 F.3d 1, 11-14 (D.C. Cir. 2005) (holding foreign defendants who "orchestrated the bombing of the American embassy in Nairobi" subject to personal jurisdiction because they "purposefully direct[ed] their terror at the United

---

[4] *See, e.g.*, Amicus Br. of Con. Law Professors 3, 19 (wrongly asserting Congress has been "hamstrung by the courts in its obligation to protect citizens"); Amicus Br. of U.S. Sens. & Reps. 5, 15-16 (wrongly claiming decision below "effectively plac[es] the PLO and PA beyond the reach of Congress and American courts"); Amicus Br. of Fmr. Officials 4 (wrongly stating decision below "takes the civil-liability option off the table vis-à-vis these defendants").

[5] The same is true of the opening "vignette" offered by one amicus, which describes the Iranian hostage crisis. *See* Amicus Br. of Con. Law Professors 4-6. Because the hostage-takers targeted the United States, they, too, would have been subject to personal jurisdiction.

26

**A-171**

States"); *Atchley v. AstraZeneca UK Ltd.,* 22 F.4th 204, 209-10, 231-38 (D.C. Cir. 2022) (holding court had specific jurisdiction over foreign companies that provided substantial support to a terrorist group that "injured or killed hundreds of United States service members" during a "years-long campaign to harm Americans and drive the United States' military … out of Iraq"); *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 169-74 (2d Cir. 2013) (holding foreign bank that used U.S. correspondent accounts to transfer funds for Hezbollah was subject to personal jurisdiction for claims arising from rocket attacks in Israel). The Due Process Clause precludes the exercise of personal jurisdiction only when plaintiffs cannot establish the requisite connection between the defendant, the attack allegedly giving rise to plaintiffs' claims, and the forum. *See Klieman*, 923 F.3d at 1126 (distinguishing claims brought by plaintiffs injured in bus attack in Israel from *Mwani*, in which the defendants "indisputably aimed to kill Americans").

In this case, Plaintiffs cannot satisfy the traditional due process requirements for exercising personal jurisdiction over a foreign defendant—as this Court already held in *Waldman*. The sole question before this Court is whether Plaintiffs can rely upon the same activities held constitutionally insufficient in *Waldman* to establish "deemed consent" to personal jurisdiction under the PSJVTA. Over the past year, three federal judges have considered that question. All three, including Judge

27

A-172

Daniels below, correctly concluded the constitutional protections afforded to defendants under the Due Process Clause are not so easily evaded.

**B.     Defendants Have Not "Consented" to Personal Jurisdiction in the United States.**

**1.     Consent to Personal Jurisdiction Must Be Knowing and Voluntary.**

"Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Bauxites*, 456 U.S. at 703. A party may expressly consent to the court's jurisdiction, or impliedly consent by "signal[ing]" its agreement "through actions rather than words." *Roell v. Withrow*, 538 U.S. 580, 589-91 (2003). In *Bauxites*, the Supreme Court cataloged a "variety of legal arrangements [that] have been taken to represent express or implied consent to the personal jurisdiction of the court," including submission "by appearance," forum-selection clauses, arbitration agreements, stipulation, "constructive consent" through "the voluntary use of certain state procedures," and failure to assert a jurisdictional defense in a responsive pleading. 456 U.S. at 703-04. Each of these "legal arrangements," the Court explained, reflects some "actions of the defendant" that "amount to a legal submission to the jurisdiction of the court." *Id.* at 704-05.

"[W]hether express or implied," however, the Supreme Court has "emphasiz[ed]" that a party's consent to jurisdiction must be "knowing and voluntary." *Wellness Int'l*, 575 U.S. at 685; *see also Brown*, 814 F.3d at 640

28

**A-173**

(explaining defendant may "submit to jurisdiction" that a court "would otherwise be unable to exercise" through "free and voluntary consent"). An "effective waiver of a constitutional right" generally requires proof of "the 'intentional relinquishment or abandonment of a known right or privilege.'" *College Savings Bank*, 527 U.S. at 682. Because implied or "constructive" consent "is not a doctrine commonly associated with the surrender of constitutional rights," federal courts "indulge every reasonable presumption against waiver."[6] *Id.* at 681-82.

In some cases, determining whether a defendant knowingly and voluntarily consented to personal jurisdiction is straightforward. A party may <u>expressly</u> agree—through a forum-selection clause, for example—to litigate in a particular forum. *See Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315-16 (1964) ("[I]t is settled … that parties to a contract may agree in advance to submit to the jurisdiction of a given court…."); *Burger King*, 471 U.S. at 472 n.14 ("Where such forum-selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their enforcement does not offend due process."); *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 379-80 & n.21 (S.D.N.Y. 2001) (finding

---

[6] Regardless of whether jurisdictional due process protections are properly categorized as "fundamental rights," constitutional rights, or liberty interests (*see* Pls. Br. 18, 59-60), the parties and the Court all agree that the waiver of such protections by consent to jurisdiction must be "knowing and voluntary." *See Wellness Int'l*, 575 U.S. at 685; Pls. Br. 41; Gov't. Br. 19.

29

voluntary "consent" via a forum-selection clause). Courts may also infer consent to jurisdiction based on <u>actions in the litigation itself</u> that demonstrate the defendant's intent to submit to jurisdiction. *See, e.g.*, *Roell*, 538 U.S. at 584 (holding parties who "voluntarily participated in the entire course of proceedings" through trial without objecting to jurisdiction "clearly implied their consent" "by their actions"); *V&A Collection, LLC v. Guzzini Props.*, 46 F.4th 127, 132 (2d Cir. 2022) (party bringing suit in forum impliedly consents to jurisdiction for all claims arising from the same transaction).

These canonical forms of consent are not at issue in this case, however, because Plaintiffs do not claim Defendants expressly consented to jurisdiction,[7] or took any action in the litigation itself evincing their intent to submit to the court's jurisdiction. To the contrary, as this Court previously noted, from the inception of this case in 2004, Defendants "repeatedly argued" the district court "lacked personal jurisdiction over them in light of their minimal presence" in the United States, and "the lack of any nexus between the facts underlying the plaintiffs' claims and [this

---

[7] One amicus asserts the PSJVTA is an "express consent" statute, but its description of "express" consent (consent "expressed through actions") makes clear it is actually discussing implied consent. *See* Amicus Br. of Am. Ass'n for Justice at 2; *see also Roell*, 538 U.S. at 589-90 (implied consent is consent "through actions rather than words"). No party to this case has ever argued Defendants expressly consented to personal jurisdiction.

forum].” *Waldman*, 835 F.3d at 322; *see also* SPA-2-3 (cataloging at least six instances in which Defendants challenged personal jurisdiction below).

In the absence of express consent or litigation conduct evincing submission to jurisdiction, determining whether the defendant knowingly and voluntarily consented to personal jurisdiction is more difficult. To establish implied consent, Plaintiffs must demonstrate some “actions of the defendant” that “amount to a legal submission to the jurisdiction of the court.” *Bauxites*, 456 U.S. at 704-05. This is “a deeply factbound analysis” that requires the court to determine “whether [defendant's] actions evinced the requisite knowing and voluntary consent.” *Wellness Int'l*, 575 U.S. at 685-86.

In making this determination, the Supreme Court expressly distinguishes between inferring a defendant's knowing and voluntary choice to submit to jurisdiction by its own conduct, and “mere assertions of power” by the forum to impose jurisdiction on nonconsenting defendants. *See Bauxites*, 456 U.S. at 705. In *Bauxites*, for example, the Court examined whether the defendant's failure to comply with court-ordered jurisdictional discovery could be treated as constructive waiver of its objection to personal jurisdiction. The Court held that it could, but only because “[t]he preservation of due process was secured by the presumption” that the defendant's specific conduct—its “failure to supply the requested information as to its contacts with [the forum]”—“was but an admission of the want of merit in the

31

**A-176**

asserted defense." *Id.* at 705, 709 (quoting *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 351 (1909)). By refusing to produce the requested materials, the defendant implicitly acknowledged that it did have sufficient contacts with the forum to support the exercise of personal jurisdiction. *Id.* at 706. The defendant's conduct thus served as a constructive waiver of any objection to jurisdiction. *See id.* ("[T]he sanction is nothing more than the invocation of a legal presumption, or what is the same thing, the finding of a constructive waiver.").

To illustrate the "due process limits" that apply to constructive consent, *Bauxites* distinguished an earlier case, *Hovey v. Elliott*, 167 U.S. 409 (1897), in which the Court held "it did violate due process for a court to take similar action as 'punishment' for failure to obey [a court] order" unrelated to the asserted defense. *Bauxites*, 456 U.S. at 705-06 (emphasis added). The defendant's conduct in that case—failure "to pay into the registry of the court a certain sum of money"—did not support the presumption of a "want of merit" in its asserted defense. *Id.* Subjecting the defendant to the court's jurisdiction, the Court explained, therefore constituted an improper penalty, rather than a valid presumption of constructive waiver drawn from the defendant's own conduct. *See id.* at 706 ("Due process is violated only if

32

**A-177**

the behavior of the defendant will not support the *Hammond Packing* presumption.").[8]

The Supreme Court similarly distinguished between valid, implied consent to jurisdiction and the improper imposition of jurisdiction in *College Savings Bank*. In that case, plaintiffs argued a state agency waived its immunity and "impliedly" consented to jurisdiction in federal court by knowingly and voluntarily engaging in interstate marketing, after a federal statute made clear that such activity would subject it to jurisdiction for Lanham Act claims. 527 U.S. at 671, 676. Writing for the Court, Justice Scalia emphatically rejected this "constructive-waiver" theory, explaining:

> There is a fundamental difference between a State's expressing unequivocally that it waives its immunity and Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived that immunity. In the latter situation, the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suits brought by individuals. That is very far from concluding that *the State* made an "altogether voluntary" decision to waive its immunity.

---

[8] As discussed further below, Judge Daniels expressly relied on *Bauxites'* discussion of the "*Hammond Packing* presumption" to hold the PSJVTA failed to provide valid consent in this case. As Judge Daniels explained, the PSJVTA's "deemed consent" provisions violate due process because engaging in the specified conduct—making payments in Palestine or conducting activities in the United States unrelated to Plaintiffs' claims—does not support an inference that Defendants intended to submit to jurisdiction. *See* SPA-9-11.

33

A-178

*Id.* at 680-81. The constitutional requirement of knowing and voluntary consent would mean nothing, the Court noted, if Congress had "[the] power to exact constructive waivers" of jurisdictional defenses "through the exercise of Article I powers." *Id.* at 683. Accordingly, the Court held that merely providing <u>notice</u> of Congress's intent to subject the defendant to jurisdiction if it "voluntarily" engaged in "federally regulated conduct" was insufficient to establish a constructive waiver. *Id.* at 679-82. In other words, knowledge of the law (congressional intent to impose jurisdiction) alone cannot be the basis for inferring "consent" to jurisdiction. *See id.* at 681. Otherwise, legislative fiat coupled with presumed knowledge of the law always would suffice to establish jurisdiction.

In describing the circumstances in which plaintiffs <u>could</u> demonstrate implied consent to jurisdiction, *College Savings Bank* located valid "consent" in the same place as many other implied consent statutes: the defendant's knowing and voluntary acceptance of a government benefit or privilege conditioned upon consent. Congress, the Court explained, may "condition its grant of [federal] funds to the States" upon their willingness to consent to jurisdiction in a federal forum. 527 U.S. at 686-87. By "acceptance of the funds," the State signals its "agreement" or consent to the condition attached. *Id.* The Court noted, however, that accepting this type of "gift" or "gratuity" conditioned on consent to jurisdiction presents a "fundamentally different" case than the imposition of jurisdiction by legislative fiat. *Id.* In the latter

34

**A-179**

case, "what Congress threatens if the State refuses to agree to its condition is not the denial of a gift or gratuity, but a sanction." *Id.*; *see also AT&T Communs. v. BellSouth Telecom.*, 238 F.3d 636, 646 (5th Cir. 2001) (contrasting "forced waiver" with "[a] state's voluntary waiver of immunity, inferred from the state's acceptance of a Congressional gratuity that it was free to decline without loss").[9]

Courts have used the same barometer to evaluate other implied consent statutes, examining whether the defendant signaled its agreement to personal jurisdiction by accepting a government benefit or privilege conditioned on consent. Many states, for example, have enacted statutes conditioning the "privilege" of driving on public roads on a non-resident's consent to personal jurisdiction in the state for any suits arising from such conduct. Because the state has the antecedent

---

[9] Plaintiffs assert that *College Savings Bank* is inapposite because it addresses state sovereign immunity rather than personal jurisdiction. *See* Pls. Br. 60-63. The decision itself, however, refutes this narrow interpretation. Relying on the "classic description of an effective waiver of a constitutional right," the Court explained that "constructive consent is not a doctrine commonly associated with the surrender of constitutional rights." 527 U.S. at 681-82 (emphasis added). Because "[s]tate sovereign immunity, no less than the right to trial by jury in criminal cases, is constitutionally protected," courts should "indulge every reasonable presumption against waiver." *Id.* at 682. Accordingly, "the principles underlying *College Savings Bank* are not specific to the Eleventh Amendment, but rather apply to constitutional rights broadly." *Fuld*, 578 F. Supp. 3d at 588. State sovereign immunity and lack of personal jurisdiction are also both jurisdictional defenses grounded in the Constitution. Plaintiffs fail to explain why Supreme Court precedent addressing the waiver of a jurisdictional defense is less instructive than their own "consent" cases, which address car searches and blood-alcohol tests. *See* Pls. Br. 62-63.

35

authority "to regulate the use of its highways" and to "exclude" non-residents from such use, the Supreme Court has held the state may also require non-residents to consent to jurisdiction "in advance of the operation of a motor vehicle on its highway." *Hess,* 274 U.S. at 354-57. By "accept[ing]" the "privilege" of driving on public roads, a non-resident defendant implicitly signals its agreement, through its actions, to consent to personal jurisdiction in the forum. *Id.*; *see also Wuchter v. Pizzutti*, 276 U.S. 13, 19 (1928) ("[T]he act of a non resident in using the highways of another state may be properly declared to be an agreement to accept service of summons in a suit growing out of the use of the highway…").

Courts apply the same framework to a host of other implied consent statutes as well. Business registration statutes, for example, condition the privilege of doing business in the state on consent to personal jurisdiction. By registering to do business in the state, a foreign corporation impliedly agrees to submit to personal jurisdiction in the forum.[10] *See, e.g.*, *Brown*, 814 F.3d at 632-33 (tracing the history

---

[10] The Supreme Court recently heard a case addressing the continued vitality of business registration statutes following *Daimler*, which sharply curtailed the exercise of general jurisdiction over foreign corporations on due process grounds. *See Mallory v. Norfolk Southern Ry. Co.*, No. 21-1168 (cert. granted April 25, 2022). In addition to challenging whether the "consent" extracted under such statutes is truly "knowing and voluntary," the Respondents in *Mallory* also challenged whether the ability to do business in a state is a "privilege" the State may deny if the corporation refuses to consent, or an antecedent "right" protected by the Constitution. *See* Resp't Br. 11-13, 25, 34-38.

36

of such statutes, which "extract" consent to jurisdiction in exchange for the privilege of doing business); *In re Mid-Atl. Toyota*, 525 F. Supp. 1265, 1278 (D. Md. 1981) (foreign corporation "consents" to jurisdiction as "part of a bargain, by which the corporation agrees to accept certain obligations in return for the right to do business in the state").

Several states have also adopted corporate director statutes, which "deem" that non-resident defendants "consent" to jurisdiction by accepting appointment to a corporation's board of directors. *See, e.g.*, *Armstrong v. Pomerance*, 423 A.2d 174, 176 & n.4 (Del. 1980) (analyzing Delaware corporate director statute). By accepting the benefits afforded to directors under state law (e.g., eligibility for interest-free, unsecured loans from the corporation, indemnification rights, and managerial powers), non-resident directors impliedly consent to personal jurisdiction in the state for any claims related to the corporation. *Id.*; *see also Swenson v. Thibaut*, 250 S.E.2d 279, 289-91 (N.C. Ct. App. 1978) (same).[11]

In each of these cases, the defendant's acceptance of a benefit or privilege conditioned by the forum on consent to jurisdiction signals the defendant's implied agreement to submit to jurisdiction in the forum—just as a state's acceptance of a

---

[11] The same is true of the other "narrowly-drawn" statutes cited by Plaintiffs: foreign companies and banks agree to appoint agents for service of process in the United States in exchange for the privilege of access to the U.S. financial system. *See* Pls. Br. 49-51.

**A-182**

conditional "gift" or "gratuity" from the federal government signals its implied waiver of sovereign immunity under *College Savings Bank*. By accepting the benefit provided by the forum, the defendant enters a "bargain with the state" whereby it consents to personal jurisdiction in exchange for permission to engage in conduct the state could otherwise prohibit. *Leonard v. USA Petroleum*, 829 F. Supp. 882, 889 (S.D. Tex. 1993); *see also Mid-Atl. Toyota*, 525 F. Supp. at 1278 (describing implied "consent" as "part of a bargain"). Indeed, the exchange of "reciprocal obligations" is exactly what makes the exercise of personal jurisdiction "fair" to a defendant under the Due Process Clause. *Ford Motor v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1029-30 (2021) (explaining that "allowing jurisdiction in these cases treats Ford fairly" because Ford enjoyed "the benefits and protection" of state law when doing business in the forum).

As Justice Scalia recognized, however, implied consent becomes a disguised form of legislatively-imposed jurisdiction when the forum does not offer any corresponding benefit for the defendant to accept or reject, in exchange for its consent to jurisdiction. *College Savings Bank*, 527 U.S. at 679-86. If the activity purportedly giving rise to "consent" does not require authorization from the forum, the defendant's choice to engage in the activity does not reflect any implied agreement to submit to jurisdiction because the defendant's ability to engage in the activity did not depend on any benefit (or "gratuity") conferred by the forum in the

38

**A-183**

first instance. *Id*. at 680-81 (holding Congress's bare "intention" to subject defendant to jurisdiction failed to establish implied consent because "there is little reason to assume actual consent based upon the [defendant's] mere presence in a field subject to congressional regulation"). "Without a received benefit," in other words, "there is no bargain, and without a bargain, there is no due process." *Leonard*, 829 F. Supp. at 889.

This does not mean that reciprocity or an exchange of benefits is necessary to establish knowing and voluntary consent in <u>every</u> case. As noted above, a defendant may expressly consent to personal jurisdiction via a forum-selection clause, for example, obviating any need to determine whether the defendant consented "through actions rather than words." Consent to jurisdiction also may result from a defendant's failure to comply with "certain procedural rules" governing the waiver of substantive rights. *See Bauxites*, 456 U.S. at 705 ("The expression of legal rights is often subject to certain procedural rules: The failure to follow those rules may well result in a curtailment of the rights."). For example, a defendant who enters an appearance and then fails to object to personal jurisdiction may impliedly submit to

39

**A-184**

the court's jurisdiction, "whether voluntary or not." *Id.* at 704-05 (discussing waiver under Fed. R. Civ. P. 12(h)).[12]

But Defendants are not aware of a single case—and neither Plaintiffs nor the Government have identified one—implying consent to jurisdiction based on a defendant's choice to engage in non-litigation-related activities in the <u>absence</u> of some benefit or privilege conferred upon the defendant in exchange for its consent. Reciprocity, or an exchange of benefits, thus provides a useful means of distinguishing between knowing and voluntary consent under an implied consent statute, and improper attempts to legislatively impose jurisdiction on a nonconsenting defendant.

### 2. Defendants Have Not Knowingly and Voluntarily Consented to Personal Jurisdiction.

Measured against these standards, the PSJVTA fails to provide valid, "knowing and voluntary" consent to personal jurisdiction in this case. Rather than

---

[12] The same is also true of a defendant who initially challenges jurisdiction, but then willfully withdraws from the litigation and defaults. *See City of NY v. Mickalis Pawn Shop*, 645 F.3d 114, 133-36 (2d Cir. 2011); *see also* Pls. Br. 42, 53, Gov't. Br. 28 (relying on *Mickalis*). These examples of procedural waiver are inapposite, as Plaintiffs cannot (and do not) claim Defendants submitted to jurisdiction by failing to follow any "procedural rule." *Bauxites*, 456 U.S. at 705; *see also* Gov't. Br. 12 (conceding "[p]ersonal jurisdiction has been contested throughout the eighteen years that this action has been pending"). Rather, the question in this case is whether a court can properly infer consent to jurisdiction based on Defendants' substantive, non-litigation-related activities.

40

**A-185**

identifying conduct that might actually demonstrate implied consent (such as the acceptance of U.S. foreign aid or some other government benefit), "Congress 'simply took conduct in which the PLO and PA had previously engaged—conduct that the Second and D.C. Circuits had held was insufficient to support personal jurisdiction in [*Waldman*, *Livnat*, *Shatsky*, and *Klieman*]—and declared that such conduct shall be deemed to be consent.'" SPA-16 (quoting *Fuld*, 578 F. Supp. 3d at 587). As Judge Daniels recognized, neither form of conduct alleged by Plaintiffs in this case—making social welfare payments in Palestine or maintaining a UN office and conducting related activities in the United States—supports the presumption that Defendants intended "to legally submit to suit in the United States," or reflects any "want of merit" in their asserted jurisdictional defenses. SPA-8-11, 16. Accordingly, the district court correctly rejected the PSJVTA as a basis for personal jurisdiction.

> a. **Social Welfare Payments Made Outside the United States Do Not Evince Agreement to Personal Jurisdiction in the United States.**

The first type of conduct specified by the PSJVTA—payments made in Palestine to those imprisoned or killed in terrorist attacks, or to their families—has "no direct connection to the United States, let alone [to] litigation in a United States court." SPA-10 & n.4 (quoting *Fuld*, 578 F. Supp. 3d at 587). The payments at issue occur entirely outside the United States under Palestinian law, and do not

41

**A-186**

require authorization from the U.S. government or the involvement of any U.S. entity. Any decision to continue making such payments reflects Defendants' own domestic laws and policy choices, rather than some implicit agreement to knowingly and voluntarily consent to jurisdiction in a forum (the United States) completely unconnected to the payments.

Applying the framework set forth by the Supreme Court in *Bauxites*, the district court properly concluded it would violate due process to imply "consent" to personal jurisdiction from such payments because the payments are "unrelated to the underlying issues" in the case, and do not reflect any "want of merit" in Defendants' asserted jurisdictional defenses. SPA-9-11 (explaining the payments "do[] not support a *Hammond Packing* presumption"). Unlike the discovery sanction affirmed by the Supreme Court in *Bauxites*, inferring consent to personal jurisdiction based on such payments therefore would "strain the idea of consent beyond its breaking point," allowing Congress to unilaterally impose jurisdiction on nonconsenting foreign defendants. SPA-10 n.4 (quoting *Fuld*, 578 F. Supp. 3d at 587).[13]

---

[13] Plaintiffs misread the decision below, myopically focusing on its discussion of the specific discovery orders at issue in *Bauxites* and *Hammond Packing* to claim the court committed "a rudimentary error of logic: the fallacy of denying the antecedent." *See* Pls. Br. 17-18, 51-53. Consistent with *Bauxites*, the district court invoked the "*Hammond Packing* presumption" to explain why the conduct specified by the PSJVTA cannot serve as a proxy for valid "consent" to personal jurisdiction: the nature of the activity does not support the presumption that Defendants knowingly and voluntarily submitted to jurisdiction in the United States. *See* SPA-

42

In asserting these payments may constitute "knowing and voluntary" consent to jurisdiction, Appellants and amici repeatedly conflate federal authority to penalize extraterritorial conduct (so-called "prescriptive" or "legislative" jurisdiction) and federal authority to subject nonresident defendants to personal jurisdiction in U.S. courts (so-called "adjudicative" jurisdiction).  Whether Congress could legislate that such payments may subject a party to liability,[14] that prescriptive authority does not answer the separate constitutional question whether Defendants can be forced to adjudicate such claims in U.S. court.  Indeed, as noted above, courts have already held that such payments, standing alone, fail to establish the requisite "connection" between Defendants, Plaintiffs' claims, and the United States to support the exercise

---

9-11.  Courts frequently cite *Hammond Packing* for this broader principle, distinguishing unconstitutional "penalties" from valid waivers or "presumptions." *See, e.g.*, *Collazos v. United States*, 368 F.3d 190, 203-06 (2d Cir. 2004) (distinguishing "punitive" waivers from permissible adverse presumptions, citing *Hammond Packing*); *Volkart Bros., Inc. v. M/V Palm Trader*, 130 F.R.D. 285, 289 (S.D.N.Y. 1990) ("The chief practical distinction between the assertion of personal jurisdiction through a valid 'presumption' as opposed to an unconstitutional 'punishment' is that the former requires that the defendant's behavior in the transaction at issue support the presumption." (citing *Hammond Packing* and *Bauxites*)).

[14] Congress has legislated that continuation of such payments forecloses Defendants from receiving a government benefit: U.S. foreign aid to Palestine. *See* Taylor Force Act, 22 U.S.C. § 2378c-1.  But like the imposition of civil or criminal liability, Congress's decision to discontinue foreign aid in response to Defendants' conduct cannot answer the separate constitutional question whether Defendants can be subject to personal jurisdiction in the United States.

43

**A-188**

of personal jurisdiction. *See, e.g.*, *Shatsky*, 955 F.3d at 1022-23, 1037 (holding alleged "martyr payments" did not confer specific jurisdiction).

"The personal jurisdiction requirement—which prevents federal courts from exercising authority over defendants without sufficient contacts with the United States—is an important limitation on the jurisdiction of the federal courts over purely extraterritorial activity that is <u>independent of the extraterritorial reach of a federal statute</u> or the court's subject matter jurisdiction." *Litecubes v. N. Light Prods.*, 523 F.3d 1353, 1363 & n.10 (Fed. Cir. 2008) (emphasis added). Although Congress can "extend[] a cause of action to reach extraterritorial activity," a federal court can only adjudicate such claims "providing [it] has personal jurisdiction over the defendants." *Id.* at 1363. In other words, Congress's "prescriptive jurisdiction," its authority to make federal law applicable to foreign conduct, "is activated only when there is personal jurisdiction, often referred to as 'jurisdiction to adjudicate.'" *Laker Airways v. Sabena*, 731 F.2d 909, 923 (D.C. Cir. 1984). Accordingly, Plaintiffs' repeated insistence that Congress has the "authority" to impose civil liability for extraterritorial attacks does not answer the separate question whether the court has personal jurisdiction over Defendants. *See, e.g.*, *Waldman*, 835 F.3d at 343 (holding federal statute providing for jurisdiction through service of process in ATA cases "does not answer the constitutional question of whether due process is satisfied").

