15-3135-cv (L)
*Waldman v. Palestine Liberation Org.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2025
Motion Filed: August 11, 2025
Motion Decided: March 30, 2026

Docket Nos. 15-3135-cv (L), 15-3151-cv (XAP), 22-1060-cv (Con)

EVA WALDMAN, REVITAL BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, SHAUL MANDELKORN, NURIT MANDELKORN, OZ JOSEPH GUETTA, MINOR, BY HIS NEXT FRIEND AND GUARDIAN VARDA GUETTA, VARDA GUETTA, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFF OZ JOSEPH GUETTA, NORMAN GRITZ, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID GRITZ, MARK I. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAMIE A. SOKOLOW, RENA M. SOKOLOW, INDIVIDUALLY AND AS A NATURAL GUARDIAN OF PLAINTIFF JAIME A. SOKOLOW, JAMIE A. SOKOLOW, MINOR, BY HER NEXT FRIENDS AND GUARDIAN MARK I. SOKOLOW AND RENA M. SOKOLOW, LAUREN M. SOKOLOW, ELANA R. SOKOLOW, SHAYNA EILEEN GOULD, RONALD ALLAN GOULD, ELISE JANET GOULD, JESSICA RINE, SHMUEL WALDMAN, HENNA NOVACK WALDMAN, MORRIS WALDMAN, ALAN J. BAUER, INDIVIDUALLY AND AS NATURAL GUARDIAN OF PLAINTIFFS YEHONATHON BAUER, BINYAMIN BAUER, DANIEL BAUER AND YEHUDA BAUER, YEHONATHON BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, BINYAMIN BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, DANIEL BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, YEHUDA BAUER, MINOR, BY HIS NEXT FRIEND AND GUARDIANS DR. ALAN J. BAUER AND REVITAL BAUER, RABBI LEONARD MANDELKORN, KATHERINE BAKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF

BENJAMIN BLUTSTEIN, REBEKAH BLUTSTEIN, RICHARD BLUTSTEIN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BENJAMIN BLUTSTEIN, LARRY CARTER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DIANE ("DINA") CARTER, SHAUN COFFEL, DIANNE COULTER MILLER, ROBERT L COULTER, JR., ROBERT L. COULTER, SR., INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JANIS RUTH COULTER, CHANA BRACHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ELIEZER SIMCHA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, ESTHER ZAHAVA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, KAREN GOLDBERG, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STUART SCOTT GOLDBERG/NATURAL GUARDIAN OF PLAINTIFFS CHANA BRACHA GOLDBERG, ESTHER ZAHAVA GOLDBERG, YITZHAK SHALOM GOLDBERG, SHOSHANA MALKA GOLDBERG, ELIEZER SIMCHA GOLDBERG, YAAKOV MOSHE GOLDBERG, TZVI YEHOSHUA GOLDBERG, SHOSHANA MALKA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, TZVI YEHOSHUA GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YAAKOV MOSHE GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, YITZHAK SHALOM GOLDBERG, MINOR, BY HER NEXT FRIEND AND GUARDIAN KAREN GOLDBERG, NEVENKA GRITZ, SOLE HEIR OF NORMAN GRITZ, DECEASED,

*Plaintiffs – Appellants,*

UNITED STATES OF AMERICA,

*Intervenor – Appellant,*

—v.—

PALESTINE LIBERATION ORGANIZATION, PALESTINIAN AUTHORITY, AKA PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY AND/OR PALESTINIAN COUNCIL AND/OR PALESTINIAN NATIONAL AUTHORITY,

*Defendants – Appellees,*

YASSER ARAFAT, MARWIN BIN KHATIB BARGHOUTI, AHMED TALEB MUSTAPHA BARGHOUTI, AKA AL-FARANSI, NASSER MAHMOUD AHMED AWEIS, MAJID AL-MASRI, AKA ABU MOJAHED, MAHMOUD AL-TITI, MOHAMMED ABDEL RAHMAN SALAM MASALAH, AKA ABU SATKHAH, FARAS SADAK MOHAMMED GHANEM, AKA HITAWI, MOHAMMED SAMI IBRAHIM ABDULLAH, ESTATE OF SAID RAMADAN, DECEASED, ABDEL KARIM RATAB YUNIS AWEIS, NASSER JAMAL MOUSA SHAWISH, TOUFIK TIRAWI, HUSSEIN AL-SHAYKH, SANA'A MUHAMMED SHEHADEH, KAIRA SAID ALI SADI, ESTATE OF MOHAMMED HASHAIKA, DECEASED, MUNZAR MAHMOUD KHALIL NOOR, ESTATE OF WAFA IDRIS, DECEASED, ESTATE OF MAZAN FARITACH, DECEASED, ESTATE OF MUHANAD ABU HALAWA, DECEASED, JOHN DOES, 1-99, HASSAN ABDEL RAHMAN,

*Defendants.*

---

Before: LEVAL AND BIANCO, Circuit Judges, AND KOELTL, District Judge.*

The plaintiffs are a group of United States citizens who were injured during terrorist attacks in Israel (and their estates and survivors). They brought this action against the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA") pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, seeking damages for alleged violations of the ATA related to those attacks. This Court concluded on appeal that the district court lacked personal jurisdiction over the PLO and the PA. We therefore vacated the judgment entered against the

---

* The Honorable John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

defendants and issued a mandate that remanded the action to the district court with instructions that the district court dismiss the case. The plaintiffs subsequently requested that we recall the mandate based on a new statute, the Anti-Terrorism Clarification Act of 2018 ("ATCA"), Pub. L. No. 115-253, 132 Stat. 3183. We denied that motion on the ground that the statute's prerequisites had not been met.

Congress then enacted yet another statute, the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082. The PSJVTA provides that the PLO and the PA "shall be deemed to have consented to personal jurisdiction" in any civil ATA action if, after a specified time subsequent to the enactment of the PSJVTA, those entities either (1) make payments, directly or indirectly, to the designees or families of incarcerated or deceased terrorists, whose acts of terror injured or killed a United States national, if such payment is made by reason of the terrorist's incarceration or death, or (2) undertake any activities within the United States, subject to limited exceptions. Id. § 903(c).