44

**A-189**

Plaintiffs and the Government also misleadingly suggest the payments are "closely linked" to the United States because they are made "by reason of terrorist acts injuring or killing U.S. nationals." *See, e.g.*, Gov't Br. 17, 23-24. That assertion overlooks this Court's prior holding that the attacks at issue (and *a fortiori* any payments purportedly following from such attacks) did <u>not</u> target the United States, and "affected United States citizens only because they were victims of indiscriminate violence that occurred abroad." *Waldman*, 835 F.3d at 337. Indeed, this Court expressly found that Plaintiffs "did not allege or submit evidence that the plaintiffs were targeted in any of the six attacks at issue because of their United States citizenship." *Id.* at 326.

Contrary to Appellants' assertions, the payments at issue are part of a broader program designed to provide a "social safety net in the face of brutal and oppressive living conditions under Israeli military occupation."[15] As part of the program, the PA provides monthly welfare payments to families of Palestinians imprisoned in Israel for political crimes and security offenses or killed during political violence.[16] Israel broadly defines what constitutes a security offense in the occupied territories,

---

[15] Carnegie Endowment, *supra* note 1.

[16] *Id.*; *see also* Brookings Institution, *Why the discourse about Palestinian payments to prisoners' families is distorted and misleading* (2020), https://www.brookings.edu/blog/order-from-chaos/2020/12/07/why-the-discourse-about-palestinian-payments-to-prisoners-families-is-distorted-and-misleading/.

45

**A-190**

and Palestinians can be imprisoned for participating in political demonstrations without a permit, waving the Palestinian flag without approval, or posting social media messages critical of Israeli forces and the occupation.[17] According to the Carnegie Endowment, 70% of Palestinian families have at least one relative detained by Israel.[18] As of 2017, an estimated 13,000 prisoners and 33,700 families received monthly payments under the program. [19] Given this context, portraying these payments as rewarding terrorism (*see, e.g.*, Pls. Br. 7, 17; Amicus Br. of Fmr. Officials 3-4, 26) is "wrong and incendiary."[20]

> **b.** **Plaintiffs' Allegations Regarding Defendants' U.S. Activities Fail to Demonstrate Knowing and Voluntary Consent to Jurisdiction.**

Plaintiffs' allegations regarding the second type of conduct specified by the PSJVTA—conducting any non-exempt activities while physically present in the United States or maintaining a U.S. office—similarly fail to establish a basis for knowing and voluntary consent to personal jurisdiction. As noted above, the jurisdictional conduct alleged by Plaintiffs in this case—maintaining Palestine's UN Mission in New York and conducting related activities, such as press conferences

---

[17] Carnegie Endowment, *supra* note 1.

[18] *Id.*

[19] *Id.*

[20] Brookings Institution, *supra* note 16.

**A-191**

and social media posts promoting the Palestinian cause—is the same conduct the courts have repeatedly held <u>insufficient</u> to satisfy the Due Process Clause. Such conduct, the district court explained, cannot serve as a proxy for knowing and voluntary consent, given the courts' repeated holdings that the same conduct failed to establish any constitutionally-meaningful connection between Defendants, the claims at issue, and the United States. SPA-16.

Appellants attempt to shoehorn this case into the line of implied consent cases described above, asserting the PSJVTA extracts valid "consent" by conditioning a government benefit (entry into the United States) on Defendants' agreement to submit to personal jurisdiction in ATA cases. *See* Pls. Br. 54, 57-58; Gov't Br. 22-24. Noticeably absent from that discussion, however, is a citation to any provision of the PSJVTA permitting Defendants to enter and operate in the United States, or waiving penalties for doing so, in exchange for their consent to personal jurisdiction.[21]

---

[21] Plaintiffs attempt to latch onto Justice Scalia's discussion of "tag jurisdiction" in *Burnham v. Superior Court*, 495 U.S. 604 (1990), asserting "historical pedigree" supports the sovereign's right to impose "deemed consent" to jurisdiction in exchange for entry into the sovereign's territory. *See* Pls. Br. 57-59. As the district court recognized, however, *Burnham* is inapplicable because "tag jurisdiction" applies only to individuals, not to entities like Defendants. SPA-17. Moreover, Plaintiffs' "territorial exclusion" argument also fails because, as explained below, the PSJVTA does not permit Defendants to operate in the United States. To the contrary, longstanding federal law continues to prohibit Defendants from operating

47

**A-192**

Since long before passage of the PSJVTA, Congress has blocked Defendants from conducting any activities in the United States. More than three decades ago, Congress enacted the Anti-Terrorism Act of 1987 for the express purpose of denying Defendants the "benefit" of "operating in the United States." *See* 22 U.S.C. § 5201(b). The 1987 ATA prohibits Defendants from operating in the United States by making it unlawful to (1) "receive anything of value except informational material" from the PLO; (2) "expend funds from the PLO"; or (3) "establish or maintain an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by," the PLO. 22 U.S.C. § 5202.

The 1987 Act has been interpreted as a "wide gauged restriction of PLO activity within the United States," *United States v. PLO*, 695 F. Supp. at 1471, that deprives Defendants of the "many benefits which accrue to organizations operating in the United States, including political stability, access to our press and capital infrastructure, and … the patina of legitimacy." *Mendelsohn v. Meese*, 695 F. Supp. 1474, 1484 (S.D.N.Y. 1988) ("The avowed interest asserted by Congress in favor of the ATA is a tactical one—to deny the PLO the benefit of operating in the United States."). Consistent with this prohibition, Defendants do not currently operate or

---

in the United States, except for Defendants' UN-related presence. *See infra* at 49-50.

maintain any physical presence in the United States—as the Government concedes. *See* Gov't Br. 7 (acknowledging Defendants do not operate any non-UN office in the United States).[22]

The sole exception is for activities conducted by Defendants in furtherance of Palestine's role as a Permanent Observer at the United Nations. The UN Headquarters Agreement ("UNHQA") guarantees "invitees" of the UN, including Defendants, basic rights of "entry, access, and residence" in the UN Headquarters District in New York. *United States v. PLO*, 695 F. Supp. at 1465-68. Under the UNHQA, the United States is "obligat[ed] … to refrain from impairing the function of the PLO Observer Mission to the United States," which falls outside U.S. "jurisdiction." *Id.* at 1465-68, 1471. Courts have thus long held that UN-related activities conducted by Defendants cannot serve as the basis for exercising personal jurisdiction. *See Klinghoffer*, 937 F.2d at 51 (holding activities of Palestine's UN

---

[22] One of the amici repeatedly (and inaccurately) asserts that Defendants "continue to operate freely on U.S. soil" and "enjoy[] the benefits of operating in the United States." *See* Amicus Br. of U.S. Sens. & Reps. 3, 5, 18. Such assertions cannot be squared with the 1987 ATA, which has prohibited Defendants from "operating freely on U.S. soil" for more than three decades. Such assertions also are inconsistent with the PSJVTA's predecessor statute, the ATCA, which specifically predicated jurisdiction on an Executive Branch waiver of the 1987 ATA (which did not exist) or on benefits that Defendants declined. *See infra* at 8, 51-52. A waiver obviously would not be necessary unless Defendants were otherwise prohibited from operating in the United States.

49

A-194

Mission cannot "properly be considered as a basis of jurisdiction").[23] The PSJVTA mirrors but does not alter this longstanding interpretation of the UNHQA, providing that "[i]n determining whether a defendant shall be deemed to have consented to personal jurisdiction," "no court may consider" Defendants' UN Mission, their UN-related activities and meetings with government officials, or "any personal or official activities conducted ancillary" thereto.[24] *See* 18 U.S.C. § 2334(e)(3).

---

[23] The 1987 ATA authorizes the Attorney General to enforce its prohibition on non-UN-related activities by filing suit in district court. 22 U.S.C. § 5203. The lack of enforcement actions brought against Defendants refutes Plaintiffs' assertions that Defendants engage in non-UN-related activities in the United States.

[24] In the proceedings below, Defendants argued that all of the U.S. activities alleged by Plaintiffs fall under this exemption, and therefore cannot trigger "deemed consent" jurisdiction under the PSJVTA. SPA-15. As part of its UN activities, the Palestinian Mission participates in the work of the UN Committee on the Exercise of the Inalienable Rights of the Palestinian People ("CEIRPP"). *See* Report, CEIRPP, UN Doc. A/75/35 (Oct. 13, 2020). The CEIRPP's purpose is to "mobilize the international community" to provide "the broadest possible international support" for the Palestinian people by "end[ing] … the Israeli occupation," supporting the "two-State solution," "highlighting the illegality of Israeli settlement activities in the West Bank," and "rais[ing] international awareness of the political, human rights and humanitarian developments on the ground." Programme of Work for 2020, CEIRPP, UN Doc. A/AC.183/2020/1 (Feb. 7, 2020). In light of the CEIRPP's work, the U.S. activities alleged by Plaintiffs in this case are all plainly either official UN business or "ancillary to" such activities under 18 U.S.C. § 2334(e)(3). The district court did not reach this issue, given its conclusions that the types of activities alleged by Plaintiffs—even if non-exempt—"do not infer any intention on the part of Defendants to legally submit to suit in the United States." SPA-16. On appeal, however, this Court may affirm on any grounds supported by the record. *See Shumway v. UPS*, 118 F.3d 60, 63 (2d Cir. 1997).

50

**A-195**

The PSJVTA does not waive the prohibitions or penalties imposed by the 1987 ATA, nor does it purport to permit Defendants to conduct any previously-unauthorized activities in the United States. Contrary to Plaintiffs' assertions, the PSJVTA thus fails to offer any "benefit" for Defendants to accept or reject in exchange for their consent to personal jurisdiction in the United States.

The PSJVTA's failure to establish valid, implied consent to jurisdiction is perhaps best illustrated by contrasting the PSJVTA with its predecessor statute, the ATCA. The ATCA provided that Defendants "shall be deemed to have consented to personal jurisdiction" if they accepted either of two government benefits: (1) U.S. foreign aid, or (2) the "benefit" of a formal "waiver or suspension" of the 1987 ATA's prohibitions on Defendants' U.S. activities under the 1987 ATA, which would have allowed them to maintain an embassy in Washington. *See* 18 U.S.C. § 2334(e)(1) (2018) (superseded by PSJVTA).

In defending the constitutionality of the ATCA, the Government specifically argued the statute was "reasonable and consistent with the Fifth Amendment" because "the political branches have long imposed <u>conditions on these benefits</u>." U.S. Brief 12-13, *Klieman v. Palestinian Auth.*, No. 15-7034 (D.C. Cir. Mar. 13, 2019) (emphasis added). The ATCA satisfied due process, in other words, because it grounded "deemed consent" on Defendants' choice to accept or reject either of

51

**A-196**

two distinct government benefits conditioned upon consent.[25] This interpretation is consistent with *Hess*, *College Savings Bank*, and the other authorities described above, which similarly hold that acceptance of a government benefit or "gratuity" conditioned on consent may constitute a knowing and voluntary waiver of jurisdictional defenses. *See Hess*, 274 U.S. at 354-57; *College Savings Bank*, 527 U.S. at 686. Both this Court and the D.C. Circuit subsequently held the ATCA did not establish personal jurisdiction because Defendants had not accepted either of the benefits specified by the Act. *See Waldman II*, 925 F.3d at 574-75; *Klieman*, 923 F.3d at 1128-31.

The PSJVTA, by contrast, does not confer any benefit on Defendants in exchange for their purported "consent." The PSJVTA does not authorize Defendants to engage in activities in the United States prohibited by the ATA, nor does it extend any government benefit (*e.g.*, foreign aid) conditioned upon consent to personal jurisdiction. Accordingly, "there is no bargain—no social compact" that could evince Defendants' implied agreement to submit to jurisdiction in the United States. *Leonard*, 829 F. Supp. at 889.

---

[25] The Government offers a similar description of the ATCA in this case, acknowledging "deemed consent" was triggered only if Defendants "accept[ed]" either of two "forms of foreign assistance." *See* Gov't. Br. 7.

52

A-197

The Government takes a different tack, asserting the PSJVTA is "consistent with due process" because the U.S. activities that give rise to "deemed consent" are "closely linked to the ATA claims that may be asserted against [Defendants]." *See* Gov't Br. 2, 17. That argument, however, runs counter to the plain language of the U.S. activities provision, which does not require any such "link." Rather, that provision specifically provides Defendants "shall be deemed to have consented to personal jurisdiction" if, *inter alia*, they "conduct[] <u>any activity while physically present</u> in the United States on behalf of the [PLO] or the [PA]" (subject to the exemptions for UN-related activities and meetings with government officials described above). 18 U.S.C. § 2334(e)(1)(B)(iii) (emphasis added). The provision does not limit "deemed consent" to activities "closely linked" to "civil ATA actions" or "attacks on Americans," but rather sweeps in any non-exempt activity conducted in the United States—no matter how unrelated or tangential to the claims at issue. Plaintiffs, for example, have asserted Defendants "consented" to jurisdiction by maintaining and "regularly updat[ing]" their UN Mission website and social media accounts, giving interviews to NPR and Voice of America, tweeting a message promoting a film about "surfing in Gaza," and publishing "a link to a statement by U.S. Secretary of State Antony Blinken" on social media. *See* Dist. Ct. Dkt 1015, Pls. Opening Mem., at 18; Dist Ct. Dkt 1027, Second Supp. Yalowitz Decl., at 2-3.

53

**A-198**

Obviously, none of those activities is "closely linked" to any "civil ATA action" or terrorist attack.

For that reason, the district court correctly recognized the specified activities cannot serve as a valid proxy for knowing and voluntary consent to jurisdiction in this case because they "do not infer any intention on the part of Defendants to legally submit to suit in the United States." SPA-16. The conduct relied upon by Plaintiffs in this case proves the point, as this Court has already held the <u>same conduct</u> insufficient to support the exercise of jurisdiction under the Due Process Clause. *See Waldman*, 835 F.3d at 323, 326, 335-37; *Shatsky*, 955 F.3d at 1022-23, 1037. As the district court concluded, "Congress 'cannot simply declare anything it wants to be consent.'" SPA-16 (quoting *Fuld*, 578 F. Supp. 3d at 595). Rather, the specified conduct must support an inference that Defendants knowingly and voluntarily consented to suit in the United States. *Id.*

In so holding, the district court expressly "join[ed] two other courts in concluding that an exercise of jurisdiction under either of the PSJVTA's factual predicates is unconstitutional." SPA-15 (citing *Fuld* and in *Shatsky*). Plaintiffs attempt to manufacture a split in authority, repeatedly asserting—without support—that the district court "eschewed" and declined to adopt *Fuld*. *See* Pls. Br. 12, 18, 59. That is a bizarre claim, given the district court's reliance on *Fuld* in both its initial decision and the order denying Plaintiffs' motion for reconsideration. SPA-

10, 15-16. To date, all three judges to consider the issue have concluded that it would violate due process to "deem" that Defendants "consented" to personal jurisdiction by engaging in the types of activities alleged by Plaintiffs in this case. No court has adopted Appellants' view that Congress can transform constitutionally-inadequate contacts with a forum into "deemed consent" merely by legislative say-so.

**C.      Permitting Congress to Impose "Deemed Consent" to Personal Jurisdiction Based on Constitutionally-Inadequate Conduct Would Eviscerate Due Process Protections.**

Although Plaintiffs and the Government concede that consent to personal jurisdiction must be "knowing and voluntary," they pay only lip service to that requirement in their briefs before this Court. *See* Pls. Br. 41-43; Gov't Br. 18-20. Instead, Plaintiffs and the Government primarily attempt to redefine the applicable standard, asserting a "deemed consent" statute satisfies due process if it provides "fair warning" and "reasonably advances legitimate government interests." Pls. Br. 4, 17, 40-51; Gov't Br. 18-26. The cases upon which they rely for that proposition, however, do not address consent, let alone "deemed consent" statutes. Rather, Plaintiffs and the Government draw their purported standard from cases like *Ford*, *Burger King*, and *International Shoe*—the same cases squarely holding that "[t]he Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful

**A-200**

contacts, ties, or relations." *Burger King*, 471 U.S. at 471-72; *see also* Pls. Br. 17, 41, 43-45; Gov't Br. 18-20.

Plaintiffs' and the Government's reliance on hornbook "minimum contacts" caselaw to establish the applicable standard for consent highlights a deeper inconsistency at the heart of their arguments before this Court. On one hand, Plaintiffs claim this Court's prior jurisdictional analysis in *Waldman* is "not germane here" because the PSJVTA hinges on "consent," a "separate basis for jurisdiction" that "may be upheld even in the absence of minimum contacts between the defendant and the forum." Pls. Br. 1, 4, 6, 39-40; *see also* Gov't Br. 2, 15. But to defend the PSJVTA as creating valid "consent" to jurisdiction, Plaintiffs and the Government turn around and summon the "fair warning" plus "reasonableness" standard from *International Shoe*—a seminal "minimum contacts" case. *See* Pls. Br. 41, 43 (quoting *Int'l Shoe*, *Burger King*, and *Ford*); Gov't Br. 18 (same). Rather than focusing on Defendants' purported "consent" as a "separate" basis for jurisdiction, in other words, Plaintiffs and the Government treat the PSJVTA as if it simply imposes personal jurisdiction on Defendants by legislative fiat—asking whether it is "fair" and "reasonable" for Congress to "assert[]" personal jurisdiction over Defendants in the United States. Gov't Br. 19-20, 26.

That, of course, is the same question resoundingly answered in the negative in *Waldman*, *Livnat*, *Klieman*, and *Shatsky*—all of which held that it would be unfair

56

**A-201**

and unreasonable to subject Defendants to suit in the United States because they lack any constitutionally-meaningful connection to the forum. Appellants' proffered "fair warning plus reasonableness" standard is also the same test squarely rejected by the Supreme Court in *College Savings Bank*. In that case, plaintiffs urged the Court to find implied waiver so long as the Government "unambiguously" warned defendants that engaging in "specified conduct governed by federal regulation" would subject it to suit, and defendants "voluntarily elect[ed]" to engage in the regulated activity. 527 U.S. at 679.

The Supreme Court emphatically rejected this "constructive-waiver" theory, holding there was a "fundamental difference" between the Government "expressing unequivocally its intention" to subject defendants to suit, and a defendant's knowing and voluntary choice to submit to jurisdiction. *Id.* at 680-81. Putting the defendant "on notice" of Congress's intention to subject the defendant to suit, the Court explained, remains "very far" from demonstrating that the defendant "made an 'altogether voluntary' decision" to submit to jurisdiction. *Id.* at 681. Or as Judge Daniels put it in this case: "Consent is not a legal fiction devoid of content[,] and neither the courts nor Congress may engage in circular reasoning that premises consent on the presumption that defendants know the law and then define the law so that anyone engaging in the defined conduct is deemed to have consented to personal jurisdiction." SPA-16 (cleaned up).

57

A-202

If "fair warning" and a legitimate government interest were all that due process required to subject a defendant to personal jurisdiction, Congress and state legislatures could circumvent modern due-process doctrine simply by enacting statutes declaring that the same activities already held insufficient to confer jurisdiction under the Due Process Clause "shall be deemed consent" to personal jurisdiction. In *Daimler*, for example, the Supreme Court held it would violate due process to allow a California court to subject a foreign car manufacturer and its U.S. subsidiary, which distributed vehicles to California dealerships but were incorporated and maintained their principal places of business elsewhere, to personal jurisdiction in the state. *See* 571 U.S. at 139. Under Plaintiffs' and the Government's novel theory, California could circumvent that holding simply by enacting a statute declaring that any foreign corporation that distributed vehicles to California dealerships "shall be deemed to have consented to personal jurisdiction" in the state.

The same would be true of virtually any decision dismissing federal claims for lack of personal jurisdiction: the legislature could simply repackage the contacts with the forum found insufficient to support the exercise of jurisdiction as grounds for "deemed consent" to jurisdiction. Accepting this interpretation "would effectively mean that there are <u>no</u> due process limitations on the exercise of personal jurisdiction. Congress or a state legislature could provide for jurisdiction over <u>any</u>

58

**A-203**

defendant for <u>any</u> conduct so long as the conduct post-dated enactment of the law at issue." *Fuld*, 578 F. Supp. 3d at 590. The only limit would be the "reach of the legislative imagination—which is to say, that there are no constitutional limits at all." *Id.* at 591.

Finally, even if this Court were to adopt Plaintiffs' proposed standard, exercising personal jurisdiction over Defendants in this case would "offend 'traditional notions of fair play and substantial justice.'" *Bauxites*, 456 U.S. at 702-03 (quoting *Int'l Shoe Co.*, 326 U.S. at 316); *see also Carnival Cruise Lines v. Shute*, 499 U.S. 585, 595 (1991) (holding that even when a party <u>expressly</u> consents to jurisdiction, the agreement is still "subject to judicial scrutiny for fundamental fairness").

Despite Defendants' long-standing objection to personal jurisdiction, the PSJVTA directs courts to "deem" that Defendants have "consented" to jurisdiction by engaging in the same conduct this Court previously held insufficient to establish the requisite connection between Defendants, Plaintiffs' claims, and the forum. Concluding that Defendants nonetheless "consented" to jurisdiction in the same case in which they successfully challenged the exercise of personal jurisdiction "would let fiction get the better of fact and make a mockery of the Due Process Clause." *Fuld*, 578 F. Supp. 3d at 595; *see also Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 183-84 (5th Cir. 1992) (holding defendant can only impliedly "consent" to

59

jurisdiction "where such jurisdiction is constitutionally permissible"); *WorldCare Ltd. Corp. v. World Ins. Co.*, 767 F. Supp. 2d 341, 361, 363 (D. Conn. 2011) (holding foreign defendant's "paltry" forum contacts failed the "reasonableness test").

## II. THIS COURT SHOULD REJECT APPELLANTS' ATTEMPTS TO AVOID THE REQUIREMENTS OF DUE PROCESS AND BINDING CIRCUIT PRECEDENT.

Because courts consistently hold that exercising personal jurisdiction over Defendants would not be "fair" or "reasonable," Plaintiffs, the Government, and amici present a variety of other reasons to depart from precedent and subject Defendants to jurisdiction. They make expansive (and unsupported) claims about legislative authority and foreign policy couched as "deference" to Congress. Gov't Br. 20-26; Pls. Br. 42-46; Amicus Br. Former Fed. Officials 25-30. But no personal jurisdiction case supports their deference arguments, and certainly no case supports turning a blind eye to due process. Put simply, this Court does not "defer" to Congress when interpreting the Constitution.

### A. Courts Do Not Defer to Congress on Constitutional Issues.

Appellants assert the PSJVTA's "deemed consent" provisions are "reasonable" because Congress has "broad authority" on matters of "foreign affairs" and "national security." Gov't Br. 2, 18, 23-26; Pls. Br. 42-46. This authority, however, does not include the power to impose personal jurisdiction where it is otherwise lacking under the Due Process Clause. The Supreme Court has long held

60

**A-205**

"Congress may not expand the jurisdiction of the federal courts beyond the bounds established by the Constitution." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 491 (1983). Cases involving "foreign affairs" and "national security" are not exceptions to the well-settled rule that "a statute cannot grant personal jurisdiction where the Constitution forbids it." *Gilson v. Republic of Ire.*, 682 F.2d 1022, 1028 (D.C. Cir. 1982). As such, "respect for Congress's policy judgments … can never extend so far as to disavow restraints on federal power that the Constitution carefully constructed." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). The Supreme Court has emphasized that "concerns of national security and foreign relations" neither "warrant abdication of the judicial role" nor "trump the Court's own obligation to secure the protection that the Constitution grants to individuals.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010).

In *Livnat*, for example, plaintiffs urged the court to depart from "ordinary due-process requirements" and exercise personal jurisdiction over Defendants because the ATA reflected "Congress's intent to provide redress in U.S. courts for terrorism abroad." 851 F.3d at 53. The D.C. Circuit rejected that argument, holding "Congress cannot wish away a constitutional provision." *Id.* Similarly, *Waldman* held that compliance with service-of-process provisions for jurisdiction "does not answer the constitutional question of whether due process is satisfied." 835 F.3d at 343. Deference is even less appropriate when, as here, Congress's explicit purpose

61

**A-206**

is to reverse federal decisions addressing constitutional limits on personal jurisdiction. *See Boerne v. Flores*, 521 U.S. 507, 536 (1997) ("When the political branches of the Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including *stare decisis*, and contrary expectations must be disappointed.").

The Government's constant assurances that the PSJVTA's "deemed consent" provisions are narrowly-tailored to apply only to the PA and PLO does not help their cause. *See* Gov't Br. 2, 15, 17, 26, 35. The "judicial powers" are vested in a non-political branch precisely to protect "the rights of one person" from the "tyranny of shifting majorities." *INS v. Chadha*, 462 U.S. 919, 961-62 (1983) (Powell, J., concurring). A statute limiting the due process rights of just two groups should result in more scrutiny, not less. If Congress were permitted to define the scope of constitutional protections for individual groups, "it is difficult to conceive of a principle that would limit congressional power." *Boerne*, 521 U.S. at 529. Without a limiting principle, which the Government fails to describe, there is no reason to assume "deemed consent" provisions will not proliferate. As explained by one scholar, courts "are very likely to apply" Fifth Amendment decisions on PSJVTA-style consent "across all areas of substantive law," and "state legislatures

62

A-207

are also likely to follow suit" with expansive legislation. Aaron Simowitz, *The Private Law of Terror*, 126 Penn St. L. Rev. 159, 193-94 (2021).

**B.** **Neither the War on Terror Nor the Alleged Need for Lawsuits Against Defendants Justifies Ignoring Due Process.**

There is similarly no merit to Appellants' claims that permitting "deemed consent" under the PSJVTA is necessary for the war on terror. The United States does not lack tools for fighting terrorism; indeed, one of the amici lists <u>dozens</u> of anti-terrorism treaties and statutes that are unaffected by the decision below. *See* Amicus Br. of U.S. Sens. & Reps. at 6-7 & 12-13 (listing more than 30 treaties, statutes, and amendments with extraterritorial effect). If the PSJVTA were essential to that effort, it would presumably confer jurisdiction for claims against other groups or individuals—but it does not. As the Government repeatedly concedes, this special legislation targets only the PA and PLO.