The Supreme Court vacated and remanded our judgment denying the motion to recall the mandate in light of the PSJVTA. We in turn remanded the case

to the district court to consider whether the PSJVTA applied and, if so, whether exercising personal jurisdiction was constitutional. The district court (Daniels, J.) concluded that the defendants had engaged in jurisdiction-triggering conduct under the PSJVTA, but that the statute was inconsistent with constitutional due process. The plaintiffs again appealed the district court's judgment.

This Court ruled in Fuld v. Palestine Liberation Organization, 82 F.4th 74 (2d Cir. 2023), that the PSJVTA was inconsistent with the Fifth Amendment's Due Process Clause, which we held was coextensive with the Fourteenth Amendment's Due Process Clause. On the basis of our holding in Fuld, we affirmed the district court's judgment in this case and again declined the plaintiffs' request that we recall our original mandate. Waldman v. Palestine Liberation Organization, 82 F.4th 64 (2d Cir. 2023) (per curiam).

The Supreme Court again granted certiorari, this time reversing and remanding our judgment on the ground that the Fifth Amendment does not impose the same limitations on jurisdiction as the Fourteenth Amendment. Moreover, the PSJVTA tied federal jurisdiction to conduct closely related to the United States that implicates important foreign policy concerns. The plaintiffs now move again to recall our original mandate and to affirm the original judgment for

the plaintiffs. The plaintiffs' motion is **GRANTED**. The original judgment of the district court is **AFFIRMED**.

---

KENT A. YALOWITZ, Arnold & Porter Kaye Scholer LLP, New York, NY (Avishai D. Don, Arnold & Porter Kaye Scholer LLP, New York, NY, Allon Kedem, Dirk C. Phillips, Stephen K. Wirth, Bailey M. Roe, Arnold & Porter Kaye Scholer LLP, Washington, D.C., on the brief), for Plaintiffs-Appellants.

MITCHELL R. BERGER, Squire Patton Boggs (US) LLP, Washington, D.C. (Gassan A. Baloul, Squire Patton Boggs (US) LLP, Washington, D.C., on the brief), for Defendants-Appellees.

Damian Williams, United States Attorney for the Southern District of New York, Benjamin H. Torrance, Assistant United States Attorney, Of Counsel, Brian M. Boynton, Principal Deputy Assistant Attorney General, Sharon Swingle, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, for Intervenor-Appellant United States of America.

Tejinder Singh, Sparacino PLLC, Washington, D.C., for Amici Curiae Abraham D. Sofaer and Louis J. Freeh in Support of Plaintiffs-Appellants and Intervenor-Appellant.

J. Carl Cecere, Cecere PC, Dallas, TX, for Amici Curiae Senators and Representatives Charles E. Grassley, Jerrold Nadler, Richard Blumenthal, James Lankford, Sheldon Whitehouse, Kathleen Rice, Bradley E.

Schneider, and Grace Meng in Support of Plaintiffs-Appellants and Intervenor Appellant.

Joshua E. Abraham, Abraham Esq. PLLC, New York, NY, for Amici Curiae Constitutional Law Scholars Philip C. Bobbitt, Michael C. Dorf, and H. Jefferson Powell in Support of Plaintiffs-Appellants.

Dina Gielchinsky, Osen LLC, Hackensack, NJ, for Amici Curiae Organizations Providing Support to Victims of Terror in Support of Plaintiffs-Appellants.

Tad Thomas, Jeffrey R. White, American Association for Justice, Washington, D.C., for Amici Curiae American Association for Justice in Support of Plaintiffs-Appellants.

---

KOELTL, District Judge:

This case returns to us on remand from the Supreme Court.

The Supreme Court's recent decision in Fuld v. Palestine Liberation Organization, 606 U.S. 1 (2025), reversed and remanded this Court's judgment in Waldman v. Palestine Liberation Organization (Waldman III), 82 F.4th 64 (2d Cir. 2023) (per curiam). Waldman III had held that the personal-jurisdiction provision of the Promoting Security and Justice for Victims of Terrorism Act (the "PSJVTA"), Pub. L. No. 116-94, § 903(c), 133 Stat. 2534, 3082, violated the Due Process Clause

of the Fifth Amendment, which followed the Due Process Clause of the Fourteenth Amendment.

The Supreme Court reversed our judgment and held that

> the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority.... The PSJVTA ties federal jurisdiction to conduct closely related to the United States that implicates important foreign policy concerns.… It is sufficient unto the day that, whatever the Fifth Amendment's outer limits on the territorial jurisdiction of federal courts, the PSJVTA does not transgress them.

Fuld, 606 U.S. at 16–19.

The parties in this case now dispute the effect of the Supreme Court's decision. The plaintiffs argue that the Supreme Court has ruled that the original district court judgment in favor of the plaintiffs has been reinstated. The Palestine Liberation Organization (the "PLO") and the Palestinian Authority (the "PA") argue that the original judgment in favor of the plaintiffs cannot be reinstated because, among other reasons, there was no jurisdiction to enter the judgment at the time it was entered. We conclude that the original judgment for the plaintiffs should be reinstated. That conclusion is consistent with the plain import of the Supreme Court's decision.

## BACKGROUND

The plaintiffs are a group of United States citizens who were injured during terrorist attacks in Israel (and their estates and survivors). The plaintiffs brought this action against the PLO and the PA pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, seeking damages for alleged violations of the ATA related to those attacks. After a seven-week trial, a jury returned a verdict for the plaintiffs. On October 1, 2015, the district court (Daniels, J.) entered judgment for the plaintiffs in the total amount of $655.5 million.

On appeal, this Court held that the district court lacked personal jurisdiction over the defendants. Waldman v. Palestine Liberation Org. (Waldman I), 835 F.3d 317, 344 (2d Cir. 2016). The Court vacated the district court's judgment and remanded the action with instructions to dismiss the case. Id. The Court entered judgment on August 31, 2016, and issued its mandate on November 28, 2016. The plaintiffs filed a petition for a writ of certiorari, which the Supreme Court denied on April 2, 2018. Sokolow v. Palestine Liberation Org., 584 U.S. 915 (2018) (Mem.).[1]

---

[1] This case has been recaptioned Waldman v. Palestine Liberation Organization. For procedural reasons not relevant here, however, the proceedings before the district court are captioned differently as Sokolow v. Palestine Liberation Organization, No. 04-cv-397, 2011 WL 1345086 (S.D.N.Y.). See Waldman III, 82 F.4th at 69 n.2.