The Government itself has acknowledged in this very case that applying traditional due-process protections in civil cases will <u>not</u> interfere with its ability to combat terrorism. In urging the denial of Plaintiffs' petition for certiorari in this case, the Solicitor General confirmed that "nothing in the court's opinion calls into question the United States' ability to prosecute defendants … in cases involving the application of U.S. criminal laws to conduct affecting U.S. citizens or interests." CVSG Br. at 18, *Sokolow v. PLO*, No. 16-1071 (U.S. 2018). In another case, the Government acknowledged the traditional standard will not "interfere with the

63

**A-208**

government's ability to combat terrorism through criminal prosecutions" because "in a criminal case, personal jurisdiction is based on the physical presence of the defendant in the forum, independent of any minimum-contacts analysis." CVSG Br. 21, *Fed. Ins. Co. v. Saudi Arabia,* No. 08-640 (U.S. 2009). As Congress has recognized, criminal cases more directly advance the Government's anti-terrorism interests than civil cases. 138 Cong. Rec. S17260 (daily ed. Oct. 7, 1992); Antiterrorism Act of 1990: Hearing on S. 2465 Before the S. Comm. on the Judiciary, 101st Cong. 46-47 (1990).

Nor is the PSJVTA necessary to allow terror victims to sue the PA and PLO because Israeli courts already allow such suits by American citizens. The estates of the American victims of the Achille Lauro hijacking (who filed *Klinghoffer*) were awarded over $100 million against the PA and PLO by an Israeli court.[26] Other Israeli cases resulted in large awards against Defendants for attacks during the Second Intifada.[27] As noted above, jurisdiction may also be available in U.S. courts

---

[26] *See Norz'its Litbac v. Palestinian Auth.* (Isr.)*,* CivC 2538/00 (Jerusalem); Shurat Hadin, Press Release (11/19/2018), https://israellawcenter.org/legal_actions/shurat-hadin-wins-precedent-setting-ruling-in-achille-lauro-terror-case/; Jerusalem Post, *Terror victims' families to collect NIS 500 m. from Palestinian Authority* (4/26/2020), https://www.jpost.com/arab-israeli-conflict/court-orders-collection-of-nis-500-m-from-pa-for-second-intifada-625930.

[27] *See Anonymous v. Palestinian Auth.* (Isr.), CivA 2362/19 (Jerusalem, 10/4/2022); *Mentin v. Palestinian Auth.* (Isr.), CivC 3361/09 (Jerusalem 2017). Times of Israel, *High Court: PA liable for terrorism due to money it pays attackers; victims can*

if an attack targeted Americans.

> ### C. *Waldman* Correctly Held that Jurisdictional Due Process Protects Individual Liberty Interests.

As *Waldman* recognized, this Court's prior decisions "clearly establish the congruence of due process analysis under both the Fourteenth and Fifth Amendments." 835 F.3d at 330. Appellants nonetheless argue that Fourteenth Amendment cases turn on federalism interests irrelevant to the Fifth Amendment, and that a watered-down version of personal jurisdiction protections therefore should apply here. Gov't Br. 31-33; Pls. Br. 45-46. But personal jurisdiction "represents a restriction on judicial power not as a matter of sovereignty, but … as a matter of <u>individual liberty</u>." *Bauxites*, 456 U.S. at 702 & n.10 (emphasis added). Accordingly, the lack of federalism concerns in this case does not diminish Defendants' due process interests.

Every circuit to reach the issue agrees with this Court's holding. The Eleventh Circuit explained that "the operative language of the Fifth and Fourteenth Amendments is materially identical, and it would be incongruous for the same words to generate markedly different doctrinal analyses." *Herederos De Roberto Gomez Cabrera v. Teck Res. Ltd.*, 43 F.4th 1303, 1308 (11th Cir. 2022). The Fifth Circuit

---

*sue* (4/10/2022), https://www.timesofisrael.com/high-court-pa-liable-for-terrorism-due-to-stipends-to-attackers-victims-can-sue/.

agrees: "Both Due Process Clauses use the same language and serve the same purpose, protecting individual liberty by guaranteeing limits on personal jurisdiction. Every court that has considered this point agrees that the standards mirror each other." *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 235 (5th Cir. 2022) (en banc). The Government reiterated this point in opposing *certiorari* in this case, arguing *Waldman* was consistent with other circuits. CVSG Br. at 10, 14-16, *Sokolow*, No. 16-1071 (U.S. 2018).

By contrast, no court has adopted the "holistic approach" to personal jurisdiction urged by Appellants. *See* Gov't Br. 25-26. Appellants rely on *Ford*, but *Ford* merely applied the standard minimum contacts test, holding that plaintiff's claims "must arise out of or relate to the defendant's contacts," such that there is "an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum." 141 S. Ct. at 1024-25 (cleaned up). Appellants selectively quote *Ford's* "reasonable, in the context of our federal system of government" language (Gov't Br. 25; Pls. Br. 43), failing to include the essential language in that sentence—that a defendant's forum "contacts" determine whether jurisdiction is reasonable.

None of Appellants' other cases discusses deference to Congress on due process or personal jurisdiction. For example, *Jesner v. Arab Bank*, 138 S. Ct. 1386, 1403 (2018), afforded deference when deciding whether to extend a judge-made

66

A-211

cause of action into an area with "foreign-policy consequences." Similarly, *ACLU v. Dep. of Defense*, 901 F.3d 125, 134 (2d Cir. 2018), approved deference to an agency's consideration of the national security implications of a FOIA request if the agency's decision is "logical and plausible." The other cases are even farther afield. *See United Student Aid Funds v. Espinosa*, 559 U.S. 260, 272 (2010) (failure to serve a summons did not violate due process when the defendant had "*actual* notice of the filing and contents"); *Snyder v. Massachusetts*, 291 U.S. 97, 117 (1934) (criminal defendant not entitled to attend jury's viewing of crime scene). The Supreme Court has never authorized federal courts to take a "holistic" approach to personal jurisdiction just because Congress wants a statute to have extraterritorial reach.

Some amici argue that *Waldman* is inconsistent with the original public understanding of the Fifth Amendment (*see* Amicus Br. of Former Officials 7-16), as they claimed in the *Fuld* appeal. This issue is waived here, however, because it "was raised by *amici*, not by the appellants themselves." *Bano v. Union Carbide*, 273 F.3d 120, 128 & n.5 (2d Cir. 2001). In any case, "courts and commentators have overwhelmingly concluded," consistent with *Waldman*, "that 'the full protection of the Due Process Clause should be available to foreign citizens summoned to defend themselves in United States courts.'" W. Dodge & S. Dodson, *Personal Jurisdiction and Aliens*, 116 Mich. L. Rev. 1205, 1222 (2018); *see* Defs. Br. 69-78, *Fuld v. PLO*, No. 22-76(L) (2d Cir. 2022) (discussing same).

67

A-212

## III.   THE PSJVTA VIOLATES SEPARATION OF POWERS.

In addition to due process, the PSJVTA's deemed consent provisions also violate separation of powers.  Congress oversteps its constitutional authority when it attempts to "usurp a court's power to interpret and apply the law to the circumstances before it."  *Bank Markazi*, 578 U.S. at 224-28 (cleaned up); *see Boerne*, 521 U.S. at 536 (Congress cannot override the judiciary's responsibility to "say what the law is"); *United States v. Klein,* 80 U.S. 128, 147 (1871) (holding statute requiring courts to treat pardons of Confederate sympathizers as conclusive evidence of disloyalty "passed the limit which separates the legislative from the judicial power").  This Court should also reject Plaintiffs' interpretation of the PSJVTA as creating a new power to "restore jurisdiction" in closed cases.  That interpretation directly violates the Supreme Court's holding in *Plaut*, 514 U.S. at 227.

### A.   The PSJVTA's "Deemed Consent" Provisions Violate Separation of Powers.

The PSJVTA usurps judicial power by directing courts to <u>always</u> find consent if its factual predicates are met—regardless of whether those activities satisfy the standard for consent under the Due Process Clause.  Determining whether a party has waived constitutional rights is a quintessentially judicial question, requiring "application of constitutional principles to the facts as found."  *Brewer*, 430 U.S. at

68

**A-213**

403 (cleaned up). While Congress may legislate standards for liability, it cannot dictate or override constitutional due-process standards.

The Government concedes that the reasonableness of personal jurisdiction must always be assessed under "the circumstances of the particular case." Gov't Br. 20, 25, 29 (quoting *Waldman*, 835 F.3d at 331). But the PSJVTA blocks the courts from assessing the reasonableness of exercising personal jurisdiction over Defendants under the circumstances of this particular case. Instead, the PSJVTA instructs the courts which activities are determinative of consent and forbids courts from deciding if those activities actually signify "knowing and voluntary" consent. *See* Gov't Br. 2 ("Congress clearly stated what knowing and voluntary activities would be deemed to be consent to personal jurisdiction").

The Government's suggestion that this encroachment is permissible because the PSJVTA targets a narrow set of defendants is no answer: "A statute may no more lawfully chip away at the authority of the Judicial Branch than it may eliminate it entirely. 'Slight encroachments create new boundaries from which legions of power can seek new territory to capture' …. We cannot compromise the integrity of the system of separated powers and the role of the Judiciary in that system, even with respect to challenges that may seem innocuous at first blush." *Stern v. Marshall*, 564 U.S. 462, 502-03 (2011).

69

**A-214**

The PSJVTA also violates the well-established principle that Congress cannot "legislatively supersede" decisions "interpreting and applying the Constitution." *Dickerson v. United States*, 530 U.S. 428, 437 (2000). As noted above, *Waldman*, *Shatsky*, *Livnat*, and *Klieman* uniformly held that subjecting Defendants to personal jurisdiction in the United States based on the same type of conduct alleged in this case would violate the Due Process Clause. Permitting Congress to supersede those constitutional holdings would make the Constitution, "like other acts … alterable when the legislature shall please to alter it," in violation of fundamental principles of separation of powers. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *see, e.g.*, *Boerne*, 521 U.S. at 523-24 (rejecting Congressional effort to overturn Supreme Court precedent by creating a different constitutional standard).

**B.    Interpreting the PSJVTA to "Restore" Jurisdiction in Closed Cases, as Plaintiffs Suggest, Would Violate Separation of Powers.**

This Court should not accept Plaintiffs' reading of the PSJVTA as creating a hitherto-unknown power to "restore" jurisdiction in this closed case. *See* Pls. Br. 21. Plaintiffs' interpretation violates separation of powers under *Plaut*: "Having achieved finality … a judicial decision becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable *to that very case* was something other than what the courts said it was." 514 U.S. at 227.

70

**A-215**

This Court's decision in *Waldman*, and the subsequent final judgment issued in 2016 (Dist. Ct. Dkt 1003), were the "last word of the judicial department" in this case. As such, Congress "may not retroactively command the federal courts to reopen final judgments," *Bank Markazi*, 578 U.S. at 226 (cleaned up), especially when the judgment originally entered by the trial court is void for lack of jurisdiction, *see infra* at 76-79. This Court has adhered to *Plaut* on multiple occasions. *Schwartz v. Merrill Lynch*, 665 F.3d 444, 454 (2d Cir. 2011) ("a statute that would require an Article III court to set aside a final judgment entered before its enactment would violate … separation of powers"); *Benjamin v. Jacobson*, 172 F.3d 144, 161 (2d Cir. 1999) (same).

Other courts agree that retroactively imposing jurisdiction in closed cases would violate separation of powers under *Plaut*. In *Roeder*, 195 F. Supp. 2d at 152, 162-63, Congress passed a special statute creating jurisdiction over that particular case after the trial court entered a default judgment. When later vacating the judgment and dismissing for lack of jurisdiction, *Roeder* refused to interpret the statute as applying retroactively, explaining that "the post-judgment retroactive imposition of jurisdiction by Congress raises serious separation of powers concerns." *Id*. "Congress' retroactive imposition of jurisdiction to reopen a case after final judgment … was an impermissible encroachment by Congress into the sphere of the federal courts and violated Article III." *Id*. The same analysis applies

71

**A-216**

here. *See, e.g., TGX Corp. v. Simmons*, 62 F.3d 666, 667 (5th Cir. 1995) ("*Plaut* turned not on the fact that the judgments Congress chose to set aside through retroactive legislation were with prejudice, but on the fact that they were final judgments.").

To avoid the constitutional problems that would arise if Congress sought to "restore" jurisdiction in closed cases, this Court should reject Plaintiffs' interpretation of the PSJVTA. Although the PSJVTA may "apply" to cases pending as of August 30, 2016 (the day before this Court's decision in *Waldman*), the text of the statute says nothing about recalling mandates, reopening cases, or restoring jurisdiction in closed cases.[28] Accordingly, this Court should interpret the PSJVTA "to avoid rendering [it] unconstitutional." *United States v. Davis*, 139 S. Ct. 2319, 2332 n.6 (2019).

---

[28] Insofar as Plaintiffs claim Congress implied or intended that result, this Court should ignore such overtures and apply the plain text of the legislation. *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) ("'an implicit congressional intent to impose ... aiding and abetting liability' could not plausibly be inferred from 'statutory silence'") (quoting *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 185 (1994)); *Peabody Coal v. Dir., Office of Workers' Comp. Programs*, 857 F.3d 310, 314 (6th Cir. 2014) ("Does it make a difference whether the judicial branch creates the separation-of-powers violation itself, as here (by interpreting the statute to have this effect), rather than by having the violation expressly thrust upon it by Congress, as in *Plaut*? No. The point of dividing power is to protect individual liberty, not the branches of government themselves.") (Sutton, J., concurring).

## IV.   THE COURT SHOULD NOT RECALL ITS SIX-YEAR-OLD MANDATE.

If this Court holds it is unconstitutional to exercise personal jurisdiction over Defendants under the PSJVTA, it need not address Plaintiffs' request to recall the mandate.  But if the Court does reach that issue, it should not resort to the extraordinary step of recalling the mandate.  There are substantial finality interests in this long-closed case; Plaintiffs have already filed a separate action in which they can pursue their claims.  Recall would be futile, in any event, because the district court's judgment was entered without personal jurisdiction and is therefore void.

### A.   Finality Interests Overwhelmingly Support Leaving the Mandate Undisturbed

Four years ago, this Court refused to recall the mandate, holding that "[t]his Court's interest in finality also weighs against recalling the mandate." *Waldman II*, 925 F.3d at 574-75.  Emphasizing that the mandate "issued two and a half years ago," and that the Supreme Court denied certiorari "more than six months before the plaintiffs filed their motion," this Court explained "it is well-established that retroactive laws generally do not affect valid, final judgments." *Id*. at 575.  Now that more than <u>six years</u> have passed since the mandate issued, the interests in finality have become even more compelling.

Recalling a mandate undermines "the profound interests in repose attaching to the mandate of a court of appeals" such that it is a tool "of last resort, to be held

73

A-218

in reserve against grave, unforeseen contingencies." *Calderon*, 523 U.S. at 549-50. "[T]he sanctity of final judgments in our federal judicial system" compels "parsimony in the exercise of our power to recall a mandate." *Sargent v. Columbia Forest Prods*, 75 F.3d 86, 89 (2d Cir. 1996). This Court should deny Plaintiffs' latest request to recall the mandate to protect the same finality interests it relied upon before.

Nor will Plaintiffs be prejudiced. In *Waldman II*, this Court noted that Plaintiffs could still pursue their claims and raise any new "developments" regarding personal jurisdiction in a separate action. 925 F.3d at 576 n.2 (referring to *Sokolow v. PLO*, No. 18-cv-12213 (S.D.N.Y.)). Plaintiffs' separate case has remained stayed at the pleadings stage, pending the outcome of this appeal. Plaintiffs can proceed with their claims there on the same footing as they would in this case: As explained below, even if the mandate is recalled, the 2015 jury verdict cannot stand because it was entered without personal jurisdiction.

The D.C. Circuit has made a similar determination. In *Shatsky v. PLO*, the D.C. Circuit rejected the newly-enacted PSJVTA as a basis to retain jurisdiction in a case on direct appeal. 955 F.3d 1016. It reasoned that plaintiffs could proceed in a new case "if new facts establish personal jurisdiction before the statute of limitations runs." *Id.* at 1038.

74

**A-219**

The cases upon which Plaintiffs rely are easily distinguished.  In *Gondeck v. Pan Am. World Airways*, 382 U.S. 25, 27 (1965) (per curiam), the Supreme Court recalled its mandate to grant a widow relief after the lower courts reached conflicting results.  The Fifth Circuit rejected a widow's claim based on a car accident, and then certiorari was denied.  *Id*.  The Fourth Circuit came to different result on the same accident, and the Supreme Court recalled its mandate to grant relief.  *Id*.

The facts here are nothing like *Gondeck*, which courts have explained represents "the interest in treating victims of the same tort consistently."  *In re Terrorist Attacks on Sept. 11, 2001*, 741 F.3d 353, 357 (2d Cir. 2013).  "In contrast to *Gondeck*, this case does not involve two similarly-situated plaintiffs who received disparate outcomes based on contrary interpretations of the same controlling legal standard."  *Afoa v. China Airlines*, 396 F. Supp. 3d 984, 991 (W.D. Wash. 2019).  Nor is the timing in this case similar to *ACLU v. Dep. of Defense*, 543 F.3d 59 (2d Cir. 2008).  *See* Pls. Br. 26-27.  There, this Court recalled its mandate *less than two months after it issued* based on new legislation, before a petition for certiorari had even been filed.  *See* Dkt, 2d Cir. No. 06-3140.

Plaintiffs also try to fit this case into the pattern of *Sargent*, 75 F.3d at 89, in which the governing state employment law changed after the court of appeals' mandate but before the petition for certiorari.  The plaintiff moved to recall the mandate mere *days* after certiorari was denied.  The facts that impacted *Sargent* are

75

**A-220**

not applicable here. The time frame here is <u>years</u> not <u>days</u>. And the "new law" (the PSJVTA) was enacted almost two years after certiorari was denied. *C.f. United States v. Tapia*, 816 F. App'x 619, 620 (2d Cir. 2020) (recalling mandate when motion was made less than three months after mandate issued); *Carrington v. United States*, 503 F.3d 888, 892-93 (9th Cir. 2007) (contrasting "case that is still subject to the filing of a petition for a writ of certiorari" with "[t]he recognition that petitioners seek [to] recall … mandates … which have been final for years").

The equities also support leaving the mandate undisturbed. As explained below, it would be profoundly unfair (and even unconstitutional) for the Court to revive the void district court judgment and permit Plaintiffs to enforce that judgment against Defendants. *See, e.g., Roman Cath. Archdiocese v. Feliciano*, 140 S. Ct. 696, 700 (2020). This Court should not effect such unfairness given that Plaintiffs have a viable alternative case (*Sokolow II*) for prosecuting their ATA claims.

**B.     Recalling the Mandate Would Be Futile Because the District Court's Judgment Is Void.**

The district court's original judgment is void because it was made without personal jurisdiction—so a new trial would be necessary even if the mandate were recalled. As explained in *Burnham*, 495 U.S. at 608-09, the limited nature of the judicial power under the Constitution means that "the judgment of a court lacking jurisdiction is void." Both the "proceedings" and "judgment" made without personal jurisdiction are "not simply erroneous, but absolutely void." *Roman Cath.*

76

**A-221**

*Archdiocese*, 140 S. Ct. at 700 (cleaned up). Stated differently, "personal jurisdiction is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (cleaned up).

Because the district court lacked personal jurisdiction when it held a jury trial and entered judgment in 2015, those proceedings are void and cannot be reinstated even if this Court recalls its mandate. *DiSapio*, 540 F.3d at 122-23 ("a judgment is void … if the court that rendered it lacked jurisdiction [over] the parties"). Prior decisions made without jurisdiction remain "absolutely void" even if a court later acquires jurisdiction in the same case. *Roman Cath. Archdiocese,* 140 S. Ct. at 700. These principles are well-understood and widely applied. *See, e.g., South Carolina v. Moore,* 447 F.2d 1067, 1073 (4th Cir. 1971) (decisions were void "despite subsequent determination that the removal petition was ineffective"); *McCulley v. Brooks & Co. Gen. Constr.*, 816 S.E.2d 270, 273-74 & n.4 (Va. 2018) (collecting cases) ("Just as medicine may cure a sick man of a fatal disease but not revive him after his burial, a litigant can 'cure' the absence of personal jurisdiction by making a general appearance prior to final judgment but cannot resurrect a void judgment thereafter."); *G.L. v. D.L.*, 406 P.3d 367 (Haw. App. 2017) (void judgment not "resurrected or reinstated" by post-judgment waiver of personal jurisdiction).

77

**A-222**

By the same token, "[e]nforcement of a judgment of a court that lacked personal jurisdiction would violate due process of law." 18 Moore's Fed. Pract. § 130.06 (2022); *H & D Tire & Auto. Hardware v. Pitney Bowes*, 227 F.3d 326, 328 (5th Cir. 2000) (If "the court lacked jurisdiction both at the time of removal and judgment, the judgment cannot stand."). This Court has thus refused to enforce judgments entered without personal jurisdiction. *See Sartor v. Toussaint*, 70 F. App'x 11, 13 (2d Cir. 2002) (when a judgment is void, "the Court has no discretion and is compelled to grant [relief from judgment] for the reason that a void judgment cannot be enforced").

Plaintiffs' cases about "salvaging" jurisdiction do not alter these well-established principles, as they involve curing diversity jurisdiction on direct appeal rather than creating personal jurisdiction after final judgment. For example, *Caterpillar v. Lewis*, 519 U.S. 61, 64, 73, 75-77 (1996), held that diversity might be salvaged in some circumstances "at the time judgment is entered"—but warned that "if, at the end of the day and case, a *jurisdictional* defect remains uncured, the judgment must be vacated." Similarly, *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 837 (1989), dismissed "a dispensable nondiverse party" on direct appeal to retain jurisdiction, but emphasized "that such authority should be exercised sparingly." Moreover, these cases do not relate to the cure of a truly "*jurisdictional* defect, but to cure of a *statutory* defect," which in *Caterpillar* was the "failure to

78

**A-223**

comply with the [complete diversity] requirement of the removal statute." *Grupo Dataflux v. Atlas Global Group*, 541 U.S. 567, 574 (2004).[29]

Finally, Plaintiffs argue recalling the mandate would be consistent with the Supreme Court's GVR. Pls. Br. 33-37. But a GVR does not decide or suggest how to resolve the merits of any issue. All circuits agree that a GVR "does not make a decision on the merits of the case nor dictate a particular outcome." *Cole v. Carson*, 935 F.3d 444, 450 n.21 (5th Cir. 2019) (collecting cases). Rather, it requires only "further consideration" of the appellate *status quo ante* in light of subsequent developments. *Amara v. CIGNA Corp.*, 775 F.3d 510, 531 (2d Cir. 2014). Here, the Supreme Court explicitly remanded the case "for further consideration in light of the [PSJVTA]." *Sokolow*, 140 S. Ct. 2714 (2020). This was not a merits decision.

## V.    IMPROPER EXPERT TESTIMONY NECESSITATES A NEW TRIAL.

Trial courts must serve a gatekeeping function to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993). Consistent with that responsibility, Rule of Evidence 702 "directs the district court to 'focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or

---

[29] Plaintiffs other cases are equally inapposite. For example, *Mullaney v. Anderson*, 342 U.S. 415, 416-17 (1952), allowed joinder of non-resident union members because "earlier joinder [would not] have in any way affected the course of the litigation" and with "the silent concurrence of the defendant."

A-224

the district court's belief as to the correctness of those conclusions.'" *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 662 (2d Cir. 2016) (citation omitted).

Plaintiffs' purported experts were Nick Kaufman, a former prosecutor and judge in the Israeli Defense Forces ("IDF"), Alon Eviatar, a former IDF intelligence officer, and Israel Shrenzel, a former Israeli intelligence and security employee. JA-3883-86, 4139-41, 4933-34. Over Defendants' objections (JA-1427-58), these witnesses reviewed case files and ran online searches, then surmised what happened and who was responsible without applying any specialized methodology or offering an approach different from a layperson. The district court's manifest error in admitting this testimony was compounded when those witnesses constructed speculative narratives and told the jury which conclusions to draw. A new trial is required because there is a "distinct possibility" that "the jury would not have reached the verdict that it did" without the improper testimony. *Nimely v. NYC*, 414 F.3d 381, 397, 400 (2d Cir. 2005).

A. **The District Court Allowed Plaintiffs' Experts to Weigh the Evidence Rather Than Apply Any Particular Methodology.**

Plaintiffs' three former IDF employees reviewed "case files" from "military courts in the West bank" provided by Plaintiffs' attorneys. JA-3886 (Kaufman); JA-4181 (Eviatar); JA-5195-96 (Shrenzel). Then each witness applied internet searches and their law-enforcement "experience" to speculate "what actually happened, who was involved, and what was the links of the perpetrators to the PA." *Id*. Each

80

**A-225**

witness vaguely claimed their "great many years of experience as an expert" enabled them to determine whether an attack was directed by Defendants. JA-4181.

The D.C. Circuit affirmed the exclusion of an expert opinion by one of the same witnesses (Eviatar) for the very same infirmities. *Gilmore*, 843 F.3d at 972-73. In *Gilmore*, a look-alike case, the court of appeals agreed Eviatar failed to offer any particular methodology in support of his opinion or explain "how [his] approach differed from that of a layperson." *Id.* at 973.

Just like in this case, Eviatar in *Gilmore* did not "explain how his 'cumulative experience and knowledge' as an IDF intelligence officer, as opposed to commonsense and general deductive principles that any non-expert finder of fact would rely on, lead him to the conclusion that [a particular individual] was the likely murderer." *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 53 F. Supp. 3d 191, 211-15 (D.D.C. 2014). As in this case, Eviatar's opinion "consist[ed] entirely of generalized and conclusory assertions that lack any basis in his specialized knowledge." *Id.* at 213. His opinion was "not based on any reliable principles [or] methodology reliably applied to the facts of the case." *Id.* at 213-14 (cleaned up). "Instead, he merely weigh[ed] the evidence in precisely the same way as would a trier of fact." *Id.*

Over Defendants' objections (JA-1427-58, JA-3287-88, JA-3299), all three of Plaintiffs' experts in this case took a nearly-identical approach to that rejected by the

81

**A-226**

D.C. Circuit. *See Gilmore*, 843 F.3d at 973;*compare Gilmore*, 53 F. Supp. 3d at 212 (rejecting Eviatar's reliance on "'cumulative experience and knowledge' as an IDF intelligence officer" as the basis for his conclusions) *with* JA-4181 (Eviatar "formulated all of that information together with my years of – my great many years of experience as an expert. I formulated that into one solid picture of evidence"). These witnesses never provided the required "indicia of reliability" for their opinions or any demonstration that their "expertise permits the opinion(s) rendered." *Carrizosa v. Chiquita Brands Int'l*, 47 F.4th 1278, 1322 (11th Cir. 2022) (requiring both showings for experience-based opinions).