On October 3, 2018, Congress enacted the Anti-Terrorism Clarification Act of 2018 (the "ATCA"), Pub. L. No. 115–253, 132 Stat. 3183. On October 8, 2018, the plaintiffs moved to recall the mandate in this case based on the ATCA. To preserve their options given the statute of limitations, the plaintiffs filed a second complaint alleging the same claims as those advanced in the original litigation. See Complaint, Sokolow v. Palestine Liberation Org., No. 18-cv-12213 (S.D.N.Y. Dec. 27, 2018), ECF No. 6. This second action has been stayed but remains pending. See Order, Sokolow v. Palestine Liberation Org., No. 18-cv-12213 (S.D.N.Y. Sept. 17, 2019), ECF No. 18.

This Court denied the plaintiffs' motion to recall the mandate because the statute's jurisdictional requirements had not been satisfied. Waldman v. Palestine Liberation Org. (Waldman II), 925 F.3d 570, 574–75 (2d Cir. 2019) (per curiam). The plaintiffs again petitioned the Supreme Court for a writ of certiorari. While the plaintiffs' petition was pending, Congress enacted, and the President signed, the PSJVTA. The PSJVTA provides that the PLO and the PA "shall be deemed to have consented to personal jurisdiction" in any civil ATA action if, after a specified time subsequent to the PSJVTA's enactment, those entities either (1) make payments, directly or indirectly, to the designees or families of incarcerated or deceased ter-

rorists whose acts of terror injured or killed United States citizens, if such payment is made by reason of the terrorist's incarceration or death, or (2) undertake any activity within the United States, subject to enumerated exceptions.[2] Id. § 903(c).

In light of the PSJVTA, the Supreme Court granted the plaintiffs' petition, vacated this Court's judgment denying the motion to recall the mandate, and remanded for further consideration. Sokolow v. Palestine Liberation Org., 590 U.S. 921 (2020) (Mem.). This Court in turn remanded the action to the district court to determine in the first instance whether the PSJVTA applied and, if so, whether it comported with due process. On remand, the district court concluded that the defendants had engaged in conduct sufficient to establish personal jurisdiction under the PSJVTA, but that the statute violated the Due Process Clause of the Fifth Amendment. Sokolow v. Palestine Liberation Org., 590 F. Supp. 3d 589, 595–97 (S.D.N.Y. 2022), reconsideration denied, 607 F. Supp. 3d 323 (S.D.N.Y. 2022).

The plaintiffs appealed again. According to the defendants, the district court correctly held that the PSJVTA was unconstitutional. The defendants also argued, however, that even if the PSJVTA were constitutional, that statute could not revive

---

[2] Unless otherwise noted, this Opinion omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

the district court's original judgment, which was rendered before the PSJVTA was enacted and thus was still void. Moreover, the defendants claimed that they would be entitled to a retrial if this Court's decision vacating the judgment for the plaintiffs was itself vacated because the district court abused its discretion in the original trial by admitting certain portions of the plaintiffs' experts' testimony.

This Court held in Fuld v. Palestine Liberation Organization, 82 F.4th 74 (2d Cir. 2023), that the PSJVTA violated the Due Process Clause of the Fifth Amendment, which was coextensive with the Due Process Clause of the Fourteenth Amendment under circuit precedent. We incorporated that analysis in Waldman III and again declined to recall the mandate. The Supreme Court granted the plaintiffs' petition for certiorari, reversed this Court's judgments in Fuld and Waldman III, and remanded for further proceedings consistent with the Supreme Court's opinion.

## DISCUSSION

We must decide three questions in light of the Supreme Court's decision in Fuld. First, should we recall the November 28, 2016, mandate instructing the district court to vacate its judgment for the plaintiffs and to dismiss the case? Second, is the district court's original judgment unsalvageable because the district court lacked personal jurisdiction over the defendants when it rendered the

judgment? And third, if recalling the mandate is appropriate and the original district court judgment is not void, are the defendants entitled to a new trial on the ground that the district court erroneously admitted certain expert testimony?

**I.**

Initially, the parties dispute whether it is necessary to recall the November 2016 mandate that instructed the district court to vacate its judgment in favor of the plaintiffs. In the plaintiffs' view, the Supreme Court's decision in Fuld, which reversed and remanded this Court's decision in Waldman III, automatically reopened the case before the district court. But even if the Fuld decision did not reopen the case, the plaintiffs contend that this Court should exercise its discretion to recall the November 2016 mandate and reopen the case.

The plaintiffs' first argument is unpersuasive. In their view, the Supreme Court's decision to reverse and remand this Court's judgment in Waldman III, rather than to vacate and remand, "supports the conclusion that the case has already been reopened." Pls.' Mot. to Remand ("Remand Mot.") 8, ECF No. 631. The plaintiffs claim that "[t]his Court has issued one judgment in this case, in 2016," and thus the "Supreme Court has … reversed this Court's 2016 judgment—i.e., its holding that the district court could not constitutionally exercise personal jurisdiction over the defendants in this case." Id. at 9.

The plaintiffs are mistaken. This Court decided in Waldman III that the PSJVTA violated the Fifth Amendment's Due Process Clause, which under existing circuit precedent was coextensive with the Fourteenth Amendment's Due Process Clause. This Court denied the plaintiffs' motion to recall the mandate on that basis. The Supreme Court held that this Court used the wrong test to analyze the constitutionality of the PJSVTA under the Fifth Amendment and thus this Court's basis for declining to recall the mandate rested on a legal error. The Supreme Court did not hold that this Court must recall the mandate. Indeed, there was no discussion in Fuld about recalling the mandate that was issued in 2016.

The Supreme Court's reversal and remand of the decision in Waldman III therefore requires this Court to consider again whether to recall its 2016 mandate. In conducting that analysis, we must first decide whether, as the PLO and the PA contend, recalling the mandate would be futile because the PSJVTA's jurisdiction-creating language does not apply retroactively to the PLO and the PA in the Sokolow action. If the PSJVTA can extend personal jurisdiction over the defendants in the Sokolow action, then we must decide whether this Court should exercise its discretion to recall the mandate.

**A.**

The defendants' main argument is that recalling the mandate would be futile because the PSJVTA does not and cannot create personal jurisdiction retroactively.