Nor did these witnesses distinguish their approach from that of a layperson. Courts reserve expert testimony for subject matters "beyond the ken of the average juror"—issues that the average juror "is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 191, 194 (2d Cir. 2008); *Amuso*, 21 F.3d at 1263 ("manifest error [to admit] expert testimony where … the subject matter of the expert's testimony is not beyond the ken of the average juror"); *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) ("expert testimony should be excluded if the witness is not actually applying expert methodology"). Though the court below initially agreed that such testimony was improper,[30] it stopped enforcing this

---

[30] *See also* JA-3283-84; JA-3286.

rule during Plaintiffs' first expert witness. *See* JA-3930-31. Thereafter, it stopped enforcing this limitation entirely, as shown below.

### B. Plaintiffs' Experts Constructed Inflammatory, Speculative Narratives and Then Told the Jury What to Decide.

The district court committed manifest error by permitting Plaintiffs' experts to give inflammatory and speculative testimony, to introduce and summarize fact evidence, and "merely [tell] the jury what result to reach." *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992). As "shortcuts to proving guilt," Plaintiffs relied on these purported experts, "whose expertise happens to be the defendant," to impermissibly chronicle and summarize facts. *Mejia*, 545 F.3d at 190-91 (cleaned up). One expert brazenly admitted that he was telling a "story" that "contributes to <u>our case</u>." JA 5288-90 (emphasis added). The district court initially recognized the impropriety of Plaintiffs' approach and instructed that the witness is "not here to tell us the story." JA-3930-31. But while it "properly established initial limits," when Plaintiffs' experts "strayed beyond those limits, and when defense counsel objected, the district court did not enforce them and thus failed to fulfill its gatekeeping function." *Dukagjini*, 326 F.3d at 55.

First, Plaintiffs' experts were improperly afforded great liberty to spin theories about a wide range of critical issues, including speculating about the thoughts of the attackers and Defendants' purported Soviet-style mind-control of the Palestinian people. *See Nimely*, 414 F.3d at 399 (rejecting expert's conclusions as "the essence

83

A-228

of unverifiable subjectivity, amounting to the sort of *ipse dixit* connection between methodology and conclusion" prohibited by Rule 702).  For example:

- Shrenzel conjectured, over objection, about one attacker's thoughts:  "for him it was clear, this is what my superiors expect from me .... They want me to go out and ... shoot indiscriminately in the streets of Jerusalem."  JA-5690-92.

- Kaufman spun a tale that a PA employee and another man "got [the attacker] ready for the attack.  They did that by taking him to pray.  Why, may you ask, did they take him to pray?  Well, he knew he was going to die, so he was preparing himself for death.  They bought him food maybe for his last supper, clothes and shoes."  JA-3926-29 (includes objection).  Needless to say, Kaufman was neither present nor clairvoyant.

- Conjuring broad accusations from nowhere, and over objection, Shrenzel testified that Defendants used techniques from "the Soviet Union" to "control [Palestinians'] minds and thoughts and lead them in a specific way that is desired by the central leadership of the PLO/PA."  JA-5329.  He claimed that Defendants created an "atmosphere" that transformed all PA employees into would-be terrorists:  "This is the crucial issue.  There was an atmosphere, either those were employees of the PA, either they read it, either they were exposed to announcement by the commanders."  JA 5690-92 (includes objection).

Experts are not permitted to "speculate as to the motivations and intentions of certain parties"—those questions are left to the jury.  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013).  As these examples illustrate, Plaintiffs' experts spent little time "translat[ing] esoteric terminology," "explicat[ing] an organization's hierarchical structure," or "describing the inner workings of a closed community," but instead became "chronicler[s] of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving

guilt." *Mejia*, 545 F.3d at 190. The speculation about Defendants' purported indoctrination of the Palestinian people and the internal thoughts of individuals was severely prejudicial. *United States v. Zhong*, 26 F.4th 536, 557-58 (2d Cir. 2022) (vacating conviction where expert improperly discussed China's "reeducation through labor camps").

Second, Plaintiffs' experts improperly offered summary and ultimate-issue testimony, which this Court has repeatedly held creates prejudice warranting a new trial. *See Mejia*, 545 F.3d at 190-94. Such testimony is not helpful in establishing facts which must be "proven by competent evidence," and "to substitute expert testimony for factual evidence of murder" constitutes an impermissible "shortcut around" Plaintiffs' evidentiary obligation. *Id.* at 195-96.

Plaintiffs deputized their experts for that very purpose. For example, Plaintiffs' experts provided the only testimony that the PA's social welfare programs were, in part, responsible for the attacks. The programs support families of Palestinian security prisoners, were created by the PA (with input from the United States) for the purpose of rehabilitating and reintegrating offenders, and have been "very successful." JA-7184-90; JA-7539-44; JA-7360 (Objections: JA-1435; JA4355, JA-4284-85, JA4373-74). Nevertheless, Eviatar, who is not an economist, offered unsupported testimony that the payments constitute "an economic motivation for the perpetration of acts of terror" (JA-4351), "are not social welfare

85

**A-230**

payments" (JA-4281) and are "a positive incentive that multiplies [terrorists']

motivation (JA-4374)."[31] Plaintiffs' counsel characterized it as a "professional

opinion" (JA-4385), but Eviatar had no qualifications or support for his opinions.

Plaintiffs' counsel argued in closing that this testimony proved the PA's social

welfare programs caused the attacks: "[I]f you set up a program in which you say if

you commit a terrorist act we will pay your family, that is providing material support,

and you can't do that." JA-8107-10; *Dukagjini*, 326 F.3d at 54 (party may not use

expert testimony to "provide [itself] with an additional summation by having the

expert interpret the evidence"). Counsel added, over objection, "[a]nytime that

there's martyr payments, you can check yes [as to material support]. You don't have

to find that those payments preceded the attack." JA-8110.

Finally, Plaintiffs' experts improperly instructed the jury how to interpret

evidence and what conclusions to draw. *Nimely*, 414 F.3d at 398. For example:

- Eviatar broadly assured the jury that PA security forces supported terrorism: "My well-founded assessment is that many hundreds from among the Palestinian security apparatuses were involved in terrorist activities." JA-4597. Eviatar repeatedly returned to that theme, claiming that Defendants were in "cooperation and coordination in the perpetration of joint acts of terror" with Hamas. JA-4619; JA-4597-98; *see* JA-4176-77 (court's reasoning for allowing such testimony).

- Eviatar contended the PA incited Palestinians, over objection: "all of the different sectors of the Palestinian leadership … want to convey to the public by messages, by statements, by hinting, by explicit calls, all of these fall under

---

[31] Eviatar also falsely represented Defendants' position: "My opinion is the same as that of the Palestinian Authority: These are not social welfare benefits." JA-4353.

86

A-231

the category of incitement, the meaning of which is clear anti-Israeli statements from an explicit call for armed struggle." JA-4154-55.

- Although Shrenzel admitted that Palestinian media does not instruct Palestinians to "please go out and kill all Jews or all the Israeli citizens," he conjectured that "it is the explicit, but no less than that, the implicit messages" to kill Israelis, and that this was a "contributing factor" that caused the attacks in this case. JA-5690-92 (includes objection). Shrenzel argued that the PA "create[d] the proper atmosphere" that caused the June 19, 2002, bomber to "go out and detonate himself." JA-5690-92; *see also* JA-5326-27 (includes objection).

- Eviatar also repeated the conclusions of an Israeli report (serving as a conduit for inadmissible hearsay (*see* JA-4313)) entitled, "Arafat's and the PA's Involvement in Terrorism … that determines that Arafat and the Palestinian Authority are involved in terrorism." JA-4425-26 (includes objection).

- Shrenzel instructed the jury, over objection, that a PA intelligence official had advance knowledge of an attack: "This very document cannot provide us with a conclusive final proof of his prior knowledge of the attack. But ... I think it's more likely than not that he had prior knowledge and involvement in that attack. That's my professional assessment." JA 5716.

As explained in *Gilmore*, 53 F. Supp. 3d at 213, such expert testimony is improper because "Eviatar has not applied any specialized knowledge to the hearsay materials on which he relies" and acts as a layperson because "his analysis consists entirely of deductions and observations that flow directly from the content of the hearsay statements." *See also United States v. Escobar*, 462 F. App'x 58, 62 (2d Cir. 2012) (error to admit expert testimony that "went far beyond interpreting jargon or coded messages, describing membership rules, or explaining organizational hierarchy") (cleaned up).

87

A-232

The district court committed manifest error by permitting Plaintiffs' experts to present lay opinions on Defendants' liability as expert testimony based on nothing more than their personal views and speculation. A new trial should be granted where, as here, Plaintiffs "emphasized in arguments to the jury" their experts' improper testimony, *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000), resulting in the "distinct possibility" that without it, "the jury would not have reached the verdict that it did." *Nimely*, 414 F.3d at 400.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's conclusion that exercising personal jurisdiction would be unconstitutional, and decline to recall the mandate.

Dated: January 27, 2023

Respectfully submitted,

SQUIRE PATTON BOGGS (US) LLP

*/s/ Gassan A. Baloul*
Gassan A. Baloul
Mitchell R. Berger
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

*Counsel for Defendants-Appellees*

88

A-233

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel certifies that this document complies as follows:

1. This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's Order (Dkt. 505) because it contains 20,951 words, excluding the parts exempted by Rule 32(f).

2. This document complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-Point font.

Dated: January 27, 2023

*/s/ Gassan A. Baloul*
Gassan A. Baloul

*Counsel for Defendants-Appellees*

A-234

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2023, the foregoing document was filed with the Clerk of the Court and served via CM/ECF upon all counsel of record.

Dated: January 27, 2023

*/s/ Gassan A. Baloul*
*Counsel for Defendants-Appellees*

**A-235**

# 15-3135(L)
## 15-3151(XAP), 22-1060(CON)

IN THE

# United States Court of Appeals
### FOR THE SECOND CIRCUIT

◆◆

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR, BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA, NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW, JAMIE A. SOKOLOW, MINOR, BY HER NEXT FRIENDS AND GUARDIAN

(*Caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

KENT A. YALOWITZ
ARNOLD & PORTER KAYE
  SCHOLER LLP
250 West 55th Street
New York, New York 10019
(212) 836-8000

ALLON KEDEM
DIRK C. PHILLIPS
STEPHEN K. WIRTH
BAILEY M. ROE
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000

*Attorneys for Plaintiffs-Appellants*

**A-236**

MARK I. SOKOLOW AND RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD MANDELKORN, KATHERINE BAKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, LARRY CARTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR., INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JANIS RUTH COULTER, CHANA BRACHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STUART SCOTT GOLDBERG/ NATURAL GUARDIAN OF PLAINTIFFS CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG,TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, NEVENKA GRITZ, SOLE HEIR OF NORMAN GRITZ, DECEASED,

*Plaintiffs-Appellants,*

UNITED STATES OF AMERICA,

*Intervenor-Appellant,*

—against—

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY and or PALESTINIAN COUNCIL and or PALESTINIAN NATIONAL AUTHORITY,

*Defendants-Appellees,*

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESATATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, DECEASED, ESTATE OF MUHANAD ABU HALAWA, DECEASED, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,

*Defendants.*

**A-237**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION .......................................................................................... 1

ARGUMENT .................................................................................................. 4

I.   THE COURT SHOULD SALVAGE JURISDICTION AND REINSTATE THE DISTRICT COURT'S JUDGMENT ............................................................. 4

    A.  This Court Has Power To Salvage Jurisdiction ............................... 5

        1.  Defendants' Futility Argument Cannot Be Reconciled With Cases Salvaging Jurisdiction ............................................. 5

        2.  Defendants' Cases Are Inapposite ............................................. 8

    B.  The Interests In Finality And Justice Favor Reinstating the District Court's Judgment .......................................................... 11

    C.  Reinstating the District Court's Judgment Will Reflect Fidelity To The Supreme Court's Mandate .................................... 14

II.  THE PSJVTA DOES NOT VIOLATE THE DUE PROCESS CLAUSE .............. 16

    A.  The PSJVTA Meets The Touchstones Of Due Process: Fair Notice And Reasonableness ............................................................. 16

        1.  The Correct Standard Is Fair Notice And Reasonableness .......................................................................... 16

        2.  The PSJVTA Gave Defendants Fair Notice, Such That Their Conduct Was Knowing And Voluntary ........................... 21

        3.  The PSJVTA Is Reasonable In The Context Of Our Federal System ........................................................................... 24

    B.  Territory-Based Consent Is Independently Constitutional ............ 27

    C.  The Reasoning Of The District Courts In This Case And In *Fuld* Was Incorrect .................................................................... 28

        1.  The District Court's Reasoning In This Case Is Indefensible ............................................................................... 28

        2.  Defendants Have Abandoned The *Fuld* District Court Decision .................................................................................... 31

    D.  Defendants' "Benefit" Theories Are Unavailing .......................... 31

i

1. The Initial Variant Of Defendants' "Benefit" Theory Is Incorrect .......................................................................32

2. The Modified Version Of Defendants' "Benefit" Theory Is Also Incorrect .......................................................................33

3. Defendants Consented To Jurisdiction Even Under Their Own "Benefit" Theory..................................................35

III. THE PSJVTA DOES NOT INVADE THE JUDICIAL POWER ........................36

IV. THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR A NEW TRIAL ..............................................................................40

A. Defendants' *Daubert* Objections Provide No Basis For A New Trial.......................................................................41

1. Defendants Waived Their *Daubert* Objection ...........................41

2. Defendants Demonstrate No Plain Error.................................43

B. Defendants' Specific Objections To Expert Testimony Provide No Basis For A New Trial ...............................................52

1. The District Court Did Not Abuse Its Discretion By Overruling Defendants' Objections..................................53

2. Any Error Was Harmless ........................................................59

CONCLUSION...................................................................................61

CERTIFICATE OF COMPLIANCE ..................................................62

ii

# TABLE OF AUTHORITIES

**Cases** Page(s)

*Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*,
817 F.3d 755 (Fed. Cir. 2016) ..................................................................18

*Aetna Ins. Co. v. Earnest*,
112 So. 145 (Ala. 1927) ...........................................................................8

*Agostini v. Felton*,
521 U.S. 203 (1997)................................................................................28

*Alden v. Maine*,
527 U.S. 706 (1999)................................................................................24

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020)................................................................58

*Andrus v. Charlestone Stone Prods.*,
436 U.S. 604 (1978)................................................................................7

*BAC Home Loans Servicing, LP v. Mitchell*,
6 N.E.3d 162 (Ill. 2014)..........................................................................9

*Banco Nacional de Cuba v. Farr*,
383 F.2d 166 (2d Cir. 1967) ..................................................................15

*Bank Markazi v. Peterson*,
578 U.S. 212 (2016)...........................................................................36, 37

*Beastie Boys v. Monster Energy Co.*,
66 F. Supp. 3d 424 (S.D.N.Y. 2014)......................................................59

*Bristol-Myers Squibb v. Superior Court*,
137 S. Ct. 1773 (2017) ...........................................................................25

*Brown v. Lockheed Martin Corp.*,
814 F.3d 619 (2d Cir. 2016) ...............................................................19, 20

*Burnham v. Superior Court*,
495 U.S. 604 (1990)................................................................................35

iii

*Carnival Cruise Lines, Inc. v. Shute,*
499 U.S. 585 (1991) ...............................................................30, 34

*Caterpillar Inc. v. Lewis,*
519 U.S. 61 (1996) ............................................................................8

*Chloé v. Queen Bee of Beverly Hills, LLC,*
616 F.3d 158 (2d Cir. 2010) ..........................................................17

*City of New York v. Mickalis Pawn Shop,*
645 F.3d 114 (2d Cir. 2011) .....................................................30, 34

*Collazos v. United States,*
368 F.3d 190 (2d Cir. 2004) ..........................................................29

*College Savings Bank v. Florida Prepaid Postsecondary*
*Education Expense Board,*
527 U.S. 666 (1999).......................................................... 23-24, 31

*Colorado v. Connelly,*
479 U.S. 157 (1986)........................................................................22

*Corporación Mexicana de Mantenimiento Integral, S. de R.L. v.*
*Pemex-Exploración y Producción,*
832 F.3d 92 (2d Cir. 2016) .........................................................6, 7

*Danziger & De Llano, LLP v. Morgan Verkamp LLC,*
948 F.3d 124 (3d Cir. 2020) ..........................................................17

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993)............................................3, 41, 42, 43, 44, 48

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.,*
805 F.2d 1074 (1st Cir. 1986) ..........................................................7

*Dickerson v. United States,*
530 U.S. 428 (2000).................................................................36, 37

*Douglass v. Nippon Yusen Kabushiki Kaisha,*
46 F.4th 226 (5th Cir. 2022) ..........................................................18

iv

*Edwards v. Vannoy,*
141 S. Ct. 1547 (2021) ..................................................................14

*In re Ephedra Prods. Liab. Litig.,*
393 F. Supp. 2d 181 (S.D.N.Y. 2005)..........................................59

*Fidrych v. Marriott Int'l, Inc.,*
952 F.3d 124 (4th Cir. 2022) ........................................................17

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.,*
141 S. Ct. 1017 (2021) ........................................16, 21, 25, 26

*Gen. Contracting & Trading Co., LLC v. Interpole, Inc.,*
940 F.2d 20 (1st Cir. 1991) ............................................................6

*Gill v. Arab Bank, PLC,*
893 F. Supp. 2d 542 (E.D.N.Y. 2012)......................................45, 48

*Gilmore v. Palestinian Interim Self-Government Auth.,*
53 F. Supp. 3d 191 (D.D.C. 2014), *aff'd,* 843 F.3d 958 (D.C. Cir.
2016) .............................................................................................46

*Gondeck v. Pan American World Airways, Inc.,*
382 U.S. 25 (1965)........................................................................11

*Guam v. Guerroro,*
290 F.3d 1210 (9th Cir. 2001)......................................................37

*Hamdan v. Rumsfeld,*
548 U.S. 557 (2006).....................................................................39

*Hammond Packing Co. v. Arkansas,*
212 U.S. 322 (1909).....................................................................28

*Henry v. Wyeth Pharms., Inc.,*
616 F.3d 134 (2d Cir. 2010) ....................................................51-52

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010)..........................................................................25

*Hovey v. Elliott,*
167 U.S. 409 (1897)...............................................................28, 29

v

*Hygh v. Jacobs,*
  961 F.2d 359 (2d Cir. 1992) ........................................................52

*Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,*
  456 U.S. 694 (1982)........................................7, 23, 24, 29, 30, 31, 33

*J. McIntyre Machinery, Ltd. v. Nicastro,*
  564 U.S. 873 (2011)................................................................. 26-27

*Johnson v. United States,*
  520 U.S. 461 (1997)......................................................................44

*Katt v. City of New York,*
  151 F. Supp. 2d 313 (S.D.N.Y. 2001), *aff'd*, 372 F.3d 83 (2d Cir. 2004).......59

*Katz v. Donna Karan Co., L.L.C.,*
  872 F.3d 114 (2d Cir. 2017) .........................................................35

*Leonard v. USA Petroleum Corp.,*
  829 F. Supp. 882 (S.D. Tex. 1993) ...............................................33

*Linde v. Arab Bank, PLC,*
  922 F. Supp. 2d 316 (E.D.N.Y. 2011)...........................................48

*Machleder v. Diaz,*
  801 F.2d 46 (2d Cir. 1986) ...........................................................33

*Mallory v. Norfolk Southern Ry. Co.,*
  142 S. Ct. 2646 (2022) ..................................................................27

*McCulley v. Brooks & Co.,*
  816 S.E.2d 270 (Va. 2018)...............................................................8

*In re Mid-Atl. Toyota Antitrust Litig.,*
  525 F. Supp. 1265 (D. Md. 1981) .................................................33

*Mullaney v. Anderson,*
  342 U.S. 415 (1952)..........................................................................8

*Nat'l Equip. Rental, Ltd. v. Szukhent,*
  375 U.S. 311 (1964)...................................................................30, 34

vi

*Newman-Green, Inc. v. Alfonzo-Larrain,*
490 U.S. 826 (1989) ....................................................................8

*Nimely v. City of New York,*
414 F.3d 381 (2d Cir. 2005) ....................................................48

*North Carolina v. Alford,*
400 U.S. 25 (1970)....................................................................23

*Oregon v. Elstad,*
470 U.S. 298 (1985)..................................................................22

*Parke v. Raley,*
506 U.S. 20 (1992)....................................................................21

*Parker v. Reda,*
327 F.3d 211 (2d Cir. 2003) ....................................................52

*Patchak v. Zinke,*
138 S. Ct. 897 (2018) ...............................................................36

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of*
*Am. Secs., LLC,*
691 F. Supp. 2d 448 (S.D.N.Y. 2010)......................................56

*Peterson v. Islamic Republic of Iran,*
758 F.3d 185 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v.*
*Peterson,* 578 U.S. 212 (2016) ..........................................36, 37

*Plaut v. Spendthrift Farm, Inc.,*
514 U.S. 211 (1995)..............................................36, 38, 39, 40

*Restivo v. Hessemann,*
846 F.3d 547 (2d Cir. 2017) ...............................................44, 58

*Roman Catholic Archdiocese of San Juan, Puerto Rico v.*
*Acevedo Feliciano,*
140 S. Ct. 696 (2020) ..........................................................10, 11

*Salazar v. Buono,*
559 U.S. 700 (2010)....................................................................2

vii

*Schneckloth v. Bustamonte,*
    412 U.S. 218 (1973)..................................................................31

*Shatsky v. Palestine Liberation Org.,*
    955 F.3d 1016 (D.C. Cir. 2020)..............................6, 14, 22, 37

*Shinseki v. Sanders,*
    556 U.S. 396 (2009)..................................................................60

*Sioux Tribe v. United States,*
    97 Ct. Cl. 613 (1942)...............................................................39

*Sitts v. Dairy Farmers of Am., Inc.,*
    2020 WL 3467993 (D. Vt. June 24, 2020).............................58

*Sleepy's LLC v. Select Comfort Wholesale Corp.,*
    779 F.3d 191 (2d Cir. 2015) ...................................................33

*South Carolina v. Moore,*
    447 F.2d 1067 (4th Cir. 1971).........................................10, 11

*Spann v. Colonial Village, Inc.,*
    899 F.2d 24 (D.C. Cir. 1990) ....................................................6

*Strauss v. Credit Lyonnais, S.A.,*
    925 F. Supp. 2d 414 (E.D.N.Y. 2013).....................................45

*Sun Forest Corp. v. Shvili,*
    152 F. Supp. 2d 367 (S.D.N.Y. 2001).....................................32

*In re Terrorist Attacks on September 11, 2001,*
    741 F.3d 353 (2d Cir. 2013) ...................................................11

*Thai-Lao Lignite (Thailand) Co. v. Lao People's Democratic Republic,*
    864 F.3d 172 (2d Cir. 2017) ...................................................13

*United Republic Ins. Co. v. Chase Manhattan Bank,*
    315 F.3d 168 (2d Cir. 2003) ...........................................1, 9, 10

*United States v. Agrawal,*
    726 F.3d 235 (2d Cir. 2013) ...................................................51

A-245

*United States v. Alabama,*
  362 U.S. 602 (1960) ............................................................................7

*United States v. Bacchus,*
  108 F.3d 1370 (2d Cir. 1997) ...........................................................43

*United States v. Blum,*
  329 F.2d 49 (2d Cir. 1964) ........................................................ 60-61

*United States v. Brown,*
  352 F.3d 654 (2d Cir. 2003) .............................................................48

*United States v. Defreitas,*
  2011 WL 317964 (E.D.N.Y. Jan. 31, 2011) .....................................48

*United States v. Diaz,*
  176 F.3d 52, 80 (2d Cir. 1999) .........................................................54

*United States v. Farhane,*
  634 F.2d 127 (2d Cir. 2011) ........................................................44, 48

*United States v. Gatto,*
  986 F.3d 104 (2d Cir. 2021) .............................................................44

*United States v. Gomez,*
  877 F.3d 76 (2d Cir. 2017) ...............................................................33

*United States v. Kadir,*
  718 F.3d 115 (2d Cir. 2013) .............................................................48

*United States v. Kassir,*
  2009 WL 910767 (S.D.N.Y. Apr. 2, 2009) ......................................46

*United States v. Khoury,*
  901 F.2d 948 (11th Cir. 1990) .........................................................42

*United States v. Lopez,*
  547 F.3d 364 (2d Cir. 2008) .............................................................45

*United States v. Marcus,*
  560 U.S. 258 (2010) ....................................................................48, 49

ix

A-246

*United States v. Mejia,*
  545 F.3d 179 (2d Cir. 2008) ...........................................................49

*United States v. Miller,*
  626 F.3d 682 (2d Cir. 2010) ......................................................44, 52

*United States v. Moye,*
  793 F. App'x 19 (2d Cir. 2019) ........................................................51

*United States v. Napout,*
  963 F.3d 163 (2d Cir. 2020) ......................................................44, 58

*United States v. Paracha,*
  2006 WL 12768 (S.D.N.Y. Jan. 3, 2006), *aff'd*, 313 F. App'x 347
  (2d Cir. 2008) ..................................................................................46

*United States v. Sioux Nation,*
  448 U.S. 371 (1980)..................................................................39, 40

*United States v. Sioux Nation,*
  518 F.2d 1298 (Ct. Cl. 1975)...........................................................39

*United States v. Smith,*
  919 F.3d 825 (4th Cir. 2019).................................................... 56-57

*United States v. Sokolov,*
  814 F.2d 864 (2d Cir. 1987) .............................................................57