In Fuld, the Supreme Court explained that the Fifth Amendment's Due Process Clause imposes fewer limits on the territorial jurisdiction of the federal courts than the Fourteenth Amendment's Due Process Clause. Although the Court declined to delineate the Fifth Amendment's outer boundaries, the Court concluded that the combined foreign-policy judgment of the political branches and the narrowness of the statute justified the PSJVTA's jurisdictional provisions. "In respectively passing and signing the PSJVTA into law, Congress and the President made a considered judgment to subject the PLO and PA to liability in U.S. courts as part of a comprehensive legal response to 'halt, deter, and disrupt' acts of international terrorism that threaten the life and limb of American citizens." Fuld, 606 U.S. at 19–20 (quoting H.R. Rep. No. 115–858, pp. 7–8 (2018)). "The PSJVTA thus reflects the political branches' balanced judgment of competing concerns over 'sensitive and weighty interests of national security and foreign affairs' and fairness to these particular defendants …." Id. at 20 (quoting Holder v. Humanitarian Law Project, 561 U.S. 1, 33–34 (2010)). The Court also held that

the statute was "suitably limited to those ends." Id. It applies only to ATA cases; its "jurisdiction triggering predicates are likewise narrow"; and it "limits jurisdiction to only two enumerated nonsovereign foreign entities, both of which have been subject to a series of congressional enactments aimed at deterring terrorism." Id. at 21.

According to the defendants, "Fuld's Fifth Amendment analysis" "depended on post-enactment conduct," and thus "does not allow the exercise of jurisdiction to support a pre-PSJVTA money judgment in Sokolow." Defs.' Response to Pls.' Mot. to Remand ("Remand Opp'n") 15–16, ECF No. 640. That is allegedly because "[b]efore the PSJVTA, there was no 'considered judgment' by [the executive and legislative] branches to subject Defendants to personal jurisdiction." Id. at 17.

This argument fails because it confuses the content of the political branches' "considered judgment" with its timing. Congress and the President made the relevant judgment in 2019, when they respectively passed and signed into law the PSJVTA—more than three years after the original trial. But "a 'key premise' of the PSJVTA was Congress's desire to facilitate 'the adjudication of ATA claims like the plaintiffs',' which it views as 'vital' to 'furthering the safety of Americans abroad,

facilitating compensation for injuries or death, and deterring international terrorism.'" Fuld, 606 U.S. at 20 (emphasis added); see also Pub. L. No. 116–94, § 903(d)(1)(A) (providing that the PSJVTA "should be liberally construed to carry out the purposes of Congress to provide relief for victims of terrorism"). Indeed, the PSJVTA expressly provides that it "shall apply to any case pending on or after August 30, 2016," id. § 903(d)(2)—one day before this Court's decision in Waldman I. Although the PSJVTA became law after Waldman I was decided, Congress and the President plainly intended for the PSJVTA to create personal jurisdiction over the defendants in that particular action based on the defendants' continuing conduct.

If the defendants mean to argue that Congress and the President cannot, consistent with the Fifth Amendment's limitations on territorial jurisdiction, extend personal jurisdiction over the defendants retroactively based on the defendants' knowing post-enactment conduct, irrespective of any considered judgment by the political branches that doing so is necessary to advance national-security interests, then that argument also fails. First, the Supreme Court already explained in Fuld that whatever the Fifth Amendment's outer limits, a jurisdictional statute enacted pursuant to the combined judgment of the legislative and

executive branches with respect to an issue of foreign policy will likely fall within permissible bounds. Because Congress and the President made such a judgment here, their action is "supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion … rest[s] heavily upon" the defendants. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

Moreover, assuming the Due Process Clause of the Fifth Amendment incorporates an "inquiry into the reasonableness of the assertion of jurisdiction in [a] particular case"—a question the Supreme Court expressly declined to answer in Fuld, 606 U.S. at 23 (quoting Asahi Metal Indus. Co. v. Super. Ct. Cal., 480 U.S. 102, 115 (1987))—the PSJVTA's application of personal jurisdiction over the PLO and the PA satisfies that test. As the Court explained in Fuld, "the Federal Government has an exceedingly compelling interest, as part of its comprehensive efforts to deter international terrorism, in providing a forum for American victims to hold the perpetrators of such acts accountable." 606 U.S. at 24. "For similar reasons, American plaintiffs have a strong interest in seeking justice through an ATA damages action in U.S. courts." Id. And the defendants "do not complain of

any lack of notice or contend that litigating these cases in the United States would force them to bear an unfair or unmanageable burden." Id.

The defendants resist this conclusion by arguing that any interests justifying litigation in U.S. courts were "created in 2019 by the concurrent actions of both political branches." Remand Opp'n 17. But this argument again confuses when the political branches made their judgment with the content of that judgment. As the PSJVTA's text makes clear, Congress and the President decided that the relevant interests justified federal courts' exercising personal jurisdiction in any action pending on August 30, 2016, Pub. L. No. 116–94, § 903(d)(2), a plain reference to jurisdiction in this case.

The defendants also contend that the burden "of litigating in a U.S. forum was far greater before the PSJVTA put them 'on clear notice' that 'certain specified conduct would open them up to potential federal court jurisdiction.'" Remand Opp'n 17. This argument is unpersuasive because the PSJVTA put the defendants on notice that specific post-enactment conduct would retroactively trigger personal jurisdiction in the Sokolow litigation. And that jurisdiction-triggering conduct "in and of itself bears a meaningful relationship to the United States." Fuld, 606 U.S. at 23. Furthermore, the district court made a factual finding in this

case that the defendants engaged in the predicate conduct within the timeframe set out by the PSJVTA. Sokolow, 590 F. Supp. 3d at 595–97. The defendants do not meaningfully dispute that finding. See Remand Opp'n 4–5 (the plaintiffs "want this Court to" subject the defendants to personal jurisdiction based on "predicate conduct occurring solely between 2020 and early 2025").[3]

The defendants thus had clear notice after the PSJVTA was enacted that their future conduct could subject them to personal jurisdiction in the Sokolow litigation. They proceeded to engage in that conduct, thereby subjecting themselves to personal jurisdiction in that litigation. They cannot credibly claim that they lacked notice that the PSJVTA could subject them to personal jurisdiction in the Sokolow litigation.