*United States v. Taylor,*
  745 F.3d 15 (2d Cir. 2014) ........................................................21, 22

*United States v. Union Gas Co.,*
  832 F.2d 1343 (3d Cir. 1987), *aff'd*, 419 U.S. 1 (1989) .....................7

*United States v. Vasquez,*
  267 F.3d 79 (2d Cir. 2001)........................................................54, 56

*United States v. Villafuerte,*
  502 F.3d 204 (2d Cir. 2007) .............................................................52

*United States v. Wexler,*
  522 F.3d 194 (2d Cir. 2008) .............................................................47

x

*United States v. Williams,*
930 F.3d 44 (2d Cir. 2019) ...................................................43

*United States v. Yu-Leung,*
51 F.3d 1116 (2d Cir. 1995) ...................................41, 42, 43

*Universal Reins. Co. v. St. Paul Fire & Marine Ins. Co.,*
312 F.3d 82 (2d Cir. 2002) .....................................................8

*Waite v. All Acquisition Corp.,*
901 F.3d 1307 (11th Cir. 2018)............................................18

*Walden v. Georgia-Pacific Corp.,*
126 F.3d 506, 520 (3d Cir. 1997) .........................................43

*Waldman v. Palestine Liberation Organization,*
835 F.3d 317 (2d Cir. 2016) ...........................3, 10, 16, 17

*Warren v. Pataki,*
823 F.3d 125 (2d Cir. 2016) .................................................60

*Weaver Const. Co. v. Dist. Ct.,*
545 P.2d 1042 (Colo. 1976) ...................................................9

*Wechsler v. Hunt Health Sys., Ltd.,*
381 F. Supp. 2d 135 (S.D.N.Y. 2003 ...................................57

## Statutes

8 U.S.C. § 1182(a)..................................................................27

18 U.S.C. § 2334(e)...........................................................22, 35

22 U.S.C. § 2378b ..................................................................27

28 U.S.C.
§ 1446(d)..........................................................................10
§ 2111...............................................................................60

31 U.S.C. § 5318(k)................................................................19

Immigration Act of 1990, Pub. L. 101-649, § 601 ...............27

xi

A-248

Middle East Peace Commitments Act of 2002, Pub. L. No. 107-228, tit. VI, § 601-04 ..................................................27

Middle East Peace Facilitation Act of 1994, Pub. L. No. 103-236, § 583 ........27

Palestinian Anti-Terrorism Act of 2006, Pub. L. No. 109-446..........................27

PLO Commitments Compliance Act of 1989, Pub. L. No. 101-246, tit. VII (1990)....................................................................27

Promoting Security and Justice for Victims of Terrorism Act,
Pub. L. 116-94, div. J, title IX, § 903 (Dec. 20, 2019) ............................*passim*
    § 903(b).......................................................................11
    § 903(d)..................................................................10, 25

**Rules**

Federal Rule of Civil Procedure 61 ....................................................60

Federal Rules of Evidence
    Rule 103 ...................................................................43
    Rule 702 ................................................................44, 45

**Legislative Materials**

164 Cong. Rec. S.2926...................................................................13

H.R. Rep. 115-858 (2018)...............................................................25

**Treatises & Scholarly Works**

*The Constitution of the United States of America: Analysis, and Interpretation,* S. Doc. No. 112-9 (2012 & Supp. 2020)...............17

16 James Wm. Moore et al., *Moore's Fed. Prac.—Civil* (2020) .......................17

Jon O. Newman, *Suing the Lawbreakers,* 87 Yale L.J. 447 (1978)............ 25-26

*Restatement (Third) of Agency* (2006)...............................................26

Charles Alan Wright & Arthur R. Miller,
*Fed. Prac. & Proc.* ................................................12, 17, 32, 42, 48

xii

**INTRODUCTION**

The Court should recall its mandate and restore the district court's original judgment. Defendants offer two procedural arguments against applying the PSJVTA in *this* case—finality and futility—but neither helps them. The interest in finality favors Plaintiffs, not Defendants: If the Court applies the PSJVTA in this case, the case will be resolved; but if the Court adopts Defendants' position, litigation of the same claims between the same parties will continue before the same district judge for years, including a second trial.

Defendants' "futility" argument is also meritless. Defendants' theory is that jurisdiction cannot appear for the first time after final judgment in the district court. But this Court and the Supreme Court have held repeatedly that a defendant's conduct, or an act of Congress, or an order of an appellate court adding or dismissing parties can salvage jurisdiction that was absent at the time of a district court's judgment. Indeed, this Court recalled its mandate for the purpose of salvaging jurisdiction in *United Republic Ins. Co. v. Chase Manhattan Bank*, 315 F.3d 168 (2d Cir. 2003), a case discussed extensively in Plaintiffs' opening brief (at 2, 14, 20, 22) but not mentioned by Defendants.

Finally, and perhaps most important, Defendants' procedural position entirely disregards the text of the Supreme Court's mandate to this Court, by

1

A-250

pretending that the Supreme Court vacated this Court's 2019 *order* denying the motion to recall the mandate, rather than its 2016 *judgment*. Due respect for the structure of our judicial system requires treating the Supreme Court's decretal language as meaningful, especially since the parties actually litigated whether the Supreme Court should vacate this Court's *order* or its *judgment*, and Plaintiffs prevailed.

Due respect for Congress is also implicated here. Congress has now enacted two statutes to address this case and others like it. Defendants belittle Congress's work, accusing Congress of "attempt[ing] an end-run around this Court's settled constitutional analysis" and demanding that this Court reject the "ruse." Def. Br. 1-3. But Defendants have things backwards. "Congress's prerogative to balance opposing interests and its institutional competence to do so provide one of the principal reasons for deference to its policy determinations." *Salazar v. Buono*, 559 U.S. 700, 717 (2010) (plurality opinion). Defendants are wrong to dismiss this work as "evasion, for the statute brought about a change of law and a congressional statement of policy applicable to the case," which is "due great respect from the other [branches]." *Id.* (quotation marks omitted).

Defendants assert that the PSJVTA's constitutionality is foreclosed by

2

this Court's analysis in *Waldman v. Palestine Liberation Organization*, 835 F.3d 317 (2d Cir. 2016) (*Waldman I*). That is incorrect. An entity is amenable to suit in any jurisdiction where it is at home (general jurisdiction); where its suit-related conduct creates a substantial connection with the forum (specific jurisdiction); or where it agrees to be sued (consent jurisdiction). In *Waldman I*, this Court determined that Defendants were not amenable to suit under principles of general jurisdiction or specific jurisdiction but did not address consent jurisdiction.

The PSJVTA easily satisfies the relevant due process requirements: fair notice and a reasonable link between the statute and a legitimate governmental interest. And Defendants' separation-of-powers argument is meritless, because Congress engaged in the quintessential legislative task of making law, leaving to the Judiciary the tasks of finding facts, applying law to facts, and exercising discretion to reopen cases.

Finally, the Court should reject Defendants' evidentiary challenges to the trial testimony of three experts. Defendants contend that the district court should have excluded the testimony *in toto* under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), but Defendants waived their *Daubert* objection, so no review is available to them. Even if review were

3

A-252

available, the district court did not commit plain error. The witnesses easily met the liberal standard for admissibility of expert testimony—that the expert is qualified, reliable, and helpful. Each had years of relevant experience; each testified on the basis of documents admitted in evidence and evaluated under well-established professional standards; and the testimony of each illuminated issues unfamiliar to the jury: the activities and structure of middle-eastern terror organizations; and the interpretation of unfamiliar documents, such as criminal convictions from a foreign legal system, and Defendants' own intelligence reports, pay and promotion records, and "martyr files."

Defendants also cherry-pick a handful of objections that the district judge overruled to suggest that they did not receive a fair trial. However, the district judge acted well within his broad discretion in overruling those objections, and Defendants have failed to carry their burden of showing prejudice in light of the overwhelming evidence of liability and the district court's even-handed jury instructions.

## ARGUMENT

I.  THE COURT SHOULD SALVAGE JURISDICTION AND REINSTATE THE DISTRICT COURT'S JUDGMENT

Our opening brief demonstrated that (a) this Court has the power to salvage jurisdiction; (b) the Court should exercise that power in order to end the

4

A-253

litigation, thereby advancing the Judiciary's dual interests in finality and justice; and (c) doing so would reflect fidelity to the Supreme Court's mandate. Insofar as Defendants respond to these points at all, their arguments are meritless.

## A. This Court Has Power To Salvage Jurisdiction

This Court has the power to recall its mandate for the purpose of salvaging jurisdiction. Pl. Br. 19-22. Defendants respond that recalling the mandate would be "futile." Their theory is that "[b]ecause the district court lacked personal jurisdiction when it held a jury trial and entered judgment in 2015, those proceedings are void and cannot be reinstated." Def. Br. 77. Defendants are incorrect.

### 1. *Defendants' Futility Argument Cannot Be Reconciled With Cases Salvaging Jurisdiction*

Defendants say (at 78) that the cases we cited do not allow for "creating personal jurisdiction after final judgment" in the district court. Not so. The cases show that jurisdiction (both personal and subject-matter) may arise for the first time after a final judgment in the district court—whether by the conduct of the defendant, by an act of Congress, or by order of the appellate tribunal.

Of direct relevance here, even if a district court lacks personal

5

jurisdiction at the moment it enters judgement, jurisdiction can be established on appeal by the defendant's conduct. *See Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1029 (D.C. Cir. 2020) (objections to lack of personal jurisdiction "can be forfeited at any stage of a proceeding, including by failing to challenge the district court's exercise of jurisdiction on appeal"); *Gen. Contracting & Trading Co., LLC v. Interpole, Inc.*, 940 F.2d 20, 22 (1st Cir. 1991) ("having objected to the absence of *in personam* jurisdiction, a defendant may rescind the objection, *i.e.*, consent to the forum court's jurisdiction, at any stage of the proceedings"); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 32 (D.C. Cir. 1990) ("forum objections, *i.e.*, personal jurisdiction and venue, can be waived at any stage of a proceeding").

Thus, in *Corporación Mexicana de Mantenimiento Integral, S. de R.L. v. Pemex-Exploración y Producción*, 832 F.3d 92 (2d Cir. 2016), the defendant raised jurisdictional and merits arguments on appeal, but then asked this Court to remand for further consideration of the merits based on new developments. *Id.* at 99-100. The defendant again lost in the district court, and this Court held that when the defendant "affirmatively and successfully sought relief from this Court remanding for a new merits determination in the Southern District, it forfeited its argument that personal jurisdiction is lacking." *Id.* at

6

101. In other words, the defendant's conduct during appellate proceedings in this Court amounted to a "legal submission" to personal jurisdiction even if the district court did not have jurisdiction. *Id.* at 100 (quoting *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982)). Defendants' theory here (at 77) that a district court judgment entered without personal jurisdiction is "absolutely void" no matter what happens later cannot be squared with *Corporación Mexicana*.

Similarly, if Congress makes an intervening law-change granting subject-matter jurisdiction, appellate courts apply that new law, even if the district court lacked jurisdiction under the prior law. *See, e.g.*, *Andrus v. Charlestone Stone Prods.*, 436 U.S. 604, 607 n.6 (1978) ("The fact that in 1973 respondent in its complaint did not allege $10,000 in controversy is now of no moment," given Congress's 1976 amendment "to eliminate the amount-in-controversy requirement" in cases against the United States); *United States v. Alabama*, 362 U.S. 602, 604 (1960) (even though district court and court of appeals lacked subject-matter jurisdiction, statue enacted while the case was pending in the Supreme Court required decision "on the basis of law now controlling"); *United States v. Union Gas Co.*, 832 F.2d 1343, 1357 (3d Cir. 1987) (same), *aff'd*, 491 U.S. 1 (1989); *Dedham Water Co. v. Cumberland Farms*

7

A-256

*Dairy, Inc.*, 805 F.2d 1074, 1084 (1st Cir. 1986) (same, while case was pending in court of appeals).

An appellate court also has authority to salvage jurisdiction by adding or dismissing parties—even if the district court lacked jurisdiction at the time it entered judgment. *See, e.g.*, *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 75 (1996) (removal jurisdiction); *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 836 (1989) (diversity); *Mullaney v. Anderson*, 342 U.S. 415, 417 (1952) (standing); *Universal Reins. Co. v. St. Paul Fire & Marine Ins. Co.*, 312 F.3d 82, 89 (2d Cir. 2002) (diversity).

### 2. Defendants' Cases Are Inapposite

Defendants rely (at 77) on state-court cases holding that a defendant does not waive its personal-jurisdiction objection by entering a general appearance after the entry of a default judgment. *See McCulley v. Brooks & Co.*, 816 S.E.2d 270, 273-74 (Va. 2018). The state-law cases are divided on this issue. *See id.* at 273-74 & nn.4-5; *see also Aetna Ins. Co. v. Earnest*, 112 So. 145, 145 (Ala. 1927) (following the "great weight of authority" that "'a general appearance validates a judgment that was theretofore absolutely void for want of jurisdiction'" (quoting 4 *Corp. Jur.* 1365, § 65 (1916)). But even the cases that go Defendants' way do not help them here. Those cases are based on concerns

8

A-257

about "the due process concept of allowing the defendant his day in court before entering judgment against him." *BAC Home Loans Servicing, LP v. Mitchell*, 6 N.E.3d 162, 168 (Ill. 2014); *see Weaver Const. Co. v. Dist. Ct.*, 545 P.2d 1042, 1046 (Colo. 1976) (default judgment obtained after improper service should be vacated to give the defaulting party "his day in court"). Obviously, that concern is absent here, where Defendants *had* their day in court and are looking for a do-over on the merits.

Indeed, the difference between the default-judgment cases and this one confirms not only that this Court has *power to* salvage jurisdiction, but also why it *should* do so. As this Court explained in *United Republic Ins. Co. v. Chase Manhattan Bank*, 315 F.3d 168 (2d Cir. 2003), "the nature of the jurisdictional inquiry is affected by the fact that a final judgment issued in the district court." *Id.* at 170. In cases that have reached judgment on the merits, "federal courts *must* salvage jurisdiction where possible," lest they "impose unnecessary and wasteful burdens on the parties, judges, and other litigants waiting for judicial attention." *Id.* (emphasis added; quotation marks omitted). Indeed, "the interests of justice, fairness and judicial economy *require* some additional opportunity to cure such [jurisdictional] defects." *Id.* (emphasis added; citation omitted). In *United Republic*, neither the fact that the district

9

A-258

court's final judgment had been entered without jurisdiction, nor that this Court's mandate had already issued, made it "futile" to try salvage jurisdiction, as Defendants here contend. *Id.* Plaintiffs discussed *United Republic* extensively (at 2, 14, 20, 22), but Defendants do not mention it.

Defendants also rely (at 77) on *Roman Catholic Archdiocese of San Juan, Puerto Rico v. Acevedo Feliciano*, 140 S. Ct. 696, 701 (2020), and *South Carolina v. Moore,* 447 F.2d 1067, 1073 (4th Cir. 1971), but those cases also undermine Defendants' argument. At issue there were orders of state courts that had been divested of jurisdiction by removal to federal court, under a statute providing that once a removal petition is filed, "the State court shall proceed no further unless and until the case is remanded." 28 U.S.C. § 1446(d). Under those circumstances, federal courts were bound to honor Congress's jurisdictional instructions that "proceedings in the state court after the filing of the petition and prior to a federal remand order [we]re absolutely void." *Moore*, 447 F.2d at 1073.

Here, by contrast, Congress has *empowered* this Court to salvage jurisdiction and *encouraged* it to do so. Congress made the PSJVTA expressly retroactive to the day before this Court's ruling in *Waldman I*. PSJVTA § 903(d)(2). And the PSJVTA contains a "sense of Congress" that cases that

10

had previously been "dismissed for lack of personal jurisdiction" "should be resolved in a manner that provides just compensation to the victims," "to the fullest extent possible and without subjecting victims to unnecessary litigation." *Id.* § 903(b)(4)(A)-(B), (b)(5). The circumstances here are thus the opposite of what they were in *Acevedo Feliciano* and *Moore*.

**B.    The Interests In Finality And Justice Favor Reinstating the District Court's Judgment**

In *Gondeck v. Pan American World Airways, Inc.*, 382 U.S. 25 (1965), the Court recalled its mandate under "the established doctrine that 'the interest in finality of litigation must yield where the interests of justice would make unfair the strict application of our rules.'" *Id.* at 26-27 (quoting *United States v. Ohio Power Co.*, 353 U.S. 98, 99 (1957)). Defendants attempt to limit *Gondeck* to its facts, but the principle that the Supreme Court invoked in that case was not so cabined. This Court's decision in *In re Terrorist Attacks on September 11, 2001*, 741 F.3d 353 (2d Cir. 2013), on which Defendants rely (at 19, 34, 36, 38), similarly affirmed that a change in law can justify reopening a case when doing so would serve "the interests of justice." *Id.* at 358. In that case, like *Gondeck*, a relevant interest of justice was "treating victims of the same tort consistently." *Id.* at 357. But neither decision indicated that treating victims alike is the *only* interest that would ever justify overriding the finality

11

A-260

of a closed case.

In this case, *both* the interest in finality *and* the interests of justice support reinstating the district court's original judgment on the jury verdict.

***1. Finality.*** In assessing the interest in finality, the Court must consider conservation of judicial resources and the parties' reliance interests. Pl. Br. 22-25. Defendants have nothing to say about the conservation of judicial resources, because the best way to conserve judicial resources is obviously not to send the parties back to the district court for a second trial, as Defendants request.

Defendants also invoke their "interests in repose," Def. Br. 73, but that makes no sense: They are seeking a second trial, not a dismissal on the merits. Indeed, "it is perilous to develop any sense of repose around a disposition based on a procedural shortcoming rather than the merits." 16 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 3938 (3d ed.).

***2. Justice***. Of the four factors relevant to the interests of justice, *see* Pl. Br. at 25-32, Defendants address only two: the lapse of time and the equities.

With regard to the lapse of time, Defendants try to move the goal posts, looking back from today rather than from the date of Plaintiffs' motion to recall the mandate. By any fair metric, there is no timeliness problem here:

Defendants' "repose" lasted less than two months, from April 2, 2018 (when the Supreme Court denied certiorari) to May 24, 2018 (when the Anti-Terrorism Clarification Act was introduced in Congress). *See* 138 S. Ct. 1438; 164 Cong. Record S.2926.[1] Only six months elapsed between the Supreme Court's denial of certiorari and Plaintiffs' motion to recall the mandate. And even if the Court ignored the pendency of the petition for certiorari, only 23 months passed between issuance of the mandate and the motion to recall it—a period well within the time approved by this Court. *See Thai-Lao Lignite (Thailand) Co. v. Lao People's Democratic Republic*, 864 F.3d 172, 189 (2d Cir. 2017) ("ten years" would be too long); Pl. Br. 27-29. Defendants cite cases in which motions were made with shorter time-frames, Def. Br. 75-76, but not a single one held that six months—or even 23 months—was too long.

With regard to the equities, Defendants do not and cannot dispute that ATA claims like those in this case advance the public interest and fundamental international-law norms reflected in statutes and conventions designed to punish and deter terrorism and to compensate terror victims. *See supra* pp. 10-11;

---

[1] Defendants appear to have started lobbying against the bill in June 2018. Squire Patton Boggs FARA Supp. Statement Attachment C (July 19, 2018), https://efile.fara.gov/docs/2165-Supplemental-Statement-20180719-29.pdf.

13

*infra* p. 27 & n.2; Pl. Br. 30-32; Gov. Br. 9 n.3, 22-23; Br. of Members of Congress at 5-11, 20-22, 29-30 (ECF No. 541).

Defendants claim (at 74) that Plaintiffs will not be prejudiced by a second trial. Not true. As Plaintiffs and *amici* have explained, there is tremendous prejudice in retrying a case, particularly given the time that has passed and the emotionally wrenching nature of the testimony and evidence in this case. *See* Pl. Br. 23-24; Br. of Organizations Providing Support to Victims of Terror at 3-14 (ECF No. 487); *see also Edwards v. Vannoy*, 141 S. Ct. 1547, 1554-55 (2021) ("conducting retrials years later inflicts substantial pain on crime victims who … would have to relive their trauma and testify again"). Since the first trial, one Plaintiff has died, and the delay associated with a retrial poses the risk that other evidence will be unavailable. *See id.* at 1554. Defendants cite (at 74) the D.C. Circuit's ruling in *Shatsky* as support for their theory that no prejudice arises from proceeding in a new case, but *Shatsky* did not go to trial, so it was not a case in which the terror-victim plaintiffs would suffer such prejudice.

## C.    Reinstating the District Court's Judgment Will Reflect Fidelity To The Supreme Court's Mandate

Defendants do not dispute that the Supreme Court vacated this Court's 2016 "judgment," not its 2019 "order," and that the Supreme Court is careful

14

A-263

about which term it uses. Pl. Br. 33-35. Nor do Defendants dispute that the Supreme Court's use of the word "judgment" was legally significant: Where a judgment has been vacated, the case remains open and "must be decided according to the law as it exists at the time" of the ultimate decision. *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 173 (2d Cir. 1967); *see* Pl. Br. 35-36.

Defendants also silently accept our showing that the parties *actually litigated* whether to apply the PSJVTA in this case or in Plaintiffs' backup case; Defendants lost that fight. *Id.* at 36-37. They do point out that a GVR order like the one in this case "requires only 'further consideration' of the appellate status quo ante." Def. Br. 79 (italics omitted). But that only raises, rather than answers, the key question: status quo before *what*? The 2016 *judgment*, or the 2019 *order*? Given the parties' active litigation of that issue in the Supreme Court, and the Supreme Court's vacatur of the "judgment," it is fair to conclude that the Supreme Court's mandate directs this Court to treat its 2016 judgment as vacated, to reopen the case, and to apply the law as it currently exists. Doing so means considering whether the PSJVTA provides a basis for the exercise of personal jurisdiction in this case.

**A-264**

## II.    THE PSJVTA DOES NOT VIOLATE THE DUE PROCESS CLAUSE

We demonstrate below that: (a) the PSJVTA easily meets the relevant due process standards of fair notice and reasonableness; (b) the PSJVTA's territory-based provision is independently constitutional; (c) the district courts' decisions in this case and *Fuld* were incorrect; and (d) Defendants' alternative "benefit" theories are unavailing.

### A.    The PSJVTA Meets The Touchstones Of Due Process: Fair Notice And Reasonableness

#### 1.    *The Correct Standard Is Fair Notice And Reasonableness*

In our opening brief, we demonstrated that a statute providing for the exercise of personal jurisdiction satisfies due process if it gives defendants fair warning of what conduct will subject them to jurisdiction and reasonably advances legitimate government interests in the context of our federal system of government. *See Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1023-25 (2021); Pl. Br. 41-43.

**a.** Defendants assert that Congress based consent on "the same conduct" that this Court held in *Waldman I* was "insufficient to support the exercise of personal jurisdiction under the Due Process Clause." Def. Br. 1, 3, 47, 54, 59 (emphasis omitted). Defendants are wrong. An entity is amenable to suit in any jurisdiction where it is headquartered or incorporated (general

16

A-265

jurisdiction); where its suit-related conduct creates a substantial connection with the forum (specific jurisdiction); or where it agrees to be sued (consent jurisdiction). *See Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129 (3d Cir. 2020). A minimum-contacts inquiry speaks to general jurisdiction and specific jurisdiction. *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010). That was the ground that this Court covered in *Waldman I*.

Contrary to Defendants' theory, the minimum-contacts inquiry is irrelevant in evaluating a consent statute. "Consent is a traditional basis of jurisdiction that may be upheld even in the absence of minimum contacts between the defendant and the forum state." 16 James Wm. Moore et al., *Moore's Fed. Prac.—Civil* § 108.53 (2020) (citation omitted); *see* 4 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1067.3 (4th ed.) (similar); *The Constitution of the United States of America: Analysis, and Interpretation*, S. Doc. No. 112-9, at 1967 (2012 & Supp. 2020) ("Consent has always been sufficient to create [personal] jurisdiction, even in the absence of any other connection between the litigation and the forum."); *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 131 (4th Cir. 2022) ("Absent consent, the exercise of personal jurisdiction must comport with the requirements of … minimum contacts") (quotation

17

marks omitted); *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018) ("Even where neither the forum state's long-arm statute nor the due process minimum contacts analysis is satisfied, a court may exercise personal jurisdiction over a party if the party consents."); *Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755, 769 (Fed. Cir. 2016) (O'Malley, J., concurring) ("consent to jurisdiction is an alternative to the minimum contacts analysis").

Defendants rely (at 66) on *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226 (5th Cir. 2022) (en banc), but that decision contradicts their argument. There, the Fifth Circuit majority expressly left open whether "*Congress* could pass a law to subject foreign defendants to American federal court jurisdiction for any injuries inflicted on American citizens or claims arising abroad." *Id.* at 232 n.8 (emphasis in original). The fact that the Fifth Circuit *rejected* the existence of minimum contacts (general jurisdiction and specific jurisdiction), yet recognized that Congress could nevertheless create a basis to exercise personal jurisdiction, further illustrates that consent jurisdiction is distinct. The Fifth Circuit also observed that "the impact of foreign relations and national security surely can affect the United States' 'sovereign reach.'" *Id.* at 237. Exactly right.

18

**b.** In our opening brief, we demonstrated that Defendants' theory of the case would jeopardize numerous federal statutes and regulations based on inferred consent to jurisdiction, including enforcement tools used to protect the financial system in 31 U.S.C. § 5318(k) and Federal Reserve Board of Governors Form FR K-2. *See* Pl. Br. 49-51. Defendants have nothing to say about these federal statutes and regulations. They do not cite a single case holding any such laws unconstitutional, and our research has found none. Indeed, as far as Plaintiffs are aware, no other federal consent-to-jurisdiction statute or regulation has *ever* been invalidated on due process grounds.

Nor do Defendants dispute that this Court's reasoning in *Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016), supports the conclusion that the relevant due process concerns are fair warning and reasonableness within the context of our federal system. The considerations that led to the holding in *Brown*—the absence of "express language alerting the potential registrant" to the jurisdictional consequences of registering under the Connecticut long-arm statute, *id.* at 636; concern about subjecting an out-of-state corporation to "general jurisdiction … with regard to all matters," *id.*; the lack of any meaningful limitation on "the class of plaintiffs entitled to avail themselves of the long-arm statute," *id.*; and the forum state's "limited" interest in adjudicating

19

A-268

the dispute, *id.* at 637—all point in precisely the opposite direction here. *See* Pl. Br. 46-51.