[3] The defendants also claim that they have a constitutional due-process right to finality and repose. See Bank Markazi v. Peterson, 578 U.S. 212, 229 (2016) ("The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation."). But any retroactive effect the PSJVTA's jurisdictional provision has depends on the defendants' knowing post-enactment conduct. Moreover, the defendants cannot credibly appeal to an interest in repose because the relief they seek is not dismissal on the merits but a new trial. As the defendants acknowledge, the plaintiffs' "separate case has remained stayed at the pleadings stage" and the plaintiffs "can proceed with their claims there on the same footing as they would in" the original Sokolow litigation. App. 219.

**B.**

Because the PSJVTA provided the constitutional basis for the district court to exercise personal jurisdiction over the PLO and the PA in this case, the question remains whether this Court should recall its mandate that found that the district court lacked personal jurisdiction over those defendants.

The federal courts of appeals have "an inherent power to recall a mandate, subject to review for abuse of discretion." Taylor v. United States, 822 F.3d 84, 90 (2d Cir. 2016). Courts are reluctant, however, to exercise that discretion because of "the need to preserve finality in judicial proceedings." Sargent v. Columbia Forest Prods., Inc., 75 F.3d 86, 89 (2d Cir. 1996). Recalling a mandate is therefore "an extraordinary remedy to be used 'sparing[ly].'" Waldman II, 925 F.3d at 574 (quoting Calderon v. Thompson, 523 U.S. 538, 550 (1998)).

Although "[n]o formal test governs the exercise of this discretion," Taylor, 822 F.3d at 90 (citing 16 Charles A. Wright, et al., Federal Practice and Procedure § 3938 (3d ed. 2015)), this Court's precedent identifies several relevant factors. For example, in Sargent, this Court recalled a mandate when (1) there had been a "supervening change in governing law that call[ed] into serious question the correctness of the court's judgment"; (2) the movant had preserved the issue in the original appeal; (3) there was "not a substantial lapse of time" before the motion

to recall the mandate; and (4) the equities "strongly favor[ed]" recalling the mandate. 75 F.3d at 89–90. The plaintiffs contend that each of the factors identified in Sargent weighs in favor of recalling the mandate in this case. For the reasons explained below, we agree.

**1.**

The plaintiffs argue that the PSJVTA constitutes a "supervening change in governing law that calls into serious question the correctness of the court's judgment." Sargent, 75 F.3d at 90. The plaintiffs argue that subsequent changes in substantive law can sometimes justify recalling a mandate. For example, the plaintiffs cite Bryant v. Ford Motor Co. for the proposition that "an abrupt change in the law shortly after the panel's opinion justifies a recall of the mandate" because it would be "patently unfair" to deprive a litigant of the benefit of new legislation. 886 F.2d 1526, 1530 (9th Cir. 1989). In the plaintiffs' view, this principle applies with even greater force than usual in this case because "[t]he PSJVTA does not merely create a new rule," but also "reflects the views of Congress and the President that national security and foreign policy are best served by providing relief to plaintiffs in this case." Remand Mot. 11.

In this case, the combined efforts of the political branches to express their dissatisfaction with the state of the law when the mandate issued constitute an

"extraordinary circumstance[]" that weighs in favor of recalling a mandate. Taylor, 822 F.3d at 91. Congress cannot, consistent with constitutional principles of separation of powers, require a court of appeals to recall a mandate or otherwise set aside a final judgment. Once a judicial decision achieves finality, it "becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable to that very case was something other than what the courts said it was." Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 227 (1995); see also Schwartz v. Merrill Lynch & Co., 665 F.3d 444, 454 (2d Cir. 2011) ("[A] statute that would 'require an Article III court to set aside a final judgment' 'entered before its enactment' would violate the constitutional principle of separation of powers.").[4] A court of appeals can, however, consider as a matter of comity the views of the legislative and

[4] The plaintiffs cite Salazar v. Buono for the proposition that "[r]espect for a coordinate branch of Government" can require federal courts to evaluate the propriety of a judicial remedy following a change in congressional policy. 559 U.S. 700, 721 (2010). But Buono stands for the more limited proposition that courts must reevaluate the continuing need for an injunction in light of intervening changes in underlying law. That is because injunctions, unlike final money judgments, involve continuing prospective relief. The Court was clear, however, that "Congress, of course, may not use its legislative powers to reopen final judgments." Id. at 717. The plaintiffs acknowledge as much and clarify that they mean to "argue only that the PSJVTA authorizes the Judiciary to reopen the case and encourages it to do so because that would serve important national interests." Reply Suppl. Mot. to Remand ("Remand Reply") 8 n.1, ECF No. 644.

executive branches in deciding how to exercise its discretion. See also Waldman II, 925 F.3d at 574 (acknowledging that "the passage of a new law might warrant recalling a mandate in some circumstances").

In this case, the Supreme Court has respected the considered judgment of the political branches concerning the exercise of personal jurisdiction over the PLO and the PA for violations of the ATA. This Court will do the same.

**2.**

Second, the plaintiffs argue that they preserved the argument they are now pressing—that the defendants in the Sokolow litigation are subject to personal jurisdiction. The defendants do not dispute this factor.

**3.**

Third, the plaintiffs contend that their motion to recall the mandate "does not involve the sort of 'substantial lapse of time' that counsels against recalling the mandate." Remand Mot. 15. They note that they filed their motion to recall the mandate on October 8, 2018—six months after the Supreme Court denied their petition for a writ of certiorari and five days after Congress enacted the ATCA.

The defendants respond that although the plaintiffs may have initially moved to recall the mandate within an appropriate amount of time, it has now been nine years since the Court issued its mandate. In the defendants' view,

recalling the mandate would "undermine[] 'the profound interests in repose attaching to the mandate of a court of appeals.'" Appendix to Pls.' Mot. to Remand ("App.") 218–19, ECF No. 631 (quoting Calderon, 523 U.S. at 550). This argument is unpersuasive, however, because the defendants do not seek repose. The dismissal of the Sokolow action was without prejudice for lack of personal jurisdiction; the defendants expressly acknowledge now that the plaintiffs can still "pursue their claims and raise any new 'developments' regarding personal jurisdiction in a separate action." App. 219. They also note that the plaintiffs' "separate action," Sokolow v. Palestine Liberation Org., No. 18-cv-12213 (S.D.N.Y.), "has remained stayed at the pleadings stage," and that the plaintiffs "can proceed with their claims there on the same footing as they would in this case." App. 219. Thus, failing to recall the mandate would not advance the interest of finality but would simply require the plaintiffs to start anew in the second action they brought. Recalling a mandate where, as here, the underlying disposition was "based on a procedural shortcoming rather than the merits" generally will not "threaten the central value[] of repose." 16 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3938 (3d ed. 2015).