Indeed, *Brown* strongly suggested the right result in this case: The Court observed there that a "carefully drawn" statute, such as one that "expressly required consent to general jurisdiction as a condition on a foreign corporation's doing business in the state, at least in cases brought by state residents, might well be constitutional." 814 F.3d at 641. The PSJVTA—which expressly provides for consent to jurisdiction over a narrow class of federal anti-terrorism cases involving harm to American citizen plaintiffs—is even *more narrowly* tailored than the statute hypothesized in *Brown*.

Defendants posit a hypothetical statute "declaring that any foreign corporation that distributed vehicles to California dealerships 'shall be deemed to have consented to personal jurisdiction' in the state." Def. Br. 58. But Defendants' hypothetical illustrates the importance of identifying the governmental interests at stake. Defendants' hypothetical statute would allow for general jurisdiction over foreign corporations without furthering any legitimate state interest, so by design it would fail constitutional scrutiny of the type identified in *Brown*. The PSJVTA, by contrast, easily survives such scrutiny by

20

A-269

reasonably advancing core interests of the national government in disputes involving its citizens.

### 2. The PSJVTA Gave Defendants Fair Notice, Such That Their Conduct Was Knowing And Voluntary

Defendants agree that inferred consent to personal jurisdiction is permissible if the defendant's conduct was "knowing and voluntary," but they ignore the accepted meaning of those terms. In the Fifth Amendment context, "'knowing' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014); *see Ford*, 141 S. Ct. at 1024-25 ("fair warning" means "knowledge that 'a particular activity may subject [defendant] to the jurisdiction of a foreign sovereign'") (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *Parke v. Raley*, 506 U.S. 20, 28-29 (1992) ("knowing and voluntary" waiver of constitutional rights occurs if it reflects "a voluntary and intelligent choice among the alternative courses of action open to the defendant") (quotation marks omitted).

Defendants do not dispute that they had "full awareness of the nature of the right being abandoned," *Taylor*, 745 F.3d at 23, by engaging in the conduct specified in the PSJVTA. Indeed, Defendants received actual notice of the

21

A-270

PSJVTA before it took effect and represented to the D.C. Circuit that they "might never make covered payments." *Shatsky*, 955 F.3d at 1038. Nor do Defendants dispute that their conduct was "free from intimidation, coercion, or deception," *Taylor*, 745 F.3d at 23, and thus "voluntary" within the meaning of the Due Process Clause. *See Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (product of "a free and unconstrained will"); *Colorado v. Connelly*, 479 U.S. 157, 163, 165 (1986). Defendants concede (at 42) that their decision to make such payments reflected their "own…policy choices."

Shockingly, Defendants attempt to whitewash their "policy choices" to pay monthly salaries to families of hundreds of terrorists responsible for murdering Americans. Their repeated claim (Br. 5, 16, 41-46, 85) that these salaries are mere "social welfare payments" is not only morally repugnant; it is false: Defendants have *conceded* that they made these payments "by reason of" the terrorists' imprisonment for murders committed against Americans or the terrorists' deaths in committing such crimes. 18 U.S.C. § 2334(e)(1)(A).

Regardless of what Defendants *call* these payments, they are wrong to assert (at 14, 21) that they did not have a "knowing and voluntary choice" to avoid personal jurisdiction by refraining from making them. They may not have relished the choice Congress gave them, but hard choices are not

22

A-271

"involuntary" choices; or, as the Supreme Court put it in *Bauxites*, "not all rules that establish legal consequences to a party's own behavior are 'mere assertions' of power." 456 U.S. at 705.

The Supreme Court illustrated the extent to which courts reject claims of "coercion" based on unwelcome choices in *North Carolina v. Alford*, 400 U.S. 25 (1970). There, a criminal defendant argued that his guilty plea to a murder charge was not "voluntary" in the sense required by the Due Process Clause. He had pleaded guilty while maintaining his innocence because the overwhelming evidence against him presented a serious risk that the State would put him to death if he insisted on proceeding to trial. *Id.* at 27-28. The Supreme Court rejected his claim that these circumstances prevented him from making a voluntary decision, holding that even the risk of a death sentence did not make the defendant's plea a product of "fear and coercion." *Id.* at 29, 37. If Alford's difficult choice to plead guilty and accept a sentence of life imprisonment was voluntary, so was Defendants' choice to pay terrorists and their families by reason of their imprisonment for murdering Americans; the same goes for their choice to engage in activities within the United States.

Finally, Defendants do not and cannot dispute our showing (Pl. Br. 60-63) that the passages on which they rely in *College Savings Bank v. Florida*

23

A-272

*Prepaid Postsecondary Education Expense Board*, 527 U.S. 666 (1999), were *dicta*. Pl. Br. 60-63. *College Savings* held that Congress does not have author-ity "to exact constructive waivers of sovereign immunity through the exercise of Article I powers." 527 U.S. at 683. This holding is uninstructive, because state sovereign immunity differs from personal jurisdiction in ways that mat-ter here: State sovereign immunity supports a "fundamental aspect" of our constitutional structure, "central to sovereign dignity." *Alden v. Maine*, 527 U.S. 706, 713-15 (1999). Personal jurisdiction can be "waived like other rights." *Bauxites*, 456 U.S. at 702-03, 706.

Nor do Defendants rebut our showing that the *dicta* in *College Savings* was incorrect, because the Supreme Court has repeatedly upheld constructive consent in many constitutional contexts. Pl. Br. 62-63 & nn.10-12. It would thus be a mistake to elevate the *dicta* in *College Savings* over the reasoning in *Bauxites*, which approved of "implied consent to the personal jurisdiction of the court," *Bauxites*, 456 U.S. at 703-04.

### 3. *The PSJVTA Is Reasonable In The Context Of Our Federal System*

Defendants dispute whether the PSJVTA reasonably advances legiti-mate governmental interests, claiming that "the PSJVTA is [not] *necessary* for the war on terror." Def. Br. 63 (emphasis added). Of course, *necessity* is

24

A-273

not the relevant question. The cases require only that the forum have "signif-icant interests at stake." *Ford*, 141 S. Ct. at 1030; *see Bristol-Myers Squibb v. Superior Court*, 137 S. Ct. 1773, 1780 (2017) ("legitimate interests in the claims in question").

That is undoubtedly the case here. Congress reasonably determined that § 2334(e) advances "a legitimate governmental purpose: to halt, deter, and disrupt international terrorism and to compensate U.S. victims of interna-tional terrorism," *see* H.R. Rep. 115-858 at 7-8 (2018), and that it serves the purpose of "provid[ing] relief for victims of terrorism," PSJVTA § 903(d)(1)(A). These national security and foreign affairs interests are plainly "significant." *Ford*, 141 S. Ct. at 1030. Indeed, a group of Senators and Repre-sentatives appear as amici in this Court to highlight the interests of the United States served by the extraterritorial statutes addressing the scourge of ter-rorism, including this one. Br. of Members of Congress (ECF No. 541).

The statutory text and legislative history reflect a "reasonable evalua-tion by the Legislative Branch." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) (cleaned up). "The private suit for civil damages can both compensate and deter. In the battle to restrain official misconduct, it is our most promising weapon…." Jon O. Newman, *Suing the Lawbreakers*, 87 Yale

25

A-274

L.J. 447, 451 (1978). Civil liability for misconduct compensates victims, forces organizations to internalize costs they inflict on others, and aligns the organization's incentives with desired conduct. *See Restatement (Third) of Agency* § 503, comment b (2006). As Professors Bobbitt, Dorf, and Powell document, such liability has special utility in the context of foreign affairs: "[t]he United States has long used the threat of civil litigation as a bargaining chip in resolving international crises." Br. of Constitutional Law Scholars 12 (ECF No. 488) (collecting examples). Striking down the PSJVTA "could inadvertently" "crippl[e]" one of the United States' "strongest tactical options" in combatting international terrorism. *Id.* at 11, 13-14. And compared to other powers undeniably available to the Government, the PSJVTA was a measured response to Defendants' pro-terror policies, as Judges Sofaer and Freeh point out. Br. of Abraham D. Sofaer and Louis J. Freeh 2-3 (ECF No. 489).

The PSJVTA furthers these interests in a manner that is reasonable "in the context of our federal system of government." *Ford*, 141 S. Ct. at 1024 (citation omitted). The PSJVTA concerns a limited class of anti-terrorism cases within the heartland of federal concern; it applies to a limited class of plaintiffs who are citizens of the forum; and it does not infringe on the interests of other sovereigns within our constitutional framework. *See J. McIntyre Machinery,*

26

A-275

*Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality opinion) ("[P]ersonal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis."). Indeed, the PSJVTA is consistent with decades of legislation in this area, in which Congress determined it to be in the national and foreign policy interests of the United States to find ways to halt terrorism sponsored by these very Defendants. *See* Statutes cited and discussed in the Government's Brief at pp. 9 n.3, 22-23.[2]

### B.    Territory-Based Consent Is Independently Constitutional

Numerous Supreme Court cases, dating back to the Nineteenth Century, uphold personal jurisdiction over artificial entities on the basis of deemed consent when those entities conduct activities within the territory of a sovereign. *See* Pl. Br. 58-59. Defendants acknowledge (at 36 n.10) that the Supreme Court recently granted certiorari to consider such a statute. *Mallory v. Norfolk Southern Ry. Co.*, 142 S. Ct. 2646 (2022). The Supreme Court may well leave the existing doctrine undisturbed. The district court's determination that

---

[2] *See also* PLO Commitments Compliance Act of 1989, Pub. L. No. 101-246, tit. VII (1990); Immigration Act of 1990, Pub. L. 101-649, § 601 (amending 8 U.S.C. § 1182(a)(3)(B)); Middle East Peace Facilitation Act of 1994, Pub. L. No. 103-236, § 583; Middle East Peace Commitments Act of 2002, Pub. L. No. 107-228, tit. VI, § 601-04; Palestinian Anti-Terrorism Act of 2006, Pub. L. No. 109-446 (adding 22 U.S.C. § 2378b).

27

A-276

Supreme Court holdings are "now obsolete," SPA-17, was improper. It is not the prerogative of a district court to disregard the Supreme Court precedent that has direct application in a case, even where the "continued vitality" of the precedent is open to question. *Agostini v. Felton*, 521 U.S. 203, 238 (1997).

C. **The Reasoning Of The District Courts In This Case And In** *Fuld* **Was Incorrect**

The reasoning of the district court in this case is incorrect, and Defendants have correctly abandoned the reasoning of the *Fuld* district court.

1. ***The District Court's Reasoning In This Case Is Indefensible***

The district court's principal basis for striking down the statute reflected a logical error: the court held that this case did not involve a refusal to obey jurisdictional discovery orders, and thus did not "support a *Hammond Packing* presumption." SPA-11 (citing *Hammond Packing Co. v. Arkansas*, 212 U.S. 322 (1909)). Defendants say that this reasoning should not be taken literally, but rather should be read as a sort of metaphor, to help "explain" that "the nature of the activity" must "support the presumption that Defendants knowingly and voluntarily submitted to jurisdiction in the United States" in any context. Def. Br. 42-43 n.13. Defendants also rely on an earlier case (not cited by the district court), *Hovey v. Elliott*, 167 U.S. 409 (1897), as authority

28

A-277

for their argument that conduct "unrelated" to jurisdiction cannot support "a valid presumption of constructive waiver." Def. Br. 32.

Defendants' attempt to rehabilitate the district court's reasoning is untenable. To begin, neither *Hammond Packing* nor *Hovey* supports the proposition for which Defendants cite them. Rather, as this Court has explained, they stand for the rule that a person's right to mount a defense (or claim a right) in court may not be foreclosed "simply 'as punishment.'" *Collazos v. United States*, 368 F.3d 190, 203 (2d Cir. 2004) (discussing *Hovey* and *Hammond Packing*). But that principle does not help Defendants here. Just as "no punishment in violation of due process occurs when a court, pursuant to statutory authority, strikes a party's answer and enters default judgment," *id.*, Defendants are not being "punished" by being subject to suit in federal court based on their choice to engage in jurisdiction-triggering conduct.

Defendants' broader reading of these cases would sweep away more than one hundred years of doctrine holding that "[w]hat acts of the defendant shall be deemed a submission to [a court's] power is a matter upon which States may differ." *Bauxites*, 456 U.S. at 704 (quoting *Chicago Life Ins. Co. v. Cherry*, 244 U.S. 25, 29-30 (1917)). There is nothing "unique about the requirement of personal jurisdiction, which prevents it from being established or

29

A-278

waived like other rights." *Id.* at 706. The constitutional question is whether this particular form of waiver gave Defendants fair notice and reasonably advanced legitimate governmental interests.

The district court also went astray by holding that "[t]he activities at issue here … are insufficient to support any meaningful consent to jurisdiction," because "these types of conduct do not infer any intention on the part of Defendants to legally submit to suit in the United States." SPA-16. As we have demonstrated, "voluntary" submission to jurisdiction does not mean that the defendant *subjectively intends* to submit to jurisdiction, as reflected in many cases overlooked by the district court (likely because Defendants did not make this argument). Pl. Br. 42-43, 54-57 (discussing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991), *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311 (1964), and *City of New York v. Mickalis Pawn Shop*, 645 F.3d 114 (2d Cir. 2011)). Defendants attempt to shoehorn these cases into their own alternate theory of the case, *see infra* pp. 34-35, but they cannot dispute that their subjective intent is irrelevant to the constitutional analysis, given the undisputable fact that these cases all involved conduct that did not signal a subjective intent to submit to personal jurisdiction.

30

A-279

### 2. Defendants Have Abandoned The *Fuld* District Court Decision

Defendants have correctly abandoned the *Fuld* district court's "fundamental rights" analysis. Def. Br. at 29 n.6. Defendants also ignore the *Fuld* district court's disregard of Supreme Court cases permitting constructive consent in contexts erroneously highlighted as troublesome by the *Fuld* district court. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 237 (1973); Pl. Br. 62-63. And, as described above, Defendants have nothing to say about the fact that the *Fuld* district court elevated the *dicta* from *College Savings* over the reasoning in *Bauxites*. Pl. Br. 62-63; *see supra* p. 24.

## D. Defendants' "Benefit" Theories Are Unavailing

A very strong indication that the district court decisions in this case and in *Fuld* are indefensible is the fact that the PLO and PA do not defend them. Instead, their brief labors to develop an alternative theory to support the judgment. All three district courts to have considered Defendants' theory rejected it. Yet Defendants have not only renewed it, but mutated it into a new variant. Neither variation is coherent, and Defendants would lose even under their own theory.

31

**A-280**

### 1. The Initial Variant Of Defendants' "Benefit" Theory Is Incorrect

Defendants assert (at 38) that "implied consent becomes a disguised form of legislatively-imposed jurisdiction when the forum does not offer any corresponding benefit for the defendant to accept or reject, in exchange for its consent to jurisdiction." The district court joined the *Fuld* district court in rejecting this argument. SPA-17 (citing *Fuld*, 578 F. Supp. 3d at 595 n.10). As the *Fuld* district court said, "[a]lthough there are cases holding that a defendant's receipt of a benefit can be deemed to be consent, Defendants do not cite, and the Court has not found, any case holding that such receipt of a benefit is a necessary condition." 578 F. Supp. 3d at 595 n.10 (citations omitted).

These courts were right to reject Defendants' theory. "'[I]mplied consent' [is] a traditional basis for personal jurisdiction" in which "voluntary consent to jurisdiction need not be supported by consideration" at all. *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 380 (S.D.N.Y. 2001) (Lynch, J.) (quoting 4 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1065 (2d ed. 1990)). Many obvious examples, such as disobeying discovery orders or failing to raise a timely objection to personal jurisdiction, *see Bauxites*, 456 U.S. at 704-05, involve no bargain with the state and no reciprocity.

32

A-281

More generally, consent requires no "bargain" with anyone to be effective, even when constitutional rights are at stake. Persons may consent without reciprocity to law-enforcement searches, *United States v. Gomez*, 877 F.3d 76, 98 (2d Cir. 2017), to the presence of individuals on private property, *Machleder v. Diaz*, 801 F.2d 46, 59 (2d Cir. 1986), or even to the publication of libelous statements, *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir. 2015). None of these consents fail for lack of a "benefit" or "bargain."

Defendants rely heavily (at 37, 38, 39, 52) on snippets from two outdated, out-of-circuit district court cases holding that consent "necessarily incorporates the Due Process 'minimum contacts' requirement." *In re Mid-Atl. Toyota Antitrust Litig.*, 525 F. Supp. 1265, 1278 (D. Md. 1981); *see Leonard v. USA Petroleum Corp.*, 829 F. Supp. 882, 889 (S.D. Tex. 1993). This Court has never cited either case; and those cases are contrary to black-letter law that even without minimum contacts, personal jurisdiction can be based on the defendant's consent. *See supra* pp. 17-18.

### 2. The Modified Version Of Defendants' "Benefit" Theory Is Also Incorrect

Defendants have now shifted ground in this Court, arguing for the first time that the law recognizes three (and only three) forms of consent:

33

A-282

(1) "express consent," (2) consent via "litigation-related activities," and (3) accepting a "benefit or privilege conferred upon the defendant in exchange for its consent." Def. Br. 40. This new theory is made up out of whole cloth. No court has ever suggested this three-part rule, which makes no sense.

The receipt of a "benefit" is not a "barometer" (Def. Br. 14, 35) of consent in any other context. *See supra* pp. 32-33. And Defendants' "express consent" category is difficult to take seriously, as they offer no theory on why cases like *Shute* and *Szukhent* were "express consent" cases rather than implied-consent cases. In *Shute*, the cruise-ship ticket said that "acceptance of this ticket … shall be deemed to be an acceptance and agreement by each [passenger] of all of the terms and conditions," and it was "doubtful" that passengers "could be deemed to have had knowledge of the clause." 499 U.S. at 587, 590. Similarly, in *Szukhent*, it "strain[ed] credulity to suggest that these Michigan farmers ever read this contractual provision." 375 U.S. at 332 (Black, J., dissenting).

Defendants also fail to explain what makes litigation-related conduct different from other conduct. A court may deem litigation conduct a submission to personal jurisdiction even if the defendant announces specifically that it "[does] not intend to waive that defense." *Mickalis Pawn Shop*, 645 F.3d at 122. What neutral principle deems the conduct of such a litigant to be

34

A-283

"voluntary" submission to jurisdiction, *id.* at 134, yet deems the conduct of *these* Defendants to be "involuntarily"?

### 3. Defendants Consented To Jurisdiction Even Under Their Own "Benefit" Theory

Even where the receipt of a benefit is constitutionally relevant, the bar is quite low. Concurring in *Burnham v. Superior Court*, 495 U.S. 604, 637-38 (1990), Justice Brennan viewed the enjoyment of the benefits of California for just a few days as sufficient to make the exercise of personal jurisdiction fair. Defendants enjoy far more substantial benefits from their presence in the United States. Their extensive U.S.-based activities would be impossible without this country's physical public infrastructure and safe, stable, and free economy and society.[3]

---

[3] Defendants ask (at 50 n.24) that this Court hold that their U.S. activities meet the PSJVTA's carve-out for "official business of the United Nations." 18 U.S.C. § 2334(e)(3)(B). The Court should not indulge that request. The district court specifically accepted Defendants' request *not* make findings of fact on that question, SPA-16, and indeed denied Plaintiffs' request for discovery, Dist. Ct. ECF No. 1011 n.1. If facts are to be found, that work must be done by the district court, after Plaintiffs have had a fair opportunity to develop a record. *See Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 121 (2d Cir. 2017) ("we have encouraged district courts to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction where necessary") (quotation marks omitted).

A-284

### III. THE PSJVTA DOES NOT INVADE THE JUDICIAL POWER

Defendants' separation-of-powers arguments are meritless. They argue that Congress crossed the line between legislative power and judicial power by: (a) "directing the result" in a particular case, *see Bank Markazi v. Peterson*, 578 U.S. 212, 228 (2016); (b) purporting to alter a constitutional rule announced by the Supreme Court, *see Dickerson v. United States*, 530 U.S. 428, 437 (2000); and (c) imposing a "legislative mandate to reopen" a final judgment on the merits, *see Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 233-34 (1995). Congress did none of those things. Rather, it properly exercised its power "to make law." *Patchak v. Zinke*, 138 S. Ct. 897, 904-05 (2018).

**A.** Defendants argue (at 68) that the "PSJVTA usurps judicial power by directing courts to *always* find consent if its factual predicates are met." That makes no sense: Determining whether statutory factors have been met—the task assigned to the Judiciary by the PSJVTA—is a quintessential judicial function. As this Court explained in *Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 191 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 578 U.S. 212 (2016), a statute does not "usurp the judicial function" if it "leaves the determination of certain facts to the courts."

A-285

In *Peterson*, a statute that "formally [gave] discretion to the courts" to make findings did not usurp the judicial function, even though the outcome-determinative facts *already* "had been established by the time Congress enacted [the statute]." *Id.* at 192. The Supreme Court affirmed this holding: Congress "may amend the law and make the change applicable to pending cases, even when the amendment is outcome determinative." 578 U.S. at 215. This case follows *a fortiori* from that one: The operative facts here did not arise until *after* Congress enacted the statute; indeed, Defendants represented to the D.C. Circuit that they "might never make" payments triggering the PSJVTA. *Shatsky*, 955 F.3d at 1038.

**B.** Defendants also argue (at 69-70) that the PSJVTA is an attempt by Congress to "legislatively supersede" judicial "decisions interpreting and applying the Constitution." *See Dickerson v. United States*, 530 U.S. at 437. To be sure, once the Supreme Court establishes a constitutional rule, Congress does not have authority to alter *that rule* by legislation, lest it "usurp the U.S. Supreme Court's judicial function." *Guam v. Guerroro*, 290 F.3d 1210, 1220 (9th Cir. 2001). That principle has no application here, since Congress has not attempted to supersede any judicial decision, let alone one by the Supreme Court. The PSJVTA created a statutory basis under which Defendants may

37

A-286

*consent* to personal jurisdiction in ATA suits through certain post-enactment conduct in the absence of minimum contacts. The question here—whether that statutory basis for jurisdiction by consent is constitutional—has not been addressed by this Court or the Supreme Court.

**C.** Finally, Defendants argue (at 70-71) that the PSJVTA runs afoul of the rule that a statute violates the separation of powers if it "require[s] federal courts to reopen final judgments." *Plaut*, 514 U.S. at 215. That rule is inapplicable here. As Defendants have conceded, "the PSJVTA has no provision requiring the reopening of closed cases." Defendants' Post-Argument Letter Br. at 14, (July 17, 2020) (ECF No. 354). Rather, Congress left the decision whether to reopen this case to the Judiciary. In the words of *Plaut*, the PSJVTA "merely reflects and confirms the courts' own inherent and discretionary power...to set aside a judgment." 514 U.S. at 233-34.

*Plaut* is distinguishable for another reason. There, as the Supreme Court emphasized, the petitioners sought to reopen judgments that had been dismissed *on the merits*. 514 U.S. at 228-29. Congress was thus attempting to "nullif[y]" those merits decisions. *Id.* at 228. That is not the case here, where Plaintiffs' claims were dismissed without prejudice for lack of personal jurisdiction. This difference is meaningful: "a jurisdiction-conferring ... statute

38

A-287

usually takes away no substantive right but simply changes the tribunal that is to hear the case." *Hamdan v. Rumsfeld*, 548 U.S. 557, 576-77 (2006) (citations and quotation marks omitted). A statute that merely empowers the judiciary to reopen a case previously dismissed for lack of jurisdiction therefore does not "interfere[]" with the judicial power, as would a statute requiring the reopening of a case previously decided on the merits. *Plaut*, 514 U.S. at 230.

Because the PSJVTA concerns the circumstances in which a party may consent to personal jurisdiction, this case is more like *United States v. Sioux Nation*, 448 U.S. 371 (1980). In *Sioux Nation*, the Court of Claims ruled that the plaintiffs had no legal claim under the Takings Clause. *Sioux Tribe v. United States*, 97 Ct. Cl. 613, 670 (1942). The Court of Claims later held that its earlier determination had preclusive effect, so that the plaintiffs could not sue. *United States v. Sioux Nation*, 518 F.2d 1298, 1302 (Ct. Cl. 1975). Congress then enacted a statute "providing for Court of Claims review of the merits" of the claim "without regard to the defenses of res judicata and collateral estoppel." *Sioux Nation*, 448 U.S. at 389. The Supreme Court held that this "waiver … does not violate the doctrine of separation of powers," because Congress "only was providing a forum so that a new judicial review of the Black Hills claim could take place" and "in no way attempted to prescribe the

39

outcome" of that review. *Id.* at 407. Just as Congress was free in *Sioux Nation* to provide for judicial review on the merits on a consent basis, *see id.* at 397, so too Congress was free to enact the PSJVTA, which creates a statutory mechanism for defendants to consent to judicial review on the merits by engaging in specifically defined conduct. *Plaut* itself recognizes that "[w]aiver subject to the control of the courts themselves would obviously raise no issue of separation of powers." 514 U.S. at 231-32.

## IV. THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR A NEW TRIAL

Defendants assert that they are entitled to a retrial on the theory that the district court allowed "three liability experts to testify at trial despite failing to apply any discernable methodology." Br. 19, 79-88. In addition to this generalized objection, Defendants also claim that a new trial is required because of a few passages of expert testimony that Defendants objected to at trial. *Id.* 83-87. Neither assertion is colorable.

Defendants waived their generalized objection to these experts' testimony; it is therefore unreviewable. And even if Defendants had merely forfeited the objection, they would not come close to demonstrating plain error. As for Defendants' specific objections, the district court did not abuse its

40

A-289

discretion in overruling them, and any error would have been harmless in light of the overwhelming evidence of liability and the district court's instructions.

## A. Defendants' *Daubert* Objections Provide No Basis For A New Trial

Defendants assert that they are entitled to a new trial on the theory that the district court should have excluded all the testimony of Eviatar, Shrenzel, and Kaufman under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendants' tactical waiver of this objection forecloses appellate review of this issue; and the district court committed no plain error anyway.