**4.**

Finally, the plaintiffs argue that the equities favor recalling the mandate. Sargent, 75 F.3d at 90 (noting that "the equities strongly favor Sargent"); Greater Boston Television Corp. v. FCC, 463 F.2d 268, 279 (D.C. Cir. 1971) ("The recall of an appellate mandate to avoid injustice is a continuation, in the appellate sphere, of a deeply rooted equity jurisprudence."). The plaintiffs specifically argue that recalling the mandate would promote judicial economy, fairness, and finality.

Given the unusual procedural posture of this case, considerations of judicial economy favor recalling the mandate. Recalling the mandate here would have the effect of reinstating the district court's jury verdict (assuming none of the defendants' other arguments in favor of a new trial, discussed below, succeed). Declining to recall the mandate, by contrast, would lead the Sokolow plaintiffs to relitigate the same claims against the same defendants in the same forum. When, as in this case, "a district court has proceeded to final judgment, 'considerations of finality, efficiency, and economy become overwhelming.'" United Republic Ins. v. Chase Manhattan Bank, 315 F.3d 168, 170 (2d Cir. 2003) (quoting Universal Reinsurance Co., Ltd. v. St. Paul Fire & Marine Ins. (Universal IV), 312 F.3d 82, 88 (2d Cir. 2002)).

Considerations of fairness also favor recalling the mandate. The Sokolow plaintiffs filed this action in 2004; a jury entered a verdict for the plaintiffs in 2015. Fuld, 606 U.S. at 7. In the twenty-one years after this action began, "[s]ome plaintiffs have died," and "others would be unable to travel to New York due to age and illness." Remand Mot. 17. Declining to recall the mandate would require the surviving plaintiffs to try their case starting anew. And even if "the evidence c[ould] be reassembled, conducting retrials years later inflicts substantial pain on … victims who must testify again and endure a new trial." Edwards v. Vannoy, 593 U.S. 255, 263 (2021).

Finally, the plaintiffs contend that the interest in finality actually supports recalling the mandate. This interest "protects the prevailing party's (and the courts') tangible interest in avoiding the costs, uncertainty, and even disrespect reflected by repeated and otherwise unfounded challenges to its judgments." Thai-Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic Republic, 864 F.3d 172, 188 (2d Cir. 2017). As explained above, declining to recall the mandate in this case does not protect either the parties or the courts from costs and uncertainty. On the contrary, the parties will likely relitigate the same dispute

anew. The defendants do not explain how declining to recall the mandate would protect any reasonable expectation of repose.

*   *   *

In short, all of the relevant considerations support the conclusion that this Court should exercise its discretion to recall its mandate that reversed the district court's judgment for the plaintiffs.

**II.**

The defendants argue that even if the Court chose to exercise its discretion to recall the mandate, doing so would also be futile because the district court lacked personal jurisdiction when it entered its original judgment. According to the defendants, that means that the district court's judgment is void and cannot be revived.

"The proposition that the judgment of a court lacking jurisdiction is void traces back to the English Year Books." Burnham v. Super. Ct. of Cal., 495 U.S. 604, 608 (1990) (plurality opinion). This principle is now embodied in the Constitution's Due Process Clauses, and thus a court that issues a judgment without personal jurisdiction over a defendant violates that defendant's constitutional due-process rights. Id. at 609 ("[T]he judgment of a court lacking personal jurisdiction violated

the Due Process Clause of the Fourteenth Amendment ....”); see also Pennoyer v. Neff, 95 U.S. 714, 732–33 (1878).

The PLO and the PA argue not only that a district court cannot enter a valid judgment without personal jurisdiction, but that federal courts may not revive a judgment made without such jurisdiction, even when later developments cure the earlier jurisdictional defect. In their view, “[p]rior decisions made without jurisdiction remain ‘absolutely void’ even if a court later acquires jurisdiction in the same case.” App. 222 (quoting Roman Cath. Archdiocese of San Juan v. Acevedo Feliciano, 589 U.S. 57, 64 (2020) (per curiam)).

The defendants are correct that a court cannot issue a judgment without jurisdiction and that enforcing a judgment of a court lacking personal jurisdiction violates due process. But it does not follow that post-judgment developments cannot cure earlier jurisdictional deficiencies. On the contrary, it is well-settled that certain post-judgment conduct can insulate a judgment from even potentially meritorious jurisdictional objections.

A classic example is waiver: “[b]ecause the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived.” Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S.

694, 703 (1982). And defendants can waive or forfeit objections to personal jurisdiction even after a final judgment is entered. See Shatsky v. Palestine Liberation Org., 955 F.3d 1016, 1029 (D.C. Cir. 2020) ("[P]ersonal jurisdiction is a 'forum objection,' and so can be forfeited 'at any stage of a proceeding,' including by failing to challenge the district court's exercise of jurisdiction on appeal." (quoting Spann v. Colonial Vill., Inc., 899 F.2d 24, 32–33 (D.C. Cir. 1990)).

For example, in Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción, 832 F.3d 92 (2d Cir. 2016), the defendant, which lost in the district court, raised both merits and jurisdictional arguments on appeal. After a favorable development, however, the defendant requested that this Court remand the action to the district court for further consideration on the merits. Id. at 99–100. This Court obliged. When the defendant lost at the district court a second time, it appealed, again raising both merits and jurisdictional objections. This time, this Court held that because the defendant "affirmatively and successfully sought relief from this Court remanding for a new merits determination in the Southern District, it forfeited its argument that personal jurisdiction is lacking." Id. at 101.

Pemex undermines the defendants' claim that "[p]rior decisions made without jurisdiction remain 'absolutely void' even if a court later acquires jurisdiction in the same case." App. 222. If that were true, then a defendant would never be able to forfeit a meritorious objection to personal jurisdiction, and a district court could never enter and enforce a judgment that was "void" when it was entered, even though the defendant waived the defense. The point is that post-judgment conduct can sustain a district court judgment that otherwise might be vulnerable to a jurisdictional challenge.