### 1. *Defendants Waived Their Daubert Objection*

When a party "consciously refrains from objecting as a tactical matter, then that action constitutes a true 'waiver,' which will negate even plain error review." *United States v. Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995). Here, Defendants made an *in limine* motion to block the testimony of Kaufman, Eviatar, and Shrenzel. JA-1427-58. The district court heard argument on that motion a few weeks before trial and deferred ruling. JA-3246 (re Kaufman: "most of these issues … usually don't get resolved until you have a context in which to resolve them"), JA-3287 (re Eviatar: "let me look at that more carefully"), JA-3300 ("I will review [Shrenzel's proposed testimony] in that context").

41

A-290

Defendants did not renew their *Daubert* objection at trial. Kaufman testified without objection to his qualifications. *See* JA-3631 (Defendants' counsel: expecting Kaufman's testimony to be "pretty clean"), 3881 (Kaufman testimony). The district court qualified Eviatar as an expert on the PLO, PA, Fatah, AAMB, and Hamas; the policies and practices of the PA and the PLO as they relate to support of terrorism; the relationship between Defendants and the AAMB; and the relationship between Defendants and Hamas. JA-4185 (Defendants' counsel: "No voir dire."). And the court qualified Shrenzel an "expert on terrorism as it relates to the policies and practices of the PA and the PLO." JA-5197 (Defendants' counsel: "I have no objection to that.").

Defendants thus waived any *Daubert* objection to these witnesses. An objection to a witness's qualification to testify "must be made when the person is first called to the stand." 21 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 5037.2 (2d ed.); *see United States v. Khoury*, 901 F.2d 948, 966 (11th Cir. 1990). An *in limine* motion does not preserve an objection unless it is "ruled upon without equivocation by the trial judge" in advance of trial. *Yu-Leung*, 51 F.3d at 1121. The "obligation [is] on counsel to clarify whether an *in limine* or other evidentiary ruling is definitive when there is doubt on that

42

A-291

point." *See* Advisory Committee Note, Fed. R. Evid. 103 (2000 Amendment) (citing *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 520 (3d Cir. 1997)).

Defendants failure to object at trial only a few weeks after arguing their *Daubert* motion was a waiver, not a forfeiture, because they have offered no indication that it was due to "mistake or oversight." *United States v. Williams*, 930 F.3d 44, 64-65 (2d Cir. 2019); *United States v. Bacchus*, 108 F.3d 1370 (2d Cir. 1997) (waiver was tactical when counsel was aware of government's intention to call witness before trial). Such a contention would be suspect, given Defendants' large trial team led by an attorney who has served as lead counsel in more than 160 jury trials, according to his website: https://www.millerchevalier.com/professional/mark-rochon.

Defendants' failure to preserve their *Daubert* objection thus reflected a tactical waiver, foreclosing review under any standard. *See Yu-Leung*, 51 F.3d at 1122.

### 2. *Defendants Demonstrate No Plain Error*

Even if Defendants had merely forfeited their *Daubert* objections, any claim of plain error would not long detain the Court. A party claiming plain error must show (1) error that (2) is plain, (3) affects substantial rights, and

43

A-292

(4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See Johnson v. United States*, 520 U.S. 461, 467 (1997).

*a. No Error.* The district court would not have committed any error by letting the three experts testify over a *Daubert* objection had one been made. "Rule 702 embodies a liberal standard of admissibility for expert opinions," *United States v. Napout*, 963 F.3d 163, 187 (2d Cir. 2020) (quotation marks omitted), and this Court applies "a highly deferential standard" on review. *Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017) (quotation marks omitted). This Court "will not disturb a ruling respecting expert testimony absent a showing of manifest error," *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011), which occurs only where "the trial judge ruled in an arbitrary and irrational fashion," *United States v. Miller*, 626 F.3d 682, 689 (2d Cir. 2010).

Under Rule 702, expert testimony is permitted if the expert is "qualified, reliable, and helpful." *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021). Each criterion was met here.

### *i. Qualified*

Kaufman was an English Barrister and Israeli lawyer; for fourteen years before entering private practice, he prosecuted terrorism and war crimes in the courts of Israel, the International War Crimes Tribunal, and the

44

International Criminal Court; he also served as a judge in the Israeli military courts. JA-3883-86. Eviatar served in an elite unit charged with "the entire system of coordination and liaising with the [PA]" for 15 years. JA-4142. Shrenzel served in an agency charged with prevention of terrorism for nearly two decades; for ten years, he was the "head of the department that dealt with the analysis of Palestinian affairs, especially the policies of the PLO [and] PA." JA-4933-34. His job was "to understand the ideas, the ideologies, the motivation and … deeds of the PA." JA-4935.

Qualifying such experts is well within the discretion of a district court. *See United States v. Lopez,* 547 F.3d 364, 373 (2d Cir. 2008) (detective with 17 years of experience investigating drug crimes was "well qualified" to give expert opinion); *Strauss v. Credit Lyonnais, S.A.,* 925 F. Supp. 2d 414, 443 (E.D.N.Y. 2013) (former Israeli intelligence agent); *Gill v. Arab Bank, PLC,* 893 F. Supp. 2d 542, 549 (E.D.N.Y. 2012) (Weinstein, J.) (same).

### ii. Reliable

The experts "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(d). Kaufman explained relevant criminal procedures based on convictions in evidence. *E.g.*, JA-3936-38. Eviatar and Shrenzel relied almost exclusively on documents in evidence, assessing them using the

45

A-294

methodology followed by intelligence officers: collecting information, cross-referencing it, verifying it, researching it, processing it, and never relying on only a single source. *See* JA-4184; JA-4936 JA-5195-96. This methodology was "similar to that employed by experts that have been permitted to testify in other federal courts involving terrorist organizations." *United States v. Paracha*, 2006 WL 12768, at \*20 (S.D.N.Y. Jan. 3, 2006), *aff'd*, 313 F. App'x 347 (2d Cir. 2008); *see, e.g.*, *United States v. Kassir*, 2009 WL 910767, at \*6 (S.D.N.Y. Apr. 2, 2009) (upholding similar methodology).

Defendants cite *Gilmore v. Palestinian Interim Self-Government Auth.*, 53 F. Supp. 3d 191, 212 (D.D.C. 2014), *aff'd*, 843 F.3d 958 (D.C. Cir. 2016), but the holding in *Gilmore* was case-specific: that Eviatar's proposed expert testimony there—based exclusively on documents the court had ruled were hearsay—was "not admissible to prove that Abu Halawa killed Gilmore." *Id.* at 214. That is not this case. Eviatar relied on documents *admitted in evidence*, including "original reports of the Palestinian General Intelligence Service," "martyr's files," "payroll records," personnel files, criminal convictions, official government reports, Defendants' own public statements, and publications of AAMB, Hamas, Fatah. He cross-referenced all materials and used methods that were "[i]dentical to all of the professional tools and instruments

46

A-295

that I made use of and that I worked with during the course of my years in the military." JA-4182-84.

### iii. Helpful

Expert testimony is helpful if it "shed[s] light on activities not within the common knowledge of the average juror." *United States v. Wexler*, 522 F.3d 194, 204 (2d Cir. 2008). Kaufman helped the jury understand criminal procedures in a foreign country. *E.g.*, JA-3936-38. Eviatar and Shrenzel provided background about Defendants' functions and policies, *e.g.*, JA-4191-94, and relevant terror organizations' activities, *e.g.*, JA-4450-51, 4190-91. They explained how Defendants' policies related to those organizations, as well to the perpetrators of the six terror attacks, *e.g.*, JA-4453-54. They also explained the purpose of documents created by Defendants, such as "Martyr Files," and explained terminology in them that was unfamiliar to the jury, *e.g.*, JA-4385, 5212, 5219-20, 5286-87. This testimony was helpful for a jury hearing a complex case involving six terror attacks, two U.S.-designated Foreign Terrorist Organizations, 30 perpetrators with unfamiliar names, and hundreds of documents like "Martyr Files," all of which are unfamiliar to ordinary jurors.

Because the structure, organization, and operational methods of terrorist organizations are "beyond the knowledge of the average citizen,"

47

A-296

*Farhane*, 634 F.2d at 158-59, courts in this Circuit regularly allow expert testimony by intelligence agents like that provided by Eviatar and Shrenzel. *See, e.g., United States v. Defreitas*, 2011 WL 317964, at *7 (E.D.N.Y. Jan. 31, 2011), *aff'd sub nom. United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013); *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 329-31 (E.D.N.Y. 2011); *Gill*, 893 F. Supp. 2d at 530-34.

*   *   *

In sum, had Defendants made a *Daubert* objection at trial, it would not have been "arbitrary and irrational" for the court to allow the testimony.

**b. No Plain Error.** An error is "plain" if it is "clear or obvious, rather than subject to reasonable dispute." *United States v. Marcus*, 560 U.S. 258, 262 (2010). Only an "egregious abuse of discretion" can qualify as plain error. 21 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 5043 (2d ed.)

Ordinarily, an error is "plain" only when it "contravenes clearly established precedent." *United States v. Brown*, 352 F.3d 654, 665 n.10 (2d Cir. 2003). Defendants do not come close to meeting this standard. They rely on cases that are inapposite. In *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005), this Court found expert testimony improper where a *medical expert* opined that other witnesses were "telling the truth." Plaintiffs' experts offered

48

A-297

no such testimony. In *United States v. Mejia*, 545 F.3d 179, 191, 195 (2d Cir. 2008), a pattern of predicate murders was an element of the charged RICO offense. Instead of introducing direct evidence of the murders—such as arrest records and death certificates—the government offered hearsay testimony from an investigating case agent as the only evidence of the murders. That is, the Government "substitute[d] expert testimony for factual evidence." *Id.* at 194-95. Here, Plaintiffs submitted actual convictions, pay records, promotion records, and internal files created by Defendants themselves. *See infra* pp. 50-51. The district court did not violate "clearly established precedent" by allowing expert testimony to explain these documents in evidence.

***c. No Effect On Substantial Rights.*** Defendants cannot meet the third element of plain-error analysis either. An error affects a defendant's substantial rights where there is a "reasonable probability that the error affected the outcome of the trial." *Marcus*, 560 U.S. at 262 (2010).

Here, overwhelming documentary evidence inculpated fifteen PA security officers who planned or participated in the attacks, *see* JA-9436,[4] and an

---

[4] PTE-1121 (summarizing PTEs 1-4, 6, 8, 22, 27-29, 36A-36D, 43-49, 58, 60, 62, 75, 90-91, 93, 96, 103, 105-07, 109, 113, 116, 118, 120, 122-23, 130, 143, 250B, 262, 297, 364, 377, 384, 418-19, 447, 486, 891-92, 895).

A-298

equal number of co-conspirators, *see* JA-9436.[5] This evidence included actual convictions of the perpetrators for committing the crimes giving rise to this case, JA-3924-4122, plus internal PA documents supporting the jury's conclusion that these perpetrators acted within the scope of their employment, including:

- Official PA records reflecting pay increases and promotions for convicted perpetrators while in prison, *e.g.*, JA-4362, 4397, 5246, 5310, 5313-14, 5566; posthumously, *e.g.*, JA-5226-31; and in once case after being warned not to disobey orders on pain of dismissal, JA-5255-56;

- Internal PA documents approving payments to convicted perpetrators after concluding that each perpetrator was incarcerated "as a result of his fight for his country," JA-5243, 5309-10, 5570, 5622, 5696-97;

- PA/PLO "martyr" files approving "martyr payments" to the families of the suicide terrorists who died committing the attacks in this case and calling the perpetrators "heroic," JA-5406; *see* JA-5219, 5300-02, 5414-15; and

- Internal PA intelligence documents assessing the perpetrators in this case as "good" in terms of "security" and "morals," *e.g.*, JA-5240-41, 5247, 5281-82, 5561.

The jury also saw "martyr" videos of suicide terrorists preparing for attacks on Plaintiffs, and video interviews of terrorists convicted of participating

---

[5] PTE-1120 (summarizing PTEs 26, 39-42, 50-51, 53-54, 63, 64, 66, 83-87, 249, 259, 288, 292, 324, 345, 350, 367, 388, 433, 425, 894).

50

A-299

in the attack. *E.g.*, JA-5235, 5412-13, D. Ct. Dkt. 702-4. It heard testimony of percipient witnesses, JA-3310-18, 4659 (Yousef), 7860-70 (Reehan), and Defendants' own officers, JA-6324-29 (Abu-Libdeh), 6328-29 (Shaqbu'a), 6329-6341 (al-Sheikh), 6343 (Fayyad), 7109-94 (Faraj), 7377-421 (Ashrawi), 7535-45 (Issa). And it had government reports from the United States and Israel implicating Defendants in the terror campaign, *e.g.*, JA-4702-05; official PA "political guidance" magazines distributed to PA security officers at the time of the attacks urging "open, bloody and fierce" action by PA security forces, JA-4491, 5597, 5406; and PLO Chairman Arafat's written approval of payments from the PLO and the PA to terrorists, JA-4426-29.

As here, "there is no reasonable probability" that the alleged error "affected the outcome" of the trial when the other evidence is overwhelming. *See United States v. Agrawal*, 726 F.3d 235, 257 (2d Cir. 2013) (analogizing to harmless error standard); *United States v. Moye*, 793 F. App'x 19, 22 (2d Cir. 2019) ("even if the admission of Modesto's testimony to show a common scheme or plan *did* amount to clear or obvious error, Moye still fails to demonstrate how it affected his substantial rights given the overwhelming evidence introduced at trial"); *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 151 (2d Cir. 2010) ("We find it unlikely that a juror would have been persuaded to change

51

**A-300**

his vote on the basis of the excluded testimony, in light of the overwhelming evidence that Wardrop was not so motivated."); *Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003) (harmless error where record included opposing accounts of disputed fact, "to permit the jurors to draw their own conclusions"); *Hygh v. Jacobs*, 961 F.2d 359, 365 (2d Cir. 1992) (harmless where "impermissible testimony was expressed within a larger body of otherwise unobjectionable testimony").

**d. No Miscarriage Of Justice.** Defendants make no attempt to meet the fourth element of plain-error review, which is to explain how allowing these three expert witnesses to testify at a civil trial "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *See United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007) (quotation marks omitted).

## B. Defendants' Specific Objections To Expert Testimony Provide No Basis For A New Trial

Defendants cherry-pick a handful of brief passages from a 4,000-page trial transcript, contending that these passages prove that the experts "strayed" beyond the limits established by the district court. Br. 83-88. But Defendants fail to show that the court overruled their objections in "an arbitrary and irrational fashion," *Miller*, 626 F.3d at 689, and fail to show prejudice.

52

***1.    The District Court Did Not Abuse Its Discretion By
Overruling Defendants' Objections***

***a. Shrenzel's Redirect Testimony About PA Political Guidance Magazines***. Defendants complain about Shrenzel's testimony on redirect that Defendants' "Political Guidance" magazines reflected an "intensification of the level of incitement" to violence, "creating an atmosphere" that "grew more and more violent," so that "the potential reader" of these magazines "understands" that he should not "condemn terrorist activity." JA-5689-91. The district court did not act arbitrarily or irrationally in admitting this testimony. Contrary to Defendants' assertion (at 84), this testimony did not come "from nowhere." It was corroborated by the U.S. government in an official report admitted in evidence: "[S]enior PLO and PA leaders did little to prevent—and in some cases encouraged—acts of violence and an atmosphere of incitement to violence in the Palestinian media and through public statements of Palestinian officials." JA-9221. Indeed, Defendants themselves elicited very similar testimony from the witness. JA-5683-84.

Moreover, the redirect testimony followed a very particular sequence of events at trial. The district court had recently admonished Defendants for improperly politicizing their cross-examination of Shrenzel. JA-5603-04, 5610 (The Court: "I don't think I have to say it, but I will say, in general, that if my

53

A-302

orders are not followed, there will be consequences. I made it clear. I don't want any of those kinds of questions…. I believe that those questions were inappropriate. I sustained the objections. I warned him. I admonished him. If it continues, I will take stronger action.").

Yet disregarding the district court's warning, Defendants *again* infused their cross-examination of Shrenzel with politicized questioning about Political Guidance magazines, reading to the jury passages asserting that "the Palestinian people … continue to suffer under the most extreme example of occupation in the world," JA-5687, and that the Palestinians are "seeking to reclaim usurped rights that are so inconsistent with the spilling of blood and killing of innocent children." JA-5689. It was in *this* context that the district court on redirect allowed testimony about the nature of the Political Guidance magazines. JA-5690-92. That was appropriate: "The scope of redirect examination is a matter entrusted to a trial judge's broad discretion. Such redirect may be used to rebut false impressions arising from cross-examination and the trial judge is in the best position to determine whether such a false impression was created." *United States v. Vasquez*, 267 F.3d 79, 85 (2d Cir. 2001) (quoting *United States v. Diaz*, 176 F.3d 52, 80 (2d Cir. 1999)).

54

A-303

***b. Shrenzel's Redirect Testimony About Exhibit 233 And Tawfik Tirawi.*** Defendants complain about Shrenzel's redirect testimony (JA-5716) concerning Exhibit 233. The document explained that Tawfik Tirawi (the head of the PA general intelligence service) tried to conceal information about suicide bomber Wafa Idris (an intelligence agent) and stated: "This information proves that the [PA's] general intelligence are involved in the issue of Wafa Idris." PTX-233 (quoted at JA-5711).

Defendants contend (at 87) that Shrenzel's testimony about this document was transmitting hearsay, but that is incorrect. Exhibit 233 was not hearsay; it was prepared by *Defendants' own employees*. JA-5421. Nor was the document unreliable, as the document's author testified that it contained "important" information that was distributed to very senior PA security officers. JA-7868, 7870-72.

Consistent with Shrenzel's methodology, his professional assessment of Tirawi's involvement was based not only on Exhibit 233 (which plainly inculpated Tirawi) but on the *whole* Tirawi file in evidence, JA-5716. Again, it was within the district court's very broad discretion to permit this testimony on redirect because Defendants had opened the door (JA-5634-35) by suggesting

55

A-304

that Tirawi was innocent of any involvement in any of the attacks. *See Vasquez*, 267 F.3d at 85.

***c. The Number Of PA Security Officers In Prison For Terrorism Crimes.*** Defendants attempt (Br. 86) to portray Eviatar's assessment that 700 PA security officers were convicted of terrorism (JA-4597) as speculation. But Eviatar based his estimate on a government report, JA-4923-24, 4929-30, as well as Defendants' own public statements, JA-4299-4305, 7249-51.

***d. "Narratives."*** Defendants complain (at 79, 81) that the experts offered "narratives." They cite testimony of Shrenzel that "a very lethal act of terror" was perpetrated by a "squad" that included two PA employees, who then received "payments, promotions," and praise for "loving their nation" by murdering civilians. JA-5326-27. This testimony was based on documents in a binder that was literally in the hands of each juror. JA-5286-5326.

Allowing this testimony was within the bounds of discretion, because an expert is permitted "to intertwine his factual narrative with his opinion testimony." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 691 F. Supp. 2d 448, 466-67 (S.D.N.Y. 2010). Such testimony is admissible where "necessary to provide context for his interpretations," if the context can "reduce[] the risk of jury confusion by providing a more coherent

56

A-305

narrative … and a proper framework for [the] expert opinions." *United States v. Smith*, 919 F.3d 825, 83-38 (4th Cir. 2019) (emphasis omitted), or where the complexity of the facts "might confuse the trier of fact in the absence of such testimony." *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 147 (S.D.N.Y. 2003).

**e. Testimony Concerning Prisoner And Martyr Payments.** Defendants argue (at 85-86) that the district court abused its discretion by allowing expert testimony concerning Defendants' pay and promotion practices for rewarding convicted or suicide terrorists and their families. *See* JA-4281, 4351, 4353, 4372-74, 4385. That argument is meritless for two separate reasons.

*First*, it was not irrational for the district judge to conclude, contrary to Defendants' argument, that Eviatar and Shrenzel had an adequate basis to provide opinions about the climate and incentives created by Defendants' policies and practices, given their extensive experience studying and preventing Palestinian terrorism. In *United States v. Sokolov*, 814 F.2d 864, 874 (2d Cir. 1987), this Court approved the admission of testimony from an expert on Nazi propaganda, who concluded that a person who created Nazi propaganda himself engaged in persecution "by creating a climate of opinion in which such persecution is acceptable." Further, there is no bar to allowing experts to

57

"testify concerning economic incentives." *Sitts v. Dairy Farmers of Am., Inc.*, 2020 WL 3467993, at \*7 (D. Vt. June 24, 2020); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 31 (S.D.N.Y. 2020) (expert properly used experience "to assess the economic incentives and rationales" of relevant parties).

*Second*, to the extent Defendants believed that some of the testimony was insufficiently supported, any such gaps would go to the *weight* of the evidence, not to its *admissibility*. *See Napout*, 963 F.3d at 188; *Restivo*, 846 F.3d at 577. Judge Daniels gave defendants a full and fair opportunity to advance their own explanation of their so-called "social welfare" policies—both in their opening, JA-3862 ("These payments are routine in my client's society. My client is essentially a social welfare state"), and during their case in chief, JA-7184-90, 7360 (defense witness Majed Faraj); JA-7539-44 (defense witness Shawqi Issa). Defendants even made a conscious choice not to call their own expert witness, who was prepared to testify that Defendants' policies are "a form of social welfare." JA-1549 (Robinson expert report); *see* JA-7601 (decision not to call Robinson). And in summation, Defendants themselves highlighted Shrenzel's testimony that the prisoner and martyr payments were not the terrorists' primary motivation. JA-8030-33.

***f. "Brazen Partisanship."*** Defendants claim (at 83) that Shrenzel acted as a partisan because he said that a particular set of facts "contributes to our case." JA-5289. Defendants also complain (at 83-84) that Shrenzel's analogy of Defendants' Political Commissioners to Soviet political commissars (JA-5329) was inflammatory. But these were Defendants' *own employees*; Defendants were free to cross-examine on this topic (they did not) and free to offer their own evidence on the role of these employees (they did not). Defendants themselves used an analogy to Soviet techniques in their own questioning of Shrenzel. JA-5626. Experts are allowed to use analogies. *See Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424, 464 (S.D.N.Y. 2014); *In re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181, 189 (S.D.N.Y. 2005).

Of course, to the extent that Shrenzel "appeared unduly partisan in any respect, such an appearance went not to the admissibility of his testimony, but to the determination of its ultimate weight and credibility—a subject that falls squarely within the jury's prerogative." *Katt v. City of New York*, 151 F. Supp. 2d 313, 363 (S.D.N.Y. 2001) (Lynch, J.), *aff'd*, 372 F.3d 83 (2d Cir. 2004).

### 2. *Any Error Was Harmless*

Even where an error has been properly preserved, this Court "will not grant a new trial if [it] find[s] that the improperly admitted evidence was

59

harmless—*i.e.*, that the evidence was unimportant in relation to everything else the jury considered on the issue in question." *Warren v. Pataki*, 823 F.3d 125, 138 (2d Cir. 2016) (quotation marks omitted); *see* 28 U.S.C. § 2111; Fed. R. Civ. P. 61. This is a civil case in which Defendants seek a new trial, so, they carry the burden "of showing that prejudice resulted." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (quotation marks omitted).

Defendants cannot meet that burden, given the overwhelming evidence—the admission of which is unchallenged on appeal. *See supra* pp. 50-52. Indeed, Defendants relegate their harmless-error argument to a single sentence. Def. Br. 88.

Moreover, Judge Daniels' even-handed rulings and instructions ensured that Defendants suffered no prejudice. He sustained 122 of Defendants' 234 objections to the experts' testimony; and, where appropriate, he instructed the jury to disregard certain answers. *E.g.,* JA-4216; JA-4389-91; JA-5305; JA-5426; JA-5585. He also gave a robust instruction on expert witnesses. JA-8202. These rulings and instructions negate any possible argument that the district court abused its discretion, or that any error affected the verdict. *See United States v. Blum,* 329 F.2d 49, 51 (2d Cir. 1964) ("Whether or not [defendant's]

objection[s were] well taken, the judge's action in striking the evidence and instructing the jury to disregard it cured any possible prejudicial error.").

## CONCLUSION

The Court should RECALL its mandate, AFFIRM the district court's judgment entered on October 1, 2015, and REMAND to the district court with instructions to reinstate that judgment.

Respectfully submitted,

March 13, 2023
New York, New York

ARNOLD & PORTER KAYE SCHOLER LLP

By:_____
    Kent A. Yalowitz
    250 West 55th Street
    New York, NY 10019-9710
    212-836-8000
    kent.yalowitz@arnoldporter.com

    – and –

    Allon Kedem
    Dirk C. Phillips
    Stephen K. Wirth
    Bailey M. Roe
    601 Massachusetts Ave., NW
    Washington, DC 20001-3743

    *Attorneys for Plaintiffs-Appellants*

61

A-310

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and the Court's order dated March 13, 2023, that the foregoing document contains 12,938 words and complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Century font.

Dated: March 13, 2023

/s/ *Stephen K. Wirth*
Stephen K. Wirth

A-311

15-3135-cv (L)
Waldman v. Palestine Liberation Organization

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT
_____

August Term 2022
Argued: May 3, 2023
Decided: September 8, 2023

Docket Nos. 15-3135-cv (L), 15-3151-cv (XAP), 22-1060-cv (Con)
_____

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF
PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA
BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR,
BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA,
INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA,
NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE
OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN
OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW, INDIVIDUALLY AND AS A
NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW, JAMIE A. SOKOLOW, MINOR,
BY HER NEXT FRIENDS AND GUARDIAN MARK I. SOKOLOW AND RENA M. SOKOLOW,
LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD
ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA
NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, INDIVIDUALLY AND AS
NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER,
DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, MINOR, BY HIS NEXT
FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN
BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND
REVITAL BAUER, DANIEL BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR.
ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND
AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD
MANDELKORN, KATHERINE BAKER, INDIVIDUALLY AND AS PERSONAL

**A-312**

REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, LARRY CARTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR., INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JANIS RUTH COULTER, CHANA BRACHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STUART SCOTT GOLDBERG/NATURAL GUARDIAN OF PLAINTIFFS CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG, TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, NEVENKA GRITZ, SOLE HEIR OF NORMAN GRITZ, DECEASED,

*Plaintiffs – Appellants,*

UNITED STATES OF AMERICA,

*Intervenor – Appellant,*

—v.—

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY AND/OR PALESTINIAN COUNCIL AND/OR PALESTINIAN NATIONAL AUTHORITY,

*Defendants – Appellees,*

2

**A-313**

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESTATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, DECEASED, ESTATE OF MUHANAD ABU HALAWA, DECEASED, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,

*Defendants.*[*]

_____

Before: LEVAL AND BIANCO, *Circuit Judges*, AND KOELTL, *District Judge*.[**]

The plaintiffs, a group of United States citizens injured during terror attacks in Israel and the estates or survivors of United States citizens killed in such attacks, brought this action against the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA") pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, seeking damages for alleged violations of the ATA related to those attacks. This Court concluded on appeal that the district court lacked both general and specific jurisdiction over the PLO and the PA, and we therefore vacated the judgment entered against the defendants and remanded the action for dismissal. The plaintiffs later moved to recall the mandate in this case based on a new statute, the Anti-Terrorism Clarification Act of 2018, Pub. L. No. 115-253, 132 Stat. 3183. We denied that motion because the statute's prerequisites had not been met.