Courts have also held that congressional changes in law expanding subject-matter jurisdiction between the time of the district court's judgment and appeal can cure earlier jurisdictional deficiencies. See, e.g., Andrus v. Charlestone Stone Prods. Co., 436 U.S. 604, 607 n.6 (1978) ("[T]he fact that in 1973 respondent in its complaint did not allege $10,000 in controversy is now of no moment," given Congress's 1976 amendment "to eliminate the amount-in-controversy requirement" in cases against the United States); United States v. Union Gas Co., 832 F.2d 1343, 1357 (3d Cir. 1987) (the Supreme Court "has held with equal[] clarity that, when a law expands the jurisdiction of the federal courts, that expansion governs cases on direct appeal"). "Thus, 'where Congress has expanded the juris-

diction of the courts in response to a perceived gap in a statutory judicial scheme,' we are not free to ignore that jurisdictional grant when considering cases on direct appeal." Union Gas, 832 F.2d at 1357 (quoting Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1084 (1st Cir. 1986)); see also Sandefur v. Cherry, 718 F.2d 682, 684–85 (5th Cir. 1983) ("[I]t would be wasteful to both the parties and the courts to dismiss this appeal for lack of federal jurisdiction, for it could be at once refiled.").

The defendants attempt to distinguish between cases that involve curing jurisdictional defects on direct appeal, like Pemex and Andrus, and those that involve curing deficiencies after final judgment, like this case. In the defendants' view, the former is permissible, but the latter is not.

Initially, it is not obvious why this distinction should make a difference if the defendants' claim is that a judgment entered without jurisdiction is "'absolutely void' even if a court later acquires jurisdiction in the same case." App. 222. If the district court lacked jurisdiction when it entered its judgment, that should end the matter on the defendants' theory, irrespective of the appellate posture.

More importantly, however, the defendants are mistaken that jurisdictional defects cannot be cured after final judgments are entered. In United Republic

Insurance, this Court recalled its earlier mandate affirming a final judgment dismissing the plaintiff's claims. 315 F.3d at 170–71. It did so after discovering that the parties may have lacked diversity of citizenship. Id. Critically, after recalling the mandate, this Court instructed the district court on remand "to salvage jurisdiction" by severing nondiverse and dispensable parties. Id. at 169. This Court explained that "[o]nce a district court has proceeded to final judgment, 'considerations of finality, efficiency, and economy become overwhelming,' and federal courts must salvage jurisdiction where possible." Id. at 170 (quoting Universal IV, 312 F.3d at 88).

The district court in this action lacked personal jurisdiction over the defendants when it entered its original judgment. But Congress could and did cure that deficiency when it created a statutory basis for jurisdiction in the PSJVTA consistent with the Fifth Amendment's Due Process Clause. That statutory basis has been satisfied, and therefore Congress's determination, endorsed by the Supreme Court, should be respected.

**III.**

Finally, the PLO and the PA argue that if this Court decides to recall the mandate and to reject their voidness argument, they are still entitled to a new trial because the district court allowed improper expert testimony to be admitted at

trial. According to the defendants, of the thirty-eight witnesses who testified at trial, only three—Kaufman, Eviatar, and Shrenzel—testified about whether the defendants knowingly supported the terrorist attacks and whether the attackers acted within the scope of their employment with the defendants. The defendants contend that the district court abused its discretion by allowing these witnesses to testify as experts and that the defendants were prejudiced as a result. The defendants concentrate on Eviatar and Shrenzel.

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides that an expert may testify if the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "For an expert's testimony to be admissible under this Rule, however, it must be directed to matters within the witness's scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help." United States v. Zhong, 26 F.4th 536, 555 (2d Cir. 2022). "The law assigns district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of Rule 702." United States v. Farhane, 634 F.3d 127, 158 (2d Cir. 2011); see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

District courts "enjoy considerable discretion in deciding on the admissibility of expert testimony," and an appellate court "will not disturb a ruling respecting expert testimony absent a showing of manifest error." Farhane, 634 F.3d at 158 (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999) and Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 213 (2d Cir. 2009)). Moreover, "[e]ven if a district court errs, a defendant ordinarily is not entitled to a new trial if those errors were 'harmless—i.e., … unimportant in relation to everything else the jury considered on the issue in question.'" Zhong, 26 F.4th at 558 (quoting Cameron v. City of New York, 598 F.3d 50, 61 (2d Cir. 2010)).

The defendants identify two kinds of errors that they believe the district court made. First, they argue that Eviatar and Shrenzel did not use a reliable methodology and simply interpreted factual evidence in the same way a layperson would.[5] Second, the defendants contend that the district court allowed Eviatar and Shrenzel to "speculate[] on mental states, summarize[] hearsay, and [provide] ultimate-issue opinions." Defs.' Suppl. Br. 8, ECF No. 650.

---

[5] Although the defendants object to certain specific portions of Kaufman's testimony, they level their reliability arguments at Eviatar and Shrenzel.

**A.**

District courts are assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. The reliability test is "flexible" and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho, 526 U.S. at 141–42. "[T]he expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the [proponent] to circumvent the rules prohibiting hearsay." United States v. Mejia, 545 F.3d 179, 197 (2d Cir. 2008).

The defendants argue that the district court erred by allowing Eviatar and Shrenzel to testify because they did not use reliable methodologies and instead merely interpreted factual evidence. But experts are routinely permitted to opine on the structure of criminal enterprises and terrorist organizations. See, e.g., United States v. Locascio, 6 F.3d 924, 936 (2d Cir. 1993) ("We have … previously upheld the use of expert testimony to help explain the operation, structure, membership, and terminology of organized crime families."); United States v. Mustafa, 406 F. App'x 526, 528–29 (2d Cir. 2011) (summary order) (affirming the admission

of expert testimony as to "the history, structure and leadership of al Qaeda, the recruitment of terrorists, and the means by which terrorist organizations raise money, distribute propaganda, and provide training" and noting that such expert testimony is "appropriate in the context of a case … which implicates the activities of terrorist organizations and their supporters"); United States v. Paracha, 313 F. App'x 347, 351 (2d Cir. 2008) (summary order) (affirming that the district court "was well within its discretion in ruling that [the expert's] methodology was sufficiently reliable and his testimony relevant to the jury's understanding of al Qaeda so as to be admissible under Fed. R. Evid. 702 and [Daubert]").