Congress responded with the statute now at issue, the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082. The PSJVTA provides that the PLO and the PA "shall be deemed to have consented to personal jurisdiction" in any civil ATA action if, after a specified time, those entities either (1) make payments, directly or

_____

[*] The Clerk of Court is directed to amend the official caption as set forth above.

[**] Judge John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

3

**A-314**

indirectly, to the designees or families of incarcerated or deceased terrorists, respectively, whose acts of terror injured or killed a United States national, or (2) undertake any activities within the United States, subject to limited exceptions. 18 U.S.C. § 2334(e). In light of this new statute, the Supreme Court vacated and remanded our decision denying the motion to recall the mandate, and we in turn remanded the case to the district court for the limited purpose of considering the PSJVTA. The district court (Daniels, J.) concluded that the defendants had engaged in jurisdiction-triggering conduct under the statute, but that the PSJVTA violated constitutional due process requirements. Both the plaintiffs and the Government now dispute the latter conclusion, and the plaintiffs argue generally that the PSJVTA justifies recalling the mandate.

In Fuld v. Palestine Liberation Organization, __ F.4th __, No. 22-76 (2d Cir. Sept. 8, 2023), which we also decide today, we conclude that the PSJVTA's provision for "deemed consent" to personal jurisdiction is inconsistent with the Fifth Amendment's Due Process Clause. Thus, no basis exists to recall the mandate in this case, and the plaintiffs' motion to recall the mandate is **DENIED**.

_____

KENT A. YALOWITZ, Arnold & Porter Kaye Scholer LLP, New York, NY (Avishai D. Don, Arnold & Porter Kaye Scholer LLP, New York, NY, Allon Kedem, Dirk C. Phillips, Stephen K. Wirth, Bailey M. Roe, Arnold & Porter Kaye Scholer LLP, Washington, D.C., *on the brief*), *for Plaintiffs-Appellants.*

MITCHELL R. BERGER, Squire Patton Boggs (US) LLP, Washington, D.C. (Gassan A. Baloul, Squire Patton Boggs (US) LLP, Washington, D.C., *on the brief*), *for Defendants-Appellees.*

BENJAMIN H. TORRANCE, Assistant United States Attorney, Of Counsel *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY (Brian M. Boynton, Principal Deputy Assistant Attorney General, Sharon Swingle, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice,

4

**A-315**

Washington, D.C., *on the brief*), *for Intervenor-Appellant United States of America.*

Tejinder Singh, Sparacino PLLC, Washington, D.C., *for Amici Curiae Abraham D. Sofaer and Louis J. Freeh in Support of Plaintiffs-Appellants and Intervenor-Appellant.*

J. Carl Cecere, Cecere PC, Dallas, TX, *for Amici Curiae Senators and Representatives Charles E. Grassley, Jerrold Nadler, Richard Blumenthal, James Lankford, Sheldon Whitehouse, Kathleen Rice, Bradley E. Schneider, and Grace Meng in Support of Plaintiffs-Appellants and Intervenor Appellant.*

Joshua E. Abraham, Abraham Esq. PLLC, New York, NY, *for Amici Curiae Constitutional Law Scholars Philip C. Bobbitt, Michael C. Dorf, and H. Jefferson Powell in Support of Plaintiffs-Appellants.*

Dina Gielchinsky, Osen LLC, Hackensack, NJ, *for Amici Curiae Organizations Providing Support to Victims of Terror in Support of Plaintiffs-Appellants.*

Tad Thomas, Jeffrey R. White, American Association for Justice, Washington, D.C., *for Amici Curiae American Association for Justice in Support of Plaintiffs-Appellants.*

————————

PER CURIAM:

The plaintiffs, a group of United States citizens injured during terror attacks in Israel and the estates or survivors of United States citizens killed in such attacks, brought this action against the Palestine Liberation Organization ("PLO") and the

5

**A-316**

Palestinian Authority ("PA") pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, seeking damages for alleged violations of the ATA related to those attacks. See id. § 2333(a). On appeal from a substantial post-trial judgment entered against the defendants, this Court concluded that the district court lacked both general and specific personal jurisdiction over the PLO and the PA. See Waldman v. Palestine Liberation Org., 835 F.3d 317, 344 (2d Cir. 2016) ("Waldman I"), cert. denied sub nom. Sokolow v. Palestine Liberation Org., 138 S. Ct. 1438 (2018) (mem.). We accordingly vacated the judgment and remanded the action for dismissal of the plaintiffs' claims. Id. Our mandate issued on November 28, 2016.

Since that time, Congress has twice enacted statutes purporting to establish personal jurisdiction over the PLO and the PA on the basis of consent, which, when validly given, may constitute an independent basis for subjecting a defendant to suit in a forum lacking general and specific jurisdiction. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 & n.14 (1985); Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703–04 (1982); see also Mallory v. Norfolk S. Ry. Co., 143 S. Ct. 2028, 2039 (2023) (plurality opinion). After the passage of the first such statute, the Anti-Terrorism Clarification Act of 2018 ("ATCA"), Pub. L. No. 115-253, 132 Stat. 3183, the plaintiffs moved to recall the

6

**A-317**

mandate in this case. In June 2019, we denied that motion because the ATCA's prerequisites for personal jurisdiction had not been satisfied. See Waldman v. Palestine Liberation Org., 925 F.3d 570, 574–76 (2d Cir. 2019) ("Waldman II") (per curiam), cert. granted, judgment vacated sub nom. Sokolow v. Palestine Liberation Org., 140 S. Ct. 2714 (2020) (mem.).

Congress responded with the enactment of the statute now at issue, the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082. The PSJVTA provides that the PLO and the PA "shall be deemed to have consented to personal jurisdiction" in any civil ATA action, irrespective of "the date of the occurrence" of the underlying "act of international terrorism," upon engaging in certain forms of post-enactment conduct, namely (1) making payments, directly or indirectly, to the designees or families of incarcerated or deceased terrorists, respectively, whose acts of terror injured or killed a United States national, or (2) undertaking any activities within the United States, subject to a handful of exceptions. 18 U.S.C. § 2334(e)(1).

The Supreme Court vacated and remanded our decision in Waldman II in light of the PSJVTA's enactment, see Sokolow, 140 S. Ct. 2714, and we in turn remanded to the district court for the limited purpose of considering the new

7

A-318

statute's effect on this case. The district court (Daniels, <u>J.</u>) concluded that the defendants had engaged in jurisdiction-triggering conduct under the statute, but that the PSJVTA's "deemed consent" provision violated constitutional due process requirements. The plaintiffs dispute the latter conclusion, and they argue generally that the PSJVTA justifies recalling this Court's mandate. The Government, as intervenor pursuant to 28 U.S.C. § 2403(a) and Federal Rule of Civil Procedure 5.1(c), joins the plaintiffs in defending the PSJVTA's constitutionality.

We address the very same constitutional issue in <u>Fuld v. Palestine Liberation Organization</u>, __ F.4th __, No. 22-76 (2d Cir. Sept. 8, 2023), which we also decide today. In <u>Fuld</u>, we conclude that the PSJVTA's provision for "deemed consent" to personal jurisdiction is inconsistent with the Due Process Clause of the Fifth Amendment. Thus, the statute cannot be applied to establish personal jurisdiction over the PLO or the PA, and as a result, no basis exists to recall the mandate in this case.

## I. BACKGROUND

We assume familiarity with <u>Waldman I</u>, <u>Waldman II</u>, and our decision today in <u>Fuld</u>, which collectively detail the history of this litigation and the relevant statutory background.

8

**A-319**

The plaintiffs commenced this action against the PLO and the PA in 2004, invoking the ATA's civil damages remedy for "national[s] of the United States injured . . . by reason of an act of international terrorism."[1] 18 U.S.C. § 2333(a). Throughout the pretrial proceedings, the PLO and the PA repeatedly moved to dismiss the claims against them for lack of personal jurisdiction. All of those motions were denied. The district court determined that it could exercise general jurisdiction over the defendants, see Sokolow v. Palestine Liberation Org., No. 04-cv-397, 2011 WL 1345086, at *7 (S.D.N.Y. Mar. 30, 2011), even after the Supreme Court narrowed the applicable test for general jurisdiction in Daimler AG v. Bauman, 571 U.S. 117 (2014).[2] See Sokolow v. Palestine Liberation Org., No. 04-cv-397, 2014 WL 6811395, at *1 (S.D.N.Y. Dec. 1, 2014).

After a seven-week trial beginning in January 2015, a jury found the defendants liable for six of the terror attacks at issue and awarded damages of

---

[1] As explained in Fuld, the PA was established under the 1993 Oslo Accords to serve as the non-sovereign and interim governing body of parts of the Gaza Strip and the West Bank (collectively referred to here as "Palestine"). The PLO, an entity founded in 1964, conducts Palestine's foreign affairs and serves as a Permanent Observer to the United Nations on behalf of the Palestinian people.

[2] For procedural reasons not relevant here, the proceedings before the district court are captioned differently, as Sokolow v. Palestine Liberation Organization, No. 04-cv-397 (S.D.N.Y.).

9

**A-320**

$218.5 million, an amount automatically trebled to $655.5 million pursuant to the ATA. See Waldman I, 835 F.3d at 322, 324; 18 U.S.C. § 2333(a). During the trial and again in post-trial briefing, the defendants unsuccessfully reasserted their argument that the case should be dismissed for lack of personal jurisdiction. The district court rejected those arguments and entered final judgment. The defendants then made the same arguments on appeal to this Court.

In Waldman I, this Court agreed with the defendants. The decision explained that the PLO and the PA have a Fifth Amendment due process right not to be sued in a forum with which they have insufficient contacts, see Waldman I, 835 F.3d at 329, and that the personal jurisdiction analysis is "basically the same under both the Fifth and Fourteenth Amendments," id. at 330. Applying Daimler, we determined that the district court lacked general jurisdiction because the PLO and the PA are not "at home" in the United States, but "in Palestine, where these entities are headquartered and from where they are directed." Id. at 334 (emphasis omitted) (citing Daimler, 571 U.S. at 139 n.20). We also found that the district court could not subject the defendants to specific jurisdiction, given the absence of any "substantial connection" between their "suit-related conduct — their role in the six terror attacks at issue — [and] . . . the forum." Id. at 335 (citing Walden v. Fiore,

10

**A-321**

571 U.S. 277, 284 (2014)). Thus, "[t]he district court could not constitutionally exercise either general or specific personal jurisdiction over the defendants." Id. at 344. We vacated the judgment of the district court and remanded the action "with instructions to dismiss the case for want of personal jurisdiction."[3] Id. at 322.

Our mandate issued on November 28, 2016. See Judgment Mandate, No. 15-3135, Doc. No. 248 (2d Cir. Nov. 28, 2016). The plaintiffs then filed a petition for a writ of certiorari, which was denied in April 2018. See Sokolow, 138 S. Ct. at 1438.

Congress responded to Waldman I and similar decisions with the enactment of the ATCA, Pub. L. No. 115-253, 132 Stat. 3183, a precursor to the statute at issue here. The ATCA amended the ATA to include a new subsection, 18 U.S.C. § 2334(e), which provided that a defendant would "be deemed to have consented to personal jurisdiction in . . . [a civil ATA] action if," following a 120-day period after the ATCA's enactment, the defendant (1) "accept[ed]" certain "form[s] of

---

[3] As discussed in Fuld, the United States Court of Appeals for the District of Columbia Circuit similarly concluded that federal courts lacked both general and specific jurisdiction over the PLO and the PA in civil ATA cases related to terrorist activity abroad. See Livnat v. Palestinian Auth., 851 F.3d 45, 54–58 (D.C. Cir. 2017) (concluding that exercising general or specific jurisdiction over the PA would not "meet the requirements of the Fifth Amendment's Due Process Clause"), cert. denied, 139 S. Ct. 373 (2018) (mem.); see also Shatsky v. Palestine Liberation Org., 955 F.3d 1016, 1036–37 (D.C. Cir. 2020) (same as to both the PLO and the PA); Est. of Klieman v. Palestinian Auth., 923 F.3d 1115, 1123–26 (D.C. Cir. 2019) (same), judgment vacated on other grounds, 140 S. Ct. 2713 (2020) (mem.), opinion reinstated in part, 820 F. App'x 11 (D.C. Cir. 2020) (mem.).

11

assistance" from the United States, or (2) "maintain[ed]" an office "within the jurisdiction of the United States" pursuant to a waiver or suspension of 22 U.S.C. § 5202, a provision barring the PLO from operating any such office. ATCA § 4, 132 Stat. at 3184. The ATCA took effect on October 3, 2018.

Several days later, on October 8, 2018, the plaintiffs filed a motion to recall the November 2016 mandate issued in this action. The plaintiffs argued that the ATCA established personal jurisdiction over the defendants with regard to the previously dismissed claims. We rejected that contention in Waldman II, reasoning that "[t]he plaintiffs ha[d] not shown that either factual predicate . . . of the ATCA [was] satisfied." 925 F.3d at 574. Specifically, the plaintiffs did not dispute that the PLO and the PA were no longer "accept[ing] qualifying assistance" from the United States, and they had failed to show that the defendants were maintaining any offices "within the jurisdiction of the United States" while "benefit[ing] from a waiver or suspension" of 22 U.S.C. § 5202. Id. at 574–75. For these reasons, and in light of "[t]his Court's interest in finality," we concluded that the circumstances did not "warrant invoking the extraordinary remedy of recalling a mandate issued two and a half years" earlier. Id. at 575–76.

12

**A-323**

Accordingly, on June 3, 2019, the plaintiffs' motion to recall the mandate was denied. Id. at 576.

While the plaintiffs' petition for a writ of certiorari from Waldman II was pending, Congress acted again, this time enacting the PSJVTA on December 20, 2019. See Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082. A detailed description of the PSJVTA is set forth in Fuld. Briefly, § 903(c) of the PSJVTA superseded the ATCA provision codified at 18 U.S.C. § 2334(e), resulting in a narrowed definition of the term "defendant," which now refers solely to the PLO, the PA, and any "successor[s]" or "affiliate[s]" thereof.[4] 18 U.S.C. § 2334(e)(5). The PSJVTA also specified new post-enactment conduct that would be "deemed" to constitute "consent" to personal jurisdiction in civil ATA actions, "regardless of the date of the occurrence of the act of international terrorism upon which such civil action was filed." Id. § 2334(e)(1).

These new factual predicates for "deemed consent" are listed in two prongs, subparagraphs (A) and (B) of 18 U.S.C. § 2334(e)(1). The first prong provides that

---

[4] As stated in Fuld, the PSJVTA also includes a number of additional provisions, but we do not pass on the constitutionality of any portion of the PSJVTA other than § 903(c). For purposes of clarity, this opinion refers to § 903(c) as the PSJVTA, which is consistent with the opinion in Fuld, as well as with the nomenclature used in the district court's decisions and the parties' briefs on appeal.

"a defendant shall be deemed to have consented to personal jurisdiction" if, after April 18, 2020, the defendant "makes any payment, directly or indirectly":

(i) to any payee designated by any individual who, after being fairly tried or pleading guilty, has been imprisoned for committing any act of terrorism that injured or killed a national of the United States, if such payment is made by reason of such imprisonment; or

(ii) to any family member of any individual, following such individual's death while committing an act of terrorism that injured or killed a national of the United States, if such payment is made by reason of the death of such individual.

Id. § 2334(e)(1)(A). Under the second prong, "a defendant shall be deemed to have consented to personal jurisdiction" if, after January 4, 2020, the defendant "continues to maintain," "establishes," or "procures any office, headquarters, premises, or other facilities or establishments in the United States," or otherwise "conducts any activity while physically present in the United States on behalf of the [PLO] or the [PA]." Id. § 2334(e)(1)(B). The PSJVTA exempts "certain activities and locations" from the reach of this second prong, including, among others, conduct related to "official business of the United Nations."[5] Id. § 2334(e)(3).

---

[5] In particular, and as discussed in Fuld, the PSJVTA includes exceptions for facilities and activities devoted "exclusively [to] the purpose of conducting official business of the United Nations," id. § 2334(e)(3)(A)–(B), specified activities related to engagements with United States officials or legal representation, id. § 2334(e)(3)(C)–(E), and any activities "ancillary to [those] listed" in these exceptions, id. § 2334(e)(3)(F). Congress also provided

14

**A-325**

Several months after the PSJVTA's enactment, the Supreme Court granted the plaintiffs' petition for a writ of certiorari, vacated the judgment in Waldman II, and remanded the case "for further consideration in light of the [PSJVTA]." Sokolow, 140 S. Ct. at 2714. On September 8, 2020, this Court in turn issued an order pursuant to United States v. Jacobson, 15 F.3d 19, 22 (2d Cir. 1994), remanding the action to the district court "for the limited purposes of determining the applicability of the PSJVTA to this case, and, if the PSJVTA is determined to apply, any issues regarding its application to this case including its constitutionality," Order, No. 15-3135, Doc. No. 368 (Sept. 8, 2020). We stated that "[a]fter the district court has concluded its consideration, the case will be returned to this Court for further proceedings," and that in the meantime, the plaintiffs' motion to recall the November 2016 mandate would be "held in abeyance." Id.

After this limited remand to the district court, the Government intervened in the action to defend the constitutionality of the PSJVTA. See 28 U.S.C. § 2403(a); Fed. R. Civ. P. 5.1(c). Several months later, on March 10, 2022, the district court issued a decision related to the questions presented in our Jacobson remand order. See Sokolow v. Palestine Liberation Org., 590 F. Supp. 3d 589 (S.D.N.Y.),

---

that the PSJVTA "shall apply to any case pending on or after August 30, 2016," PSJVTA § 903(d)(2), 133 Stat. at 3085, just one day before this Court's decision in Waldman I.

15

A-326

reconsideration denied, 607 F. Supp. 3d 323 (S.D.N.Y. 2022). The district court found that the defendants had triggered the PSJVTA's first prong, 18 U.S.C. § 2334(e)(1)(A), because the "[p]laintiffs ha[d] presented sufficient evidence to support the determination that [the] [d]efendants . . . made [qualifying] payments after April 18, 2020."[6] Id. at 594. Nonetheless, the district court determined that "[t]he conduct identified in the [first prong] is insufficient to support a finding that [the] [d]efendants have consented to personal jurisdiction," id. at 596, and accordingly, the statute "violate[s] [constitutional] due process," id. at 597.

On March 24, 2022, we reinstated the proceedings concerning the plaintiffs' motion to recall the mandate. The plaintiffs then moved for reconsideration of the district court's March 10, 2022 decision, specifically requesting that the district court make factual findings under the PSJVTA's second prong and consider its constitutionality. We stayed the proceedings in this Court pending the resolution of that motion.

---

[6] Specifically, the district court found that the defendants had made payments "to the families of individuals killed while committing acts of terrorism . . . [that] harmed U.S. nationals," thereby triggering 18 U.S.C. § 2334(e)(1)(A)(ii). Sokolow, 590 F. Supp. 3d at 594. The district court did not address whether the defendants had made payments to the designees of incarcerated terrorists, see 18 U.S.C. § 2334(e)(1)(A)(i), and it also declined to "reach the issue of whether the factual predicates in . . . 18 U.S.C. § 2334(e)(1)(B)," the PSJVTA's second prong, "ha[d] been met." Sokolow, 590 F. Supp. 3d at 595 n.3.

16

A-327

The district court denied the motion for reconsideration on June 15, 2022.

See Sokolow v. Palestine Liberation Org., 607 F. Supp. 3d 323, 324 (S.D.N.Y. 2022).

It declined to resolve the parties' factual dispute as to whether the defendants'

United States activities were exempt from the PSJVTA's second prong, because

"[e]ven accepting [the] [p]laintiffs' argument" that no exception applied, the

"types of conduct" at issue did not evince "any intention on the part of [the]

[d]efendants to legally submit to suit in the United States."[7]  Id. at 326. In light of

that determination and its March 10, 2022 decision, the district court concluded

that "the exercise of [personal] jurisdiction under either of the PSJVTA's two

jurisdiction-triggering prongs would violate due process." Id. at 327–28.

With the plaintiffs' motion for reconsideration resolved, we lifted the stay

on these proceedings concerning the motion to recall the mandate.

---

[7] To support their argument that the defendants had engaged in nonexempt activities "while physically present in the United States," 18 U.S.C. § 2334(e)(1)(B)(iii), the plaintiffs pointed to the defendants' "provision of consular services in the United States, their interviews with prominent media and social media activity, and their maintenance of an office in New York." Sokolow, 607 F. Supp. 3d at 325. The defendants did "not dispute" that they had engaged in these activities; instead, the defendants argued that all of the conduct in question fell within the PSJVTA's exemptions for UN-related conduct. Id. at 325–26; see 18 U.S.C. § 2334(e)(3)(A), (F). The district court found that it was unnecessary to resolve this issue, and we need not resolve it on appeal.

17

**A-328**

## II. DISCUSSION

Our principal task is to give "further consideration" to the motion at issue in <u>Waldman II</u> — that is, the plaintiffs' October 2018 motion to recall this Court's November 2016 mandate — "in light of the [PSJVTA]." <u>Sokolow</u>, 140 S. Ct. at 2714.

"We possess an inherent power to recall a mandate, subject to review for abuse of discretion." <u>Taylor v. United States</u>, 822 F.3d 84, 90 (2d Cir. 2016) (internal quotation marks omitted and alteration adopted). However, "[i]n recognition of the need to preserve finality in judicial proceedings, . . . we exercise [this] authority sparingly and only in exceptional circumstances." <u>Id.</u> (internal quotation marks omitted and alteration adopted); <u>see also</u> <u>Calderon v. Thompson</u>, 523 U.S. 538, 550 (1998). In some cases, the enactment of a new statute might justify the exercise of our power to recall a previously issued mandate. <u>Cf.</u> <u>Sargent v. Columbia Forest Prods., Inc.</u>, 75 F.3d 86, 90 (2d Cir. 1996) (noting that a recall may be warranted where changes in governing law cast serious doubt on a previous judgment). But given today's decision in <u>Fuld</u>, this case is not one of them.

The plaintiffs make a variety of arguments in support of their position that "[t]his Court should recall the mandate, apply the PSJVTA in this case, and remand to the district court with instructions to reinstate its original judgment

18

**A-329**

based on the jury's verdict." Pls.' Br. at 2. All of those arguments, however, flow from the premise that the PSJVTA "establishes [consent-based] personal jurisdiction" over the PLO and the PA in a manner consistent with due process. Id. at 26. We reach the opposite conclusion today in Fuld, and we incorporate the entirety of Fuld's analysis here. Thus, as set forth in Fuld, the PSJVTA's provision for "deemed consent" to personal jurisdiction violates the Fifth Amendment's Due Process Clause.

Because we find in Fuld that the PSJVTA is unconstitutional, the statute cannot be applied to establish personal jurisdiction over the PLO or the PA in this case. Accordingly, no basis exists to recall the November 2016 mandate that issued after Waldman I, where we determined that the plaintiffs' claims had to be "dismiss[ed] . . . for want of personal jurisdiction." 835 F.3d at 322. In view of this conclusion, it is unnecessary to address the parties' various disputes that assume the constitutionality of the PSJVTA.

We reiterate that the terror attacks at issue in this litigation were "unquestionably horrific." Id. at 344. But as we stated in Waldman I and reaffirm today in Fuld, "the federal courts cannot exercise jurisdiction in a civil case beyond the limits" of the Due Process Clause, "no matter how horrendous the underlying

19

**A-330**

attacks or morally compelling the plaintiffs' claims." Id. The PSJVTA's provision for "deemed consent" to personal jurisdiction exceeds those constitutional limits, and accordingly, the statute supplies no basis for taking the extraordinary step of recalling this Court's mandate.

## CONCLUSION

We have considered all of the arguments of the parties and their amici. To the extent not specifically addressed above, those arguments are either moot or without merit. For the foregoing reasons, the plaintiffs' motion to recall the November 2016 mandate is **DENIED.**

20

**A-331**

# Supreme Court of the United States

### No.  24–20

### MIRIAM FULD, ET AL.,

Petitioners

*v.*

### PALESTINIAN LIBERATION ORGANIZATION, ET AL.;

### EVA WALDMAN, ET AL.,

Petitioners

*v.*

### PALESTINIAN LIBERATION ORGANIZATION, ET AL.;

### No.  24–151

### UNITED STATES,

Petitioner

*v.*

### PALESTINIAN LIBERATION ORGANIZATION, ET AL.;

### *and*

### UNITED STATES,

Petitioner

*v.*

### PALESTINIAN LIBERATION ORGANIZATION, ET AL.;

**ON WRITS OF CERTIORARI** to the United States Court of Appeals for the Second Circuit.

**THESE CAUSES** came on to be heard on the transcript of the record from the above court and were argued by counsel.

**A-332**

**ON CONSIDERATION WHEREOF**, it is ordered and adjudged by this Court that the judgments of the above court are reversed with costs, and the cases are remanded to the United States Court of Appeals for the Second Circuit for further proceedings consistent with the opinion of this Court.

**IT IS FURTHER ORDERED** that the petitioners, Miriam Fuld, et al., and United States, recover from Palestinian Liberation Organization, et al., Thirty-Two Thousand Six Hundred Forty Nine Dollars and Eight Cents ($32,649.08) for costs herein expended.

June 20, 2025

| | |
|---|---|
| **Printing Costs:** | **$32,349.08** |
| **Clerk's costs:** | **$300.00 (as to No. 24-20)** |
| **Total:** | **$32,649.08** |

A True copy SCOTT S. HARRIS

Clerk of the Supreme Court of the United States

**A-333**