This Court has recognized that "[a]n increasingly thinning line separates the legitimate use of an [] expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence." Mejia, 545 F.3d at 190. But to the extent the expert testimony by Eviatar and Shrenzel occasionally veered from the "dry explanation of an organization's activities that is an appropriate use of expert testimony," United States v. Gentile, 233 F. App'x 86, 89 (2d Cir. 2007) (summary order), the jury was presented with the underlying documents from which the experts formed their allegedly impermissible testimony, and the jury

was therefore free to credit or discount their testimony. See United States v. Felder, 993 F.3d 57, 74 (2d Cir. 2021) (noting that the "jury remained free to accept or reject [the expert's] opinion based on its assessment of the sufficiency of the data and experience informing the proffered opinion, [the expert's] credibility generally, and the jury's own evaluation of the [underlying evidence]").

The defendants also analogize this case to Gilmore v. Palestinian Interim Self-Government Authority, in which the Court of Appeals for the D.C. Circuit affirmed a district court's decision to exclude testimony from Eviatar because he did not employ a reliable methodology and instead "simply repeat[ed] hearsay evidence without applying any expertise whatsoever." 843 F.3d 958, 972 (D.C. Cir. 2016). The Court of Appeals noted that "[i]t was also unclear how Eviatar's approach differed from that of a layperson." Id. at 973. But Gilmore is distinguishable.

Eviatar's testimony in Gilmore was about a different subject, and the relationship between his proffered methodology and conclusion was far murkier than in this case. In Gilmore, Eviatar testified that he believed a particular person, Muhanad Abu Halawa, murdered the decedent. Although he alluded to his experience as an intelligence officer and his use of various sources, he never "ex-

plain[ed] how his 'cumulative experience and knowledge' as an IDF intelligence officer, as opposed to commonsense and general deductive principles that any non-expert finder of fact would rely on, le[]d him to the conclusion that Abu Halawa was the likely murderer." Gilmore v. Palestinian Interim Self-Gov't Auth., 53 F. Supp. 3d 191, 212 (D.D.C. 2014). By contrast, in this case, the crux of Eviatar's and Shrenzel's opinions was not a bare recitation of the ultimate issue of liability. Rather, they opined on the relationship between the PLO and the PA on the one hand, and Fatah, Hamas, and Al-Aqsa Martyr Brigades on the other. Indeed, the district court qualified Eviatar and Shrenzel as experts on the relationship between these organizations and the policies and practices of the PLO and the PA.

Moreover, unlike in this case, Eviatar's analysis in Gilmore was "based entirely on hearsay evidence that the Court ha[d] already ruled [wa]s inadmissible." Gilmore, 53 F. Supp. 3d. at 212. According to the district court, Eviatar did not apply "any specialized knowledge to the hearsay materials on which he relie[d]." Id. at 213. He was thus merely acting as a conduit for inadmissible hearsay. But in this case, Eviatar relied primarily on documents admitted in evidence, including "original reports of the Palestinian General Intelligence Service," "payroll records," criminal convictions, and official government reports.

See Joint Appendix ("Joint App.") 4182–84. Eviatar explained that in reviewing these materials, his methodology was "identical to all of the professional tools and instruments that [he] made use of and that [he] worked with during the course of [his] years in the military." Joint App. 4184.

**B.**

The defendants also object to specific testimony by the experts on the grounds that the experts merely "speculated on mental states, summarized hearsay, and [provided] ultimate-issue opinions." Defs.' Suppl. Br. 8.

As an initial matter, experts in civil cases may, while providing otherwise appropriate expert opinions, speak to mental states, provide ultimate-issue opinions, and consider inadmissible evidence. Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Rule 704(b) adds a caveat for opinions about mental states in criminal cases, but that "exception does not apply in civil cases." Diaz v. United States, 602 U.S. 526, 534 (2024). Moreover, Rule 703 provides that "experts can testify to opinions based on inadmissible evidence, including hearsay, if experts in the field reasonably rely on such evidence in forming their opinions." Mejia, 545 F.3d at 197.

In any event, the district court did not abuse its discretion in admitting the expert testimony. While the defendants object to specific instances of expert testimony, those instances do not amount to reversible error.

The defendants argue that Eviatar inappropriately testified that the defendants "were responsible for the attacks because their social welfare programs were intended to (and did) motivate terrorist attacks." Defs.' Suppl. Br. 9. They note that Eviatar testified that welfare payments made to prisoners "represent[ed] a positive incentive that multiplies [their] motivation" and "prod and assist the prisoner[s] to go ahead and carry out those things that [they] want[] to do," namely "terror attacks and terror incidents." Joint App. 4374.

The district court was within its discretion in allowing Eviatar to testify about the relationship between this specific Palestinian welfare law and acts of terrorism. Eviatar purported to base his testimony on his familiarity with the PA as an intelligence officer, his review of the relevant Palestinian law, and documents itemizing payments to released prisoners. It was not unreasonable for the district court to conclude that Eviatar's experience and methodology would allow him to speak about the effect of these welfare payments in a way that a lay person could not.

The defendants also argue that the plaintiffs' experts offered "improper summary and ultimate-issue testimony that Defendants knowingly provided material support, and that terrorism was within the scope of their employment and in furtherance of the PA's activities." Defs.' Suppl. Br. 10. But the evidentiary bases for this testimony was introduced at trial and the jury was carefully instructed:

> You may give the expert testimony whatever weight, if [] any, you find it deserves in light of all the evidence in this case. You should not, however, accept an expert's opinion testimony merely because he or she is an expert. Nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you.

Joint App. 8202. Although "such a charge cannot always cure the trial court's error in allowing inadmissible evidence," on this record, "the instruction adequately protected against the jury's giving undue weight to [the experts'] opinion[s]." Fiataruolo v. United States, 8 F.3d 930, 942 (2d Cir. 1993). The defendants' arguments with respect to the admission of expert testimony provide no basis for reversal.

## CONCLUSION

We have considered all of the arguments of the parties. To the extent not specifically addressed above, those arguments are either moot or without merit.

For the foregoing reasons, the plaintiffs' motion to recall the November 28, 2016 mandate is **GRANTED.** The district court's October 1, 2015 judgment is **AFFIRMED**.